

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.00-6147-CIV-LENARD/TURNOFF

813268 ONTARIO, INC., as
General Partner of OAKLAND
PARK (FLORIDA) LIMITED PARTNERSHIP,
an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;
       Plaintiff,

vs.

OAKLAND LAKES, LTD.,
a Florida Limited Partnership,
WILLIAM O. BRISBEN, W.O. BRISBEN
COMPANIES, INC., and ROBERT E. SCHULER,
as General Partners of OAKLAND LAKES, LTD.,
THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,
       Defendants.
_____/

## AMENDED COMPLAINT

    Plaintiff, 813268 ONTARIO, INC., as general partner of OAKLAND PARK

(FLORIDA) LIMITED PARTNERSHIP, an Ontario limited partnership; as limited partner of,

and on behalf of OAKLAND LAKES, LTD., a Florida Limited Partnership; sues THE

SECRETARY OF HOUSING AND URBAN DEVELOPMENT, and CONDOR ONE, INC.,

a Delaware Corporation, and alleges:

1



## I. INTRODUCTION

1.      This is a limited partner derivative action pursuant to Florida Statute Section

620.163, seeking declaratory relief pursuant to Florida Statutes Chapter 86, as authorized

by 28 U.S.C. § 2201, to set aside a provisional workout arrangement (the "Workout

Arrangement") effective February 1, 1995, by and between the Secretary of the United

States Department of Housing and Urban Development ("HUD") and Oakland Lakes Ltd.,

a limited partnership organized and existing under the laws of the State of Florida (Oakland

Lakes), whose primary place of business is 2325 N.W. 33rd Street, Fort Lauderdale, Florida

33309 and for damages against Defendants Condor and HUD.

## II. JURISDICTION

2.      This action is properly before this Court pursuant to 12 U.S.C. § 1702

because the subject of the Workout Arrangement and HUD's participation as a party

thereto were undertaken by HUD pursuant to its administration of the National Housing Act.

3.      Federal question jurisdiction is proper under 28 U.S.C. § 1331, in that this

action arises under laws of the United States.

4.      Diversity of citizenship jurisdiction is  proper under 28 U.S.C. § 1332, in that

Plaintiff, 813268 ONTARIO, INC. is a Canadian corporation and is the general partner of

Oakland Park (Florida) Limited Partnership ("Oakland Park"), a limited partnership

organized and existing under the laws of the Province of Ontario, Canada; Defendant

Oakland Lakes is a limited partnership organized and existing under the laws of the State

of Florida; Defendant, Condor One, Inc. ("Condor"), is a corporation that was organized

and is validly existing under the laws of the State of Delaware;  Defendant, HUD, is

2

deemed to be a federal corporation and a citizen of the District of Columbia for purposes of diversity jurisdiction;  and the amount in controversy exceeds $75,000.00.

## III. VENUE

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (e).

## IV. PARTIES

6.     Plaintiff Oakland Park is an Ontario Limited Partnership formed for the purpose of investing capital in Defendant Oakland Lakes, and which did in fact invest in excess of 1.8 million dollars in Oakland Lakes, and executed the Amended Limited Partnership Agreement described in paragraph 23 herein, as the investor limited partner, with an ownership interest in Defendant Oakland Lakes of 50%.

7.     Defendant Oakland Lakes is a Florida limited partnership formed for the primary purpose of ownership and development of certain real and personal property as an apartment complex of approximately 387 units located in Oakland Park, Broward County, Florida, which apartment complex is currently owned and titled in Oakland Lakes and is presently known or does business as the "Sailboat Pointe Apartments".  The apartment complex owned and operated by Oakland Lakes was formerly known and did business originally as the "Lakes of Casablanca Apartments" (the apartment complex and real property shall be referred to herein as "the Property").

8.     HUD is an agency of the United States government charged with administering the National Housing Act.

3

9.     Condor is a Delaware Corporation to which HUD purportedly assigned the Mortgage and Loan Documents described herein, which are the subject of the Workout Arrangement.

## V.  GENERAL ALLEGATIONS

10.     Beginning in or about 1989, Oakland Lakes initiated negotiations to obtain favorable, low interest mortgage financing for the development, construction, ownership, and operation of the Lakes of Casablanca apartment project on the property owned by Oakland Lakes and located at 2325 N.W. 33rd Street, Fort Lauderdale, FL 33309, Oakland Park, Broward County, Florida; principally, through a mortgage loan extended by Cincinnati Mortgage Corporation ("Cincinnati Mortgage").

11.     Cincinnati Mortgage  was a corporation that had been approved by HUD to originate and service mortgage loans insured by HUD under the National Housing Act, and had been further approved by HUD to co-insure mortgages under the provisions set forth in Section 221(d)(4) of the National Housing Act and 24 C.F.R. Part 244.

12.     Cincinnati Mortgage issued its commitment for insurance of advances (the "Firm Commitment") to Oakland Lakes, which Firm Commitment obligated Cincinnati Mortgage to: a) co-insure a first mortgage loan (the "Insured Loan") concerning the Project under the provisions set forth in Section 221(d)(4) of the National Housing Act and 24 C.F.R. Part 244;  and b) cause the Government National Mortgage Association ("GNMA"), an agency of HUD, to issue its mortgage backed securities ("MBS") concerning the Insured Loan.

4

13.     The Florida Housing Financing Agency ("FHFA") agreed to issue tax-exempt revenue bonds (the "Bonds") for the purpose of funding the Insured Loan, and upon the condition that the MBS issued by GNMA be pledged as collateral for the Bonds. The proceeds from the sale of the Bonds were used to fund the Insured Loan.

14.     On information and belief, FHFA and a group of underwriters headed by Kidder Peabody & Co. Incorporated and Dean Witter Reynolds, Inc. (the "Underwriters") entered into a bond purchase agreement (the "Bond Purchase Agreement") which obligated the Underwriters to purchase the Bonds from FHFA.

15.     On information and belief, on or about October 5, 1989, Oakland Lakes and Cincinnati Mortgage closed the Insured Loan, which closing entailed the execution by Oakland Lakes and delivery to Cincinnati Mortgage of the following loan documents (collectively, the "Loan Documents"), to wit: a) a mortgage note, as amended, (the "Note") dated October 5, 1989, evidencing the Insured Loan in the original principal amount of $22,779,600.00); b) a mortgage, as amended and restated, (the "Mortgage") encumbering the real, personal and intangible property comprising the Project and constituting a first mortgage lien against the property; and c) the following documents: a regulatory agreement; the Limited Partnership Agreement including resolutions of all general and limited partners authorizing the Insured Loan; a land use restriction agreement; lender's policy of title insurance; evidence of zoning compliance; copies of all land use and building permits; survey and surveyor's report; building loan agreement; mortgagee's certificate; mortgagor's certificate; mortgagor's oath; agreement and certification; attorney's opinion letter; construction contract – cost plus; payment and performance bond; contractor's certification; owner – architect agreement; mortgagor and architect

5

certificate; design architect certification; state and county uniform commercial code filing forms; security agreement; letters certifying availability of utility services to the project; certificates of insurance; notice of commencement; escrow agreements concerning working capital, minor non-realty items and operating deficits; draw request; and construction progress schedule. True and correct copies of the Note and Mortgage, as amended, are attached hereto as Exhibits "A" and "B" and by this reference are made a part of this Complaint.

16.     Prior to closing the loan, on information and belief, Cincinnati Mortgage delivered copies of all Loan Documents, including but not limited to the Limited Partnership Agreement, to HUD.

17.     On information and belief, On October 5, 1989, the mortgage note was endorsed for coinsurance under the provisions of Section 221(d)(4) of the National Housing Act and pursuant to 24 C.F.R. Part 244, FHA mortgage number 06636650, and Cincinnati Mortgage delivered final copies of all Loan Documents, including but not limited to the Limited Partnership Agreement, to HUD.

18.     On or about October 5, 1989, Oakland Lakes commenced construction of the apartment complex.

19.     On or about October 13, 1989, Cincinnati Mortgage delivered an assignment in blank of the mortgage and copies of all Loan Documents, including but not limited to the Limited Partnership Agreement, to a custodian of GNMA, for the benefit and security of GNMA; and caused GNMA's MBS to be delivered to the trustee of the Bonds.

20.     On or about June 29, 1990, the Limited and General Partners of Oakland Lakes executed, by and amongst all of such partners, a Second Amended and Restated

Agreement of Limited Partnership for Oakland Lakes ("the Amended Limited Partnership Agreement"). A true and correct copy of the Amended Limited Partnership Agreement is attached hereto as Exhibit "C", and by this reference is made a part of this Complaint. The terms and provisions of the Amended Limited Partnership Agreement have not been further amended, revised, and/or superceded through the date of filing this Complaint.

21.    On information and belief, Oakland Lakes delivered a copy of the Amended Limited Partnership Agreement to HUD and/or Cincinnati Mortgage as required under the National Housing Act and the Loan Documents.

22.    On information and belief, on or about November 8, 1990 GNMA declared Cincinnati Mortgage in default of the guarantee agreement by and between Cincinnati Mortgage and GNMA; thereafter the custodian delivered all Loan Documents, including but not limited to, the Amended Limited Partnership Agreement, to GNMA, and Cincinnati Mortgage delivered all Loan Documents, and a complete loan file to GNMA.

23.    The insured mortgage was converted from coinsurance to full insurance on January 31, 1992, under new FHA project number 066-94026, and at the time of the conversion, a complete copy of Cincinnati Mortgage's loan file, and Loan Documents, including but not limited to, the Amended Limited Partnership Agreement, were delivered to HUD.

24.    Almost immediately after completion of construction of the apartment complex, Oakland Lakes apparently defaulted in one or more of its obligations under the Loan Documents. The apparent event(s) of default were not cured and continued to exist at the time of the assignment of the Loan documents by Cincinnati Mortgage to GNMA.

25.     At the time of the assignment of the Loan Documents to HUD and HUD's ownership and administration of the loan, HUD elected not to exercise the rights and remedies set forth and provided in the Loan Documents, specifically the right to accelerate and to demand payment of the balance of all sums due and payable under the Note, Mortgage, and other Loan Documents. As an alternative, HUD elected in such event(s) of default to enter into settlement - workout negotiations with William O. Brisben, as the then general partner of Oakland Lakes.

26.     Effective February 1, 1995, HUD and William O. Brisben, as the then General Partner of Oakland Lakes, executed a written, provisional Workout Arrangement (the "Workout Arrangement"). A true and correct copy of the Workout Arrangement is attached hereto as Exhibit "D", and by this reference made a part of this Complaint.

27.     Brisben, as general partner of Oakland Lakes, lacked authority under the terms and provisions of the Amended Limited Partnership Agreement, to enter into the Workout Arrangement without the prior written consent of and/or joinder of certain of the other partners, both limited and general, of Oakland Lakes.

28.     At all times, during the workout negotiations with Brisben, acting in his capacity as general partner of Oakland Lakes, HUD had copies, or should have had copies, of all Loan documents and knew or should have known that Brisben was acting in his capacity as general partner of Oakland Lakes, and knew or should have known that the General Partner did not have authority to enter into the Workout Arrangement.

29.     On or about May 8, 1995, HUD attempted to assign by written assignment all of its rights under the terms and provisions of the Loan Documents, including, upon information and belief, the Workout Arrangement, to Condor. A true and correct copy of

8

the purported Assignment from HUD to Condor is attached hereto as Exhibit "E" and by this reference is made a part of this Complaint.

30.    On information and belief, at the time William O. Brisben entered into the workout negotiations with HUD, Oakland Park provided both verbal and written notice to William O. Brisben that the consent and authorization of certain of the other general and limited partners was required before William O. Brisben, as general partner, could bind Oakland Park under the Workout Arrangement, and that Oakland Park did not so consent or authorize William O. Brisben, as general partner, to enter into the Workout Arrangement.

31.    On information and belief, subsequent to the effective date of the Workout Arrangement, Oakland Park became aware the Workout Arrangement was entered into without Oakland Park's authorization, and Oakland Park again raised its objections concerning the Workout Arrangement to William O. Brisben, as general partner.

32.    Subsequently, by letter dated April 29, 1999, counsel for Oakland Park notified William O. Brisben of its position that he had entered into the Workout Arrangement without authority, and tendered an offer to purchase the 50% interest of William O. Brisben and the other partners in the Oakland Lakes Limited Partnership, as was its right under the Amended Limited Partnership Agreement, so that Oakland Park could gain control of the Oakland Lakes Limited Partnership and take appropriate action regarding the unauthorized Workout Arrangement, as well as improve the operation and management of the apartment complex. A copy of the letter is attached hereto as Exhibit "F",  and by this reference is made a part of this Complaint.

9

33.    William O. Brisben, as well as the other general and limited partners, refused to take any action in regard to the unauthorized execution of the Workout Arrangement, and refused to sell their 50% interest in the Limited Partnership as required under the Amended Limited Partnership Agreement.

34.    As a result, Oakland Park initiated suit in the Circuit Court for the 17th Judicial Circuit in Broward County Florida, in case number 99-10831 (13) ("the State Court Action"), in an effort to enforce the Amended Limited Partnership Agreement and thereby acquire the interests of William O. Brisben and the other partners in Oakland Lakes, in order to gain control of the Limited Partnership.

35.    Oakland Park, in the State Court Action, moved to appoint a receiver to stabilize the operation determine the financial status of the apartment complex, and also attempted to expedite trial in order to gain control of the Limited Partnership so as to be able to bring this suit as the Limited Partnership, rather than on its behalf.

36.    After this Federal Court action was initiated, Oakland Park and William O. Brisben, W.O. Brisben Companies, Inc. and Robert E. Schuler settled the State Court Action. The settlement was entered into to enforce the buy out provisions of the Amended Limited Partnership Agreement, which Oakland Lakes found necessary to enforce in great part due to the unauthorized actions of William O. Brisben as alleged herein. Pursuant to the settlement,    William O. Brisben and all other former general partners have been replaced as  General Partner of Oakland Lakes.

37.    Subsequent to and as a part of the settlement of the State Court Action, Oakland Park G.P. Corporation became the new General Partner of Oakland Lakes. Oakland Park G.P. Corporation consents to and supports this action.

10

38.     On August 31, 2000, Oakland Park filed a voluntary petition for Chapter 11 reorganization under the United States Bankruptcy Code, in case Number 00-25351-BKC-RBR, in the United States Bankruptcy Court for the Southern District of Florida, Ft. Lauderdale Division.

39.     As required by Florida Statute Section 620.164, at the time of bringing this action, Oakland Park is a partner of Oakland Lakes, and was also a partner at the time William O. Brisben, as general partner, entered into the unauthorized Workout Arrangement.

40.     As a result of the General Partners' actions, Plaintiff has been forced to engage the undersigned counsel, and is obligated to pay them a reasonable fee for their services.

41.     Plaintiff is entitled to recover its attorneys fees in this action from Oakland Lakes, pursuant to Florida Statute Section 620.166, and is also entitled to recover its attorneys' fees from Condor and HUD, pursuant to the note and mortgage which are the subject of this action.

42.     All conditions precedent to the bringing of this action have occurred, been satisfied by Plaintiff, or have been waived by defendants.


## COUNT I

43.     This is a count for declaratory relief and the allegations set forth in paragraphs 1 through 42 above are hereby realleged and incorporated into this Count I.

44.     For reason of the failure of HUD and/or Brisben, as general partner, to obtain the prior written consent and authority of certain of the other general and limited partners

of Oakland Lakes in connection with the Workout Arrangement, as required under the terms and provisions of the Amended Limited Partnership Agreement, the Workout Arrangement is invalid and of no effect and is unenforceable as to its terms and provisions. It is a position of Plaintiff, that the terms and provisions of the original Mortgage and Loan Documents continue to control the loan transaction consummated by and between Oakland Lakes and Cincinnati Mortgage, and as subsequently assigned by Cincinnati Mortgage to GNMA.

45.     A dispute exists between Oakland Park and HUD and/or Condor concerning each parties' respective rights under the Workout Arrangement, Mortgage and Loan Documents regarding HUD's and/or Condor's rights to enforce the Workout Arrangement, Mortgage and Loan Documents, and whether Oakland Park must comply with the Workout Arrangement.

46.     Oakland Lakes is in doubt as to its rights under the Workout Arrangement, and how the workout Arrangement affects Oakland Lakes' rights and responsibilities under the Mortgage, Note and Loan Documents, and is entitled to a judicial declaration as to its rights in order to remove such doubt.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes, Ltd., requests that this Court enter judgment declaring the rights of the parties under the provisional Workout Arrangement and corresponding Loan Documents; declare that the provisional Workout Arrangement is of no force and effect and reinstate the terms of the original Mortgage and Loan Documents; award Plaintiff its reasonable attorneys' fees and

costs incurred in bringing this action; and award any other relief the Court deems necessary and proper.

## COUNT II

47.  This is a second count for declaratory relief, and paragraphs 1 through 42 above are hereby realleged and incorporated into this Count II.

48.  The attempted assignment from HUD to Condor on May 8, 1995 provides that HUD:

> assigns, transfers, sets over and conveys to [Condor], its successors and assigns, the [Amended Mortgage and Note], all as they may have been modified, consolidated, assigned, amended, restated, or supplemented (whether or not of record) through and including May 8, 1995.

49.  The Workout Arrangement, effective February 1, 1995, is an amendment and/or modification of the Mortgage and other Loan Documents.

50.  The attempted assignment by HUD to Condor on May 8, 1995 contemplated the assignment of the Mortgage and other Loan Documents, as modified by the Workout Arrangement.

51.  Because the Workout Arrangement was entered into without the authority of Oakland Lakes, the attempted assignment by HUD to Condor is a nullity, and Oakland Lakes is entitled to a reinstatement of the original terms of the Mortgage and other Loan Documents, as held by HUD, with the Mortgage reverting to HUD ownership.

52.  A dispute exists between Oakland Park and HUD and/or Condor concerning each parties' respective rights under the Assignment, Workout Arrangement, Mortgage and Loan Documents and as to whether HUD or Condors is the true party in interest under the

13

Mortgage and Loan Documents, and whether Oakland Park must comply with the Workout Arrangement.

53.   Oakland Lakes is in doubt as to its rights under the Assignment and Workout Arrangement, and how the workout Arrangement affects Oakland Lakes' rights and responsibilities under the Mortgage, Note and Loan Documents, and is entitled to a judicial declaration as to its rights in order to remove such doubt.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes, Ltd., requests that this Court enter judgment declaring the rights of the parties under the Assignment from HUD to Condor, the provisional Workout Arrangement and corresponding Mortgage Loan Documents; declare that the attempted assignment from HUD to Condor is of no force and effect and reinstate the terms of the original Mortgage and Loan Documents, as being held and owned by HUD, effective the date of entry of the Court's order; award Plaintiff its reasonable attorneys' fees and costs incurred in bringing this action; and award any other relief the Court deems necessary and proper.

## COUNT III

54.   This is a third Count for declaratory relief, and paragraphs 1 through 42 are hereby realleged and incorporated into this Count III.

55.   The Workout Arrangement specifically states:

> To afford an opportunity to effect reinstatement, the Secretary, Department of Housing and Urban Development, will hold the defaulted Note and Mortgage on the subject project under the terms and conditions stated herein.

56.    The Workout Arrangement, according to its own terms, required HUD to hold the subject Note and Mortgage.

57.    HUD, rather than holding the Note and Mortgage after entering into the Workout Arrangement, almost immediately assigned HUD's interest to Condor, in direct violation of the terms of the Workout Arrangement.

58.    A dispute exists between Oakland Park and HUD and/or Condor concerning each parties' respective rights under the Workout Arrangement, Mortgage, Loan Documents and Assignment,  regarding HUD's and/or Condor's rights to enforce the Workout Arrangement, Mortgage and Loan Documents, and whether Oakland Park must comply with the Workout Arrangement.

59.    Oakland Lakes is in doubt as to its rights under the Workout Arrangement, and how the workout Arrangement affects Oakland Lakes' rights and responsibilities under the Mortgage, Note and Loan Documents, and is entitled to a judicial declaration as to its rights in order to remove such doubt.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes, Ltd., respectfully requests that this Court declare the rights of the parties under the Workout Arrangement, Mortgage and corresponding Loan Documents; enter judgment setting aside the assignment of the Mortgage to Condor, and reinstating the terms of the original Mortgage and Loan Documents, effective the date of entry of the Court's order; award Plaintiff its reasonable attorneys' fees and costs incurred in bringing this action; and award any other relief the Court deems necessary and proper.

15

## COUNT IV

60.     This is an action for damages in excess of $75,000.00 against HUD and Condor for breach of contract.

61.     Plaintiff repeats and realleges Paragraphs 1 through 42 as if fully stated herein.

62.     The Workout Arrangement, in Paragraph 8, requires payments of $6,560.84 per month, to be made to the "Reserve for Replacement account" ("the Reserve Account") by the mortgagor.

63.     The Reserve Account was originally established pursuant to the Regulatory Agreement for Multifamily Housing Projects Coinsured by HUD ("the Regulatory Agreement"), a copy of which is attached hereto as Exhibit 1,and by this reference made a part hereof.

64.     Pursuant to the Regulatory Agreement, the Reserve Account was to create a fund to cover the cost of major replacements for the project, thereby ensuring that the condition of the property was maintained at an acceptable level.

65.     The funds in the Reserve Account were only to be used for capital improvements, unless HUD otherwise approved, and such approval was in accordance with HUD's administrative procedures.

66.     When HUD attempted to assign the loan documents in dispute herein to Condor, the Assignment specifically excluded the Regulatory Agreement, which remained with HUD.

16

67. Pursuant to the terms of the Regulatory Agreement, HUD continues to be obligated to receive Reserve Account payments and maintain the Reserve Account for the benefit of the Property.

68. On information and belief, when HUD attempted to assign its interest in the subject property to Condor, HUD, in violation of the Regulatory Agreement, turned over the Reserve Account to Condor.

69. On information and belief, Condor has used, or permitted the use of the Reserve Account funds as payments on the loan indebtedness evidenced by the Loan Documents, thereby depleting the Reserve Account, and as a result, the lack of capital funds in the Reserve Account has resulted in the Property falling into a state of disrepair.

70. On information and belief, Condor has taken such action without the knowledge and/or authority of HUD.

71. HUD, by failing to maintain control over the Reserve Account has abrogated its duties under Regulatory Agreement, Workout Arrangement and Loan Documents.

72. Condor, by improperly and without authorization using or permitting the use of the Reserve Account funds to make payments on the subject loan indebtedness, has breached its duties under the Loan Documents.

73. As a result of HUD's and Condor's actions, the lack of available funds in the Reserve Account has prevented normal maintenance and upkeep on the

17

Property, and resulted in the lack of available funds with which necessary repairs

and improvements to the Property could be made, and further inhibited the Property

from being adequately maintained by Oakland Lakes, thereby damaging Oakland

Lakes and Plaintiff.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland

Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes,

Ltd., requests that this Court enter judgment against Defendants Condor and HUD for

damages, attorneys' fees, the costs of bringing this suit, and for any other relief this Court

deems necessary and proper, and demands trial by jury on all issues so triable.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished
by U.S. Mail to: **DAVID W. TRENCH, ESQ.**, 2500 First Union Financial Center, Miami, FL
33131-2336, **WILLIAM C. HEALY, ESQ.**, 99 N.E. 4th Street, Third Floor/civil Division, Miami,
FL 33132-2111, and **RICHARD T. WOULFE, ESQ.,** P.O. Drawer 03040, 888 E. Las Olas
Blvd., Suite 400 Ft. Lauderdale, FL 33303-0340, this ___ day of November, 2000.

> ICARD, MERRILL, CULLIS, TIMM,
>   FUREN & GINSBURG, P.A.
> 2033 Main Street, Suite 600
> Sarasota, Florida 34237
> Telephone: (941) 366-8100
> Attorneys for Plaintiff
>
> By:_____
>       ROBERT E. MESSICK
>       Florida Bar #31477

F:\USERS\CJB\CJBC\OAKLAND\HUD-FED.CT\AMDCOMP.WPD

18

1.1                                                              9/27/89

## AMENDED AND RESTATED
## RENEWAL MORTGAGE NOTE

$22,779,600.00                          Oakland Park, Florida

October $\underline{5}$ 1989

    FOR VALUE RECEIVED, the undersigned, Oakland Lakes, Ltd., a Florida limited partnership, ("Mortgagor"), promises to pay to or upon the order of CINCINNATI MORTGAGE CORPORATION, an Ohio Corporation (the "Holder", as hereinafter defined), the principal sum of Twenty Two Million Seven Hundred Seventy Nine Thousand Six Hundred and no/100 Dollars ($22,779,600.00) with interest from the date hereof at the rate of eight and one-quarter percent (8.25%) per annum on the outstanding principal hereof until paid. The said principal and interest shall be payable in lawful money of the United States of America in monthly installments as follows:

    Interest in arrears payable monthly beginning on the first day of November, 1989 and on the first day of each month thereafter up to and including December 1, 1991. Commencing on January 1, 1992, monthly installments of interest and principal shall be paid in the sum of One Hundred Sixty-Two Thousand Six Hundred Seventy Seven and 97/100 Dollars ($162,677.97) each, such payments to continue monthly on the first day of each succeeding month until the entire indebtedness has been paid. In any event, the balance of principal, if any remaining unpaid, plus accrued interest, shall be due and payable on December 1, 2031. The payments of principal and interest shall be applied first to interest at the applicable rate upon the principal sum or so much thereof as shall from time to time remain unpaid and the balance thereof shall be applied on account of principal.

    In addition to the foregoing, the Mortgagor shall aggregate with the monthly installments of principal and interest all other payments payable pursuant to the Mortgage (as hereinafter defined).

    Until further notice from the Holder, all payments by the Mortgagor of any sums due hereunder shall be by check payable to Cincinnati Mortgage Corporation, 2368 Victory Parkway, Suite #210, Cincinnati, Ohio 45206.

    Except as hereinafter provided, there shall be no payments made hereunder, other than regularly scheduled payments of principal hereunder, to reduce the principal amount of the debt evidenced hereby in whole or in part prior to October 31, 1999.

-1-

EXHIBIT
A

On or after October 31, 1999, provided that there is no default under this Note or the Mortgage, privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due, on the last day of any month prior to maturity upon at least thirty (30) days' prior written notice to the Holder.

Notwithstanding any prepayment prohibitions imposed and/or penalties required by this Note with respect to prepayments made prior to October 31, 1999 the indebtedness may be prepaid in part or in full without the consent of the Holder and without a prepayment penalty if the Secretary of Housing and Urban Development (the "Secretary") determines in writing that prepayment will avoid a mortgage coinsurance claim and is therefore in the best interest of the United States Government, which determination shall be made by the Secretary only if:

>    (a)  the Mortgagor has defaulted in the payments due under this Note and the Secretary has received notice of such default, as required by 24 CFR Section 251.810;

>    (b)  the Secretary determines that the Project has been experiencing a net income deficiency which has not been caused solely by management inadequacy or lack of owner interest, and which is of such a magnitude that the Mortgagor is currently unable to make required debt service payments, pay all Project operating expenses and fund all reserves required by the Secretary;

>    (c)  the Secretary determines that there is a reasonable likelihood that the Mortgagor can arrange to refinance this Note at a lower interest rate or otherwise reduce the debt service payments due hereunder through partial prepayment; and

>    (d)  the Secretary determines that refinancing this Note at a lower rate or partial prepayment is necessary to restore the Project to a financially viable condition and to avoid a coinsurance claim.

All payments to reduce the principal balance hereunder (including all penalty or penalties required pursuant hereto), other than regularly scheduled payments of principal, must be made to the Holder hereof in Federal Funds.

In the event of any partial prepayment of this Note for any reason, including but not limited to a pre-payment as a result of (i) an award in condemnation, (ii) an insurance payment on the property subject to the Mortgage, (iii) the imposition of any requirement of the Secretary, or (iv) any voluntary prepayment,

the Holder shall have the right, in its sole discretion, to apply such prepayment to the payments last due hereunder or to recast the remaining principal payments hereunder so that the required monthly payments of principal and interest shall be in equal amounts sufficient to pay the remaining principal balance of this Note over the then remaining term hereof.

In the event any installment or part of any installment due hereunder becomes delinquent for more than fifteen (15) days, there shall be due at the option of the Holder, in addition to other sums then due hereunder, a sum equal to four percent (4%) of the amount of principal and interest so delinquent for each month, or portion thereof, that such amount remains unpaid as liquidated damage for losses due to cash flow disruption and accounting and other expenses incident to handling such delinquent payment. Whenever, under the laws of the State of Florida, the amount of any such late penalty is considered to be additional interest, this provision shall not be used to the extent that the rate of interest specified is in excess of the maximum rate of interest permitted and would constitute usury.

This Note is secured by a Mortgage, Assignment of Rents and Security Agreement (the "Mortgage") of even date herewith made by the Mortgagor, upon certain property and premises situate and lying in Broward County, Florida, and being more particularly described in said Mortgage. The terms, covenants, conditions, provisions, stipulations and agreements contained in the Mortgage are hereby made a part hereof to the same extent and with the same effect as if fully set forth herein; and without limiting the foregoing, reference is hereby made to the Mortgage for a description of the property conveyed thereunder, definition of certain terms, the nature and extent of the security and the rights of the Holder in respect of such security. It is expressly agreed that upon the occurrence of any default under this Note or Event of Default under the Mortgage, the whole principal sum hereof or so much thereof as shall remain unpaid, with interest thereon, together with all other sums secured under the Mortgage shall at the option of the Holder hereof, become immediately due and payable. Any capitalized term used herein, but not herein defined, shall have the meaning set forth in the Mortgage.

Mortgagor further agrees to pay to the order of the Holder immediately on demand any advancements and/or expenditures made by such Holder in accordance with the Mortgage including, without limitation, those for the payment of taxes, special assessments, insurance penalties, mortgage insurance penalties, lender's penalties, and costs of maintenance and preservation of property mortgaged or pledged in connection with the loan evidenced by this Note. At the option of Holder, without notice or demand (which notice and demand are expressly waived by Mortgagor), all or any part of the advancements and/or expenditures described in this paragraph may be added to the unpaid principal balance

-3-

hereof and become a part of and on a parity with the principal indebtedness secured by the Mortgage, and all other instruments executed in connection herewith, and the same shall accrue interest, until paid, at the highest rate permitted to be penaltied on delinquent installments of principal and interest under this Note.

