UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.00-6147-CIV-LENARD/TURNOFF

813268 ONTARIO, INC., as
General Partner of OAKLAND
PARK (FLORIDA) LIMITED PARTNERSHIP,
an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;
        Plaintiff,

vs.

OAKLAND LAKES, LTD.,
a Florida Limited Partnership,
WILLIAM O. BRISBEN, W.O. BRISBEN
COMPANIES, INC., and ROBERT E. SCHULER,
as General Partners of OAKLAND LAKES, LTD.,
THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,
        Defendants.





### PLAINTIFF'S MOTION TO EXTEND FACT DISCOVERY DEADLINE

Plaintiff, 813268 ONTARIO, INC., as General Partner of OAKLAND PARK

(FLORIDA) LIMITED PARTNERSHIP, an Ontario limited partnership, as limited partner of,

and on behalf of OAKLAND LAKES, LTD., a Florida Limited Partnership, ("Oakland

Park"), by and through its undersigned attorneys, files this motion to extend the fact

discovery deadline imposed by the Court, and as grounds therefor would show:

1.      As more fully alleged in the complaint, beginning in or about 1989, Oakland

Lakes Ltd. (Oakland Lakes) initiated negotiations to obtain favorable, low interest mortgage

financing for the development of an apartment complex in Broward County, Florida (the

"Project"); principally, through a mortgage loan (the "Loan") extended by Cincinnati Mortgage Corporation ("Cincinnati Mortgage").

2.      In return for receiving the low interest financing, the Project was to be subject to a recorded land use restriction which required that a portion (20%) of the Project be devoted to low income housing.

3.      As also more fully alleged in the complaint, Oakland Lakes obtained mortgage financing, with Cincinnati Mortgage, which was originally coinsured by the Secretary of Housing and Urban Development (HUD).  Cincinnati Mortgage defaulted under the loan documents and HUD assumed the role of lender under the loan documents.

4.      As further more fully alleged in the complaint, Oakland Lakes, on or about January, 1990, and continuing thereafter, defaulted under the loan agreements evidencing the Loan.  Thereafter, effective February 1, 1995, Oakland Park and HUD entered into a Provisional Workout Arrangement (PWA).  It is Plaintiff' position, as more fully alleged in the complaint, that the PWA was entered into by the former general partner of Oakland Lakes, William O. Brisben, without the consent and authorization of Oakland Lakes' limited partners, as required under the amended and restated partnership agreement of Oakland Lakes (the "Amended & Restated Limited Partnership Agreement").

5.      On information and belief HUD, either prior to or immediately subsequent to entering into the PWA, actively solicited third party bids to sell the Loan.

6.      On March 28, 1995 HUD sold the Loan, as part of a large package of loans(the Loan Pool) to Condor One, Inc. (Condor).  Condor was created for the sole and specific purpose of purchasing the Loan Pool and realizing a profit from such purchase, either by foreclosure or sale of each loan in the Loan Pool. Copies (portions of which were redacted by Condor)of the Amended and Restated Loan Sale Agreement Between HUD

-2-

and Condor One, and the Bid Confirmation Letter, are attached hereto as composite Exhibit "B

7.      Plaintiff filed suit on January 31, 2000, seeking declaratory relief under the Loan documents and specifically the PWA, concerning whether the PWA was in fact properly entered into, and whether language in the PWA specifically required HUD to own and to hold the Loan and was prohibited from selling the loan to Condor.

8.      The Court entered its Order Adopting Joint Scheduling Report, Setting Pretrial Conference and Trial, Establishing Pretrial and Trial Procedures and Establishing Pretrial Deadlines on May 5, 2000. This Order set a fact discovery cut-off deadline in this proceeding of February 1, 2001.

9.      Prior to the filing of this action, Plaintiff was involved in state court litigation with William O. Brisben, W.O. Brisben Companies, Inc. and Robert E. Schuler, as general partners of Oakland Lakes (the "Former General Partners") in an effort to enforce the terms and provisions of the Amended and Restated Limited Partnership Agreement between Plaintiff and the Former General Partners.

10.     Since the filing of the original complaint in this Federal Court action, Plaintiff and the former General Partners have substantially resolved and settled the state court litigation, and as a result, the former General Partners have been replaced by Oakland Park G.P. Corporation, as the new General Partner of Oakland Lakes.

11.     The Former General Partners, pursuant to the state court settlement, were dismissed from this litigation, pursuant to this Court's order dated August 31, 2000.

12.     On August 31, 2000, Oakland Lakes filed a voluntary petition for Chapter 11 reorganization under the United States Bankruptcy Code, in case Number 00-25351-BKC-

RBR, in the United States Bankruptcy Court for the Southern District of Florida, Ft. Lauderdale Division (the "Bankruptcy Proceeding").

13.    On November 1, 2000, Plaintiff filed a motion in this action seeking leave to amend its complaint to address the settlement with the Former General Partners and assert additional causes of action against Defendants Condor and HUD.

14.    Since initiating its Chapter 11 Bankruptcy Proceeding, Plaintiff's efforts have been focused on that reorganization, and discovery, including several depositions, which have taken place in the Bankruptcy Proceeding.

15.    During the course of discovery in the Bankruptcy Proceeding, Plaintiff has become aware of facts and circumstances which may constitute a basis for maintaining a class action under Federal Rule of Civil Procedure 23. The class would consist of borrowers who's loans were sold by HUD to Condor as a part of the Loan Pool, who, on information and belief, are similarly situated to Plaintiff.

16.    Douglas Goldrick, a loan asset manager for Condor, who is in charge of monitoring and enforcing some or all of the loans in the Loan Pool, testified in his Bankruptcy Proceeding deposition, a copy of which is attached hereto as Exhibit "A." Mr. Goldrick testified that Condor in purchasing the Loan Pool acquired several hundred loans from HUD (Deposition, p.13-14).

17.    Mr. Goldrick also testified that a large percentage of the loans Condor acquired in the Loan Pool were operating under Provisional workout Arrangements similar to the PWA at issue in this case (Deposition, p. 29).

18.    The potential Class which Plaintiff would intend to attempt to certify in this proceeding pursuant to applicable law would consist of those borrowers in the Loan Pool who entered into Provisional Workout Arrangements similar to Plaintiff's, and any other

borrowers to whom HUD failed to disclose sufficient information and/or to negotiate and to consummate Provisional Workout Arrangements in good faith, as alleged below.

19.    On information and belief, HUD, during the same time period it was negotiating with Oakland Lakes,  entered into negotiations with all similarly situated borrowers obligated under substantially similar HUD generated mortgage loans, in an effort to obtain Provisional Workout Arrangements in which the borrowers all agreed (as did Oakland Lakes in its PWA) to confirm the full principal amount of the debt, plus accrued interest, and to also agree to an "equity kicker" in favor of HUD, whereby a percentage of any equity in any property subject to each loan would be paid to HUD upon any sale of the property securing such loan.  In addition, the Provisional Workout Arrangements included ongoing onerous operating restrictions, including requiring a reserve account monthly servicing fees and cash balance forfeiture requirements.

20.    On information and belief, HUD  took such actions only after it had begun to solicit bids and/or enter into negotiations to sell the loans to Condor or a similar "vulture fund" lender at a substantial discount which plaintiff believes amounted to a sale of the loans at less than 50% of the total principal loan value of each loan, including the Loan of Oakland Lakes.

21.    During Mr. Goldrick's deposition, he was questioned concerning the purchase price of the Loan Pool, and questioned about the Amended and Restated Loan Sale Agreement Between HUD and Condor One, and the Bid Confirmation Letter, copies of which are attached hereto as Exhibit "B," which Condor produced at the deposition.

22.    Mr. Goldrick testified that he understood Condor purchased the Loan Pool at a percentage of the total amount of all of the loans in the Loan Pool, but was unaware of the percentage, notwithstanding the fact that the originals of the documents he produced

at the deposition appeared to contain this information, but same had been redacted from the copies produced to Oakland Lakes' Bankruptcy Counsel

23.    HUD, while negotiating the sale of the loans in the Loan Pool to Condor(including the Loan of Oakland Lakes) at a substantial discount of their outstanding balance, at the same time required a substantial number of borrowers (including Oakland Lakes) to enter into Provisional Workout Arrangements confirming the full amount of the debt, and providing the "equity kicker." At this time, HUD failed to disclose in any manner the nature of the negotiations to the borrowers in the Loan Pool so as to allow the borrowers to be able to make an informed decision as to whether the borrowers should enter into the provisional workout arrangements with HUD, or instead initiate efforts to obtain alternative financing of their loans.

24.    The PWA in this case contains language requiring HUD to hold the Loan, and it logically follows that Plaintiff, and other similarly situated borrowers who entered into Provisional Workout Arrangements with similar language, did so with the full expectation that HUD would be holding the loans and working with the borrowers in an effort to further the interests of the National Housing Act, by attempting to ensure the viability of the projects, in order to maintain affordable low income housing.

25.    Instead, HUD immediately after finalizing the execution of the Provisional Workout Arrangement with Oakland Lakes, sold the loans to Condor One, Inc, a wholly owned subsidiary of G.E. Capital Corporation, and an admitted "vulture fund," who's sole motive was profit, and who has made and continues to make exorbitant returns on each loan after an event of a default, which would allow Condor to foreclose on each property, which forecloses and in turn eliminates the land use restrictions applicable to each property involving a HUD loan and other HUD imposed burdens on such properties, thereby

enabling Condor to re-sell such properties at a considerable profit even beyond the amount Condor would realize as a result of the deeply discounted sale price of the loans in the Loan Pool.

26.     HUD, by selling the loans to a vulture fund like Condor, rather than allowing the borrowers the opportunity to obtain alternative financing at a reduced principal amount, effectively maintained unfavorable financial conditions in relation to each property, thereby forcing each borrower to expend additional funds on debt service, rather than devoting funds to the maintenance and enhancement of each specific property, which would have more effectively advanced the goals of the National Housing Act to provide for affordable quality low income housing.  Such actions amount to a failure by HUD to negotiate in good faith and in furtherance of the National Housing Act.

27.     On information and belief, HUD sold the Loan Pool consisting of 200 or more loans to Condor with a then outstanding principal balance far in excess of one billion dollars

28.     In addition, even assuming that any one of the similarly situated borrowers was able to comply with the terms of the PWA, they still would have had to comply with the "equity kicker" in the Provisional Workout Arrangements.  Had the borrowers been aware that HUD intended to sell their loans a at a substantial discount to Condor, they may never have agreed to the Provisional Workout Arrangements.

29.     Plaintiff is of the belief that extensive documentary and other evidence exists which will demonstrate HUD either negligently or intentionally misled a substantial number of borrowers in the Loan Pool to incorrectly believe that HUD would hold the loans with the effort and intent to continue the viability of each given project, and instead improperly concealed information from the borrowers which prevented them from being able to make

-7-

an informed decision concerning the projects and loans, while at the same time making the loan package more attractive to Condor to purchase.

30.    Plaintiff should be given adequate opportunity to conduct all discovery in this regard and determine the extent of evidence in support of the allegations contained herein.

31.    Based on the discovery completed to date, Plaintiff believes the discovery sought will involve hundreds of loans and hundreds of borrowers, and will take considerable time and effort. Plaintiff will be unable to complete such a mammoth undertaking within the current fact discovery deadline, and would respectfully request that the Court extend the deadline so as to allow Plaintiff the opportunity to adequately seek discovery on these issues.

32.    In addition, based on Condor's efforts to date in the Bankruptcy Proceeding to actively conceal and redact information regarding the Loan Pool purchase and to also conceal and redact correspondence containing objections made by borrowers concerning the sale of their loans, coupled with Condor's failure to answer and respond to questions concerning the Loan Pool purchase, Plaintiff anticipates the need for one or more motions to compel, and hearings on same to resolve the issues surrounding Condor's refusal to disclose information.

33.    The discovery sought herein is relevant to the subject matter involved in the pending action and is also reasonably calculated to lead to the discovery of admissible evidence.

34.    Based on the discovery to date, good cause exists to extend the fact discovery deadline beyond the current February 1, 2001 deadline.

WHEREFORE, Plaintiff would respectfully request that this Court enter an order extending the time in which Plaintiff has to seek fact discovery.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by facsimile and U.S. Mail to: **DAVID W. TRENCH, ESQ.**, 2500 First Union Financial Center, Miami, FL 33131-2336, **WILLIAM C. HEALY, ESQ.**, 99 N.E. 4th Street, Third Floor/civil Division, Miami, FL 33132-2111, and **RICHARD T. WOULFE, ESQ.**, P.O. Drawer 03040, 888 E. Las Olas Blvd., Suite 400 Ft. Lauderdale, FL 33303-0340, this 20th day of November, 2000.

Respectfully submitted,

ICARD, MERRILL, CULLIS, TIMM,
FUREN & GINSBURG, P.A.
2033 Main Street, Suite 600
Sarasota, FL 34237
Telephone: (941) 366-8100
Attorneys for Plaintiff

By:_____
ROBERT E. MESSICK
Florida Bar No. 31477
JASON A. LESSINGER
Florida Bar No. 0091601

F \USERS\CJB\CJBC\OAKLAND\HUD-FED.CT\DISEXT.WPD

-9-

1        UNITED STATES BANKRUPTCY COURT
          SOUTHERN DISTRICT OF FLORIDA
2

3              CASE NO. 00-25351-BKC-RBR

4

   IN RE:
5

   OAKLAND LAKES, LTD.,
6

       Debtor.
7  _ _ _ _ _ _ _ _ _ _ _ _ _ _/

8

9

10

11

12              200 S. Biscayne Boulevard
                Miami, Florida
13              October 12, 2000
                10:35 a.m.
14

15

16

17

18

19

20         DEPOSITION OF DOUGLAS GOLDRICK

21

22         Taken before HELAYNE FURMAN WILLS,

23  Shorthand Reporter and Notary Public in and for the

24  State of Florida at Large, pursuant to Notice of

25  Taking Deposition filed in the above cause.

OUELLETTE & MAULDIN
(305) 358-8875

EXHIBIT
A

```
 1  APPEARANCES:

 2      LAW OFFICES OF GENOVESE, LICHTMAN, JOBLOVE &
        BATTISTA, P.A.
 3      BY:  JOHN H. GENOVESE, ESQ.
        and
 4      GLENN D. MOSES, ESQ.
        Attorneys for Debtor.

 5
        LAW OFFICES OF BILZIN, SUMBERG, DUNN, BAENA,
 6      PRICE & AXELROD, LLP
        BY:  SCOTT BAENA, ESQ.
 7      and
        DAVID J. TRENCH, ESQ.
 8      and
        RICHARD J. BERNARD, ESQ.
 9      Attorneys for Condor One, Inc.

10      ALSO PRESENT:
        SOL ROTER
11
```

12                     I N D E X

```
13
    WITNESS                  DIRECT    CROSS
14
    DOUGLAS GOLDRICK           3        --
15
```

16                     EXHIBITS

```
17
    Exhibit A.................................... 20
18  Exhibit A withdrawn.......................... 21
    Exhibit A.................................... 21
19  Exhibit B.................................... 28
    Exhibit C.................................... 34
20  Exhibit D.................................... 46
    Exhibit E.................................... 51
21  Exhibit F.................................... 62
    Exhibit G.................................... 69
22  Exhibit H.................................... 85
    Exhibit I.................................... 91
23  Exhibits J and K............................ 103
    Exhibit L................................... 114
24  Exhibits M and N............................ 114
    Exhibit O................................... 117
25  Exhibit P................................... 118
```

OUELLETTE & MAULDIN
(305) 358-8875

1  Thereupon:

2                    DOUGLAS GOLDRICK

3  was called as a witness by the Debtor and having been

4  first duly sworn, was examined and testified as

5  follows:

6                    DIRECT EXAMINATION

7  BY MR. GENOVESE:

8       Q.    Please state your name for the record.

9       A.    Douglas Michael Goldrick.

10      Q.    And where do you reside, Mr. Goldrick?

11      A.    Dallas, Texas.

12      Q.    And the way you dutifully raised your

13 right hand, I assume you've been deposed before?

14      A.    Yes, I have.

15      Q.    You understand the instructions that your

16 lawyer, David Trench, gave yesterday?  If you don't

17 understand a question, please ask that it be

18 clarified.  You can continue to supplement an answer,

19 if you think you want to further explain an answer.

20 You must answer audibly.  Don't nod affirmatively or

21 negatively.  Try to give an audible response, so the

22 court reporter can note what you say and not how you

23 gesture.  Okay?

24      A.    Yes.

25      Q.    You're currently employed, I assume?

1       A.      Yes.

2       Q.      And is that with Condor and some affiliate

3  of GE?

4       A.      I'm employed by GE Capital Real Estate.

5       Q.      Explain to me in the corporate structure

6  of GE how that fits.

7       A.      Fits with what?

8       Q.      Is it a subsidiary of GE Capital, is it an

9  affiliate of what we commonly understand to be the GE

10 empire?

11      A.      GE Capital Real Estate is a subsidiary of

12 GE Capital Corporation.

13      Q.      And is its business primarily transactions

14 involving real estate, as the name suggests?

15      A.      I would say yes.  Real estate related;

16 financing, acquisitions, sales, brokerage,

17 securitization of loans.  It covers a very broad

18 spectrum of the real estate industry.

19      Q.      What is your background and education?

20      A.      Well, I graduated from high school in

21 1968.  I graduated from college in 1973.

22              I went to work for Trailways Bus

23 Corporation in 1974.  I went to work for a real

24 estate developer in 1978, became self-employed in

25 1982 for a few years, and then in 1986 I went back to

1  work for the developer.   Then in 1988 I went to work

2  for one of the failed thrift institutions in Texas.

3          Q.     Which one was that?

4          A.     Sunbelt Savings, FSB.

5                 Then in 1993 I went to work for GE

6  Capital.

7          Q.     Did the Sunbelt Savings position involve

8  real estate lending?

9          A.     No.

10         Q.     What were your duties at Sunbelt?

11         A.     I was a vice-president asset manager,

12 responsible for a portfolio of nonperforming loans

13 and some real estate.

14         Q.     What was your self-employment that you

15 described?

16         A.     It was a general partnership between

17 myself and an attorney in Dallas, the purpose of

18 which was to locate and acquire income producing

19 properties, provide property management services, and

20 we did some brokerage.

21         Q.     You had mentioned high school.  Did you

22 have formal education after high school?

23         A.     Yes.

24         Q.     What education was that, and where?

25         A.     I graduated in 1973 from Southwest Texas

1  State University in San Marcos, Texas.

2       Q.   What was your degree in?

3       A.   I had a business degree.

4       Q.   General business?

5       A.   Accounting.

6       Q.   Did you become licensed in any state as an

7  accountant?

8       A.   Yes.

9       Q.   What state is that?

10      A.   Texas.

11      Q.   Do you still hold that designation?

12      A.   Yes.

13      Q.   As a licensed accountant?

14      A.   I'm a certified public accountant.

15      Q.   You mentioned real estate brokerage.   Do

16 you hold a real estate broker's license?

17      A.   No, I don't.

18      Q.   Have you ever?

19      A.   No.

20      Q.   Any other professional licenses that you

21 hold?

22      A.   No.

23      Q.   Did you have advanced education beyond

24 your bachelor's degree?

25      A.   No.

1      Q.    Any courses in lending, asset

2 securitization, real estate finance, leasing; any

3 postgraduate business related courses?

4      A.    There may have been some that were related

5 to CPE, but none that I would say were formal courses

6 at universities.

7      Q.    For either GE or Sunbelt, did you have a

8 formal training program?

9      A.    Training in what area?

10     Q.    Well, when you undertook your position at

11 Sunbelt, did you go through a new management, new

12 executive training program in any aspect of the

13 bank's operation, or did you just start working as an

14 officer?

15     A.    I did not attend a formal credit program

16 at the institution.  I was hired.  I began my job.  I

17 was assigned a portfolio of assets, and basically hit

18 the ground running.

19     Q.    Now, you mentioned you went to work for

20 Sunbelt, which was a failed savings bank.  When was

21 it subject to oversight by the RTC, I suppose it was

22 at that time?

23     A.    It would have been June of 1988 that I was

24 hired by Independent American Savings Association.

25 It was closed by the Federal Home Loan Bank or FSLIC

1  in August of 1988.  Immediately all those assets were

2  transferred to Sunbelt Savings, along with the

3  employees.  So it was like a two month period that I

4  actually worked for this Independent American.

5            Sunbelt was -- the oversight group, I

6  believe it was the FSLIC at the time.  RTC came in

7  subsequently.

8       Q.    You were at the predecessor before it was

9  sold by the Fed under an assistance agreement to the

10 buyer, who was Sunbelt; is that right?

11      A.    Yeah.  And there were like 12 institutions,

12 including Independent American, that were rolled up

13 into this Sunbelt Savings, FSB.

14      Q.    I'm gathering from your testimony that

15 what was acquired was a troubled loan portfolio in

16 that process?

17      A.    Yes, and REO.

18      Q.    Was your primary duty in that connection

19 to work through that troubled loan portfolio?

20      A.    Along with the real estate, yes.

21      Q.    You weren't involved at that point, were

22 you, with new credits of Sunbelt and new borrowers?

23      A.    No, I was not.

24      Q.    It was primarily working through this

25 portfolio of assets and credits?

1      A.    It was basically recovery of moneys,

2  either loaned, or loans that were converted into REO

3  through foreclosure attempts to sell those properties.

4      Q.    Did you work yourself out of a job?  Was

5  it anticipated that you would have a further position

6  with the bank, or were you primarily there to work

7  through this portfolio?

8      A.    I think the whole goal of the RTC was to

9  ultimately resolve the crisis that occurred.  I had

10 transferred from the position of the loan asset

11 manager to the position of a loan underwriter for

12 purposes of underwriting the sales, the financing of

13 some of the REOs that the bank owned.

14         I guess that was sometime in early 1992, I

15 think.  So I did that for about a year before I went

16 to work for GE.

17     Q.    How did you come to work for GE?

18     A.    My supervisor at Sunbelt in the department

19 that did the underwriting for financing REO sales was

20 recruited by GE, I think in either December of '92 or

21 January of '93, and he called me and asked me to come

22 over for interviews.

23     Q.    And at that point in time, what did you

24 understand the job at GE would be?

25     A.    It would be a job where I would be a loan

1  asset manager responsible for a portfolio of loans,

2  which I understood to be substantially nonperforming.

3  My job was basically to administer those loans,

4  collect them, resolve them.

5          If there weren't resolutions that could be

6  achieved, then we would pursue collection in

7  accordance with our loan documents.

8      Q.    Did you anticipate doing more or less the

9  same kind of work you had done at Sunbelt?

10     A.    It was similar, but at Sunbelt we were

11 hamstrung with the RTC rules and regulations that

12 really made it very difficult to move quickly or

13 gracefully in the collection process or resolution

14 process of the loan.

15         There were too many approvals, too many

16 committees that had to approve, too many appraisal

17 requirements, review of appraisal requirements.  It

18 was financial constipation, is what it was.

19     Q.    I did RTC work for years, so I can

20 appreciate it.

21     A.    You know what I'm talking about then.

22     Q.    I assume from your answer that GE

23 established the subsidiary not to work through

24 troubled loan portfolios, but for the purpose of

25 profiting from transactions in loan portfolios and

1 real estate; is that correct?

2     A.    Well, GE, the real estate group, has been

3 around a long time making real estate loans and

4 investing in real estate through joint ventures.  So

5 it had been existing.

6          I'm not sure I follow what your question

7 was.

8     Q.    You were describing the red tape and the

9 financial constipation, to use your words.

10         The GE entity by which you are employed,

11 the purpose is to engage in profitable transactions;

12 is that correct?

13    A.    Well, we're not governed under any

14 regulatory agency, I guess, other than the SEC, but

15 for banking purposes, our process is to collect the

16 loan.  Our process is what the company deems to be

17 the appropriate courses of conduct.

18    Q.    But GE acquired troubled loan portfolios,

19 bid on them, didn't it?

20    A.    As part of its business, one segment of it

21 was to acquire some portfolios, yes.

22    Q.    And what is your title at the GE entity

23 for which you work?

24    A.    I call myself a loan asset manager.  That's

25 what's on my card.  The company is not really a title

1  kind of sensitive company.

2      Q.    Have you had that designation since you

3  started?

4      A.    Yes.

5      Q.    The entity Condor One, is that a special

6  purpose corporation formed by GE?

7      A.    To my knowledge, yes.

8      Q.    And to your knowledge, when was Condor

9  formed?

10     A.    Sometime before May of 1995, but I don't

11 know what date.

12     Q.    And from what you've learned, what was

13 Condor's business?

14     A.    Condor acquired a portfolio of loans from

15 the Department of Housing and Urban Development in

16 May of 1995.

17     Q.    Do I understand from your answer that

18 Condor was formed for the purpose of acquiring this

19 HUD portfolio?

20     A.    It's my understanding that that's what it

21 was formed for.

22     Q.    Do you have any knowledge as to why an

23 entity would be formed for this purpose?  Do you know

24 the business reasons why that was structured that way?

25     A.    No, I don't.

1    Q.    And from what you understand, was all of

2    the asset base of Condor real estate or loans derived

3    from HUD financed projects?

4    A.    I'm not sure I follow your question.

5    Q.    Condor acquired only HUD related assets;

6    is that correct?

7    A.    To my knowledge, yes.

8    Q.    Was HUD related projects something that GE

9    had had substantial experience with previously?

10    A.    Previous to when?

11    Q.    To the establishment of Condor.

12    A.    Not any HUD assets.    I believe the May '95

13    purchase was the first portfolio that HUD offered for

14    sale.

15    Q.    And were you involved in the bid process

16    related to the acquisition of this portfolio?

17    A.    No.

18    Q.    How many properties were in the portfolio

19    that Condor acquired?

20    A.    How many -- I'm not sure I follow your

21    question.

22    Q.    You mentioned that Condor acquired a

23    number of HUD related loans.

24    A.    They were all loans, to my knowledge, not

25    real estate, not real property.    There were a few

1 hundred.  I don't know the exact count.

2      Q.    When you said not related to real

3 property, do I understand there were HUD loans that

4 were unrelated to real property?

5      A.    No.  I distinguished that the loans that

6 were purchased were secured with real estate.  There

7 was no direct acquisition of real property from HUD.

8      Q.    Subsequent to the closing of the purchase

9 of the portfolio, I assume that HUD properties became

10 the property of Condor; is that correct?  In other

11 words, you exercised your legal remedies in

12 connection with some of those loans?

13           When I say "you," I mean the corporate

14 you, Condor.

15      A.    Well, the properties were owned by the

16 owners.  To the extent that some of those owners --

17 that there were no resolutions to loans in default,

18 there were some foreclosures, and those properties

19 became owned by Condor One, Inc.

20      Q.    And of this several hundred loans that

21 formed Condor's assets, how many properties and/or

22 loans does Condor have today?