Each payment shall be applied: first, to the payment of such additional advancements and expenditures as Holder may make in accordance with the terms of the Mortgage including, without limitation, advancements for taxes, mortgage coinsurance penalty, insurance and the like; second, to the payment of accrued but unpaid interest; and third, to the payment of principal. Late penalties will not be deducted from any monthly mortgage payment but will be separately penaltied to and collected from the Mortgagor.

If default be made in the payment of any installment under this Note (or any other amount due under the Mortgage) and if such default is not made good prior to the due date of the next such installment, or if any other Event of Default should occur, then, in addition to any other action permitted to be taken by the Holder hereunder or under the Mortgage or any other Loan Documents, the entire principal sum hereof and accrued interest hereon shall at once become due and payable without notice, at the option of the Holder, and the Holder shall have the remedies of a secured party under the laws of the State of Florida with respect to all property mortgaged or pledged as security for this Note and all of the rights and remedies available under the Mortgage or any other Loan Documents. When this Note becomes due, by acceleration or otherwise, the Holder may, at its option, demand, sue for, collect, or make any compromise or settlement it deems desirable with reference to property held as security herefor. The Holder shall not be bound to take any steps necessary to preserve any rights in the property held as security herefor against prior parties, which the Mortgagor hereby assumes to do. The failure to exercise any option to declare the maturity of the principal debt or to exercise any other rights under any of the covenants or conditions contained in the Loan Documents, shall not be taken or deemed to be a waiver of the right to exercise such option or to declare such maturity after such past or any subsequent violation of any such covenants or conditions. All remedies provided for herein upon any default by the Mortgagor shall be cumulative and not exclusive.

In the event of default in the payment of this Note, and if the same is collected by an attorney at law, the undersigned hereby agree(s)' to pay all costs of collection, including reasonable attorneys fees.

Mortgagor and Holder intend that this Note shall be in compliance with all applicable laws and shall be enforceable in

accordance with its terms. If any provision of this Note shall be illegal or unenforceable, such provision shall be deemed cancelled to the extent of such illegality or enforceability, but the remaining provisions shall not be affected thereby.

All agreements herein are expressly limited so that in no event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forebearance or detention of the money to be advanced hereunder exceed the highest lawful rate permissible under applicable law. If, due to any circumstances whatsoever, fulfillment of any provision hereof, or of any of the Loan Documents, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction deems applicable hereto, then ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if under any circumstances the Holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest.

At the option of Holder, if a court of competent jurisdiction determines that any amounts otherwise to be paid hereunder exceed the highest permissible lawful rate or if Mortgagor or any guarantor asserts the amounts otherwise to be paid hereunder exceed the highest permissible lawful rate, then Holder shall have the right to accelerate the maturity of the entire unpaid principal balance and accrued interest due under this Note, immediately upon notice to the Mortgagor.

Funds representing the proceeds of the indebtedness evidenced hereby and disbursed for any purpose permitted hereunder by the Holder by mail, wire transfer or other delivery to Mortgagor, to escrows or in any way for the benefit of Mortgagor, for any purpose, shall be deemed outstanding hereunder and to have been received by Mortgagor as of the date of such mailing, wire transfer or other delivery, and interest shall accrue and be payable upon such funds from and after the date of such wire transfer, mailing or delivery and until repaid, notwithstanding the fact that such funds may not at any time have been remitted from such escrows to Mortgagor or for its benefit. Funds paid hereunder by or on behalf of Mortgagor shall be deemed received by the Holder on the next business day if not received by 2:00 p.m. local time at the location where payments hereunder are to be made.

Each maker and endorser jointly and severally hereby consents to any extensions or renewals of this Note or any part thereof without notice, and each maker and endorser agrees that he/she/it will remain liable as such during any extension or renewal hereof until the debt represented hereby is paid in full.

All parties to this Note, whether principal, surety, guarantor or endorser, hereby waive all applicable exemption rights (whether under the State Constitution, Homestead laws, or otherwise), valuation, appraisement, presentment for payment, demand, protest, notice of protest and notice of dishonor.

As used herein, the term "Holder" means the payee of this Note, so long as it shall own the same, and such other person or entity to whom the Note shall have been endorsed, transferred, pledged and by whom, as the lawful holder thereof, the Note is then held, subject, however, to the terms of any agreement for any such transfer or pledge.

This Note and the Mortgage are made and delivered in and shall be construed in accordance with the laws of the State of Florida.

The covenants set forth in this Mortgage Note shall not be deemed as varying the terms or conditions of the contract of mortgage coinsurance between the Secretary and Cincinnati Mortgage Corporation.

Mortgagor and the partners thereof assume no personal liability for the payment hereof, except as set out in the Mortgage.

This Amended and Restated Renewal Mortgage Note amends, restates and renews in its entirety, and shall be in substitution of, but does not enlarge the face principal amount of, that certain Mortgage Note from Mortgagor to the Florida Housing Finance Agency ("FHFA") dated October _1_, 1989, which Mortgage Note was assigned by FHFA to Citizens and Southern Trust Company (Florida), National Association (the "Trustee") by an Assignment of Mortgage Note and Mortgage and Security Agreement dated October _4_, 1989 and recorded October _5_, 1989 as Clerk's File No. _89399809_ in the Public Records of Broward County, Florida, and which Mortgage Note was further assigned by the Trustee to Cincinnati Mortgage Corporation by an Assignment of Mortgage Note and Mortgage and Security Agreement dated October _4_, 1989 and recorded October _5_, 1989, as Clerk's File No. _89399810_ in the Public Records of Broward County, Florida.

IN WITNESS WHEREOF, the Mortgagor has caused this Note to be executed by its duly authorized general partner as of the day and year first above written.

WITNESS/ATTEST:

                                    OAKLAND LAKES, LTD., a
                                    Florida limited partnership

                                    By: _____
                                        William O. Brisben,
                                        General Partner


THIS IS TO CERTIFY that this is the Note described in and secured by the Mortgage of even date herewith and in the same principal amount as herein stated and secured by real estate situated in the City of Oakland Park, County of Broward, State of Florida.

Dated: October **5**, 1989        _____ (Munch)
                                   Notary Public

22450-74-S

                                   JENNIFER L MUNCH
                                   Notary Public, State of Ohio
                                   My Commission Expires March 2 1954

-7-

1.2                                                                9/28/89

After Recordation, please forward this document to:

Charles C. Bissinger, Jr., Esq.
Strauss & Troy
2100 Central Trust Center
201 East Fifth Street
Cincinnati, Ohio 45202-4186

89399612

AMENDED AND RESTATED RENEWAL

MORTGAGE, ASSIGNMENT OF RENTS
AND
SECURITY AGREEMENT

BY AND BETWEEN

OAKLAND LAKES, LTD.

AND

CINCINNATI MORTGAGE CORPORATION

Section 221(d)(4) pursuant to Section 244 of
the National Housing Act as amended

October 5, 1989

      This Amended and Restated Renewal Mortgage, Assignment of
Rents and Security Agreement amends, restates and renews in its
entirety, and shall be in substitution of, that certain Mortgage
and Security Agreement from Mortgagor to the Florida Housing
Finance Agency ("FHFA") dated October 1, 1989 and recorded
October 5, 1989 as Clerk's File No. 89399803 in the Public
Records of Broward County, Florida, which Mortgage and Security
Agreement was assigned by FHFA to Citizens and Southern Trust
Company (Florida), National Association (the "Trustee") by
Assignment of Mortgage Note and Mortgage and Security Agreement
dated October 4, 1989 and recorded October 5, 1989 as Clerk's
File No. 89399809 in the Public Records of Broward County,
Florida, and which Mortgage and Security Agreement was further
assigned by the Trustee to Cincinnati Mortgage Corporation by
Assignment of Mortgage Note and Mortgage and Security Agreement
dated October 4, 1989 and recorded October 5, 1989 as Clerk's
File No.89399810in the Public Records of Broward County, Florida.

THIS INSTRUMENT PREPARED BY:
CHARLES C. BISSINGER JR., ESQ
STRAUSS & TROY, CO., L.PA.
2100 CENTRAL TRUST CENTER
201 EAST FIFTH STREET

WILL CALL

RETURN TO:
PATRICK NEWTON
ATKINSON, JENNE,
STONE & COHEN, P.A.
P.S. DRAWER 20146



EXHIBIT
B

# AMENDED AND RESTATED RENEWAL
## MORTGAGE, ASSIGNMENT OF RENTS
### AND SECURITY AGREEMENT

THIS AMENDED AND RESTATED RENEWAL MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT, (the "Mortgage") is made and entered into as of the 5th day of October, 1989 and between Oakland Lakes, Ltd., a limited partnership organized and existing under the laws of the State of Florida and having its principal place of business at 4750 Ashwood Drive, Suite 300, Cincinnati, Ohio 45241 (the "Mortgagor"), and CINCINNATI MORTGAGE CORPORATION, a corporation organized and existing under the laws of the State of Ohio and having its principal place of business at 2368 Victory Parkway, Suite 210, Cincinnati, Ohio 45206 and any successors thereof as the holder or holders of the Note, as hereinafter defined ("Mortgagee").

## R E C I T A L S

WHEREAS, the Mortgagor is indebted to the Mortgagee, in the sum of Twenty Two Million Seven Hundred Seventy Nine Thousand Six Hundred and no/100 Dollars ($22,779,600.00), (the "Mortgage Loan"), with interest thereon from the date hereof at the rate of eight and one-quarter percent (8.25%) per annum on the unpaid balance until paid; as evidenced by a Mortgage Note of even date herewith which matures on December 1, 2031, and all extensions thereof, however evidenced (the "Note"); and

WHEREAS, Mortgagee has obtained two Commitments to Guarantee Mortgage Backed Securities from the Government National Mortgage Association ("GNMA") based upon the Mortgage Loan and the pledge of this Mortgage as required by GNMA (the "GNMA Commitments"), one of which relates to construction loan certificates ("CLC's") and the other of which relates to permanent loan certificates ("PLC's"); and

WHEREAS, Mortgagee intends to issue and present to GNMA for its guarantee "fully modified pass through" mortgage-backed CLC's and PLC's guaranteed as to timely payment of principal and interest by GNMA (the "GNMA Securities"); and

WHEREAS, the Mortgage Loan is made to provide for the construction of certain premises and consisting of a 376-unit apartment project located in the State of Florida (the "State"), including related parking and other ancillary facilities (the "Project"), pursuant to an agreement between Mortgagee and Mortgagor dated January 13, 1989, and including any amendments thereto (the "Coinsured Loan Commitment"); and

-1-

WHEREAS, this Mortgage shall be a valid first lien on the real and personal property comprising the Project; and

WHEREAS, the advances of the Mortgage Loan proceeds made, and to be made, to Mortgagor, shall be coinsured by Mortgagee and the Secretary of Housing and Urban Development of Washington, D.C. ("HUD") under Section 221(d)(4) and pursuant to Section 244 of the National Housing Act, as amended (the "Housing Act"), and the regulations thereunder (the "Coinsurance Regulations"), such coinsurance being evidenced by HUD's endorsement of the Note; and

WHEREAS, all things necessary to make the Note a valid, binding and legal obligation of the Mortgagor, and to make this Mortgage a valid, binding and legal instrument for the security of the Note and the performance of Mortgagor's obligations thereunder and hereunder, have been duly performed.

NOW, THEREFORE, THIS MORTGAGE WITNESSETH:

That, for good and valuable consideration, including the indebtedness herein recited, the receipt of which is hereby acknowledged, Mortgagor has granted and conveyed, and does hereby grant, convey, and warrant unto Mortgagee, its successors and assigns forever, for the benefit and security of the Mortgagee, its successors and assigns, in order to secure performance of its obligations under the Note, this Mortgage and the other Loan Documents, all of that certain real estate situated in the County of Broward and State of Florida and more particularly described in Exhibit A, attached hereto incorporated herein and made a part hereof (the "Real Estate"); being the same property conveyed to Mortgagor by deeds recorded in Official Records Book _16203_, Pages _517 ½_, of the Public Records of Broward County, Florida.
         * 519, 521, 567, 571 & 575, respectively,
TOGETHER WITH all of the collateral described in Exhibit B, attached hereto incorporated herein and made a part hereof;

AND TOGETHER WITH all easements, rights-of-way and rights used in connection therewith or as a means of access thereto, and all tenements, hereditaments and appurtenances thereof and thereto, all water rights and all right, title and interest of Mortgagor, now owned or hereafter acquired, in and to any land lying within the right-of-way of any street, open or proposed, adjoining said land, and any and all sidewalks, alleys, strips and gores of land adjacent to or used in connection with the said land and the improvements thereon;

AND TOGETHER WITH all of the rents, issues and profits and insurance or condemnation proceeds which may arise or be had from any of the foregoing, and all articles of personal property now or hereafter attached to or used in and about the building or buildings now erected or hereafter to be erected on said land which are necessary to the complete and comfortable use and

-2-

occupancy of such building or buildings for the purposes for
which they were or are to be erected, including all goods and
chattels and personal property as are ever used or furnished in
operating a building or the activities conducted therein, similar
to the one(s) herein described and referred to, and all renewals
or replacements thereof or articles in substitution therefor,
whether or not the same are, or shall be attached to said build-
ing or buildings in any manner except property belonging to the
tenants (Mortgagor agrees that, to the extent permitted by law,
the foregoing property shall be deemed to be real estate and
affixed to the realty);

AND TOGETHER WITH all right, title and interest of Mortgagor
in and to all leases or subleases covering the Project or any
portion thereof now or hereafter existing or entered into, any
and all right, title and interest of Mortgagor thereunder, in-
cluding, and without limitation, all cash and, subject to the
rights of tenants therein, all security deposits, advance depos-
its, advance rentals and deposits or payments of similar nature;

TO HAVE AND TO HOLD the above granted Property as described
in the aforesaid granting clauses unto and to the use and benefit
of Mortgagee, its successors and assigns, forever, for the uses
and purposes hereinafter set forth.

AND THIS MORTGAGE FURTHER WITNESSETH, that to protect the
security of this Mortgage, Mortgagor, for itself, its successors
and assigns, has covenanted and agreed and does hereby covenant
and agree with Mortgagee, and its successors and assigns, as
follows.

## ARTICLE I

## DEFINITIONS

Section 1.01. <u>Defined Terms</u>. Capitalized terms defined in
the recitals hereto shall have the meanings specified therein,
certain capitalized terms not defined herein shall have the
meanings specified in the Building Loan Agreement, and the fol-
lowing capitalized terms shall have the following meanings:

"Building Loan Agreement" means the Building Loan Agreement
of even date herewith between Mortgagor and Mortgagee with re-
spect to the Project.

"Coinsurance Contract" means the agreement between Mortgagee
and HUD of coinsurance for the Mortgage Loan under Section
221(d)(4) pursuant to Section 244 of the National Housing Act and
the Coinsurance Regulations, created by HUD's endorsement of the
Note.

-3-

"Event of Default" is defined in Section 6.01.

"HUD Regulatory Agreement" means the agreement entitled Regulatory Agreement for Multifamily Housing Projects Coinsured by HUD of even date herewith, between Mortgagee and Mortgagor with respect to the operation of the Project.

"Indebtedness Hereby Secured" means, as of any particular time, the then unpaid balance of the principal sum of the Note together with interest thereon, all other payments due under the Note and/or hereunder and such additional unrepaid sums as shall have been paid or advanced by or on behalf of Mortgagee, on behalf of Mortgagor, pursuant to the Note, the Building Loan Agreement or hereunder, or which shall otherwise be payable by Mortgagor to Mortgagee, with interest thereon, all as herein and in the Loan Documents provided, as well as all documentary and intangible taxes on the Note and Mortgage as may be imposed by State law, which taxes Mortgagor covenants and agrees to pay.

"Loan Documents" means this Mortgage, the Note, the Coinsured Loan Commitment, the HUD Regulatory Agreement, the Building Loan Agreement, and any other instrument given to evidence or further secure the payment or performance of any obligations secured under this Mortgage.

"Mortgagee" means Cincinnati Mortgage Corporation, as payee of the Note as long as it shall own the same, and such other person, firm or corporation to whom the Note shall have been endorsed, pledged, transferred or assigned and by whom, as the lawful holder thereof, the Note is then held, subject, however, to the terms of any agreement for any such pledge, transfer or assignment and provided that HUD is under no obligation to recognize any entity as the beneficiary of the Coinsurance Contract unless it is an approved coinsured lender pursuant to applicable regulations.

"Property" means and shall include the Real Estate, all property of the Mortgagor as is described in the granting clauses hereof, all of the property set forth on Exhibit B and any and all other property which is or becomes subject to the lien of this Mortgage or any security interest created pursuant to the provisions of this Mortgage.

## ARTICLE II

## MORTGAGOR'S REPRESENTATIONS AND WARRANTIES

Section 2.01 Due Authorization, Etc. Mortgagor represents and warrants that it has duly authorized, executed and delivered the Note and has duly authorized, executed, acknowledged and delivered the other Loan Documents to secure the repayment of the

-4-

Indebtedness Hereby Secured, and to secure the performance of the covenants, agreements and conditions contained therein and herein.

Section 2.02 <u>Validity of Loan Documents</u>.  Mortgagor represents and warrants that all things necessary to make the Loan Documents valid, binding and legal obligations of Mortgagor for the security of the Indebtedness Hereby Secured, in accordance with their respective terms, have been duly performed.

## ARTICLE III

### PAYMENT BY MORTGAGOR

Section 3.01 <u>Covenant to Pay</u>.  Mortgagor hereby expressly covenants, promises and agrees that it will duly and punctually pay the Indebtedness Hereby Secured at the times and in the manner herein or in the Note or in the other Loan Documents provided, according to the true intent and meaning hereof and thereof, time being of the essence for such payments.  Any remittance by check or draft shall be made subject to the condition that such check or draft may be handled for collection in accordance with the practice of the collecting bank or banks, and any receipt issued therefor shall be ineffective until the amount due is actually received by the Mortgagee.

Section 3.02 <u>Limitation on Liability</u>.  The covenant of the Mortgagor to pay principal and interest is included in the Note secured hereby for the purpose of establishing and continuing the existence of the indebtedness.  However, it is a condition of said covenant and those contained herein that in the event of a default under the terms hereof, the Mortgagee shall take no action against the Mortgagor, or its partners, except such as may be necessary to subject to the satisfaction of the Indebtedness Hereby Secured, the Property described herein and any chattels appurtenant to the use thereof, provided, that nothing in this covenant and no action so taken shall operate to impair any obligation of the Mortgagor under the Building Loan Agreement and/or the HUD Regulatory Agreement herein referred to and made a part hereof (including, with respect thereto, the rights of HUD) or to deprive the Mortgagee of any rights it may have by law which are not expressly waived.  This Section shall not be deemed to limit the remedies of the Mortgagee, its successors or assigns, in law or in equity, pursuant to this Mortgage, provided that the exercise of any such remedies, including the obtaining of any judgments or decrees at law or in equity or other orders shall not impose any personal liability on Mortgagor or any partner of Mortgagor.

-5-

The provisions of this Section shall not be deemed to limit claims by Mortgagee or HUD for the following:

   (a)   Misapplication of insurance or condemnation proceeds;

   (b)   Misapplication of Mortgage Loan proceeds;

   (c)   Improper application of tenant security deposits or pre-paid rents;

   (d)   Failure, prior to Mortgagor's default hereunder, to properly apply rents and other revenue of the Property actually collected by Mortgagor to necessary and proper expenses of the Property, including the Indebtedness Hereby Secured or failure, after Mortgagor's default hereunder, to properly apply rents and other revenue of the Property actually collected by the Mortgagor (i) to necessary and proper expenses of the Property or (ii) to reduce the Indebtedness Hereby Secured by applying such amounts first to costs permitted to be paid from Project revenues by this Mortgage and by HUD regulations, then to unpaid interest due and finally to the principal balance outstanding on the Note or other Indebtedness Hereby Secured; and

   (e)   Failure to pay valid mechanic's and/or materialmen's liens filed against the Property prior to Mortgagor's default under the Indebtedness Hereby Secured or filed after Mortgagor's default under the Indebtedness Hereby Secured to the extent the claim set forth in such lien relates to labor performed or materials supplied prior to the date of Mortgagor's default under the Indebtedness Hereby Secured.

## ARTICLE IV

### PARTICULAR COVENANTS

Section 4.01 <u>Title to Property and Authority to Convey</u>. Mortgagor covenants that, at the time of the execution, delivery and recording of this Mortgage, it is the absolute and lawful owner of the legal and beneficial title to, and is lawfully seized and possessed of, and has good title to all of the Property, and it has good right and lawful authority to bargain, sell, grant and convey the same as provided in this Mortgage, in fee simple as to all real property described in Exhibit A, and that said Property is free and clear of all encumbrances except for those encumbrances approved by Mortgagee as specified in Exhibit C attached hereto and made a part hereof. Mortgagor hereby covenants, agrees and warrants that it will defend the

-6-



title of such property, and every part thereof, unto Mortgagee and its successors and assigns, against all claims and demands by any person or persons, and will execute such further assurances thereof as may be required by Mortgagee.

Section 4.02 Recordation and Filings. At any and all times, Mortgagor will promptly do, prepare, execute, acknowledge, deliver, file and record and will cause to be done, prepared, executed, acknowledged, delivered, filed and recorded all and every such actions, deeds, indentures, conveyances, transfers, assignments, instruments and financing statements under the Uniform Commercial Code and assurances in law as Mortgagee shall reasonably require for the better assuring, conveying, transferring, assigning and confirming unto Mortgagee all and singular the hereditaments and premises, estates and Property, real and personal, hereby granted, conveyed or transferred, or intended to be; and Mortgagor will bear all expenses, charges and taxes in connection therewith. Mortgagor shall promptly take all actions necessary to perfect and maintain the priority and validity of Mortgagee's interest in the Property as a first and paramount lien and charge against the rights, claims and interests of all other persons and parties. Upon failure by Mortgagor to do so, Mortgagee may make, execute, record, file, re-record or refile any such actions, deeds, indentures, conveyances, transfers, assignments, instruments and financing statements under the Uniform Commercial Code and assurances in law for and in the name of Mortgagor, and Mortgagor hereby appoints Mortgagee its agent and attorney-in-fact to do so, such appointment to stand irrevocable as being coupled with an interest.

Section 4.03 Use or Alteration of the Project. Mortgagor covenants that it will not permit or suffer the use of the Project, the Property or any portion thereof for any purpose other than for a multifamily apartment housing project (including the commercial and other ancillary uses permitted or approved in writing by Mortgagee), and as is further provided in the HUD Regulatory Agreement. Mortgagor covenants that it shall not without the prior written consent of Mortgagee remove any Property from the Real Estate unless such removal is of personal property in the ordinary course of business and the personal property so removed is simultaneously replaced with like property of equal or greater value. Mortgagor covenants that it shall not, without the prior written consent of Mortgagee, permit any material alterations of or additions to buildings or other improvements now existing or hereafter constructed with respect to the Project. For purposes of this Section any expenditure in excess of Fifty Thousand and No/100 Dollars ($50,000.00) shall be considered material.

Mortgagor covenants to comply with all present and future statutes, laws, ordinances and governmental rules, regulations and orders which are applicable to the Property.

-7-



Section 4.04 HUD Regulatory Agreement. Mortgagor agrees that the HUD Regulatory Agreement shall be recorded immediately following this instrument, and that it is incorporated in and hereby made a part of this Mortgage. Upon default under the HUD Regulatory Agreement, and with the prior written approval of HUD as long as the Coinsurance Contract is in effect, Mortgagee may declare such default to be an Event of Default under this Mortgage as provided in Article VI hereof and may proceed as provided in Article VI hereof.

Section 4.05 Restriction on Transfer; Leases. Anything herein to the contrary notwithstanding, Mortgagor shall not convey, sell, assign, lease, (except commercial space leases previously approved in writing by Mortgagee and leases for residential units in the ordinary course of business), transfer or otherwise dispose of, or obtain secondary financing on, the Property or any part thereof or any interest therein, whether voluntary or involuntary, by operation of law or otherwise, without the prior written consent of the Mortgagee and, if such approval is required under the Coinsurance Contract, the Secretary of HUD.

All commercial leases now existing or hereafter entered into shall be subordinate and subject to the lien of this Mortgage and Mortgagor shall require any and all tenants of commercial space to enter into a subordination and attornment agreement in a form satisfactory to Mortgagee. Mortgagee may at its option, permit the Mortgagor to include a non-disturbance provision in any such subordination and attornment agreement.

Whether in violation of the provisions of this section or pursuant to consent, if Mortgagor has demised, or shall hereafter demise, the Property or any part thereof by leases subordinate or junior either by the date thereof or by the express terms thereof to the lien of this Mortgage, any such lease shall be, subject to the condition that in the event of any foreclosure sale or sales hereunder, by virtue of judicial proceedings or otherwise, such leases shall, at the option of the Mortgagee, continue in full force and effect and the tenants thereunder will, upon request, attorn to and acknowledge the foreclosure purchaser or purchasers at such sale as landlord thereunder. The Mortgagee may, at its option and in its sole discretion, require that any or all of the leases affecting the Property, other than leases for individual rental units, be made subject and subordinate to the lien of this Mortgage. In the absence of a recorded agreement expressly subordinating this Mortgage to any or all of such leases, said leases shall be deemed to be subordinate in all respects to this Mortgage.

Section 4.06 Aggregate Monthly Payments. In order more fully to protect the security of this Mortgage, Mortgagor, toget-

-8-

her with and in addition to the monthly payments of principal and
interest (or interest only until the first payment to principal)
under the terms of the Note, beginning with the first payment to
principal under the Note and monthly thereafter until the Note is
fully paid, will pay to Mortgagee the following sums:

(a)   So long as the Mortgage Loan is coinsured under the
provisions of the Housing Act and the Coinsurance
Regulations, an amount sufficient to accumulate in the
hands of Mortgagee one month prior to the due date the
annual mortgage co-insurance premium (including any
lender's premium) payable to HUD and Mortgagee aggre-
gating 0.75% per year calculated on the average daily
principal balance of the Mortgage Loan scheduled to be
outstanding during the year covered thereby (without
taking into account delinquent payments or prepay-
ments).

(b)   A sum equal to the ground rents, if any, next due, plus
the premiums next due on all required insurance poli-
cies, plus sewer and water rates, taxes and special
assessments next due on the Property (all as estimated
by the Mortgagee), less all sums already paid therefor,
divided by the number of months to elapse before one
month prior to the date when such ground rents, premi-
ums, water rates, taxes and assessments will become
delinquent, such sums to be held by Mortgagee in trust
to pay said ground rents, premiums, sewer and water
rates, taxes and special assessments.

(c)   All monthly payments required to be made under the HUD
Regulatory Agreement to the reserve for replacements.

All payments mentioned in the three preceding clauses and
all other payments to be made under the Note shall be added
together and the aggregate amount shall be paid each month in a
single payment to be applied by Mortgagee in the following order:

(i)    amounts payable under clause (a) above;

(ii)   amounts payable under clause (b) above;

(iii)  interest on the Note;

(iv)   amortization of the principal sum of the Note;
and

(v)    amounts payable under clause (c) above.

The amounts paid to Mortgagee under clauses (a), (b) and (c)
above (the "Funds") shall be held in one or more accounts with
Mortgagee.  Unless applicable law requires interest, earnings or

-9-

profits to be paid, Mortgagee shall not be required to pay Mort-
gagor any interest, earnings or profits on the Funds except that
Mortgagee, shall, upon Mortgagor's written request invest for
Mortgagor's benefit that portion of the Funds consisting of the
reserve for replacements in a manner consistent with applicable
HUD requirements.   Mortgagee shall give to Mortgagor, without
charge, an annual accounting of the Funds in Mortgagee's normal
format showing credits and debits to the Funds and the purpose
for which each debit to the Funds was made.

Section 4.07 <u>Treatment of Accumulations of Monthly Pay-
ments.</u>  Any excess funds paid by Mortgagor pursuant to Sections
4.06(a) and (b) remaining after payment of the items herein
provided on an annual basis, shall be credited to subsequent
monthly payments of the same nature; but if any such item shall
exceed the estimate therefor, Mortgagor shall without demand
forthwith make good the deficiency.   In the event the Indebted-
ness Hereby Secured is paid in full by Mortgagor in accordance
with the terms of the Note, accumulations under Section 4.06 not
required to meet obligations due for which the payments were
collected shall be refunded to Mortgagor.   If the Property is
sold through foreclosure or is acquired by Mortgagee after de-
fault, any then remaining balance of the accumulation under
Section 4.06 hereof shall be credited against the Indebtedness
Hereby Secured.

Section 4.08 <u>Payment of Impositions.</u>

(a)  Mortgagor will pay all ground rents, if any, taxes,
special assessments, sewer and water rates and other governmental
or municipal charges or impositions, to the extent provision
therefor has not been made by monthly payments as hereinabove
provided, before the same become delinquent or subject to inter-
est or penalties, and in default thereof Mortgagee may pay the
same without waiving or affecting its option to foreclose or any
other rights hereunder.   All such sums paid by Mortgagee, plus
any sums which Mortgagee has advanced to pay mortgage insurance
premiums or other insurance premiums not paid for by monthly
payment hereunder or otherwise paid by Mortgagor, shall be added
to the Indebtedness Hereby Secured, shall bear interest at the
Mortgage Loan rate specified in the Note from the date of the
advance and shall be due and payable to Mortgagee upon demand.
Nothing contained in this paragraph shall be construed as re-
quiring Mortgagee to advance or expend monies for any purposes
mentioned in this paragraph.

(b)  In the event of the passage after the date of this
Mortgage of any law deducting from the value of real property for
the purposes of taxation any lien thereon or changing in any way
the laws for the taxation of mortgages or debts secured by mort-
gage for federal, state or local purposes or the manner of the
collection of any such taxes, and imposing a tax, either directly

-10-

or indirectly, on this Mortgage, the Note or the debt which it secures, the Mortgagee shall have the right to declare the principal sum and the interest due on the date to be specified by not less than thirty (30) days' written notice to be given to Mortgagor by Mortgagee; provided, however, that such election shall be ineffective if Mortgagor is permitted by law to pay the whole of such tax in addition to all other payments required hereunder, and if Mortgagor, prior to such specified date, does pay such tax and agrees to pay any such tax when thereafter levied or assessed against the premises, and such agreement shall constitute a modification of this Mortgage. This Section 4.08(b) shall not be applicable so long as this Mortgage is coinsured by HUD.