23      A.    I don't know the exact number.  I would

24 say three to four pieces of real estate, and maybe

25 twenty to twenty-five loans.

1      Q.    I assume these are all over the country?

2      A.    Most of them are in the southeast.  In

3 fact, the first sale was a southeast -- it was titled

4 something, the southeast sale.  So the Condor loans

5 were substantially in the southeast region of the

6 country.

7      Q.    How did GE come to learn of the opportunity

8 to acquire the HUD assets?

9      A.    I'm not absolutely sure.  It's my

10 understanding, however, that HUD advertised a sale,

11 and interested parties could make inquiries, sign

12 confidentiality agreements and obtain information.

13     Q.    Did you understand that all of the loans

14 acquired by Condor were troubled loans, loans in

15 default, loans that were classified in some fashion

16 by HUD as nonperforming, or loans that were risky

17 loans?

18     A.    I don't understand your question.

19     Q.    Were there loans, to your knowledge,

20 acquired that were fully performing, excellent

21 credits, or was the HUD sale of the loan portfolio a

22 sale of predominantly troubled loans, if you know?

23     A.    There were some loans performing in

24 accordance with the original contract.  There were

25 some loans performing in accordance with Forbearance

1 Agreements called Provisional Workout Arrangements.

2 There were probably some loans that were in monetary

3 default.

4      Q.    Did you come to understand the reason why

5 HUD was offering these loans for sale?

6      A.    I really don't know what -- to me, the

7 logical reason was, they wanted to liquidate them,

8 but if you're asking me do I know why HUD, as a

9 federal agency, wanted to do it, no, I don't know.

10      Q.    Did you ever find out whether this is the

11 kind of thing that happens periodically, or was this,

12 so far as HUD is concerned, a rare opportunity to

13 purchase these types of loans?

14      A.    You've lost me.  I don't know what you

15 mean.

16      Q.    Well, since this transaction closed where

17 Condor purchased, have you had occasion to see other

18 HUD offerings of loans since then?

19      A.    There have been subsequent sales of

20 portfolios by HUD after the 1995 sale.

21      Q.    Let me ask you what documents you produced

22 in connection with this deposition.  Can you describe

23 generally the several cartons here and several stacks

24 of documents?  Can you describe what it is that you

25 produced?

1  A.  I produced information from our file room

2 that contained copies of the loan documents for the

3 subject loan of this proceeding.  It contained

4 probably some insurance information, probably

5 inspired insurance information.  Whatever we received

6 from HUD when we bought the loan would have been in

7 those files.

8  Q.  I'll ask you more specific questions later

9 about the correspondence, but what correspondence

10 have you not produced with what Mr. Trench described

11 as the Brisben entities?  Is there correspondence

12 that has not been produced with Brisben and any of

13 his other entities?

14  A.  I'm not sure.

15  Q.  You don't know what your attorneys have?

16  A.  I'm not exactly sure what the attorneys

17 may have put on a privilege log.  Right now I don't

18 know the answer to that.

19  Q.  But there is correspondence in connection

20 with other projects owned by Brisben or in which he

21 has an interest, other than the property here, which

22 is called alternatively Casablanca Lakes or Oakland

23 Lakes, correct?

24  A.  Bill Brisben is the general partner on the

25 property in Boynton Beach.  I don't know of any

1  correspondence.  There may be some specifically for

2  Boynton Beach from Mr. Brisben's office.  Generally,

3  the correspondence that I received from the Brisben

4  office dealt with both loans or referred to both

5  loans, if that helps you.

6      Q.    I'd like to ask you about all of the

7  relationships between Condor and GE, to your

8  knowledge, and Brisben and any affiliates, to your

9  knowledge, of Brisben.  We've talked about the

10  Boynton Beach property.  We talked about the property

11  owned by the debtor in this case.

12          Is Brisben and his affiliate relationships

13  with Condor and GE limited to these two projects, or

14  are there other relationships that you're aware of?

15      A.    To the best of my knowledge, it's limited

16  to these two, but there could be things I'm not

17  familiar with.

18      Q.    He could have a credit card or he could

19  have a loan or something like that?

20      A.    Yes.

21      Q.    To your knowledge, has GE or any of its

22  affiliates managed any of Brisben's property, been a

23  consultant for Brisben or vice versa?

24      A.    GE Capital Real Estate does not have a

25  management company, so it doesn't manage any real

1  estate for anybody.

2      Q.    Okay.

3      A.    We don't do consulting, to my knowledge,

4  so that wouldn't have taken place.

5      Q.    To your knowledge, has Brisben or any of

6  its affiliates made offers to purchase assets that

7  any GE entities own, other than these two?  Are there

8  any other situations you're aware of in which Brisben

9  has acted as broker, buyer, in connection with

10 obtaining properties or obtaining a loan from GE?

11     A.    Can you break that up a little bit?

12     Q.    I'm really looking for any other

13 relationships than these two properties, in which

14 Brisben would have an economic interest as broker,

15 buyer, seller, consultant, and wondering if there are

16 any pending discussions that you're aware of where

17 Brisben is involved in any capacity in a perspective

18 transaction with Condor or GE or any of its

19 affiliates?

20          MR. BAENA:  Object to the form of the

21     question.

22          MR. GENOVESE:  You think there's something

23     wrong with that?

24          MR. BAENA:  If you can handle it, go

25     ahead.

1          THE WITNESS:  I'm not aware that Bill

2     Brisben has made application for any loans

3     recently, but I'm not positive.

4  BY MR. GENOVESE:

5     Q.    Do I understand from your answer that the

6  totality of your business discussions with Brisben

7  would have been about Boynton Beach or the Oakland

8  Lakes property?

9     A.    To the best of my knowledge, yes.

10          MR. GENOVESE:  This is a document that was

11     produced.  You guys used numbers.  We'll

12     probably use letters.  I'll call this Composite

13     Exhibit A.

14          (Thereupon, the said document was marked

15     as Exhibit A for identification.)

16  BY MR. GENOVESE:

17     Q.    This looks to me to be something I'd call

18  a bid package.  Can you identify that document?

19     A.    It's a funding request approval.

20     Q.    And what is that?

21     A.    This would have been the form that was

22  prepared by our draw team.

23     Q.    I gave you the wrong package.  We will

24  redact that Composite Exhibit A and --

25          MR. BAENA:  Indact a new one.

1              (Thereupon, the said document was

2        withdrawn as Exhibit A for identification.)

3              MR. GENOVESE:  We'll ask that that be

4        marked as Composite Exhibit A.

5              (Thereupon, the said document was marked

6        as Exhibit A for identification.)

7              THE WITNESS:  Have you asked me a question

8        about this?

9   BY MR. GENOVESE:

10       Q.    Can you just identify what that package of

11   documents is?

12       A.    Well, there's a May 1995 letter from

13   Department of HUD to Dmitri Stockton; a document

14   called Amended and Restated Loan Sale Agreement

15   between HUD and Condor One; Amended and Restated Loan

16   Sale Agreement, Page 34; a letter dated April 20,

17   1995, from HUD to Leonard Zax; a letter from HUD,

18   dated May 8, 1995, to Condor One, Inc.; a duplicate

19   of the May HUD letter to Mr. Stockton; a fax

20   transmittal from Hamilton Securities Group, Inc.,

21   dated March 31, '95; a letter dated April 17, 1995,

22   from Leonard Zax to a person with HUD; a letter dated

23   June 22, 1995, from Leonard Zax to a person at HUD; a

24   document called Notice and Release; a fax transmittal

25   from Hamilton Securities Group, dated March 31, 1995,

1  that's got fairly thick attachments.  It appears to

2  be the same transmittal, but it doesn't have the same

3  attachments.  Then there's an Amended and Restated

4  Loan Sale Agreement between HUD and Condor One, Inc.

5      Q.     All the documents that have been produced

6  that we have here today from your counsel, these are

7  all documents provided by you that you maintained in

8  your files in the ordinary course of the performance

9  of your duties at GE?

10     A.     These were not in my files.

11     Q.     Where did you get those documents?

12     A.     These came from -- I think these came from

13  Locke, Liddell, Sap.

14     Q.     What is Locke, Liddell, Sap?

15     A.     They're our attorneys in Dallas.

16     Q.     In connection with the acquisition by

17  Condor of the loan portfolio from HUD?

18     A.     Yes.

19     Q.     Do all the documents in that package you

20  have relate to the purchase by Condor of the loan

21  portfolio from HUD?

22     A.     Without having read them I'm not

23  absolutely sure.  I presume they do, on the sale

24  number one.

25     Q.     And everything you've indicated has the

1  time frame on or about the transaction with Condor,

2  correct?

3      A.    Yes.

4          MR. BAENA:  Was that package a package in

5      the documents produced, or is that something

6      you put together from the records?

7          MR. MOSES:  It came as clipped.

8          MR. GENOVESE:   The bid package note is

9      ours?

10         MR. MOSES:  Yes.

11 BY MR. GENOVESE:

12     Q.    Let me ask generally, how did Condor, to

13 your knowledge, determine the amount owed in

14 connection with any one of the loans in its diligence

15 to acquire the loan portfolio?

16     A.    Amount owed at what point in time?

17     Q.    At the time of the acquisition, would

18 there not have been a determination by GE and Condor

19 about the amount of the financial obligations owing

20 by the borrower to HUD in connection with each loan?

21     A.    I believe there was a schedule that may

22 have shown unpaid principal balance as of a certain

23 date, and accrued interest, also as of a certain

24 date.  It may have included maybe tax escrow balances,

25 reserve for replacement balances.

1    Q.    That was prepared by HUD and provided in

2  connection with the transaction?

3    A.    I would think so.  I can't recall if I

4  ever saw that.  I would have expected that that would

5  have been -- that there would have been a document

6  such as that that would have gone out with due

7  diligence information.

8    Q.    As you understand the transaction, would

9  HUD have represented that for each of the acquired

10  loans, that the figures it gave as to the balance on

11  them were correct?

12    A.    I think that the schedule reflected their

13  position as to what was owed, yes.

14    Q.    To your knowledge, generally, would the

15  particular borrower in each instance provide some

16  kind of information to HUD and/or Condor, agreeing to

17  the amounts that HUD asserted was owed at the time of

18  the sale transaction?

19    A.    Can you say that again?

20    Q.    Did HUD provide, or did Condor require

21  that the borrowers provide, the equivalent of some

22  estoppel information indicating what they asserted

23  was owed under their respective loan obligations to

24  HUD?

25    A.    Not that I'm aware of.

1    Q.    HUD essentially told Condor, "We represent

2 to you this is what's owing on each of these hundreds

3 of loans"?

4    A.    Yes.

5    Q.    To your knowledge, was there ever a dispute

6 between any of the borrowers and HUD, and subsequently

7 Condor, about the amounts owed under any loans?

8    A.    Are you saying were there disputes between

9 all three parties; borrower, HUD and Condor?

10    Q.    Let me withdraw the question and just show

11 you this letter of June 22, 1995, to Mr. Richbourg at

12 HUD, and signed by Latham & Watkins.

13         Have you seen that letter before?

14         MR. BAENA:  That's part of the bid package,

15     as you characterized it?

16         MR. GENOVESE:  What we called the bid

17     package.  Just documents that have been clipped

18     together.

19         MR. BAENA:  In Exhibit A though?

20         MR. GENOVESE:  Yes.

21 BY MR. GENOVESE:

22    Q.    Do you see the second paragraph?

23    A.    Yes.

24    Q.    There's a reference to disputes with

25 borrowers about amounts asserted to be owed under

1  various loan documents.

2       A.     I don't recall ever seeing this.

3       Q.     You were not involved in any discussions

4  relative to borrowers disputing the amounts owed?

5       A.     I think this was a much higher level issue

6  that did not involve me.

7       Q.     And Latham & Watkins was counsel for

8  Condor in connection with the acquisition?

9       A.     Yes.

10      Q.     I'm gathering that you were not heavily

11 involved in the acquisition itself?

12      A.     I wasn't involved at all.

13      Q.     You said you started in '93?

14      A.     Yes.

15      Q.     Do you know if Condor or GE or anyone had

16 any discussions with the borrower, the debtor

17 partnership, prior to the closing of the sale by HUD

18 to Condor?

19      A.     I don't know.

20      Q.     You don't know if there were any such

21 conversations?

22      A.     No.

23      Q.     Do you know whether Condor in its

24 diligence sought to determine that the borrower had

25 the capacity to execute the PWA, the Provisional

1  Workout Agreement?

2      A.    If who did that?

3      Q.    If the borrower had the authority to sign

4  the PWA.

5      A.    Who would have reviewed that?

6      Q.    Did anyone at Condor inquire as to the

7  capacity of the borrower to execute the PWA?

8      A.    To my knowledge, nobody called Bill Brisben

9  and asked if he had authority to sign the PWA, if

10 that's your question.

11     Q.    You had answered before that there were

12 numbers of PWAs that were acquired.

13     A.    That's correct.

14     Q.    And my question is really directed at, did

15 you do a lot of diligence by contacting borrowers --

16 when I say "you," I mean Condor -- if you know, or

17 did you rest primarily on the representations of HUD,

18 as reflected in one of the documents in this package?

19     A.    Well, we had our --

20        MR. BAENA:  Objection to the form of the

21     question.

22 BY MR. GENOVESE:

23     Q.    Which is entitled Amended and Restated

24 Loan Sale Agreement between Secretary, U.S Department

25 of Housing and Urban Development, Condor One, Inc.,

1  Bidder.

2      A.    Our law firm reviewed all of the loan

3  files, so it wasn't just employees with GE who

4  reviewed documents and made legal decisions.  They

5  did not do that.

6          I don't believe that it was -- I don't

7  believe that in the underwriting process, borrowers

8  were contacted.  That would generally not be the

9  thing that -- in fact, I think that HUD probably

10  prohibited that.

11      Q.    Do you understand why HUD would not permit

12  that?

13      A.    They had their own reasons.  I don't know

14  what they were.

15      Q.    The PWA -- I think that it was marked

16  yesterday.

17          MR. GENOVESE:  Go off the record for a

18      second.

19          (Discussion off the record.)

20  BY MR. GENOVESE:

21      Q.    We referred yesterday to the Provisional

22  Workout Agreement.  Let me show you a copy of that.

23  We'll mark that as Exhibit B.

24          (Thereupon, the said document was marked

25      as Exhibit B for identification.)

BY MR. GENOVESE:

    Q.    We talked about a Provisional Workout Agreement.  Your counsel, I think, has appended it to the pending motion before the court.

         You're familiar with that document?

    A.    Yes.

    Q.    When we talk about PWA, we're talking about this Provisional Workout Agreement, correct?

    A.    Yes.

    Q.    You mentioned that there were a number of these in the Condor portfolio that were acquired from HUD, correct?

    A.    Yes.

    Q.    Would they be very similar or were there significant variances from PWA to PWA?

    A.    They were generally pretty similar.

    Q.    I understand the numbers were different, but it's kind of a boilerplate agreement for HUD?

    A.    The concept was similar, yes.

    Q.    We've heard people refer to that as a Forbearance Agreement.  You've heard that term?

    A.    Yes.

    Q.    Do you understand the PWA to be a Forbearance Agreement?

    A.    Yes.

1    Q.    The effective date of this PWA was

2 February 1, 1995.  When was the transaction closed

3 with Condor?

4    A.    May of 1995.

5    Q.    Were there discussions, if you know,

6 between HUD and Condor, prior to the execution of the

7 PWA, in connection with this property?

8    A.    None that I know of.

9    Q.    To the best of your knowledge, the first

10 time Condor saw it, it was an executed PWA, not a PWA

11 that was in the stages of negotiations?

12    A.    I'm not sure when Condor saw this for the

13 first time.

14    Q.    Who would have more knowledge than you

15 about the acquisition of the loan portfolio, in

16 particular the debtor's loan in this case?

17    A.    I'm not sure I know who that would be.

18    Q.    How many people would have been involved

19 in the process?

20    A.    I don't know.  There could have been 25,

21 there could have been 40 people involved in going out

22 into the field and looking at properties.  Then there

23 would have been several executive officers in

24 Stamford who would have ultimately had the authority

25 to authorize a bid.  I don't know who those people

1  were.

2      Q.    And you mentioned counsel as well

3  reviewing documents?

4      A.    Yes.

5      Q.    And counsel would have reviewed the PWA, I

6  assume?

7      A.    I would think they would have reviewed

8  everything in the file.

9      Q.    There's no question from the PWA that

10 there had been defaults prior to the acquisition by

11 Condor of this particular loan, correct?

12     A.    Correct.

13     Q.    So Condor knew going in that there had

14 been defaults?

15     A.    Yes.

16     Q.    There is no question that HUD did not

17 continue to hold the defaulted note and mortgage on

18 the subject property after the transaction; isn't

19 that correct?

20     A.    After what transaction?

21     Q.    All the rights associated with the note

22 and mortgage, as you understand it, were conveyed at

23 closing to Condor?

24     A.    In May '95, Condor acquired this loan.

25     Q.    My assumption is, from the documents we've

1  reviewed, that a purchase price was paid for the

2  entire portfolio; is that correct?

3      A.    Yes.

4      Q.    Based upon a calculation of a percentage

5  factor for all of the loans, correct?

6      A.    I don't know about the percentage factor

7  part.

8      Q.    The bid, to your knowledge, by Condor/GE

9  to HUD was for X percent of the total aggregate

10 obligations owing under all of the loans?

11     A.    I think that's correct, yes.

12     Q.    And that wasn't something, to your

13 knowledge, that Condor wanted to do.  I mean, the way

14 the bid package was structured it's, "Give us a

15 percentage of the total amount of these loans"?

16     A.    I believe that's correct.

17     Q.    Let me show you a document in this

18 package, which is a letter dated March 31st, which is

19 a bid confirmation letter, and ask you to identify

20 that.

21     A.    It's a bid confirmation letter, Southeast

22 Auction, dated March 31, 1995.  It's addressed to

23 Dmitri Stockton.  It's sent by an authorized agent of

24 HUD.  It appears to be informing Mr. Stockton that

25 Condor's bid was the successful bid for the pool of

1 mortgage loans, as identified on Exhibit A.

2    Q.    And there's a redaction to the

3 percentage.  Do you know what was in that blank?

4    A.    I don't think it was redacted, but I don't

5 know what the percentage was, no.

6    Q.    When you say you don't think that it was

7 redacted, you mean the original letter --

8    A.    I don't think they put redacted in the

9 original letter.  Somebody did take out the

10 percentage.

11    Q.    Do you know what the percentage was?

12    A.    No, I don't.

13    Q.    Would you dispute it if I told you it's

14 about 40 percent?

15    A.    Do you know it to be 40 percent?

16    Q.    I believe it to be.  I'm asking a

17 question.  If I'm wrong, you can tell me I'm wrong.

18         MR. BAENA:  Object to the form of the

19    question.  He said he doesn't know.  If he

20    doesn't know, he can't dispute what you're

21    saying.  It's argumentative.

22 BY MR. GENOVESE:

23    Q.    Do you know?

24    A.    I would be surprised if it was 40 percent.

25         MR. BAENA:  I don't want you to guess.

1              THE WITNESS:  I don't know.

2  BY MR. GENOVESE:

3       Q.    You have no knowledge about what the

4  percentage bid was; is that correct?  Is that your

5  testimony?

6       A.    I wasn't involved in this.  I don't know

7  what the percentage was.  My knowledge is, I guess --

8  there isn't any knowledge on this.

9       Q.    Did you understand that the loan portfolio

10 was purchased at a discount?

11      A.    Yes, I did.

12      Q.    Let me show you the next exhibit, which is

13 Exhibit C, and ask you -- why don't we have the court

14 reporter mark that.

15             (Thereupon, the said document was marked

16      as Exhibit C for identification.)

17 BY MR. GENOVESE:

18      Q.    Can you identify that package of documents?

19      A.    This is a grouping of monthly billing

20 statements generated by GE Capital Servicing Company,

21 with respect to the subject loan.  It looks like

22 there's a Boynton Beach one in here, as well.

23      Q.    Are you familiar with that form?

24      A.    Yes.

25      Q.    That is a form that Condor uses in

1  connection with billings under these acquired loans?

2      A.    Well, the form may have changed over time,

3  the formating, but this would be what would have been

4  sent out.  On this first one, on July 28, 1997, I

5  suspect that it would have been for the August 1st

6  payment.

7      Q.    Let me turn to one of these in this

8  package.  It's dated -- I don't see a date on it.

9  There's no date on the statement, but there's a date

10 on the bottom of this document that says 17 August

11 '95, reserves payment.

12          Do you see that?

13     A.    Yes, I see that.

14     Q.    Can you describe what this document is?

15     A.    It says it's a billing statement.

16     Q.    But it doesn't bear a particular date that

17 I see, other than reflecting some transactions that

18 occurred on the date, correct?  It's the fifth one

19 from the back of this package.

20          Are you familiar with this document?

21     A.    No.  I can't say that I am.

22     Q.    Let me ask you for some references here.

23 This indication of "tran value," what does that mean,

24 do you know?

25     A.    I have no idea.

1      Q.    There's a figure of 40.4040 percent.  Do

2 you know what that number is?

3      A.    No.  I don't know.  It's in the reserves

4 payment row, tran value.  It almost looks like it's

5 the first statement to set up the balances.  It talks

6 about beginning balances.

7      Q.    It also has no due date on it either.

8      A.    It doesn't have -- it's dated August

9 17th.  Is there one before this one?  Here's one

10 August 1, 1995.

11      Q.    The following document, correct?

12      A.    Yeah.  This one, if you'd like me to talk

13 about it --

14      Q.    Tell me what this document is.  It's the

15 next succeeding one in the package.

16      A.    This has a date payment due of August 1,

17 1995, and it shows a beginning balance at the bottom

18 of the transactions, what I think is a setup of the

19 loan on the system, the servicing system, because

20 it's showing the principal balance of 22.7 million.

21 Then it's showing the setup of the escrow.

22           To tell you the truth, I don't know if

23 that's tax escrow or reserve for replacements.  It's

24 either.  Then a transaction value, I guess that

25 column just deals with the dollar amounts.

1              It shows a payment received in July.  It

2    shows applications to the reserve for replacement

3    account, tax escrow.

4         Q.    The document you're referring to, would

5    this be the first document from Condor setting forth

6    the obligations that it asserted were owed after

7    closing, if you know?

8         A.    I don't know.

9              Here's one 6-23-95.  I would say it's

10   probably not the first one, if we've got one dated in

11   June of '95.

12        Q.    Let me digress a second.

13             Are you the officer at Condor/GE

14   principally responsible for the handling of the loan

15   in this particular case?

16        A.    Yes.

17        Q.    Were you, from inception of the Condor

18   acquisition of this loan, the person responsible?

19        A.    No.

20        Q.    What was the name of the person who was

21   responsible?

22        A.    I'm not sure who the first person was.  I

23   know that Scott Kocurek was involved for a while.  I

24   think he was involved for a year or two years.  Then

25   Dave Ingwalson was involved for some period of time.

1          I think it was like March or April of 1998

2   that Scott had left our department, and that's why

3   David took over the loan.  Then David left the

4   department, and it was assigned to me at that time.

5   It was like April of '98, I believe, somewhere in

6   that time frame.

7        Q.    Now, the documents you produced here

8   today, many of them were in the files, I assume, that

9   you inherited from Scott and David?

10       A.    Yes, sir.

11       Q.    Including these documents, because they

12  preceded your involvement?

13       A.    Yes, sir.

14       Q.    What have you used to determine the

15  accuracy of the amounts that Condor asserts that the

16  debtor owes?

17       A.    Well, after Condor acquired these loans,

18  they were set up on our servicing system.  There's a

19  separate company in Houston that handles the master

20  servicing for these Condor loans.  Each loan was set

21  up on the system to generate these statements.

22          I suspect they loaded the original

23  balances or the unpaid principal balance, loaded the

24  transfer of tax escrow funds, reserve escrows, set up

25  what the billing should be.  Then that system was

1  used as a basis to integrate into our accounting

2  system and basically track the billings and the

3  collections on the loans.

4      Q.    These documents that we just looked at,

5  are these documents that are generated by the master

6  servicing entity?

7      A.    Yes.

8      Q.    Information would have been in-processed

9  at the time of acquisition, and then incorporated

10  into their accounting system, generating the type of

11  billing statements we're referring to here, correct?

12      A.    Yes.

13      Q.    Let me show you this document, which says

14  Release of Regulatory Agreement.  It appears to be

15  unexecuted, but it's in that package that was

16  provided to us, which we've called the bid package.

17      A.    Okay.

18      Q.    Do you know what that document is?

19      A.    Well, it appears to be a blank form.

20      Q.    The type of agreement, are you familiar

21  with what it is?

22      A.    Yes.

23      Q.    From your experience with Condor, what

24  does that agreement purport to do?

25          MR. BAENA:  I will just note that it's the

1      first page of something.  All it is is the first

2      whereas clause.

3 BY MR. GENOVESE:

4      Q.    Do you know, whether it's one page or ten

5 pages, if there's an agreement bearing the same

6 title, Release of Regulatory Agreement?  Have you seen

7 those in connection with the Condor HUD portfolio?

8      A.    I may have.  I don't know.

9      Q.    This is not something that you're readily

10 familiar with?  You don't have familiarity with this

11 document?

12     A.    It's my understanding that all of these

13 Condor acquired loans were subject to regulatory

14 agreements executed by the borrowers when they

15 borrowed the money, closed the loans, and it's my

16 understanding that when Condor wanted to acquire

17 these loans, it was a requirement of HUD to basically

18 terminate prospectively the regulatory agreement.

19 That's my understanding.

20     Q.    Mr. Trench referred yesterday to a

21 restriction regarding the use of the property,

22 dedicating a percentage of the units to low income

23 individuals.

24          Do you remember that discussion yesterday?

25     A.    Yes.

1      Q.    Is this document in any way related to
2  that restriction?

3      A.    It's my understanding no, but to tell you
4  the truth, I'm not sure that I've ever read this
5  document.  I don't believe the regulatory agreement
6  dealt with that.

7      Q.    You mentioned in your answer a moment ago
8  that HUD assured that the regulatory agreement was
9  terminated at the time of transfer to Condor.  I'm
10 just trying to understand what was encompassed by the
11 regulatory agreement that you just testified it was
12 your understanding was terminated.

13     A.    I think the regulatory agreement provided,
14 for instance, criminal sanctions.  In the event that
15 someone took money from a property, such as what
16 happened in this particular case, HUD could throw
17 them in jail.

18     Q.    You're referring to not the moneys that
19 Brisben took, I assume you're referring to the
20 post-July use of moneys; is that correct?

21     A.    Yes.

22     Q.    So other than criminal penalties, what
23 else would have been released, in terms of regulatory
24 agreement?

25     A.    As I recall, there were provisions in the

1  regulatory agreement that dealt with how reserve for

2  replacement funds were to be disbursed by the lender.