Section 4.09 <u>Permitted Contests.</u> Mortgagor may in good faith contest, by proper legal proceedings, the validity or amount of any tax, special assessment or other charge or imposition which Mortgagor has agreed to pay pursuant to the provisions of Section 4.08 hereof and may delay payment or discharge thereof during the period in which the same is being contested; provided, however, that if payment is delayed: (i) such proceedings shall suspend the collection thereof from Mortgagor, Mortgagee, or either of them, and from the Property; (ii) in any such event, Mortgagor shall deposit with Mortgagee, as security for the payment or discharge of such contested item, an amount equal thereto plus interest, penalties and costs (to the extent such amount is not already in the hands of Mortgagee); and (iii) such contested item and all costs and penalties, if any, shall have been paid at least sixty (60) days before the date on which the Property, or any portion thereof, may be sold in order to satisfy any such contested item.

Section 4.10 <u>Insurance.</u> Mortgagor will at all times keep the Property insured against loss by fire and all of the other risks ordinarily covered by insurance of the type known as "fire and extended coverage" in such amounts, in such form and with such coverages and endorsements as may be required from time to time by Mortgagee. All such insurance shall be carried for such periods as may be required by Mortgagee, and shall be in an amount which will comply with the Coinsurance Regulations, but if required by Mortgagee, as to losses other than loss of rental income, such insurance shall be in an amount which is not less than the greatest of (i) eighty percent (80%) of the actual cash value of the Property, (ii) the unpaid principal amount of the Mortgage Loan, and (iii) such amount as will avoid treatment of Mortgagor as a coinsurer with the issuer of the policy. Mortgagor will at all times keep and maintain public liability and property damage insurance covering injury and damage to persons and property with limits of not less than $1,000,000 per occurrence. Mortgagee reserves the right to increase said limits should sound business practice so dictate. Mortgagor shall also maintain, at any and all times required by Mortgagee, rental interruption insurance in such amount as may be required from

-11-

time to time by Mortgagee. Mortgagor shall also maintain, at any and all times required by Mortgagee, broad form builders' risk insurance with respect to the Property and the construction or reconstruction of any improvements thereto. All such policies as aforesaid shall be in standard form and endorsed with standard mortgagee clauses with loss payable to Mortgagee, the Secretary of HUD and such other parties as may be designated by Mortgagee, as their interests may appear, and shall contain a clause providing, that the policy may not be cancelled or modified without thirty (30) days' prior written notice to Mortgagee. Mortgagor shall deliver all such policies evidencing the insurance required hereunder to Mortgagee, and will likewise deliver renewals of such policies not less than thirty (30) days in advance of the expiration of same, stamped "paid" by the issuer thereof. The carriers providing the insurance shall be chosen by Mortgagor subject to approval by Mortgagee provided that such approval shall not be unreasonably withheld.

Mortgagor shall at all times comply (and cause its agents, contractors and subcontractors to comply) with all applicable worker's compensation insurance requirements.

Section 4.11 Maintenance and Repairs. Mortgagor shall keep the Property in good condition and repair, and will not permit or suffer any waste of the Property. Mortgagor will, at its sole cost and expense, promptly and in a good workmanlike manner make all needful and proper renewals, replacements and repairs to the property, including alterations and repairs as may be required by laws, ordinances and regulations necessary to insure that the value of the Property as security shall not be impaired.

In the event the Property suffers an uninsured loss, Mortgagor if required to do so by Mortgagee, shall use its own funds to repair and restore the Property. If, in any such event, Mortgagor fails to make such repairs or restoration, Mortgagee may advance sums necessary to complete such repair and restoration. Any such advance by Mortgagee shall become part of the Indebtedness Hereby Secured, shall bear interest at the Mortgage Loan rate specified in the Note from the date of the advance, and shall be due and payable to Mortgagee upon demand.

Section 4.12 Indemnification by Mortgagor. Subject to the provisions of Section 3.02 hereof, Mortgagor will protect, indemnify and save harmless Mortgagee and the Secretary of HUD (the party being indemnified is sometimes called the "indemnitee") from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including, without limitation, attorneys' fees and expenses at or prior to trial and on appeal) imposed upon or incurred by or asserted against any such indemnitee by reason of (i) any accident, injury to or death of persons or loss of or damage to property occurring on or about the Property or the adjoining sidewalks, curbs,

-12-



streets, or ways; (ii) any use, nonuse or condition of any of the Property or the adjoining sidewalks, curbs, streets or ways; (iii) any failure on the part of Mortgagor to perform or comply with any of the terms of this Mortgage or the Building Loan Agreement; or (iv) performance of any labor or services or the furnishing of any materials or other property in respect of any portion of the Property or the use thereof. In case any action, suit or proceeding is brought against any such indemnitee by reason of any such occurrence, Mortgagor, upon the request of any such indemnitee, will at Mortgagor's expense resist and defend such action, suit or proceeding or will cause the same to be resisted or defended by counsel designated by the Mortgagor and reasonably acceptable to the indemnitee, provided that such approval shall not be required in the case of defense by counsel designated by any insurance company undertaking such defense pursuant to any applicable policy of insurance. Any amounts payable to Mortgagee by reason of the application of this paragraph shall become immediately due and payable, shall be secured by the Property as if part of the Indebtedness Hereby Secured, and shall bear interest at the Mortgage Loan rate specified in the Note from the date loss or damage is sustained by Mortgagee until paid. This obligation of Mortgagor shall survive any termination or satisfaction of this Mortgage.

Section 4.13 Operation of the Property to be Sole Activity of Mortgagor. So long as any of the Indebtedness Hereby Secured remains outstanding, Mortgagor shall not engage in any business or activity other than, or in addition to, the ownership, operation and management of the Property. This Section shall not apply to the general or limited partners of Mortgagor.

Section 4.14 Permitted Liens. Mortgagor will not create or permit a lien to exist against the Property inferior or superior to the lien of this Mortgage, other than liens for real estate taxes and assessments not yet due and payable, and inferior liens for which the prior written consent of Mortgagee has been obtained in accordance with the Coinsurance Regulations.

Section 4.15 Assignment of Rents and Leases and Profits.

(a) To further secure the obligations of Mortgagor under the Note and this Mortgage, as collateral security therefor, Mortgagor hereby irrevocably assigns to Mortgagee all the rents, profits, issue and income of the Property, and any and all leases and/or subleases (together the "Leases") thereof, which are in force on the date hereof, or which may be hereafter entered into, as further security for the Indebtedness Hereby Secured, and the Mortgagor shall not further assign nor encumber the rents of the Property, or any part thereof, without the prior written consent of the Mortgagee. Mortgagee shall not be obligated to perform or discharge any obligation or duty to be performed or discharged by Mortgagor under any of said Leases, and this assignment shall not

-13-

place any responsibility upon Mortgagee for the control, care, management, or repair of the Property or make the Mortgagee derivatively responsible or liable for any negligence in the management, operation, upkeep, repair, or control of the Property, whenever occurring.  At the option of the Mortgagee, this assignment shall become effective immediately upon the occurrence of an Event of Default hereunder.  Provided, however, that all such rents, and all rents, profits and payments due Mortgagor under such Leases shall be payable to Mortgagor and be its sole property until such time as an Event of Default as hereafter described shall occur, provided, further, that no rent more than one month in advance plus a security deposit shall be collected or accepted without the prior written consent of Mortgagee, and no rent shall be collected or accepted in violation of any law, ordinance, rule, regulation or order.  Mortgagor agrees that said assignment of rents and leases is an essential consideration for the making of the Mortgage Loan by Mortgagee.  Mortgagor agrees that it will faithfully perform and comply with all terms, conditions and covenants of any Lease covering any part of the Property.  Upon Mortgagee's request from time to time, Mortgagor shall furnish Mortgagee a statement, in affidavit form and in such reasonable detail as Mortgagee may require, of all Leases on the Property and the status thereof and, on demand, to furnish Mortgagee executed counterparts of any and all such Leases.

(b)  Upon the occurrence of any Event of Default, Mortgagee may at its option at any time thereafter: (i) proceed to enter upon, take possession of, and manage and operate the Property under the foregoing assignment without becoming a mortgagee in possession; (ii) proceed to perform any or all obligations of the Mortgagor under the Leases, and exercise the rights of the Mortgagor contained therein as fully as the Mortgagor itself could, without regard to the adequacy of security for the indebtedness hereby secured and with or without bringing any legal action or causing any receiver to be appointed by any court; (iii) let or re-let the Property or any part thereof and enforce, modify, cancel or accept the surrender of any of the Leases; (iv) evict lessees pursuant to appropriate legal proceedings; (v) bring or defend any suits in connection with the possession of the Property or any part thereof, in the name of the Mortgagor and/or Mortgagee; (vi) make such repairs as the Mortgagee may reasonably deem appropriate; (vii) pay out of rents, income, profits, reserves, escrows and/or security deposits (or from other sources of funds) any liens, taxes, assessments, insurance premiums, management fees, utility charges, costs of keeping the Property in good condition and repair and/or any other fees, expenses, premiums, costs or charges which Mortgagee deems to be necessary or appropriate in connection with the Note, Mortgage, Leases, the Property and/or the operation of the Property; (viii) fix or modify rent; (ix) in the name of either the Mortgagor and/or the Mortgagee sue for or otherwise collect and receive all rents, issues and profits, including those past due and unpaid, and

-14-

apply the same first against all costs and expenses of the opera-
tion of the Property, of the performance of the Mortgagor's
obligations under the Leases and of such collection, including
reasonable attorneys' fees, and any amounts remaining after such
application will be applied next to accrued and unpaid interest
and the remainder thereof, if any, to the payment of principal of
the Indebtedness Hereby Secured; (x) without regard to the ade-
quacy of security for the Indebtedness Hereby Secured, have a
receiver appointed to manage and collect income and rents from
the Property; (xi) cancel or terminate any or all of the Leases;
and (xii) do all other things the Mortgagee may deem necessary or
proper to protect its security. Entry upon and taking possession
of the Property and the collection of the rents and the appli-
cation thereof will not operate to cure or waive any default
under any instrument given by the Mortgagor to the Mortgagee or
prohibit the taking of any other action by the Mortgagee under
any such other instrument, or at law or in equity to enforce the
payment of the Indebtedness Hereby Secured or to realize on any
other security or guarantee. The existence and/or exercise of
the rights of Mortgagee set forth in this Section 4.15 shall not
create any obligations on the part of the Mortgagee other than
for Mortgagee's gross negligence or willful misconduct.

    (c)  Mortgagee may give notice of the foregoing assignment
at any time to any of the lessees.  Lessees may rely on any
notice given them by Mortgagee pursuant to the foregoing assign-
ment and Mortgagor agrees to hold harmless any lessee with re-
spect to any payment made or action taken in reliance on any such
notice.

    Section  4.16  Books  and  Records;  Financial  Statements.
Mortgagor hereby agrees that Mortgagee shall have the right to
inspect the books and records of the operation of the Property
and make copies thereof at all reasonable times and upon reason-
able notice to Mortgagor. Mortgagor shall furnish to Mortgagee,
within ninety (90) days after the end of each fiscal year of
Mortgagor, a balance sheet, statement of income and expenses of
the Property and a statement of changes in financial position,
all prepared in accordance with generally accepted accounting
principals consistently applied, and which shall be certified by
the chief financial officer of Mortgagor. Such financial state-
ments shall set forth, in reasonable detail, rents received and
total operating expenses of the Property and shall be accompanied
by a certificate executed by the chief financial officer of
Mortgagor certifying that there exists no Event of Default under
this Mortgage or any of the Loan Documents (and no circumstances
which, with the passage of time, the giving of notice, or both,
would constitute an Event of Default). Such financial statements
shall be audited by an independent certified accountant.  In
addition, Mortgagor shall promptly provide to Mortgagee such
other financial statements and information with respect to the
Property, Mortgagor and/or Project as Mortgagee may, from time to

time, request. All expenses in connection with financial statements shall be borne by the Mortgagor.

Section 4.17 <u>Zoning Changes</u>. Mortgagor agrees not to participate in any proceedings for, or acquiesce in, any change or proposed change of, zoning laws or regulations governing the Property, the creation of a subdivision of or cut-up involving the Property, consolidation of the Property with any other property, nor to subject the Property to any declaration of condominium, "time-share" ownership or other provisions for subdivided or common ownership, without the prior written consent and participation of Mortgagee. Promptly after Mortgagor becomes aware thereof, Mortgagor shall notify Mortgagee of any proposed change in the zoning of the Property or any portion thereof.

Section 4.18 <u>Coinsurance Regulations and Housing Act</u>. Mortgagor shall comply in a timely fashion with any and all obligations of Mortgagor under the Coinsurance Regulations and National Housing Act which are applicable to Mortgagor and/or the Project.

<div align="center">

ARTICLE V

CASUALTY AND CONDEMNATION; CERTAIN PREPAYMENTS

</div>

Section 5.01 <u>Casualty</u>. If the Property, or any part thereof, shall be damaged by fire or other hazard against which insurance is held, the amount paid by any insurance company pursuant to the contract of insurance shall, to the extent of the Indebtedness Hereby Secured then remaining unpaid, be paid to Mortgagee, and at Mortgagee's election, may be applied to reduction of the Indebtedness Hereby Secured as set forth in Section 5.03 hereof or released for the repair or restoration of the Property to substantially the same condition as existed before the casualty. In the event of such loss or damage, all proceeds of insurance shall be payable to Mortgagee, and Mortgagor hereby authorizes and directs any affected insurance company to make payment of such proceeds directly to Mortgagee. Mortgagee is hereby authorized and empowered by Mortgagor to settle, adjust, or compromise any claims for loss, damage, or destruction under any policy or policies of insurance. All such amounts together with amounts, if any, earned thereon pending the decisions whether to repair and restore are herein referred to as the "Insurance Fund." Mortgagor will give immediate notice by mail to the Mortgagee and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, of any fire damage or other casualty to the Property.

Section 5.02 <u>Condemnation; Application of Proceeds</u>. Mortgagor agrees that if the Property, or any part thereof, is condemned under any power of eminent domain or acquired for any

<div align="center">

-16-

</div>



public use or quasi-public use, Mortgagor shall give prompt
written notice thereof to Mortgagee, and the damages, proceeds,
and consideration for such acquisition to the extent of the full
amount of Indebtedness Hereby Secured remaining unpaid are hereby
assigned by Mortgagor to Mortgagee and shall be paid forthwith to
Mortgagee for the account of Mortgagor, to be applied by Mort-
gagee on account of the Indebtedness Hereby Secured as set forth
in Section 5.03 hereof.   Mortgagee shall be entitled, at its
option, to appear in its own name in any action or proceeding
relating to such condemnation and shall have the right to com-
promise or settle such proceeding subject to reasonable approval
by the Mortgagor.   In case of any partial condemnation, Mortgagee
may in its sole discretion, elect to release a portion or all of
the proceeds to Mortgagor for repairs and restoration of the
Property.   All such amounts together with amounts, if any, earned
thereon pending the decision whether to repair and restore are
herein referred to as the "Condemnation Fund."

   Section 5.03 Prepayment from Amounts in the Insurance or
Condemnation Funds.   Within thirty (30) days after Mortgagee's
receipt of any insurance or condemnation proceeds pursuant to
Sections 5.01 and 5.02 as applicable Mortgagee shall give to
Mortgagor notice of Mortgagee's election to apply the Insurance
Fund or Condemnation Fund to either (i) reduction of the Indebt-
edness Hereby Secured or (ii) pay costs and expenses for the
repair and restoration of the Property.   Upon any election by
Mortgagee to apply the  surance Fund or Condemnation Fund to a
reduction of the Indebt dness Hereby Secured, Mortgagee shall
give notice to Mortgagor that the Indebtedness Hereby Secured, or
so much of the principal thereof as can be paid from the Insur-
ance Fund or Condemnation Fund must be prepaid as hereinafter set
forth.   The amount of such fund shall be deemed to have been
received on the date of such notice.   The effective date of such
prepayment (the "effective date"), in case of any such notice
which has been given prior to the 25th day of any month, shall be
the 16th day of the next following month, or in case of any such
notice given on or after the 25th day of any month, the 16th day
of the second following month.   If the entire Indebtedness Hereby
Secured shall be discharged from such insurance or condemnation
proceeds, Mortgagee shall not be required to release the lien of
this Mortgage from the Property until the date which is ninety-
five (95) days after the effective date of such discharge of the
Indebtedness Hereby Secured so as to protect the Mortgagee
against any loss of security if such discharge of the Indebted-
ness Hereby Secured is subsequently rescinded by a trustee  in
bankruptcy with respect to the Mortgagor.   On the applicable
effective date, the Indebtedness Hereby Secured shall be deemed
prepaid to the extent hereinafter provided.   If, after giving
effect to such prepayment, the entire amount of the Indebtedness
Hereby Secured has not been discharged, the amount of the applic-
able fund shall be deemed to have been applied first to the
accrued and unpaid interest on the amount prepaid through the

-17-

effective date, and then to the prepayment of the principal balance of the Mortgage Loan.  In the event of any partial prepayment of the principal balance of the Mortgage Loan pursuant to the provisions of this section, an amount equal to (i) the amount of interest on the principal balance of the Mortgage Loan prepaid pursuant to the provisions of this section from the first day of the month in which the effective date occurs to the effective date, plus (ii) all interest actually earned by Mortgagee from investment of the Insurance Fund or Condemnation Fund, as applicable, from the date of the initial notice of the prepayment by Mortgagee to Mortgagor through the day immediately preceding the effective date, shall be credited to Mortgagor's next scheduled installment of principal and interest on the Mortgage Loan. Following any prepayment which discharges the entire amount of the Indebtedness Hereby Secured, Mortgagee shall refund to Mortgagor the amount referred to in clause (ii) of the immediately preceding sentence.

Section 5.04 <u>Due Diligence by Mortgagor to Complete Repairs or Restoration; Disbursement.</u>  If, at Mortgagee's election, insurance or condemnation proceeds are released for repair or restoration of the Property, Mortgagor shall promptly commence and diligently prosecute the completion of such repairs or restoration.  Such repairs shall be effected in accordance with all appropriate HUD requirements.  Mortgagor if required to do so by Mortgagee, shall use its own funds to complete repair or restoration of the Property if insurance or condemnation proceeds, as applicable, are insufficient to accomplish same.  If, in order to complete repair or restoration of the Property to the satisfaction of Mortgagee, it is necessary for Mortgagor to use its own funds, and Mortgagor fails to do so, Mortgagee may at its option and election advance sums necessary to complete such repair and restoration.  Any such advance by Mortgagee shall become part of the Indebtedness Hereby Secured, shall bear interest at the Mortgage Loan rate specified in the Note from the date of the advance and shall be due and payable to Mortgagee upon demand.

Section 5.05 <u>Release of Amounts in the Insurance or Condemnation Funds.</u>  If, at Mortgagee's election, insurance or condemnation proceeds are released for repair or restoration of the Property pursuant to this Article V, such proceeds shall be disbursed by the Mortgagee from time to time as work progresses, provided that prior to any disbursement, Mortgagee is in receipt of proof, satisfactory to it, that the work has been completed, and further provided that the Mortgagee is in receipt of proof, reasonably satisfactory to it, that there are no outstanding mechanics' liens or materialmen's liens and that all charged costs and expenses incurred with respect to work completed have been paid for in full.  Mortgagor shall provide Mortgagee with such contractors' and subcontractors' affidavits and materialmen's certificates and such other evidences of payment as Mortgagee may require in connection with the disbursement of such

-18-


under any other of the Loan Documents, when and as due, or any default under the Building Loan Agreement, and the continuation of any such default for a period of thirty (30) days or more following written notice given to Mortgagor by Mortgagee specifying the default, provided that (i) a default in payment as provided in Section 4.06 hereof shall not require notice to Mortgagor, but shall be treated in accordance with clause (a) above and (ii) a default in failing to maintain any insurance required hereunder or under any other of the Loan Documents shall not require notice to Mortgagor, but shall be treated as an Event of Default immediately upon such default.

(c)  Any default in the observance or performance of any other of the covenants or agreements contained herein or under the Note, or any other of the Loan Documents if such default shall continue for thirty (30) days after written notice given to Mortgagor by Mortgagee specifying the default.

(d)  Mortgagor having filed a voluntary petition or having been adjudicated as bankrupt or insolvent after the filing of a voluntary petition, or having filed any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors; or seeking or consenting to or acquiescing in the appointment of any trustee, receiver or liquidator of Mortgagor or of all or any part of its properties or assets, or making any general assignment for the benefit of creditors, or admitting in writing its inability to pay its debts generally as they become due.

(e)  A court of competent jurisdiction having entered an order, judgment or decree approving a petition filed against Mortgagor seeking any reorganization, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, and such order, judgment or decree remaining unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the first date of entry thereof; or any trustee, receiver or liquidator of Mortgagor or of all or any part of its properties or assets, being appointed without the consent or acquiescence of Mortgagor and such appointment remaining unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive).

-20-



(f) For the purpose of clauses (d) or (e) above, any refer-
ence to Mortgagor shall be deemed to separately apply
to any general partner.

(g) Final judgment for the payment of money in excess of
Twenty Thousand Dollars ($20,000.00) having been ren-
dered against Mortgagor and such judgment not being
discharged or bonded to Mortgagee's satisfaction, or a
stay of execution thereon not procured, within thirty
(30) days after the date of entry thereof, or if there-
after such judgment remains unsatisfied for a period of
fifteen (15) days after the termination of any such
stay of execution.

Section 6.02 Acceleration. If any Event of Default shall
occur, then, at the option and election of Mortgagee, the entire
Indebtedness Hereby Secured shall become due, payable and col-
lectible at once and thereafter as Mortgagee may elect, regard-
less of the date of maturity and without notice, and may be
enforced and recovered at once.

Section 6.03 Remedies. If any Event of Default shall have
occurred, Mortgagee may elect to exercise or cause to be exer-
cised any or all of the remedies provided for in this Mortgage
and at law, including without limitation the following:

(a) Mortgagee shall be entitled to apply at any time prior
to or during any foreclosure suit to the court having
jurisdiction thereof for the appointment of a receiver
of all or a portion of the Property, and all rents,
incomes, profits, issues, and revenues thereof, derived
from any source. It is hereby expressly covenanted and
agreed that thereupon the court shall forthwith appoint
such receiver with the usual powers and duties of
receivers in similar cases, and the appointment shall
be made by the court as a matter of Mortgagee's strict
right, and without reference to the adequacy or inade-
quacy of the value of the Property hereby mortgaged, or
to the solvency or insolvency of the Mortgagor or any
other party defendant to such suit. The Mortgagor
hereby specifically waives the right to object to the
appointment of a receiver as described herein and
hereby expressly consents that such appointment shall
be made as an admitted equity and is Mortgagee's abso-
lute right, and that the appointment may be done with-
out notice to the Mortgagor. Mortgagor further con-
sents to the appointment of the Mortgagee or any of-
ficer or employee of Mortgagee as receiver.

(b) Mortgagee may foreclose this Mortgage and sell the
Property as an entirety or in separate parcels or

-21-



parts, under the judgment or decree of a court or courts of competent jurisdiction.

(c)  Mortgagee may, either after foreclosure and/or the appointment of a receiver as hereinbefore provided, or without same, proceed by suit or suits at law or equity or by any other appropriate remedy to protect and enforce the rights of Mortgagee whether for the specific performance of any covenant or agreement contained herein, or in aid of the execution of any power herein granted, or to foreclose the Mortgage, or to sell, as an entirety or in several parcels or parts, the Property under the judgment or decree of a court or courts of competent jurisdiction, or otherwise.  Mortgagee's remedies shall not be exhausted by any single exercise thereof, and may be pursued concurrently, consecutively and repeatedly until all of the Indebtedness Hereby Secured is paid in full.

(d)  Mortgagee shall apply the proceeds of sale, or foreclosure of the Property, first, to the payment of reasonable attorney's fees and expenses prior to, and at trial and on appeal, if any; secondly, to discharge all taxes, levies and assessments, with costs and interest if they have priority over the lien of the Mortgage, including the due pro rata portion thereof for the current year; thirdly , to discharge in the order of their priority, if any, the remaining debts and obligations secured by the Mortgage and any liens of record inferior to the Mortgage under which sale is made, with lawful interest; and, fourthly, the residue of the proceeds shall be paid to Mortgagor, or its assigns; provided, however, that Mortgagee as to such residue shall not be bound by any inheritance, devise, conveyance, assignment or lien of or upon Mortgagor's equity, without actual notice thereof prior to distribution.

(e)  In the case of any receivership, insolvency, bankruptcy, liquidation or other judicial proceeding relative to Mortgagor or affecting the Property, Mortgagee may pursue and perfect claims against the Property arising under this Mortgage and the Note.

(f)  Mortgagee may take such other and further actions as may be required and permitted, it being understood that no remedy under this Mortgage is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or as now or hereinafter existing at law or in equity or by statute.

-22-

Section 6.04 <u>Reinstatement</u>. If, after the occurrence of an Event of Default, Mortgagor cures the default prior to completion of foreclosure, receivership or other proceedings pursuant to Section 6.03 above, and Mortgagor pays to Mortgagee all reasonable and actual expenses incurred by Mortgagee in connection with the foreclosure, receivership or other proceedings, including, without limitation, all reasonable attorney's fees and expenses prior to and at trial and on appeal, advertising costs, Mortgagee's fees, auctioneer's commissions and payments or reimbursements made by Mortgagee on account of the GNMA Securities (in the event that Mortgagee has issued mortgage-backed securities as described in Section 4.10), the Mortgage Loan shall with the prior written consent of the Mortgagee in accordance with the Coinsurance Contract be reinstated as if an Event of Default had not occurred.

Section 6.05 <u>Mortgagee's Role at Sale</u>. Upon any foreclosure sale, Mortgagee may bid and become the purchaser of the Property, and upon compliance with the terms of sale, may hold, retain and possess and dispose of such Property in its own absolute right, without further accountability.

Section 6.06 <u>Waiver by Mortgagor</u>. Mortgagor agrees, to the extent that it may lawfully so agree, that in the case of an Event of Default on its part, as aforesaid, neither Mortgagor nor anyone claiming through or under it shall, or will, set up, seek or claim to take advantage of any exemption laws (whether under the State Constitution, Homestead laws, or otherwise), or laws providing for any appraisement, apportionment, valuation, stay, extension or redemption now or hereafter in force in the locality where the Property is situated, in order to prevent or hinder the enforcement or foreclosure of the Mortgage, or the final or absolute putting into possession thereof, immediately after such foreclosure, of the purchaser thereof. Mortgagor, for itself and all who claim through or under it, hereby waives, to the fullest extent that it may lawfully do so, the benefit of all such laws and any and all right to have the estate comprising the security intended to be created hereby marshalled upon any foreclosure of the lien hereof and agrees that Mortgagee or any court having jurisdiction to foreclose such lien may sell the Property as an entirety or in parts, and further hereby waives any right to assert in any bankruptcy proceeding in which Mortgagor is debtor: (i) that the Property should be valued by any method other than liquidation value where Mortgagee seeks "adequate protection" or relief from the automatic stay under the Bankruptcy Code, (ii) that Mortgagee's security interest in cash proceeds of the Property, including rent payments received, is limited to any amount less than the actual amount of such proceeds deposited in deposit accounts of Mortgagor and commingled with other funds, (iii) use of cash proceeds of the Property, including rent payments received, without consent of Mortgagee unless authorized by the bankruptcy court in which such bank-

-23-



ruptcy is pending, after notice and a hearing, and (iv) use of cash proceeds of the Property, including rent payments received, unless Mortgagee is granted an additional substitute lien in other property to the extent such cash proceeds are used by Mortgagor.   If an Event of Default occurs, Mortgagor shall pay all costs and expenses including reasonable attorneys' fees at and prior to trial and on appeal, incurred in the collection of the Note, the Indebtedness Hereby Secured or obligations under this Mortgage.

Section 6.07 No Waiver, Etc.  Any waiver of any Event of Default hereunder shall not extend to or affect any subsequent or other then existing Event of Default, nor shall it impair any rights or remedies relating to any such subsequent or other then existing Event of Default.  No delay or omission of Mortgagee to exercise any right or power accruing upon any Event of Default shall impair any such right or power or shall be construed to be a waiver of any such Event of Default or an acquiescence therein, or shall extend to any subsequent Event of Default, and every power and remedy given by the Mortgage may be exercised, from time to time, and as often as may be deemed expedient by Mortgagee.

Section 6.08 Costs and Expenses.  In any suit to foreclose the lien of this Mortgage, there shall be allowed and included as additional indebtedness in the decree of sale, to the extent permitted by law, all expenditures and expenses that may be paid or incurred by or on behalf of Mortgagee, for reasonable attorneys' fees, court costs, appraisers' fees, sheriff's fees, documentary and expert evidence, stenographers' charges, publication costs and such other costs and expenses as Mortgagee may deem reasonably necessary to prosecute such suit or to evidence to bidders at any sale that may be had pursuant to such decree the true condition of the title to or the value of the Property.   To the extent permitted by law, all such expenditures and expenses shall become payable on demand with interest thereon from the date of expenditure at the interest rate charged under the Note.

In addition, Mortgagor shall pay to Mortgagee promptly upon demand all expenditures and expenses incurred by Mortgagee in connection with (a) any proceeding to which Mortgagee shall be a party, either as plaintiff, claimant or defendant, by reason of this Mortgage or any of the indebtedness; (b) preparations for the commencement of any suit for foreclosure after accrual of such right to foreclosure, whether or not actually commenced; and/or (c) preparation for the defense of or investigation of any threatened suit, claim or proceeding that might affect the Property, whether or not actually commenced.

Section 6.09 Certain Remedies Subject to HUD Approval. Before Mortgagee may accelerate and declare the Indebtedness Hereby Secured due and payable for an Event of Default hereunder

-24-



arising from (i) a default under the HUD Regulatory Agreement,
(ii) a violation of the restrictions on transfers under Section
4.05, (iii) a failure to make monthly payments to the Replacement
Reserve Fund, (iv) a violation of Section 4.13 as to sole busi-
ness of Borrower being operation of the Property, or (v) a fail-
ure to provide financial statements under Section 4.16; Mortgagee
shall obtain the prior written consent of the Secretary of HUD.