3  There were probably provisions, I think, that may

4  have dealt with any management agreements that were

5  in place.

6       Q.    What about reporting requirements to HUD?

7       A.    It could easily have included reporting,

8  and other things.  I'm not sure exactly what all was

9  in there.

10      Q.    Would Condor have wanted, if you know,

11 that there be a termination of such regulatory

12 requirements at the time?

13      A.    In my personal opinion, I wish we had the

14 regulatory agreement, and could use that as part of

15 our ability to enforce our loan documents.

16      Q.    Did you know whether it was HUD that

17 requested that it no longer be applicable, or that

18 Condor said, "We don't want your regulations"?

19      A.    It was my understanding HUD dictated that

20 these would be terminated.

21      Q.    Do you understand the reason for that?

22      A.    I don't know what was in their mind.  I

23 don't think they wanted to give us the ability for

24 criminal sanctions against borrowers.  There may have

25 been other legislative reasons.  I don't know.

1     Q.     Are you aware of any HUD supervision of

2 the subject property in this case of any kind after

3 the closing of the Condor transaction?

4     A.     What do you mean "HUD supervision"?

5     Q.     Has HUD made any inquiries since 1995

6 regarding whether the loan is being paid, the quality

7 of the asset, Condor's relationship with the

8 borrower?

9     A.     Prior to me becoming the asset manager I

10 don't know what happened.  Subsequent there was a

11 time when, I think it was Bob Schuler called, and

12 indicated that they were in the process of getting

13 some financing.  I think it was FHA.  He basically

14 asked for a letter from Condor that indicated

15 generally that they were in compliance with the loan

16 and the PWA on this property.

17     Q.     And you gave him such a letter?

18     A.     We gave a letter to -- I think it was

19 addressed to Mr. Brisben.  I think he passed it on to

20 somebody.

21     Q.     Do I understand your testimony to be that

22 the purpose of that letter was so that to another

23 government funded loan program, he could show that

24 he's in compliance with government regulations to

25 qualify for another loan?

1    A.    I think he wanted to be able to show that

2 they were complying with the loan documents.  I'm not

3 sure what else.  That was the gist of what I recall

4 in that letter.

5    Q.    But to your knowledge, HUD has taken no

6 active involvement post-sale to Condor with this

7 project of any kind?

8    A.    Not that I'm aware of.

9    Q.    You're not aware of any correspondence,

10 communication, any notes that you have indicating

11 that anyone at GE spoke to HUD about this property

12 post-transaction?

13    A.    I can't think of any correspondence

14 post-purchase that I was involved in.  Maybe there

15 is.  You're asking it like there is some, but I don't

16 recall any.

17         I don't recall any on any of the loans

18 that I've been involved in.  I can't think of

19 anything right now that would change my answer.

20    Q.    The other Brisben property, the Boynton

21 Beach property, that also is a HUD project, is it

22 not?

23    A.    It was in the same pool of assets that we

24 bought.

25    Q.    Do you understand that Brisben has

1  continued to purport to comply with the HUD

2  restrictions on the use of the property?

3      A.    I'm not sure whose restrictions those

4  are.  I have read the restrictive covenants.  I'd

5  actually like to know whether or not they're

6  enforceable right now or mandatory or whatever you

7  want to call it, or subordinate to our lien.

8           But it is my understanding that the

9  Brisben-Schuler group continued to, I guess, restrict

10 20 percent of the units for low income.

11     Q.    And continued until the transfer to the

12 new control group on this property, correct?

13     A.    I did see some correspondence that I was

14 copied on that noticed the Florida Department of

15 Housing or someone about the change of the general

16 partnership interest.

17     Q.    Let me ask you this question:  If Condor

18 were to foreclose on these properties, is it your

19 view -- and I'm not asking for a legal opinion, but

20 is it your view that Condor would be restricted in

21 its use of the property, such that it must make

22 available 20 percent of the units to low income

23 individuals?

24     A.    That's a question I've asked our attorneys,

25 and they are doing the research.  I don't know the

1  answer yet.

2          MR. GENOVESE:  Can we take like five

3      minutes?

4          (Thereupon, a short recess was taken.)

5  BY MR. GENOVESE:

6      Q.    You provided a letter to Brisben to enable

7  him to obtain other financing by showing he was in

8  compliance with HUD regulations.

9          Is that what you said?

10     A.    Well, I don't know if it enabled him to

11 obtain financing.  He made a request from me to

12 provide a letter that basically said that they were

13 in compliance with this particular loan.

14         MR. GENOVESE:  Let's have this marked as

15     Exhibit D.

16         (Thereupon, the said document was marked

17     as Exhibit D for identification.)

18 BY MR. GENOVESE:

19     Q.    You referred a moment ago to providing a

20 letter to Brisben at his request.  Can you identify

21 what's been handed to you as Exhibit D?

22     A.    A letter dated April 16, 1999, from me to

23 Bill Brisben.

24     Q.    And is that the letter that you referred

25 to a moment ago?

1    A.    Yes.

2    Q.    This sentence that says, "Further, based

3 upon my knowledge" -- which is a defined term -- "of

4 these loans and the operating statements and

5 independent audits for the property which you have

6 provided, it does not appear that any net cash

7 existed pursuant to Paragraph 3b of the Provisional

8 Workout Arrangements for either of the loans."

9         Do you understand the reason why you would

10 give that representation?

11   A.    Yes.

12   Q.    As you understood it, what was the reason

13 for asking you to give that representation?

14   A.    I think so that Mr. Brisben could show

15 someone with FHA a letter that indicated that he was

16 in compliance of the Provisional Workout Arrangement.

17   Q.    You said, based upon your knowledge, as a

18 defined term, and the operating statements and the

19 independent audits for the property, you made that

20 statement.

21        Do you recall what you reviewed and when

22 you reviewed it, prior to making that representation?

23   A.    I don't recall that I reviewed anything.

24 This was what I knew, I think -- I consciously knew

25 at the time this letter was written.

1   Q. It says, "'Knowledge' shall mean only my

2 'current actual knowledge without inquiry,' and the

3 term 'current actual knowledge without inquiry' shall

4 mean only my actual, current and conscious, and not

5 constructive, imputed or implied knowledge."

6    This is the first time I've ever seen

7 knowledge as a defined term.

8   A. It got heavily lawyered, as you can tell.

9   Q. So the based upon what you knew and what

10 you recalled, I guess, on or about April 16, 1999,

11 about the financial statements, you made this

12 representation?

13   A. That's correct.

14   Q. And I guess the suggestion is that you

15 were not provided with operating statements and

16 audits in connection with this?

17   A. No.  That's not correct.

18   Q. I had asked you a minute ago what things

19 you reviewed prior to giving this representation, in

20 order to make this representation.  I think you said

21 you weren't sure if you reviewed anything.

22   A. Well, each month I get copies of the

23 financial statements.  I review those, just as a

24 standard routine process.  I did not review them

25 especially for this letter.

1      Q.    So based upon your memory of what you had

2  reviewed in the course of the preceding several month

3  period, you gave this representation?

4      A.    And the knowledge that the payments had

5  been made.

6      Q.    Now, did you know that Brisben, on April

7  16, 1999, was undertaking an effort to refinance the

8  property for the purpose of paying Condor?

9      A.    Well, I wasn't sure.  I had several

10  conversations about the refinancing or efforts to

11  refinance.  It was not my understanding that this

12  letter was given to Brisben to accomplish refinancing

13  for this property.

14      Q.    But you had mentioned that he wanted to

15  show, in connection with FHA, that he was in

16  compliance.  Would I be wrong in assuming that what

17  he had indicated he wanted to do was to refinance

18  this property and the Boynton property under

19  government programs?

20      A.    I think you'd be wrong.  I think what he

21  was needing this letter for, wanting it for, was for

22  financing on a totally different, new project.

23      Q.    So your belief is that some lender looking

24  at a financing for some unrelated property wanted to

25  see his general compliance on other loans he was

1    involved with?

2        A.    I think the FHA, or whatever insuring

3    agent, wanted some evidence that Brisben was in

4    compliance, or Brisben was going to be categorized in

5    whatever kind of categorization is used by FHA for a

6    borrower who is in default, which could adversely

7    impact future loans.

8        Q.    And you had no specific discussion about

9    what particular other project this was related to?

10       A.    No.

11       Q.    Does Brisben have a number of projects, to

12   your knowledge?

13       A.    Yes.  To my knowledge, he has developed a

14   number of properties.

15       Q.    He currently has active involvement in a

16   number of properties?

17       A.    I don't know what his portfolio is.  He

18   told me they were building some 2,000 units last

19   year, so that's a lot of properties.

20       Q.    And that would be apartment units?

21       A.    Yes.

22       Q.    Is that, to your knowledge, primarily what

23   business he's involved in, which is residential

24   leasing of apartment units?

25       A.    That's my understanding, yes.

1    Q.    Predominantly government programs?

2    A.    I'm not sure about that.

3         MR. GENOVESE:  We'll have this marked as

4    Exhibit E.

5         (Thereupon, the said document was marked

6    as Exhibit E for identification.)

7 BY MR. GENOVESE:

8    Q.    Can you identify that package of documents?

9    A.    This is a document prepared by our

10 servicing company in Houston that reflects the

11 servicing of the subject loan from the date that it

12 was put on the system in May of 1995.

13    Q.    These are documents that are maintained in

14 your file, I assume?

15    A.    Well, typically I don't print these out.

16 This was printed out recently.  I don't typically get

17 those on a regular basis.

18    Q.    But you would have requested them on some --

19    A.    I requested this one.

20    Q.    This shows, does it not, the dates of all

21 payments received by Condor in connection with the

22 applicable periods from the borrower?

23    A.    Yes.

24    Q.    After the closing of the Condor purchase

25 of the portfolio, in which the subject loan was

1  included, was a default ever declared by Condor prior

2  to July of 2000?

3       A.    Not that I'm aware of.

4       Q.    There was no default and acceleration of

5  the full obligation prior to July of 2000?

6       A.    Not that I'm aware of.

7       Q.    Now, there have been substantial

8  negotiations over the course of the last couple of

9  years between Brisben and Condor, regarding a takeout

10 of Condor's loan of both the Boynton Beach and the

11 Sailboat Point properties, right?

12      A.    There have been discussions.

13      Q.    And in those discussions, the two

14 properties, from Condor's point of view, are part of

15 a negotiation package for takeout on both, correct?

16      A.    Well, during a certain period of time the

17 general partner was the same on both, as you know.

18 Their interest was to do something on both of those

19 loans.  So it made sense to talk with Mr. Brisben or

20 Mr. Schuler at the same time about both loans, and

21 that did occur.

22      Q.    And in all the negotiations, it was such

23 that a proposal would only have been considered by

24 Condor that was made in connection with the takeout

25 of both loans?

1      A.    Not in all of them, but substantially all

2 of them.

3      Q.    Do you remember agreeing with Brisben on

4 the amount of money that Condor would accept in a

5 combination of both loans as a takeout?

6      A.    Well, there have been several numbers.   I

7 guess it depends on what point in time you're talking

8 about.

9      Q.    If you remember the points in time and you

10 remember changes in the total amount of the takeout,

11 please tell me.

12     A.    Going back to --

13           MR. BAENA:   These were in the nature of

14      settlement meetings.

15           MR. GENOVESE:   It raises admissibility.

16      It doesn't raise discovery issues.   You can

17      argue, if I attempt to prove a claim by virtue

18      of offering it, it's not proof, but it is

19      clearly discoverable.

20           MR. BAENA:   I'm going to let him answer,

21      but I'm going to reserve whatever objections I

22      have.

23           MR. GENOVESE:   Okay.

24           THE WITNESS:   Well, thinking back, in

25      April of 1999, I think we were at 32.5 million;

1      April, May of '99.

2  BY MR. GENOVESE:

3      Q.    For both properties, correct?

4      A.    But we did segregate and show an amount

5  for either one.

6      Q.    It was 11 and a half for Boynton or

7  thereabouts?

8      A.    I'm not sure.  There's a letter in here.

9      Q.    We'll get to it.

10      You did allocate a value to each of the

11  properties, even though there was a collective

12  takeout?

13      A.    What do you mean "collective takeout"?

14      Q.    The settlement discussion was that Condor

15  in total would be taking out the 32 and a half

16  million, right?

17      A.    Yes, sir.

18      Q.    But there was an allocation of which value

19  would be ascribed to which property?

20      A.    The sale proceeds were broken down by us

21  for the Oakland Lakes and the Boynton Beach property.

22      Q.    And each component had a discount off what

23  you assert to be the amounts owing on the mortgages

24  for each property?

25      A.    Yes.

1      Q.    The allocation of the split of the

2 proceeds between the two properties, was that a

3 Brisben allocation or was that Condor allocated?

4      A.    I believe the aggregate of 32.5 was a

5 number that GE, my office, came up with.

6      Q.    And how did you arrive at that number?

7      A.    It would have been through reviewing the

8 financial reports of operating results of each of the

9 properties, and making some assumptions about the

10 valuation, based on the operating performance, market

11 conditions, comparable information we might have

12 obtained from brokers.

13      Q.    Which particular operating reports would

14 you be referring to that you would have reviewed in

15 reaching those allocations; year end financials?

16      A.    I could have looked at several.  I could

17 have looked at the combination of year end '98, year

18 to date '99, just the month of April of '99.  I don't

19 remember.

20      Q.    Were there further discussions after that,

21 in which takeout of Condor on either or both of the

22 properties occurred?

23            Subject to the same objection.

24      A.    I'm sorry.  I don't follow you.

25      Q.    Were there subsequent discussions where

1  there was a change in allocation of the takeout, or

2  the total amount of the takeout went up or down?

3       A.    I think we later discussed the payment of

4  31.5 million that was part of the entire settlement

5  between Sol Roter's group, the Brisben group and

6  Condor, where Brisben would pay a million and a half

7  dollars to Mr. Roter's group, and then pay Condor 31

8  and a half million dollars, and everybody would be

9  happy.

10      Q.    In what period of time would those

11  discussions have occurred, do you recall?

12      A.    I can't remember if that was in May of '99

13  or -- I'm pretty sure we have a letter on that.

14      Q.    Brisben told you what --

15      A.    I may be talking about 2000 now.  I've got

16  my years -- that would have been in 2000.

17      Q.    Did Brisben tell you that he was attempting

18  to put together kind of a global package that raised

19  sufficient moneys, not just to pay Condor what it

20  wanted, but also to take care of --

21      A.    He told me that he was pursuing

22  refinancing for both properties, and that he would be

23  using some of his own cash to cover the difference.

24      Q.    Did he tell you what he thought the

25  refinancing on the two properties would yield?

1          A.    I don't think so.

2          Q.    Did brisben tell you who the specific

3     perspective lenders were?

4          A.    It was my understanding that a broker who

5     was either with GMAC, or formally with GMAC, had

6     introduced the Brisben group to a company called

7     Capri Capital, and that Capri Capital was basically

8     the loan underwriter, originator, party obtaining the

9     third party reports and that sort of thing.  That's

10    what he told me.

11         Q.    And that transaction obviously didn't

12    occur; that refinancing?

13         A.    That's correct.

14         Q.    Were you told the reason that it didn't

15    occur?

16         A.    I was told by Bob Schuler that at the last

17    minute Capri Capital reduced their loan proceeds by

18    $1 million.

19         Q.    Was an explanation given to you as to why

20    that occurred?

21         A.    No.

22         Q.    Okay.

23         A.    And that as a result, the numbers just

24    didn't work for the Brisben group.

25         Q.    To your knowledge, Brisben would refinance

1  both properties and continue to hold them and operate

2  them?  That's what he expected to do?

3      A.    I think their plan was to refinance, pay

4  off Mr. Roter's group, and pay Condor 31.5, and go on

5  down the road.

6      Q.    Now, I showed you in Exhibit A, a letter

7  by Leonard Zax from Latham & Watkins, who is one of

8  the lawyers that you had indicated represented

9  Condor.

10          Do you know whether that firm represented

11 Condor in any litigation with any borrowers that

12 asserted disputes, or were they transactional counsel

13 in connection with the sale?

14     A.    I think they were transactional, but I

15 really am not absolutely sure.

16     Q.    Have there been other litigations in

17 connection with Condor's acquisition of the HUD

18 portfolios, in which the issue of the amount asserted

19 by Condor to be owing was litigated?

20     A.    Yes.

21     Q.    You had mentioned hundreds of loans in the

22 loan portfolio.  Do you know how many litigations

23 involved disputes over the amount of the asserted

24 Condor obligation?

25     A.    I don't know how many in number.  My

1 experience on the loans that I've worked on is that

2 matters that went into Chapter 11, generally they

3 were protested.  We had to prove those amounts up.

4         Foreclosure actions, there's one going on

5 right now in New York State where there's referees,

6 and the referee has to determine what's owed.  The

7 borrowers have objected to the amounts owed.

8         From my perspective, a good portion of

9 that is just their defensive strategy.  It's not

10 uncommon in an adversarial situation for nearly

11 everything to be objected to.

12     Q.    Not down here.  We always agree to the

13 amount of the indebtedness, first thing.

14     A.    Well then, we shouldn't have a problem.

15     Q.    At GE or Condor or outside counsel, who

16 would be most knowledgeable about cases concerning

17 the Condor portfolio and the identify of these cases;

18 disputes about the indebtedness?  Who would have the

19 most knowledge as to that?

20     A.    I'm not sure.  We have in-house general

21 counsel, assistant general counsel.  They get

22 involved sometimes, not every time there's

23 litigation, whether it's foreclosure litigation or

24 Chapter 11 litigation or other litigation.

25         The asset managers typically are the ones

1  responsible for administering any of those activities

2  involving litigation.  It's not information that is

3  kept track of.  It is fairly typical in litigation

4  that I've been involved in.  I don't know who would

5  know that.

6       Q.    To your knowledge, the portfolio purchase,

7  the operative documents contain certain obligations

8  of indemnity from HUD to Condor.

9            Do you recall those?

10      A.    I don't.

11      Q.    Can you recall whether or not Condor had

12  the right to put any loans back to HUD or seek

13  certain economic adjustments with HUD, regarding any

14  of these loans?

15      A.    There may have been.  I don't remember.

16      Q.    Do you know whether Condor asserted any

17  claims against HUD post-closing of the portfolio

18  sale, arising from the acquisition of the portfolio

19  sale?

20      A.    They may have.

21      Q.    Who would have that knowledge?

22      A.    Well, the lawyer that handled the

23  transaction in-house for GE was a lady named Jane

24  Kerpon.  She's no longer with GE, so I don't know who

25  you would go to in her absence.

1    Q.    Do you know whether notice has ever been

2 given under the document that you produced here

3 entitled Amended and Restated Loan Sale Agreement;

4 notice of any defaults by HUD under this particular

5 agreement?

6    A.    I have no idea.

7    Q.    And the same person would be knowledgeable

8 about that?

9    A.    It was done at a very high level up in

10 Stamford on the actual purchase of the loan

11 portfolio.  I would not have been involved in that.

12 I wasn't involved in it.

13         MR. GENOVESE:  Why don't we break for half

14     an hour or so.

15         (Thereupon, a short recess was taken.)

16 BY MR. GENOVESE:

17    Q.    Do you recall yesterday -- do you mind if

18 I call you Doug?

19    A.    No.

20    Q.    Doug, do you remember we discussed

21 yesterday the issue of litigation relative to a

22 trustee holding certain financing proceeds several

23 years ago; whether the money belonged to HUD or it

24 belonged to the borrower?

25    A.    Yes, I do.

1    Q.  Let me show you a document that was in

2 your file and that you produced, and ask that it be

3 marked as Exhibit F.

4     (Thereupon, the said document was marked

5  as Exhibit F for identification.)

6 BY MR. GENOVESE:

7    Q.  You produced that document.  Are you

8 familiar with it, other than it being in your file?

9    A.  Actually, I don't recall reading it any

10 time recently.

11    Q.  Before I ask you a question about that

12 document, the two individuals you indicated had prior

13 responsibility were Scott and David?

14    A.  Yes.

15    Q.  What were their last names again?

16    A.  Scott Kocurek and David Ingwalson.

17    Q.  And I think you suggested they had been

18 promoted, or did they leave?

19    A.  They changed departments.

20    Q.  Are they still at GE?

21    A.  No.

22    Q.  One or both --

23    A.  Both of them have left.

24    Q.  Do you know how to find them if we would

25 need to take their depositions?

```
 1      A.    David is in Sweden starting a church.

 2      Q.    Was that as a result of this loan?

 3      A.    I don't know what it was the result of.

 4      Q.    "Starting a church," meaning --

 5      A.    He and some buddies are literally starting

 6 a new church in Sweden.

 7            Scott Kocurek works for a company in

 8 Dallas named PNL.

 9      Q.    The same type of business?

10      A.    Yes, generally.

11      Q.    Do you have occasion to talk to him, or

12 you just know he went there?

13      A.    I've talked to him a few times since he's

14 gone there.

15      Q.    Did you look at that document?

16      A.    I see who it's from and who it's to.

17      Q.    Did you hear any discussion about the

18 matters set forth in that document from any of the

19 other officers or agents of Condor or GE?

20      A.    The writers of this weren't with GE.  The

21 writers of this were HUD's.  HUD hired contractors to

22 asset manage loans.  Irvin & Associates was the asset

23 manager that HUD hired.

24      Q.    So this was a document that was contained

25 in the files, apparently transferred from HUD to
```

1  Condor at closing?

2      A.    Or it was in the due diligence information.

3      Q.    Do you recall Sol Roter making the comment

4  yesterday in response to a question that he had

5  thought that the money that was the subject of the

6  dispute held by the trustee had been obtained by HUD?

7      A.    Yes.

8      Q.    Do you have independent knowledge of that?

9      A.    I don't.

10     Q.    Had you heard any discussions about that

11 prior to Mr. Roter testifying to it?

12     A.    No.  In fact, I was curious, looking

13 through some of the materials we brought, or perhaps

14 it was some of your materials that you all produced,

15 trying to figure out where that money might have

16 gone.  I don't know where it is.

17     Q.    When you say "might have gone," that was

18 my question.  My question is, would you know how that

19 would have been applied to the loan balance, if it

20 was applied to the loan balance?

21     A.    I don't know.  What we would have done, if

22 it came in today, we'd apply it probably first to

23 accrued interest.  I don't know what HUD would have

24 done.

25     Q.    You had mentioned, although I haven't seen

1  it in the documents you produced, a summary of what

2  all the hundreds of loans had as the principal

3  balances, and I assume past due interest, that kind

4  of thing.

5      A.    Yes.

6      Q.    You cannot provide us with a copy of that?

7  You don't have readily accessible a copy of that

8  document?

9      A.    No, I don't.

10     Q.    From your recollection of the document,

11 would it have a breakdown of when amounts accrued,

12 how much were late charges, how much were penalties?

13     A.    I think it would have definitely included

14 principal and accrued interest, and probably tax

15 escrow and reserve for replacement balances.  Maybe

16 late charges.  I'm not sure.

17     Q.    There's a reference in the same exhibit

18 you have in front of you, I believe, to additional

19 security as letters of credit.  I thought I saw a

20 reference to that.

21     A.    I haven't read this.  Would you like me to

22 read it?

23     Q.    If there were additional letters of credit

24 that were brought into the transaction and were

25 security, have you seen anything that would indicate

1  demand under the letters, collection of the proceeds,

2  application of the proceeds?

3      A.    I have not seen anything where Condor,

4  through our company, has had possession of any letter

5  of credit or drawn down any letter of credit or had

6  any proceeds paid to it on account of this loan,

7  other than the monthly payments that Bill Brisben --

8      Q.    When did you first have occasion to talk

9  to Sol Roter?

10     A.    I received a letter from Robert Messick

11 either in June of '99 or early July, in that time

12 period.  The content of that letter basically had to

13 do with Mr. Messick saying that his client was Sol's

14 limited partners, the Canadian limited partners.  The

15 letter said that it was their position that the

16 Provisional Workout Arrangement that was executed by

17 Mr. Brisben was executed without proper authority.

18         There was also in that letter the urging

19 by Mr. Messick of a meeting to be held as soon as

20 possible.

21     Q.    Did you attend the meeting thereafter?

22     A.    Yes.  There was a meeting in July.

23     Q.    Of '99?

24     A.    Of 1999, in Cincinnati, at Bill Brisben's

25 office.  Bob Messick was there, Mr. Roter was there,

1  I was there, Bob Schuler was there, and Brian Forbes,

2  who's an attorney with Locke, Liddell in Dallas was

3  with me.

4        Q.    He was counsel for Condor?

5        A.    Yes, sir.

6        Q.    And what was the purpose of that meeting?

7        A.    We were responding to their request in

8  Mr. Messick's letter that they wanted to have a

9  meeting.

10       Q.    And when you had the meeting, what were

11 the matters considered at the meeting?

12       A.    Well, I basically said, "Here we are.

13 What is it that you want to talk about?"

14       Q.    And what did they want to talk about?

15       A.    They said, "We have a problem.  We want to

16 talk about resolving it."

17             I got pretty agitated, because I thought

18 they might be a little bit more prepared to have some

19 ideas on what their solution was, and instead, it was

20 basically, "Here we are twiddling our thumbs.  Where

21 do we all go from here?"

22             So I was upset over that.  I had gone to

23 some expense and time, and dragged my lawyer with me,

24 and they really didn't have anything to say

25 specifically, other than, "We have a problem that

1  needs to be resolved."

2      Q.    And they didn't propose a resolution?

3      A.    I don't recall specific resolutions that

4  were proposed.  Basically, they said they wanted to

5  get out of the partnership with Brisben.  They wanted

6  to divorce themselves of Mr. Brisben.  The impression

7  was that they did not want to retain ownership in the

8  real property.  They wanted something from Brisben

9  for their interest, and Brisben presumably then would

10 deal with Condor.

11          That kind of discussion or resolution

12 scenario was discussed, but no specifics as to what

13 they wanted from Brisben.

14          Then there was a comment by Mr. Roter

15 about the notion of them taking ownership of the

16 property and then coming to us for a settlement.

17     Q.    Was it a specific topic of discussion the

18 validity of Condor's lien, because of the assertion

19 that the PWA was not appropriately authorized by the

20 partnership?

21     A.    You know, that I don't think came up.  It

22 might have, but I think the position that was taken,

23 as I recall, was the buy/sell provision in the

24 partnership agreement, where Mr. Roter's group could

25 be bought out for its investment plus its preferred

1 return, or in the alternative, could buy out Brisben

2 for $100. That may have been the first time I heard

3 about that provision.

4      Q.    Had you seen the partnership agreement

5 before that meeting?

6      A.    I don't recall if I did or did not.

7      Q.    And you don't know whether that agreement

8 was included in any diligence that any professionals

9 or anyone at GE or Condor did prior to the closing of

10 the sale to Condor?

11      A.    I don't know. I got the partnership

12 agreement from -- I think I got it from Bob Schuler.