### ARTICLE VII

### MISCELLANEOUS PROVISIONS

Section 7.01 <u>Assignment of Mortgage.</u> Subject to any appli-
cable requirements of HUD, Mortgagee may sell, assign, transfer,
convey, pledge or encumber the Note or all or any part of its
interest, rights and obligations thereunder or under this Mort-
gage to one or more persons or parties, and Mortgagor hereby
consents to any such sale, assignment, transfer, conveyance,
pledge or encumbrance and agrees upon the request of Mortgagee or
its assignee to execute and deliver promptly any instrument
confirming Mortgagor's consent as effectuating, as necessary,
such sale, assignment, transfer, conveyance, pledge or encum-
brance.

Section 7.02 <u>Notices.</u> Any notice, demand or request re-
quired or permitted hereunder to be given to Mortgagor or Mort-
gagee shall be sufficiently given if in writing and personally
delivered or mailed by registered or certified first class mail,
postage prepaid, addressed to:

Mortgagor:     Oakland Lakes, Ltd.
               4750 Ashwood Drive, Suite 300
               Cincinnati, Ohio  45241
               Attention: William O. Brisben

Mortgagee:     Cincinnati Mortgage Corporation
               2368 Victory Parkway, Suite 210
               Cincinnati, Ohio  45206
               Attention: Robert W. Jorden

or at such other address as either Mortgagor or Mortgagee may
have furnished to the other in writing, and shall be deemed to be
given when mailed.

-25-

Section 7.03 <u>Security Agreement</u>.

(a)  In addition to being a mortgage, this Mortgage is intended to be a security agreement pursuant to the Uniform Commercial Code for any of the items specified herein as part of the Property, which under applicable law may be subject to a security interest pursuant to the Uniform Commercial Code, and Mortgagor hereby grants Mortgagee a security interest in said items, and all substitutions, replacements, replacement parts, additions, repairs, repair parts, accessions and accessories incorporated therein or affixed thereto in which Mortgagor acquires an interest, and the proceeds thereof (sometimes referred to herein as the "Collateral"). Mortgagor agrees that Mortgagee may file this Mortgage, or a reproduction thereof, in the real estate records or other appropriate index, as a financing statement for any of the items specified above as part of the Property. Any reproduction of this Mortgage or of any other security agreement or financing statement shall be sufficient as a financing statement. In addition, Mortgagor agrees to execute and deliver to Mortgagee, upon Mortgagee's request, any financing statements, as well as extensions, renewals and amendments thereof, and reproductions of this Mortgage in such form as Mortgagee may require, to perfect or protect the security interest hereby created with respect to the Collateral, or to more fully describe the Collateral. Mortgagor shall pay all costs of and expenses (including reasonable expenses of counsel and filing fees) relative to the preparation and filing of any financing statements and any extensions, renewals, amendments and releases thereof, and shall pay all reasonable costs and expenses of any record searches for financing statements Mortgagee may reasonably require. Mortgagor hereby irrevocably authorizes Mortgagee as Mortgagor's agent and attorney in fact to execute and file any UCC Financing Statements and similar instruments signed by Mortgagee alone.

(b)  Upon Mortgagor's breach of any covenant or agreement of Mortgagor contained in this Mortgage, including the covenants to pay when due all sums secured by this Mortgage, Mortgagee shall have the remedies of a secured party under the Uniform Commercial Code and, at Mortgagee's option, may also invoke all other remedies as provided herein. In exercising any of said remedies, Mortgagee may proceed against the items of real property and any items of personal property specified herein as part of the Property separately or together and in any order whatsoever, without in any way affecting the availability of Mortgagee's remedies under the Uniform Commercial Code or any of the other remedies provided herein. Mortgagor hereby agrees that a notice sent to it at least ten (10) days before the time of any intended public sale or of the time after which any private sale or other disposition of the Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. Until any default hereunder, Mortgagor may have possession of the Collater-

-26-



al and use it in any lawful manner not inconsistent with this Section 7.03 and not inconsistent with any policy of insurance thereon.

(c) Mortgagor will, at its own cost and expense, keep the Collateral in as good and substantial repair as the same is in at this date, or as the same is when acquired, reasonable wear and tear excepted, making replacements when and where necessary.

(d) At its option, Mortgagee may discharge taxes, liens or secured interests or other encumbrances at any time levied or placed on the Collateral, may pay for insurance on the Collateral and may pay for the maintenance and preservation of the Collateral. Mortgagor agrees to reimburse Mortgagee on demand for any payment made, or any expense incurred by Mortgagee pursuant to the foregoing authorization together with interest thereon at the interest rate set forth in the Note.

(e) Mortgagor will not later than thirty (30) days after acquiring additional Collateral promptly advise Mortgagee of the type, description, nature, cost and quantity thereof. Should Mortgagor at any time fail to advise Mortgagee of any such acquisition, such failure shall not affect, diminish, modify or limit Mortgagee's lien or security interest in all Collateral which the Mortgagor may acquire from time to time hereafter.

Section 7.04 Governing Law. The Note and this Mortgage are made and delivered in and shall be governed by and construed in accordance with the laws of the State. In the event that any provision of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provisions, and to this end the provisions of the Mortgage and the Note are declared to be severable.

Section 7.05 Nondiscrimination. Mortgagor covenants and agrees that so long as this Mortgage and the Note secured hereby are coinsured by HUD, or held under the provisions of the Housing Act, it will not execute or file for record any instrument which imposes a restriction upon the sale or occupancy of the Property on the basis of race, color or creed. Upon any violation of this undertaking, Mortgagee may, at its option, and with the prior written consent of HUD, declare the Indebtedness Hereby Secured immediately due and payable.

Section 7.06 Amendments. This Mortgage may be amended or modified only by a written instrument executed by Mortgagor and Mortgagee and any purported modification or amendment hereof, by whatever means, which is not in strict conformance with the foregoing shall be null and void and absolutely ineffective.



Section 7.07 <u>Third Parties</u>. The Mortgagor and Mortgagee intend that there are no third party beneficiaries to this Mortgage except for HUD.

Section 7.08 <u>Rights of Mortgagee</u>. Mortgagee may, at its option, do all things provided or permitted to be done by a mortgagee under the laws of the State of Florida for the protection of Mortgagee's interest in the property.

Section 7.09 <u>Mortgagor's Obligations Unconditional</u>. The obligations of the Mortgagor to make payments of any and all amounts due hereunder shall be absolute and unconditional without defense or set-off by reason of any default whatsoever, including, without limitation a default by any tenant of the Property under any lease with the Mortgagor or under any other agreement or instrument between the Mortgagee and the Mortgagor, and such payments to Mortgagee shall not be decreased, abated, postponed or delayed for any reason whatsoever, including without limitation, any acts or circumstances that may constitute failure of consideration, destruction of or damage to the Property, the taking of any part of the Property, commercial frustration of purpose, failure of any person to perform or observe any agreement, whether expressed or implied, or any duty, liability or obligation arising out of or connected with this Mortgage, the Note, or any of the other Loan Documents, or failure of any tenant of the Property to pay the fees, rentals or other charges owed to Mortgagor, and irrespective of whether or not any such tenant of the Property receives either partial or total reimbursement as a credit against such payment, it being the intention of the parties that the payments required of the Mortgagor hereunder will be paid in full when due without any delay or diminution whatsoever.

Section 7.10 <u>Additional Limitations on Mortgagee's Duties</u>. Mortgagor hereby acknowledges and agrees that the undertaking of Mortgagee under this Mortgage is limited as follows:

Except as specifically appointed herein as attorney-in-fact to act on behalf of Mortgagor, Mortgagee shall not act in any way as the agent for or trustee of Mortgagor. Mortgagee does not intend to act in any way for or on behalf of Mortgagor with respect to disbursement of the proceeds of the indebtedness secured hereby. Its purpose in making the requirements set forth herein and in the Building Loan Agreement and Loan Documents is that of a lender protecting the priority of its mortgage and the value of its security. Mortgagee assumes no responsibility for the completion of any improvements erected or to be erected upon the Property, the payment of bills or any other details in connection with the Property, any plans and specifications in connection with the Property, or Mortgagor's relations with any contractors. This Mortgage is not to be construed by Mortgagor or anyone furnishing labor, materials, or any other work or

-28-



product for improving the Property as an agreement upon the part
of Mortgagee to assure anyone that he will be paid for furnishing
such labor, materials or any other work or product; any such
person must look entirely to Mortgagor for such payment. Mort-
gagee assumes no responsibility to Mortgagor for the architec-
tural or structural soundness of any improvements on or to be
erected upon the Property or for the approval of any plans and
specifications in connection therewith or for any improvements as
finally completed.

Section 7.11 <u>Mortgage; Building Loan Agreement; Construc-
tion.</u>

(a)  It is agreed between the Mortgagor and Mortgagee that
this Mortgage is intended to secure the balance of obligatory
loan advances to be made after the Mortgage is delivered to the
Recorder for record, said loan advances to be made pursuant to
the provisions of the Building Loan Agreement.  The maximum
amount of unpaid balances of such loan advances in the aggregate
and exclusive of interest accrued thereon is Twenty Two Million
Seven Hundred Seventy Nine Thousand Six Hundred and no/100 Dol-
lars ($22,779,600.00).  The Mortgagor understands and agrees that
Mortgagor may not reborrow amounts of principal under the Note
which have already been repaid without the prior written consent
of HUD.  In addition to the foregoing advances, the Mortgage
shall secure unpaid balances of advances made by Mortgagee to
protect said premises including but not limited to advances to
pay taxes, assessments, and all other amounts which Mortgagor
herein agrees to pay for the protection of the premises and any
and all other advances that may be made by Mortgagee under this
Mortgage, together with interest thereon.

(b)  Mortgagor warrants and represents that the funds to be
advanced herein are to be used in the construction of certain
improvements on the lands herein described, in accordance with
the Building Loan Agreement which Building Loan Agreement (except
such part or parts thereof as may be inconsistent herewith) is
incorporated herein by reference to the same extent and effect as
if fully set forth and made a part of this Mortgage; and if the
construction of the improvements to be made pursuant to said
Building Loan Agreement shall not be carried on with reasonable
diligence, or shall be discontinued at any time for any reason,
the Mortgagee, after due notice to the Mortgagor or any subse-
quent owner, is hereby invested with full and complete authority
to enter upon the Property, employ watchmen to protect such
improvements from depredation or injury and to preserve and
protect the personal property therein, and to continue any and
all outstanding contracts for the erection and completion of said
building or buildings, to make and enter into any contracts and
and obligations wherever necessary, either in its own name or in
the name of the Mortgagor, and to pay and discharge all debts,
obligations, and liabilities incurred thereby.  All such sums so

-29-





advanced by the Mortgagee (exclusive of advances of the principal of the indebtedness secured hereby) shall be added to the principal of the indebtedness secured hereby and shall be secured by this Mortgage and shall be due and payable on demand with interest at the rate specified in the Note. The principal sum and other charges provided for herein shall, at the option of the Mortgagee or holder of this Mortgage and the Note securing the same, become due and payable on the failure of the Mortgagor to keep and perform any of the covenants, conditions, and agreements of said Building Loan Agreement.

(c) This Mortgage secures an obligation incurred for the construction of improvements to the Property and, as such, is a "construction mortgage" as said term is used and defined under Article 9 of the Uniform Commercial Code as effective in the State.

Section 7.12 **Binding Effect.** All the terms, covenants and conditions of this Mortgage shall bind Mortgagor, its partners and their respective heirs, successors and assigns and shall inure to the benefit of and be available to the Mortgagee, its successors and assigns.

Section 7.13 **Interpretation; Time of the Essence.** All references to Mortgagor and Mortgagee shall be read in the singular or plural, and in the masculine, feminine or neuter gender, as the sense may require. Time is of the essence with respect to each and every obligation of Mortgagor under the Note, the Mortgage and the other Loan Documents.

Section 7.14 **Estoppel Certificate.** Mortgagor shall, within ten days of a written request from Mortgagee, furnish Mortgagee with a written statement, duly acknowledged, setting forth the sums secured by this Mortgage and such other information as Mortgagee may reasonably request.

Section 7.15 **Right to Inspect and/or Enter Property.** Mortgagee and its agents, representatives and employees are authorized subject to applicable state and federal laws and regulations, to enter at any reasonable time or times upon or in any part of the Property for the purpose of inspecting the same and for the purpose of performing any of the acts that Mortgagee is authorized to perform under the terms of this Mortgage.

PROVIDED ALWAYS that if Mortgagor shall (i) pay according to the tenor and effect thereof all principal and interest evidenced by the Note and any extensions, replacements, modifications or renewals thereof and (ii) pay and perform all obligations of this Mortgage, and all other security agreements, supplements and other instruments now or hereafter executed by Mortgagor for the purpose of further evidencing or securing all or any part of the indebtedness under or secured by this Mortgage, then this Mortgage shall be void; otherwise to remain in full force and effect.

-30-




IN WITNESS WHEREOF, the said Mortgagor has caused these presents to be signed in its name by its General Partner as of the date first above written.

WITNESS/ATTEST:

OAKLAND LAKES, LTD., a Florida limited partnership

*Charles (Benny J*

*Jennifer L. Favas*

By: _____
    William O. Brisben,
    General Partner

STATE OF OHIO          )
                       )  SS:
COUNTY OF HAMILTON     )

Before me, a Notary Public in and for said County, personally appeared William O. Brisben, to me known and known to me to be the person who, as General Partner of Oakland Lakes, Ltd., a Florida limited partnership, which executed the foregoing instrument, signed the same and acknowledged to me that he did so sign said instrument in the name and on behalf of said partnership, that the same is his free act and deed as such partner and the free act and deed of said partnership.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my official seal in said County _____ this __2nd__ day of October 1989.



This Instrument Prepared By:    Barrett N. ~~WHIPPLE HUNCH~~, Esq.
                                Strauss & ~~Troy, a Legal~~
                                   Professional Association
                                2100 Central Trust Center
                                201 East Fifth Street
                                Cincinnati, Ohio  45202-4186
                                (513) 621-2120

22459-77-S
Fla.
1/23/89

-31-

## EXHIBIT "A"

**PARCEL I:**

TRACT A OAKLAND LAKES, according to the Plat thereof, recorded in Plat
Book 111, Page 7, of the Public Records of Broward County, Florida.

- and -

**PARCEL II:**

TRACT B, OAKLAND LAKES, according to the Plat thereof, recorded in Plat
Book 111, Page 7, of the Public Records of Broward County, Florida.

- and -

**PARCEL III:**

A portion of the North one-half (N1/2) of the Southeast one-quarter (SE1/4) of
SECTION 20, TOWNSHIP 49 SOUTH, RANGE 42 EAST, being more particularly
described as follows:

Commencing at the Southeast corner of the said North one-half (N1/2) of the
Southeast one-quarter (SE1/4) of Section 20; thence South 89°07'10" West, along
the South line of the said North one-half (N1/2) of the Southeast one-quarter
(SE1/4), a distance of 498.42 feet, to the POINT OF BEGINNING of this
description, said point also being the Northeast corner of said Tract B; thence
continue South 89°07'10" West, along the last described course and the North
line of said Tract B and Tract "A", a distance of 1937.45 feet; thence
North 01°50'43" East, a distance of 25.03 feet; thence North 89°07'10" East,
along a line parallel with and 25.00 feet North of, as measured at right angles
to the South line of the North one-half (N1/2) of the Southeast one-quarter
(SE1/4) of Section 20, a distance of 1936.65 feet; thence South 00°00'00" East
along a northerly projection of the East line of said Tract B, a distance of
25.00 feet to the POINT OF BEGINNING.

- and -

**PARCEL IV:**

A parcel of land lying in the City of Oakland Park, Broward County, Florida,
being a portion of Tract G of "OAKLAND LAKES," according to the Plat
thereof, as recorded in Plat Book 111, at Page 7, of the Public Records of
Broward County, Florida, and being more particularly described as follows:

Commence at the Northeast corner of said Tract G; thence run S 89°05'55" W
along the North line of said Tract G for 113.19 feet to the Point of Beginning;
thence run South for 336.04 feet fo a point; thence run S 89°05'55" W for 30.03
feet to a point; thence run S 00°54'05" E for 1.07 feet to a point; thence run
N 84°03'31" W for 29.67 feet to a point; thence run N 00°54'05" W for 30.54 feet
to a point; thence run N 89°05'55" E for 35.00 feet to a point; thence run
South for 32.01 feet to a point; thence run N 89°05'55" E for 24.00 feet to a
point; thence run North for 335.04 feet to a Point of Intersection with said
North line of Tract G; thence run N 89°05'55" E along said North line of
Tract G for 1.00 foot to the Point of Beginning.

Said lands situate, lying and being in Broward County, Florida.



EXHIBIT __A__
(CONTINUED)

SAID PROPERTY ALSO BEING DESCRIBED AS:

DESCRIPTION:

A PORTION OF THE N½ OF THE SE¼ OF SECTION 20, TOWNSHIP 49 SOUTH, RANGE 42 EAST, TOGETHER WITH ALL OF TRACTS "A", "B" AND A PORTION OF TRACT "G", "OAKLAND LAKES", ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 111, PAGE 7 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, ALL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT "A"; THENCE N 89°07'10" E, ALONG THE NORTH LINE OF SAID TRACT "A", A DISTANCE OF 175.15 FEET; THENCE N 01°50'43" E, A DISTANCE OF 25.03 FEET; THENCE N 89°07'10" E, ALONG A LINE PARALLEL WITH AND 25.00 FEET NORTH OF, AS MEASURED AT RIGHT ANGLES TO THE SOUTH LINE OF THE NORTH ONE-HALF (N½) OF THE SOUTHEAST ONE-QUARTER (SE¼) OF SECTION 20, A DISTANCE OF 1936.65 FEET; THENCE S 00°00'00" E, ALONG A NORTHERLY PROJECTION OF THE EAST LINE OF SAID TRACT "B" AND THE EAST LINE OF SAID TRACT "B", A DISTANCE OF 999.87 FEET TO THE SOUTHEAST CORNER OF SAID TRACT "B"; THENCE S 89°05'55" W ALONG THE SOUTH LINE OF SAID TRACT "B", A DISTANCE OF 460.00 FEET TO THE NORTHEAST CORNER OF SAID TRACT "G"; THENCE CONTINUE S 89°05'55" W ALONG THE NORTH LINE OF SAID TRACT "G" AND THE SOUTH LINE OF SAID TRACT "A", A DISTANCE OF 113.19 FEET; THENCE RUN SOUTH FOR 336.04 FEET TO A POINT; THENCE RUN S 89°05'55" W FOR 30.03 FEET TO A POINT; THENCE RUN S 00°54'05" E FOR 1.07 FEET TO A POINT; THENCE RUN N 84°03'31" W FOR 29.67 FEET TO A POINT; THE LAST THREE DESCRIBED COURSES BEING ALONG THE NORTH RIGHT OF WAY LINE OF OAKLAND PARK BOULEVARD AS RECORDED IN OFFICIAL RECORD BOOK 13439, PAGE 730 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA; THENCE RUN N 00°54'05" W FOR 30.54 FEET TO A POINT; THENCE RUN N 89°05'55" E FOR 35.00 FEET TO A POINT; THENCE RUN SOUTH FOR 32.01 FEET TO A POINT; THENCE RUN N 89°05'55" E FOR 24.00 FEET TO A POINT; THENCE RUN NORTH FOR 335.04 FEET TO A POINT OF INTERSECTION WITH SAID NORTH LINE OF TRACT "G" AND THE SOUTH LINE OF SAID TRACT "A"; THENCE S 89°05'55" W, ALONG THE SOUTH LINE OF SAID TRACT "A", A DISTANCE OF 1512.81 FEET TO THE SOUTHWEST CORNER OF SAID TRACT "A"; THENCE N 00°19'45" W, A DISTANCE OF 7.34 FEET; THENCE N 02°49'07" W, A DISTANCE OF 328.61 FEET; THENCE N 00°19'45" W, A DISTANCE OF 640.02 FEET TO THE POINT OF BEGINNING, THE LAST THREE DESCRIBED COURSES BEING ALONG THE WEST LINE OF SAID TRACT "A" AND THE EAST RIGHT OF WAY LINE OF N.W. 27TH AVENUE AS SHOWN ON SAID "OAKLAND LAKES" PLAT.

SAID LANDS SITUATE, LYING AND BEING IN THE CITY OF OAKLAND PARK, BROWARD COUNTY, FLORIDA, CONTAINING 2,103,817 SQUARE FEET OR 48.297 ACRES, MORE OR LESS.





## EXHIBIT B

As used herein, the term "Debtor" shall mean and include the terms "Mortgagor," "Grantor" and "Borrower"; and the term "Creditor" shall mean and include the terms "Lender," "Beneficiary" and "Secured Party."

This Exhibit B refers to the following, which may be located on the premises of, relate to, or be used in connection with, the acquisition, construction, rehabilitation, reconstruction, equipping, repair, ownership, management, or operation of a multifamily apartment complex known as Lakes of Casablanca (the "Project), FHA Project No. 066-36650 located in the County of Broward, State of Florida, in which Debtor has an interest now or hereafter existing or acquired:

1.   All materials now owned or hereafter acquired by the Debtor and intended for construction, rehabilitation, reconstruction, alteration and/or repair of any building, structure or improvement now or hereafter erected or placed on the Real Estate, all of which materials shall be deemed to be included within the Project immediately upon the delivery thereof to the Project.

2.   All of the walks, fences, shrubbery, driveways, fixtures, machinery, apparatus, equipment, fittings, chattels and other goods and other personal property of every kind and description whatsoever, now owned or hereafter acquired by the Debtor and attached to or contained in and used or usable in connection with any present or future operation of the Project, including, by way of example rather than of limitation, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, motors, furnaces, compressors and transformers; all generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment and fixtures, fans and switchboards; all telephone equipment; all piping, tubing, plumbing equipment and fixtures; all heating, refrigeration, air conditioning, cooling, ventilating, sprinkling, water, power and communications equipment, systems and apparatus, all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture installed or to be installed or used or usable in the operation of any part of the Project or facilities erected or to be erected in or upon the Real Estate; and every renewal or replacement thereof or articles in substitution therefor, whether or not the same are now or hereafter attached to the

-1-




Real Estate in any manner; all except for any right, title or interest therein owned by any tenant (it being agreed by the Debtor and Secured Party that all personal property owned by the Debtor and placed by it on the Real Estate shall, so far as permitted by law, be deemed to be affixed to the Real Estate, appropriated to its use, and covered by the Mortgage and/or any Financing Statements, as applicable).

3.    All of the Debtor's right, title and interest in and to any and all judgments, awards of damages (including but not limited to severance and consequential damages), payments, proceeds, settlements or other compensation (collectively, the "Awards") heretofore or hereafter made, including interest thereon, and the right to receive the same, as a result of, in connection with, or in lieu of (i) any taking of the Property or any part thereof by the exercise of the power of condemnation or eminent domain, or the police power, (ii) any change or alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Property or any part thereof (including but not limited to destruction or decrease in value by fire or other casualty), all of which Awards, rights thereto and shares therein are hereby assigned to the Secured Party, who is hereby authorized to collect and receive the proceeds thereof and to give property receipts and acquittances therefor and to apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the indebtedness secured hereby.

4.    All of the Debtor's right, title and interest in any and all payments, proceeds, settlements or other compensation heretofore or hereafter made, including any interest thereon, and the right to receive the same from any and all insurance policies covering the Property or any portion thereof, or any of the other property described herein.

5.    The interest of the Debtor in all of the rents, royalties, issues, profits, revenues, income and other benefits of the Property, or arising from the use or enjoyment of all or any portion thereof, or from any lease or agreement pertaining thereto, and all right, title and interest of the Debtor in and to, and remedies under, all contract rights, accounts receivable and general intangibles arising out of or in connection with any and all leases and subleases of the Property, or any part thereof, and of the other property described herein, or any part thereof, both now in existence or hereafter entered into, together with all proceeds (cash and non-cash) thereof; and including, without limitation, all cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder.

6.    All of the Debtor's rights, options, powers and privileges in and to (but not the Debtor's obligations and burdens under) any construction contract, architectural and engineering

-2-



agreements and management contracts pertaining to the construction, development, ownership, equipping and management of the Property and all of the Debtor's right, title and interest in and to (but not the Debtor's obligations and burdens under) all architectural, engineering and similar plans, specifications, drawings, reports, surveys, plats, permits and the like, contracts for construction, operation and maintenance of, or provision of services to, the Property or any of the other property described herein, and all sewer taps and allocations, agreements for utilities, bonds and the like, all relating to the Property.

7.     All of the records and books of account now or here-after maintained by or on behalf of Mortgagor in connection with the Project.

8.     All names now or hereafter used in connection with the Project and the goodwill associated therewith.

9.     All intangible personal property, accounts, licenses, permits, instruments, contract rights, and chattel paper of the Debtor, including but not limited to cash; accounts receivable; bank accounts; certificates of deposit; securities; promissory notes, rents; rights (if any) to amounts held in escrow; insurance proceeds; condemnation rights; deposits judgments, liens and causes of action; warranties and guarantees.

10.     The interest of the Debtor in any cash escrow fund and in any and all funds, securities, instruments, documents and other property which are at any time paid to, deposited with, under the control of, or in the possession of the Secured Party, or any of its agents, branches, affiliates, correspondents or others acting on its behalf, which rights shall be in addition to any right of set-off or right of lien that the Secured Party may otherwise enjoy under applicable law, regardless of whether the same arose out of or relates in any way, whether directly or indirectly, to the Project located upon the Real Estate.

11.     The interest of the Debtor in any and all funds created or established and held by any trustee pursuant to any indenture of trust or similar instrument authorizing the issuance of bonds or notes for the purpose of financing the Project located upon the Real Estate.

12.     Any collateral provided by the Debtor for its account to each and every issuer of a letter of credit, subject to the prior claim of the issuer of any such letter of credit to such collateral.

13.     All inventory, including raw materials, components, work-in-process, finished merchandise and packing and shipping materials.

-3-




14.    Proceeds, products, returns, additions, accessions and substitutions of and to any or all of the above.

15.    Any of the above arising or acquired by the Debtor or to which the Debtor may have a legal or beneficial interest in on the date hereof and at any time in the future.

16.    Any of the above which may become fixtures by virtue of attachment to the Real Estate.

22450-77-S

-4-

## EXHIBIT C

(1)  Taxes for the year 1989, and subsequent years which are not yet due and payable.

(2)  Easements and other matters as shown on the Plat of OAKLAND LAKES, recorded in Plat Book 111, Page 7; as modified by Resolution of the City of Oakland Park No. R-88-187 recorded January 18, 1989 in Official Records Book 16120, Page 58 and Resolution of Broward County recorded July 5, 1989 in Official Records Book 16571, Page 993, which Resolutions abandon 20 feet utility and drainage easement over the north 20 feet of Tracts A and B and further modified by that certain Agreement to Place Notation on Plat recorded in Official Records Book 16312, Page 566.

(3)  Agreement with the CITY OF OAKLAND PARK, recorded September 23, 1981 in Official Records Book 9809, Page 661.

(4)  Utility Easement(s) granted to the CITY OF OAKLAND PARK recorded July 16, 1987 in Official Records Book 14625, Page 291.

(5)  Roadway Easement recorded in Official Records Book 13439, Page 773, as set forth in Resolution NO. R-86-44 recorded May 30, 1986 in Official Records Book 13439, Page 730.

(6)  Master Development Plan for Oakland Lakes recorded September 7, 1988 in Official Records Book 15760, Page 500.

(7)  Agreement Governing Land Development for Oakland Lakes Planned Unit Development recorded September 7, 1988 in Official Records Book 15760, Page 494.

AS TO PARCELS I AND III ONLY:

(8)    Drainage Easements recorded February 16, 1989 in Official Records Book 16203, Page 524; in Official Records Book 16203, Page 528; in Official Records Book 16203, Page 532; and in Official Records Book 16203, Page 536.

AS TO PARCEL III ONLY:

(9)  Reservations for fill and minerals together with an easement for purposes of dredging and removing fill and minerals, in favor of HPAV, a Florida general partnership, set forth in that certain Warranty Deed dated June 15, 1981, recorded September 21, 1981 in Official Records Book 9804, Page 807.



(10)  Easement recorded September 17, 1971 in Official Records Book 4612, Page 887.

(11)  Riparian and littoral rights are neith guaranteed nor insured.

(12)  Submerged land is not insured.

AS TO PARCEL IV ONLY:

(13)  Private Easement Agreement for access recorded March 18, 1982 in Official Records Book 10087, Page 363.

(14)  Resolution No. R-86-21 recorded in Official Records Book 13436, Page 558, which resolution abandons existing non-vehicular access lines on the aforesaid Plat of Oakland Lakes along southerly boundary of Tract G thereto.

(15)  Road Contribution Agreement recorded in Official Records Book 9802, Page 677.

AS TO PARCEL I ONLY:

(16)  Utility Easement in favor of the City of Oakland Park recorded in Official Records Book 14625, Page 295.

RECORDED IN THE OFFICIAL RECORDS BOOK
OF BROWARD COUNTY, FLORIDA
L. A. HESTER
COUNTY ADMINISTRATOR






OAKLAND LAKES, LTD.
SECOND AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP

THIS SECOND AMENDED AND RESTATED AGREEMENT OF LIMITED
PARTNERSHIP AGREEMENT made and entered into as of the 29th day
of June, 1990, by and among William O. Brisben, Robert E.
Schuler and W. O. Brisben Companies, Inc., an Ohio corporation,
(hereinafter referred to as the "General Partners"), Gray
Construction Co., Inc., a Texas corporation (the "Special
Limited Partner"), and Oakland Park (Florida) Limited
Partnership, an Ontario limited partnership (the "Investor
Limited Partner"), William O. Brisben and the Brisben Family
Trust (collectively the "Limited Partners"), all of said
parties being hereinafter sometimes referred to collectively as
the "Partners" and individually as a "Partner", is intended to
evidence the mutual agreement of the General Partners, Special
Limited Partner and Limited Partners under the provisions of
Chapter 620 of the Florida Statutes for the purposes and upon
the terms and conditions hereinafter set forth.