13      Q.    You got it from Bob Schuler with a

14 specific notation when you got it as to the consent

15 provision of the agreement; isn't that correct? Do

16 you recall?

17      A.    Consent agreement --

18      Q.    There's a transmittal here that shows --

19 let me show it to you. We're going to mark this as

20 Exhibit G.

21           (Thereupon, the said document was marked

22      as Exhibit G for identification.)

23           THE WITNESS: I think I also got a

24      complete copy of it when I asked Mr. Trench to

25      get copies of the filings in the state court

1              action brought by Mr. Roter's group against

2       Mr. Brisben, but on what you've handed me --

3  BY MR. GENOVESE:

4       Q.    There's a notation on the cover that

5  directs you to a specific paragraph.

6       A.    Yes.  It speaks to Section 3.2, Powers of

7  General Partners.

8       Q.    What was your understanding of what

9  Schuler was telling you by directing you to that

10  provision?

11       A.    He was telling me that Bill Brisben had

12  authority to execute the PWA.

13       Q.    And this was before or after the meeting

14  that you just talked about with Mr. Roter?

15       A.    I think it was before, but I could be

16  wrong.

17              We got the letter from Messick.  It

18  obviously raised some concerns.  We were in the

19  process of selling the loan, and Messick's letter

20  screwed that up.  I probably called Bob -- in fact, I

21  remember Mr. Brisben called me and made some

22  reference to the limited partners in Canada hiring

23  counsel, and they were going to sue him.  I didn't

24  understand what that was all about.

25       Q.    You mentioned the Messick letter stopped

1  you from selling the loan?  Did I understand that?

2        A.    Well, it didn't stop us, but the purchaser

3  was given that information as part of due diligence,

4  and basically, they reviewed it and it queered the

5  sale.

6        Q.    Was it your understanding that they

7  perceived a litigation risk?

8        A.    They perceived a litigate risk.

9        Q.    Was the purchaser Ocwen?

10       A.    Yes.

11       Q.    There was some discussion in the documents

12  you provided, was there not, about an assessment of a

13  monetary amount that might result?

14       A.    Yes.

15       Q.    Is that approximately $1.5 million?

16       A.    Yes.

17       Q.    Was that number something that they looked

18  at when they did their diligence and said, "We're

19  going to spend a million and a half resolving this,"

20  or is that a number that you --

21       A.    That was an estimate they gave me.

22       Q.    That's because, being forthcoming in your

23  diligence, you had provided them with the letter that

24  Messick provided challenging the PWA?

25       A.    Yes.

1    Q.    Were there any opinions obtained in

2 connection with the proposed sale to Ocwen about the

3 validity of the PWA?  Did they request such an

4 opinion from anyone?

5    A.    I don't know that they requested opinions.

6 Our attorneys at Locke, Liddell spoke with the Ocwen

7 attorneys directly about this.

8    Q.    Has anyone, to your knowledge, ever offered

9 a legal opinion for use in a transaction, setting

10 forth their analysis that the PWA was authorized to

11 be executed by the partnership?

12        MR. BAENA:  Don't disclose any opinions

13    that were given to you by your counsel.

14 BY MR. GENOVESE:

15    Q.    I'm asking about written opinions.  I'm

16 not asking for the substance.  I'm just asking you

17 whether there is one.

18        MR. BAENA:  You described the substance.

19    By describing the substance, you're asking their

20    opinion.

21        MR. GENOVESE:  I'll rephrase the question.

22 BY MR. GENOVESE:

23    Q.    Are you aware of any legal opinion given,

24 written opinion, regarding the validity or lack

25 thereof of the execution of the PWA, as it pertains

1  to the partnership's authority to execute it?

2          MR. BAENA:  Without disclosing the nature

3      of the opinion.

4          THE WITNESS:  Are you talking about a

5      legal opinion or a memorandum from a lawyer?

6  BY MR. GENOVESE:

7      Q.    I'm not asking you in the context of

8  litigation that's presently pending and previously

9  contemplated.

10          I'm asking you, in connection with any

11  transactions or contemplated transactions, did any

12  perspective buyer request an opinion of counsel as to

13  the validity of the authority of the partnership to

14  execute the PWA?

15      A.    Not that I'm aware of.

16      Q.    Do you recall whether Ocwen requested such

17  a legal opinion?

18      A.    I don't think they did.

19      Q.    When the Messick letter was given to

20  counsel and the discussion ensued, to your knowledge,

21  there was no request for an opinion regarding that

22  singular issue?

23      A.    No.

24      Q.    Are you aware of any lawyers refusing to

25  give an opinion about the validity of the authority

1  of the partnership to have executed the PWA?

2          MR. BAENA:  Other than your lawyers.

3          THE WITNESS:  No.

4  BY MR. GENOVESE:

5      Q.    The note on the cover says, "See Section

6  3.2 on Page 16 Re:  Refinancing."

7          Do you see that reference?

8      A.    Yes.

9      Q.    A moment ago you said that you perceived

10 the direction on the cover sheet to be an indication

11 of, to paraphrase, "See, we had authority"?

12     A.    Correct.

13     Q.    Which refinancing did you think Schuler

14 was referring to?

15         MR. BAENA:  I believe the question is

16     asking you at the time you received that memo,

17     not now.

18         THE WITNESS:  Let me just look at this 3.2

19     a second.

20         It's my understanding that the refinancing

21     on the transmittal had to do with Section 3.2 of

22     the partnership agreement where it says -- and

23     I'll start off at the beginning -- where it says,

24     "The general partner shall have all necessary

25     powers to carry out the purposes, business and

1     objectives referred to in Section 1.3, and shall

2     possess and enjoy all rights, powers of partners

3     of the partnership without limited partners,

4     except as otherwise provided by Florida law and

5     by this agreement, provided, however, the

6     express written consent of the investor limited

7     partner expressed by special resolution, but not

8     the consent of any other limited partner, shall

9     be required before the general partners may, A,

10    sell or exchange substantially all of the assets

11    of the partnership, or B" -- and this is the

12    part I think he's referring to -- "refinance any

13    mortgage indebtedness which is a lien and

14    encumbrance on the project for an amount in

15    excess of the aggregate amount of the mortgage

16    loan."

17         It's my understanding that Schuler meant

18    that since this PWA did not go in excess of the

19    mortgage, that in essence, it's a refinancing

20    that falls within this 3.2b.  That's what I

21    recall Bob pointing me to.

22 BY MR. GENOVESE:

23    Q.    What about the provision regarding the

24 equity kicker?

25    A.    What equity kicker?

1    Q.    Wasn't there an equity kicker given in
2   connection with the PWA?
3    A.    There was an agreement in the PWA that
4   provided for additional payment, but no equity to the
5   lender.
6    Q.    Was that a 20 percent payment?
7    A.    I think it's 25 percent.
8    Q.    So Schuler is telling you that by virtue
9   of this, that that paragraph authorized the PWA
10  refinancing?
11   A.    That's my understanding.  That paragraph
12  in the partnership agreement points to Bill Brisben's
13  authority to execute the PWA.
14   Q.    Now, is the transmittal on 6-15-99 the
15  first time that you've ever seen the partnership
16  agreement?
17   A.    Yes.
18   Q.    You don't have a recollection of seeing it
19  previous?
20   A.    I don't know why I would have looked at it
21  previously, to tell you the truth, because the loan
22  was performing.
23   Q.    After that meeting in Cincinnati, what was
24  the resolution of the issues discussed?
25        You said previously that you were annoyed

1 that there was just an issue raised without any

2 proposed resolution.  When the parties left the

3 meeting, what were the understandings, if any?

4      A.    Well, I think I left with the impression

5 that Mr. Roter and Mr. Schuler would be having some

6 settlement discussions about how to get divorced from

7 each other.

8      Q.    Did you have a particular view as to

9 whether that's something that you wanted or didn't

10 care about, that you're indifferent to?

11      A.    With what respect?

12      Q.    Did it matter to you whether you were

13 dealing with Brisben and Schuler or the Roter group?

14      A.    Well, it mattered to me, because I knew

15 that Brisben had some financial resources with the

16 ability to consummate a payoff if he so desired.

17            I felt jerked around.  I felt that our

18 company was jerked around by the behavior of

19 Mr. Roter's company, the Canadian limited partners.

20 I do think that the letter that Messick sent, that

21 its purpose was to cause the Ocwen sale not to occur.

22      Q.    You believe that --

23      A.    I believe that, yes.

24      Q.    Your answer assumes that they were fully

25 knowledgeable of where the Ocwen sale was at that

1  point in time?

2      A.    I just answered the question.  I think

3  they knew.  I think their intent was to queer that

4  sale.

5      Q.    Let me interrupt you.

6          Your assumption is that from how they

7  acted they knew, or you have independent knowledge

8  that they knew about the pendency of the Ocwen sale?

9      A.    There are some comments that Mr. Messick

10 said to our attorney regarding the Ocwen sale, in

11 conversations after he sent that letter.

12     Q.    That led you to conclude that he had known

13 about the pending deal?

14     A.    There was an indication that Ocwen was

15 going to go forward anyway.  That indication was

16 given to Mr. Messick, who acted very surprised,

17 according to Brian Forbes.

18          Why would he care if the purpose of this

19 letter -- I shouldn't be asking you questions.  I'm

20 sorry.

21     Q.    If you reach any conclusions as to what

22 you thought other people were doing, you can say

23 that.  If you concluded he deliberately wrote this

24 letter to queer the deal, that's your impression and

25 you can testify to that.

1    A.    We'll save that for another day, I guess.

2    Q.    Was it your assumption that Messick, on

3  behalf of the Canadian partners, was trying to obtain

4  leverage by, for want of a better expression, peeing

5  in the punch bowl?

6    A.    I don't think that's it.  I think to the

7  extent that we sold this loan to a third party at a

8  discount, then in the event that Messick's group,

9  Mr. Roter's group, gets control of this property,

10  then they now owe Ocwen, for example, $25 million,

11  and Ocwen paid something less to us to purchase that,

12  that the juice had already been squeezed out through

13  that third party sale to Ocwen, so their bargaining

14  position with Ocwen would be much less.

15    Q.    So they hurt themselves actually, do you

16  think, in such a transaction by raising these issues?

17    A.    They hurt Condor.

18    Q.    What was the relationship like that you

19  observed between the Roter group and the Brisben

20  group?

21    A.    There appeared that there was distrust

22  among the two groups.  There was, I guess, some anger

23  between the two groups, apparent disrespect.

24        Mr. Roter, I think, has taken the position

25  that they basically ransacked the property and had

1  caused -- are the primary root to the losses of the

2  limited partners.  So they weren't buddy buddy.

3      Q.    Were there accusations made at the

4  meeting?

5      A.    I don't recall any.  There may have been.

6      Q.    What litigation was pending at the time of

7  this meeting, if any?

8      A.    I think at that time there may have been

9  the state court litigation brought by Mr. Roter's

10  group against Mr. Brisben and Mr. Schuler over the

11  buy/sell provision in the partnership agreement.

12      Q.    But obviously, the litigation regarding

13  the validity of the assignment and the PWA had not

14  yet been filed?

15      A.    That's my understanding.

16      Q.    What had your relationship with Brisben

17  been like up until that point in time?

18      A.    Well, I had not really ever talked to or

19  met Mr. Brisben.

20      Q.    Until that point in time?

21      A.    I don't know.  Maybe a few weeks before

22  that time.  I had telephone -- I may have had

23  conversation with him, but most of my contact was

24  with Bob Schuler.

25      Q.    And had you met with Schuler?

1    A.    I've met with Bob Schuler.  I met with

2 him -- I'm trying to think if the first time was when

3 we had the meeting in Cincinnati in July of '99.

4         Actually, I met with him before then.

5 That's right.  That's when I first met Bob Schuler

6 and Mr. Brisben.

7    Q.    Would you describe the relationship as

8 pleasant, businesslike?  How would you describe it?

9    A.    I would say it was both pleasant and

10 businesslike.

11   Q.    How many occasions did you have, prior to

12 the meeting we discussed, to visit the property?

13   A.    Well, I was there, I think the first time

14 was December of 1998.  Then I was there in

15 February -- let me think a second.  I was there in

16 February of 2000.  I can't remember if I was there in

17 '99.  I may have been, may not have been.

18   Q.    Were there any comments made at the

19 meeting about the misuse of the reserve account?

20   A.    I don't recall any specifically.  There

21 could have been.

22   Q.    Were there any discussions about the way

23 the property was maintained?

24   A.    I don't recall specifically.  Again, there

25 could have been.

1           The purpose of the meeting was to talk

2   about resolution, and the focus, I understood from

3   Mr. Roter, was they wanted a divorce.  So maybe he or

4   Messick made comments about those things.  They don't

5   stand out.

6       Q.    Was there anything that was said at the

7   time about Brisben and Schuler and the way they had

8   managed the debtor, that made you ask for information

9   or make further inquiry about any issues raised at

10  the meeting?

11      A.    Not that I remember.

12      Q.    So there was nothing that caused you to be

13  suspicious about Brisben, and reevaluate the way that

14  he was managing Condor's collateral?

15      A.    Well, understand that since May of '95,

16  this loan had paid every month on a timely basis.  We

17  had had a cash flow audit done.  I can't remember if

18  it was '97 or '98.  That was done routinely.  It was

19  not done because of any particular reason.  All of

20  the submissions for draw requests were submitted with

21  the proper documentation that are required by Condor.

22          I don't know of any reason that I would

23  have to look into the financial records of the

24  partnership.

25      Q.    When you said that the payments were made

1 timely since '95, at the time what would you consider

2 timely?

3     A.   Usually, timely is within the first week

4 or ten days.  That's when a number of payments come

5 in.

6     Q.   Were there late payments that late payment

7 fees were charged for from '95 until June of 2000?

8     A.   I don't know.

9     Q.   There's a provision of the PWA that

10 permits a late fee to be charged, correct?

11     A.   Late fees are pretty typical in promissory

12 notes, and there is a late fee that is triggered per

13 the PWA.

14     Q.   That's triggered after the 15th of the

15 month, isn't it?

16     A.   I think that's right.

17     Q.   You don't recall, during the several years

18 that preceded July 2000, whether late fees were

19 charged and paid?

20     A.   Well, during the time that I've been

21 administering the loan, there may have been.  I just

22 don't remember.

23     Q.   Now, in terms of the draw requests, please

24 describe how that capital escrow worked.  How did

25 that get funded?

1      A.    Well, we refer to it as reserve for

2  replacement.

3            Under the Provisional Workout Arrangement

4  there's a requirement that the borrower pay monthly

5  an amount of money that goes into the reserve for

6  replacement escrow.  That's held by our servicing

7  company.  Then periodically, when the borrower deems

8  it necessary to make a draw of all or a portion of

9  those funds, they would make a written request and

10 sign an affidavit and attach paid invoices.

11           Those draw requests would then be sent to

12 a draw department within my office that handles all

13 the draws for GE Capital Real Estate.  An individual

14 within the draw department would look at the bills,

15 would know that this is going to be drawn from moneys

16 already held that belong to the borrower in a reserve

17 account, and would prepare an approval form to

18 circulate to the asset manager, in this case myself,

19 and also to the portfolio manager, who is my boss,

20 for approval.

21           Once those approvals were obtained, then

22 the draw department would inform the loan servicing

23 department in Houston to transfer funds to the

24 borrower.

25           MR. GENOVESE:  We'll have this marked as

1          Exhibit H.

2               (Thereupon, the said document was marked

3          as Exhibit H for identification.)

4    BY MR. GENOVESE:

5          Q.    Let me ask you to identify Exhibit H.

6          A.    The top sheet is a GECRE Funding Request

7    Approval; wire transfer instructions; a spread sheet

8    showing the various draws; a copy of the servicing

9    screen showing money in the reserve account at the

10   time of the draw.

11              That's one of the screens off our data

12   base.  I'm not sure why that's there, but that's what

13   that is.  Then there's a borrower's affidavit signed

14   by Brisben.  Then there's the actual letter

15   transmitting the request for the draw.  The letter is

16   to me from the representative of the borrower.  Then

17   basically there's --

18         Q.    Invoices?

19         A.    Copies of invoices and tapes showing totals.

20         Q.    You indicated a moment ago that the money

21   was released when there was evidence that there was

22   an obligation paid?

23         A.    I believe the affidavit -- let me glance

24   at it real quick.

25              It's my understanding that these invoices

1 were paid typically when the reserve for replacement

2 draw request was made.  Maybe that's not the case all

3 the time.

4      Q.    That's what I'm asking.  I'm asking, just

5 for clarification, was it that they say, "We have

6 these things to pay, please release money," or they

7 say, "We paid it, please reimburse us"?

8      A.    It may be both.

9      Q.    Now, the Sailboat property, they permit

10 pets there, do they not?

11     A.    Yes.

12     Q.    And they also, we discussed, make 20

13 percent of the units available to low income families

14 or tenants, correct?

15     A.    Yes.

16     Q.    Do they get security deposits in

17 connection with each new lease?

18     A.    I don't really know what their management

19 policies were.  I think they do get security

20 deposits.  I think they get pet deposits.

21     Q.    In your experience, is the replacement of

22 carpet and painting and that sort of thing items that

23 are typically charged against security deposits?

24     A.    I don't understand the question.

25     Q.    In your experience with real estate, which

1  you described, is it typical to charge a tenant for

2  replacing the carpet or repainting the premises, and

3  charge the security deposit?

4          MR. BAENA:  Object to the form.

5          THE WITNESS:  Are you saying if I'm moving

6      in, and the owner wants $500 as a deposit, and

7      they also want me to give them $1,000 to pay for

8      carpet?

9  BY MR. GENOVESE:

10     Q.    No.  If you're a tenant and you're leaving,

11 and you ask for your security deposit back, and the

12 landlord said, "You brought in your stinky pets, I

13 have to replace the carpet," in your experience,

14 would the landlord typically say, "I'm replacing the

15 carpet and I'm charging your security deposit"?

16     A.    So I'm taking your security deposit,

17 you're forfeiting it?

18     Q.    Or a portion of it.

19     A.    That's whatever is in the lease agreement.

20 I don't know that agreement.

21     Q.    Do you regard carpet and paint as capital

22 items or is it maintenance items?

23     A.    Well, you're replacing paint, you're

24 replacing carpet.  What's the difference?

25     Q.    Do I understand from your testimony that

OUELLETTE & MAULDIN
(305) 358-8875

1  you don't know what amounts, if any, the Brisben

2  group would have charged tenants to do things like

3  painting, replacing carpet, that kind of thing?

4      A.    I don't know that.

5      Q.    Is it the capital reserve account?  Is

6  that what you've been calling it?

7      A.    Reserve for replacement.

8      Q.    The reserve for replacement account,

9  approximately $6,000 a month is funded into that

10 account by the borrower?

11     A.    Yes.

12     Q.    And that historically ran up significant

13 balances, did it not, of a couple of hundred thousand

14 dollars?

15     A.    I don't remember what the balance was when

16 I took over the loan, but there may have been 200,000

17 in there.

18     Q.    And the only way that the borrower could

19 have had access to those funds for any purpose was

20 with the approval of Condor?

21     A.    Well, procedurally we ask the borrowers to

22 do the things that I mentioned in the draw request.

23 That's what we asked.  Typically, the borrowers

24 agreed to do that.

25     Q.    And that account, who are signatories on

1  that account, the reserve account?

2       A.    Well, the reserve for replacement account

3  is held -- the actual funds are in a GE Capital

4  Bankers Trust account, I believe, and the servicing

5  company in Houston tracks those accounts through

6  debits and credits for this particular loan.

7            When the draw department in my office has

8  the approvals, it would then send wiring instructions

9  to the servicing company in Houston to wire funds,

10 and then procedurally down there, I don't know

11 exactly what they did.

12      Q.    The only way to get funds out of that

13 account by the borrower is with Condor's consent,

14 right?

15      A.    I don't know how else they would get

16 them.  We'd have to wire them to them, so we'd have

17 to consent to wiring the funds.

18      Q.    Do you know what the balance of the

19 reserve account for replacements was at June 30th of

20 2000?

21      A.    I think it was around 30,000, maybe a

22 little bit higher than that.

23      Q.    Do you know how it got to be $30,000?

24      A.    Well, it started with a beginning balance,

25 and that was increased by monthly payments and

1  decreased by the draws, and a cumulative impact of

2  that would bring it to 30,000.

3      Q.    In the last 90 days before June 30th, what

4  substantial repairs or replacements, to your

5  knowledge, were done on the property?

6      A.    I don't know.

7      Q.    Have you produced here today the draw

8  requests submitted for the last several months prior

9  to June 30th?  Was that in the package we --

10     A.    I brought the files that should have had

11 that.  I don't know that I looked at it.

12     Q.    This seems to conclude, if it's

13 chronological, in late '99.  It seems to run to late

14 '99.

15           When you get a chance, would you review

16 your records and see if you have the draw requests

17 for the first several months of 2000?  Maybe you have

18 them here.

19     A.    How do we know there was one necessarily?

20     Q.    Well, are you aware of what the reserve

21 account would have been in the months preceding that,

22 or are you suggesting that it was 30,000 and remained

23 30,000?

24     A.    I don't know.  I'll be happy to check.

25 The only reason it wouldn't be in this set of files

1    would be that either the draw department hadn't sent

2    it down to the file room, or it's in the file room,

3    but it hasn't been filed yet.

4            MR. GENOVESE:  Let's identify this as

5        Exhibit I.

6            (Thereupon, the said document was marked

7        as Exhibit I for identification.)

8            THE WITNESS:  This is the June 30, 2000

9        balance sheet and income statement sent to me by

10        National Realty Management, for the property

11        that's the subject of this proceeding.

12    BY MR. GENOVESE:

13        Q.    Who is National Realty Management?

14        A.    They were the management company managing

15    the property.

16        Q.    That was a Brisben related entity?

17        A.    Yes.

18        Q.    How is it that you came to receive that?

19        A.    They faxed it to me.

20        Q.    When did they fax it to you?

21        A.    It looks like sometime in July; July 19,

22    2000.

23        Q.    Would there not have been deposits every

24    month for all of 2000 of the $6,000?

25        A.    Well, not all of 2000.

92

1       Q.      The first six months of 2000?

2       A.      January through June there should have

3  been, yes.

4       Q.      I asked you how is it that you came to get

5  that, and I was distracted when you may have

6  answered.

7       A.      National Realty Management faxed this to

8  me on July 19th of this year.

9       Q.      Is that per your request?

10      A.      No.

11      Q.      They just sent it to you?

12      A.      Yes.

13      Q.      You don't know why they sent it to you?

14      A.      Well, they sent me the one before and the

15  one before and the one before, so this was not

16  unusual.

17      Q.      And this was subsequent to their departure

18  as management company, correct?

19      A.      That's correct.

20      Q.      Let me show you the financial statements,

21  year ended December 31, '99 and '98.  It was a

22  portion of a composite exhibit from yesterday.  It

23  was produced by Mr. Roter.

24              Have you previously seen the financial

25  statements in connection with the property for the

1  years '98 and '99?

2      A.    I'm sure I have, yes.

3      Q.    These documents were provided to Condor in

4  its role as lender?

5      A.    Probably so, yes.

6      Q.    What do you understand to be the amount of

7  cash that was held by the borrower, as of December 31,

8  1999?

9          MR. BAENA:  Are you asking for his

10      personal knowledge?

11         MR. GENOVESE:  From reading the statement.

12         THE WITNESS:  $100,978.

13 BY MR. GENOVESE:

14     Q.    There's further cash, isn't there?

15     A.    Security deposits, mortgage escrow

16 deposits, reserve fund for replacements, and then

17 just other deposits.

18     Q.    Are you aware of any restrictions on the

19 100,000 in cash?

20     A.    No.

21     Q.    That would just be money in their bank

22 accounts?

23     A.    Well, it says in cash equivalent.  I don't

24 know what that would be.

25     Q.    Now, let's turn to further discussions

1  with Mr. Roter after that initial meeting that you

2  were not very pleased with.

3          When did you next have a discussion with

4  Mr. Roter?

5      A.    I think he called me.  I may have called

6  him.  I don't remember.  I don't know that it was

7  that long after the meeting, but to tell you the

8  truth, I don't remember.

9      Q.    What was the topic of that conversation?

10     A.    I don't remember what we talked about.  At

11 the time they weren't the general partner.  I'm not

12 sure that they'd be the proper party for me to even

13 be talking to.  I don't recall anything significant.

14     Q.    You don't recall any negotiations or

15 discussions about how to resolve the issues?

16     A.    Well, they weren't in a position to deal

17 with Condor, because they weren't the appropriate

18 party at the time.  I think from our standpoint, or

19 my standpoint, I felt it was probably important to

20 deal with the proper party.

21         I don't know.  There may not have even

22 been a conversation shortly after.  I don't remember.

23     Q.    Was your relationship less than pleasant

24 at that point in time with the group represented by

25 Mr. Roter?

1      A.    As I said, I felt tooled around by the
2  letter from Mr. Messick and by the request for an
3  urgent meeting.  Then when we get there, they're
4  twiddling their thumbs.  I think any reasonable
5  person would feel that way after you've expended time
6  and money to accommodate what they deemed to be very
7  urgent.
8            We have a $25 million loan here, and I'm
9  flying up there and they have nothing to tell me.
10     Q.    Was litigation commenced thereafter?
11     A.    By who?
12     Q.    By the Roter group challenging the PWA?
13     A.    Well, I wasn't in the loop.  Condor wasn't
14  a party.  Whatever they did, they did.  I think at
15  some point in time I learned of it and called
16  Mr. Trench and asked him to talk to some of the
17  attorneys.  Basically, I wanted to get an attorney
18  involved, so we could monitor what was going on.
19     Q.    Was the first time you involved Mr.
20  Trench's firm when the disputes regarding the PWA
21  arose?  Was that their first involvement?
22     A.    I can't remember.  I think initially when
23  the letter from Messick came, we were relying on
24  Locke, Liddell.  I can't remember if Locke, Liddell
25  touched base with Mr. Trench or not.  When I learned

1 about the state court action on the buy/sell

2 business, I know that I probably contacted David and

3 asked him to please get involved.

4     Q.    You became aware that at a point in time

5 there was an agreement, a settlement reached in

6 litigation between the Brisben group and the limited

7 partners regarding the buyout?

8     A.    Yes.

9     Q.    How did you come to learn about that?

10     A.    Probably from Bob Schuler.

11     Q.    And did Schuler tell you that it was

12 Brisben's intention to buy out the limited partners?

13     A.    Yes.

14     Q.    And the amount was $1.5 million?

15     A.    He said the plan was to buy them out, or

16 he was going to give them the keys.

17     Q.    Did he have a particular view as to what

18 would happen?

19     A.    What his preference was?  What do you

20 mean, "what would happen"?

21     Q.    Was he conveying a tone of, "I'm going to

22 get this deal, I'm going to get the 1.5 million," or,

23 "I'm going to do my best to get it," or, "It's a

24 long shot"?