WHEREAS, the Partnership (hereinafter defined) was formed
among some of the Partners pursuant to an Agreement of Limited
Partnership dated as of February 1, 1989, and continued
pursuant to an Amended and Restated Agreement of Limited
Partnership dated as of September 18, 1989.

WHEREAS, the Partners desire to admit the Investor Limited
Partner into the Partnership as a Limited Partner pursuant to
the terms hereof, William O. Brisben, in his capacity as the
Original Limited Partner, will be withdrawn upon such
admission, William O. Brisben will hold some of his remaining
interest as a Limited Partner, and the Special Limited Partner
will withdraw as hereinafter provided.

NOW, THEREFORE, intending to be legally bound hereby, the
parties hereto agree as follows:



INTRODUCTION

DEFINED TERMS

Capitalized words and phrases used in this Agreement have the following meanings:

(a)  "Act" means the Florida Revised Uniform Limited Partnership Act, as set forth in Chapter 620 of the Florida Statutes, as amended from time to time (or any corresponding provisions of succeeding law).

(b)  "Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i)  Credit to such Capital Account any amounts which such Partner is obligated to restore pursuant to Section 4.5 or is deemed to be obligated to restore pursuant to the penultimate sentence of Regulations Section 1.704-1(b)(4)(iv)(f); and

(ii)  Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations with the approval of the Investor Limited Partner.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(c)  "Affiliate" means, with respect to any Person, any other Person which either directly or indirectly controls, is controlled by or is under common control with such Person. For this purpose, control means ownership of fifty percent or more of the outstanding equity interest of such Person.

(d)  "Agreement" or "Partnership Agreement" means this Second Amended and Restated Agreement of Limited Partnership, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder," refer to this Agreement as a whole, unless the context otherwise requires.

(e)  "Auditors" means Spaeth & Batterberry, Certified Public Accountants, Cincinnati, Ohio, U.S.A., or any other firm of independent certified public accountants selected by the General Partner with the approval of the Investor Limited Partner

(f)  "Capital Account" means, with respect to any Partner, the Capital Account maintained for such Partner at any time and from time to time in accordance with the following provisions:

- 2 -

(h) "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

(i) "Coinsuring Lender" means Cincinnati Mortgage Corporation, an Ohio corporation, which will be making the Mortgage Loan to the Partnership.

(j) "Construction Contract" means any construction contract entered into by the Partnership, providing for the construction of the Project.

(k) "Contributed Equity" means the capital contribution to the Partnership in the amount of $1,852,000 made and to be made by the Investor Limited Partner.

(l) "Cumulative Priority Return" means, at any time, an aggregate amount equal to 12 - 1/2% per year (compounded annually on January 1 of each year) on the Contributed Equity from September 1, 1991 to the relevant time, pro-rated for any partial year and adjusted at any time for payments to the Investor Limited Partner on account of the Contributed Equity as a result of a distribution or distributions to the Investor Limited Partner of Net Cash Receipts in excess of the cumulative Preferred Return or any Net Proceeds of Refinancing or New Proceeds of Sale in excess of the cumulative Preferred Return.

(m) "Depreciation" means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis unless the Partners agree to some other reasonable amount of Depreciation for an asset.

(n) "Development Group" means the General Partners and their associates and affiliates holding an aggregate 50% interest in the Partnership after admission of the Investor Limited Partner, namely W.O. Brisben Companies, Inc. as to a 0.1% interest, William O. Brisben (in his capacity as a General Partner) as to a 5.0% interest (inclusive of the interest of the Special Limited Partner), Gray Construction Co., Inc., the Special Limited Partner, as to a 0.1% interest, the Brisben Family Trust as to a 10.0% interest, Robert E. Schuler as to a 4.9% interest, and William O. Brisben (in his capacity as a Limited Partner) as to a 30% interest (a 5.0% interest may be transferred to Eileen R. Brisben, as a Limited Partner, out of such 30% interest at any time) and includes any and all successors and permitted assigns of such persons in respect of their interests in the Partnership.

(o)  "General Partner" means any Person who (i) is referred to as such in the first paragraph of this Agreement or is designated as such in Exhibit A hereto or has become a General Partner pursuant to the terms of this Agreement, in any case in such Person's capacity as a General Partner of the Partnership, and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.  "General Partners" means all such Persons.

(p)  "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)  The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the Partnership;

(ii)  The Gross Asset Value of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partners, as of the following times:  (a) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership Assets as consideration for a reduction in an interest in the Partnership if the General Partners reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership; and (c) the liquidation of the Partnership within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g);

(iii)  The Gross Asset Value of any Partnership asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution; and

(iv)  The Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted to the extent the General Partners determine that an adjustment is not necessary or appropriate in connection with a transaction that would otherwise result in an adjustment.

If the Gross Asset Value of an asset has been determined or adjusted, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

- 5 -

(q)  "HUD" means the United States Department of Housing and Urban Development, including the Federal Housing Administration ("FHA") and any other instrumentality thereof.

(r)  "Immediate Family" means, with respect to any Person, his spouse, parents, parents-in-law, descendants, nephews, nieces, brothers, sisters, brothers-in-law, sisters-in-law, children-in-law, and grandchildren-in-law or a trust for the primary benefit of any such immediate family or a custodianship for such minor immediate family.

(s)  "Limited Partner" means any Person, including the Investor Limited Partner, (i) whose name is set forth in the first paragraph of this Agreement as a Limited Partner or is designated as such in Exhibit A hereto or who has been admitted as an additional or Substitute Limited Partner pursuant to the terms of this Agreement, in such Person's capacity as a Limited Partner of the Partnership, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement. "Limited Partners" means all such Persons.

(t)  "Limited Partnership Interests" means the Partnership Interests of the Limited Partners in the Partnership as determined from time to time and reflected herein and on Exhibit A.

(u)  "Managing General Partner" means W.O. Brisben Companies, Inc., as hereinafter provided in Article 3.

(v)  "Mortgage Loan" means any indebtedness of the Partnership evidenced by a promissory note ("Note") of the Partnership to the Coinsured Lender and secured by a mortgage ("Mortgage") creating a lien on Partnership Assets, including the Property, as the same may be amended from time to time.

(w)  "Net Cash Receipts" means the gross cash proceeds from Partnership operations (exclusive of any cash described in (x) and (y) below) less the portion thereof used to pay or establish reasonable reserves for all Partnership expenses, debt service payments, capital improvements, and any necessary replacements and contingencies, all as determined by the Managing General Partner. "Net Cash Receipts" shall not be reduced by depreciation, amortization, cost recovery deductions or similar allowances.

(x)  "Net Proceeds of Refinancing" means the net proceeds received by the Partnership on any upward refinancing of all of the Partnership Assets or any substantial part thereof after deduction of all costs associated with the refinancing and any existing financing on the Partnership Assets and repayment of any advances under any Optional Deficiency Loans or Optional LP Deficiency Loans.

(y) "Net Proceeds of Sale" means the net proceeds received by the Partnership from the sale of all or any substantial part of the Partnership Assets after deduction of all costs associated with the sale, any mortgage financing then outstanding on Partnership Assets and all other obligations of the Partnership including repayment of any Optional Deficiency Loans or Optional LP Deficiency Loans.

(z) "Nonrecourse Deductions" has the meaning set forth in Section 1.704-1(b)(4)(iv)(b) of the Regulations.  The amount of Nonrecourse Deductions for a Partnership fiscal year equals the net increase, if any, in the amount of Partnership Minimum Gain during that fiscal year, determined according to the provisions of Section 1.704-1(b)(4)(iv)(b) of the Regulations.

(aa) "Optional Deficiency Loans" means any loans advanced to the Partnership from time to time by any Partner or Partners of the Development Group to cover any deficiencies in Net Cash Receipts excluding any funds advanced by the Managing General Partner or any of the Development Group to the Partnership pursuant to any contractual obligation to advance money to the Partnership.

(bb) "Optional LP Deficiency Loans" means any additional funds advanced to the Partnership from time to time by the Investor Limited Partner to cover any deficiencies in Net Cash Receipts, excluding, however, the Contributed Equity amount.

(cc) "Ordinary Resolution" of the Investor Limited Partner means:

      (i) a resolution passed by its Partners holding, in the aggregate, more than 50% of the aggregate number of votes held by those Partners who, being entitled to do so, vote in person or by proxy at a duly convened meeting of its Partners or any adjournment thereof; or

      (ii) a written resolution in one or more counterparts consented to in writing by its Partners holding, in the aggregate, more than 50% of the aggregate number of votes held by those Partners who are entitled to vote.

(dd) "Partners" means all General Partners and all Limited Partners, where no distinction is required by the context in which the term is used herein.  "Partner" means any one of the Partners.

        (iii)  In the event the Gross Asset Value of any Partnership Asset is adjusted, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such Asset for purposes of computing Profits or Losses;

        (iv)  Gain or loss resulting from any disposition of Partnership Assets with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

        (v)  In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period; and

        (vi)  Notwithstanding any other provision herein, any items which are specially allocated shall not be taken into account in computing Profits or Losses.

        (kk)  "Project" means the Property and the buildings and other improvements constructed thereon pursuant to any Construction Contract.

        (ll)  "Property" means the property described in the instruments securing the Mortgage Loan and more particularly described in Exhibit B attached hereto.

        (mm)  "Recourse Liabilities" means those liabilities of the Partnership that are not taken into account for purposes of determining Partnership Minimum Gain.

        (nn)  "Refinancing" means a borrowing on the security of the Partnership Assets which does not constitute a current obligation, where such borrowing is advanced after full advance of the Mortgage Loan and includes any renewal, replacement, supplementary or additional financing.

        (oo)  "Regulations" means the Treasury Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

        (pp)  "Sale" means the sale or other disposition of all or substantially all of the Partnership Assets by the Partnership.

        (qq)  "Special Resolution" of the Investor Limited Partner means:

     (i)    a resolution passed by its Partners holding, in the aggregate, not less than 66-2/3% of the aggregate number of votes held by those Partners who, being entitled to do so, vote in person or by proxy at a duly convened meeting of its Partners or any adjournment thereof; or

    (ii)    a written resolution in one or more counterparts consented to in writing by its Partners holding, in the aggregate, not less than 66-2/3% of the aggregate number of votes held by those Partners who are entitled to vote.

(rr)  "Subordinated Return" means a distribution payable by the Partnership to the Development Group in any given year equal to the amount distributed in that year by the Partnership on account of the Preferred Return in respect of that fiscal year, which entitlement will only be payable in the event that the distribution for the Preferred Return for that year and any unpaid deficiency from previous years' Preferred Returns have been fully paid in that fiscal year, and then only to the extent of any Net Cash Receipts available for such purpose.

(ss)  "Substitute Limited Partner" means any Person admitted to the Partnership as a Limited Partner pursuant to Article 5 hereof.

(tt)  "Syndication Expenses" means all expenditures classified as syndication expenses pursuant to Section 1.709-2(b) of the Regulations.  Syndication Expenses shall be taken into account under this Agreement at the time they would be taken into account under the Partnership's method of accounting if they were deductible expenses.

(uu)  "U.S. Prime Rate" means, at any time during any month, the annual rate of interest declared to the Managing General Partner by its bankers in Florida as the prime rate of interest charged by such bank to its most creditworthy commercial customers for short-term unsecured loans in U.S. funds payable on demand.

# ARTICLE 1

## NAME AND PURPOSES

Section 1.1  <u>Formation</u>.  The parties hereby form and continue a limited partnership pursuant to the Uniform Limited Partnership Act of the State of Florida, Chapter 620 of the Florida Statutes.

- 10 -

Section 1.2  <u>Name and Office</u>.  The Partnership shall be conducted under the name of Oakland Lakes, Ltd.  The Partnership's registered agent and also the agent of the Partnership for service of process is Wilson C. Atkinson, Esq., whose address is c/o Atkinson, Jenne, Stone & Cohen, 1946 Tyler Street, Hollywood, Florida 33022-2088.  The record-keeping office in Florida of the Partnership is c/o W. O. Brisben Companies, Inc., 1451 West Cypress Creek Road, Suite 300, Ft. Lauderdale, Florida 33309.

Section 1.3  <u>Purposes and Powers</u>.

(a)  The purposes of the Partnership and the business to be carried on and the objectives to be effected by it are:

(1)  To acquire and purchase the Property and to construct, own, develop, maintain and operate the Project.

(2)  To enter into, perform and carry out contracts of any kind necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Partnership.

(3)  To acquire any property, real or personal, in fee or under lease, or any rights therein or appurtenant thereto, necessary for the construction and operation of the Project.

(4)  To borrow money, and to issue evidence of indebtedness and to secure the same by mortgage, deed of trust, pledge or other lien, in furtherance of any or all of the purposes of the Partnership, provided that each such borrowing shall be permitted hereby.

(5)  To carry on any other activities necessary to, in connection with or incidental to the foregoing.

(b)  The Partnership shall not engage in any other business without the prior consent of all the Partners.

Section 1.4  <u>Term</u>.  The Partnership shall commence on the date upon which the Certificate of Limited Partnership is duly filed in the Florida Secretary of State's Office and shall continue in full effect until December 31, 2039, unless sooner dissolved and terminated as herein provided.

Section 1.5  <u>Limited Partners</u>.  The General Partners shall have the authority on behalf of the Partnership and each Partner (without notice and consent from any other Partner) to admit additional Limited Partners as provided in Article 2.

- 11 -

## ARTICLE 2

### CAPITAL CONTRIBUTIONS

Section 2.1  Capital.

(a)  The General Partners have contributed to the capital of the Partnership the aggregate sum of $100 plus interests in various commitments and agreements relating to the Project which interests have an agreed capital value of $0.00.

(b)  The Original Limited Partner and the Special Limited Partner have each contributed the sum of $50 to the capital of the Partnership.  The Limited Partners, other than the Investor Limited Partner, have contributed to the capital of the Partnership the aggregate sum of $600.

(c)  The Investor Limited Partner will acquire a 50% Limited Partnership Interest for an aggregate capital contribution (the "Contributed Equity") in an amount of $1,852,000, payable as follows:

$1,000,000 on or before June 30, 1990, $213,000 on or before September 30, 1990, $213,000 on or before December 31, 1990, $213,000 on or before March 31, 1991, and $213,000 on or before June 30, 1991.  The first installment of $213,000 shall also be conditioned on at least $12,000,000 having been then disbursed or advanced under the Mortgage Loan, the second installment of $213,000 shall also be conditioned on at least $15,000,000 having been then disbursed or advanced under the Mortgage  Loan, the third installment  of $213,000 shall also be conditioned on at least $18,000,000 having been then disbursed or advanced under the Mortgage Loan, and the final installment of $213,000 shall also be conditioned on at least $19,000,000 having been then disbursed or advanced under the Mortgage Loan.  The conditions for the payment of each of the last four installments shall be deemed satisfied upon receipt by the Investor Limited Partner of a certificate or certificates from the Coinsuring Lender that the applicable amounts of the Mortgage Loan have been disbursed or advanced, after which the Investor Limited Partner shall have five business days within which to pay each such installment.

At such time as the Investor Limited Partner makes each payment in accordance with this Agreement its capital account shall be credited with the amounts of such payments.  The amount of the capital contribution by each Partner and the interest in the Partnership represented by such contribution shall be set forth herein and opposite each Partner's name and address in Exhibit A attached hereto. Such capital contributions shall be used and applied by the Partnership as follows and in the order set forth:

(i)  To pay all costs, fees and expenses incurred or to be incurred by the Partnership in connection with the acquisition of the Property and the construction,development and rent-up of the Project which are in excess of total Mortgage Loan proceeds, including without limitation advances and loans made at any time and from time to time by one or more of the Partners in the Development Group with respect to such costs, fees and expenses, the General Partners representing that all loans and advances made by them to the Partnership were for uses related to the Project.

(ii) To the extent that the total development costs of the Project, including land, construction, equipment, financial and bond issue costs and pre-development costs through the date of substantial completion of construction of the Project (as defined in the Construction Contract between the Partnership and the Special Limited Partner), are determined at final endorsement of the Mortgage Loan to be less than $25,237,491, an amount equal to such difference shall, to the extent of any unused amount of the Contributed Equity, be paid to the Managing General Partner and William O. Brisben (as a General Partner) as an incentive fee.

Contemporaneously with its execution and delivery of this Agreement the Investor Limited Partner shall contribute to the capital of the Partnership the amount of $1,000,000.  The four remaining installments of $213,000 shall be evidenced by four promissory notes of the Investor Limited Partner payable to the Partnership.  Any promissory notes given to the Partnership by the Investor Limited Partner to evidence unpaid installments of the agreed capital contributions may be used by the Partnership and/or the General Partners as collateral for borrowings or other Partnership obligations.

(d)  In the event the Investor Limited Partner shall fail to make a scheduled payment under the terms of any promissory note or notes executed by the Investor Limited Partner when such shall become due, the Partnership after 30 days written notice to the Investor Limited Partner of such failure, may avail itself of any or all remedies at law or in equity which it may have to collect such payment.  In any event, the Investor Limited Partner shall not thereafter be entitled to exercise any of its rights, including any voting rights (which shall be exercised by the General Partners) nor to receive any allocations or distributions from the Partnership until the amount of such Investor Limited Partner's delinquent notes, plus interest at the U.S. Prime Rate plus 3% per annum from the date such payment became delinquent, is paid in full.  Any allocations and distributions so withheld shall belong to and shall be given to the General Partners.

(e)  The specific present capital contributions of all Partners are as set forth on Exhibit A hereto.

- 13 -

Section 2.2  <u>Additional Loans and Funds</u>.

(a)  <u>Completion Cost Funding</u>.  To the extent that the total
development costs of the Project, including land, construction,
equipment, financial and bond issue costs and pre-development
costs through the date of substantial completion of
construction of this Project are determined at final
endorsement of the Mortgage Loan to exceed $25,237,491, the
Managing General Partner and William O. Brisben, as a General
Partner, are jointly and severally obligated to make a capital
contribution or contributions to the Partnership in the amount
of such costs in excess of said $25,237,491.

(b) <u>Optional Deficiency Loans</u>.  In the event of any
deficiencies from time to time in operating revenues of the
Project, the Managing General Partner or any of its Affiliates
may, at its option, make Optional Deficiency Loans to the
Partnership, which loans will bear interest at the U.S. Prime
Rate plus 3% per annum.  Neither the Managing General Partner
nor any Affiliate has any obligation to make any Optional
Deficiency Loans other than in the event and to the extent that
the Managing General Partner is required to make loans to the
Partnership pursuant to its legal obligation as a General
Partner of the Partnership.  Repayments of any such Optional
Deficiency Loans will be made by the Partnership from time to
time from future Net Cash Receipts, proceeds of Refinancing or
proceeds of a Sale prior to any distributions to the Investor
Limited Partner except in the case of any Optional LP
Deficiency Loans which will be repaid pro rata with Optional
Deficiency Loans.

(c) <u>Optional LP Deficiency Loans</u>.  In the event of any
deficiencies from time to time in operating revenues of the
Project, the Investor Limited Partner may, at its option, make
Optional LP Deficiency Loans to the Partnership, which funding
will bear interest at the U.S. Prime Rate plus 3% per annum,
but which will not increase the base on which Preferred Returns
and Cumulative Priority Returns are calculated.  The Investor
Limited Partner does not have any obligation to make any
Optional LP Deficiency Loans.  Repayments of any such Optional
LP Deficiency Loans will be made by the Partnership from time
to time from future Net Cash Receipts, proceeds of Refinancing
or proceeds of a Sale pro rata with any Optional Deficiency
Loans outstanding at that time.

Section 2.3  <u>General Provisions</u>.

(a)  No Limited Partner, Investor Limited Partner or
Special Limited Partner shall be liable for any of the debts of
the Partnership or be required to contribute any capital or
lend any funds to the Partnership other than as expressly
provided in Section 2.1. No General Partner shall have any
personal liability for the repayment of the capital
contributions of any Limited Partner, except as provided to the
contrary in this Agreement.

(b)  No interest shall be paid on any capital contributed to the Partnership.

(c)  No Limited Partner, Investor Limited Partner or Special Limited Partner shall have the right to demand and receive property other than cash in return for his or its capital contribution.

Section 2.4  <u>Partnership Borrowings</u>.  In addition to the Mortgage Loan and advances made pursuant to Section 2.2 hereof, the Partnership may borrow sums for partnership purposes from any source, including any Partner, provided that such additional borrowing is not secured by any lien or other charge upon the assets of the Partnership, except any such borrowing maybe secured upon the promissory notes receivable from the Investor Limited Partner, and provided further that such loans shall bear interest at rates which are competitive with then market rates.  No Limited Partner shall have any personal liability with respect to any indebtedness of the Partnership for borrowed money, and each instrument evidencing any such indebtedness shall contain a provision to such effect.

Section 2.5  <u>Additional Partners; Additional Capital</u>.  The Managing General Partner may admit additional Limited Partners to the Partnership for the purpose of meeting additional capital needs of the Partnership, provided, however, that the Investor Limited Partner shall have the first right, to be exercised within 120 days of written notice from the Managing General Partner of such intent, to make such additional capital contributions which shall increase the initial amount of the Contributed Equity.  Any such additional capital contributions by third parties shall adjust the existing percentage Limited Partnership Interests of all Partners, in a manner acceptable both to the Development Group and to the Investor Limited Partner.

Section 2.6  <u>Withholding Tax Capital Contribution</u>.  In the event that the Partnership is required to remit to the Internal Revenue Service withholding taxes pursuant to Section 1446 of the Code with respect to a foreign Partner's allocable share of the Partnership's Profits at any time, such withholding taxes shall first be paid out of such Partner's allocable share of available Net Cash Receipts at such time, and thereafter each foreign Partner shall be required to make a capital contribution to the Partnership (a "Withholding Tax Capital Contribution") in an amount equal to such Partner's allocable share of the difference, if any, between:

(a)  the aggregate Section 1446 withholding taxes required to be remitted by the Partnership and

(b)  the Partner's allocable share of the Partnership's available Net Cash Receipts.

- 15 -

Under no circumstances shall Withholding Tax Capital Contributions accrue to the benefit of any third party and no third party may enforce the payment of such capital contribution by any such foreign Limited Partner.

Section 2.7  Code Sections 1441 and 1446 Withholding.  Any amounts required to be withheld by the Partnership pursuant to Sections 1441 and 1446 shall reduce any amounts otherwise to be distributed to such foreign Partners.

ARTICLE 3

RIGHTS, POWERS AND DUTIES OF PARTNERS

Section 3.1  Management of Partnership Business.  The General Partners shall have the sole right to manage the business of the Partnership.  The Managing General Partner shall direct and control the day-to-day operations and activities of the Project and the Partnership.  The General Partners shall use their best efforts to carry out the purposes, business and objectives of the Partnership referred to in Section 1.3, and shall devote to the Partnership business such time as shall be reasonably required for its welfare and success. The General Partners shall receive no compensation for their services as General Partners other than as may be provided in Section 2.1 and in Article 4 hereof.

Section 3.2  Powers of General Partners.  The General Partners shall have all necessary powers to carry out the purposes, business and objectives referred to in Section 1.3, and shall possess and enjoy all the rights and powers of Partners of a partnership without limited partners except as otherwise provided by Florida law and by this Agreement; provided, however, that the express written consent of the Investor Limited Partner, expressed by Special Resolution, but not the consent of any other Limited Partners, shall be required before the General Partners may (a) sell or exchange substantially all of the assets of the Partnership or (b) refinance any mortgage indebtedness which is a lien and encumbrance on the Project for an amount in excess of the aggregate amount of the Mortgage Loan, the capital contributions of the Partners (including the Contributed Equity), any outstanding Optional Deficiency Loans and Optional LP Deficiency Loans, any outstanding Preferred Return and any outstanding Cumulative Priority Return, the General Partners having the right to consummate any Refinancing for a lesser amount without obtaining any consent from any Limited Partner (including the Investor Limited Partner).  Unless otherwise provided in this Agreement, the consent of the General Partners shall be required to approve any matter with respect to which Limited Partners have any right of consent and/or approval hereunder.

Section 3.3  <u>Exercise of Rights and Powers by General Part-ners</u>.  The General Partners, if there is more than one, shall have proportional rights in the management of the Partnership business in accordance with the percentages set forth in Section 4.2.  Any one or more of such General Partners is and are authorized to enter into and execute any document or instrument for and on behalf of the Partnership.

Section 3.4  <u>Special Duties and Obligations of General Partners</u>.

(a)  In addition to their usual and customary duties and obligations the General Partners shall perform the following special duties and obligations:

(1)  The General Partners shall use their best efforts to cause the Partnership at all times to perform and comply substantially with the provisions of the Mortgage Loan.

(2)  The General Partners shall cause the Partnership at all times to maintain such insurance, in such amounts and against such risks as the General Partners deem advisable.

(3)  The General Partners shall:

(i)  make any decision relating to the design of the buildings (including but not limited to the facade) or the layout of the Project, provided, however, that any substantial and material change in such design shall also require the written consent of the Investor Limited Partner; and

(ii)  approve any deviation from the original Plans and Specifications of the Project.

In order to facilitate such activities, the General Partners shall meet periodically with the architects and any contractor for the Project.

(4)  Subject to any requirement by the mortgagee under the Mortgage Loan the General Partners shall supervise the proper establishment, maintenance and investment of any and all reserve funds, with a view to the required degree of safety as well as return on such invested funds.

(5)  The General Partners may employ such contractors as they deem appropriate in the construction of the Project and supervise such construction, and they may employ such agents as they deem appropriate in the management of the Project.

Section 3.5  <u>Liabilities of General Partners</u>.  In carrying out their duties hereunder, the General Partners shall not be liable to the Partnership or to any other Partner for any actions taken in good faith and reasonably believed to be in the best interests of the Partnership, or for errors of

- 17 -

judgment, neglect, omission or wrongdoing, but shall only be liable for willful misconduct, gross negligence, breach of their obligations under this Agreement or other breach of their fiduciary duties.

Section 3.6  <u>Reliance on Act of General Partners</u>.  No financial institution or any other person, firm or corporation dealing with the General Partners shall be required to ascertain whether they are acting in accordance with this Agreement, but such financial institution or such other person, firm or corporation shall be protected in relying solely upon the deed, transfer, or assurance of and the execution of such instrument or instruments by such General Partners.

Section 3.7  <u>Prohibitions with Respect of Limited Partners</u>.  No Limited Partner, including the Investor Limited Partner, shall have the right:

(a)  To take part in the control of the Partnership business or to sign for or to bind the Partnership, such power being vested in the General Partners;

(b)  To have his or its capital contribution repaid except to the extent provided in this Agreement;

(c)  To require partition of Partnership property or to compel any sale or appraisement of Partnership assets or sale of a deceased Partner's interests therein, notwithstanding any other provisions of Florida law to the contrary; or

(d)  To sell or assign his or its interest in the Partnership or to constitute the vendee or assignee thereunder a substituted Limited Partner, except as provided in Article 7 hereof.

Section 3.8  <u>Limited Partners</u>.  Neither the Partnership nor any Partner shall disclose the name of any Limited Partner to any person not a Partner, except (i) with the consent of such Limited Partner, or (ii) to comply with the provisions of this Agreement, or (iii) as may be required by applicable laws or governmental rules or regulations, or (iv) as the Investor Limited Partner may consider necessary or advisable for the purposes of raising capital.

Section 3.9  <u>Other Interests of Partners</u>.  Any of the Partners may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including, but not limited to, the real estate business in all its phases, which shall include, without limitation, ownership, operation, management, syndication and development of real property.  Neither the Partnership nor the other Partners shall have any rights in and to such independent ventures or the income or profits derived therefrom. The Partnership may employ or transact business with any person,

notwithstanding the fact that any Partner or member of his family may be one of, or may have an interest in or connection with, such persons and neither the Partnership nor the other Partners shall have any rights in or to any income or profits derived therefrom.

Section 3.10  <u>Original Limited Partner and Special Limited Partner</u>.  Upon the execution and delivery of this Agreement by all of the Partners, the Original Limited Partner shall be deemed withdrawn and his capital contribution returned to him. His share of profits, losses, capital and equity of the Partnership shall be deemed included in the interest of William O. Brisben in his capacity as a General Partner.  The Special Limited Partner shall be withdrawn and its capital contribution returned to it immediately after the consummation of final endorsement by the Coinsuring Lender and/or HUD of the Mortgage Loan.  Its share of profits, losses, capital and equity of the Partnership shall be deemed included in the interest of William O. Brisben in his capacity as a General Partner.  All Limited Partners, including the Investor Limited Partner, hereby consent to these withdrawals which shall in all respects be in accordance with the provisions of this Agreement.

Section 3.11  <u>Tax Matters Partner</u>.  The Managing General Partner shall be the Tax Matters Partner for purposes of Section 6231(a)(7) of the Code and shall have all of the authority granted by the Code to the Tax Matters Partner.

## ARTICLE 4

### ALLOCATIONS AND DISTRIBUTIONS

Section 4.1  <u>Special Allocations</u>.

(a)  Except as provided in Section 4.1(d) hereof, in the event any Partner who is not a General Partner unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Regulations, items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the regulations, the Adjusted Capital Account Deficit of such Partner as quickly as possible.

(b)  Except as provided in Section 4.1(d) hereof, in the event any Partner who is not a General Partner has an Adjusted Capital Account Deficit at the end of any Partnership fiscal year which is in excess of the sum of (i) the amount such Partner is obligated to restore and (ii) the amount such Partner is obligated to restore pursuant to the penultimate sentence of Regulations Section 1.704-1(b)(4)(iv)(f), each such Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible.

- 19 -

(c)  Notwithstanding any other provision of this Article 4, if there is a net decrease in Partnership Minimum Gain during any Partnership fiscal year, each Partner who would otherwise have an Adjusted Capital Account Deficit at the end of such year shall be specially allocated items of Partnership income and gain for such year (and, if necessary, subsequent years) in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible.  The items to be so allocated shall be determined in accordance with Section 1.704-1 (b)(4)(iv)(e) of the Regulations.  This Section 4.1(c) is intended to comply with the minimum gain chargeback requirement in such Section of the Regulations and shall be interpreted consistently therewith.

(d)  To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(e)  Syndication Expenses for any fiscal year or other period shall be specially allocated to the Partners in accordance with the percentages for sharing Losses set forth in Section 4.2(b)(2).

Section 4.2  <u>Allocation of Profits and Losses</u>.