25         I mean, was he confident about the

1  probability of getting 1.5 million and achieving the

2  buyout?

3      A.    Yes.

4      Q.    And what steps was he taking to accomplish

5  that?

6      A.    Well, it's my understanding that they had

7  a mortgage broker, who was either a GMAC or a former

8  GMAC employee, someone that Bob Schuler personally

9  knew or had done business with.  That person had

10 introduced Bob Schuler to Capri Capital.

11         Capri Capital, it's my understanding, was

12 given money for third party reports.  An application

13 was provided to them for the financing and the due

14 diligence reports were being done; all of those

15 things that are incidental to financing.

16         The indications I got from Mr. Schuler was

17 that everything was looking very positive towards the

18 refinancing and appraisals.  The appraised value that

19 was necessary to get the proceeds that they wanted

20 and -- you know, they had already factored in the

21 million and a half, and any considerations that they

22 had from just a tax standpoint or from a cash flow

23 standpoint.

24         We had agreed to a number.  We had not

25 reached a written agreement, but we had at least

1  agreed to a number, subject to getting the documents

2  or an agreement signed up.  So from a big picture

3  standpoint, the dollars were acceptable to Mr. Brisben

4  and Mr. Schuler, and as well, Condor and Mr. Roter's

5  group.

6      Q.    The context of the conversation were still

7  both properties at this point; both Boynton Beach

8  and --

9      A.    It was, right.

10     Q.    So what happened?

11     A.    Well, I tried to contact Mr. Schuler to

12  get an update at some point in time, and was having

13  trouble getting through.  Finally I caught him and

14  asked him what was going on, what's an update, where

15  are we.

16          He informed me that the lender had reduced

17  the loan proceeds by $1 million at the last minute,

18  and that it made the deal uneconomical for them.

19     Q.    Did he tell you the reason for the

20  reduction?

21     A.    No.

22     Q.    No justification at all was given for the

23  reduction?

24     A.    No.

25     Q.    Do you have a recollection of the point in

1 time that this conversation would have occurred?

2      A.    Well, I think it was -- under Mr. Roter's

3 settlement agreement, I think there was a deadline.

4 I think there was an additional week or so that

5 Mr. Brisben's group asked for, I guess, for purposes

6 of finalizing the financing.

7           Somewhere in that period of time they

8 learned that this million dollar reduction had taken

9 place, and that just changed the whole complexion of

10 the deal from Mr. Brisben's perspective.

11     Q.    Would this be early June of 2000, late

12 May?

13     A.    I don't know.  What was the expiration of

14 the deal with the Canadians?  I think it was a week

15 or so after that 90 day period or 60 day period that

16 Brisben was given.

17     Q.    You were told by Schuler that, "We can't

18 do it, it's no longer feasible"?

19     A.    He felt like Capri had jerked him around.

20 He had not worked with Capri before, did not have a

21 relationship.  He had been given promises and

22 assurances by Capri, as far as the timing for the

23 underwriting and all the things necessary to get to a

24 closing date, and I got the impression that Capri was

25 not living up to what they had promised.

```
 1              Then at the last minute they say, "The
 2  loan proceeds are a million less."
 3       Q.     Neither Schuler or Brisben had any other
 4  irons in the fire, to your knowledge?
 5       A.     Not to my knowledge.
 6       Q.     Did they indicate to you at that point in
 7  time, "We're giving the property back, because we
 8  can't abide by the settlement agreement"?
 9       A.     Basically.  The impression I got, it was
10  cheaper for them from a cash flow standpoint to
11  transfer the ownership and deal with whatever tax
12  liability would be triggered as a result of that.
13       Q.     Did they tell you, on or about June 30th,
14  that they would transfer ownership of the property?
15       A.     Yes, they did.
16       Q.     Would those discussions have been weeks
17  before June 30th; they would have said, "On June 30
18  we're going to give the property" --
19       A.     I think it was a few days before June 30th.
20  I don't think it was weeks.
21       Q.     When you learned of this, did you have a
22  negative reaction, a positive reaction?
23       A.     I had a reaction.  I was not happy about it.
24       Q.     You were not happy, because you thought
25  you were about to be paid out on a deal that you
```

1  would accept, and you weren't going to be?

2      A.    That's right.

3      Q.    And you were also dealing with the

4  charming Mr. Roter again, you thought?

5      A.    Well, not really that.  We had the sale to

6  Ocwen cued up.  That got queered.  Then we had it

7  cued up again with this kind of -- not really

8  triparty, but the three groups reaching their

9  respective agreements with their respective parties.

10         Bob Schuler told me he's 85 percent

11  certain this is going to happen, so I had every

12  reason to believe that this deal was going to close,

13  and I represented to my management that this thing

14  was pretty much a done deal.  So I looked a little

15  foolish when it didn't close.

16         I didn't really have any thoughts about

17  having to deal with Mr. Roter.  He seems like a nice

18  enough guy.  I was disappointed that the transaction

19  didn't close.  I'm sure that Mr. Roter's group was

20  also disappointed; probably in the same respect.

21      Q.    You think having a million and a half

22  dollars is more fun than this?

23      A.    I'd rather have 31.5 than a million and a

24  half.

25      Q.    You got, I guess, verbal notification from

1  Schuler that, "I hate to tell you, but we can't do

2  the deal, we're giving the property back," correct?

3      A.    Yes.

4      Q.    That preceded any written notification?

5      A.    He told me by telephone first.

6      Q.    Did you take any steps at that point to

7  contact Mr. Roter?  Did you call him up, write a

8  letter?

9      A.    On June 30th or prior to that?

10      Q.    When you first heard verbally, did you

11  contact Mr. Roter?

12      A.    I don't think I did.  I may have.  I don't

13  know.  I made some calls.

14            Again, at that point in time he wasn't

15  general partner.  I'm not sure it would have been

16  appropriate for me to be calling the limited partner

17  up.

18      Q.    But he was about to be.  As you understood

19  it, after June 30th he was going to be your borrower,

20  in effect, correct?

21      A.    Well, it was my understanding from Bob's

22  letter that they were turning over the keys to the

23  property and would be terminating their insurance.

24  So I could put two and two together that basically

25  they were going to sell their general partner

103

1  interest to Mr. Roter.

2       MR. GENOVESE:  Mark these as the next two

3  exhibits.

4       (Thereupon, the said documents were marked

5  as Exhibits J and K for identification.)

6  BY MR. GENOVESE:

7       Q.    Let me show you Exhibit J, which is a

8  letter dated June 28th, which purports to be to you

9  from Bob Schuler.

10      Did you receive that letter?

11      A.    Yes, I did.

12      Q.    That's a couple of days before the change

13 of control, telling you there's going to be a change

14 of control, correct?

15      A.    Yes.

16      Q.    Let me show you this next exhibit and ask

17 you if you can identify this?

18      A.    This is an e-mail regarding force placing

19 insurance on the property, where I asked the

20 appropriate person at my company to force place

21 insurance on the collateral securing the loan.

22      Q.    "Force placing," meaning you would incur

23 the cost for a lender's insurance policy, and you

24 would add it back, per the terms of the mortgage, to

25 the amounts owed by the borrower, correct?

1    A.    I don't know about the last part.  My

2  concern was that Bob Schuler told me he was

3  cancelling coverage June 30th.  I didn't want there

4  to be a gap in time when my collateral was not

5  insured, if there had been a casualty loss.  After

6  all, the lender is the one with the risk here.

7          So I don't know what Mr. Roter's group had

8  done in preparation for insurance to go into effect,

9  so I took this course of action.

10          I don't think anything was added to the

11  loan, in answering the second part of your question.

12  I have since terminated that, upon the recent receipt

13  of evidence of coverage that Mr. Baena provided me.

14    Q.    Was there ever a lapse in the insurance?

15    A.    I don't know.

16    Q.    You since have learned that effective

17  12:01 on July 1, 2000, that there was insurance

18  coverage and there was never a lapse?

19    A.    If that's what that certificate says, but

20  I don't know if it was obtained on the 5th of July or

21  backdated or what.  I couldn't afford to run the risk

22  that there was not coverage.  We requested evidence.

23  We never got it.

24    Q.    At that point in time, Mr. Trench was one

25  of your lawyers?

1    A.    Yes.

2    Q.    Was he involved in the litigation with

3 HUD?  Was he involved in that?

4    A.    The federal case?

5    Q.    Yes.

6    A.    Yes.

7    Q.    Without telling us what you discussed with

8 him, was the issue of the lapse of insurance

9 discussed at all?

10    A.    Yes.

11    Q.    And did you ever consider just calling Mr.

12 Roter and asking Mr. Roter what he intended to do

13 about insurance on the property?

14    A.    A request was made for evidence of the

15 coverage.  I don't remember who the request was made

16 to or by, but we never got the certificate.

17         I could have called Mr. Roter.  Evidently,

18 I didn't call him for the request for the insurance,

19 but we contacted their attorney or someone that was

20 capable of getting to Mr. Roter to get that insurance

21 certificate.

22    Q.    Do you know when that was?

23    A.    I don't know off the top of my head, no.

24    Q.    Were you having any conversations with Mr.

25 Roter in the days immediately preceding June 30th?

1      A.      There may have been some.  I don't
2 remember.
3      Q.      Did you have any conversations immediately
4 after June 30th with Mr. Roter?
5      A.      Yeah.  We talked after June 30th.  I can't
6 remember what point in time in July for sure, but I
7 think there was some indication from Mr. Roter about
8 maybe it was now appropriate to talk about some sort
9 of payoff to us.
10          It may have been -- there may have been a
11 number that he proposed.  If there was one, it was
12 one that I rejected pretty quick.  I recall in a
13 conversation asking him, "Where do I send the default
14 letter?"  Because we had not received the payment due
15 July 1st.
16      Q.      Did he tell you he wasn't going to make
17 the July 1st payment?
18      A.      I think he told me he was going to talk to
19 his attorneys.
20      Q.      And in this conversation, did you ask
21 about whether there was insurance on the property?
22      A.      I don't remember.  I might have, might not
23 have.
24      Q.      Would this have been in early July, this
25 conversation?

1      A.     I don't think it was like July 2nd or 3rd.

2      Q.     The 7th, 8th?

3      A.     Well, I went to Alaska July 3rd, and I

4 didn't get back until the 11th.  I'm going to guess

5 it was sometime the week of the 11th, unless I talked

6 to him like July 1st.

7      Q.     So you were back in Dallas the week of the

8 11th?

9      A.     I think so, yeah.

10      Q.     And to your recollection, you had no

11 conversations while you were on vacation?

12      A.     I'm pretty sure I did not.

13      Q.     Did you force place insurance coverage?

14      A.     Yes.

15      Q.     I'm assuming from your answer that

16 whatever charges you incurred, you haven't included

17 it in the amounts you assert are owed by the

18 borrower?

19             MR. BAENA:  You said have not or have?

20             MR. GENOVESE:  Have not.

21             THE WITNESS:  That's correct.

22             (Discussion off the record.)

23 BY MR. GENOVESE:

24      Q.     I'm gathering in early July that you're

25 rather distressed about the relationship between

1  Condor and its new borrower?

2      A.    Well, we didn't get paid.  We had been

3  paid for probably 60 preceding months with the

4  borrower, who submitted financial statements, was

5  responsive to any questions we had, and who we felt

6  was doing a very good job of managing the property.

7          All of a sudden there's a change in

8  management or ownership by a group that purports to

9  have been -- purports that Mr. Brisben's group has

10 pilfered the partnership, and the first thing they do

11 is basically screw us.

12     Q.    Well, you say that you'd been paid for 60

13 preceding months but, in fact, you were paid on the

14 1st, on the 10th, on the 14th, on the 23rd.

15          Isn't that the payment history with

16 Mr. Brisben, that he paid relatively late frequently?

17     A.    If that's when he paid, that's when he

18 paid, but we got the payments.  On the other hand,

19 the current debtor, come July 1st or July 10th or

20 July 15th, didn't pay anything to us, and in fact,

21 took the money.

22     Q.    Well, you didn't know that at the time.

23     A.    No.  I know that now.

24     Q.    At the time you just knew that you hadn't

25 received a payment on July 1st?

109

1      A.      Well, at the time, whenever that

2 conversation was, I knew I hadn't received a payment

3 due July 1st.

4      Q.      It could have been July 11th, July 12th?

5      A.      Yeah.

6      Q.      Did you instruct your lawyers to send out

7 the default letter?

8      A.      Yes.

9      Q.      Was it you that calculated the dates that

10 were applicable to sending the default letter?  Did

11 you elect to send it on, I think it was July 14th?

12      A.      I don't know how that date came up.

13      Q.      If you had a conversation with counsel,

14 please don't tell me what you discussed with your

15 lawyer.  I'm just asking if you looked at the PWA and

16 the mortgage and said, "I have a right to send out a

17 default letter, as of July 14th"?

18      A.      We had the right to do that, yes.

19      Q.      That's your construction and understanding

20 of the PWA and the mortgage?

21      A.      Yes.

22      Q.      And the default for lack of insurance, you

23 were satisfied that you had sufficient information in

24 hand from which you could conclude there was, in fact,

25 no insurance?

1       A.    At the time I force placed I had no

2    evidence.    At the time of the default letter we had

3    no evidence of coverage.

4       Q.    You had notification orally of a

5    termination of insurance effective June 30th from the

6    prior partner?

7       A.    Yes.

8       Q.    And you can't recall if you discussed the

9    issue of insurance with Mr. Roter whenever you spoke

10   to him in July, perhaps the week of July 11th?

11      A.    That's right.

12      Q.    And you don't remember if insurance was

13   discussed at that point?

14      A.    I don't know if it was discussed in that

15   conversation.

16            MR. GENOVESE:  This is a good place to

17        take a break.

18            (Thereupon, a short recess was taken.)

19   BY MR. MOSES:

20      Q.    Mr. Goldrick, what did you do to prepare

21   for this deposition?

22      A.    Well, in preparation of it, I brought all

23   the boxes of files to -- had them shipped to Miami,

24   to Mr. Trench, went through the files with the

25   lawyers, and we talked a little bit about areas of

1  interest that we thought you all would be talking

2  about.  We talked about --

3              MR. TRENCH:  Be careful what you say.

4              MR. BAENA:  You talked to counsel.  That's

5       all you have to say.

6  BY MR. MOSES:

7       Q.    I don't want to know what you talked about

8  with your counsel.  I just want to know generally

9  what you did to prepare.

10      A.    In the course of bringing these documents

11 in, I've looked at them.  Some of them I hadn't seen

12 in a long time.  Some of them I hadn't seen at all.

13 I consulted with counsel.

14      Q.    Did you have any conversations with Mr.

15 Brisben?

16              MR. BAENA:  In preparation for this?

17 BY MR. MOSES:

18      Q.    In preparation for this deposition.

19      A.    No.

20      Q.    When was the last time you spoke with

21 Mr. Brisben?

22      A.    It may have been April.  Most of my

23 conversations were with Bob Schuler.

24      Q.    When was the last time you spoke with Mr.

25 Schuler?

1    A.    I talked to him sometime, I think, after

2 the GP transfer, maybe once or twice, but it was

3 related to the other loan.

4    Q.    "The other loan," meaning the Boynton

5 loan?

6    A.    Yes.

7    Q.    You didn't talk to Mr. Schuler about this

8 particular bankruptcy proceeding?

9    A.    I haven't talked to him since this matter

10 was filed.

11    Q.    You testified earlier about a deal with

12 Ocwen Financial.

13    A.    Let me back up just a second.  I did talk

14 to Bob Schuler, I think, after June 30th, about the

15 notion of trying to unwind this settlement where

16 there might be a way to still get the deal done

17 through a reduced payment to Mr. Roter's group, in an

18 effort to try to go the extra yard to try to get that

19 deal done.

20    I also talked to Mr. Roter about it.  I

21 thought there might be some hope that with the three

22 parties, there might be -- if each gave, then if it

23 was really over this million dollars, that something

24 could be agreed to.

25    I held out hope actually, even when I

1 heard these documents transferring the GP interest

2 were in escrow, that kind of led me to believe that

3 whatever tax ramifications or other events that were

4 irreversible, if those had not occurred, that maybe

5 there was some chance of being able to have cooler

6 heads prevail, and everybody recognize what's really

7 in the best interest of the parties.

8            I think the personalties between -- the

9 feelings of the Canadian partners and the Cincinnati

10 partners -- I don't know.  There didn't seem to be

11 interest by either of them to make the first call.

12 So I absolutely lost all hope of any unwinding when

13 the bankruptcy was filed, but those conversations

14 took place by me with Mr. Schuler and by me with

15 Mr. Roter.

16            Whether it was a call Mr. Roter made to me

17 and then I brought it up -- I may have called him.  I

18 don't remember.  Those conversations took place, but

19 not with Brisben.

20      Q.    Do you recall whether those conversations

21 took place after the July 14th default letter went

22 out?

23      A.    I can't recall.  They could have and may

24 very well have.  I just don't remember.

25      Q.    Do you recall how many conversations you

1  had on the subject?

2      A.    Probably one or two with Bob and maybe the

3  same with Mr. Roter.

4      Q.    We talked earlier about a potential deal

5  with Ocwen, whereby Ocwen was going to purchase the

6  Boynton loan and the Sailboat Point loan.

7      A.    Right.

8          MR. MOSES:  Why don't we mark this as the

9      next exhibit.

10          (Thereupon, the said document was marked

11      as Exhibit L for identification.)

12  BY MR. MOSES:

13      Q.    Can you identify that for me, please?

14      A.    This is a letter from Ocwen to Mr. William

15  Miles, dated May 6, 1999, which referred to a bid

16  that Ocwen was making for the two loans.

17          MR. MOSES:  Mark these two.

18          (Thereupon, the said documents were marked

19      as Exhibits M and N for identification.)

20  BY MR. MOSES:

21      Q.    Why don't I show you what's been marked as

22  Exhibit M.  Tell me whether you can identify that.

23      A.    Yes.  It's a letter dated June 23, 1999,

24  from me to Angie Strauss of Ocwen Federal Bank.

25      Q.    This is the reference to the litigation

1  risk, I guess, that was brought about by Mr. Messick's

2  letter?

3      A.    Yes.

4      Q.    Tell me if you can identify Exhibit N.

5      A.    This is a letter dated September 17, 1999,

6  from me to Angie Strauss of Ocwen Federal Bank.

7      Q.    We already talked about Exhibit I earlier.

8  It's a June 30, 2000 balance sheet.  I'm going to

9  show this to you again.  There's a reference to

10 accrued real estate taxes.  There's an entry across

11 from that.

12         What's that entry?

13     A.    $224,400.

14     Q.    Is that kept in a separate account with

15 GE, that money?

16     A.    Well, that's the payable.  That's where

17 they're accruing the liability.  The deposit should

18 be an asset.

19         Mortgage escrow deposits, 254 versus 224.

20 So they were a little bit overfunded, at least based

21 on that.

22     Q.    So the mortgage escrow deposit, that's

23 kept in a separate account with GE; is that correct?

24     A.    Yes.

25     Q.    Basically, as of June 30th, the balance

1  was $254,295.58, correct, according to this document?

2      A.    I don't know if this matches with what's

3  in the servicing system, but I recall it's over

4  200,000.  I'd have to confirm that.

5      Q.    Do you know what the current status of

6  that account is today?

7      A.    Well, it's sitting there.  Is that what

8  you mean?

9      Q.    Do you know as of today --

10     A.    The balance?

11     Q.    Yes.

12     A.    No.  I don't know the balance.

13     Q.    Do you know whether GE earns interest on

14 that account?

15     A.    GE earns interest.  It's deposited in a

16 Bankers Trust New York account.  We do not pay

17 interest on the real estate tax escrow to the

18 borrowers.

19     Q.    But you earn interest?

20     A.    Yes.

21     Q.    Do you know what the rate is?

22     A.    No.  Money market rate, I'm pretty sure.

23 I don't know what that rate is.

24     Q.    The HUD financing rate?

25     A.    It's just whatever the overnight deposits

1  are.

2      Q.    What are the Indian Woods and Kings Lane

3  loans?  Do you know what those are?

4      A.    I sure do.  They're loans in the portfolio

5  I'm responsible for.  Kings Lane is from a different

6  portfolio acquisition.  Indian Woods is in

7  foreclosure, with a July 26th foreclosure date.

8      Q.    Does Brisben have an interest in either

9  Indian Woods or Kings Lane?

10     A.    No.

11     Q.    Do you know whether Dmitri Stockton is

12  still with GE?

13     A.    I think he's still with GE.  I'm not

14  sure -- I think he's with GE Mortgage, but I don't

15  know.  He's not with the real estate company.

16     Q.    Are you aware if he's still in Stamford,

17  Connecticut?

18     A.    I don't know.

19          MR. MOSES:  Let's mark this as Composite

20      Exhibit O.

21          (Thereupon, the said document was marked

22      as Exhibit O for identification.)

23  BY MR. MOSES:

24     Q.    Take a look at that and tell me whether

25  you can identify it.

1      A.    It's a letter dated February 6th, from Bob

2  Schuler to Scott Kocurek.  It is a transmittal of

3  letters dated September 6, 1995, addressed to Bill

4  Brisben, signed by Scott Kocurek.  This is what we

5  would refer to as a pre-negotiation letter.

6      Q.    What would you be negotiating?

7      A.    Well, it was standard practice shortly

8  after the purchase of these loans for there to be

9  some meetings with these borrowers, and discussions

10 to explore various ideas of liquidation of the loan,

11 discounted payoffs.  So it's fairly standard for

12 these to be sent out.  Not all of them came back

13 signed.

14          Shortly after the sale, a number of the

15 borrowers contacted us with a bit of concern over

16 what's going to happen now.  I don't know if that

17 happened in this case or not, but this would be the

18 normal, customary asset manager's action taken on one

19 of the loans before any discussions took place about

20 anything related to the loan.

21          MR. MOSES:  Mark this as Exhibit P.

22          (Thereupon, the said document was marked

23     as Exhibit P for identification.)

24 BY MR. MOSES:

25     Q.    Take a look at that and tell me whether

1  you recognize it.

2      A.    This is a letter dated May 9, 2000, from

3  Greg Lowry of Locke, Liddell, to Mr. Steven Hunt, who

4  was Mr. Brisben's attorney.  It transmits a revised

5  draft of the payoff and settlement agreement and

6  black lined copy, comparing the revised draft to the

7  prior version.

8          It only deals with Oakland Lakes.

9      Q.    And the number you were negotiating with

10 the Brisben group at that time for the Oakland Lakes

11 loan was for an agreed payoff amount of $20,625,000,

12 correct?

13     A.    Yes.

14     Q.    And the document obviously speaks for

15 itself, but Paragraph 8 talks about conditions for

16 closing.

17     A.    Right.

18     Q.    It appears one of the conditions to

19 closing is having Boynton make a payment to Condor in

20 an amount exceeding $11 million.

21     A.    Yes.

22     Q.    At that time, what was the status of the

23 negotiations with Boynton concerning the payoff of

24 that amount, and why was that tied into that

25 agreement?

1    A.    Well, Mr. Brisben, as a general partner of

2  both partnerships, was the appropriate party to

3  discuss basically the discounted payoff or loan sale

4  on each of the loans, and Condor, as well as

5  Mr. Brisben, wanted to close on both loans.

6         Our position at Condor was, the Sailboat

7  Point loan, PWA had a maturity or expiration in, I

8  think, February of this next year.  That put a little

9  bit more urgency on the Sailboat Point loan being

10  refinanced.  The Boynton Beach loan was also

11  operating under a PWA Forbearance Agreement, but it

12  had a lengthier period of time before it expired.

13         Condor's position was, we're willing to

14  discount both of them at once, but not separately.

15  That is, we want both of these to be resolved, we

16  want to liquidate them both now, we don't want to do

17  the Sailboat Point one today, and wait three years to

18  do the Boynton Beach one, because the urgency of the

19  Boynton Beach loan won't occur until a few years

20  after.

21    Q.    Why isn't the Boynton group a signatory to

22  that agreement?  Do you know why?

23    A.    Well, the idea was, there would be a

24  reciprocal agreement that would be with Boynton

25  Beach, and that would have the same conditions to

1  closing.  It would be signed by Bill Brisben.  There

2  would be actually two documents, but we never got that

3  far.

4      Q.    Back in May of '95, I think you said that

5  Condor acquired several hundred loans?

6      A.    It was a couple of hundred, 250 maybe.

7      Q.    Currently Condor has around 25 loans and a

8  couple of properties that were foreclosed upon and it

9  now owns?

10      A.    Right.

11      Q.    It essentially liquidated a couple of

12  hundred loans in a five year period; is that correct?

13      A.    Yes.

14      Q.    Do you know how shortly after the May '95

15  acquisition did Condor liquidate the majority of the

16  loans it acquired from HUD?

17      A.    I don't know how that worked out.  We had

18  a much larger staff.  The ones that were in default,

19  we proceeded to pursue our legal remedies under the

20  documents.  If they were in default when we bought

21  them, then the process started earlier.

22          Compared to this loan that's been

23  performing under the PWA until a July payment was

24  missed.  There wasn't anything really I could do

25  except continue to collect payments.  We did have

123

1  discussions about payoffs, but there wasn't an

2  urgency for the borrower to do anything.  The loan

3  was performing.

4            The loans that weren't performing when we

5  bought the portfolio probably either went into

6  Chapter 11 or foreclosure sooner, just because the

7  collection process started sooner.  Ultimately they

8  were resolved through payoffs sooner, or foreclosure

9  and ultimate disposition of the real estate sooner.

10      Q.    Can you guess how many loans you liquidated

11  in the first year?

12            MR. BAENA:  Object to the form of the

13       question.

14  BY MR. MOSES:

15      Q.    If you know.

16            MR. BAENA:  "Can you guess if you know"?

17  BY MR. MOSES:

18      Q.    Do you know?

19      A.    I don't know.  That would be a portfolio

20  manager kind of knowledge.  I was just dealing with

21  my little world.

22            MR. MOSES:  Just give me a couple of

23       minutes.  I'm almost done.  Let me just see if I

24       have any follow-up questions.

25            (Thereupon, a short recess was taken.)

123

1  BY MR. MOSES:

2      Q.    What's the status with the Boynton loan?

3  Is Condor still lending to Boynton?

4      A.    The loan is performing in accordance with

5  the Forbearance Agreement.

6      Q.    Who do you report to at GE?  Do you have a

7  portfolio manager?

8      A.    My boss is Joe Elsener; E-L-S-E-N-E-R.

9      Q.    And he's at the same office you are at in

10 Dallas?

11     A.    Yes.

12         MR. MOSES:  I think that's it.  Thanks for

13     coming down.

14         MR. TRENCH:  He'll read.

15         (Thereupon the taking of the deposition

16     was concluded.  Reading, subscribing and notice

17     of filing were not waived.)