(a)  <u>Profits</u>.  Except as provided in Section 4.1 hereof, Profits for any fiscal year shall be allocated in the following order and priority:

(1)  First, to the General Partners up to the amount of any Losses allocated pursuant to Section 4.2(c), and then to the Partners in the percentages set forth in Section 4.2(b)(2) until the cumulative Profits allocated pursuant to this Section 4.2(a)(1) are equal to the total Losses allocated pursuant to Section 4.2(b)(2) hereof for all prior periods.

(2)  Second, any remaining Profits shall be allocated in the following order of priority:

(A)  To the Investor Limited Partner until the cumulative Profits allocated pursuant to this Section 4.2(a)(2)(A) are equal to the amount of distributions made on account of the Preferred Return in such year for such year and for all prior periods, to the extent not previously allocated.

- 20 -

(B)  To the Development Group up to the amount of distributions made of the Subordinated Return in such year.

It is agreed that allocations under Sections 4.2(a)(2)(A) and 4.2(a)(2)(B) shall be deemed to be made simultaneously and pro rata.

(C)  In the event that Profits include taxable gain from a Sale, to the Investor Limited Partner up to the amount of distributions made of Cumulative Priority Return.

(D)  If Profits are allocated under (C) above, then to the Development Group up to the amount of distributions made to the Development Group pursuant to Section 4.6(b)(5).

(3)  Third, any remaining Profits shall be allocated as follows:

|  | Profits |
|---|---|
| General Partners: | |
| William O. Brisben | 5.0% |
| W. O. Brisben Companies, Inc. | 0.1% |
| Robert E. Schuler | 4.9% |
| (Including Special Limited Partner | 0.01%) |
| Limited Partners: | |
| Investor Limited Partner | 50.0% |
| William O. Brisben | 30.0% |
| The Brisben Family Trust | 10.0% |

(b)  Losses.  Except as otherwise provided in Section 4.1, Losses for any fiscal year shall be allocated in the following order and priority:

(1)  To the extent Profits have been allocated pursuant to Sections 4.1 or 4.2(a)(3) hereof for any prior period, Losses shall be allocated first to offset any Profits allocated pursuant to Section 4.2(a)(3) hereof, and then to offset Profits allocated under Section 4.1 hereof and until the cumulative Profits allocated pursuant to this Section 4.2(b)(1) are equal to the total Profits allocated pursuant to Sections 4.2(a)(3) and 4.1 for all prior periods.  For this purpose, Losses will be allocated in the same proportion as the Profits that the Losses offset were allocated.

(2)  Except as limited by Section 4.2(c), after Losses have been allocated in accordance with Section 4.2(b)(1), any remaining Losses shall be allocated in the following percentages:

Losses

```
General Partners:
     William O. Brisben .    .    .    .    5.0%
     W. O. Brisben Companies, Inc.  .    0.1%
     Robert E. Schuler  .    .    .    .    4.9%

(Including Special Limited Partner       0.01%)


Limited Partners:
     Investor Limited Partner    .    .    50.0%
     William O. Brisben .    .    .    .    30.0%
     The Brisben Family Trust    .    .    10.0%
```

(c)  The Losses allocated pursuant to Section 4.2(b) shall not exceed the maximum amount of Losses that can be so allocated without causing any Partner who is not a General Partner to have an Adjusted Capital Account Deficit at the end of any fiscal year.  Any Losses that are subject to the foregoing limitation will be allocated to the General Partners.

Section 4.3  Tax Allocations: Code Section 704(c).  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Gross Asset Value.

In the event the Gross Asset Value of any Partnership asset is adjusted, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the General Partners in any manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant to this Section 4.3 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Profits, Losses, other items or distributions pursuant to any other provision of this Agreement.

Section 4.4  Other Allocations Rules.

(a)  In the event additional Partners are admitted to the Partnership on different dates during any fiscal year, the Profits (or Losses) shall be allocated to the Partners in accordance with Code Section 706, using any convention permitted by law and selected by the General Partners.

(b)  For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly, or other basis, as determined by the General Partners using any permissible method under Code Section 706 and the Regulations thereunder.

(c)  Except as otherwise provided in this Agreement, all items of Partnership income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Partners in the same proportions as they share Profits or Losses, as the case may be, for the year.

(d)  The Partners are aware of the income tax consequences of the allocations made by this Article 4 and hereby agree to be bound by the provisions of this Article 4 in reporting their shares of Partnership income and loss for income tax purposes.

Section 4.5  <u>Obligation to Restore Deficits</u>.  Upon liquidation of the Partnership, any Partner with a deficit in its Capital Account will restore such deficit to the Partnership in a manner that comports with Section 1.704-1(b)(2)(<u>c</u>) of the Regulations provided, however, that no Limited Partner will be required to restore any deficit that exceeds the maximum amount the Limited Partner can be required to provide to the Partnership as a Capital Contribution as set forth in Section 2.2 hereof.

Section 4.6  <u>Distributions</u>.

(a)  Net Cash Receipts shall be distributed semi-annually by the Managing General Partner as follows and in the following order of priority:

(1)  To pay any outstanding balance (together with interest thereon) on any Optional Deficiency Loans and any Optional LP Capital Funding, pro rata.

(2)  To the Investor Limited Partner to pay the Preferred Return for the current or any applicable previous fiscal years, together with interest accrued thereon, if any.

(3)  To the Development Group to pay the Subordinated Return in an amount equal to the amount distributed in such year to the Investor Limited Partner on account of its Preferred Return in respect of the current fiscal year.

(4)  Pro rata 50% to the Investor Limited Partner and 50% to the Development Group.

(b)  Net Proceeds of Refinancing or Net Proceeds of Sale, as the case may be, will be distributed by the Partnership as follows and in the following order of priority:

- 23 -

(1)  To pay any outstanding balance (together with interest thereon) on any Optional Deficiency Loans and any Optional LP Capital Funding, pro rata.

(2)  To the Investor Limited Partner to complete payment of Preferred Returns for all periods up to and including the current fiscal year, together with interest accrued thereon, if any.

(3)  To the Investor Limited Partner up to the amount of any unpaid balance of the Contributed Equity.

(4)  To the Investor Limited Partner to pay the Cumulative Priority Return, net of any distributions from operations actually paid to the Investor Limited Partner prior to such date that are in excess of the Preferred Returns and any previous distributions actually paid to the Investor Limited Partner on account of the Cumulative Priority Return.

(5)  To the Development Group in an amount equal to the aggregate distributions made pursuant to Sections 4.6 (b) (3) and 4.6 (b) (4).

(6)  Pro rata 50% to the Investor Limited Partner and 50% to the Development Group.

Section 4.7  <u>Effect on Capital Accounts</u>.  All allocations of Profits and Losses, any special allocations of items and any distributions made to the Partners under or pursuant to Article 4 shall be credited or debited, as the case may be, to the respective Capital Accounts of the Partners receiving such allocations and/or distributions.

Section 4.8  <u>Distributions as Return of Capital</u>.

(a)  A distribution made to Partners under this Article and under Section 8.2(b) shall be deemed a "return of contribution" to the extent that the distribution to the Partners reduces their share of the fair value of the net assets of the Partnership below the value, as set forth in the certificate of limited partnership, of their contributions that had not been distributed to them.

(b)  No "return of contribution" shall be made to a Partner unless the distribution is made pursuant to either Section 4.6 or Section 8.2(b).

Section 4.9  <u>Development Group Allocations</u>.  Profits and Losses allocated and any distributions made to the Development Group pursuant to this Agreement shall be allocated and divided among the Partners comprising the Development Group in accordance with their respective partnership interests in the Partnership at the date or dates of such allocations and/or distributions as set forth herein and on Exhibit A hereto.

Section 4.10  <u>Calculations for Canadian Income Tax Purposes</u>.  In order to enable the Investor Limited Partner to calculate its taxable income or loss for Canadian income tax purposes, but without affecting in any way the calculations or allocations for United States federal or state income tax purposes, the Partnership shall as at the end of each fiscal year:

(a)    calculate any loss for Canadian income tax purposes and allocate same pursuant to Section 4.2(b)(2), or

(b)    calculate any taxable income for Canadian income tax purposes and allocate same on a cumulative basis:

(1)    pursuant to Section 4.2(a)(3) to the extent of any cumulative losses allocated pursuant to Section 4.10(a), and

(2)    thereafter, pursuant to Sections 4.2(a)(2) and (3).

## ARTICLE 5

### EVENTS OF WITHDRAWAL AND ASSIGNMENTS OF INTEREST OF GENERAL PARTNERS

Section 5.1  <u>General Restrictions</u>.  Except as herein otherwise provided, the General Partners may not assign, sell, pledge, encumber or otherwise transfer an interest in the Partnership, or any part thereof, and may not voluntarily withdraw or otherwise retire as General Partners without the prior consent of the Investor Limited Partner.

Section 5.2  <u>Procedure Following Event of Withdrawal</u>.  Upon the occurrence of an Event of Withdrawal, the General Partner concerned shall cease to be a member of the Partnership and the remaining Partners shall have the option to liquidate the Partnership interest of such General Partner or to convert such interest to that of an assignee.  The Partnership and all its Partners shall be notified of an Event of Withdrawal by the involved General Partner or its legal representative or by any remaining General Partner.

Section 5.3  <u>Exercise of Option</u>.  The remaining Partners shall exercise their option to liquidate the interest of a General Partner or to convert such interest to that of an assignee by serving notice upon the involved General Partner or the legal representative of such General Partner within ninety (90) days from the date it receives notification of the Event of Withdrawal.  If the remaining Partners choose to liquidate the interest of such General Partner, the purchase price to be paid by the remaining Partners for the interest shall be the value of such interest (determined as set forth in Article 7) as of the date of such notice, and shall be paid in cash at a closing to be held within 30 days of the determination of such value.

Section 5.4  <u>Continuation of Partnership</u>.  If the remaining Partners exercise one of the options set forth in Section 5.3, the Partnership shall not dissolve, wind up and terminate but its business shall be continued if there is a remaining General Partner or, if there is not a remaining General Partner, if the Limited Partners unanimously consent to the appointment of a new General Partner within ninety (90) days of the Event of Withdrawal.  If necessary, the interests of the Partners shall be adjusted appropriately to reflect the liquidation of the General Partner's interest and, if applicable, the admission of a new General Partner.  If the remaining Partners do not exercise their option to liquidate the interest of the General Partner but convert the interest of the General Partner to that of an assignee, the Partnership shall not dissolve, wind up and terminate but its business shall be continued if there is a remaining General Partner or, if there is no remaining General Partner, if the Limited Partners unanimously consent to the continuance of the Partnership and unanimously appoint a new General Partner within ninety (90) days of the Event of Withdrawal.

Section 5.5  <u>Termination</u>.  Upon the occurrence of an Event of Withdrawal at such time as the Partnership has a sole General Partner, the Partnership shall be dissolved, wound up and terminated unless all of the Limited Partners consent to the continuance of the Partnership as contemplated in Section 5.4.

Section 5.6  <u>Event of Withdrawal Defined</u>.  For purposes of this Agreement, the term "Event of Withdrawal" shall mean:

(a)  Any one of the following being done or permitted by the General Partner:

        (1)  making an assignment for the benefit of creditors;

        (2)  filing a voluntary petition in bankruptcy;

        (3)  being adjudicated bankrupt or insolvent;

        (4)  filing a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or rule;

        (5)  filing an answer or other pleading admitting or failing to contest the material allegations against it in any proceeding described in item (4), above; or

        (6)  seeking, consenting to or acquiescing in the appointment of a trustee, receiver, or liquidator for it or for all or any substantial part of its properties;

(b)  the death or adjudication of incompetency of a General Partner who is a natural person;

(c) the termination of the trust in the case of a General Partner that is trustee of the trust;

(d) the dissolution and commencement of the winding up of a separate partnership in the case of a General Partner that is a separate partnership;

(e) the filing of a certificate of dissolution, or the equivalent, or the revocation of its charter in the case of a corporate General Partner;

(f) the distribution by the fiduciary of an estate's entire interest in the Partnership in the case of a General Partner that is an estate; or

(g) the permitted withdrawal or retirement of a General Partner.

The commencement of a proceeding against a General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or rule without the consent to or acquiescence in the appointment of a trustee, receiver or liquidator by such General Partner will not be deemed to be an Event of Withdrawal and will not result in such General Partner ceasing to be a General Partner or otherwise dissolve the Partnership, provided that such proceeding is contested and continues to be contested by such General Partner.

Section 5.7  <u>Substitute Limited Partner</u>.  An assignee of all or any portion of a General Partner's interest in the Partnership shall be admitted as a Substitute Limited Partner only upon compliance with the following conditions:

(a) The assignee must deliver to the Partnership an executed counterpart of the instrument of transfer, which may be a conversion notice, satisfactory in substance and form to the General Partners that contains a statement of the assignee's desire to be admitted as a Substitute Limited Partner and the assignee's agreement to be bound by this Agreement.

(b) All of the General Partners and the Investor Limited Partner, in their sole discretion, consent to the admission of the assignee as a Substitute Limited Partner.

(c) The assigning General Partner and the assignee execute and acknowledge such instruments as the General Partners may deem necessary or desirable to effect such admission, and the assignee agrees to pay all expenses in connection with such admission.

- 27 -

Section 5.8 <u>Absolute Restrictions</u>.  Notwithstanding any other provision of this Agreement to the contrary, without the prior written consent of all Limited Partners a General Partner shall not voluntarily withdraw or otherwise retire as a General Partner of the Partnership and shall not transfer, assign, sell, give, pledge, alienate, encumber or otherwise dispose of all or any part of its Partnership interest, whether voluntarily or by operation of law, or at judicial sale or otherwise, if the effect of same would result in the dissolution of the Partnership or would cause such General Partner to cease to be a General Partner of the Partnership under the Act, except to the extent such dissolution and/or cessation are permitted or provided for by the provisions of this Article 5.

## ARTICLE 6

### ASSIGNMENT OF INTEREST OF LIMITED PARTNER

Section 6.1  <u>Assignment</u>.

(a)  The Partnership interest of a Limited Partner, including the Investor Limited Partner,  may be assigned only as permitted by the provisions of this Article 6.  Neither the Partnership nor any Partner shall be bound by any such assignment until a counterpart of the instrument of assignment, executed and acknowledged by the parties thereto, is delivered to the Partnership.

(b)  No assignee of all or part of the Partnership interest or any part thereof of any Limited Partner shall have the right to become a substitute or additional Limited Partner unless (i) his or its assignor has stated such intention in the instrument or assignment (ii) the General Partners have consented to such admission, the granting or denial of which consent shall be within the sole and absolute discretion of the General Partners, and (iii) the assignee has executed an instrument satisfactory in form and substance to the General Partners, whereby such assignee accepts and agrees to be bound by all the terms and provisions of this Agreement.  Notwithstanding the foregoing, the consent of the General Partners shall not be required if the assignee is a person who is otherwise a Partner. The substitution of a Limited Partner may be effected without the consent of any of the Limited Partners. The failure or refusal of the General Partners to consent to any such admission shall not affect the validity and effectiveness of any such instrument of assignment delivered to the Partnership as an assignment of the right to receive Partnership profits, losses or distributions with respect to the Partnership interest or part thereof transferred. At the time of admission of a substitute or additional Limited Partner, the Partnership may require the payment of a sum to reimburse it, or to provide

it with funds, for the payment of any reasonable expenses in connection with such admission, including the expenses of preparing an amendment to this Agreement and the expenses of preparing and filing an amendment to the Certificate of Limited Partnership of the Partnership.

(c) Without the consent of the General Partners, no part of the Partnership Interest of a Limited Partner may be assigned or transferred to a minor or incompetent but the consent of the General Partners shall not be required for any assignment or transfer in trust for the benefit of any member (including a minor or an incompetent) of such Limited Partner's Immediate Family.

Section 6.2  <u>Absolute Restrictions</u>.

(a) The assignment, sale, transfer or pledge of an interest by a Limited Partner to any person is prohibited, unless (i) the Partnership causes such interest to be registered under the Securities Act of 1933, as amended, (ii) counsel satisfactory to the General Partners has rendered to the Partnership an opinion that anu exemption from registration is available and that such transfer will not otherwise violate federal or state securities laws, or (iii) the General Partners consent to the assignment, sale, transfer or pledge.

(b) For a period of one (1) year from the date of its execution of this Agreement, the Investor Limited Partner shall not sell, assign or otherwise transfer its Limited Partnership interest within the boundaries of the United States of America or its territories or possessions, or to citizens, residents or nationals thereof, or to any institution organized, chartered or resident in the United States of America or its territories or possessions.

Section 6.3  <u>Capital Account Carryover</u>.  Upon the transfer, sale or other disposition of a Partner's interest, the capital account of such transferor Partner shall carry over and become the capital account of the transferee Partner and shall be adjusted to reflect any adjustments to the basis of Partnership assets that may result from such transfer.

Section 6.4  <u>Bankruptcy and Other Events</u>.  The Partnership shall not be dissolved, wound up and terminated upon the death, incapacity, dissolution, merger or bankruptcy of a Limited Partner.

Section 6.5  <u>Right of First Opportunity concerning Bankruptcy and Other Events</u>.  Within 30 days after the death, incapacity, dissolution, merger or bankruptcy of a Limited Partner, the Partnership is permitted to offer to acquire the entire interest of such Limited Partner for an amount equal to the value of the interest held by the Limited Partner determined in accordance with Article 7.  If the Partnership

- 29 -

does not exercise its right to make an offer, the other Partners will have an additional 120 days to make the same offer.  If one or more or all of the other Partners exercise their right to make offers and such Partners cannot agree on the proportions of such interest each will acquire, then they will acquire the interests in the same relative proportions that they share Profits.  Payment for such interest may be made in the manner described in Section 5.3.  If an offer is made by either the Partnership or one or more or all of the other Partners to acquire the entire interest in the Partnership held by such Limited Partner, the Limited Partner must accept the offer.

Section 6.6  <u>Withdrawal of Limited Partner</u>.  No Limited Partner may withdraw from the Partnership at any time, except as expressly provided in this Agreement.

Section 6.7  <u>Conversion to Limited Partner</u>.  An assignee (including an assignee of an interest formerly held by a General Partner) cannot be required to make any additional Capital Contributions to the Partnership without first being admitted as a Substitute Limited Partner.

Section 6.8  <u>Section 6050K</u>.  Upon the transfer or assignment of any Partnership Interest, including that of a General Partner, the assignor must provide to the Partnership the information set forth in Section 6050 K of the Code, and the Partnership shall furnish the required information to the Internal Revenue Service, the assignor and the assignee as required by such section.

Section 6.9  <u>Buy/Sell Arrangements; First Refusals</u>.  Notwithstanding any other provisions of this Agreement to the contrary, the Investor Limited Partner and the Development Group and each and every Partner that is a member thereof hereby agree as follows:

(a)  Each of the Investor Limited Partner and the Development Group has a right of first refusal to purchase the other's interest in the Partnership in the event of any bona fide offer therefor made by any third party, which on the same terms and conditions as are contained in such offer, right must be exercised within 120 days of notice of such offer.

(b)  Neither the Investor Limited Partner nor any member of the Development Group shall be entitled to pledge, hypothecate, mortgage or otherwise encumber its Partnership interest in the Partnership without the other's prior written consent.

(c)  Each of the Development Group and the Investor Limited Partner shall have the right to offer to purchase the other's 50% interest in the Partnership provided that the other party is given the option (to be exercised by written notice

— 30 —

within 120 days of receipt of such offer) to either agree to sell its Partnership interest for the price and on the terms and conditions provided in such offer or alternatively to purchase the offeror's 50% interest in the Partnership (a "Reversal") for the price and on the same terms and conditions contained in such offer, provided, however, that any offer to purchase the interest of the Investor Limited Partner (including pursuant to a Reversal of an offer by the Investor Limited Partner at a lower price) must be for a price not less than the aggregate of the Contributed Equity, any Optional LP Deficiency Loan (including accrued interest), any outstanding Preferred Return (including accrued interest) and any outstanding Cumulative Priority Return.

(d)  If either the Development Group or the member thereof or the Investor Limited Partner receives a bona fide offer acceptable to the recipient from an arm's length third party for the purchase of the entire Project, then such recipient can require the other Partner, after written notice of such offer, to agree (by written notice to be given within 120 days of receipt of notice of the offer) either to have the Partnership sell the Project to such third party or to purchase the recipient's 50% interest in the Partnership for the same price the recipient would have received on the sale to the third party and otherwise on the same terms and conditions contained in the offer, provided, however, that the net proceeds of sale of the Project, as applicable, must be sufficient to pay to the Investor Limited Partner the aggregate of the Contributed Equity, any Optional LP Deficiency Loans (including accrued interest), any outstanding Preferred Return (including accrued interest) and any outstanding Cumulative Priority Return.

(e)  The parties agree that the rights conferred in Sections 6.1, 6.9 (a), 6.9 (c) and 6.9 (d) may not be exercised or required to be exercised until after October 1, 1996.

ARTICLE 7

VALUE

Section 7.1 <u>Valuation of Interest</u>.  The "value" of a Partner's interest shall be such Partner's interest in the Partnership, determined from the books and records of the Partnership by the Auditors of the Partnership subject to the following adjustments to be made by such Auditors:

(a)  No allowance shall be made for goodwill, trade names or other similar intangible assets, except such which may have been specifically acquired by the Partnership with funds after the date of this Agreement, in which case such intangible assets shall be valued at their remaining unamortized cost.

- 31 -

(b)  All accounts payable shall be taken at their face amount, less discounts deductible therefrom, including any appraisal costs as set forth below, and all accounts or rents receivable shall be taken at their face amount, less a reasonable reserve for bad debts.

(c)  All real and tangible property or interests therein shall be appraised as herein provided, and the fair market value thereof, as determined by such appraisal (which shall be in writing), shall be used for purposes of determining "value." Within sixty (60) days of the event causing such appraisal, the selling or withdrawing Partner and the remaining Partner(s) shall agree on one appraiser; provided, however, that if they cannot agree on one appraiser, each side shall select one appraiser and the appraisers thus chosen will appoint a third appraiser.  The fair market value determined by the one appraiser if the parties have agreed on one appraiser, or, the average of the two closest fair market values determined by the three appraisers, shall be the fair market value of such property or property interests.

(d)  The value of the interest of the Partner shall be the amount the Partner would receive upon termination of the Partnership following a sale of all Partnership Assets at their values (as adjusted herein) as of the date of the sale or transfer of such interest.

(e)  The expense of the accounting and appraisal shall be borne by the selling or withdrawing Partner in the case of a sale, transfer or withdrawal due to assignments or other transfer of Partnership interest of such Partner and by the Partnership in the case of a sale due to the bankruptcy of a Partner.

(f)  Such determination (which shall be in writing), when made and delivered to the Partnership, shall be binding upon all concerned parties.

ARTICLE 8

DISSOLUTION AND TERMINATION OF THE PARTNERSHIP

Section 8.1  Events Causing Dissolution.  The Partnership shall dissolve, wind up and terminate upon the first to occur of the following:

(a)  The expiration of the term of the Partnership;

(b)  the occurrence of an Event of Withdrawal unless the business of the Partnership is continued as provided in Article 5;

(c)  the sale of all or substantially all of the assets of the Partnership and the collection and distribution of all proceeds (including interest on deferred payments) from such sale;

(d) upon the express written consent of all Partners.

Section 8.2 <u>Procedure on Termination</u>. Upon the occurrence of an event described in Section 8.1, the General Partners (or, if none, the person or persons required by law to carry out the winding up) shall proceed to liquidate and wind up the business of the Partnership. Upon 120 days' prior written notice to all of the Partners identifying the assets to be sold, the liquidating Partner or other required person may, in lieu of selling the Partnership Assets, convey undivided interests in the assets to the Partners or distribute the Assets in kind to the Partners. The Partnership Assets and the proceeds of any liquidation sale shall be applied and distributed at the closing of any sale in the following order of priority:

(a) To the payment of all debts and liabilities of the Partnership and all expenses of liquidation.

(b) To the setting up of such reserves as the liquidating Partner or other required person may deem necessary for any contingent liabilities of the Partnership. Any reserves shall be deposited with an attorney-at-law of the State of Florida, as escrowee, to be applied to the discharge of any contingent liabilities, and, at the expiration of whatever period the liquidating Partner or other required person may deem advisable, the balance shall be distributed as provided in clause (c) below.

(c) The balance, if any, shall be distributed to the Partners in accordance with their Capital Accounts after allocation of Profits, Losses, Gains and Liquidation Gains in accordance with Article 4 hereof.

Section 8.3 <u>Compliance With Timing Requirements of Regulations</u>. In the event the Partnership is "liquidated" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), (i) distributions shall be made to the Partners who have positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2), and (ii) if any Partner's Capital Account has a deficit balance (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which such liquidation occurs), such Partner shall contribute to the capital of the Partnership the amount necessary to restore such deficit balance to zero in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(3), provided, however, that no Limited Partner will be required to restore any deficit that exceeds the maximum amount the Limited Partner can be required to provide to the Partnership as a Capital Contribution as set forth in Article 2 hereof. In the discretion of the General Partners, a pro rata portion of the distributions that would otherwise be made to the Partners pursuant to the preceding sentence may be:

(a)  distributed to a trust established for the benefit of the Partners for the purposes of liquidating Partnership assets, collecting amounts owed to the Partnership, and paying any contingent or unforeseen liabilities or obligations of the Partnership or of the Partners arising out of or in connection with the Partnership.  The assets of any such trust shall be distributed to the Partners from time to time, in the reasonable discretion of the General Partners, in the same proportions as the amount distributed to such trust by the Partnership would otherwise have been distributed to the Partners pursuant to this Agreement; or

(b)  withheld to provide a reasonable reserve for Partnership liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Partnership, provided that such withheld amounts shall be distributed to the Partners as soon as practicable.

Section 8.4  <u>Rights of Partners</u>.  Except as otherwise provided in this Agreement, each Partner shall look solely to the assets of the Partnership for the return of its Capital Contribution and for any Partnership distributions to which it is entitled, shall have no right or power to demand or receive any distributions from the Partnership except as provided in Article 4 hereof, and shall have no right or power to demand or receive property other than cash from the Partnership.

ARTICLE 9

FISCAL MATTERS

Section 9.1  <u>Books and Records</u>.  The General Partners shall maintain full and accurate books of the Partnership at the Partnership's principal place of business, showing all receipts and expenditures, assets and liabilities, profits and losses, and all other records necessary for recording the Partnership's business and affairs, including those sufficient to record the allocations and distributions provided for in Article 4. The books of the Partnership shall be kept on an accrual basis. Each Partner and his duly authorized representatives shall at all times during regular business hours have access to and may inspect and copy any of such books and records.

Section 9.2  <u>Fiscal Year</u>.  The fiscal year of the Partnership shall be the calendar year unless otherwise required by Section 706 of the Code.

Section 9.3  <u>Reports</u>.  Annual statements showing the income and expenses of the Partnership for the fiscal year and the balance sheets thereof as of the end of such year shall be reported upon by the Auditors. The Partnership shall have an annual audit of its books by the Auditors.  Each Partner shall be furnished copies of such statements of income and expenses and of such audit, within seventy-five (75) days after the end

- 34 -

of each fiscal year of the Partnership. The Partnership, at its expense, shall also furnish to each Partner all necessary reports in sufficient detail to enable each Partner to prepare his tax return.  The Managing General Partner shall also cause the Partnership to provide to the Investor Limited Partner within 20 days after the last day of each such month unaudited monthly management/operating reports from the manager of the Project detailing the operations of the Project for the previous month.  The Partnership shall also furnish to any Partner, at such Partner's expense, such other reports on the Partnership's operations and condition as such Partner may reasonably request.

Section 9.4 <u>Bank Accounts and Investment of Funds</u>.  All funds of the Partnership shall be deposited in its name in such checking and savings accounts or time deposits or certificates of deposit as shall be designated by the General Partners from time to time.  Withdrawals therefrom shall be made upon such signature or signatures as the General Partners may designate.

Section 9.5 <u>Accounting Decisions</u>.  All decisions as to accounting matters, except as specifically provided to the contrary herein, shall be made by the General Partners in accordance with generally accepted accounting principles consistently applied.  Such decisions shall be acceptable to the Auditors, and the General Partners may rely upon the advice of the Auditors as to whether such decisions are in accordance with generally accepted accounting principles.

Section 9.6  <u>Federal Income Tax Elections</u>.

(a)  The Partnership shall elect to treat as an expense for Federal income tax purposes all amounts incurred for rent, real estate taxes, interest and other charges during or relating to the construction of the Project which may, in accordance with applicable law and regulations, be considered as expenses.

(b)  The Partnership shall, to the extent permitted by applicable statutes and regulations and upon obtaining any necessary approval of the Commissioner of Internal Revenue, elect to use such methods of accelerated depreciation on each depreciable unit of the assets of the Partnership as shall be most favorable to Limited Partners unless the General Partners determine, upon advice of the Auditors, that another method of depreciation will be more favorable to Limited Partners.

(c)  In the event of a transfer of all or part of the Partnership Interest of any Partner, the Partnership may elect pursuant to Section 754 of the Code (or corresponding provisions of future law) to adjust the basis of the assets of the Partnership.

ARTICLE 10

GENERAL PROVISIONS

Section 10.1 Notices. Except as otherwise provided in this Agreement, any and all notices, consents, waivers, requests, votes or other instruments or communications provided for under this Agreement shall be in writing, signed by the party giving the same and shall be deemed properly given only if hand-delivered, delivered by recognized overnight couriers, given or furnished by facsimile or other means of permanent visible communication, or sent by registered or certified mail, postage prepaid, return receipt requested, addressed: (a) in the case of the Partnership, to the Partnership at the principal place of business of the Partnership, (b) in the case of a General Partner, or any Limited Partner, to such Partner at his or its address set forth in Exhibit A hereto. Each Partner may, by notice to the Partnership, specify any other address for the receipt of such instruments or communications. Any such communication sent by telegram shall be properly given when received by the Person to whom it is sent.

Section 10.2 Indemnification and Liability of General Partners. The Partnership shall indemnify the General Partners against any claim or liability incurred by them in connection with the business of the Partnership. Neither the Partnership nor any Partner shall have any claim against the General Partners by reason of any acts or omissions that were performed in the good faith belief that they were acting within the scope of their authority under this Agreement and that such General Partners were not grossly negligent or guilty of misconduct with respect to such actions or omissions. Except as provided herein or required by law, no General Partner shall have any obligation or liability to any other Partner or to make any advance to, or contribution to the capital of, the Partnership. The right to indemnification provided in this Section 10.2 shall not extend to personal liability, if any, imposed on the General Partners under state or federal securities laws.