18

19

20     _____

                                   Deponent
21

22         Sworn to and subscribed before me
       this ____ day of March, 1999.
23

24     _____

                                   Notary Public
25

## CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY  OF  DADE

        I, the undersigned authority, certify that
DOUGLAS GOLDRICK personally appeared before me and
was duly sworn.
        WITNESS my hand and official seal this
16th day of October, 2000.

                    _____
                    HELAYNE FURMAN WILLS
                    Notary Public - State of Florida
                    My Commission No. CC-660309
                    Expires:  July 20, 2001


## REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA
COUNTY  OF  DADE

        I, HELAYNE FURMAN WILLS, Court Reporter,
certify that I was authorized and did stenographically
report the deposition of DOUGLAS GOLDRICK; that a
review of the transcript was requested; and that the
transcript is a true and complete record of my
stenographic notes.

        I further certify that I am not a
relative, employee, attorney, or counsel of any of
the parties, nor am I a relative or employee of any
of the parties' attorney or counsel connected with
the action, nor am I financially interested in the
action.

        DATED this 16th day of October, 2000.

                    _____
                    HELAYNE FURMAN WILLS

## AMENDED AND RESTATED LOAN SALE AGREEMENT

### BETWEEN

## SECRETARY OF U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

### AND

CONDOR ONE, INC. _____ ("Bidder")

**(NONPERFORMING, MULTIFAMILY, SOUTHEAST REGION)**
**(MARCH 28, 1995 BID DATE)**


EXHIBIT
B

## TABLE OF CONTENTS

ARTICLE I       DEFINITIONS . . . . . . . . . . . .       2
        Section 1.01 Defined Terms . . . . . . . . . . .       2

ARTICLE II      PURCHASE AND SALE/CLOSING . . . . .       10
        Section 2.01   Agreement to Purchase and Sell the
                       Mortgage Loan(s); Release and
                       Satisfaction. . . . . . . . . .       10
        Section 2.02   Closing; Failure to Close . . . . . .       12

ARTICLE III     PAYMENT OF TOTAL DEPOSIT/ NOTICE TO
                SUCCESSFUL BIDDER/LIQUIDATED DAMAGES . . . .       12
        Section 3.01   Payment of Initial Deposit . . . . .       12
        Section 3.02   HUD's Retention of Initial Deposit;
                       Notice to Successful Bidder. . . . .       12
        Section 3.03   Payment of Final Deposit . . . . . .       13
        Section 3.04   Forfeiture of Total Deposit; Liquidated
                       Damages. . . . . . . . . . . .       14

ARTICLE IV      CLOSING DATE PAYMENT/RESTORATION OF ESCROW
                ACCOUNTS . . . . . . . . . . . . .       14
        Section 4.01   Delivery of Closing Date Payment
                       Notice. . . . . . . . . . . . .       14
        Section 4.02   Payment of Closing Date Payment. . . .       14
        Section 4.03   Transfer of Payments Received by HUD
                       after the Final Cut-Off Date. . . . .       15
        Section 4.04   Restoration of Escrow Accounts. . . . .       15
        Section 4.05   Post-Closing Date Adjustments and
                       Remittances. . . . . . . . . . .       15

ARTICLE V       BIDDER'S PREPARATION OF TRANSFER DOCUMENTS;
                DELIVERY TO HUD . . . . . . . . . .       16
        Section 5.01   Preparation and Delivery to HUD of
                       Transfer Documents . . . . . . . .       16
        Section 5.02   Failure to Deliver Transfer Documents . .       17

ARTICLE VI      HUD'S DELIVERY OF DOCUMENTS TO
                BIDDER/RECORDATION . . . . . . . . .       18
        Section 6.01   Delivery of Mortgage Loan Documents and
                       Transfer Documents. . . . . . . . .       18
        Section 6.02   Delivery of Servicing Files and Project
                       Information. . . . . . . . . . .       20
        Section 6.03   Risk Of Loss of Documents . . . . . .       21
        Section 6.04   Recording of Transfer Documents . . . .       21

ARTICLE VII     REPRESENTATIONS AND
                WARRANTIES/REMEDIES/INDEMNIFICATION . . . .       21
        Section 7.01   HUD's Representations and Warranties
                       Regarding HUD and each Mortgage Loan . .       21
        Section 7.02   HUD's Representations and Warranties
                       Regarding Mortgage Loan Schedule and
                       Closing Date Payment Notice . . . . . .       22

Section 7.03    Disclaimer of HUD's Representations and
               Warranties. . . . . . . . . . . . . . .    22
Section 7.04    Survival of Representations and
               Warranties of HUD . . . . . . . . . .    23
Section 7.05    Remedies for Breach of Certain
               Representations and Warranties by HUD . .    23
Section 7.06    Bidder's Representations and
               Warranties. . . . . . . . . . . . . .    24
Section 7.07    Survival of Representations and
               Warranties of Bidder . . . . . . . .    26
Section 7.08    Bidder Indemnification of HUD . . . . .    26

ARTICLE VIII    CASUALTY LOSS/CONDEMNATION/PREPAYMENT . . . .    26
Section 8.01    Rights in the Event of Casualty Loss
               and/or Condemnation . . . . . . . . .    26
Section 8.02    Rights in the Event of Prepayment or
               HUD's Acquisition of Mortgaged Property .    28

ARTICLE IX    MISCELLANEOUS . . . . . . . . . . . . .    29
Section 9.01    Review of Mortgage Loan Documents,
               Servicing Files and Project Information .    29
Section 9.02    Notification to Mortgagors . . . . . .    29
Section 9.03    Post-Closing Servicing of the Mortgage
               Loan(s) . . . . . . . . . . . . . . .    29
Section 9.04    Termination of FHA Mortgage Insurance,
               FHA Mortgage Insurance Premium, Monthly
               HUD Service Charge and HUD Regulatory
               Agreement . . . . . . . . . . . . . .    29
Section 9.05    Notices . . . . . . . . . . . . . . .    30
Section 9.06    Expenses. . . . . . . . . . . . . . .    31
Section 9.07    No Assignment . . . . . . . . . . . .    31
Section 9.08    Governing Law . . . . . . . . . . . .    31
Section 9.09    Entire Agreement; No Modifications;
               Conflict with Bid Information, Bid
               Package and/or Machine Readable Bid
               Card . . . . . . . . . . . . . . . . .    31
Section 9.10    Headings . . . . . . . . . . . . . . .    32
Section 9.11    Time of Essence; Time . . . . . . . .    32
Section 9.12    No Third Party Beneficiaries . . . . .    32
Section 9.13    No Limitation on HUD's Ability to
               Administer and Enforce Laws . . . . . .    33
Section 9.14    Further Assurances . . . . . . . . . .    33
Section 9.15    Counterparts . . . . . . . . . . . . .    33
Section 9.16    Execution and Delivery of Duplicate
               Original Sale Agreements/Bid Form . . . .    33
Section 9.17    Unsecured Debt. . . . . . . . . . . . .    33

LIST OF ATTACHMENTS

ATTACHMENT A-1
        List of Individual Mortgage Loans

ATTACHMENT A-2
        List of Mortgage Loan Pools

ATTACHMENT B
        Form of Mortgage Note Endorsement

ATTACHMENT C
        Form of Assignment and Lost Note Affidavit

ATTACHMENT D
        Form of Assignment of Mortgage and Other Collateral Loan
        Documents

ATTACHMENT E
        Form of Release of Regulatory Agreement

ATTACHMENT F
        Form of Mortgage Loan Schedule

ATTACHMENT G
        Form of Notice and Release

ATTACHMENT H
        List of Non-First Lien Loans

This Amended and Restated Loan Sale Agreement replaces and supersedes in its entirety the Loan Sale Agreement previously made available to interested parties.

### AMENDED AND RESTATED LOAN SALE AGREEMENT
### (SOUTHEAST AUCTION)

THIS AMENDED AND RESTATED LOAN SALE AGREEMENT, entered into as of the 28th day of March, 1995, between the SECRETARY OF HOUSING AND URBAN DEVELOPMENT ("HUD" ), and _____ CONDOR ONE. INC., a Delaware Corporation _____ ("Bidder") for the sale of one or more Mortgage Loans or Mortgage Loan Pools (as defined below), servicing released and without FHA Mortgage Insurance.

### WITNESSETH THAT:

WHEREAS, HUD is the owner of certain mortgage loans secured by properties located in the Southeastern United States ("Southeast Mortgage Loans"), and wishes to sell such Southeast Mortgage Loans at an auction to be held on or around March 28, 1995 ("Southeast Auction"); and

WHEREAS, the Bidder wishes to purchase one or more Southeast Mortgage Loan(s) or pools of Southeast Mortgage Loans;

WHEREAS, the Bidder has inserted an "X" in the appropriate space(s) provided below in order to indicate whether this Agreement (as defined below) has been executed with respect to the sale, assignment and transfer of one or more of the following:

_____ one individual Mortgage Loan;

_____ two or more individual Mortgage Loans;

_____ one Mortgage Loan Pool; and/or

_XXX_ two to ten Mortgage Loan Pools;

WHEREAS, the Bidder has identified each individual Mortgage Loan subject to a Bid made by the Bidder on Attachment A-1, and each Mortgage Loan Pool subject to a Bid made by the Bidder on Attachment A-2; and

WHEREAS, the Bidder and HUD acknowledge that the terms and conditions of this Agreement shall apply to each Bid on any such individual Mortgage Loan, and each Bid on any such Mortgage Loan Pool, as if a separate Agreement had been executed by the parties with respect to each such Mortgage Loan and/or Mortgage Loan Pool.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01 Defined Terms.  Whenever used in this Agreement, the following terms shall have the meanings set forth in this Article I and shall include the plural as well as the singular, unless otherwise defined herein or the context otherwise requires.

Adjusted Bid Price:  An amount equal to the product of the Bid multiplied by: (i) the Unpaid P&I Balance of the Mortgage Loan as of the Final Cut-Off Date, if the Bid is on a single Mortgage Loan; or (ii) the Aggregate Unpaid P&I Balance of the Mortgage Loan Pool as of the Final Cut-Off Date, if the Bid is on a Mortgage Loan Pool.

Aggregate Unpaid P&I Balance:  If the Bid is on a Mortgage Loan Pool, an amount equal to the sum of the Unpaid P&I Balances of all Mortgage Loans in the Mortgage Loan Pool as of the date specified herein.

Agreement:  This Amended and Restated Loan Sale Agreement, including all recitals and attachments hereto.

Asset Review File:  The documents, files, data and other information relating to each Southeast Mortgage Loan (including any amendments, revisions or supplements thereto) which the Bidder may order from, or review at, the Due Diligence Facility.

Assignment and Lost Note Affidavit:  An assignment and lost note affidavit substantially in the form of Attachment C.

Assignment of Mortgage and Other Collateral Loan Documents: An assignment of mortgage and other collateral loan documents substantially in the form of Attachment D.

Award Date:  A date within three (3) Business Days following the Bid Date:

Bid:  The Bidder's bid for the Mortgage Loan or the Mortgage Loan Pool, if applicable, which bid shall be expressed as a percentage (carried to one hundred thousandth of one percent) of: (i) the Unpaid P&I Balance of the Mortgage Loan as of the Initial

Cut-Off Date, if the Bid is on a single Mortgage Loan; or (ii) the Aggregate Unpaid P&I Balance of the Mortgage Loan Pool as of the Initial Cut-Off Date, if the Bid is on a Mortgage Loan Pool. For example, the Bidder's Bid on a Mortgage Loan or a Mortgage Loan Pool may be 99.55555%. The Bid shall be identified on the Bid Form submitted to HUD by the Bidder.

Bid Confirmation Letter: A letter from HUD confirming HUD's acceptance of a bid made in connection with the Southeast Auction.

Bid Date: March 28, 1995, or such later date identified in writing by HUD to the Bidder.

Bid Form: That document (including the Machine Readable Bid Card) which identifies the Bid, the Bid Price and certain other information relating to the Bidder. The Bid Form shall be made available to the Bidder prior to the Bid Date.

Bid Information: All information made available to potential bidders in connection with the Southeast Auction.

Bid Package: The written information package, entitled "Bidder's Information Package" (including any amendments, revisions or supplements thereto), that has been made available to potential bidders by HUD in connection with the Southeast Auction.

Bid Price: An amount equal to the product of the Bid multiplied by: (i) the Unpaid P&I Balance of the Mortgage Loan as of the Initial Cut-Off Date, if the Bid is on a single Mortgage Loan; or (ii) the Aggregate Unpaid P&I Balance of the Mortgage Loan Pool as of the Initial Cut-Off Date, if the Bid is on a Mortgage Loan Pool. For example, if the Bidder's Bid on a Mortgage Loan Pool is 99.55555%, and the Aggregate Unpaid P&I Balance of the Mortgage Loan Pool (as of the Initial Cut-Off Date) is $10,000,000, the Bid Price is $9,955,555.

Bidder: The Bidder, including any purchaser and subsequent transferee of the Mortgage Loan(s).

Breach Notice: Written notice from the Successful Bidder to HUD that the Successful Bidder has determined that a breach of one or more of HUD's representations and/or warranties contained in Sections 7.01 or 7.02 hereof exists, specifying the Mortgage Loan(s) to which such breach is applicable and the nature of such breach, which notice shall be in form and substance reasonably acceptable to HUD.

Amended and Restated
Loan Sale Agreement
Page 4

**Business Day:** Any day other than a Saturday, a Sunday, a federal holiday, or a day on which banking institutions in Washington, D.C. are authorized or obligated by law or executive order to remain closed.

**Casualty/Condemnation Notice:** As defined in Subsection 8.01.A hereof.

**Closing Date:** June 8, 1995; provided, however, if the Successful Bid is awarded to a previously Unsuccessful Bidder, as provided in Subsection 3.02.C hereof, the Closing Date shall be June 15, 1995.

**Closing Date Payment:** The payment due to HUD on the Closing Date, as computed in accordance with Subsection 4.02 hereof.

**Closing Date Payment Notice:** As defined in Subsection 4.01 hereof.

**Closing Escrow Account Balance:** The balance(s) of the Escrow Account(s) relating to each Mortgage Loan as of the Final Cut-Off Date, as identified in the Closing Date Payment Notice. The Closing Escrow Account Balances shall not include any replacement reserve account balances (all such replacement reserve balances shall have previously been applied by HUD to the Mortgagor's debt under the related Mortgage Note).

**Cover Bid:** As defined in Subsection 3.02.B hereof.

**Deposit Investment Rate:** An interest rate equal to: (A) the Federal Funds Rate, as published in The Wall Street Journal on the Bid Date, minus (B) one hundred basis points (1.00%).

**Documents Delivery Date:** That date, on or after the Closing Date, upon which HUD confirms receipt of the full amount of the Closing Date Payment from the Bidder.

**Due Diligence Facility:** The facility located at The Woodward Building, 733 15th Street, N.W., Suite 800, Washington, D.C.

**Environmental Report(s):** The environmental report(s) relating to the subject Mortgaged Property, which report(s) was prepared no more than six (6) months prior to the Bid Date. A copy of the Environmental Report shall be included with the Bid Information.

**Escrow Accounts:** With respect to each Mortgage Loan, the accounts held by HUD, as mortgagee, for the deposit and withdrawal of Escrow Payments.

**Escrow Payments**: With respect to each Mortgage Loan, any payment made by a Mortgagor to HUD, as mortgagee, for real estate taxes, hazard insurance premiums, if any, assessments and other similar items; provided, however, that Escrow Payments shall not include any amount, including without limitation replacement reserve payments, that have previously been applied by HUD to the Mortgagor's debt under the related Mortgage Note.

**FHA**: The Federal Housing Administration, an organizational unit within HUD.

**FHA Mortgage Insurance**: All rights, benefits, entitlements and obligations of a mortgagee under a mortgage insured or co-insured by FHA in accordance with the relevant sections of the National Housing Act, and the applicable regulations promulgated thereunder.

**Final Cut-Off Date**: 5:00 p.m. on May 31, 1995.

**Final Deposit**: That amount which, when added to the amount of the Initial Deposit, equals ten percent (10%) of the Bid Price; provided, however, if the Bidder is a Successful Multiple Bidder, that amount which, when added to the amount of the Initial Deposit, equals ten percent (10%) of the largest of the Bidder's Successful Multiple Bid Prices.

**Final Deposit Date**: The second Business Day following the Award Date.

**HUD Closing Fee**: The fee paid by the Bidder to HUD to reimburse HUD for costs and expenses relating to the sale, assignment and transfer of the Mortgage Loan(s), which HUD Closing Fee shall equal $5,000 per Mortgage Loan for purchases of one (1) to five (5) Mortgage Loans and $1,000 per Mortgage Loan for each additional Mortgage Loan, up to a maximum HUD Closing Fee of $100,000 for any specific Mortgage Loan Pool.

**HUD's Financial Advisor**: The Hamilton Securities Group, Inc.

**Individual Loan Price**: An amount equal to the product of the Bid multiplied by the Unpaid P&I Balance of the subject Mortgage Loan as of the Final Cut-Off Date.

**Initial Cut-Off Date**: 5:00 p.m. on February 28, 1995.

**Initial Deposit**: An amount equal to five percent (5%) of the Bid Price; provided, however, if the Bidder submits Multiple

Bids, an amount equal to five percent (5%) of the largest of the Bidder's Multiple Bid Prices.

**Interest Arrearage:** An amount equal to the accrued but unpaid interest of a specific Mortgage Loan as of the date specified herein.

**Machine Readable Bid Card:** That certain machine readable bid card which is incorporated into, and made a part of, the Bid Form.

**Maturity Date:** The date on which the last payment of principal and accrued interest, if any, is due and payable under the terms of the Mortgage Note relating to each Mortgage Loan, determined without giving effect to: (1) any acceleration of the due date of the principal of such Mortgage Loan; (2) any grace period permitted under the terms of the related Mortgage Note; or (3) any mortgage modification agreement and/or provisional workout agreement relating to such Mortgage Loan.

**Mortgage:** With respect to each Mortgage Loan, the original mortgage, deed of trust or other instrument creating and evidencing a lien on the related Mortgaged Property and securing the related Mortgage Note.

**Mortgage Interest Rate:** The fixed rate of interest per annum specified in the Mortgage Note relating to each Mortgage Loan, determined without giving effect to any mortgage modification agreement and/or provisional workout agreement relating to such Mortgage Loan.

**Mortgage Loan:** Each mortgage loan identified on Attachment A-1 and/or each mortgage loan included in each Mortgage Loan Pool.  .

**Mortgage Loan Documents:** As defined in Subsection 6.01.A hereof.

**Mortgage Loan Pool:** Each pool of two (2) or more Mortgage Loans identified on Attachment A-2.

**Mortgage Loan Schedule:** That certain schedule relating to each Mortgage Loan, to be prepared by HUD substantially in the form of Attachment F (and to be made available by HUD to potential bidders prior to the Bid Date), which sets forth the following information with respect to such Mortgage Loan:

(A) as of the date of endorsement by HUD for insurance or coinsurance, (1) the name of the Mortgagor; (2) the

Mortgage Interest Rate, (3) the Maturity Date, and (4) the Scheduled Payment; and

(B) as of the Initial Cut-Off Date, (1) the FHA case number, (2) the Unpaid Principal Balance, (3) the Interest Arrearage, (4) the balances of the Escrow Accounts, and (5) a list of any mortgage modification agreement(s) and/or provisional workout agreement(s) relating to such Mortgage Loan.

Mortgage Note:  With respect to each Mortgage Loan, the original note or other evidence of indebtedness of the Mortgagor originally endorsed for insurance or co-insurance by HUD under the relevant sections of the National Housing Act.

Mortgage Note Endorsement:  An endorsement to the Mortgage Note substantially in the form of Attachment B.

Mortgaged Property:  The fee simple estate or leasehold estate in real property and the improvements thereon that are subject to the Mortgage relating to each Mortgage Loan, and that constitute security for the repayment of the related Mortgage Note.

Mortgagor:  The obligor, including its successor and assigns, on the Mortgage Note relating to each Mortgage Loan.

Mortgagor Notification Letter:  A letter from HUD to the Mortgagor notifying the Mortgagor of the sale of its Mortgage Loan to the Successful Bidder, which notice shall be in form and substance reasonably acceptable to HUD.  The Mortgagor Notification Letter shall be prepared by the Successful Bidder and delivered to HUD for review and execution pursuant to Subsection 5.01.A(5) hereof.

Multiple Bid:  Each Bid submitted to HUD by a Multiple Bidder.  Each Mortgage Loan and/or Mortgage Loan Pool that is subject to a Bid by a Multiple Bidder, and the related Bid Price, shall be identified on Attachments A-1 and/or A-2.

Multiple Bid Price:  With respect to each Multiple Bid submitted by a Multiple Bidder, an amount equal to the product of the Multiple Bid multiplied by: (i) the unpaid principal and interest balance of the Southeast Mortgage Loan relating to such Multiple Bid (as of the Initial Cut-Off Date), if the Multiple Bid is on a single Southeast Mortgage Loan; or (ii) the aggregate unpaid principal and interest balance of the pool of Southeast Mortgage Loans relating to such Multiple Bid (as of the Initial Cut-Off Date), if the Multiple Bid is on a pool of Southeast Mortgage Loans.  The Multiple Bid Price shall be used for

purposes of computing the amount of the Initial Deposit and the Final Deposit that is due to HUD with respect to Multiple Bids.

Multiple Bidder:  The Bidder is a Multiple Bidder if it has identified on Attachments A-1 and/or A-2 any combination of two (2) or more Mortgage Loans and/or Mortgage Loan Pools.

Non-First Lien Loan:  Each of the loans or debts identified on Attachment H.  Each Non-First Lien Loan shall be sold with the related Mortgage Loan.

Non-Performing Bidder:  As defined in Subsection 3.02.C hereof.

Notice and Release:  A notice and release in the form of Attachment G.

Person:  Any individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, unincorporated organization or other entity recognized as a legal person under the jurisdiction in which it was created and does business, or any government or any agency or political subdivision thereof.

Project Information:  As defined in Subsection 6.02.B hereof.

Recision Date:  The date upon which HUD pays the Bidder the Recision Payment pursuant to Subsection 7.05.C(2) hereof.

Recision Payment:  With respect to any recision of a sale, assignment and transfer of a Mortgage Loan pursuant to Subsection 7.05.C(2) hereof, an amount equal to: (A) the sum of (i) the Individual Loan Price of the subject Mortgage Loan plus simple interest thereon at the Deposit Investment Rate for the period from the Closing Date through the Recision Date, plus (ii) the sum of all reasonable, unreimbursed advances (as determined by HUD) made by the Bidder to preserve and/or protect the Mortgaged Property between the Closing Date and the Recision Date; minus (B) any and all payments, other than Escrow Payments, received by the Bidder (including without limitation payments of principal, interest, prepayments and payments pursuant to Section 4.03 hereof) on account of such Mortgage Loan from the Closing Date through the Recision Date.

Regulatory Agreement:  With respect to each Mortgage Loan, that certain HUD regulatory agreement executed between HUD (or the original co-insuring mortgagee) and the Mortgagor.

Release Documents:  As defined in Section 2.01.B hereof.

Release of Regulatory Agreement:  A release of the Regulatory Agreement substantially in the form of Attachment E.

Scheduled Payment:  The scheduled payment of principal and interest which is due to be paid by the Mortgagor pursuant to the terms of the Mortgage Note relating to each Mortgage Loan, determined without giving effect to any mortgage modification agreement and/or provisional workout agreement relating to such Mortgage Loan.

Security Agreement:  The security agreement, if any, related to each Mortgage Loan.

Servicing Files:  As defined in Subsection 6.02.A hereof.

Successful Bid:  The Bid which is the subject of a Bid Confirmation Letter from HUD.

Successful Bidder:  The Bidder is a Successful Bidder if it has been sent a Bid Confirmation Letter by HUD.

Successful Multiple Bid:  Each Multiple Bid which is the subject of a Bid Confirmation Letter from HUD.

Successful Multiple Bid Price:  The Multiple Bid Price relating to each Successful Multiple Bid.

Successful Multiple Bid Transaction:  Each Southeast Mortgage Loan(s) sale, assignment and transfer transaction to be entered into by a Successful Multiple Bidder; each Successful Multiple Bid Transaction shall be evidenced by a separate Bid.

Successful Multiple Bidder:  The Bidder is a Successful Multiple Bidder if it has been sent Bid Confirmation Letters by HUD relating to two (2) or more of the Bidder's Multiple Bids.

Terminated Mortgage Loan:  As defined in Subsection 8.02.A hereof.

Title Update:  The title update relating to the subject Mortgaged Property, which update was prepared no more than six (6) months prior to the Bid Date.  A copy of the Title Update shall be included with the Bid Information.

Total Deposit:  An amount equal to the sum of the Initial Deposit plus the Final Deposit, including any interest earned thereon pursuant to this Agreement.

Transfer Documents:  As defined in Subsection 6.01.B hereof.

Transfer/Recordation Requirements:  As defined in Subsection 5.01.C hereof.

UCC Assignment:  As defined in Subsection 5.01.A(4) hereof.

Unpaid Principal Balance:  An amount equal to the unpaid principal balance of a specific Mortgage Loan as of the date specified herein.

Unpaid P&I Balance:  An amount equal to the sum of the Unpaid Principal Balance plus the Interest Arrearage of a specific Mortgage Loan as of the date specified herein.

Unsecured Debt:  That certain debt identified by HUD as FHA No. 065-35081a (Lakeview Arms Apartments), which debt was never subject to any FHA Mortgage Insurance nor secured by any Mortgaged Property or any other collateral of the Mortgagor.

Unsuccessful Bidder:  The Bidder is an Unsuccessful Bidder if it has not been sent a Bid Confirmation Letter relating to its Bid within three (3) Business Days following the Bid Date.

Warranty Period:  The period beginning on the Closing Date and ending at 5:00 p.m. on the ninetieth (90th) calendar day following the Closing Date.

Wire Transfer Instructions:  The wire transfer instructions which shall be made available to the Bidder.  One set of the wire transfer instructions shall relate to the transfer of the Initial Deposit and the Final Deposit (and shall be made available to the Bidder prior to the Bid Date).  The second set of wire transfer instructions shall relate to the transfer of the Closing Date Payment (and shall be made available to the Bidder at least two weeks prior to the Closing Date).


## ARTICLE II

## PURCHASE AND SALE/CLOSING

Section 2.01 Agreement to Purchase and Sell the Mortgage Loan(s); Release and Satisfaction.

A.    Subject to the terms and conditions of this Agreement, on the Closing Date, HUD shall sell, assign and transfer to the Bidder, and the Bidder shall acquire from HUD, all of HUD's right, title and interest, as mortgagee, in and to the Mortgage Loan or the Mortgage Loan Pool, if applicable, with servicing released and without FHA Mortgage Insurance.  Such sale, assignment and transfer shall also include the rights to payments

of any kind received by HUD with respect to each Mortgage Loan after the Final Cut-Off Date.