Section 10.3 Integration. This Agreement embodies the entire agreement and understanding among the Partners relating to the subject matter hereof, and supersedes all prior agreements and understandings relating to such subject matter.

Section 10.4 Applicable Law. This Agreement and the rights of the Partners shall be governed by and construed and enforced in accordance with the laws of the State of Florida.

Section 10.5 Counterparts. This Agreement may be executed in several counterparts and all so executed shall constitute one Agreement binding on all the parties hereto, notwithstanding that all the parties are not signatory to the original counterpart, except that no counterpart shall be authentic unless signed by a General Partner.

Section 10.6  <u>Separability</u>.  In case any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and any other application thereof shall not in any way be affected or impaired thereby.

Section 10.7  <u>Binding Effect</u>.  Except as herein otherwise provided to the contrary, this Agreement shall be binding upon, and inure to the benefit of, the Partners and their respective heirs, executors, administrators, successors and permitted assigns.

Section 10.8  <u>Agreement for Further Execution</u>.  At any time or times upon the request of the General Partners, the Limited Partners agree to sign and acknowledge the certificate required by Chapter 620 of the Florida Statutes, to sign and acknowledge any amendment to or cancellation of such certificate as required by law, to sign and acknowledge similar certificates or affidavits or certificates of fictitious firm name or the like (and any amendments or cancellations thereof) required by the laws of Florida, or any other jurisdiction in which the Partnership does, or proposes to do, business, and cause the filing of any of the same for record wherever such filing shall be required by law.  This Section 10.8 shall not prejudice or affect the rights of Limited Partners to approve certain amendments to the Agreement pursuant to Section 11.1.

Section 10.9  <u>Certificate of Limited Partnership</u>.  The General Partners are not required to deliver or mail a copy of the Partnership's Certificate of Limited Partnership and any amendments thereto to any of the Limited Partners, except the Investor Limited Partner.

## ARTICLE 11

### AMENDMENTS

Section 11.1  <u>Authority to Amend</u>.  Amendments to this Agreement shall require the approval of the General Partners and the approval of the Limited Partners holding 60% or more of the Limited Partnership Interests held by all cf the Limited Partners.

Section 11.2  <u>Notice of Amendments</u>.  A copy of any amendment to be approved by the Limited Partners pursuant to Section 11.1 shall be mailed in advance to the Limited Partners.

## ARTICLE 12

### REGISTRATION

Section 12.1  Federal.

All Limited Partners hereby represent and covenant that they are acquiring their interests solely for investment purposes and not with a view to the distribution or resale thereof.

All Limited Partners further represent and covenant that they are relying on their own professional tax, legal and other business advisors in making their decision to enter into and execute this Agreement.

Notwithstanding any statements contained in other Articles in this Agreement, no Limited Partnership Interest may be offered or sold and no transfer of such Limited Partnership Interest will be made either by the Partnership or the Partners unless:  (a) such interest is registered under the Securities Act of 1933, or (b) an opinion of counsel for the Partnership is obtained to the effect that registration is not necessary.

## ARTICLE 13

### DOCUMENTS AND ACKNOWLEDGMENT

Section 13.1  Acknowledgments.

(a)  Each of the Limited Partners and the Substitute Limited Partners signatory hereto, if any, acknowledges that prior to the date of execution of a counterpart of this Agreement, copies of any and all forms and statements filed with any applicable state division of securities or similar agency in connection with the sale of Limited Partnership Interests and all copies of any and all documents relating to this transaction have been and are available for inspection at the office of the Partnership or at the office of the Partnership's counsel.

(b)  Each of the parties hereto and each of the Substitute Limited Partners signatory hereto, if any, acknowledges that he has been advised of and hereby approves of the application of Partnership funds to pay all expenses incurred in connection with the formation of the Partnership and the sale of the Limited Partnership Interests, including, without limitation, legal fees, accounting fees, registration fees and filing and recording charges.

## ARTICLE 14

### POWER OF ATTORNEY

Section 14.1 <u>Power</u>. Except to the extent otherwise required by Florida law, each of the Limited Partners, including the Investor Limited Partner, irrevocably constitutes and appoints the General Partner, jointly and severally, with full power of substitution, his or its true and lawful attorneys in his or its name, place and stead to make, execute, swear to, acknowledge, deliver and file:

(a) Any certificates or other instruments which may be required to be filed by the Partnership under the laws of the State of Florida, or of any other state or jurisdiction in which the Partnership shall transact business or in which the General Partners shall deem it advisable to file;

(b) Any documents, certificates or other instruments, including, without limiting the generality of the foregoing, any and all amendments and modifications of this Agreement or the instruments described in Section 14.1(a) which may be required or deemed desirable by the General Partners to effectuate the provisions of any part of this Agreement, and, by way of extension and not in limitation, to do all such other things as shall be necessary to continue and to carry on the business of the Partnership; and

(c) All documents, certificates or other instruments which may be required to effectuate the dissolution and termination of the Partnership, to the extent such dissolution and termination is authorized hereby.

The power of attorney granted hereby shall not constitute a waiver of, or be used to avoid, the rights of the Limited Partners to approve certain amendments to this Agreement pursuant to Section 11.1 or be used in any other manner inconsistent either with Florida law or with the status of the Partnership as a limited partnership.

Section 14.2 <u>Survival of Power</u>. It is expressly intended by each of the Limited Partners that the foregoing power of attorney is coupled with an interest, is irrevocable and shall survive the death, incompetence, dissolution, adjudication of insanity, or disability of each such Limited Partner. The foregoing power of attorney shall survive the delivery of an assignment by any of the Limited Partners of his or its entire interest in the Partnership, except that where an assignee of such entire interest has become a substitute Limited Partner, then the foregoing power of attorney of the assignor Limited Partner shall survive the delivery of such assignment for the sole purpose of enabling the General Partners to execute, acknowledge and file any and all instruments necessary to effectuate such substitution.

## ARTICLE 15

### OTHER REQUIREMENTS
### AND INCORPORATIONS BY REFERENCE

Section 15.1    HUD and Coinsuring Lender Requirements.  The
Partnership is authorized to execute the Note and Mortgage in
order to obtain the Mortgage Loan to be coinsured by the
Coinsuring Lender and HUD and to execute a certain regulatory
agreement ("Regulatory Agreement") between the Partnership and
the Coinsuring Lender and such other documents as may be
required by the Coinsuring Lender and/or HUD in connection with
said Mortgage Loan.  Any incoming Partner, as a condition of
receiving an interest in the Partnership, shall agree to be
bound by the Note, Mortgage and Regulatory Agreement and other
documents required in connection with said Mortgage Loan and to
the same extent and on the same terms as the other Partners.
Upon any dissolution, no title or right to possession and
control of any of the Partnership's property, and no right to
collect the rents therefrom, shall pass to any person who is
not bound by the Regulatory Agreement in a manner satisfactory
to the Coinsuring Lender and HUD.  The provisions of the
Regulatory Agreement shall be controlling over any inconsistent
provisions of this Agreement or other agreements among the
Partners.  So long as the Coinsuring Lender and/or HUD or their
successors and assigns have any interest in the Mortgage Loan
or the Partnership property, this Agreement shall not be
amended so as to alter or delete this Section 15.1 without the
written consent of the Coinsuring Lender and HUD.

IN WITNESS WHEREOF, the parties have hereunto set their
hands as of the day and year first above written.

ORIGINAL LIMITED PARTNER:
(WITHDRAWN)

_____
William O. Brisben

GENERAL PARTNERS:

_____
William O. Brisben

SPECIAL LIMITED PARTNER:

GRAY CONSTRUCTION CO., INC.

By:_____
     David F. Gray
     Chairman

W. O. BRISBEN COMPANIES, INC.

By:_____
     William O. Brisben,
     President

_____
Robert E. Schuler

6593a

## EXHIBIT A TO AGREEMENT OF LIMITED PARTNERSHIP

### GENERAL PARTNERS

| Names of Partner | Partnership Admission Date | Class | Interest |
|---|---|---|---|
| William O. Brisben | 9/18/89 | General | 5.0% |
| W.O. Brisben Companies, Inc. | 9/18/89 | General | 0.1% |
| Robert E. Schuler | 6/29/90 | General | 4.9% |

Aggregate Cash Contribution:    $100 Cash

### LIMITED PARTNERS

| | Admission Date | Class | Interest |
|---|---|---|---|
| Gray Construction Co., Inc. | 9/18/89 Contribution: $50 Cash | Special Limited | 0.01% * |
| Brisben Family Trust | 9/18/89 Contribution $500 Cash | Limited | 10% |
| William O. Brisben | 9/18/89 Contribution $100 Cash | Limited | 30% |
| Oakland Park (Florida) Limited Partnership | 6/29/90 $1,852,000 | Investor Limited | 50% |

* Included in William O. Brisben's 5.0% General Partner Interest

6593a/35

– 41 –

## LIMITED PARTNER SIGNATURE PAGE

The undersigned, desiring to become a Limited Partner of Oakland Lakes, Ltd. (the "Partnership"), hereby agrees to all of the terms of the Agreement of Limited Partnership of the Partnership (the "Agreement") and agrees to be bound by all of the terms and provisions thereof. The undersigned further constitutes and appoints the General Partners of the Partnership, jointly and severally, with full power of substitution, its true and lawful attorney for it in accordance with Article 14 of the Agreement. The power of attorney hereby granted shall be deemed to be coupled with an interest and shall be irrevocable. The place of residence or business address of the undersigned is as shown below. This power of attorney shall not be affected by any disability of the party granting it.

Executed, acknowledged and sworn to by the undersigned.

Limited Partner:

BRISBEN FAMILY TRUST

(To be completed by a General Partner)

By: _____ , Trustee
(Signature of Limited Partner)

Capital Contribution
$ _____

_____
(Name of Limited Partner-Please Print)

_____
(Address)

_____
(City          State      Zip Code)

_____
(Taxpayer Identification or Social Security Number)

- 42 -

STATE OF _Ohio_ )
                    )ss:
COUNTY OF _Hamilton_ )

On this _5th_ day of _July_ _____, 1990, before me, the undersigned notary, personally appeared the Brisben Family Trust, by _W.S. O. Brisben_ _____, Trustee, known to me to be the person whose name is subscribed to the within instrument, and who subscribed and swore to such instrument and acknowledged that he executed the same as his free and voluntary act and deed, individually and as such trustee.

_Karen L. Harris (Notary)_

Notary Public
KAREN L. HARRIS
Notary Public, State of Ohio

My commission expires _____ My Commission Expires Nov. 13, 1991

Accepted:

_____
General Partner


## LIMITED PARTNER SIGNATURE PAGE


The undersigned, desiring to become the Investor Limited Partner of Oakland Lakes, Ltd. (the "Partnership"), hereby agrees to all of the terms of the Agreement of Limited Partnership of the Partnership (the "Agreement") and agrees to be bound by all of the terms and provisions thereof. The undersigned further constitutes and appoints the General Partners of the Partnership, jointly and severally, with full power of substitution, its true and lawful attorney for it in accordance with Article 14 of the Agreement. The power of attorney hereby granted shall be deemed to be coupled with an interest and shall be irrevocable. The place of residence or business address of the undersigned is as shown below. This power of attorney shall not be affected by any disability of the party granting it.

Executed, acknowledged and sworn to by the undersigned.

Limited Partner:

OAKLAND PARK (FLORIDA) LIMITED PARTNERSHIP
By:  Oakland Park (Florida) General Partner
     Ltd., an Ontario Corporation

(To be completed by          By:_____
 a General Partner)          (Signature of Officer)

Capital Contribution         OAKLAND PARK (FLORIDA) LIMITED PARTNERSHIP
$ 1,852,000                  (Name of Limited Partner-Please
                              Print)

                             #500, 330 University Avenue
                             (Address)

                             Toronto, Ontario        M5G 1S1
                             (City           State   Zip Code)

                             _____
                             (Taxpayer Identification or
                              Social Security Number)

Province  OF  Ontario    )
                         )ss:
  City    OF  Toronto    )

     On this  29th day of June, 1990, before me, the undersigned
notary, personally appeared the Oakland Park (Florida) Limited
Partnership, an Ontario limited partnership, by Oakland Park
(Florida) General Partner Ltd., an Ontario corporation,
by  Peter Simmie_____, its ____President_____,
known to me to be the person whose name is subscribed to the

- 44 -

within instrument, and who subscribed and swore to such
instrument and acknowledged that he executed the same as his
free and voluntary act and deed, individually and as such
officer on behalf of said corporation and said limited
partnership.

_____
Notary Public

My commission expires __N/A_____


Accepted:


_____
General Partner


6593a/0772o

## LIMITED PARTNER SIGNATURE PAGE

The undersigned, desiring to become the Investor Limited Partner of Oakland Lakes, Ltd. (the "Partnership"), hereby agrees to all of the terms of the Agreement of Limited Partnership of the Partnership (the "Agreement") and agrees to be bound by all of the terms and provisions thereof. The undersigned further constitutes and appoints the General Partners of the Partnership, jointly and severally, with full power of substitution, his true and lawful attorney for him in accordance with Article 14 of the Agreement. The power of attorney hereby granted shall be deemed to be coupled with an interest and shall be irrevocable. The place of residence or business address of the undersigned is as shown below. This power of attorney shall not be affected by any disability of the party granting it.

Executed, acknowledged and sworn to by the undersigned.

Limited Partner:

(To be completed by a General Partner)

_____
(Signature of Limited Partner)

Capital Contribution
$_____100.00_____

William O. Brisben
(Name of Limited Partner-Please Print)

Suite 300, Ashwood Drive
(Address)

Cincinnati            OH        45241
(City              State     Zip Code)

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
(Taxpayer Identification or Social Security Number)

- 45 -

STATE OF OHIO        )
                     )ss:
COUNTY OF HAMILTON)

        On this 5th day of ~~June~~ July, 1990, before me, the undersigned
notary, personally appeared the known to me to be the person
whose name is subscribed to the within instrument, and who
subscribed and swore to such instrument and acknowledged that
he executed the same as his free and voluntary act and deed.

                              _____
                              Notary Public

                              KAREN L. HARRIS
                              Notary Public, State of Ohio
My commission expires _____ My Commission Expires Nov. 13, 1991


Accepted:

W.O. Brisben Companies, Inc.,
General Partner

By:_____
     President

6593a/0772o

- 47 -

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

PROJECT NAME: **LAKES OF CASABLANCA**

PROJECT NO: 066-94026    EFFECTIVE DATE: **February 1, 1995**

LOCATION:    Oakland Park, FL EXPIRATION DATE: **January 1, 2001**

# PROVISIONAL WORKOUT ARRANGEMENT

The undersigned mortgagor hereby expressly acknowledges that the Mortgage and Note secured by the above project is in default. To afford an opportunity to effect reinstatement, the Secretary, Department of Housing and Urban Development, will hold the defaulted Note and Mortgage on the subject project under the terms and conditions stated herein. Failure of the property to perform as projected will not excuse performance of any clauses in this Arrangement. The written terms of the workout are complete and there are no oral side agreements or verbal understandings which might affect the workout at some future date.

1. <u>Possession</u>. The mortgagor acknowledges that the default entitles HUD to assume possession of the encumbered premises, but that possession has not been demanded. As an inducement for HUD approval of this Arrangement, the mortgagor agrees that it will not oppose or interfere in any way should HUD demand possession by reason of subsequent default under the terms of this arrangement.

2. <u>Junior Obligations</u>. The mortgagor agrees that project revenues will not be used to repay either interest or principal for any project obligations, other than reasonable and necessary operating expenses, that are junior to the Secretary's lien.

3. <u>Payment Provision</u>. All payments will be made to the lock box and copies of each check will be sent to the Field Office in Jacksonville, Florida. The mortgagor agrees to make monthly payments in a timely manner until this Arrangement is accepted by all parties. Unless otherwise identified, at HUD's option, these remittances will be applied in the sequence illustrated on form HUD-2771, Statement of Multifamily Mortgage Account. The source of the amounts used in this Arrangement is form HUD-2771, Statement Of Multifamily Mortgage Account, payment due date 08/01/94. If the amounts on form HUD-2771 change, the mortgagor will pay the new amount billed monthly, with the exception that only the required percent of interest, as identified below, will be paid.

**EXHIBIT**

D

2

a.1. For the two (2) year period beginning February 1, 1995, and continuing through January 31, 1997, the mortgagor will remit by the first of each month $166,368.09, which consists of Service Charges of $9,405.90, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 70 percent of interest, which is $109,598.00.

a.2. Beginning February 1, 1997, and continuing through January 31, 1998, the mortgagor will remit by the first of each month $182,024.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 80 percent of interest, which is $125,255.00.

a.3. Beginning February 1, 1998, and continuing through January 31, 1999, the mortgagor will remit by the first of each month $197,680.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 90 percent of interest, which is $140,911.00.

a.4. Beginning February 1, 1999, and continuing through January 31, 2000, the mortgagor will remit by the first of each month $213,337.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 100 percent of interest, which is $156,568.00.

a.5. Beginning February 1, 2000, and continuing through January 31, 2001, the mortgagor will remit by the first of each month $228,994.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 110 percent of interest, which is $172,225.00.

b. Failure to remit net cash is cause for HUD to proceed with foreclosure. Net cash in excess of $25,000 remaining in the property accounts each month after payment of necessary and reasonable project operating expenses, and payment of the minimum monthly payment as noted in paragraphs 3(a)(1) through 3(a)(5) above, will be remitted to HUD within 15 days. At HUD's option, these funds may first be applied against delinquent Other (Late) Charges and then against other accrued delinquencies in the payment sequence outlined as "Account Items" of form HUD-2771.

c. At no time will the owner permit any delinquency to accrue in either the service charge due HUD or the tax escrow as billed by HUD each month.

3

     d.    A four percent late charge will be assessed against payments not received by the fifteenth of the month. In addition to the above payments, the owner will remit $2,000.00 monthly until Other Charges have been eliminated. Future Late Charges will be paid monthly as incurred. Any Late Charges not resolved upon completion of this Arrangement will be paid in full prior to Mortgage Modification.

4.    <u>Lump Sum Payments</u>.  The owner will not remit any additional funds as a lump sum payment to meet equity capital requirements.

5.    <u>Balance Sheet Reclassification</u>.  Owner agrees to reclassify $580,900 listed as Accounts Payable General Partner on the Balance Sheet to Equity. Owner certifies these funds were advanced to fund operating shortages since final endorsement and were used for necessary and reasonable operating expenses. These funds may only be recovered after successful completion of this Arrangement and may only be taken from Surplus Cash as that term is defined by the Regulatory Agreement. These funds do not represent a lien on the property.

6.    <u>Mortgage Modification</u>.

     a.    If the mortgagor has fully complied with the terms of this Arrangement and HUD has determined that it is financially feasible, as of <u>February 1, 2001</u>, HUD agrees to recast any delinquent principal and interest equal to or less than ten <u>(10)</u> percent of the original mortgage amount at the current mortgage interest rate of <u>8.25</u> percent, amortized over the remaining term of the mortgage, but not less than <u>180</u> months. The amount of delinquent interest and principal <u>together</u> cannot exceed ten percent of the original mortgage amount.

     b.    The mortgagor agrees to modify the Note and Mortgage to insert a call provision. The call provision gives the mortgagee the option to declare the entire indebtedness due and payable at or after ten (10) years from the date of the modification.

     c.    In the event the mortgage and note is considered for modification, the property must demonstrate that net operating income can support the increased debt service. If it cannot, the mortgagor agrees to fund the amount necessary to buy down the mortgage to an amount supportable by net operating income.

4

d.   If, at the time of recast, a delinquency in excess of the
     10 percent HUD allowance remains, the owner will make a
     lump sum payment to fund the deficit.

7.   **Equity Kicker.**   If, at any time, Maker sells, assigns,
     transfers, converts or conveys the Property (collectively a
     "Sale") or, if Maker refinances the indebtedness secured by
     the Property (a "Refinancing"), twenty five and one quarter
     (25.25) percent of the Gross Sale, Conversion or Refinancing
     Proceeds shall be paid by Maker to Mortgagee or its successors
     and assigns at the closing of the Sale or Refinancing (the
     "Sale or Refinancing Obligation").   If none of the above
     circumstances occur and the Mortgagor pays the note in full
     through normal amortization, twenty five and one quarter
     (25.25) percent of the mutually agreed upon appraised value or
     twenty five and one quarter (25.25) percent of the original
     mortgage value, whichever is greater, shall be paid by Maker
     to Mortgagee or its successors and assigns on the date of
     Mortgage Satisfaction.

     "Proceeds" are defined as the amount needed to payoff or
     refinance the note securing the real estate plus any equity
     "pulled", minus the mortgage balance and minus reasonable
     closing costs. Gross Sale, Conversion or Refinancing Proceeds
     shall also mean consideration of any kind directly or
     indirectly received by Maker, or its principals, in connection
     with a Sale, Conversion or Refinancing.

     The obligation set forth above shall be effective until one of
     the stated conditions has been fulfilled and shall apply to
     the first Sale, Conversion, Mortgage Satisfaction or
     Refinancing, after the date of this Arrangement, which
     Mortgagee determines is an arms-length transaction for full
     value.  No Sale or Refinancing shall occur unless Mortgagee
     consents in writing. Maker must certify (subject to 18 U.S.C.
     1001) to Mortgagee that the Sale, Conversion or Refinancing is
     not an identity of interest transaction.

8.   **Repairs.**  Past delinquency in the Reserve for Replacement is
     hereby forgiven. The physical property will be maintained in
     accordance with the requirements of the Regulatory Agreement.
     All disbursements from the RFR Account will be approved by the
     Jacksonville Field Office in accordance with the Regulatory
     Agreement.  The mortgagor agrees to monthly escrow $6,560.84
     to the Reserve For Replacement account and acknowledges this
     amount may be increased at any time during this Arrangement if
     the Field Office determines an increase is necessary to
     maintain the property in a manner acceptable to HUD. Separate
     remittance checks must be written monthly, clearly identifying
     the payment to assure proper application by HUD. These checks
     will be submitted in addition to the minimum mortgage payment.

5

9. **Accounting Reports.** During the term of this Arrangement, the mortgagor will submit monthly Reports for Establishing Net Income (Forms HUD-93479, 93480, and 93481). The reports will be mailed to the HUD Office in Jacksonville, Florida.

10. **Distributions.** The mortgagor agrees not to take any distributions while the mortgage is being held in default under the terms of this Arrangement and of the original Note, Mortgage and Regulatory Agreement.

11. **Cancellation Clause.** This Arrangement is on a month-to-month basis. The Secretary agrees to take no action because of the existing monetary default, provided the mortgagor remits the required minimum monthly payment and satisfactorily performs the other requirements of this Arrangement. Failure of the mortgagor to meet the terms of this Arrangement will be sufficient cause for the Secretary to immediately terminate this Arrangement and to commence foreclosure action. Failure of the mortgagor to meet the terms of the Arrangement is also grounds for the Department to consider taking administrative sanctions against the mortgagor including, but not limited to, suspension or debarment from participation in HUD programs.

12. **Criminal Sanctions for Misuse of Project Funds.** The mortgagor acknowledges that the use of project funds derived from the project covered by this Arrangement for any purpose other than to meet actual and necessary project expenses may be a criminal offense punishable by a fine of not more than $5,000 and imprisonment of not more than three (3) years or both.

DATE APPROVED: ___December 22, 1994___
Oakland Lakes, Ltd.

MORTGAGOR SIGNATURE: _____

MORTGAGOR TITLE: ___William C. Brisben___
___General Partner___

ASSISTANT SECRETARY FOR HOUSING-FEDERAL HOUSING COMMISSIONER:

BY: ___Ferdinand R. Juluke Jr.___

TITLE: ___Ferdinand R. Juluke, Jr., Director, Multifamily Division, 4HHS___

DATE: ___Jan 5, 1995___

95-198510  T#0005
05-11-95  02:48PM

PREPARED (IN CONSULTATION WITH
A MEMBER OF THE FLORIDA BAR) BY
AND AFTER RECORDING PLEASE RETURN TO:

Latham & Watkins
885 Third Avenue, Suite 1000
New York, New York 10022-4802
Att'n: Joshua Stein, Esq.

Former FHA Project No.:      066-94026
Asset No.:                   10026
Project Name:                LAKES OF CASABLANCA
County, State:               Broward, Florida

---

### ASSIGNMENT OF AMENDED AND RESTATED RENEWAL MORTGAGE, ASSIGNMENT
### OF RENTS AND SECURITY AGREEMENT AND
### OTHER COLLATERAL LOAN DOCUMENTS

---

The SECRETARY OF HOUSING AND URBAN DEVELOPMENT, solely in its capacity as
mortgagee ("HUD"), pursuant to the terms of that certain Amended and Restated Loan Sale Agreement
dated as of March 28, 1995 (the "Loan Sale Agreement") between HUD and Condor One, Inc., a Delaware
corporation ("Assignee"), having a mailing address of c/o General Electric Capital Corporation, 292 Long
Ridge Road, Stamford (Fairfield County), Connecticut 06927, Attention: Legal Operation, and in
consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by Assignee, hereby
assigns, transfers, sets over and conveys to Assignee, its successors and assigns, the following, all as they
may have been modified, consolidated, assigned, amended, restated, or supplemented (whether or not of
record) through and including May 8, 1995.

- That certain Amended and Restated Renewal Mortgage, Assignment of Rents and Security
Agreement executed by Oakland Lakes, Ltd., a Florida limited partnership, for the benefit
of Cincinnati Mortgage Corporation, an Ohio corporation, as Mortgagee, dated October 5,
1989, and recorded on October 5, 1989, at Book 16818, Page 609, in the Official Records
of Broward County, Florida (the "Mortgage"), which Mortgage secures, that certain
Amended and Restated Renewal Mortgage Note dated October 5, 1989, made by Oakland
Lakes, Ltd., a Florida limited partnership, in favor of Cincinnati Mortgage Corporation, an
Ohio corporation ("Note"), together with the indebtedness secured by said Mortgage and
evidenced by said Note, and any right, title, and interest of HUD (if any) in and to the
property described in said Mortgage; and

WILL CALL 23787
CHICAGO TITLE INSURANCE CO.

FL 52-66-94026  ASSIGNMENT 1




EXHIBIT
E



• Such other documents, agreements, instruments, and other collateral (excluding the Regulatory Agreement referenced in the Mortgage) which evidence, secure or otherwise relate to HUD's right, title or interest in and to the Mortgage and/or the Note, including without limitation the Security Agreement, if any, and the title insurance policies and hazard insurance policies that may presently be in effect.

The Note was endorsed by HUD to Assignee without "FHA Mortgage Insurance" (as such term is defined in the Loan Sale Agreement).

IN WITNESS WHEREOF, HUD has caused this Assignment to be executed and delivered by its duly authorized agent as of May 8, 1995.

Witness:

SECRETARY OF HOUSING AND URBAN DEVELOPMENT

By _____
(Authorized Agent)
William Bichbourg

ACKNOWLEDGMENT

DISTRICT OF COLUMBIA )
)
)

BEFORE ME, _____, a Notary Public in and for the jurisdiction aforesaid, on this ___ day of MAY, 1995, personally appeared William Bichbourg, who is personally well known to me (or sufficiently proven) to be an authorized agent of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT and the person who executed the foregoing instrument by virtue of the authority vested in him/her and he/she did acknowledge the signing of the foregoing instrument to be his/her free and voluntary act and deed as the agent of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT, for and on behalf of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT for the uses, purposes and consideration therein set forth.

Witness my hand and official seal, this ___ day of MAY, 1995.

_____
Notary Public

My Commission expires: _____

FL 52-66-94026 ASSIGNMENT 2

ICARD, MERRILL, CULLIS, TIMM,

FUREN & GINSBURG, P.A.

ATTORNEYS AND COUNSELLORS

2033 MAIN STREET, SUITE 600

SARASOTA, FLORIDA 34237

FACSIMILE (941) 366-6384

TELEPHONE (941) 366-8100

ROBERT E. MESSICK

TAMPA TELEPHONE
(813) 221-2100

REPLY TO:
P.O. BOX 4195
SARASOTA, FLORIDA 34230

April 29, 1999

VIA FAX TO (5**13**) 489-2780,
CERTIFIED MAIL R/R/R,
AND REGULAR U.S. MAIL

Mr. William O. Brisben, individually and as
President of W.O. Brisben Companies, Inc.
7800 E. Kemper Road
Cincinnati, OH 45249

Re:    Oakland Lakes, Ltd., a Florida Limited Partnership

Dear Gentlemen:

The undersigned attorneys represent 813268 Ontario, Inc., an Ontario Corporation, being the newly appointed General Partner of Oakland Park (Florida) Limited Partnership, an Ontario Limited Partnership (the "Canadian Limited Partnership"). We would advise you that, pursuant to the enclosed Consent Order, 813268 Ontario, Inc., is the duly authorized General Partner of the Canadian Limited Partnership.

We have been requested by 813268 Ontario, Inc., as General partner of the Canadian Limited Partnership, to prepare and forward to you this correspondence which shall respond to your correspondence of April 13, 1999, to Mr. A. Peter Simmie at Nigel Stephens Counsel, Inc., Willowdale, Ontario, as well as your correspondence of April 20, 1999, to Mr. Peter Browning, Trinity Wood Capital Corporation, Toronto, Ontario. This will further respond to your follow up correspondence of April 23, 1999, to Mr. Browning and to the Canadian counsel of the General Partner, Mark L. Goodman of Solmon, Rothbart, Goodman, Toronto, Ontario.

It is the position of the Canadian Limited Partnership that the General Partner of the Florida Limited Partnership, Oakland Lakes, Ltd., is not authorized, pursuant to the terms and provisions of the Second Amended and Restated Agreement of Limited Partnership of Oakland Lakes, Ltd., to enter into or to consummate any negotiations, as contemplated by the above-specified correspondence. As stated by Mr. Browning in his correspondence to you of April 22, 1999, the Limited Partnership Agreement of the Florida Limited Partnership clearly does not authorize or permit the cash call requirements as set forth in your request. This correspondence constitutes a written direction on behalf of the Canadian Limited Partnership to you as the General Partner of the Florida Partnership that you are specifically not authorized to enter into any further negotiations and/or agreements of any nature with AMRESCO Capital or any other takeout lender.