B. Notwithstanding anything to the contrary in this Agreement, if the Bidder is also the Mortgagor on the subject Mortgage Loan(s), the Bidder may, upon written notice delivered to HUD no later than the fortieth (40th) calendar day prior to the Closing Date, elect to have the Mortgage Loan(s) released and satisfied rather than sold, assigned and transferred to the Bidder. Each such release and satisfaction shall be accomplished by using form release and satisfaction documents to be provided to the Bidder by HUD ("Release Documents"). Each such release and satisfaction shall be subject to all of the terms and conditions of this Agreement, except Subsections 4.04., 7.05.C(2), 9.02 and 9.03 hereof. If the Bidder elects to have the Mortgage Loan(s) released and satisfied as provided in this Subsection 2.01.B, all references contained in this Agreement to the sale, assignment and transfer of the Mortgage Loan(s) shall instead be deemed to refer to the release and satisfaction of such Mortgage Loan(s).

C. On the Closing Date, the Bidder shall assume (or cause to be assumed) any and all responsibilities and obligations as mortgagee and/or as servicer of each Mortgage Loan arising on or after the Closing Date. On and after the Closing Date, HUD shall have no further responsibilities or obligations with respect to any Mortgage Loan, except as expressly set forth in Sections 4.03, 4.05, 7.05 and 9.14 hereof.

D. The Bidder acknowledges and agrees that HUD shall evaluate all bids, including the Bidder's Bid, in a manner that optimizes the gross proceeds to HUD from the sale of all of the Southeast Mortgage Loans, collectively, rather than from the sale of any specific Southeast Mortgage Loan or any specific pool of Southeast Mortgage Loans. All evaluations and determinations made by HUD as to which bid(s) optimizes the gross sale proceeds to HUD from the sale of the Mortgage Loan(s) shall be binding upon the Bidder. The Bidder acknowledges and agrees that HUD reserves the right to reject any and all bids made in connection with the Southeast Auction, including the Bidder's Bid, without prejudice to HUD's right to include the related Southeast Mortgage Loan(s) in a subsequent sale or auction.

E. The Bidder, including any and all subsequent purchasers and transferees of any Mortgage Loan, hereby waive any right or cause of action that they may now or in the future have against HUD, or any Person acting on HUD's behalf, arising out of or relating to the Southeast Auction and/or the sale, assignment and transfer of the Mortgage Loan or the Mortgage Loan Pool, if

applicable, except with respect to HUD's failure to satisfy its obligations under this Agreement.

F.    The Bidder acknowledges and agrees that any and all defaults by the Mortgagor under any of the Mortgage Loans (including without limitation any monetary default) may be cured at any time on or before the Closing Date, and that the Bidder shall remain bound by all terms and conditions of this Agreement regardless of whether any or all such defaults have been cured on or before the Closing Date.

Section 2.02  Closing; Failure to Close.

The closing of the sale of the Mortgage Loan or the Mortgage Loan Pool, if applicable ("Closing") shall occur on the Closing Date.  Subject to the terms and conditions of this Agreement, in the event that the Successful Bidder fails to purchase the Mortgage Loan or the Mortgage Loan Pool, if applicable, on the Closing Date, the Successful Bidder shall forfeit its Total Deposit as provided in Section 3.04 hereof.

ARTICLE III

PAYMENT OF TOTAL DEPOSIT/
NOTICE TO SUCCESSFUL BIDDER/LIQUIDATED DAMAGES

Section 3.01  Payment of Initial Deposit.

During the period between 9:00 a.m. on the day prior to the Bid Date and 3:30 p.m. on the Bid Date, the Bidder shall deliver to HUD, by wire transfer in accordance with the Wire Transfer Instructions, an amount equal to the Initial Deposit.  HUD's retention of the Initial Deposit shall be subject to Section 3.02 hereof.

Section 3.02  HUD's Retention of Initial Deposit; Notice to Successful Bidder.

A.    If the Bidder has submitted the Successful Bid for the Mortgage Loan or the Mortgage Loan Pool, if applicable, HUD shall: (1) retain the Initial Deposit, (2) on or promptly following the Award Date, send the Successful Bidder a Bid Confirmation Letter by telecopier or over-night courier, and (3) on or promptly following the Award Date, return to the Successful Bidder one duplicate original Agreement executed by HUD.

B.    If the Bidder is an Unsuccessful Bidder, HUD may retain such Unsuccessful Bidder's Initial Deposit as a cover bid ("Cover Bid") for a period not to exceed ten (10) Business Days following

the Final Deposit Date. In the event that the Cover Bid does not become a Successful Bid, as provided in Subsection 3.02.C hereof, HUD shall return to the Unsuccessful Bidder the Initial Deposit (plus simple interest thereon at the Deposit Investment Rate for the period from the first calendar day following HUD's confirmation of its receipt of the Initial Deposit through the date immediately preceding HUD's return of the Initial Deposit to the Unsuccessful Bidder). Upon HUD's return of the Initial Deposit to the Unsuccessful Bidder, as provided in this Subsection 3.02.B, all terms and conditions of this Agreement, with the exception of those stated in Subsections 2.01.D and 2.01.E, shall be terminated; HUD and the Unsuccessful Bidder agree that Subsections 2.01.D and 2.01.E shall survive any such termination of the remainder of this Agreement.

C.   If a Successful Bidder fails to pay the Final Deposit in accordance with Section 3.03 hereof ("Non-Performing Bidder"), HUD may, at HUD's option, within five (5) Business Days following the Final Deposit Date: (1) accept that bid of a previously Unsuccessful Bidder which HUD has determined shall optimize the gross sale proceeds to HUD; or (2) elect to withdraw the related Southeast Mortgage Loan(s) from the Southeast Auction, without prejudice to HUD's right to include such Southeast Mortgage Loan(s) in a subsequent sale or auction. In order to award a Successful Bid to a formerly Unsuccessful Bidder, HUD must, within such five (5) Business Day period, send a Bid Confirmation Letter to such previously Unsuccessful Bidder which indicates that: (1) HUD has accepted the previously Unsuccessful Bidder's Bid as the Successful Bid for the Mortgage Loan or the Mortgage Loan Pool, if applicable, and (2) notwithstanding any other terms and conditions of the Agreement, the previously Unsuccessful Bidder's Final Deposit must be delivered to HUD within two (2) Business Days of the date of such Bid Confirmation Letter. Provided that HUD complies with the notice requirements of this Subsection 3.02.C, such previously Unsuccessful Bidder and HUD shall remain bound by all of the terms and conditions of the related Agreement.

Section 3.03   Payment of Final Deposit.

During the period between 9:00 a.m. and 2:00 p.m. on the Final Deposit Date, the Successful Bidder shall deliver to HUD, by wire transfer in accordance with the Wire Transfer Instructions, an amount equal to the Final Deposit. Simple interest at the Deposit Investment Rate shall accrue on the Total Deposit as provided in Subsection 4.02.C(1) hereof.

Section 3.04  Forfeiture of Total Deposit; Liquidated Damages.

In the event that the Successful Bidder shall fail to perform any of its obligations under this Agreement, including without limitation the payment of any portion of the Total Deposit and/or the Closing Date Payment to HUD, this Agreement shall automatically terminate as to any and all further obligations of HUD hereunder and HUD shall declare an amount equal to the Total Deposit forfeited as fixed, agreed and liquidated damages (such amount having been agreed to as liquidated damages due to the difficulty and inconvenience of measuring actual damages), and the Successful Bidder, upon payment in full to HUD of such Total Deposit as liquidated damages, shall be relieved of any and all further obligations under this Agreement.

## ARTICLE IV

### CLOSING DATE PAYMENT/RESTORATION OF ESCROW ACCOUNTS

Section 4.01  Delivery of Closing Date Payment Notice.

Within five (5) calendar days after the Final Cut-Off Date, HUD shall provide the Successful Bidder with a written notice (the "Closing Date Payment Notice") identifying (i) HUD's computation of the Closing Date Payment; (ii) the Unpaid Principal Balance of each Mortgage Loan as of the Final Cut-Off Date; (iii) the Interest Arrearage of each Mortgage Loan as of the Final Cut-Off Date; and (iv) the Closing Escrow Account Balances relating to each Mortgage Loan.

Section 4.02  Payment of Closing Date Payment.

During the period between 9:00 a.m. and 3:30 p.m. on the Closing Date, the Successful Bidder shall deliver to HUD, by wire transfer in accordance with the Wire Transfer Instructions, the Closing Date Payment, which, subject to Section 8.01 hereof, shall equal the sum of:

A.    the Adjusted Bid Price,

B.    plus the amount of the HUD Closing Fee,

C.    and then minus the sum of the following amounts:

(1)  the amount of the Total Deposit (plus simple interest earned thereon at the Deposit Investment Rate for the period from the first calendar day following the Final

Deposit Date through the Closing Date: provided, however, if
the Total Deposit is being held in connection with
Successful Multiple Bids of the Successful Bidder, the
reduction to the Closing Date Payment required by this
Subsection 4.02.C(1) shall be applied only to the closing of
the last such Successful Multiple Bid Transaction (and
further, shall be applied only if the Total Deposit has not
been forfeited as liquidated damages, pursuant to Section
3.04 hereof, in connection with an earlier Successful
Multiple Bid Transaction); and

    (2)  the aggregate amount of the Closing Escrow Account
Balances relating to the Mortgage Loan or the Mortgage Loan
Pool, if applicable.

Section 4.03   Transfer of Payments Received by HUD after the
Final Cut-Off Date.

Subject to Subsections 8.01.A, 8.02.A and 8.02.B hereof, HUD
shall, if HUD receives payments of any kind with respect to any
Mortgage Loan after the Final Cut-Off Date, remit such payments
to the Successful Bidder after the Closing Date by check, wire
transfer or such other reasonable means selected by HUD without
adjustment to the Closing Date Payment: provided, however, that
HUD's obligations under this Section 4.03 shall be subject to the
Successful Bidder having fully performed all of its obligations
under this Agreement.

Section 4.04   Restoration of Escrow Accounts.

Within ten (10) Business Days following the Closing Date,
the Successful Bidder shall fully restore the Closing Escrow
Account Balances relating to each Mortgage Loan, plus any
additional amounts relating to the Escrow Accounts that have been
transferred to the Successful Bidder pursuant to Section 4.03
hereof.

Section 4.05   Post-Closing Date Adjustments and Remittances.

If, within forty-five (45) calendar days after the Closing
Date, HUD and/or the Successful Bidder determine that the Closing
Date Payment was computed incorrectly, such party shall, within
the above-referenced forty-five (45) calendar day period, notify
the other party in writing of the incorrect computation (which
notice shall include a reasonably detailed description of the
incorrect computation).  HUD and the Successful Bidder agree to
promptly remit to the other any overpayments or underpayments of
the Closing Date Payment identified in any such notice which are
mutually agreed upon by HUD and the Successful Bidder; provided,
however, if neither HUD nor the Successful Bidder provide such

notice within the above-referenced forty-five (45) calendar day period, both parties shall be deemed to have waived their rights to contest the amount of the Closing Date Payment.

### ARTICLE V

### BIDDER'S PREPARATION OF TRANSFER DOCUMENTS; DELIVERY TO HUD

Section 5.01   Preparation and Delivery to HUD of Transfer Documents.

A.   Except as otherwise provided in Subsection 5.01.B, at least thirty (30) calendar days prior to the Closing Date, the Successful Bidder shall, at the Successful Bidder's cost and expense, prepare and deliver to HUD for execution, with respect to each Mortgage Loan, the following Transfer Documents:

(1)   an original Mortgage Note Endorsement in the form of Attachment B (provided, however, that if HUD has advised the Successful Bidder that HUD cannot deliver the original Mortgage Note, the Successful Bidder shall instead prepare and deliver to HUD an original Assignment and Lost Note Affidavit in the form of Attachment C);

(2)   an original Assignment of Mortgage and Other Collateral Loan Documents in the form of Attachment D;

(3)   an original Release of Regulatory Agreement in the form of Attachment E;

(4)   an original UCC financing statement assignment (the "UCC Assignment") for each effective financing statement, which UCC Assignment shall be on a form supplied by the Successful Bidder;

(5)   an original Mortgagor Notification Letter.

B.   If the Mortgage Loan(s) will be released and satisfied pursuant to Section 2.01.B hereof, the Successful Bidder shall, at the Successful Bidder's cost and expense, at least thirty (30) calendar days prior to the Closing Date, prepare and deliver to HUD for execution the Release Documents relating to each Mortgage Loan.

C.   The Successful Bidder shall ensure that all of the Transfer Documents (or Release Documents, if applicable) comply with the requirements of applicable state law, local law and/or the requirements of the applicable recording or filing office ("Transfer/Recordation Requirements"). The Transfer Documents (or Release Documents, if applicable) submitted to HUD for

execution (with the exception of any UCC Assignment, UCC termination or Mortgagor Notification Letter, which shall be on the form supplied by the Successful Bidder) shall contain no modifications to the form Transfer Documents attached hereto as Attachments B through E (or to the form Release Documents, if applicable), other than those modifications which are necessary to: (1) complete the missing information required to be inserted therein; or (2) comply with the Transfer/Recordation Requirements.

D.    In the event that any modification to the Transfer Documents (or Release Documents, if applicable) or any additional document is required in order to comply with the Transfer/Recordation Requirements, the Successful Bidder shall, at the Successful Bidder's cost and expense, deliver to HUD for HUD's review, at least thirty (30) calendar days prior to the Closing Date, the following with respect to each Mortgage Loan: (1) a transmittal letter describing in reasonable detail the applicable Transfer/Recordation Requirements which necessitate any such modification and/or additional document; (2) each such modified Transfer Document (or Release Document) and/or each such additional document; and (3) a black-lined copy of each form Transfer Document (or Release Document) that has been modified by the Successful Bidder, which black-lined copy shall reflect all revisions made thereto.    Provided that each modification and/or additional document and the related transmittal letter are acceptable to HUD, they shall be incorporated into or included with, as applicable, the Transfer Documents (or Release Documents) to be executed by HUD.    If, however, any of the foregoing are not acceptable to HUD, HUD shall provide the Successful Bidder with a letter identifying HUD's objections within ten (10) Business Days after HUD's receipt of the relevant modification and/or additional document from the Successful Bidder.

E.    At least thirty (30) calendar days prior to the Closing Date, the Successful Bidder shall deliver to HUD four (4) prepaid, overnight courier packages, each of which shall be addressed to the Successful Bidder.    Such courier packages shall be used by HUD to send the Mortgage Loan Documents and the Transfer Documents (or the Release Documents, if applicable) to the Successful Bidder on the Documents Delivery Date.

Section 5.02    Failure to Deliver Transfer Documents.

In the event that the Successful Bidder fails to deliver the completed Transfer Documents (or the Release Documents, if applicable) to HUD as provided in Section 5.01 hereof, the Successful Bidder shall forfeit its Total Deposit as provided in Section 3.04 hereof.

### ARTICLE VI

### HUD'S DELIVERY OF DOCUMENTS TO BIDDER/RECORDATION

Section 6.01  Delivery of Mortgage Loan Documents and Transfer Documents.

Subject to Subsection 6.01.C hereof, on the Documents Delivery Date, HUD shall send the Mortgage Loan Documents and the Transfer Documents (or the Release Documents, if applicable) to the Successful Bidder by over-night courier (all such documents shall be delivered in the over-night courier packages provided to HUD by the Successful Bidder pursuant to Subsection 5.01.E hereof).

A.   The Mortgage Loan Documents, with respect to each Mortgage Loan, shall include, to the extent in HUD's possession, the following documents and items:

(1)  the Mortgage Note (including any assignments thereto and modifications thereof) marked with an "X" across the panel evidencing FHA Mortgage Insurance and marked with the words "FHA Insurance Terminated.  Mortgage Note Endorsement From HUD Hereby Made A Part Hereof." (and signed and dated by an FHA official);

(2)  the original or a recorder-certified copy of the Mortgage (including any assignments thereto and modifications thereof);

(3)  the original or a copy of any mortgage modification agreement or provisional workout agreement relating to such Mortgage Loan in effect as of the Closing Date, if any;

(4)  the original or a recorder-certified copy of the UCC financing statements and/or other chattel security documents in effect as of the Closing Date (including any assignments thereto and modifications thereof), if any;

(5)  the original or a copy of the Security Agreement (including any assignments thereto and modifications thereof), if any;

(6)  the original or a copy of the mortgagee title insurance policy in effect as of the Closing Date;

(7)  the original or a copy of the hazard insurance policy in effect as of the Closing Date, together with any endorsements thereof, if any;

(8)  the original or a copy of the indemnity agreements; and

(9)  the original or a copy of the Form HUD 289(s).

B.  The Transfer Documents, with respect to each Mortgage Loan, shall include the following documents and items, each of which shall be executed by HUD, where applicable:

(1)  an original Mortgage Note Endorsement; provided, however, if HUD has advised the Successful Bidder that it cannot deliver the original Mortgage Note, an original Assignment and Lost Note Affidavit relating to the Mortgage Note;

(2)  an original Assignment of Mortgage and Other Collateral Loan Documents;

(3)  an original Release of Regulatory Agreement;

(4)  an original UCC Assignment (which UCC Assignment shall be on a form supplied to HUD by the Successful Bidder) for each effective financing statement which the Successful Bidder elects to have assigned; and

(5)  an original Mortgagor Notification Letter.

C.  Any Successful Bidder who would prefer to retrieve (or cause to be retrieved) the Mortgage Loan Documents and the Transfer Documents for each related Mortgage Loan (the "Document Package") from HUD, on the Closing Date shall be permitted to do so provided that: (1) HUD is able to confirm that the full amount of such Successful Bidder's Closing Data Payment has been received by HUD (in accordance with the Wire Transfer Instructions) on or before 11:00 a.m. on the Closing Date; and (2) such Successful Bidder has executed and returned the Notice and Release to HUD at least ten (10) Business Days prior to the Closing Date.  Provided that the Successful Bidder has satisfied both of these conditions, the Successful Bidder may, at its option, retrieve (or cause to be retrieved) each Document Package from a location to be designated by HUD (and at a time designated by HUD during the period between 2:00 p.m. and 5:30 p.m. on the Closing Date).  If such Successful Bidder has failed to retrieve (or caused to be retrieved) any Document Package by 5:30 p.m. on the Closing Date, such Document Package shall be sent to the

Successful Bidder by over-night courier in accordance with the first sentence of Section 6.01.

D.    In the event that any Successful Bidder, at least ten (10) Business Days prior to the Closing Date, provides HUD with a written request to have HUD send copies of any of the executed Transfer Documents to the Successful Bidder by telecopier on the Closing Date, HUD shall undertake reasonable efforts to comply with such Successful Bidder's request.

Section 6.02    Delivery of Servicing Files and Project Information.

Within five (5) Business Days after the Documents Delivery Date, the Successful Bidder shall retrieve (or cause to be retrieved) from the Due Diligence Facility the Servicing Files and the Project Information.

A.    The Servicing Files, with respect to each Mortgage Loan, shall include the following documents and items:

(1)    the amortization schedule;

(2)    if in HUD's possession, the twelve (12) most recent monthly billing statements (HUD-2771);

(3)    if in HUD's possession, the most recent real estate tax bill(s), and proof of payment thereof; and

(4)    if in HUD's possession, any correspondence with taxing authorities relating to the one (1) year period preceding the Closing Date.

B.    The Project Information, with respect to each Mortgage Loan, shall include the following documents and items:

(1)    if in HUD's possession, a summary of the underlying project's most recent financial statement;

(2)    if in HUD's possession, the most recent management review;

(3)    if in HUD's possession, the most recent physical inspection report;

(4)    the Title Update; and

(5)    the Environmental Report.

Section 6.03   Risk Of Loss of Documents.

The risk of loss with respect to the Mortgage Loan
Documents, the Transfer Documents, the Servicing Files and the
Project Information relating to each Mortgage Loan shall rest
with the Successful Bidder from and after the following,
whichever is applicable: (i) the time that such documents are
retrieved by, or on behalf of, the Successful Bidder in
accordance with Subsection 6.01.C or Section 6.02 hereof; or (ii)
the time that such documents are delivered by HUD to the over-
night courier service identified on the packages provided to HUD
pursuant to Section 5.01.E hereof.

Section 6.04   Recording of Transfer Documents.

The Successful Bidder shall, at the Successful Bidder's cost
and expense, use its best efforts to cause all applicable
Transfer Documents (or Release Documents, if applicable) with
respect to each Mortgage Loan to be recorded or filed among the
appropriate land records or other records within thirty (30)
calendar days following the Documents Delivery Date.


ARTICLE VII

REPRESENTATIONS AND WARRANTIES/REMEDIES/INDEMNIFICATION

Section 7.01   HUD's Representations and Warranties Regarding
HUD and each Mortgage Loan.

HUD hereby represents and warrants to the Bidder, as of the
date of this Agreement and the Closing Date, as follows:

A.,   HUD has the power and authority to execute, deliver and
perform this Agreement and all of the transactions contemplated
hereby.  HUD has taken all actions necessary to authorize it to
perform its obligations under this Agreement and to consummate
the transactions contemplated to be performed by it hereunder.
This Agreement and all of the other instruments and agreements
executed and delivered by HUD in connection with the transactions
contemplated hereunder on or prior to the Closing Date have been
or will be duly executed and delivered by HUD and (assuming due
execution and delivery by the Bidder) constitute or will
constitute legal, valid and binding obligations of HUD,
enforceable against HUD in accordance with the terms hereof and
thereof.  The execution, delivery and performance of this
Agreement by HUD does not violate any provisions of any existing
federal law or regulation applicable to HUD, or violate or
contravene any judgment, injunction or decree binding upon HUD,
or violate, contravene or constitute a default under any

provision of any agreement, contract or other instrument binding upon HUD.

B.    Immediately prior to the sale, assignment and transfer of each Mortgage Loan pursuant to this Agreement, HUD had title to, and was the sole owner of, such Mortgage Loan free and clear of any ownership, security or participation interest in such Mortgage Loan in favor of any other Person, and had the full right and authority to sell, assign and transfer such Mortgage Loan to the Bidder pursuant to this Agreement.

C.    With respect to each Mortgage Loan (excluding each of the Non-First Lien Loans identified on Attachment H), the related Mortgage is a valid and enforceable first lien on the related Mortgaged Property, except for: (1) liens for real estate taxes, and municipal sewer or water charges and special assessments, if any; (2) liens on personal property or chattels located on the Mortgaged Property which are not deemed affixed to the real property, if any; (3) covenants, conditions and restrictions, rights of way, easements and other matters of public record; and (4) other matters to which like properties are commonly subject which do not, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by such Mortgage.

Section 7.02   HUD's Representations and Warranties Regarding Mortgage Loan Schedule and Closing Date Payment Notice.

With respect to each Mortgage Loan, HUD hereby represents and warrants to the Bidder as follows:

A.    As of the Initial Cut-Off Date, the information set forth on the Mortgage Loan Schedule was true and correct in all material respects.  As of the Closing Date, no mortgage modification agreement and/or provisional workout agreement remains in effect with respect to the Mortgage Loan other than: (i) those identified on the Mortgage Loan Schedule; and (ii) those consented to in writing by the Successful Bidder on or after the Award Date.

B.    As of the Final Cut-Off Date, the information set forth on the Closing Date Payment Notice shall be true and correct in all material respects.

Section 7.03   Disclaimer of HUD's Representations and Warranties.

EXCEPT AS EXPRESSLY PROVIDED IN SECTIONS 7.01 AND 7.02 HEREOF, NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, HAVE BEEN MADE BY HUD OR BY ANY PERSON ACTING ON HUD'S BEHALF,

WITH RESPECT TO ANY MORTGAGE LOAN.  PARTICULARLY, BUT WITHOUT IN
ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, NO
REPRESENTATIONS OR WARRANTIES HAVE BEEN MADE WITH RESPECT TO (1)
THE CONDITION OF ANY MORTGAGED PROPERTY, ENVIRONMENTAL OR
OTHERWISE; (2) THE VALUE OF ANY MORTGAGED PROPERTY; (3) THE
COLLECTIBILITY OF ANY MORTGAGE LOAN; (4) THE CREDITWORTHINESS OF
ANY MORTGAGOR; (5) THE EXISTENCE OR STATUS OF ANY HAZARD
INSURANCE COVERAGE OR TITLE INSURANCE COVERAGE RELATING TO ANY
MORTGAGED PROPERTY; (6) THE ACCURACY OR COMPLETENESS OF THE BID
INFORMATION, THE BID PACKAGE OR ANY ASSET REVIEW FILE; OR (7) THE
ACCURACY OR COMPLETENESS OF ANY ENVIRONMENTAL REPORT, TITLE
UPDATE, OR ANY OTHER DESCRIPTION OR REPORT RELATING TO ANY
MORTGAGED PROPERTY.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN
THIS AGREEMENT AND THE TRANSFER DOCUMENTS, EACH MORTGAGE LOAN IS
SOLD, ASSIGNED AND TRANSFERRED TO BIDDER WITHOUT RECOURSE.

Section 7.04   Survival of Representations and Warranties of
HUD.

The representations and warranties of HUD contained in
Subsections 7.01.A and 7.01.B shall survive the Closing Date and
shall not be subject to the Warranty Period.  The representations
and warranties of HUD contained in Subsections 7.01.C, 7.02.A and
7.02.B hereof shall expire at the end of the Warranty Period.

Section 7.05   Remedies for Breach of Certain Representations
and Warranties by HUD.

A.   The obligations and liabilities of HUD to a Successful
Bidder with respect to the breach of any representation or
warranty set forth in Sections 7.01 or 7.02 hereof shall be
limited solely to the remedies provided for in this Section 7.05.

B.   In the event that the Successful Bidder determines that
there exists a breach of a representation or warranty made by HUD
in Sections 7.01 or 7.02 hereof, the Successful Bidder shall
deliver to HUD a Breach Notice.  A Breach Notice shall be
effective only if delivered to HUD within the following time
periods:

(1)   For breaches of one or more of the representations
or warranties in Subsections 7.01.A and/or 7.01.B hereof, at
any time prior to the payment in full of the related
Mortgage Loan.

(2)   For breaches of one or more of the representations
or warranties in Subsections 7.01.C, 7.02.A or 7.02.B
hereof, at any time prior to expiration of the Warranty
Period.