We have had the opportunity to review with our client the terms and provisions of the provisional workout arrangements which were apparently executed by you as General Partner of the Florida Partnership dated February 1, 1995, with the Department of Housing and Urban Development/Condor/GE. We would



EXHIBIT
F

Mr. William O. Brisben, individually and as
President of W.O. Brisben Companies, Inc.
April 29, 1999
Page 2

further advise you that it is the position of the Canadian Limited Partner that that agreement and all related agreements were executed by you without authority and without the required consent of the Canadian Limited Partnership under the terms and provisions of the Second Amended and Restated Agreement of Limited Partnership of Oakland Lakes, Ltd.

On behalf of the Canadian Limited Partnership, we are requesting that a meeting be scheduled at your earliest possible convenience to review and to discuss with you the matters detailed in your correspondence referenced hereinabove, and to address the serious concerns of the Canadian Limited Partnership with respect to Oakland Park, the Florida Partnership, as noted hereinabove. Additionally, we would advise you of the election of the Canadian Limited Partnership to complete a comprehensive review and audit of all books, records, and operations of the Florida Limited Partnership at the earliest possible date and time. We would hope that the General Partner will fully and timely cooperate with each and all of these requests and demands of the Canadian Partnership. We await your prompt response in that regard.

Finally, this correspondence shall constitute written notice of the Canadian Limited Partnership's election to exercise its right to offer to purchase the 50% interest of the "Development Group" (as that term is defined in Subparagraph (n), Defined Terms, of the Second Amended and Restated Agreement of Limited Partnership of Oakland Lakes, Ltd.) for the price of $100.00. The purchase terms are cash payment in full at closing, with closing to be effective within 10 days of the date of receipt of this correspondence; excepting, specifically, the election of the Development Group to exercise its option to purchase the interests of the "Investor Limited Partner" (as that term is defined in the Second Amended and Restated Agreement of Limited Partnership of Oakland Lakes, Ltd.); any offer of the Development Group to purchase the interests of the Investment Limited Partner must be in compliance with Article 6, Section 6.9(c). Specifically, the offer to purchase the interests of the Investment Limited Partner must be for a price not less than aggregate of the Contributed Equity, any option L.P. Deficiency Loan (including accrued interest through the date of such purchase and closing), any outstanding Preferred Return (including accrued interest through the date of closing), and any outstanding Cumulative Priority Return.

Please review and provide the response of the Development Group to this offer of purchase made and exercised on this date by the Canadian Limited Partnership at your earliest possible convenience.

Very truly yours,

ICARD, MERRILL, CULLIS, TIMM,
FUREN & GINSBURG, P.A.

Robert E. Messick
For the Firm

1.4                                                          9/28/89

REGULATORY AGREEMENT FOR MULTIFAMILY HOUSING PROJECTS
COINSURED BY HUD

Project Name:   **LAKES OF CASABLANCA**   Project No.: 066-36650
                (the "Project")

Mortgagee:      **CINCINNATI MORTGAGE**   PM
                **CORPORATION**

Mortgage Note: **$22,779,600.00**     Dated: October __5__, 1989

Mortgage Recorded:                    Dated: October __5__, 1989

• County:   **Broward**               State: **Florida**
    _Clerk's File No. 89399812_
    ~~Book:~~        ~~Page:~~         Date: October __5__, 1989

     This Agreement entered into as of this __5th__ day of _October_,
1989, between Oakland Lakes, Ltd., a Florida limited partnership
(herein called "Owner") and the undersigned Mortgagee and the
Mortgagee's successors or designates (herein called "Mort-
gagee"). This Agreement and the Mortgage cover the real property
described in <u>Exhibit A</u> attached hereto and hereby incorporated
herein by references.

     In return for the endorsement by the Secretary of the United
States Department of Housing and Urban Development (the "Secre-
tary") for mortgage coinsurance of the Note identified above by
the Secretary and the Mortgagee and to comply with the require-
ments of the National Housing Act and the regulations and admin-
istrative requirements adopted by the Secretary pursuant thereto,
the Owner agrees to abide by the provisions of this Agreement.
This Agreement will continue so long as the contract of coinsur-
ance remains in force. The Owner agrees that this Agreement
shall be binding on its successors, heirs or assigns. Breach of
this Agreement may be a basis for denial of additional participa-
tion in the Secretary's and/or the Mortgagee's programs. The
Owner's willingness and ability to prevent or cure violations of
this Agreement may have a bearing on the Secretary's and/or the
Mortgagee's review of any Owner request for additional participa-
tion in the Secretary's and/or the Mortgagee's programs.

A.   <u>DEFINITIONS</u>

     1.   "Default" means any violation of this Agreement.

     2.   "Distribution" means the withdrawal of any cash or
asset of the Project excluding outlays for:

          a.   mortgage payments;



**EXHIBIT**

**1**

b.    reasonable expenses necessary for the proper operation and maintenance of the Project; and

c.    repayment of Owner advances authorized by HUD's administrative procedures.

3.    "Identity-of-interest" means any relationship which would give the Owner or its Management Agent control or influence over the price paid to an individual or business supplying goods and/or services to the Project.    An identity-of-interest is construed to exist when any of the situations listed below exist.

a.    When (1) the Project Owner or Management Agent; or (2) any officer or director of the Project Owner or Management Agent; or (3) any person who directly or indirectly controls 10 percent or more of the voting rights or directly or indirectly owns 10 percent or more of the Project Owner or Management Agent; is also (1) the contractor, subcontractor or supplier or (2) an officer or director of the contractor, subcontractor or supplier; or (3) a person who directly or indirectly controls 10 percent or more of the contractor's, subcontractor's or supplier's voting rights or directly or indirectly owns 10 percent or more of the contractor, subcontractor or supplier.

b.    When (1) the Project Owner; or (2) any officer or director of the Project Owner; or (3) any person who directly or indirectly controls 10 percent or more of the voting rights or directly or indirectly owns 10 percent or more of the Project Owner; is also (1) an officer or director of the Management Agent; or (2) a person who directly or indirectly controls 10 percent or more of the Management Agent's voting rights or directly or indirectly owns 10 percent or more of the Management Agent.

For purposes of this definition, the term "person" includes any individual, partnership, corporation, or other business entity. Any ownership, control or interest held or possessed by a person's spouse, parent, child, grandchild, brother or sister shall be attributed to such person.

4.    "Mortgage" includes "Deed of Trust," "Uniform Commercial Code Security Instrument," and any other security for the note identified herein that is endorsed for mortgage coinsurance by the Secretary.

5.    "Mortgaged Property" includes all real and personal property covered by the mortgage or mortgages securing the note endorsed for coinsurance by the Secretary.

6.    "Mortgagee" means Cincinnati Mortgage Corporation.

7.    "Note" means the note which is secured by the Mortgage and which is endorsed for mortgage coinsurance by the Secretary.

8.    "Project" includes the mortgaged property and all of its assets.

9.    "Secretary" refers to the Secretary of the Department of Housing and Urban Development.

10.    "Surplus Cash" means any unrestricted cash remaining after:

> a.    the payment of:
>
>> (1)  All sums due or currently required to be paid under the terms of any mortgage or note coinsured by the Secretary;
>>
>> (2)  All amounts required to be deposited in the Reserve for Replacements; and
>>
>> (3)  All obligations of the Project other than the coinsured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Mortgagee; and
>
> b.    the segregation and recording of:
>
>> (1)  An amount equal to the aggregate of all special funds required to be maintained by the Project;
>>
>> (2)  An amount equal to the Project's total liability for tenant security deposits.

In computing Surplus Cash as defined above, the Mortgagor must follow the administrative requirements prescribed by the Secretary.

## B.  OBLIGATIONS OF OWNER

The Owner agrees to do the following:

1.    Establish and maintain a Reserve for Replacements to cover the cost of major replacements which are not provided for in the Project's operating budget.

> a.    Owner agrees to make an initial deposit of $0 with the Mortgagee on the date that the insured Mortgage loan proceeds

---

*  Applies only to projects with 223(f) coninsured loans.

-3-

re disbursed.   Owner agrees to make monthly deposits to the
Reserve for Replacements in the amount of $4,968.58 commencing on
the date that amortization is scheduled to begin under the Note
and continuing each month thereafter, unless the Mortgagee estab-
lishes a different amount in accordance with the Secretary's
administrative requirements.   Owner agrees to make the Reserve
for Replacements deposits on the first day of each month.   The
amount of the monthly deposit may be increased or decreased from
time to time without amending this Agreement.

        b.   The Reserve for Replacements will be held by the
Mortgagee or by a safe and responsible depository designated by
the Mortgagee.   Such Reserve for Replacements shall at all times
remain under the control of the Mortgagee.

        c.   Owner acknowledges that, in order to prevent or
cure a default, the Mortgagee may, in accordance with the Secre-
tary's administrative procedures, use Reserve Funds to pay
amounts due under the Mortgage.   If the Mortgage debt is acceler-
ated pursuant to a default under the Mortgage, the Owner agrees
that the Mortgagee may apply the balance in such Reserve for
Replacements to the amount due on the mortgage debt, as acceler-
ated.

        d.   Owner agrees to analyze the adequacy of the Re-
-erve for Replacements when and as required by the Mortgagee.   If
the Mortgagee determines, in accordance with the administrative
requirements of the Secretary, that a higher monthly deposit is
needed to ensure the future adequacy of the Reserve for Replace-
ments, Owner agrees to increase the monthly deposit as directed
by the Mortgagee.

        e.   Owner agrees to direct the Mortgagee to invest the
Reserve for Replacements only in accordance with the administra-
tive requirements of the Secretary.   The Owner acknowledges that
the Mortgagee may charge a reasonable fee for placing and admin-
istering any such investments and Owner agrees to pay such fees
when Mortgagee bills the Owner for such fees.   All earnings
received from investments of the Reserve for Replacement shall
accrue to the benefit of the project.   At the option of the
Owner, such earnings may be deposited in either the Reserve for
Replacements or in the Project operating account.   Amounts earned
on investments are not a substitute for the regular monthly
deposits required by Paragraph B.1.a. of this Agreement.

    2.   a.   Request and implement rent increases only as
provided next to the boxes checked below.   (See instructions at
the end of this appendix and check appropriate box or boxes):

            (1)   /‾X‾/      Owner may adjust rents for all unsubsi-
                            dized    units    without    obtaining    the
                            lender's approval.

-4-

(2)  /‾‾‾/    HUD (or the Public Housing Agency (PHA)
              Contract administrator in the case of
              projects assisted under the ,Section 8
              Moderate Rehabilitation Program) will
              adjust rents for units receiving Section
              8 assistance as provided in the HAP
              Contract and the Secretary's regulations
              and administrative procedures.

(3)  /‾‾‾/    Owner must obtain the lender's written
              approval for any rent increase.  Rents
              will be processed in accordance with the
              Secretary's regulations and administra-
              tive procedures, using the

       (a)  /‾‾‾/   Cost Approach (See Para-
                    graph 7-5.a. of HUD Hand-
                    book 4566.1.)

       (b)  /‾‾‾/   Market Approach (See Para-
                    graph 7-5.b. of HUD Hand-
                    book 4566.1.)

     b.    For units receiving Section 8 assistance, obtain
the Secretary's written approval of charges for facilities and
services of the project not included in rent.

     c.    For projects built exclusively for the elderly and
handicapped, obtain the Lender s written approval of charges for
facilities and services of the project not included in rent.
Lender will review and approve such charges according to the
Secretary's regulations and administrative procedures.

     d.    Not permit any part of the project to be rented
for transient or hotel purposes.  The term "rental" for transient
or hotel purposes shall mean (1) rental for any period less than
30 days; or (2) any rental, if the occupants of the housing
accommodations are provided customary hotel services, such as
room service for food and beverages, maid service, furnishing and
laundering of linens, and bellboy service.

     e.    Rent commercial facilities only in accordance with
applicable regulations and other administrative requirements of
the Secretary and upon such terms as approved by the Mortgagee.

     f.    If the Mortgagee has approved rents based on a
cost approach, notify the Mortgagee when State or local govern-
ment action causes a reduction in property taxes, utilities or
other project expenses.  If the Mortgagee determines that the
reduction in those expenses is not offset by an increase in other
expenses or by an increase in deposits to the Reserve for Re-

placements, the Owner agrees to reduce rents accordingly.  The Owner agrees to provide the Mortgagee sufficient information to make the determination discussed in this paragraph.  The Owner agrees to reduce the rents within sixty days of the date of the Mortgagee's directive to do so.

g.  Obtain the Mortgagee's written approval before leasing the Project or any part of it for other than individual apartment units.

3.  a.  Deposit all rents and other receipts of the Project in the name of the Project in accounts which are fully insured as to principal by an agency of the Federal government. Project funds in excess of those needed to meet short-term Project operating expenses may be invested in accordance with the administrative requirements of the Secretary.

b.  Use Project funds only to:

(1) pay amounts required by the Mortgagee;

(2) make required deposits to the Reserve for Replacements;

(3) pay reasonable expenses necessary to the proper operation and maintenance of the Project;

(4) pay distributions of Surplus Cash permitted by Paragraph B.4.a. of this Agreement; and

(5) repay Owner advances if such repayments are authorized by the Secretary's administrative procedures and approved by the Mortgagee.

Project funds may not be used to liquidate liabilities related to the construction of the Project, other than the mortgage, unless the Mortgagee authorizes such use.

c.  Any Owner receiving funds of the Project other than through distributions permitted by Paragraph B.4.a. of this Agreement must immediately deposit such funds in the Project bank account and failing so to do in violation of this Agreement shall hold such funds in trust.  Any Owner receiving property of the project in violation of this Agreement shall immediately deliver such property to the Project and failing so to do shall hold such property in trust.  At such time as the Owners shall have lost control and/or possession of the Project, all funds held in trust shall be delivered to the Mortgagee to the extent that the mortgage indebtedness has not been satisfied.

d.  Deposit and maintain residents' security deposits in a trust account separate and apart from all other funds of the Project.  This trust account must be held in the name of the

Project and the balance in the account must at all times equal or exceed the Project's liability for residents' security deposits.  The Owner must comply with any state or local laws regarding investment of security deposits and distribution of any interest or other income earned thereon.  Any earnings received from the investment of security deposits must accrue to the benefit of the Project or the Project residents.

4.   a.   Make, or receive and retain, distributions of cash or other assets of the Project only as authorized by this Agreement.

(1)  Distributions may be paid only from Surplus Cash which existed as of the end of a semi-annual or annual fiscal period.  The Owner must compute distributions in accordance with the Secretary's administrative requirements.

(2)  The first fiscal period's distribution may not be paid until construction has been completed and any required cost certification has been received by the Mortgagee.

(3)  Distributions may be paid only after the end of the fiscal period in which the Surplus Cash is generated.

(4)  No distribution may be paid from borrowed funds, or when payments due under the Note, Mortgage or this Agreement have not been made.

(5)  In the event that the Mortgagee determines that any of the conditions listed below apply, the Owner may distribute Surplus Cash only after obtaining the Mortgagee's written approval to do so.

(a)  the Owner has not satisfactorily responded to any Mortgagee Management Review, Physical Inspection Report, annual financial statement correspondence or any other correspondence which requires corrective action and which was received at least 30 days prior to the end of the fiscal period for which the Surplus Cash computation is made;

(b)  the Project has significant uncorrected physical deficiencies; or

(c)  there is a default under this Agreement.

b.   Limit distributions in any one fiscal period to the amount specified below and calculate distributions in accordance with the administrative requirements of the Secretary.

(1)  No distributions are permitted on projects owned by non-profit entities.

(2) On projects owned by limited distribution entities, distributions may not exceed the lesser of Surplus Cash available at the end of the fiscal period or the distributions earned and unpaid as of the end of the prior fiscal period. Distributions shall be earned annually at the rate of N/A% of the initial equity investment.

**If the project is subsidized by HUD, obtain this amount from applicable HUD regulations.

(3) On projects owned by profit-motivated entities not covered by paragraph B.4.b.(2), distributions may be paid up to the amount of Surplus Cash generated during the prior fiscal period.

5.    a.    Deposit the following amounts with the Mortgagee within sixty days after the end of each annual or semi-annual fiscal period in which Surplus Cash is generated. The funds deposited pursuant to this paragraph shall be referred to as Residual Receipts. The Residual Receipts shall at all times remain under the control of the Mortgagee, who shall have the power and authority to direct that the Residual Receipts, or any part thereof, be used for such purposes as it may determine, subject to the Secretary's administrative requirements.

(1) On projects owned by non-profit entities, all Surplus Cash.

(2) On projects owned by Limited Distribution entities, any Surplus Cash remaining after payment of distributions authorized by Paragraph B.4. of this Agreement.

(3) No deposit is required on projects owned by other profit-motivated entities.

b.    Use Residual Receipts only for the purposes for which the Mortgagee authorizes their withdrawal.

c.    Invest the Residual Receipts in accordance with the administrative requirements of the Secretary and the Mortgagee and add all earnings on such investments to the Residual Receipts Account. The Owner acknowledges that the Mortgagee may charge a reasonable fee for placing and administering any such investments and Owner agrees to pay such fees when due.

6.    Maintain the Mortgaged Property in good repair and condition and promptly complete necessary repairs and maintenance as required by the Mortgagee.

7.    a.    Assure that all Project expenses are reasonable in amount and necessary to the operation of the Project.

b.   Comply with the Secretary's and Mortgagee's admin-
istrative requirements regarding payment and reasonableness of
management fees and allocation of management costs between the
management fee and the Project account.

c.   Not obligate the Project to pay for costs other
than those reasonable and necessary to the operation and mainte-
nance of the Project.

d.   Purchase goods and services from identity-of-
interest individuals or companies only if the charges levied by
those individuals or companies are not in excess of the costs
that would be incurred in making arms-length purchases on the
open market.

e.   Exert reasonable effort to take advantage of
available discounts and credit the Project with all discounts,
rebates or commissions received with respect to purchases, ser-
vice contracts and other transactions made on behalf of the
Project.

f.   Obtain contracts, materials, supplies and ser-
vices, including the preparation of the annual audit, on terms
most advantageous to the Project and at costs not in excess of
amounts ordinarily paid for such contracts, materials, supplies
and services in the area in which such services are rendered or
supplies and materials furnished.

g.   Solicit oral or written cost estimates as neces-
sary to assure compliance with the provisions of this paragraph
and document the reasons for selecting other than the lowest
estimate or bid.  Maintain copies of such documentation and make
such documentation available for inspection during normal busi-
ness hours.

8.   Require any purchaser to assume all of the Owner's
obligations under this Agreement.

9.   Comply with the Secretary's administrative procedures
for Previous Participation Clearance and Transfers of Physical
Assets.

10.   Obtain the Secretary's and the Mortgagee's written
approval before engaging, except for natural persons, in any
business or activity, including the operation of any other proj-
ect, or incurring any liability or obligation not in connection
with the Project.

11.   Obtain the Mortgagee's written approval before:

a.   Conveying, assigning, transferring, encumbering or
disposing of any ownership interest in the Project or any benefi-
cial interest in any trust or other entity holding title to the

Project or any legal interest in the Project including rents and security deposits.

      b.    Remodeling, adding to, reconstructing, ,or demolishing of any part of the Project.

      c.    Undertaking self-management, contracting for management services or paying, or incurring any obligation to pay, fees for management services.

      d.    Paying, or incurring any obligation to pay, compensation (including wages, supervisory fees or salaries) to themselves, or to any officers, directors, stockholders, trustees, partners, beneficiaries under any trust, or to any of their nominees.

      e.    Permitting the use of the dwelling accommodations for any purposes except the use which was originally intended, or permitting commercial use greater than that originally approved by the Mortgagee.

    12.  Resign or withdraw from the Project only after the Mortgagee has approved a substitute Owner. Resignation or withdrawal from the Project prior to the Mortgagee approving a substitute Owner shall be considered abandonment and shall place such Owner in default under this Agreement.

    13.  Provide for management satisfactory to the Mortgagee and the Secretary; execute a written management agreement with any management agent; assure that all contracts and management agreements meet the Secretary's and Mortgagee's requirements; and deliver to the Mortgagee such information and certifications regarding Project management as the Secretary and the Mortgagee may require.

      a.    The Owner agrees to include in any management contract entered into on behalf of the Project a provision that the Mortgagee or HUD may terminate the contract for good cause and without penalty effective thirty days after the notice of the Mortgagee's or Secretary's desire to terminate is mailed or otherwise delivered to the contractor. The Owner agrees to mail such notice within seven days of receipt of the Mortgagee's or Secretary's request to do so. Owner also agrees to make immediate arrangements for providing new management satisfactory to the Mortgagee and the Secretary.

      b.    The Owner agrees that the following clause will be included in any contract entered into with ,any individual or business with whom the Owner or Management Agent has an identity f interest for the provision of goods or services to the Project: "Upon request of the Mortgagee or (Name of Owner or Management Agent), (name of Management Agent, Contractor or Supplier) will make available to the Mortgagee, at a reasonable time and

place, its records and records of identity-of-interest companies, which relate to goods and services charged to the project. Records and information will be sufficient to permit the Mortgagee to determine the services performed, the dates performed, the location, the time consumed in providing the service, the charges made for materials, and the per unit and total charges levied for said service." The Owner agrees to request such records within seven days of receipt of the Mortgagee's or HUD's request to do so.

14. Establish and maintain the books and accounts of the Mortgaged Property in accordance with the requirements of the Secretary and the Mortgagee. Such books and accounts shall be kept current and in such form as to permit a speedy and effective audit. Such books and accounts shall be maintained for such periods of time as may be prescribed by the Secretary and the Mortgagee.

15. Permit the Secretary, the Inspector General of HUD, the Comptroller General of the United States, the Mortgagee and their authorized agents to inspect the Project's property, equipment, buildings, plans, offices, apparatus, and devices, books, accounting records, contracts, documents and papers during reasonable business hours.

16. a. Within 60 days following the end of each fiscal year, furnish the Mortgagee with a financial report on the Project's operations unless the Mortgagee authorizes the Owner to submit the report on a later date. The Owner agrees that the report will be prepared, signed and certified in accordance with the requirements of the Secretary and the Mortgagee.

b. If the Owner fails to submit its annual financial report within sixty days of the due date or any other date as may be established in writing by the Mortgagee, the Owner agrees that the Mortgagee may retain a certified public accountant to prepare the report on behalf of the Owner and that the cost of such report will be a Project expense. The Mortgagee may do so only after giving the Owner thirty days' written notice of its intent to do so.

17. Upon request, the Owner shall furnish the Mortgagee with operating budgets, occupancy, accounting and other reports; properly certified copies of minutes of meetings of the directors, officers, stockholders, or beneficiaries of the mortgagor entity; and specific answers to questions raised from time to time by the Mortgagee relative to income, assets, liabilities, contracts, operations, actual cost of repairs and improvements, disposition of mortgage funds, conditions of the Project and the status of the Mortgage. The Owner shall furnish a response to the Mortgagee's management review reports, physical inspection reports and written inquiries regarding annual or monthly financial statements no later than 30 days after receipt of the Mortgagee's report or inquiries.

18. Notify the Mortgagee in writing within five days after instituting litigation seeking recovery, equitable relief, or defense to litigation, excluding litigation related to individual resident evictions. The Owner may use Project funds to pay for such litigation only if the Mortgagee authorizes, or a court directs, the Owner to do so.

19. a. Refrain from utilizing criteria or tenant selection practices that discriminate against any family because of the sex of the household head, or because there are children in the family, unless the Project was designed primarily for occupancy by the elderly.

b. Comply with the provisions of Title VIII of the Civil Rights Act of 1968, as amended, and any regulations or administrative procedures issued pursuant thereto. These laws and regulations prohibit discrimination in the rental or financing of housing on the basis of race, color, national origin, religion (creed), or sex. Owner agrees to administer the Project and related activities in a manner to further fair housing affirmatively. The Owner also agrees to comply with similar State and local fair housing laws and ordinances.

c. Comply with the provisions of Executive Order 11063 on Equal Opportunity in Housing and all regulations issued pursuant thereto. This order and related regulations prohibit discrimination on the basis of race, color, religion (creed), national origin, or sex in housing and related facilities provided through federal financial assistance.

d. Not discriminate on the basis of race, color, religion (creed), national origin, or sex against any employee or applicant for employment. Owner agrees to include a provision to this effect in any contract or subcontract executed for Project repairs and improvements, and to comply with the provisions of Executive Order 11246 and Title 41 CFR Chapter 60, when applicable to such contracts.

20. Issue shares of capital stock, beneficial certificates of interest, or partnership interests as applicable, only in a number and form approved by the Mortgagee.

21. Whether or not the Owner or the individuals comprising the ownership entity assume personal liability for payments due under the Note and Mortgage or for payments to the Reserve for Replacements, these individuals shall remain liable under this Agreement with respect to these matters:

a. For funds or property of the Project which come into their hands and which they are not entitled to retain; and

b.   For their own acts and deeds or acts and deeds of their authorized agents that are in violation of the provisions of this Agreement.

22.   Refrain from executing any document which contains provisions that contradict or oppose the provisions of this Agreement unless the Mortgagee approves such document. If the Owner executes such a document without the prior written approval of the Mortgagee, this Agreement will be controlling as to the rights and obligations which it sets forth.

23.   The invalidity of any clause, part or provisions of this Agreement shall not affect the validity of the remaining portions thereof.

C.   RIGHTS OF THE MORTGAGEE AND SECRETARY

1.   If the Owner violates any provisions of this Agreement, the Mortgagee or Secretary may send the Owner written notice of such violation by registered or certified mail. If such violation is not corrected to the satisfaction of the Mortgagee or Secretary (whichever party issued the notice of violation) within 30 days after the date such notice is mailed or within such further time as the Mortgagee or Secretary, as applicable, establishes in writing, without further notice the Mortgagee or Secretary, as applicable, may initiate any of the following actions:

a.   With the prior written approval of the Secretary, declare the whole indebtedness due and thereupon proceed with foreclosure of the Mortgage.

b.   Collect all rents and other operating receipts of the Project and use such collections to pay the Owner's obligations under this Agreement and under the Note and Mortgage and the necessary expenses of maintaining and operating the Project.

c.   Take possession of the Project, bring any action necessary to enforce any rights of the Owner related to operation of the Project, and operate the Project in accordance with the terms of this Agreement until such time as it determines that the Owner is again in a position to operate the Project in accordance with the terms of this Agreement, the Note and the Mortgage.

d.   Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violations of this Agreement, for the appointment of a Receiver to take over and operate the Project in accordance with the terms of this Agreement, or for such other relief as may be appropriate, given the nature of the default and the damage resulting from the default.

e.   Assess the Owner for the cost of reasonable attorney, audit and other fees incurred in enforcing compliance with

this Agreement.  The Owner agrees to pay such fees within 45 days of receipt of the Mortgagee's billing, or within such longer payment period as the Mortgagee approves.

2.    The damage to the Project as a result of Owner's breach of its duties and obligations under this Agreement shall include, but not be limited to, those amounts specified below.  Any damages collected or recovered by the Mortgagee or the Secretary shall be payable to the Project account established under Paragraph B.3.a. above.

a.    In the case of unauthorized distributions of Project funds or Project assets, the damages shall be the amount of the unauthorized distributions plus interest from the date the distribution was made.

b.    In the case of failure to provide management satisfactory to the Mortgagee and the Secretary, the damage shall be the cost to the Project resulting from such failure.

c.    In the case of willful or negligent failures to maintain the Project in appropriate physical condition, the damage shall be the cost of the repairs required to return the Project to decent, safe, and sanitary condition.

d.    In the case of incurring costs significantly in excess of amounts ordinarily paid, the damage shall be such excess costs.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the date first herein above written.

WARNING:   18 U.S.C. 1001 provides, among other things, that whoever knowingly and willingly makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

12 U.S.C. 1715z-4 provides in part:  "Whoever, as an owner of a property which is security for a mortgage (covering multi-family housing, as defined in the regulations of the Secretary) or as a stockholder...beneficial owner...trust...or as an officer, director or agent of any such owner (1) willfully uses or authorizes the use of any part of the rents or other funds derived from the property covered by such mortgage in violation of a regulation .(2) willfully and knowingly uses or authorizes the use, while such mortgage is in default, of any part of the rents or expenses...shall be fined not more than $5,000 or imprisoned not more than three years or both."

-14-

WITNESS/ATTEST:

                                  OAKLAND LAKES, LTD., a
                                  Florida limited partnership

                                  By:
                                     William O. Brisben,
                                     General Partner

                                  CINCINNATI MORTGAGE CORPORATION

                                  By:
                                     Robert W. Jorden,
                                     Executive Vice President

STATE OF OHIO        )
                    ) SS:
COUNTY OF HAMILTON  )

     Before me, a Notary Public in and for said County, personally appeared William O. Brisben, who, as general partner of Oakland Lakes, Ltd., a Florida limited partnership, who acknowledged to me that he did sign the foregoing instrument in the name and on behalf of said partnership, and that the same is his free act and deed and the free act and deed of said partnership and that he was duly authorized to execute said instrument by the partnership.

     IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my official seal this ___2nd___ day of October, 1989.

                                             Notary Public

STATE OF OHIO        )
                    ) SS:
COUNTY OF HAMILTON  )

     Before me, a Notary Public in and for said County, personally appeared Robert W. Jorden the person who was Executive Vice President of CINCINNATI MORTGAGE CORPORATION, an Ohio corporation, acknowledged to me that he did sign the foregoing instrument in the name and on behalf of CINCINNATI MORTGAGE CORPORATION, and that the same is his free act and deed as such officer and the free act and deed of said corporation, and that he was duly authorized to execute said instrument on behalf of such corporation.

JENNIFER L. MHUCH
Notary Public, State
My Commission Expires March

BK:1681PG:663

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my official seal this ___2nd___ day of October, 1989.

_Jennifer L. Farris_
Notary Public

This instrument prepared by:  STRAUSS & TROY
2100 Central Trust Center
201 East Fifth Street
Cincinnati, Ohio  4520
(513) 621-2120

CMC-9967

JENNIFER L. MUNCH
Notary Public, State of Ohio
My Commission Expires March 2, 1994

3K7681PG1964

-16-