C.    Within twenty (20) Business Days of receipt of a Breach Notice, HUD shall either (i) notify the Successful Bidder that HUD has accepted such Breach Notice, or (ii) notify the Successful Bidder that HUD does not accept the Breach Notice as giving sufficient evidence of the existence of the asserted breach and request additional information or documentation evidencing the asserted breach.  If the Breach Notice, as accepted by HUD, states a breach of one or more of the warranties specified in Sections 7.01 or 7.02 hereof, HUD shall, within ninety (90) Business Days of such acceptance, take one or more of the following actions, at HUD's sole and exclusive option:

(1)    undertake to diligently cure the asserted breach of warranty within a reasonable period of time; or

(2)    rescind the sale, assignment and transfer with respect to the subject Mortgage Loan, which shall include HUD remitting to the Successful Bidder an amount equal to the Recision Payment after the Successful Bidder has: (a) reassigned to HUD all of the Successful Bidder's right, title and interest in and to such Mortgage Loan including all real estate tax, insurance and other escrows held or controlled by the Successful Bidder as mortgagee; (b) delivered to HUD evidence satisfactory to HUD that there have been no changes to the title to the Mortgaged Property (other than those changes beyond the reasonable control of the Bidder), which, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the related Mortgage; (c) delivered to HUD evidence satisfactory to HUD that there have been no material changes to the terms or conditions of the related Mortgage Loan Documents; (d) delivered to HUD the related Transfer Documents, Mortgage Loan Documents, Servicing Files, Project Information, and such other documents, instruments, books, records and information as are requested by HUD; and (e) delivered to HUD evidence satisfactory to HUD that the Successful Bidder shall promptly remit to HUD any and all amounts received by the Successful Bidder on account of the Mortgage Loan during the period following the Recision Date.

Section 7.06    Bidder's Representations and Warranties.

The Bidder hereby represents and warrants to HUD, as of the date of this Agreement and the Closing Date, as follows:

A.    If other than a natural person, the Bidder is validly existing and in good standing under the laws of the jurisdiction in which the Bidder was organized.

B.   The Bidder is not: (1) an employee of HUD; (2) an individual or entity that is debarred from doing business with HUD pursuant to 24 Code of Federal Regulations (CFR) Part 24; (3) a contractor, subcontractor and/or consultant (including any agent of the foregoing) who performed services for, or on behalf of, HUD in connection with the Southeast Auction; (4) an individual that was a principal and/or employee of any entity or individual described in Subsection 7.06.B(3) at any time during which such entity or individual performed services for, or on behalf of, HUD in connection with the Southeast Auction; (5) an entity or individual that served as a loan servicer or performed other services for, or on behalf of, HUD with respect to any of the Mortgage Loans at any time during the two year period prior to the Bid Date; or (6) an individual that was a principal and/or employee of any entity or individual described in Subsection 7.06.B(5) at any time during the two year period prior to the Bid Date.

C.   The Bidder has the power and authority to execute, deliver and perform this Agreement and all of the transactions contemplated hereby.. The Bidder has taken all actions necessary to authorize it to perform its obligations under this Agreement and to consummate the transactions contemplated to be performed by it hereunder.  This Agreement and all of the other instruments and agreements executed and delivered by the Bidder in connection with the transactions contemplated hereunder on or prior to the Closing Date have been or will be duly executed and delivered by the Bidder and (assuming due execution and delivery by HUD) constitute or will constitute legal, valid and binding obligations of the Bidder, enforceable against the Bidder in accordance with the terms hereof and thereof, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity. The execution, delivery and performance of this Agreement by the Bidder does not violate any provisions of any existing federal, state or local law or regulation applicable to the Bidder, or violate or contravene any judgment, injunction or decree binding upon the Bidder, or violate, contravene or constitute a default under any provision of the organizational documents, if any, governing the Bidder, or of any agreement, contract or other instrument binding upon the Bidder.

D.   The Bidder has independently reviewed the Bid Package and has reviewed, or has elected not to review, the Asset Review Files, and has made its Bid and decision to purchase the Mortgage Loan or the Mortgage Loan Pool, if applicable, based upon its own independent evaluation of such Mortgage Loan or Mortgage Loan Pool and the terms and conditions of this Agreement.  The Bidder has not relied upon any statements or representations of HUD

other than those expressly provided in Sections 7.01 and 7.02 of this Agreement.

Section 7.07   Survival of Representations and Warranties of Bidder.

The representations and warranties of the Bidder set forth in this Agreement shall survive the Closing Date and shall not be subject to the Warranty Period.

Section 7.08   Bidder Indemnification of HUD.

The Bidder agrees to indemnify HUD and hold HUD harmless against any loss, damage, cost or expense (including reasonable attorney's fees) that may be incurred by HUD on or after the Closing Date as a result of:

A.   the Bidder's breach of any representation or warranty set forth in Section 7.06 hereof; and/or

B.   the Bidder's failure to restore all of the Closing Escrow Account Balances in accordance with Section 4.04 hereof; and/or

C.   the Bidder's failure to service any Mortgage Loan(s) (or cause any Mortgage Loan(s) to be serviced) in accordance with applicable federal, state and local law and regulations; and/or

D.   the Bidder's failure to perform any of the obligations of the Bidder set forth in Sections 4.05, 6.04, 8.01, 9.02, 9.03 and 9.05 hereof.


## ARTICLE VIII

## CASUALTY LOSS/CONDEMNATION/PREPAYMENT

Section 8.01   Rights in the Event of Casualty Loss and/or Condemnation.

A.   If, prior to the Closing Date, HUD or the Successful Bidder has knowledge that a Mortgaged Property, or any part thereof, is damaged as the result of fire or other casualty, or is taken by eminent domain, such that the cost of repair or replacement, or the award proposed by the condemning authority is reasonably likely to equal or exceed twenty percent (20%) of the then Unpaid Principal Balance of such Mortgage Loan, such party shall promptly notify the other party in writing of such damage, destruction or taking (a "Casualty/Condemnation Notice"). The Successful Bidder may elect, within five (5) Business Days after

it has knowledge of such damage, destruction or taking (whether
as a result of a Casualty/Condemnation Notice from HUD or
otherwise), by written notice to HUD (which notice shall be
delivered to HUD no later than the fifth (5th) Business Day prior
to the Closing Date), to:

    (1)  terminate this Agreement as follows:

       (a)  if a single Mortgage Loan is the subject of
this Agreement, terminate this Agreement in its
entirety and, upon HUD's return to the Successful
Bidder of the Total Deposit, or application of the
Total Deposit in accordance with Subsection 4.02.C(1)
hereof, neither party shall have any further liability
to the other under this Agreement; or

       (b)  if a Mortgage Loan Pool is the subject of
this Agreement, terminate this Agreement solely as it
relates to the Mortgage Loan subject to the Casualty
Condemnation Notice, in which event (i) the Closing
Date Payment shall be reduced by the Individual Loan
Price relating to such Mortgage Loan (and the
corresponding adjustments shall be made to the amounts
computed in accordance with Subsections 4.02.B and
4.02.C(2) hereof), (ii) neither party shall have any
further liability to the other with respect to the
Mortgage Loan subject to the Casualty Condemnation
Notice, and (iii) both parties shall remain bound by
all terms and conditions of this Agreement with respect
to each other Mortgage Loan that is the subject of this
Agreement.

    (2)  complete the sale, assignment and transfer of such
Mortgage Loan without any abatement of the Closing Date
Payment whatsoever, in which event on the Closing Date HUD
shall assign to the Successful Bidder all of the insurance
or condemnation proceeds paid to HUD prior to the Closing
Date, as well as all of HUD's rights with respect to any
insurance or condemnation proceeds that may be paid to HUD
or become due after the Closing Date (and upon receipt
thereof, the Successful Bidder shall be required to apply
such proceeds in accordance with the terms of the applicable
Mortgage and applicable law).

If the Successful Bidder does not make such election as provided
above, the Successful Bidder shall be deemed to have elected to
proceed with this transaction as described in Subsection
8.01.A(2) above.

B.   If, prior to the Closing Date, the Mortgaged Property, or any part thereof, is damaged as the result of fire or other casualty, or is taken by eminent domain, such that the cost of repair or replacement, or the award proposed by the condemning authority is not reasonably likely to equal or exceed twenty percent (20%) of the then Unpaid Principal Balance of such Mortgage Loan, both HUD and the Successful Bidder shall proceed with this transaction.  With respect to such Mortgage Loan, HUD shall, on the Closing Date, assign to the Successful Bidder all of the insurance or condemnation proceeds paid to HUD prior to the Closing Date, as well as all of HUD's rights with respect to any insurance or condemnation proceeds that may be paid to HUD or become due after the Closing Date (and upon receipt thereof, the Successful Bidder shall be required to apply such proceeds in accordance with the terms of the applicable Mortgage and applicable law).

   Section 8.02   Rights in the Event of Prepayment or HUD's Acquisition of Mortgaged Property.

   A.   If, prior to the Closing Date, HUD receives a payment from a Mortgagor which, when applied in accordance with the terms of the related Mortgage, results in a prepayment of the then entire Unpaid Principal Balance of such Mortgage Loan (a "Terminated Mortgage Loan"), this Agreement shall terminate as follows:

      (1)   if a single Mortgage Loan is the subject of this Agreement, this Agreement shall terminate in its entirety and, upon HUD's return to the Successful Bidder of the Total Deposit, or application of the Total Deposit in accordance with Subsection 4.02.C(1) hereof, neither party shall have any further liability to the other under this Agreement; or

      (2)   if a Mortgage Loan Pool is the subject of this Agreement, this Agreement shall terminate solely as it relates to the Terminated Mortgage Loan, in which event (i) the Closing Date Payment shall be reduced by the Individual Loan Price relating to such Mortgage Loan (and the corresponding adjustments shall be made to the amounts computed in accordance with Subsections 4.02.B and 4.02.C(2) hereof), (ii) neither party shall have any further liability to the other with respect to the Mortgage Loan subject to the prepayment, and (iii) both parties shall remain bound by all terms and conditions of this Agreement with respect to each other Mortgage Loan that is the subject of this Agreement.

   B.   If, prior to the Closing Date, HUD determines, in HUD's sole discretion, that it is necessary to acquire title to the

Mortgaged Property relating to any Mortgage Loan, this Agreement shall terminate as provided in Section 8.02.A hereof, as if such Mortgage Loan were a Terminated Mortgage Loan.

## ARTICLE IX

## MISCELLANEOUS

**Section 9.01   Review of Mortgage Loan Documents, Servicing Files and Project Information.**

During the period between the first Business Day following the Award Date and the Closing Date, HUD shall make available to the Bidder for review and copying (at the Bidder's cost and expense), at such times and on such dates as are mutually agreed upon by HUD and the Bidder, copies of the Mortgage Loan Documents, the Servicing Files and the Project Information.

**Section 9.02   Notification to Mortgagors.**

Promptly following the Closing Date, the Successful Bidder shall, at the Successful Bidder's cost and expense, mail each Mortgagor Notification Letter to the related Mortgagor.

**Section 9.03   Post-Closing Servicing of the Mortgage Loan(s).**

A.   From and after the Closing Date, the Successful Bidder shall be fully bound by the Mortgage Loan Documents relating to each Mortgage Loan, including without limitation any mortgage modification agreement and/or provisional workout agreement relating to such Mortgage Loan.

B.   From and after the Closing Date, the Successful Bidder, and not HUD, shall be responsible for sending the Mortgagor all bills relating to each Mortgage Loan.

**Section 9.04   Termination of FHA Mortgage Insurance, FHA Mortgage Insurance Premium, Monthly HUD Service Charge and HUD Regulatory Agreement.**

A.   From and after the Closing Date, no FHA Mortgage Insurance shall be in effect with respect any Mortgage Loan and no FHA mortgage insurance premium or monthly HUD service charge shall be payable by the related Mortgagor. Nothing contained herein shall preclude the Successful Bidder from entering into an agreement for servicing any Mortgage Loan and compensating the servicer.

B.     From and after the Closing Date, the Regulatory Agreement relating to each Mortgage Loan shall be released and terminated as provided in the Release of Regulatory Agreement.

Section 9.05   Notices.

All notices, requests, demands and other communications which are required or permitted to be given under this Agreement shall be in writing and shall be sent (except as otherwise expressly provided herein) by hand-delivery, over-night courier, telecopier (and confirmed by a similar mailed writing) or by registered or certified mail, return receipt requested, postage prepaid:

If to HUD, to:

Attention: William Richbourg/Southeast Auction
Room: 5146
United States Department of
       Housing and Urban Development
451 7th Street, S.W.
Washington, D.C. 20410
Telecopier Number: (202) 401-2664

If to HUD's Financial Advisor, to:
Attention: Robert W. Robinson or Richard F. Karsch
The Hamilton Securities Group, Inc.
1438 Corcoran Street, N.W.
Washington, D.C.  20009

If to the Bidder or the Successful Bidder, to:

Attention:  Dmitri L. Stockton
   Condor One, Inc.
   c/o.General Electric Capital Corporation
   292 Long Ridge Road
   Stamford, CT 06927
Telecopier Number: (203)357-6364

All such notices, requests, demands and other communications shall be effective upon the actual delivery thereof to the address identified pursuant to this Section (or the refusal thereof by the addressee at the address identified pursuant to this Section).  Either party to this Agreement may change such party's address for purposes of this Section by sending to the other party to this Agreement written notice of the new address in the manner specified in this Section.

Section 9.06   Expenses.

The Successful Bidder shall pay any and all costs incurred by the Successful Bidder in connection with the sale, assignment and transfer of the Mortgage Loan or the Mortgage Loan Pool, if applicable, including, but not limited to, any city, county and/or state taxes, any recordation or filing fees, the costs of title examination, title commitment and title insurance, any transfer fees payable to any governmental agency, and any other costs or fees relating to or arising from the sale, assignment and transfer of each Mortgage Loan.

Section 9.07   No Assignment.

This Agreement shall not be assigned, in whole or in part, by HUD or the Bidder; provided, however, that the Bidder may assign this Agreement, in whole or in part, after the sale, assignment and transfer of the Mortgage Loan(s) to the Bidder provided that such assignment is in writing, and such assignment expressly states that: (1) the assignee(s) assumes any and all of the Bidder's obligations under this Agreement with respect to the Mortgage Loans relating to such assignment; and (2) both the Bidder and the assignee(s) shall each remain jointly and severally liable to HUD for the failure of either the Bidder or the assignee(s) to fully comply with Sections 4.04 and 4.05 of this Agreement (and the Bidder's indemnification obligations with respect to Sections 4.04 and 4.05, as identified in Section 7.08 of this Agreement) with respect to such Mortgage Loans. Any assignment made by the Bidder, or any assignee of the Bidder, in violation of the foregoing shall be deemed void and of no effect with respect to HUD. Upon request by HUD, the Bidder and the assignee(s) shall provide HUD with a copy of any such assignment.

Section 9.08   Governing Law.

This Agreement shall be governed by and construed in accordance with federal law and, to the extent that there is no applicable federal law, the laws of the District of Columbia. All laws or rules of construction of federal or District of Columbia law, as the case may be, shall govern the rights of parties to this Agreement, their performance hereunder and the interpretation of the provisions of this Agreement.

Section 9.09   Entire Agreement; No Modifications; Conflict with Bid Information, Bid Package and/or Machine Readable Bid Card.

This Agreement, and the documents and instruments to be executed and delivered pursuant to this Agreement, constitute the entire agreement between the parties hereto with respect to the

subject of the transactions contemplated hereby and supersede all
prior agreements and understandings with respect thereto, if any.
The terms and conditions of this Agreement shall apply to each
Bid on any individual Mortgage Loan, and each Bid on any Mortgage
Loan Pool, made by the Bidder as if a separate Agreement had been
executed by the parties with respect to each such Mortgage Loan
and/or Mortgage Loan Pool.  Unless otherwise required by HUD,
this Agreement shall not be modified or amended in any manner,
except as required to: (1) insert the information required on
page 1 of this Agreement; (2) insert the Bidder's address and
telecopier number in Section 9.05 hereof; (3) complete the
Attachments hereto in accordance with the terms of this
Agreement; and (4) execute the last page of this Agreement.  If
the Bidder makes any modifications or amendments to this
Agreement, except as expressly provided herein, this Agreement
shall be deemed automatically terminated.  To the extent that
there is any conflict, ambiguity or inconsistency between this
Agreement and the Bid Information and/or the Bid Package, this
Agreement shall be deemed controlling and any such conflict,
ambiguity or inconsistency shall be resolved in favor of, and
pursuant to the terms of, this Agreement.  To the extent that
there is any conflict, ambiguity or inconsistency between the
information supplied by the Bidder on the Machine Readable Bid
Card, and any other information supplied by the Bidder in
connection with this Agreement, the information supplied by the
Bidder on the Machine Readable Bid Card shall be deemed
controlling.

Section 9.10  Headings.

.The headings of the several articles and sections of this
Agreement are inserted for convenience only and do not constitute
a part of this Agreement.

Section 9.11  Time of Essence; Time.

Time is of the essence with respect to all of HUD's and the
Bidder's obligations under this Agreement.  All references in
this Agreement to a specific time of day shall be deemed to refer
to Eastern Standard Time or Daylight Savings Time, whichever is
then applicable in Washington, D.C.

Section 9.12  No Third Party Beneficiaries.

Except with respect to each Mortgagor's right to the
restoration of the Closing Escrow Account Balances by the
Successful Bidder in accordance with Section 4.04 hereof, this
Agreement does not create, and shall not be deemed to create, a
relationship between either or both of the parties hereto and any

third party in the nature of a third party beneficiary
relationship.

Section 9.13    No Limitation on HUD's Ability to Administer
and Enforce Laws.

Except as otherwise expressly set forth in the Agreement,
nothing in this Agreement shall in any way be construed to affect
HUD's ability to administer or enforce the laws, regulations and
policies pertaining to any Mortgage Loan, or otherwise.

Section 9.14    Further Assurances.

During the period from the Award Date through and after the
Closing Date, upon the reasonable request of the Successful
Bidder or HUD, and without payment of further consideration from
one party to the other (other than reimbursement of out-of-pocket
expenses incurred by the party receiving the request), the
Successful Bidder and/or HUD will do, execute, acknowledge and
deliver, and will cause to be done, executed, acknowledged and
delivered, all such further acts, instruments, documents and
assurances as may be required in order to complete the
transactions contemplated by this Agreement.

Section 9.15    Counterparts.

This Agreement may be executed and delivered in any number
of counterparts and such counterparts taken together shall
constitute one and the same agreement.

Section 9.16    Execution and Delivery of Duplicate Original
Sale Agreements/Bid Form.

A.    During the period between 9:00 a.m. and 5:00 p.m. on
the day prior to the Bid Date or 9:00 a.m and 3:30 p.m. on the
Bid Date, the Bidder shall have delivered to HUD's Financial
Advisor, in accordance with the instructions contained in the Bid
Package, two (2) fully completed duplicate originals of this
Agreement, each of which shall have been executed by the Bidder.

B.    The Bidder shall deliver the Bid Form to HUD's
Financial Advisor in accordance with the instructions contained
in the Bid Package.

Section 9.17    Unsecured Debt.  [This Section 9.17 shall be
inapplicable to the Bidder unless the Bidder has identified the
Unsecured Debt on Attachments A-1 and/or A-2 hereto].

A.    The Unsecured Debt is evidenced by the following (i) a
certified copy of that certain Plan of Reorganization filed on

April 30, 1992 with the U.S Bankruptcy Court for the Southern
District of Mississippi; and (ii) a certified copy of that
certain Agreed Order filed on November 13, 1992 with the U.S
Bankruptcy Court for the Southern District of Mississippi.  For
purposes of this Agreement, the foregoing documents shall be
deemed the only "Mortgage Loan Documents" relating to the
Unsecured Debt.  The only "Transfer Document" relating to the
Unsecured Debt shall be an Assignment of Unsecured Debt, to be
prepared by HUD, which assigns to the Bidder all of HUD's right,
title and interest in and to the Unsecured Debt.

        B.    Notwithstanding anything to the contrary contained in
this Agreement, and except as otherwise provided in Subsection
9.17.C hereof, the Unsecured Debt shall be sold, assigned and
transferred to the Bidder pursuant to the terms and conditions of
this Agreement as if such Unsecured Debt was a Mortgage Loan.

        C.    Sections 4.04, 5.01.A, 6.01.A, 6.01.B, 6.02, 6.04,
7.01.C, 7.08.B, 8.01, 8.02.B and 9.04.B of this Agreement shall
be of no force or effect with respect to the sale, assignment and
transfer of the Unsecured Debt.  Further, to the extent that any
of the other terms or conditions of this Agreement may reasonably
be deemed inapplicable to the sale, assignment and transfer of a
loan such as the Unsecured Debt, such terms and conditions shall
be of no force or effect with respect to the sale, assignment and
transfer of the Unsecured Debt.

        IN WITNESS WHEREOF, each of the parties hereto have caused
this Agreement to be duly executed and delivered in their names
as of the date first above written.

                              SECRETARY OF HOUSING AND URBAN
                              DEVELOPMENT

                              By: _____
                                         Authorized Agent

                              BIDDER:

ATTEST/WITNESS:               _____

_____       By: _____

                              Name: _____

                              Title: _____



OFFICE OF THE ASSISTANT SECRETARY
FOR HOUSING-FEDERAL HOUSING COMMISSIONER

## BID CONFIRMATION LETTER
### (SOUTHEAST AUCTION)

Date:          March 31, 1995

Name:          Dmitri L. Stockton
Title:         Vice President
Address:       292 Long Ridge Road
               Stamford, CT 06927

Re:  Bid Made By Condor One, Inc. ("Successful Bidder")

Dear Mr. Stockton:

The purpose of this letter is to accept your Bid of REDACTED % and advise you that you are the Successful Bidder for the pool of mortgage loans, as identified on Exhibit A (attached), in the Southeast Auction.  Enclosed herewith is a duplicate original of the Amended and Restated Loan Sale Agreement executed by HUD ("Loan Sale Agreement").

Pursuant to Section 3.03 of the Loan Sale Agreement, the Successful Bidder is obligated to deliver the Final Deposit to HUD within the time period of 9:00 a.m. to 2:00 p.m. on April 4, 1995. Failure to comply with this requirement (as well as any other term or condition of the Loan Sale Agreement) shall cause a forfeiture of the Total Deposit and the payment of liquidated damages, in accordance with Section 3.04 of the Loan Sale Agreement.

Questions regarding matters contained in this letter may be directed to Robert Robinson of The Hamilton Securities Group, Inc., 1410 Q St., N.W. Washington, D.C. 20009 (Fax: 202-462-7761).  However, matters pertaining to closing should be referred to Gerald Salzman, Esquire, Senior Attorney, The Department of Housing and Urban Development, 451 Seventh St., S.W., Washington, D.C. 20410 (202-708-3667).

By: _____
      Authorized Agent

Enclosures

EXHIBIT A (Page 1 of 2)

MORTGAGE LOAN POOL

Identified by the applicable Computer Input Numbers:









MAR-31-95

<u>EXHIBIT A</u> (Page 2 of 2)





REDACTED

## RECEIPT FOR DOCUMENTS

The Hamilton Securities Group, Inc. ("Hamilton"), on behalf of The U.S. Department of Housing and Urban Development Federal Housing Administration ("HUD"), hereby acknowledges receipt of the Bid Package submitted by Condor One, Inc., a Delaware corporation ("Bidder") in connection with the Southeast Region Nonperforming and Unsubsidized Multifamily Mortgage Loan Sale, which Bid Package was received by Hamilton on the date and at the time set forth below.

Date: _____3-20-95_____

Time of Delivery: _____2:05 pm_____


The Hamilton Securities Group, Inc

By: _____

Name: _____

Title: _____

## Pool Bid Sheet
### (10 Pool Bids Maximum)

Please fill in your pool bid: asset number, (as many assets as you want for each bid) and the percentage of UPB plus interest Arrearage for the corresponding pool bid.

Please write in your bidder name.

Condor ONE, Inc.



% of (UPB + IA)

REDACTED

% of (UPB + IA)

REDACTED

**Pool Bid 3**

% of (UPB + IA)

REDACTED

**Pool Bid 4**

% of (UPB + IA)

REDACTED

**Pool Bid 5**

% of (UPB + IA)

REDACTED

PLEASE DO NOT WRITE IN THIS AREA

00134

# FINAL DEPOSIT FORM

## SOUTHEAST REGION
## NONPERFORMING AND UNSUBSIDIZED
## MULTIFAMILY MORTGAGE LOAN SALE

**To:**

The Hamilton Securities Group, Inc.
Attn:   Robert W. Robinson
1438 Corcoran Street, NW
Washington, DC  20009
Phone:  (202) 483-6009 Ext. 203

**From:**

| | |
|---|---|
| Bidder Name: | Condor One, Inc. c/o General Electric Capital Corporation |
| Address: | 292 Long Ridge Road |
| City, State, Zip Code: | Stamford, Connecticut |
| Authorized Contact Person: | Dmitri L. Stockton |
| Phone: | (203)357-4567 |
| Fax: | (203)357-6364 |

**Wire Tracking:**

| | |
|---|---|
| Agent Bank: | Bankers Trust Company-NY |
| Federal Reference Number: | 0404B1Q8384C002045 |
| Amount Sent: | REDACTED |
| Time Sent: | 11:29.53 |

---

The Hamilton Securities Group, Inc.                                                    Page 9

U.S. Department of Housing and Urban Development
Federal Housing Administration

Southeast Mortgage Loan Sale
Amended Bid Instructions

# BID FORM

## SOUTHEAST REGION
### NONPERFORMING AND UNSUBSIDIZED
### MULTIFAMILY MORTGAGE LOAN SALE

To:     The Hamilton Securities Group, Inc.
        Attn:   Robert W. Robinson
                1438 Corcoran Street, NW
                Washington, DC 20009
                Phone: (202) 483-6009 Ext. 203

From:   Bidder Name:                   Condor One, Inc.
                                       c/o General Electric Capital Corporation
        Address:                       292 Long Ridge Road

        City, State, Zip Code:         Stamford, Connecticut 06927

        Authorized Contact Person:     Dmitri L. Stockton

        Phone:                         (203) 357-4567

        Fax:                           (203) 357-6364


Wire        Agent Bank:                _____
Tracking:   Federal Reference Number:  _____
            Dollar Amount Sent:        REDACTED
            Time Sent:                 _____

In accordance with the Amended and Restated Loan Sale Agreement, the undersigned offers to purchase those Mortgage Loan(s) identified on the Machine Readable Bid Card(s) provided at Tab 5. The Bid shall be expressed on the Machine Readable Bid Card(s) as a percentage (carried to one hundred thousandth of one percent; for example 99.55555%) of the Unpaid P&I Balance (or the Aggregate Unpaid P&I Balance) of such Mortgage Loan(s). *This completed form and the related Machine Readable Bid Card(s) constitutes the "Bid Form."*

All capitalized terms used herein shall have the same meaning as that given to such terms in Section 1 of the Amended and Restated Loan Sale Agreement. The undersigned acknowledges and agrees that the undersigned's Bid shall become irrevocable at 3:30 p.m. EST on the Bid Date and that, if the undersigned's Bid is accepted, the Bid Price to be paid by the undersigned pursuant to the Amended and Restated Loan Sale Agreement shall be adjusted only as provided in the Amended and Restated Loan Sale Agreement.