In re:                                      Case No.00-25351-BKC-RBR
                                            Chapter  11
OAKLAND LAKES, LTD.
                                            USDC Related Case No.
_____ Debtor(s). _____/             00-6147-CIV-LENARD/
                                                    TURNOFF

813268 Ontario, Inc., as General Partner of
Oakland Park (Florida) Limited Partnership, an
Ontario Limited Partnership, as limited partner
Of, and on behalf of Oakland Lakes, Ltd., a
Florida Limited Partnership
                Plaintiff(s),
vs.                                         Adv No.  00-2530-BKC-RBR-A

OAKLAND LAKES, LTD.
_____ Defendant(s). _____/

**TO: CLERK OF COURT**

### TRANSMITTAL OF RECORD TO UNITED STATES DISTRICT COURT
### PURSUANT TO ORDER OF REMAND

DOCUMENTS TRANSMITTED:

__X__ Certified Copy of Order of Remand Entered on  1/12/01
__X__ Original Bankruptcy File, Including Certified Docket for Adv No. 00-2530-BKC-RBR-A
_____ Copies of State Court Documents Filed With Removal Proceeding
_____ Transcripts of bankruptcy hearings
_____ *Copy of Bankruptcy File and Notice of Appeal*
_____ Other: _____

DATE TRANSMITTED: 2/1/01

                                            KAREN EDDY, CLERK OF COURT

                                            By: Laird Kennedy Temple
                                                    Deputy Clerk

Copies to:
Attorney for Plaintiff                      Telephone:  954-769-5708
Attorney for Defendant

- - - - - - - - - - - - - - -**U S DISTRICT COURT ACKNOWLEDGMENT**- - - - - - - - - - -

WE HEREBY ACKNOWLEDGE RECEIPT OF THE ABOVE REFERENCED
BANKRUPTCY FILE.

                                            CLERK OF COURT

DATE: 2/5/01                                By: _____
                                                    Deputy Clerk

PLEASE RETURN COPY TO BANKRUPTCY COURT UPON COMPLETION

☐ 299 E. Broward Blvd., Ft. Lauderdale, Florida 33301

CF-D15 (rev. 08/03/00)       Rec'd in MIA Dkt  2/5/01

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA

In re:                                    Case No.00-25351-BKC-RBR
                                          Chapter 11

OAKLAND LAKES, LTD.

_____Debtor(s)._____/

813268 ONTARIO, INC.

                    Plaintiff(s),
vs.                                       Adv No. 00-2530-BKC-RBR-A

OAKLAND LAKES, LTD.

_____Defendant(s).___/

### NOTICE OF ENTRY ON DOCKET OF JUDGMENT/ORDER

Notice is hereby provided pursuant to Bankruptcy Rule 9022 that the

Judgment/Order titled ___Order Granting Condor One, Inc.'s Motion for Remand_____

(copy attached) was entered on the docket on ___1/12/01_____.


DATED: 2/1/01_____                       KAREN EDDY, CLERK OF COURT

                                          By:_ Laird Kennedy Temple_____
                                          Deputy Clerk

                                          Telephone:___954-769-5708_____

Copies of notice and judgment/order to:
[Deputy clerk must immediately notice all required parties and list below]

   Richard J. Bernard, Esq., 200 S Biscayne Blvd #2500, Miami, FL 33131
   John H. Genovese, Esq., 100 SE 2 St #3600, Miami, FL 33131
   William C. Healy, Esq., Sect of HUD, 99 NE 4 St, Miami, FL 33132
   Scott Baena, Esq., 200 S Biscayne Blvd #3300, Miami, FL 33131
   Glenn D. Moses, Esq., 100 SE 2 St #3600, Miami, FL 33131

CF-D11 (rev. 12/01/98)

```
                    U.S. Bankruptcy Court
          Southern District of Florida (Broward)

              Adversary Proceeding #: 00-2530

Date filed: 11/28/00
Assigned to: Judge Raymond B. Ray
Related Bankruptcy Case #: 00-25351
In Re: Oakland Lakes, Ltd,
Demand: $0,000                        Nature of Suit:  459


========================      * Attorneys *

81328 ONTARIO, INC., AS       John H Genovese, Esq
GENERAL PARTNER OF OAKLAND    100 SE 2 St #3600
PARK (FLORIDA) LIMITED        Miami, FL 33131
PARTNERSHIP, AN ONTARIO       305-372-2400
LIMITED PARTNERSHIP
c/o Glenn D Moses
100 SE 2 St 36 Fl
Miami, FL 33131
        * Plaintiff *
```



```
    v.

OAKLAND LAKES, LTD.
        * Defendant *

WILLIAM O. BRISBEN
        * Defendant *

W. O. BRISBEN COMPANIES, INC.
        * Defendant *

ROBERT E. SCHULER
        * Defendant *

THE SECRETARY OF HOUSING AND      William C Healy, Esq
URBAN DEVELOPMENT (HUD)           99 NE 4 St
        * Defendant *             Miami, FL 33132
                                  305-961-9438

CONDOR ONE, INC.                  Richard J Bernard, Esq
        * Defendant *             200 S Biscayne Blvd #2500
                                  Miami, FL 33131
                                  305-374-7580
```

Proceedings include events between 1/1/31 and 2/1/01.
00-2530          813268 Ontario, Inc. v. Oakland Lakes, Ltd., et al

11/28/00 1        Notice of Removal/Application By Plaintiff 813268 Ontario,
                  Inc. For Removal.(00-2530) 813268 Ontario, Inc. vs. Oakland
                  Lakes, Ltd. ***fee pd***      ***filed in an expandable file
                  folder*** (lt) [EOD 11/29/00] [00-2530]

12/11/00 2        Motion By Defendant The Secretary of Housing and Urban
                  Develpment To Dismiss Plaintiff's Amended Complaint/Case
                  and Memorandum of Law (lt) [EOD 12/12/00] [00-2530]

12/13/00 3        Motion By Defendant Condor One, Inc. For Remand To USDC (lt
                  [EOD 12/15/00] [00-2530]

12/14/00 4        Notice of Filing By Defendant Condor One, Inc. Re:
                  Exhibits In Support of and Referred to in Condor One, Inc's
                  Motion for Remand (lt) [EOD 12/18/00] [00-2530]

12/26/00 6        Notice of Hearing By Richard J Bernard for Defendant Condor
                  One, Inc. Re: [3-1] Motion For Remand To USDC by Condor
                  One, Inc. schd For 9:30 1/9/01 at Room 308, Ft. Lauderdale
                  (sh) [EOD 12/29/00] [00-2530]

12/28/00 5        Consent By: Plaintiff 813268 Ontario, Inc. Re: [3-1] Motion
                  For Remand To USDC by Condor One, Inc. (sh) [EOD 12/29/00]
                  [00-2530]

12/28/00 7        Agreed Motion By Plaintiff 813268 Ontario, Inc. To Extend
                  Time To Serve Memorandum of Law in Opposition to
                  Defendant's HUD's Motion to Dismiss Plaintiff's Amended
                  Complaint and Incorporated Memorandum of Law . (sh)
                  [EOD 12/29/00] [00-2530]

1/4/01   8        Order ( 1/4/01) Granting [7-1] Motion To Extend Time To
                  Serve Memorandum of Law in Opposition to Defendant's HUD's
                  Motion to Dismiss Plaintiff's Amended Complaint and
                  Incorporated Memorandum of Law by 813268 Ontario, Inc. and
                  Plaintiff has until 1/26/01 to file its Memorandum of Law
                  in Opposition to Defendant HUD's Motion to Dismiss et al (lt
                  [EOD 01/04/01] [00-2530]

1/12/01  9        Order ( 1/11/01) Granting [3-1] Motion For Remand To USDC
                  by Condor One, Inc. (EOD 1/12/01) (lt) [EOD 01/12/01]
                  [00-2530]

1/16/01  10       Certificate Of Service By Richard J Bernard for Defendant
                  Condor One, Inc. Of [9-1] Order Granting Motion for Remand
                  to USDC by Condor One, Inc. (lt) [EOD 01/22/01]
                  [00-2530]

2/1/01   11       Notice of Entry of Judgment. (lt) [EOD 02/01/01]
                  [00-2530]

2/1/01   12       Transmittal of Record to U S Disctrict Court Pursuant to
                  Order of Remand, Re: [1-1] Complaint by 813268 Ontario,
                  Inc. (lt) [EOD 02/01/01] [00-2530]

Print as of February 1, 2001 3:30 pm                    Page 2

Certified to be a true and
correct copy of the original.
Karen Eddy, Clerk
U.S. Bankruptcy Court
So. Dist. of Fla.
Deputy Clerk
Date 2-1-01

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

_00cv 6147-1 enard_

In re:                                        CASE NO. 00-25351-BKC-RBR

OAKLAND LAKES, LTD.,                          CHAPTER 11

     Debtor.

_____/

813268 ONTARIO, INC., as General Partner
of Oakland Park (Florida) Limited Partnership,
an Ontario Limited partnership, as limited partner          JAN 1 2 2001
of, and on behalf of Oakland Lakes, Ltd.,
a Florida Limited Partnership,

     Plaintiff,

v.                                            ADV. NO. 00-2530-BKC-RBR-A

OAKLAND LAKES, LTD., a Florida limited
partnership, et al.

     Defendants.

_____/

## ORDER GRANTING CONDOR ONE, INC.'S
## MOTION FOR REMAND

On January 9, 2001 at 9:30 a.m., the Court conducted a hearing on Condor One, Inc.'s

Motion for Remand (the "Motion"). The Court, having considered the Motion and the consent

thereto filed by 813268 Ontario, Inc. and Oakland Lakes, Ltd., having reviewed the file in this

case and the captioned main bankruptcy case, and being otherwise fully advised in the premises,

hereby

ORDERS AND ADJUDGES as follows:

1.     The Motion is granted.

2.     The captioned adversary case is remanded to the United States District Court for

the Southern District of Florida.



3.    The clerk of this Court shall take any and all actions necessary to effectuate the remand of this adversary case, including, without limitation, the transmittal of the record in this adversary case to the United States District Court for the Southern District of Florida.

ORDERED in the Southern District of Florida this _11_ day of January, 2001.



RAYMOND B. RAY
United States Bankruptcy Judge

JAN 1 2 2001

Copy to:
Richard J. Bernard, Esq.
Bilzin Sumberg Dunn Baena Price & Axelrod LLP
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2336

[Attorney Bernard is hereby directed to serve a conformed copy of this order upon all interested parties.]

#30086814



2

## SOUTHERN DISTRICT OF FLORIDA

In re:                                  Case No.00-25351-BKC-RBR

                                        Chapter 11

                                        00cv6147-Lenard

OAKLAND LAKES, LTD.


_____Debtor(s)._____/       FEB - 1 2001

813268 ONTARIO, INC.


                Plaintiff(s),
vs.                                     Adv No. 00-2530-BKC-RBR-A

OAKLAND LAKES, LTD.


_____Defendant(s).___/


### NOTICE OF ENTRY ON DOCKET OF JUDGMENT/ORDER

Notice is hereby provided pursuant to Bankruptcy Rule 9022 that the

Judgment/Order titled ___Order Granting Condor One, Inc.'s Motion for Remand_____

(copy attached) was entered on the docket on ___1/12/01_____.


DATED: 2/1/01____              KAREN EDDY, CLERK OF COURT

                              By:__Laird Kennedy Temple_____
                                   Deputy Clerk

                              Telephone:___954-769-5708_____

Copies of notice and judgment/order to:
[Deputy clerk must immediately notice all required parties and list below]

    Richard J. Bernard, Esq., 200 S Biscayne Blvd #2500, Miami, FL 33131
    John H. Genovese, Esq., 100 SE 2 St #3600, Miami, FL 33131
    William C. Healy, Esq., Sect of HUD, 99 NE 4 St, Miami, FL 33132
    Scott Baena, Esq., 200 S Biscayne Blvd #3300, Miami, FL 33131
    Glenn D. Moses, Esq., 100 SE 2 St #3600, Miami, FL 33131

CF-D11 (rev. 12/01/98)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)

In re:                                          CASE NO. 00-25351-BKC-RBR

OAKLAND LAKES, LTD.,                            CHAPTER 11

    Debtor.

_____/

*00-2530-A*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the *Order Granting Condor One,*

*Inc.'s Motion for Remand*, was served via U.S. Mail upon all parties listed on the attached service

list and by fax to those listed with an asterisk (*) this *16*th day of January, 2001.

> I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and that I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).

BILZIN SUMBERG DUNN BAENA PRICE &
AXELROD, LLP
Counsel for Debtor
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, FL 33131-7593
Tel. No.: (305) 374-7580


By: _____
    Richard J. Bernard
    Florida Bar No. 57266

#30086912

*Glenn D. Moses, Esq.
Genovese Lichtman Joblove & Battista, P.A.
NationsBank Tower
100 Southeast Second Street
36th Floor
Miami, FL  33131

Offices of Assistant U.S. Trustee
Federal Building, Ste. 1204
51 S.W. First Avenue
Miami, FL  33130

*Greg A. Lowry, Esq.
Locke Liddell & Sapp LLP
2200 Ross Avenue
Suite 2200
Dallas, TX  75201-6776

Robert Messick, Esq.
Icard, Merrill, Cullis, Timm,
  Furen & Ginsburg, P.A.
2033 Main Street, Suite 600
Sarasota, Florida 34237

Peak Equity Corp.
5650 Yonge Street
Suite 207
Toronto, Ontario  M2M4GS

Douglas J. Snyder, Esq.
Douglas J. Snyder, P.A.
1320 South Dixie Highway
Coral Gables, Florida  33146

Oakland Lakes, Ltd.
Sailboat Pointe
2325 N.W. 33rd Street
Oakland Park, FL  33305

*Doug Goldrick
G.E. Capital Real Estate
16479 Dallas Parkway
Suite 120
Addison, TX  75001

ICORR Properties International
2 North Tamiami Trail
Suite 210
Sarasota, FL  34236

Sol Roter
Peak Equity Corp.
5650 Yonge Street
Suite 207
Toronto, Ontario  M2M4GS

Anchor Securities Limited
6 Adelaide Street East
Suite 210
Toronto Canada

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:                                         CASE NO. 00-25351-BKC-RBR

OAKLAND LAKES, LTD.,                           CHAPTER 11

      Debtor.
_____/

813268 ONTARIO, INC., as General Partner
of Oakland Park (Florida) Limited Partnership,
an Ontario Limited partnership, as limited partner
of, and on behalf of Oakland Lakes, Ltd.,
a Florida Limited Partnership,

      Plaintiff,

v.                                             ADV. NO. 00-2530-BKC-RBR-A

OAKLAND LAKES, LTD., a Florida limited
partnership, et al.

      Defendants.
_____/

**ORDER GRANTING CONDOR ONE, INC.'S
MOTION FOR REMAND**

On January 9, 2001 at 9:30 a.m., the Court conducted a hearing on Condor One, Inc.'s

Motion for Remand (the "Motion"). The Court, having considered the Motion and the consent

thereto filed by 813268 Ontario, Inc. and Oakland Lakes, Ltd., having reviewed the file in this

case and the captioned main bankruptcy case, and being otherwise fully advised in the premises,

hereby

ORDERS AND ADJUDGES as follows:

1.      The Motion is granted.

2.      The captioned adversary case is remanded to the United States District Court for

the Southern District of Florida.

3.    The clerk of this Court shall take any and all actions necessary to effectuate the remand of this adversary case, including, without limitation, the transmittal of the record in this adversary case to the United States District Court for the Southern District of Florida.

ORDERED in the Southern District of Florida this ⌊⌊ day of January, 2001.

# RAYMOND B. RAY

RAYMOND B. RAY
United States Bankruptcy Judge

Copy to:
Richard J. Bernard, Esq.
Bilzin Sumberg Dunn Baena Price & Axelrod LLP
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2336

[Attorney Bernard is hereby directed to serve a conformed copy of this order upon all interested parties.]

#30086814

2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:                                              CASE NO. 00-25351-BKC-RBR

OAKLAND LAKES, LTD.,                                CHAPTER 11

     Debtor.
_____/

813268 ONTARIO, INC., as General Partner
of Oakland Park (Florida) Limited Partnership,
an Ontario Limited partnership, as limited partner      JAN 1 2 2001
of, and on behalf of Oakland Lakes, Ltd.,
a Florida Limited Partnership,

     Plaintiff,

v.                                                  ADV. NO. 00-2530-BKC-RBR-A

OAKLAND LAKES, LTD., a Florida limited
partnership, et al.

     Defendants.
_____/


## ORDER GRANTING CONDOR ONE, INC.'S
## <u>MOTION FOR REMAND</u>

On January 9, 2001 at 9:30 a.m., the Court conducted a hearing on Condor One, Inc.'s

Motion for Remand (the "Motion"). The Court, having considered the Motion and the consent

thereto filed by 813268 Ontario, Inc. and Oakland Lakes, Ltd., having reviewed the file in this

case and the captioned main bankruptcy case, and being otherwise fully advised in the premises,

hereby

ORDERS AND ADJUDGES as follows:

1.     The Motion is granted.

2.     The captioned adversary case is remanded to the United States District Court for

the Southern District of Florida.



3.     The clerk of this Court shall take any and all actions necessary to effectuate the remand of this adversary case, including, without limitation, the transmittal of the record in this adversary case to the United States District Court for the Southern District of Florida.

ORDERED in the Southern District of Florida this _11_ day of January, 2001.

RAYMOND B. RAY
United States Bankruptcy Judge

JAN 1 2 2001

Copy to:
Richard J. Bernard, Esq.
Bilzin Sumberg Dunn Baena Price & Axelrod LLP
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2336

[Attorney Bernard is hereby directed to serve a conformed copy of this order upon all interested parties.]

#30086814

Certified to be a true and
correct copy of the original.
Karen Eddy, Clerk
U.S. Bankruptcy Court
So. Dist. of Fla.
Deputy Clerk
Date: 2-7-01

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)

In re:                                                    CASE NO. 00-25351-BKC-RBR

OAKLAND LAKES, LTD.                                       CHAPTER 11

      Debtor.
_____/

813268 ONTARIO, INC., as General Partner
of OAKLAND PARK (FLORIDA) Limited                         JAN - 4 2001
Partnership, an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;

           Plaintiff,
v.                                                        ADV. NO. 00-2530-BKC-RBR-A

OAKLAND LAKES, LTD.,
a Florida Limited Partnership, et al.

      Defendants.
_____/

## ORDER ON PLAINTIFF'S AGREED MOTION TO EXTEND TIME TO SERVE ITS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S HUD'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

THIS CAUSE, having come before the Court on Plaintiff's Agreed Motion to Extend Time to

Serve its Memorandum of Law in Opposition to Defendant HUD's Motion to Dismiss Plaintiff's

Amended Complaint and Incorporated Memorandum of Law, and the Court, having reviewed the

Motion, and being otherwise advised in the premises, it is hereby

ORDERED AND ADJUDGED that:

1.      The Agreed Motion to Extend Time to Serve its Memorandum of Law in Opposition to

Defendant HUD's Motion to Dismiss Plaintiff's Amended Complaint and Incorporated Memorandum

of Law  is hereby granted.



2.    Plaintiff has until January 26, 2001 to file its Memorandum of Law in Opposition to Defendant HUD's Motion to Dismiss Plaintiff's Amended Complaint and Incorporated Memorandum of Law.

DONE AND ORDERED in Chambers in Ft. Lauderdale, Florida, on this ___4___ day of January, 2001

JAN - 4 2001

U.S. District Court Judge

Copies furnished to:

Jason A. Lessinger, Esq.
Robert E. Messick, Esq.
William Healy, Esq.
David Trench, Esq.
Richard Woulfe, Esq.

F:\USERS\CJB\CJBC\OAKLAND\ORD-AGR.MOT

-2-

ICARD, MERRILL, CULLIS, TIMM,
FUREN & GINSBURG, P.A.

ATTORNEYS AND COUNSELORS
2033 MAIN STREET, SUITE 600
SARASOTA, FLORIDA 34237
FACSIMILE (941) 366-6384
TELEPHONE (941) 366-8100

JASON A. LESSINGER

TAMPA TELEPHONE
(813) 221-2100

REPLY TO:
P.O. BOX 4195
SARASOTA, FLORIDA 34230

December 28, 2000

U.S. Bankruptcy Court
Ft. Lauderdale Division
Attn: Clerk
299 E. Broward Blvd., Rm 310
Ft. Lauderdale, FL 33301

Re:    In re: Oakland Lakes, Ltd., Debtor; Case No. 00-25351-BKC-RBR
       813268 Ontario, Inc. v. Oakland Lakes, Ltd.; Adv. No. 00-2530-BKC-RBR-A

Dear Clerk:

On December 27, 2000, Plaintiff's Agreed Motion to Extend Time to Serve its Memorandum of Law in Opposition to Defendant's HUD's Motion to Dismiss Plaintiff's Amended Complaint and Incorporated Memorandum of Law was filed. At that time, an order was inadvertently not submitted with the motion. Accordingly, enclosed please find a proposed Order on Plaintiff's Agreed Motion to Extend Time to Serve its Memorandum of Law in Opposition to Defendant's HUD's Motion to Dismiss Plaintiff's Amended Complaint and Incorporated Memorandum of Law with copies for conforming and envelopes for serving on the parties.

Sincerely yours,

ICARD, MERRILL, CULLIS,
TIMM, FUREN & GINSBURG, P.A.

Jason A. Lessinger
For the Firm

JAL/ds
Enclosure
cc:    Robert E. Messick, Esq.
       William Healy, Esq.
       David Trench, Esq.
       Richard Woulfe, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)

In re:                                      CASE NO. 00-25351-BKC-RBR

OAKLAND LAKES, LTD.                         CHAPTER 11

      Debtor.
_____/

813268 ONTARIO, INC., as General Partner
of OAKLAND PARK (FLORIDA) Limited
Partnership, an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;

      Plaintiff,
v.                                          ADV. NO. 00-2530-BKC-RBR-A

OAKLAND LAKES, LTD.,
a Florida Limited Partnership, et al.

      Defendants.
_____/

### PLAINTIFF'S AGREED MOTION TO EXTEND TIME TO
### SERVE ITS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
### HUD'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT
### AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, 813268 ONTARIO, INC., as General Partner of OAKLAND PARK (FLORIDA)

LIMITED PARTNERSHIP, an Ontario limited partnership, as limited partner of, and on behalf of

OAKLAND LAKES, LTD., a Florida Limited Partnership,  ("Oakland Park"), by and through its

undersigned attorneys, files this agreed motion to extend time to serve its memorandum of law in

opposition to HUD's Motion to Dismiss Plaintiff's amended complaint and incorporated memorandum

of law, and as grounds therefor would show:

1.     Plaintiff filed its motion to amend complaint, with attached proposed amended complaint on

     December 8, 2000.

2.     The Court entered its order granting the motion to amend the complaint on November 21,

     2000.  HUD filed its motion to dismiss Plaintiff's amended complaint and incorporated



memorandum of law on December 8, 2000. Plaintiff did not receive same until December 14, 2000. Pursuant to Rule 7.1 of the local rules of the United States District Court for the Southern District of Florida, Plaintiff's memorandum in opposition to HUD's motion must be served on or before December 26, 2000.

3.     The issues involved in this matter are quite complex, and will require considerable amounts of time in order to research and draft the appropriate opposing memorandum.

4.     Due to the fact that the service deadline falls during the holiday season, and the fact that much of Plaintiff's counsel's support staff and research staff are taking time away from work due to the holidays; and also Plaintiff's counsel's schedule on other matters in January of 2001, good cause exists to extend the time within which Plaintiff must serve a memorandum of law in opposition to HUD's motion to dismiss until January 26, 2001.

5.     This motion is filed in good faith and not for dilatory purposes.

6.     Counsel for Plaintiff spoke to William Healy, counsel for HUD, who advised that he has no objection to the extension of time until January 26, 2001.

WHEREFORE, Plaintiff would respectfully request that this Court enter an order extending the time in which Plaintiff has to file a memorandum in opposition to HUD's Motion to Dismiss until January 26, 2001.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to: **DAVID W. TRENCH, ESQ.**, 2500 First Union Financial Center, Miami, FL 33131-2336, **WILLIAM C. HEALY, ESQ.**, 99 N.E. 4th Street, Third Floor/civil Division, Miami, FL 33132-2111, **GLEN MOSES, ESQ.**, Genovese, Lichtman, et al. Bank of America Tower, 100 South East Second Street 36th Floor, Miami, FL 33131 and  **RICHARD T. WOULFE, ESQ.**, P.O. Drawer 03040, 888 E. Las Olas Blvd., Suite 400 Ft. Lauderdale, FL 33303-0340, this _26th_ day of December, 2000.

Respectfully submitted,

ICARD, MERRILL, CULLIS, TIMM,
FUREN & GINSBURG, P.A.
2033 Main Street, Suite 600
Sarasota, FL 34237
Telephone: (941) 366-8100
Attorneys for Plaintiff

By: _____
ROBERT E. MESSICK
Florida Bar No. 31477
JASON A. LESSINGER
Florida Bar No. 0091601

F:\USERS\CJB\CJBC\OAKLAND\Hud-fed.ct\MOT-AGR.EXT

FILED BY_____DC

RECEIVED BY_____DC

00 DEC 26 PM 4: 11

CLERK
BANKRUPTCY CT.
SD OF FLA.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)

In re:                                          CASE NO. 00-25351-BKC-RBR

OAKLAND LAKES, LTD.,                            CHAPTER 11

     Debtor.
_____/

813268 ONTARIO, INC., as General Partner
of Oakland Park (Florida) Limited Partnership,
an Ontario limited partnership; as limited partner
of, and on behalf of Oakland Lakes, Ltd.,
a Florida Limited Partnership,

     Plaintiff,

v.                                              ADV. NO. 00-2530-BKC-RBR-A

OAKLAND LAKES, LTD., a Florida limited
partnership; et al.

     Defendants.
_____/

## NOTICE OF HEARING

NOTICE IS HEREBY GIVEN that a hearing will be held in the above matter at 9:30

a.m./p.m on the _9TH_ day of _Jan_____, _2001_, at the following location:

( )    Claude Pepper Federal Bldg., 51 S.W. 1st Avenue, Courtroom 1406, Miami,
      Florida.

(X)    U.S. Courthouse, Room 308, 299 E. Broward Blvd., Ft. Lauderdale, Florida.

( )    Paul G. Rogers Federal Building, Courtroom #6, Room 329, 701 Clematis Street,
      West Palm Beach, Florida.

to consider the following:

## CONDOR ONE, INC.'S MOTION FOR REMAND

DATED: _12·20·00_    By: _[signature]_
                     Courtroom Deputy
                     Phone: (954) 769-5760

The movant, or movant's counsel, Richard J. Bernard, Esq., shall serve a copy of this notice and, unless previously served, the above-described pleading to all required parties and within the time frames required by the Federal Rules of Bankruptcy Procedure, Local Rules, or orders of the court, and shall file this original notice and completed certificate of service with the court. ALL MOVING OR OBJECTING PARTIES SHALL BRING TO THE HEARING A PROPOSED ORDER, SUSTAINING THEIR POSITION WITH APPROPRIATE COPIES AND ENVELOPES.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and copy of this Notice of Hearing was served via Facsimile and U.S. mail, upon all parties included on the attached service list this 26th day of _December_, 2000.

BILZIN SUMBERG DUNN BAENA
PRICE & AXELROD LLP
Counsel for Condor One, Inc.
200 South Biscayne Boulevard
2500 First Union Financial Center
Miami, Florida 33131
Tel: (305) 374-7580

By: _[signature]_ for
    Richard J. Bernard
    Fla. Bar No. 57266

#30086499

- 2 -

*Glenn D. Moses, Esq.
Genovese Lichtman Joblove & Battista, P.A.
NationsBank Tower
100 Southeast Second Street
36th Floor
Miami, FL  33131

Offices of Assistant U.S. Trustee
Federal Building, Ste. 1204
51 S.W. First Avenue
Miami, FL  33130

*Greg A. Lowry, Esq.
Locke Liddell & Sapp LLP
2200 Ross Avenue
Suite 2200
Dallas, TX  75201-6776

Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.
2033 Main Street, Suite 600
Sarasota, Florida 34237

Peak Equity Corp.
5650 Yonge Street
Suite 207
Toronto, Ontario  M2M4GS

Douglas J. Snyder, Esq.
Douglas J. Snyder, P.A.
1320 South Dixie Highway
Coral Gables, Florida  33146

Oakland Lakes, Ltd.
Sailboat Pointe
2325 N.W. 33rd Street
Oakland Park, FL  33305

*Doug Goldrick
G.E. Capital Real Estate
16479 Dallas Parkway
Suite 120
Addison, TX  75001

ICORR Properties International
2 North Tamiami Trail
Suite 210
Sarasota, FL  34236

Sol Roter
Peak Equity Corp.
5650 Yonge Street
Suite 207
Toronto, Ontario  M2M4GS

Anchor Securities Limited
6 Adelaide Street East
Suite 210
Toronto Canada

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)

In re:                                          CASE NO. 00-25351-BKC-RBR

OAKLAND LAKES, LTD.,                            CHAPTER 11

          Debtor.
_____/

813268 ONTARIO, INC., as General Partner
of Oakland Park (Florida) Limited Partnership,
an Ontario limited partnership, as limited partner
of, and on behalf of Oakland Lakes, Ltd.,
a Florida Limited Partnership,

          Plaintiff,
v.                                              ADV. NO. 00-2530-BKC-RBR-A

OAKLAND LAKES, LTD., a Florida limited
partnership, et al.

          Defendants.
_____/

## CONSENT TO MOTION FOR REMAND

Plaintiff, 813268 Ontario, Inc., as General Partner of Oakland Park (Florida) Limited

Partnership, an Ontario limited partnership, as limited partner of, and on behalf of Oakland

Lakes, Ltd., and Oakland Lakes, Ltd., hereby file this notice of consent to Condor One, Inc.'s

Motion for Remand of the above captioned adversary proceeding to the United States District

Court for the Southern District of Florida.

Respectfully submitted,

GENOVESE LICHTMAN JOBLOVE & BATTISTA, P.A.
Bank of America Tower
100 S.E. Second Street, Suite 3600
Miami, Florida 33131
Tel. No. (305) 349-2300
Fax. No. (305) 349-2310


By: _____
        Glenn D. Moses, Esq.
        Florida Bar No. 174556



## CERTIFICATE OF SERVICE AND
## COMPLIANCE WITH LOCAL RULE 2090-1(A)

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A). I FURTHER CERTIFY that a true and correct copy of the foregoing was served by U.S. Mail upon all parties on the attached service list this 27 day of December, 2000.

Glenn D. Moses

X:\Documents\WORK\Oakland Lakes\Pleading\Consent to motion for remand.wpd

# OAKLAND LAKES, LTD.
## SERVICE LIST

Oakland Lakes, Ltd.
Sailboat Pointe
2325 N.W. 33rd St.
Oakland Park, FL 33305

Offices of Assistant U.S. Trustee
Federal Building, Ste. 1204
51 S.W. First Ave.
Miami, FL 33130

I.R.S.
Special Procedures - Involvency
P. O. Box 17167 Stop 5760
Ft. Lauderdale, FL 33318

Andrea Horowitz Handel
Civil Division
U.S. Department of Justice
P.O.Box 875
Ben Franklin Station
Washington, D.C. 20044

Florida Dept. of Labor & Employment Security
c/o Michael M. Metz, Senior Attorney
Hartman Building, Suite #307
2012 Capital Circle, Southeast
Tallahassee, FL 32399

Florida Dept. of Revenue
P. O. Box 6668
Bankruptcy Division
Tallahassee, FL 32314-6668

Scott Baena, Esq.
Bilzin Sumberg Dunn Baena
Price & Axelrod LLP
200 South Biscayne Blvd.
2500 First Union Financial Center
Miami, FL 33131

United States Department of Housing
 & Urban Development
c/o Carol Wilson
451 7th Street
Room 10258
Washington, DC 20410

United States Department of Housing
 & Urban Development
c/o Sharon Swain, Esq.
909 S.E. First Avenue
Miami, FL 33131

Robert Messick, Esq.
Icard, Merrill, et al
2033 Main Street, Ste. 600
Sarasota, FL 34237

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)

In re:                                          CASE NO. 00-25351-BKC-RBR

OAKLAND LAKES, LTD.,                            CHAPTER 11

     Debtor.

_____/

813268 ONTARIO, INC., as General Partner
of Oakland Park (Florida) Limited Partnership,
an Ontario limited partnership; as limited partner
of, and on behalf of Oakland Lakes, Ltd.,
a Florida Limited Partnership,

     Plaintiff,

v.                                              ADV. NO. 00-2530-BKC-RBR-A

OAKLAND LAKES, LTD., a Florida limited
partnership; et al.

     Defendants.

_____/

## NOTICE OF FILING EHIBITS IN SUPPORT OF AND
## REFERRED TO IN CONDOR ONE, INC'S MOTION FOR REMAND

     Defendant, Condor One, Inc. ("Condor One"), hereby gives notice of the filing of the Exhibits in

Support of and Referred to in Condor One, Inc.'s Motion for Remand.

                                        Respectfully submitted,

                                        Bilzin Sumberg Dunn Baena Price &
                                           Axelrod LLP
                                        Counsel for Condor One, Inc.
                                        2500 First Union Financial Center
                                        200 South Biscayne Boulevard
                                        Miami, Florida 33131-2336
                                        Telephone: (305) 374-7580
                                        Facsimile:  (305) 374-7593

                         By: _____
                                Scott L. Baena
                                  Florida Bar No. 186445
                                  David W. Trench
                                  Florida Bar No. 202975
                                  Richard J. Bernard
                                  Florida Bar No. 57266

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy foregoing was served via regular U.S. mail upon all parties and counsel listed on the attached service list this ⎽⎽14th⎽⎽ day of December, 2000.

Richard J. Bernard

#30086518

2

*Glenn D. Moses, Esq.
Genovese Lichtman Joblove & Battista, P.A.
NationsBank Tower
100 Southeast Second Street
36th Floor
Miami, FL  33131

Oakland Lakes, Ltd.
Sailboat Pointe
2325 N.W. 33rd Street
Oakland Park, FL  33305

Offices of Assistant U.S. Trustee
Federal Building, Ste. 1204
51 S.W. First Avenue
Miami, FL  33130

*Doug Goldrick
G.E. Capital Real Estate
16479 Dallas Parkway
Suite 120
Addison, TX  75001

*Greg A. Lowry, Esq.
Locke Liddell & Sapp LLP
2200 Ross Avenue
Suite 2200
Dallas, TX  75201-6776

ICORR Properties International
2 North Tamiami Trail
Suite 210
Sarasota, FL  34236

Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.
2033 Main Street, Suite 600
Sarasota, Florida 34237

Sol Roter
Peak Equity Corp.
5650 Yonge Street
Suite 207
Toronto, Ontario  M2M4GS

Anchor Securities Limited
6 Adelaide Street East
Suite 210
Toronto Canada

Peak Equity Corp.
5650 Yonge Street
Suite 207
Toronto, Ontario  M2M4GS

Douglas J. Snyder, Esq.
Douglas J. Snyder, P.A.
1320 South Dixie Highway
Coral Gables, Florida  33146

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 00-6147-CIV-LENARD/TURNOFF

**COPY**

813268 ONTARIO, INC., as
General Partner of OAKLAND
PARK (FLORIDA) LIMITED PARTNERSHIP,
an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;
      Plaintiff,

vs.

OAKLAND LAKES, LTD.,
a Florida Limited Partnership,
WILLIAM O. BRISBEN, W.O. BRISBEN
COMPANIES, INC., and ROBERT E. SCHULER,
as General Partners of OAKLAND LAKES, LTD.,
THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,
      Defendants.
_____/

(Bankruptcy Case: In re Oakland
Lakes, Ltd., Case No. 00-25351-
BKC-RBR, Fort Lauderdale Division)

**00- 2530
BKC-RBR-A**



### NOTICE OF REMOVAL PURSUANT TO FED. R. BANKR. P. 9027

Plaintiff, 813268 Ontario, Inc., as General Partner of Oakland Park (Florida) Limited

Partnership, an Ontario limited partnership, as limited partner of and on behalf of Oakland Lakes,

Ltd., a Florida Limited Partnership ("Oakland Lakes" or "Debtor"), by and through the undersigned

counsel, hereby files this Notice of Removal of the within adversary proceeding to be referred to the

United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division. In

support thereof, Plaintiff respectfully states as follows:

1.      On or about January 31, 2000, Plaintiff filed a Complaint against, among other

defendants, the Secretary of Housing and Urban Development ("HUD") and Condor One, Inc.

("Condor"), seeking declaratory relief under certain loan documents between Oakland Lakes and

HUD (the "Adversary"). In the Adversary, Plaintiff seeks to set aside a certain Provisional Workout

Arrangement (the "PWA") between Oakland Lakes and HUD, and the subsequent assignment of the PWA and other loan documents from HUD to Condor. It is the position of Oakland Lakes that HUD, and not Condor, is its appropriate lender.

2.      The Adversary was filed as a limited partner derivative action, and named Oakland Lakes and its then general partners, William O. Brisben, W.O. Brisben Companies, Inc. and Robert Schuler (the "Brisben Parties") as defendants. Thereafter, the limited partners entered into a settlement agreement with the Brisben Parties whereby they transferred their interest in Oakland Lakes to the limited partners on June 30, 2000.

3.      On August 31, 2000, Oakland Lakes filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The case is currently pending before the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division, Case Number 00-25351-BKC-RBR. Since that time, Oakland Lakes has operated as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.      On October 24, 2000, the Debtor filed its Plan of Reorganization and Disclosure Statement. The Plan provides for the treatment of the alleged secured and unsecured claims of either Condor or HUD, depending on the outcome of the Adversary. If Condor is determined to be the appropriate party in interest, it will receive treatment of its claims against the bankruptcy estate. Alternatively, if HUD is determined to be the appropriate party in interest, it will receive treatment of its claims against the bankruptcy estate.

5.      The Debtor is entitled to remove the Adversary to the Bankruptcy Court pursuant to Fed. R. Bank. P. 9027. Upon removal, the Adversary will be a core proceeding within the meaning of 28 U.S.C. § 157 (b)(A), (K) and (O). Adjudication of the Adversary will resolve the validity, extent and priority of the claims of either Condor or HUD against the estate, will affect the

-2-

administration of the bankrı      ˙ estate, and will determine the adjus\     .t of the debtor-creditor

relationship as between the Debtor, Condor and HUD.

6.      Accompanied with this Notice is a copy of all process and pleadings in the Adversary.


Respectfully submitted this *28* day of November, 2000

> Genovese Lichtman Joblove & Battista, PA
> Counsel to the Debtor
> Bank of America Tower
> 100 SouthEast Second Street 36[th] floor
> Miami, Florida 33131
> (305) 349-2300
> (305) 349-2310 (telecopier)


By:_____
> John H. Genovese
> Florida Bar # 280852

> Glenn D. Moses
> Florida Bar # 174556


X:\Documents\WORK\Oakland Lakes\Pleading\Notice of Removal

-3-

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:                                    CASE NO. 00-25391-BKC-RBR

OAKLAND LAKES, LTD.,                      CHAPTER 11

        Debtor.
_____/

## MEMORANDUM OPINION DISMISSING CASE AS BAD
## FAITH FILING AND GRANTING RELIEF FROM STAY

THIS MATTER came before the Court for hearing on October 25
and November 2, 2000, upon the Motion by Condor One, Inc. ("Condor
One") to Dismiss Petition for Bad Faith, or, Alternatively, for
Relief from Stay (the "Motion to Dismiss"; CP 11) and the Debtor's
response thereto (the "Response to Motion to Dismiss"; CP 38); and
the Debtor's Emergency Motion for Authority to Use Cash Collateral
on a Preliminary Basis and Request for Final Hearing (the "Motion
to Use Cash"; CP 3), Condor One's Response to the Debtor's Motion
for Use of Cash Collateral and Motion to Prohibit Use of Cash
Collateral and for Adequate Protection (the "Motion to Prohibit Use
of Cash"; CP 5), and the Debtor's response thereto (CP 8).

The Court, having considered the Motions and the Responses to
each, having reviewed the court file and having heard argument of
counsel, and being otherwise fully informed in the premises, hereby
makes the following findings of fact and conclusions of law:

*Page 1 of 18*

## PROCEDURAL BACKGROUND

On August 31, 2000 (the "Petition Date"), Oakland Lakes, Ltd. (the "Debtor") filed its petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor operates as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The following day, the Debtor filed its Motion to Use Cash Collateral, requesting preliminary, and thereafter final, authority to use cash pursuant to a budget to be provided. In opposition, Condor One filed its Motion to Prohibit Use of Cash Collateral, to which the Debtor filed its Response on September 11, 2000(the "Response to Motion to Prohibit Use of Cash").

Based upon agreement of Condor One and the Debtor, on September 25, 2000, the Court entered the Agreed Order on Preliminary Use of Cash, authorizing the Debtor to expend cash in accordance with the budget attached thereto on a preliminary basis. Condor One filed its Motion to Dismiss on September 14, 2000 and the Debtor filed its response to this Motion on October 23, 2000. On the following day, the Debtor filed its Disclosure Statement for Plan of Reorganization.

## FINDINGS OF FACT

The Debtor is a limited partnership organized and existing under the laws of the State of Florida. The Debtor's sole business

is ownership of the Sailboat Pointe Apartments, a 376-unit apartment project located in Fort Lauderdale, Florida (the Property). The Property (and claims in respect thereof) is the Debtor's sole asset. To finance the development of the Property, the Debtor executed (i) the Amended and Restated Renewal Mortgage Note dated October 5, 1989, in the original principal amount of $22,779,600 (the "Note") and (ii) the Amended and Restated Renewal Mortgage, Assignment of Rents and Security Agreement dated October 5, 2000 (the "Mortgage"; the Note and the Mortgage, as well as such other documents and agreements executed in connection therewith are collectively referred to as the "Loan Documents), each in favor of Cincinnati Mortgage Corporation.

Cincinnati Mortgage Corporation defaulted under a guarantee agreement with the Government National Mortgage Corporation in November 1990, and all of the Loan Documents were ultimately delivered or assigned to the Secretary of Housing and Urban Development ("HUD"), which then became the holder of the Loan Documents. Almost immediately after completing construction of the Property, the Debtor defaulted in one or more of its obligations under the Loan Documents. The Debtor's monetary defaults were not cured and continue to exist.

As a result of the Debtor's defaults under the Loan Documents,

the Debtor and HUD entered into a Provisional Workout Arrangement (the "PWA"), a month-to-month forbearance arrangement. Under the PWA, HUD agreed to take no action on the defaulted Loan provided that the Debtor made specified minimum monthly payments and performed other requirements thereunder. The PWA did not amend or modify the Note or Mortgage; rather, it specifically sets forth that failure to remit a payment would be cause for the holder to proceed with foreclosure.

The Debtor's Limited Partners received an executed copy of the PWA within months of its execution. In addition, the fact of the Debtor's default under the Loan Documents and the execution of the PWA were continuously reported by the Debtor's certified public accountant in the Debtor's annual audited financial statements which were furnished to Limited Partners and to Condor One. The Debtor performed under the terms of the PWA for five years until control of the Debtor changed in late June 2000.

HUD assigned the Note and Mortgage to Condor One on May 8, 1995, and this assignment was recorded on May 11, 1995 in Broward County. One of the Debtor's limited partners commenced a derivative action against Brisben, HUD and Condor on January 31, 2000, seeking to set aside the PWA as well as the assignment of the Loan Documents from HUD to Condor. That action is currently

pending in the District Court for the Southern District of Florida, Case Number 00-6147-CIV-LENARD (the "District Court Action"). The Debtor announced its intention to remove that action to the Bankruptcy Court pursuant to Bankruptcy Rule 9027, however, this Court is advised that the Plaintiff has made a demand for jury trial which this Court may not be able to hear.

In the District Court Action, the Debtor seeks a determination that the PWA is of no force and effect; that the purported assignment of the Loan Documents and PWA from HUD to Condor is a nullity; and that the original terms of the Loan Documents be reinstated, with the Mortgage reverting to HUD. It is the Debtor's contention that Condor is not its secured lender. Furthermore, Condor has the right to "put" the loan back to HUD should it appear that any representation made by HUD concerning the validity of the PWA be false.

In 1998, certain Canadian Limited Partners contacted Anchor Securities ("Anchor"), a brokerage firm, for assistance with their investment in the Debtor. In turn, Anchor contacted Peak Equity Corp. ("Peak") for its assistance. Sol Roter serves as president of Peak. Eventually, Peak and Anchor formed 813268 Ontario, Inc., which became the general partner of Oakland Park, solely in consideration for its efforts on behalf of the Canadian investors.

The limited partners commenced a derivative action against Brisben in Broward County Circuit Court. The parties ultimately entered into a Settlement Agreement (the "Settlement Agreement") which provided for a change in control and management of the Debtor. The Settlement Agreement required Brisben and his affiliates to transfer their interest in the Debtor to the limited partners if certain financial conditions were not met. Effective June 30, 2000, at a cost of $100, the Brisben parties transferred their interest in the Debtor to the limited partners and management and control of the Debtor changed.

From June 1995 through June 2000, the Debtor remitted all required payments to Condor One. Immediately upon the change in ownership, the Debtor refused to make any further payments to Condor One despite having sufficient income from the Property to do so.

Subsequent to the Debtor's failure to make the July 2000 payment under the PWA, Condor One received no assurances from Mr. Roter, the Debtor's new spokesperson, that the Debtor intended to remit the July, 2000 PWA payment. Accordingly, on July 14, 2000, Condor One served upon the Debtor, through Mr. Brisben, a demand letter reciting the Debtor's defaults, asserting Condor One's rights under the Loan Documents and the PWA, accelerating all

amounts due and payable under the Note, and, pursuant to F.S.A. §697.07, demanding all rents, income and profits (the "Rents") from and of the Property.

Copies of the demand were also furnished to Oakland Park's counsel and others. It is without dispute that the notice was received by the Debtor's new general partner on or about the day it was provided. The Debtor still has not remitted the July, 2000 payment or any subsequent payments under the PWA.

The Debtor ignored Condor One's notices to remit Rents payable. Instead, during the period July through August, 2000, Mr. Roter directed the Property manager to utilize Rents to make payments to insiders, including Peak, Anchor, Oakland Park and their counsel, aggregating more than $300,000. As a consequence of the Debtor's payments to insiders, the Debtor was unable to pay its vendors and other creditors holding unsecured claims, which would have otherwise been paid on the Petition Date. As of the Petition Date, such claims, which the Debtor does not dispute, were the Debtor's only unpaid obligations save the Debtor's indebtedness to Condor One.

On August 24, 2000, Condor One filed a complaint (the "Complaint") against the Debtor, styled <u>Condor One, Inc. v. Oakland Lakes, Ltd.</u>, Case No. 00-014108 (18), in Broward County Circuit

Court, seeking to foreclose the Mortgage and Note and to enforce the assignment of Rents (the "State Court Action"). That same day, in the State Court Action, Condor One filed its Emergency Motion to Appoint Receiver and for Turnover of Rents Pursuant to Florida Statutes §697.07 (the "Motion to Appoint Receiver").

On August 31, 2000, the day of the scheduled emergency hearing on the Motion to Appoint Receiver, the Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code. The record clearly indicates that this action was undertaken primarily for the purpose of preventing Condor One from obtaining the appointment of a receiver.

The Debtor estimates the value of the Property between $21,000,000 to $24,000,000. According to the Debtor's financial statements, as well as the testimony on behalf of Condor One, the total debt due under the Note and Mortgage exceeds $25,540,000. While the Debtor disputes this amount, it does not dispute that the value of the Property is less than the amount owed under the Loan Documents.

## CONCLUSIONS OF LAW

Section 1112(b) of the Bankruptcy Code empowers the Court, upon application of an interested party, to dismiss a case under Chapter 11 for cause. Numerous courts, including the Eleventh

Circuit, have held that cause for dismissal includes a debtor's bad faith filing of its petition for relief. Phoenix Piccadilly, Ltd. v. Future Fed. Savings Bank of Louisville, Kentucky et al. (In re Phoenix Piccadilly, Ltd.), 849 F.2d 1393, 1394 (11th Cir. 1988); Westbrook v. Albany Partners, Ltd. (In re Albany Partners, Ltd.), 749 F.2d 670, 674 (11th Cir. 1984). See also Barclays-American/Business Credit, Inc. v. Radio WBHP, Inc. (In re Dixie Broadcasting, Inc.), 871 F.2d 1023, 1026 (11th Cir. 1989). "[G]ood faith is an implicit prerequisite to filing a Chapter 11 bankruptcy petition." In re IAMEC Funding, Inc., 234 B.R. 539, 542 (Bankr. M.D. Fla. 1999) (citation omitted).

The courts have identified numerous factors which are conducive to a finding of bad faith. In Phoenix Piccadilly, the Eleventh Circuit enumerated the following non-exclusive factors that courts should consider in making such a determination:

1.    Whether the debtor has only one asset;

2.    Whether the debtor has few unsecured creditors, whose claims are small in relation to the claims of secured creditors;

3.    Whether the debtor has few, if any, employees;

4.    Whether the debtor's single asset is the subject of court action;

4.   Whether the debtor's single asset is the subject of court action;

5.   Whether the debtor's financial problems involve essentially a two-party dispute which can be resolved in state court litigation; and

6.   Whether the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

Phoenix Piccadilly, 849 F.2d at 1394-95.

In this case, each of the foregoing factors weighs heavily in favor of dismissal.

### Whether the debtor has only one asset

Indisputably, the Property is the Debtor's sole asset.

### Whether the debtor has few unsecured creditors, whose claims are small in relation to the claims of secured creditors

According to the Debtor's Schedules and Statement of Financial Affairs, unsecured claims aggregate approximate $171,000. The Debtor's secured obligation exceeds $25,540,000. The value of the Property and thus, the value of any claim secured by the Property, does not exceed the sum of $24,000,000. Moreover, all of the Debtor's unsecured claims could and would have been paid in full had the Debtor not commenced this case.

### Whether the debtor has few, if any, employees

The Debtor has no employees.    Mr. Roter is solely a

spokesperson. The Debtor has retained the services of Icorr Properties, Inc. ("Icorr") exclusively to operate and manage the Property. The significance of this factor, of course, is whether the dismissal of the case may jeopardize the employment of a significant number of wholly innocent employees.

Where an entity has no employees, courts have determined that protection of the bankruptcy laws is not proper because there are no employees to protect. The Sixth Circuit in Winshall Settlor's Trust, 758 F.2d at 1137, aptly noted that [t]he purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state. *See* In re Dolton Lodge Trust No. 35188, 22 B.R. 918, 922 (Bankr.N.D.Ill.1982). "[I]f there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its raison d'etre . . .." In re Ironsides, Inc., 34 B.R. 337, 339 (Bankr.W.D.Ky.1983), cited in Matter of Little Creek Development Co. 779 F.2d 1068, 1073 (5th Cir. 1986).

Even if it is assumed that the Property manager's employees should be deemed employees of the Debtor for this purpose, the dismissal of the case should have little impact on the continued employment of those employees by the current or any successor

manager or owner of the Property since it must be presumed that the Property will continue to be operated in any scenario.

**Whether the debtor's single asset is the subject of court action**

The State Court Action and the District Court Action were pending at the Petition Date. Both actions solely relate to the Property and indebtedness under the Note and Mortgage secured by the Property.

**Whether the debtor's financial problems involve essentially a two-party dispute which can be resolved in state court litigation**

Despite the Debtor's attempts to implicate HUD and others in litigation, at this juncture, the Debtor's financial problems solely involve two parties, the Debtor and Condor One. Each of the issues raised by the Debtor in its defense against Condor One's motion to dismiss are implicated or raised in the District Court Action and the State Court Action.

**Whether the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights**

The timing of the Debtor's filing evidences a clear intent to delay and frustrate the legitimate efforts of Condor One to enforce its rights under the Loan Documents in the State Court Action. As amply indicated in the record, the Debtor has admitted that it filed its petition for relief under Chapter 11, on the same day as

the scheduled hearing to appoint a receiver in the State Court Action, to avert the outcome of that hearing. Even the Property manager is unaware of any reason other than the dispute between the Debtor and Condor One for the Debtor's bankruptcy filing.

### Other Factors

In addition to the foregoing, other factors weigh in favor of the dismissal of the Debtor's Chapter 11 case.

### The Debtor lacks equity in its single asset

The Debtor estimates that the Property has a value between $21,000,000 to 24,000,000. Condor One claims to be owed $25,540,000. While the Debtor's schedules list the debt to Condor One as disputed, the amount in dispute was not clear from the Debtor's evidence. Furthermore, while the Debtor may be hopeful that the value of the Property will increase in the future, in part because of its ability to increase rents, the pertinent inquiry is whether any meaningful equity in the Property existed as of the Petition Date. Therefore, on the basis of the record before the Court, the Debtor appears to lack any meaningful equity in the Property.

### Transfers to Insiders and Their Professionals

During the period July 1 through August 31, 2000, the Property manager, at Mr. Roter's direction, made payments to Peak and

Anchor. These payments, allegedly in reimbursement of legal fees
incurred in connection with the following: litigation involving the
former general partner; to Oakland Park purportedly for the same
purpose; to Oakland Park's counsel for fees incurred for such legal
actions, as well as for future legal services. The total of such
payments exceeded $300,000 and were made from Rents. The vast
majority of such payments occurred after Condor One's Notice of
Default and demand for Rents. As a consequence of these payments,
the Debtor could not pay its vendors and unsecured creditors on
August 31, 2000, as it ordinarily would have before bankruptcy."
The Debtor failed to make any payments to Condor One under the PWA
in July and August, 2000.

As the Court observed in Midway Investments, 187 B.R. at 389-
90, transfers to equity interest holders prior to bankruptcy (in
that case, some seven months before the petition date) "provides
the most salient evidence of bad faith." The Debtor asserts that
the Plan and Disclosure Statement which it filed on the eve of this
hearing are evidence of its good faith and ability to reorganize.
The Court is unpersuaded by this assertion for several reasons.

First, the filing of a plan is insufficient to overcome the
existence of the numerous factors which weigh heavily in favor of
dismissal of this case. The Eleventh Circuit in Phoenix Picadilly

omitted the filing of a plan and the ability of a debtor to reorganize from its list of factors indicating a good faith filing. This is suggestive of the relative unimportance of these factors.

In addition, a plan cannot be confirmed unless it has been proposed in good faith. 11 U.S.C. 1129(a)(3). It would be incongruous to conclude that while a Chapter 11 petition may have been filed in bad faith, a plan in such a case can meet the section 1129(a)(3) good faith requirement for confirmation purposes. Chapter 11 reorganization is not possible if the case should not have been before this Court in the first instance.

Finally, the Plan filed in this instance does not appear to be confirmable. The proposed plan does little to resolve the Debtor's principal problem since, under the Plan, the Debtor's obligation under the Loan Documents continues to depend on the outcome of the District Court Action. The Debtor's Plan also appears to separately classify Condor One's deficiency claim and this may engender assertions of gerrymandering. In re Holywell Corp., 913 F.2d 873, 880 (11th Cir. 1990). Furthermore, this separate classification may violate the absolute priority rule under 11 U.S.C. §1129(b)(2). Bank of America Nat'l Trust and Savings Assn. v. 203 North LaSalle Street Partnership, 119 S.Ct. 1411 (1999). It appears that the Debtor's reorganization is altogether dependent

upon obtaining a reduction of Condor One's claim either by agreement or through litigation; neither of which is imminent.

Condor One is entitled to relief from stay for cause, pursuant to 11 U.S.C. §362(d)(1), and may continue prosecuting the State Court Action. Dixie Broadcasting, Inc., 871 F.2d at 1026; In re Double W Enters., Inc., 240 B.R. 450, 453 (Bankr. M.D. Fla. 1999) ("The Eleventh Circuit Court of Appeals has long recognized that a debtor's lack of good faith constitutes cause for the dismissal of a case . . . and also cause for granting relief from the automatic stay pursuant to §362(d)(1)"). The factors constituting bad faith for purposes of dismissal of a bankruptcy case and relief from the automatic stay are the same. See, e.g., Dixie Broadcasting, 871 F.2d at 1026-27.

As a result of the timing of the Debtor's filing, Condor One was deprived of its hearing to appoint a receiver to collect Rents. To restore the parties to the pre-petition status quo, Condor One seeks immediate and complete relief from the automatic stay, under 11 U.S.C. §§ 362(d)(1) and 105(a), to permit Condor One to prosecute the State Court Action to the fullest extent permitted by applicable law and reschedule appropriate hearings while dismissal becomes final. Such relief is appropriate to prevent the Debtor from depleting Rents collected to date and to protect Condor One's

interest in such Rents.

## CONCLUSION

The Court finds that the Debtor filed its petition for relief under Chapter 11 in bad faith. As such, dismissal of the case and immediate stay relief are the appropriate. Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1.    Condor One's Motion For Relief From Automatic Stay is **GRANTED.** Condor One may continue prosecuting the State Court Action, pursuant to 11 U.S.C. § 362(d)(1), effective immediately upon the date of this order.

2.    Condor One's Motion to Dismiss is **GRANTED.** The captioned main bankruptcy case is dismissed, pursuant to 11 U.S.C. §1112(b), with prejudice, effective 10 days from the date of this order.

3.    Final approval of the Motion to Use Cash and the Motion to Prohibit Use of Cash are **DENIED** as moot.

4.    Except as may be agreed to by the Debtor and Condor One, the Debtor's further use of Condor One's cash collateral is **PROHIBITED.**

5.    All pending Motions are **DENIED** as moot.

interest in such Rents.

## CONCLUSION

The Court finds that the Debtor filed its petition for relief under Chapter 11 in bad faith.  As such, dismissal of the case and immediate stay relief are the appropriate.  Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1.    Condor One is granted complete relief from the automatic stay to continue prosecuting the State Court Action, pursuant to 11 U.S.C.  § 362(d)(1), effective immediately upon the date of this order.

2.    The Motion to Dismiss is GRANTED.   The captioned main bankruptcy case is dismissed, pursuant to 11 U.S. C. §1112(b), with prejudice, effective 10 days from the date of this order.

3.    Final approval of the Motion to Use Cash and the Motion to Prohibit Use of Cash are DENIED as moot.

4.    Except as may be agreed to by the Debtor and Condor One, the Debtor's further use of Condor One's cash collateral is prohibited.

5.    All pending Motions are DENIED as Moot.

DONE AND ORDERED in the Southern District of Florida on

_December 11, 2000_

RAYMOND B. RAY
United States Bankruptcy Judge

Copy to:

Assistant United States Trustee
51 S.W. First Avenue
Room 1204
Miami, FL 33130

Scott L. Baena, Esq.
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131

Glenn D Moses, Esq
100 SE 2 St #3600
Miami, FL 33131

**Attorney Baena** is hereby directed to serve a conformed copy of this order upon all interested parties and to file a certificate of service with the clerk of court.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)

In re:                                          CASE NO. 00-25351-BKC-RBR

OAKLAND LAKES, LTD.,                            CHAPTER 11

      Debtor.
_____/

813268 ONTARIO, INC., as General Partner
of Oakland Park (Florida) Limited Partnership,
an Ontario limited partnership; as limited partner
of, and on behalf of Oakland Lakes, Ltd.,
a Florida Limited Partnership,

      Plaintiff,

v.                                              ADV. NO. 00-2530-BKC-RBR-A

OAKLAND LAKES, LTD., a Florida limited
partnership; et al.

      Defendants.
_____/

## CONDOR ONE, INC.'S MOTION FOR REMAND

    Defendant, Condor One, Inc. ("Condor One") moves this Court pursuant to 28 U.S.C. §

1452(b) to remand this action to the United States District Court for the Southern District of

Florida for further proceedings and, in support, states as follows:

    1.    On January 31, 2000, plaintiff filed this action in the United States District Court

for the Southern District of Florida, Case No. 00-6147-CIV-LENARD/TURNOFF, asserting

various causes of action against, inter alia, Condor One in connection with the assignment of the

Debtor's note and mortgage by The Secretary of Housing and Urban Development ("HUD") to

Condor One and that certain provisional workout arrangement entered into between the

captioned debtor (the "Debtor") and HUD.

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336



2.     On or about June 30, 2000, plaintiff or an affiliate thereof acquired control of the Debtor through a settlement with William O. Brisben, W.O. Brisben Companies, Inc. and Robert E. Schuler.

3.     On August 31, 2000, the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code (CP 1).

4.     Condor One filed its Motion to Dismiss Petition for Bad Faith, or, Alternatively, for Relief from Stay (the "Motion to Dismiss"; CP 11) on September 14, 2000, and the Debtor filed its response thereto on October 23, 2000 (CP 38). The Court conducted a hearing on the Motion to Dismiss on October 25 and November 2, 2000.

5.     On November 28, 2000, plaintiff filed its notice of removal pursuant to Fed. R. Bankr. P. 9027, citing core matter jurisdiction under 28 U.S.C. § 157(b)(A), (K) and (O) as its basis. A copy of the notice of removal is attached hereto as Exhibit A.

6.     On December 11, 2000, the Court entered its Memorandum Opinion Dismissing Case as Bad Faith Filing and Granting Relief from Stay (the "Order Dismissing Case"; CP __), dismissing the captioned main bankruptcy case effective December 21, 2000. A copy of the Order Dismissing Case is attached hereto as Exhibit B.

7.     Pursuant to 28 U.S.C. § 1452(b), an action removed to this Court on the basis of 28 U.S.C. § 1334 may be remanded on any equitable grounds.

8.     Pursuant to the Order Dismissing Case, this Court, as of December 21, 2000, will no longer have jurisdiction under 28 U.S.C. §§ 1334 and 157 in that the dismissal of the captioned main bankruptcy case will become effective. As such, cause exists now to remand the captioned adversary proceeding to the United States District Court for the Southern District of

Florida.[1]

WHEREFORE, Condor One respectfully requests this Court to issue an order remanding this case to the United States District Court for the Southern District of Florida and granting any additional relief the Court deems appropriate.

Respectfully submitted,

Bilzin Sumberg Dunn Baena Price & Axelrod LLP
Counsel for Condor One, Inc.
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2336
Telephone: (305) 374-7580

By: _____
    Scott L. Baena (Fla. Bar No. 186445)
    David W. Trench (Fla. Bar No. 202975)
    Richard J. Bernard (Fla. Bar No. 57266)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by first class mail upon all parties on the attached service list this 13th day of December, 2000.

_____
Richard J. Bernard

---

[1]     Condor One files this Motion in an abundance of caution to avoid any confusion concerning the procedural status of the captioned adversary proceeding.

*Glenn D. Moses, Esq.
Genovese Lichtman Joblove & Battista, P.A.
NationsBank Tower
100 Southeast Second Street
36th Floor
Miami, FL 33131


Offices of Assistant U.S. Trustee
Federal Building, Ste. 1204
51 S.W. First Avenue
Miami, FL 33130


*Greg A. Lowry, Esq.
Locke Liddell & Sapp LLP
2200 Ross Avenue
Suite 2200
Dallas, TX 75201-6776


Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.
2033 Main Street, Suite 600
Sarasota, Florida 34237


Peak Equity Corp.
5650 Yonge Street
Suite 207
Toronto, Ontario M2M4GS


Douglas J. Snyder, Esq.
Douglas J. Snyder, P.A.
1320 South Dixie Highway
Coral Gables, Florida 33146


Oakland Lakes, Ltd.
Sailboat Pointe
2325 N.W. 33rd Street
Oakland Park, FL 33305


*Doug Goldrick
G.E. Capital Real Estate
16479 Dallas Parkway
Suite 120
Addison, TX 75001


ICORR Properties International
2 North Tamiami Trail
Suite 210
Sarasota, FL 34236


Sol Roter
Peak Equity Corp.
5650 Yonge Street
Suite 207
Toronto, Ontario M2M4GS


Anchor Securities Limited
6 Adelaide Street East
Suite 210
Toronto Canada

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

Case No. 00-2530 BKC-RBR-A

IN RE:

OAKLAND LAKES, LTD.,
a Florida Limited Partnership;

DEBTOR,

v.

THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and
CONDOR ONE, INC.,
a Delaware Corporation,

Defendants.

_____/



## DEFENDANT HUD'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

The Secretary of the United States Department of Housing and Urban Development ("HUD"), by and through the undersigned Assistant United States Attorney for the Southern District of Florida, moves to dismiss Plaintiff's Amended Complaint pursuant to Fed.Bankr.R. 7012 and Fed.R.Civ.P. 12(b)(1) and 12(b)(6). Additionally, Plaintiff fails to state claim against HUD for



which relief can be granted.  Under Fed.Bankr.R. 7012(b), HUD
submits that the proceeding appears to be a core proceeding.

I.  <u>INTRODUCTION</u>

Plaintiff filed its Amended Complaint as a limited
partner derivative action on behalf of a Florida limited
partnership to set aside a Provisional Workout Arrangement
("PWA"), and for damages. Am. Compl. at ¶ 1.  Plaintiff
admittedly defaulted on its original mortgage obligations, <u>id.</u>
at ¶ 24, and as a result entered into the PWA, which became
effective on February 1, 1995.  <u>See</u> <u>id.</u>, Ex. D at 1. However,
having accepted the benefits of the PWA since 1995, Plaintiff
seeks to have the original mortgage terms reinstated, claiming
that the general partner of the mortgagor was not authorized
to enter into the PWA.  <u>Id.</u> at Count I, Prayer for Relief; <u>id.</u>
at ¶¶ 27 and 44.  Plaintiff also seeks to set aside the May 8,
1995 mortgage assignment, <u>see</u> <u>id.</u> at Exhibit E, from the
Secretary of Housing and Urban Development ("HUD") to co-

2

defendant Condor One, Inc. ("Condor"). <u>Id.</u> at Counts II and III, Prayer for Relief.

Finally, having settled its state court litigation with the former general partners, <u>see</u> Plaintiff's Motion to Amend its Complaint at ¶ 3, and the former general partners having been dismissed from this lawsuit as well by the district court's Order dated August 31, 2000, Plaintiff has now amended its damages claim in Count IV to substitute, in place of the former general partners, HUD and Condor. Am. Compl. at Count IV.

As will be shown in section III A, this Court lacks subject matter jurisdiction over this Amended Complaint. First, as will be shown in section III.A.1, Plaintiff lacks standing to sue because it has failed to comply with Florida's statutory requirements pursuant to which this limited partner derivative suit purports to have been brought.

II. <u>STATEMENT OF RELEVANT FACTS FROM COMPLAINT AND ATTACHMENTS</u>
<u>Complaint</u>

1. Oakland Lakes, Ltd., ("Oakland Lakes"), on whose behalf this derivative lawsuit is brought, is a limited partnership organized and existing under the laws of the State of Florida. Am.Compl. ¶ 1.

3

The Secretary of the United States Department of Housing and Urban Development ("HUD"), by and through the undersigned Assistant United States Attorney for the Southern District of Florida, moves to dismiss Plaintiff's Amended Complaint pursuant to Fed R.Civ.P. 12(b)(1) and 12(b)(6). Additionally, Plaintiff fails to state claim against HUD for which relief can be granted.

I.   <u>INTRODUCTION</u>

Plaintiff filed its Amended Complaint as a limited partner derivative action on behalf of a Florida limited partnership to set aside a Provisional Workout Arrangement ("PWA"), and for damages. Am. Compl. at ¶ 1. Plaintiff admittedly defaulted on its original mortgage obligations, <u>id.</u> at ¶ 24, and as a result entered into the PWA, which became effective on February 1, 1995. <u>See id.</u>, Ex. D at 1. However, having accepted the benefits of the PWA since 1995, Plaintiff seeks to have the original mortgage terms reinstated, claiming that the general partner of the mortgagor was not authorized to enter into the PWA. <u>Id.</u> at Count I, Prayer for Relief; <u>id.</u> at ¶¶ 27 and 44. Plaintiff also seeks to set aside the May 8, 1995 mortgage assignment, <u>see id.</u> at Exhibit E, from the Secretary of Housing and Urban Development ("HUD") to co-

2

defendant Condor One, Inc. ("Condor").  <u>Id.</u> at Counts II and III, Prayer for Relief.

Finally, having settled its state court litigation with the former general partners, <u>see</u> Plaintiff's Motion to Amend its Complaint at ¶ 3, and the former general partners having been dismissed from this lawsuit as well by the district court's Order dated August 31, 2000, Plaintiff has now amended its damages claim in Count IV to substitute, in place of the former general partners, HUD and Condor.  Am. Compl. at Count IV.

As will be shown in section III A, this Court lacks subject matter jurisdiction over this Amended Complaint. First, as will be shown in section III.A.1, Plaintiff lacks standing to sue because it has failed to comply with Florida's statutory requirements pursuant to which this limited partner derivative suit purports to have been brought.

II. <u>STATEMENT OF RELEVANT FACTS FROM COMPLAINT AND ATTACHMENTS</u>
<u>Complaint</u>

1. Oakland Lakes, Ltd., ("Oakland Lakes"), on whose behalf this derivative lawsuit is brought, is a limited partnership organized and existing under the laws of the State of Florida.  Am.Compl. ¶ 1.

2. On or about October 5, 1989, Oakland Lakes obtained from Cincinnati Mortgage a mortgage loan endorsed for coinsurance by the Secretary of the United States Department of Housing and Urban Development. Id. ¶ 17.

3. On or about October 5, 1989, Oakland Lakes commenced construction of an apartment complex. Id. ¶ 18.

4. Almost immediately after completion of the apartment complex, Oakland Lakes defaulted on its mortgage loan. Id. ¶ 24.

5. The mortgage loan was assigned to HUD, and HUD became the mortgagee under the mortgage loan. Id. ¶¶ 22-23.

6. Effective February 1, 1995, HUD and William O. Brisben ("Brisben"), as General Partner of Oakland Lakes, executed a Provisional Workout Arrangement. Id. ¶ 26; Ex. "D."

7. On or about May 8, 1995, HUD assigned the Oakland Lakes mortgage loan to Condor One, Inc. ("Condor"). Id. ¶ 29; Ex. "E."

<u>Complaint, Exhibit "A"</u>

8. Oakland Lakes, Ltd. executed an Amended and Restated Renewal Mortgage Note ("Note") on October 5, 1989, in the amount of $22,779,600.00.

4

9. The Note provides as follows:

> If default be made in the payment of any
> installment under this Note (or any other
> amount due under the Mortgage) and if such
> default is not made good prior to the due date
> of the next such installment, or if any other
> Event of Default should occur, then, in
> addition to any other action permitted to be
> taken by the Holder hereunder or under the
> Mortgage or any other Loan Documents, the
> entire principal sum hereof and accrued
> interest hereon shall at once become due and
> payable without notice, at the option of the
> holder ….

Note at 4.

10. The Note also provides as follows:

> The failure to exercise any option to declare
> the maturity of the principal debt or to
> exercise any other rights under any of the
> covenants or conditions contained in the Loan
> Documents, shall not be taken or deemed to be
> a waiver of the right to exercise such option
> or to declare such maturity after such past or
> any subsequent violation of any such covenants
> or conditions.  All remedies provided for
> herein upon any default by the Mortgagor shall
> be cumulative and not exclusive.

Id.

11. The Note also provides that "[t]his Note and the

Mortgage are made and delivered in and shall be

construed in accordance with the laws of the State of

Florida." Id. at 6.

5

12.  William O. Brisben signed the Note as General Partner of
     Oakland Lakes, Ltd., a Florida limited partnership.  Id.
     at 7.

                    Complaint, Exhibit "B"

13.  Oakland Lakes, Ltd. executed an Amended and Restated
     Renewal Mortgage, Assignment of Rents and Security
     Agreement ("Mortgage") on October 5, 1989, in the amount
     of $22,779,600.00.

14.  The Mortgage at Section 1.01 Defined Terms defines "Loan
     Documents" as

          this Mortgage, the Note, the Coinsured Loan
          Commitment, the HUD Regulatory Agreement, the
          Building Loan Agreement, and any other
          instrument given to evidence or further secure
          the payment or performance of any obligations
          secured under this Mortgage.

     Mortgage at 4.

15.  The Mortgage at Section 6.02 Acceleration provides as
     follows:

          If any Event of Default shall occur, then, at
          the option and election of the Mortgagee, the
          entire Indebtedness Hereby Secured shall
          become due, payable and collectible at once
          and thereafter as Mortgagee may elect,
          regardless of the date of maturity and without
          notice, and may be enforced and recovered at
          once.

     Id. at 21.

16.   The Mortgage at Section 7.01 <u>Assignment of Mortgage</u>

provides as follows:

>   Subject to any applicable requirements of HUD,
>   Mortgagee may sell, assign, transfer, convey,
>   pledge or encumber the Note or all or any part
>   of its interest, rights and obligations
>   thereunder or under this Mortgage to one or
>   more persons or parties, and Mortgagor hereby
>   consents to any such sale, assignment,
>   transfer, conveyance, pledge or encumbrance
>   and agrees upon the request of the Mortgagee
>   or its assignee to execute and deliver
>   promptly any instrument confirming Mortgagor's
>   consent as effectuating, as necessary, such
>   sale, assignment, transfer, conveyance, pledge
>   or encumbrance.

<u>Id.</u> at 25.

17.   The Mortgage at Section 7.02 <u>Notices</u> provides in

relevant part as follows:

>   Any notice, demand or request required or
>   permitted hereunder to be given to Mortgagor …
>   shall be sufficiently given if in writing and
>   personally delivered or mailed by registered
>   or certified first class mail, postage
>   prepaid, addressed to:

>   Mortgagor:Oakland Lakes, Ltd.
>            4750 Ashwood Drive, Suite 300
>            Cincinnati, Ohio  45241
>            Attention:  William O. Brisben.

<u>Id.</u>

18.   The Mortgage at Section 7.04 <u>Governing Law</u> provides in

relevant part that "[t]he Note and this Mortgage are

made and delivered in and shall be governed by and

construed in accordance with the law of the State [of Florida]. <u>Id.</u> at 27.

19.  The Mortgage at Section 7.12 <u>Binding Effect</u> provides that:

> All the terms, covenants and conditions of this Mortgage shall bind Mortgagor, its partners and their respective heirs, successors and assigns and shall inure to the benefit of and be available to the mortgagee, it successors and assigns.

<u>Id.</u> at 30.

<u>Complaint, Exhibit "C"</u>

20.  The Oakland Lakes, Ltd. Second Amended and Restated Agreement of Limited Partnership ("Partnership Agreement") states in relevant part in Section 1.3 <u>Powers and Purposes</u>, as follows:

> (a)  The purposes of the Partnership and the business to be carried on and the objectives to be effected by it are:
>
> (1)  To acquire and purchase the [apartment complex] and to construct, own, develop, maintain and operate the [apartment complex].
> * * *
> (4)  To borrow money, and to issue evidence of indebtedness and to secure the same by mortgage, deed of trust, pledge or other lien ….
> (5)  To carry on any other activities necessary to, in connection with or incidental to the foregoing.

8

21.  The Partnership Agreement states in relevant part in

Section 3.2 <u>Powers of General Partners</u>, as follows:

> The General Partners shall have all necessary
> powers to carry out the purposes, business and
> objectives referred to in Section 1.3, and
> shall possess and enjoy all the rights and
> powers of Partners of a partnership without
> the limited partners except as otherwise
> provided by Florida law and by this Agreement
> ….

22.  The Partnership Agreement states in relevant part in

Section 3.3 <u>Exercise of Rights and Powers by General</u>

<u>Partners</u>, as follows:

> Any one or more of such General Partners is
> and are authorized to enter into or execute
> any document or instrument for and on behalf
> of the Partnership.

23.  The Partnership Agreement states in relevant part in

Section 3.4 <u>Special Duties and Obligations of General</u>

<u>Partners</u>, as follows:

> (a)  In addition to their usual and
> customary duties and obligations the General
> Partners shall perform the following special
> duties and obligations:
>
> (1)  The General Partners shall use
> their best efforts to cause the Partnership
> at all time to perform and comply
> substantially with the provisions of the
> Mortgage Loan.

9

24.    The Partnership Agreement states in relevant part in Section 3.6 <u>Reliance on Act of General Partners</u>, as follows:

> No financial institution or any other person, firm or corporation dealing with the General Partners shall be required to ascertain whether they are acting in accordance with this Agreement, but such financial institution or such other person, firm or corporation shall be protected in relying solely upon the deed, transfer, or assurance of and the execution of such instrument or instruments by such General Partners.

25.    The Partnership Agreement states in Section 10.4 <u>Applicable Law</u>, as follows:

> This Agreement and the rights of the Partners shall be governed and construed and enforced in accordance with the law of the State of Florida.

26.    The Partnership Agreement states in relevant part in Section 14.1 <u>Power</u>, as follows:

> Except to the extent otherwise required by Florida law, each of the Limited Partners, including the Investor Limited Partner, irrevocably constitutes and appoints the General Partner, jointly and severally, with full power of substitution, his or its true or lawful attorney or in his or its name, place and stead, to make, execute, swear to, acknowledge, deliver and file:
>
> ***
> (b)    … by way of extension and not in limitation, to do all such other things as

10

shall be necessary to continue and to carry on the business of the partnership.

27. The Partnership Agreement states in relevant part in Section 15.1 <u>HUD and Coinsuring Lender Requirements</u>, as follows:

> The Partnership is authorized to execute the Note and Mortgage in order to obtain the Mortgage Loan to be coinsured by the Coinsuring Lender and HUD and to execute a certain regulatory agreement ("Regulatory Agreement") between the Partnership and the Coinsuring Lender and such other documents as may be required by the Coinsuring Lender and/or HUD in connection with said Mortgage Loan.

28. The Partnership Agreement states in relevant part on the Limited Partner Signature Page (pp. 43-44) for the "OAKLAND PARK (FLORIDA) LIMITED PARTNERSHIP," as follows:

> The undersigned, desiring to become the Investor Limited Partner of Oakland Lakes, Ltd. (the "Partnership"), hereby agrees to all of the terms of the Agreement of Limited Partnership of the Partnership (the "Agreement") and agrees to be bound by all of the terms and provisions thereof.  The undersigned further constitutes and appoints the General Partners of the Partnership, jointly and severally, with full power of substitution, its true and lawful attorney for it in accordance with Article 14 of the Agreement.  The power of attorney herein granted shall be deemed to be coupled with an interest and shall be irrevocable.

11

29. "Oakland Park (Florida) General Partner Ltd., an Ontario corporation" executed the Limited Partner Signature Page on behalf of "OAKLAND PARK (FLORIDA) LIMITED PARTNERSHIP."

30. The name of Plaintiff "813268 Ontario, Inc." does not appear in the Partnership Agreement, as general partner of OAKLAND PARK (FLORIDA) LIMITED PARTNERSHIP, or in any other capacity.

<u>Complaint, Exhibit "D"</u>

31. Oakland Lakes and HUD entered into a Provisional Workout Arrangement ("PWA"), with an effective date of February 1, 1995 and an expiration date of January 1, 2001.

32. The PWA states in the opening unnumbered paragraph as follows:

> The undersigned mortgagor [Oakland Lakes, Ltd.] hereby expressly acknowledges that the Mortgage and Note secured by the [Lakes of Casablanca] project is in default. To afford an opportunity to effect reinstatement, the Secretary, Department of Housing and Urban Development, will hold the defaulted Note and Mortgage on the subject project under the terms and conditions stated herein.

<u>PWA</u> at 1.

33. The PWA states in section 1 <u>Possession</u> that "[t]he mortgagor acknowledges that the default entitles HUD to

assume possession to the encumbered premises, but that possession has not been demanded." <u>Id</u>. at 1.

34. Under the terms of the PWA, from February 1, 1995 through January 31, 1997, Oakland Lakes was only required to pay seventy percent of the interest otherwise payable under the terms of the note. <u>Id.</u> at § 3.a.1.

35. From February 1, 1997 through January 31, 1998, Oakland Lakes was only required to pay eighty percent of the interest otherwise payable under the terms of the note. <u>Id.</u> at § 3.a.2.

36. From February 1, 1998 through January 31, 1999, Oakland Lakes was only required to pay ninety percent of the interest otherwise payable under the terms of the note. <u>Id.</u> at § 3.a.3.

37. Section 6 of the PWA provides for a possible mortgage modification if Oakland Lakes complies with the requirements of the PWA. <u>Id.</u> at 6.

38. Upon sale or refinancing of the Lakes of Casablanca project, twenty-five and one quarter (25.25) percent of the proceeds "shall be paid by Maker to Mortgagee or its successors and assigns." <u>Id.</u> at § 7.

39. Section 11 of the PWA, "Cancellation Clause," provides in part as follows:

> This Arrangement is on a month-to-month basis. The Secretary agrees to take no action because of the existing monetary default, provided that the mortgagor remits the required monthly payment and satisfactorily performs the other requirements of this Arrangement.

Id. at § 11.

40. The PWA contains no prohibition against HUD assigning the mortgage on the Lakes of Casablanca project.  Id.

41. William O. Brisben signed the PWA as General Partner of Oakland Lakes, Ltd., on December 22, 1994.  Id. at Signature Block.

Complaint, Exhibit "E"

42. On May 8, 1995, HUD executed an Assignment of Amended and Restated Renewal Mortgage, Assignment of Rents and Security Agreement and Other Collateral Loan Documents ("Assignment") in favor of Condor One, Inc.

43. The assignment expressly excluded the Regulatory Agreement.  Assignment at 2.

Complaint, Exhibit "F"

44. On April 29, 1999, the law firm of Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A., wrote a letter (the "letter") to Mr. William O. Brisben on behalf of 813268 Ontario, Inc.

14

45.   The letter represented that 81326 Ontario was the new
      general partner of the Oakland Park (Florida) Limited
      Partnership.  Letter at 1.

46.   The letter stated that Mr. Brisben was not authorized as
      general partner to enter into the PWA.  Id.

47.   The letter did not indicate that a copy was sent to HUD
      and/or Condor.  Id.

                    Complaint, Exhibit "1"

48.   Oakland and HUD entered into a Regulatory Agreement
      dated October 5, 1989, with respect to the Lakes of
      Casablanca project.

49.   The Regulatory Agreement provides that it "will continue
      so long as the contract of coinsurance remains in
      force."  Regulatory Agreement at 1.

50.   The Regulatory Agreement provides in subsection 1.c. of
      section B. OBLIGATIONS OF OWNER, as follows:

           c. Owner acknowledges that, in order to
           prevent or cure a default, the Mortgagee may .
           . . use Reserve Funds to pay amounts due under
           the Mortgage.  If the Mortgage debt is
           accelerated pursuant to a default under the
           Mortgage, the Owner agrees that the Mortgagee
           may apply the balance in such Reserves for
           Replacements to the amount due on the mortgage
           debt, as accelerated.

      Id. at 4.

                              15

51.    The signature page to the Regulatory Agreement provides

as follows:

> Before me, a Notary Public in and for
> said County, personally appeared William O.
> Brisben, who, as general partner of Oakland
> Lakes, Ltd., a Florida limited partnership,
> who acknowledged to me that he did sign the
> foregoing instrument in the name of and on
> behalf of said partnership, and that the same
> is his free act and deed and the free act and
> deed of said partnership and that he was duly
> authorized to execute said instrument by the
> partnership.

Id. at signature page.

III.    ARGUMENT AND CITATION OF AUTHORITY

A.    THIS COURT DOES NOT HAVE JURISDICTION OVER THIS
COMPLAINT AGAINST HUD BECAUSE PLAINTIFF
HAS NO STANDING TO SUE

Plaintiff's Amended Complaint states that Plaintiff's

lawsuit "is a limited partner derivative action pursuant to

Florida Statute Section 620.163 …." Am. Compl. ¶ 1.

Plaintiff must rely upon this Florida statute for standing to

sue, because limited partners ordinarily cannot bring

derivative actions on behalf of a partnership. As stated in

Bankston v. Burch, 27 F.3d 164, 167 (5th Cir. 1994),

> [l]imited partners have less management
> responsibility for the partnership than its general
> partners. With that reduced responsibility and
> exposure to liability come reduced individual
> rights. 'It is well settled,' a New York federal
> court recently observed, 'that the only direct
> lawsuit against general partners that a limited

16

partner can bring in an individual, non-representative capacity consists on an action for an accounting.'

Furthermore, the limited partnership is an indispensable party under a limited partnership derivative action. See, e.g., Bivens Gardens Office v. Barnett Banks of Florida, 140 F.3d 898, 909-10 (11th Cir. 1998). Plaintiff, as a limited partner, has standing with respect to its derivative claims only if it sues the limited partnership as a defendant and if it complies with the other requirements of the Florida law through which standing is conferred on limited partners.[1] Section 620.163, upon which Plaintiff solely relies, states as follows:

> A limited partner may bring an action in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring an action is not likely to succeed.

West's F.S.A. § 620.163.

For such a derivative action, the Florida statute further imposes a clear pleading requirement that Plaintiff has not met, and cannot meet, based on the allegations in its

---

[1] The Amended Complaint does not disclose why Plaintiff continues to assert a derivative claim. In the introduction, the Amended Complaint states that the Plaintiff "sues THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT, and CONDOR ONE, INC.," and no relief is sought against the Oakland Lakes, Ltd., limited partnership.

17

Amended Complaint.  This requirement is found under § 620.165, "Derivative action; pleading," which states as follows:

> In a derivative action, the complaint must set forth with particularity the effort of the plaintiff to secure initiation of the action by a general partner or the reasons for not making the effort.

Id., § 620.165.

Contrary to the express requirement of Florida law conferring standing upon limited partners to bring derivative actions, Plaintiff's Amended Complaint demonstrates no effort to secure initiation of the instant action by the general partner, nor does the Amended Complaint disclose any reason why such effort was not made.  Instead, the Amended Complaint states as follows:

> 37.  Subsequent to and as a part of the settlement of the State Court Action, Oakland Park G.P. Corporation became the new General Partner of Oakland Lakes.  Oakland Park G.P. Corporation consents to and supports this action.

Am. Compl. ¶37. (emphasis added).

As discussed above, the Florida Statute authorizing limited partnership derivative suits makes it clear that the complaint must allege that the partnership will not bring the suit.  According to Plaintiff's own Amended Complaint, the general partner actually supports the instant lawsuit. Therefore, Plaintiff lacks standing, and Plaintiff's Amended

Complaint must be dismissed for failure to comply with the clear, express requirements of Florida law through which limited partners are granted standing to bring derivative actions on behalf of the limited partnership.

B.    <u>PLAINTIFF HAS FAILED TO STATE A CLAIM FOR WHICH</u>
      <u>RELIEF CAN BE GRANTED</u>

In evaluating a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff. <u>See</u> <u>Scheuer v. Rhodes</u>, 416 U.S. 232 (1974). A complaint may not be dismissed for failure to state a cause of action "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Bank v. Pitt</u>, 928 F.2d 1108, 1111-12 (11th Cir. 1991)(quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).

In its evaluation, this Court should consider the exhibits that Plaintiff has attached to its Amended Complaint. As stated in <u>Breckenridge Creste Apartments v. Citicorp</u>, 826 F.Supp 460, 464 (N.D. Ga. 1993)

> To determine whether to grant a Rule 12(b)(6)
> motion to dismiss, the court primarily considers
> the allegations in the pleadings, although exhibits
> attached to the complaint may also be taken into
> account. <u>Case v. State Farm Mutual Auto. Ins. Co.</u>,
> 294 F.2d 676 (5th Cir. 1961); <u>Jacksonville Newspaper</u>
> <u>Printing Pressmen & Assistants' Union No. 57 v.</u>

<u>Florida Publishing Co.</u>, 340 F.Supp. 993, 995 (M.D. Fla.), <u>aff'd</u>, 468 F.2d 824 (5th Cir. 1972), <u>cert. denied</u>, 411 U.S. 906, 93 S.Ct. 1531, 36 L.Ed.2d 196 (1973).

Plaintiff has attached to its Amended Complaint all of the relevant documents in support of the allegations in its Amended Complaint. Under Florida law, which should be applied here, construction of these documents should ordinarily be a question of law for the trial court, so long as the terms of the contract are unambiguous. <u>Bivens Gardens Office v. Barnett Banks of Florida</u>, 140 F.3d 898, 905 (11th Cir. 1998).

As will be shown, Plaintiff's conclusory allegations to the contrary notwithstanding, the Oakland Lakes limited partnership agreement clearly authorized HUD to rely upon Mr. Brisben's execution of the PWA to bind the Oakland Lakes limited partnership entity. Likewise, all other complained of actions by HUD and Condor were clearly and unambiguously authorized by the various attached exhibits attached to the Amended Complaint.

COUNTS I & II

Count I seeks to have the PWA declared "invalid and of no effect" as a result of the failure to "obtain the prior written consent and authority of certain of the other general and limited partners." Am. Compl. ¶ 44. Count II is also based on the allegedly unauthorized execution of the PWA, and

seeks to have the mortgage assignment from HUD to Condor set aside due to that allegedly unauthorized execution.  <u>Id.</u> ¶ 51. Contrary to the conclusory allegations in the Amended Complaint, which does not even reference any particular provisions in the limited partnership agreement, the Oakland Lakes limited partnership agreement clearly demonstrates that HUD was unquestionably entitled to rely on Mr. Brisben's negotiation and execution of the PWA on behalf of Oakland Lakes.

The Oakland Lakes, Ltd. Second Amended and Restated Agreement of Limited Partnership ("Partnership Agreement") states in relevant part in Section 1.3 <u>Powers and Purposes</u>, as follows:

> (a)  The purposes of the Partnership and the business to be carried on and the objectives to be effected by it are:
>
> (1)  To acquire and purchase the [apartment complex] and to construct, own, develop, maintain and operate the [apartment complex].
> * * *
> (4)  To <u>borrow money</u>, and to issue evidence of indebtedness and to secure the same by mortgage, deed of trust, pledge or other lien ….
> (5)  To carry on any <u>other activities necessary to, in connection with or incidental to the foregoing</u>.

Am. Compl., Ex. "C." (emphasis added).

21

Thus, the Oakland Lakes partnership was clearly and expressly authorized to engage in borrowing money and activities in connection with such borrowing.

Further, Mr. Brisben was clearly authorized in his sole capacity to undertake this authorized business on behalf of Oakland Lakes. The Partnership Agreement states in relevant part in Section 3.3 <u>Exercise of Rights and Powers by General Partners</u>, as follows:  "<u>Any one or more</u> of such General Partners is and are authorized to enter into or execute any document or instrument for and on behalf of the Partnership." <u>Id.</u> (emphasis added).

If there could possibly exist any doubt as to HUD's entitlement to rely upon Mr. Brisben's authority, several other partnership provisions would remove any such doubt. The Partnership Agreement states in relevant part in Section 3.6 <u>Reliance on Act of General Partners</u>, as follows:

> No financial institution or any other person, firm or corporation dealing with the General Partners shall be required to ascertain whether they are acting in accordance with this Agreement, but such financial institution or such other person, firm or corporation <u>shall be protected in relying solely upon the deed, transfer, or assurance of and the execution of such instrument or instruments by such General Partners.</u>

<u>Id.</u> (emphasis supplied).

22

There is even an additional provision authorizing reliance by HUD. The Partnership Agreement states in relevant part in Section 15.1 <u>HUD and Coinsuring Lender Requirements</u>, as follows:

> The Partnership is authorized to execute the Note and Mortgage in order to obtain the Mortgage Loan to be coinsured by the Coinsuring Lender and HUD and to execute a certain regulatory agreement ("Regulatory Agreement") between the Partnership and the Coinsuring Lender <u>and such other documents as may be required by the Coinsuring Lender and/or HUD in connection with said Mortgage Loan</u>.

<u>Id.</u> (emphasis supplied).

Furthermore, Oakland Park, the limited partner that brought this derivative state law action, granted an irrevocable power of attorney to Mr. Brisben as general partner. The Partnership Agreement states in relevant part on the Limited Partner Signature Page (pp. 43-44) for the "OAKLAND PARK (FLORIDA) LIMITED PARTNERSHIP," as follows:

> The undersigned, desiring to become the Investor Limited Partner of Oakland Lakes, Ltd. (the "Partnership"), hereby agrees to all of the terms of the Agreement of Limited Partnership of the Partnership (the "Agreement") and agrees to be bound by all of the terms and provisions thereof. <u>The undersigned further constitutes and appoints the General Partners of the Partnership, jointly and severally, with full power of substitution, its true and lawful attorney for it in accordance with Article 14 of the Agreement. The power of attorney herein granted shall be deemed to be coupled with an interest and shall be irrevocable.</u>

23

Id. (emphasis supplied).

Although HUD was clearly entitled to rely upon the above excerpted limited partnership provisions as conclusive authority that Mr. Brisben was authorized to bind the limited partnership by his execution of the PWA, the Florida Revised Uniform Limited Partnership Act (1986) ("RULPA") further supports HUD's reliance. Section 620.186 of the RULPA provides that "[i]n any case not provided for in this act, the provisions of the Uniform Partnership Act and the rules of law and equity shall govern." West's F.S.A § 620.186 (1992). The Uniform Partnership Act ("UPA"), § 620.60(1) provides as follows:

> (1) Every partner is an agent of the partnership for the purpose of its business. The act of every partner, <u>including the execution in the partnership name of any instrument</u>, for apparently carrying on in the usual way the business of the partnership of which he is a member, binds the partnership, <u>unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no authority.</u>

Id. at § 620.60(1)(emphasis supplied).

As discussed above, acquiring and operating an apartment complex and borrowing money are included in the express powers of the Oakland Lakes limited partnership, and Mr. Brisben was clearly authorized under the partnership documents to execute the PWA on behalf of Oakland Lakes. However, even assuming

24

for the sake of argument that Mr. Brisben was not so authorized, Plaintiff has not alleged that it ever notified HUD, between December 22, 1994, when Mr. Brisben executed the PWA on behalf of Oakland Lakes, and the date of service of the instant lawsuit, that Plaintiff construed the partnership documents as not authorizing Mr. Brisben to execute the PWA.

Indeed, the April 29, 1999 letter to Mr. Brisben, attached to the Amended Complaint as Exhibit F, appears to have been the first time that Plaintiff, as the newly appointed general partner of Oakland Park, asserted Mr. Brisben's alleged lack of authority. This letter does not contain any indication that Plaintiff provided HUD with a copy, nor has Plaintiff alleged that Plaintiff communicated, prior to the commencement of this lawsuit, its interpretation regarding Mr. Brisben's alleged lack of authority. Therefore, under both the literal terms of the Oakland Lakes limited partnership agreement, as well as under the Florida RULPA and UPA, HUD was entitled to rely upon Oakland Lakes' execution of the PWA by its general partner, with the result necessarily being that Counts I and II fail to state a claim upon which relief can be granted.

25

<u>COUNT III</u>

Count III is based on the theory that HUD was required by the terms of the PWA to hold the note and mortgage, rather than assigning it to Condor.  This theory is clearly not supported by any reasonable interpretation of the documents involved.

First, the PWA expressly contemplates the possibility of an assignment. Section 7 twice states that the "equity kicker" or the amount then owing "shall be paid by Maker to Mortgagee <u>or its successors and assigns</u>."  Am. Compl, Ex. D § 7 (emphasis added).

Second, the Mortgage at Section 7.01 <u>Assignment of Mortgage</u> expressly provides for assignment, as follows:

> … Mortgagee may sell, assign, transfer, convey, pledge or encumber the Note or all or any part of its interest, rights and obligations thereunder or under this Mortgage to one or more persons or parties, and Mortgagor hereby consents to any such sale, assignment, transfer, conveyance, pledge or encumbrance and agrees upon the request of the Mortgagee or its assignee to execute and deliver promptly any instrument confirming Mortgagor's consent as effectuating, as necessary, such sale, assignment, transfer, conveyance, pledge or encumbrance.

<u>Id.</u>, Ex. B at 25.  The Amended Complaint even references two prior assignments of the note and mortgage.  <u>See</u>, <u>e.g.</u>, <u>id.</u> ¶¶ 24-25.

26

Third, the PWA itself does not "according to its own terms, [require] HUD to hold the mortgage," as alleged in the Amended Complaint. <u>Id.</u> ¶ 56. The language referenced in ¶ 55 plainly uses the permissive word "will," and not the mandatory word "shall." The PWA clearly also lacks any express prohibition against HUD assigning the mortgage.

That HUD did not commit to a long term arrangement is further illustrated by Section 11. Section 11 "<u>Cancellation Clause</u>," provides in part as follows:

> This Arrangement is on a month-to month basis. The Secretary agrees to take no action because of the existing monetary default, provided that the mortgagor remits the required monthly payment and satisfactorily performs the other requirements of this Arrangement.

<u>Id.</u> at § 11.

The PWA cannot reasonably be read as imposing requirements upon HUD, which was simply affording Plaintiff an opportunity to avoid foreclosure as a result of the ongoing mortgage default by Plaintiff. Further, Plaintiff has not alleged that it complied with the PWA. Therefore, Plaintiff's conclusory allegation that HUD could not assign the Note and Mortgage is clearly erroneous as a matter of law, and Count III accordingly should be dismissed as to HUD.

## COUNT IV

Count IV relies upon the alleged continuing existence of the Regulatory Agreement, which Plaintiff recognized was not assigned to Condor.  See Am. Compl. ¶ 66.  However, Plaintiff's conclusion that the Regulatory Agreement "remained with HUD" is unquestionably wrong in light of the terms of the Regulatory Agreement, as construed by two recent district court decisions.

The Regulatory Agreement provides that it "will continue so long as the contract of coinsurance remains in force."  Am. Compl., Ex. 1 at 1.  Plaintiff's mortgage was converted from coinsurance to full insurance on January 31, 1992.  Id. ¶ 23. Subsequently, the mortgage was assigned to HUD.  Id. ¶ 25.

The precise issue of when the Regulatory Agreement for co-insured loans ceases to operate has been addressed by at least two federal district courts, which reached somewhat different conclusions, neither of which supports Plaintiff's position.  In United States v. David, 1998 WL 351693 at 4, Motion for Reconsideration Denied, 1998 WL 709292 (E.D. Penn. 1998), the court found that the Regulatory Agreement was unambiguous and therefore expired when the contract of coinsurance was converted to full insurance.

28

In <u>United States v. Schlesinger</u>, 88 F.Supp.2d 431,440 (D. Md. 2000), however, the court disagreed with <u>David</u> and found that the Regulatory Agreement was ambiguous and that "the RA is fully enforceable against [mortgagor] notwithstanding the conversion of the Project Mortgage from HUD's coinsurance program to its full insurance program." Significantly, the court in <u>Schlesinger</u> found that Regulatory Agreement remained enforceable only as long as "the insurance obligation was still extant." <u>Id.</u> at 447.

Even under the <u>Schlesinger</u> decision, by which the Regulatory Agreement survived for the longest duration, once HUD paid the mortgage insurance claim and became the mortgagee, the insurance obligation expired, and the Regulatory Agreement ceased to be enforceable. Moreover, even if were assumed that the Regulatory Agreement had continued in effect, which it did not, the United States Court of Appeals for the Federal Circuit has recently stated that "[a]lthough the regulatory agreement was signed on behalf of the Owner and HUD, it was the <u>Owner who assumed obligations under the agreement</u>." <u>Cienega Gardens et al. v. United States</u>, 162 F.3d 1123, superceded by 194 F.3d 1231, 1241 (Fed. Cir. 1998) <u>cert. denied</u>, <u>Sherman Park Apts. v. United States</u>, 528 U.S. 820, 120 S. Ct. 62 (1999) (emphasis added).

Accordingly, because the Regulatory Agreement had expired by the time of the assignment of the mortgage to Condor, and because, in any event, it was Plaintiff, and not HUD, that assumed obligations under the Regulatory Agreement, Plaintiff's allegation that HUD owed it a continuing duty under the Regulatory Agreement after the mortgage was assigned to Condor fails as a matter of law.[2]

---

[2] If Plaintiff genuinely believed that the Regulatory Agreement continued in effect, Plaintiff would not have made unauthorized distributions for legal fees, thereby subjecting Plaintiff and its partners to severe penalties.

IV.    <u>CONCLUSION</u>

Plaintiff's complaint against HUD should be dismissed because this Court lacks jurisdiction over Plaintiff's claim against HUD, and because Plaintiff has failed to state a claim against HUD upon which relief can be granted.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY


By: _____
    WILLIAM C. HEALY
    Assistant U. S. Attorney
    Florida Bar No.  0848395
    99 N.E. 4th Street
    Miami, Florida 33132
    TEL: (305) 961-9438
    FAX: (305) 530-7139

Of Counsel
Jud E. McNatt
Trial Attorney
U.S. Department of Housing
and Urban Development
40 Marietta Street
Atlanta, GA 30303-2806

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this 8th day of December 2000, to David W. Trench, Esq., Bilzin Sumberg Dunn Price & Axelrod, L.L.P., 2500 First Union Financial Center 200 South Biscayne Boulevard, Miami, Florida 33131; Richard T. Woulfe, Esq., Bunnell, Woulfe, Kirschbaum, Keller, Cohen & McIntyre, P.A., P.O. Drawer 030340, 888 Las Olas Boulevard, Suite 400, Ft. Lauderdale, Florida 33303-0304; Robert E. Messick, Esq., Icard, Merrill, Cullis, Timm, Furen & Ginsberg, P.A. 2033 Main Street, Suite 600, Sarasota, Florida 34237 and John H. Genovese, Esq., Genovese Lichtman Joblove & Battista, P.A., Bank of America Tower, 100 S.E. Second Street, 36th Floor, Miami, FL 33131.

WILLIAM C. HEALY
Assistant U.S. Attorney

32

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA

ADV. CASE NO: 00-2530-A

## _ATTENTION_

# THIS COURT PAPER

☑ IS IN EXPANDABLE FOLDER NO. _____1_____

Document description:

Notice of Removal

CP#_____1_____

CF-R20 (12/01/98)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 00-6147-CIV-LENARD PLANTIFF

**00- 2530**

**BKC-RBR-A**

813268 ONTARIO, INC., as
General Partner of OAKLAND
PARK (FLORIDA) LIMITED PARTNERSHIP,
an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;
 Plaintiff,

(Bankruptcy Case: In re Oakland
Lakes, Ltd., Case No. 00-25351-
BKC-RBR, Fort Lauderdale Division)

vs.

OAKLAND LAKES, LTD.,
a Florida Limited Partnership,
WILLIAM O. BRISBEN, W.O. BRISBEN
COMPANIES, INC., and ROBERT E. SCHULER,
as General Partners of OAKLAND LAKES, LTD.,
THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,
 Defendants.
_____/



US BANKRUPTCY COURT
SO. DISTRICT OF FLORIDA

NOV 2 8 2000

FILED ___ RECEIVED ___

## NOTICE OF REMOVAL PURSUANT TO FED. R. BANKR. P. 9027

 Plaintiff, 813268 Ontario, Inc., as General Partner of Oakland Park (Florida) Limited
Partnership, an Ontario limited partnership, as limited partner of and on behalf of Oakland Lakes,
Ltd., a Florida Limited Partnership ("Oakland Lakes" or "Debtor"), by and through the undersigned
counsel, hereby files this Notice of Removal of the within adversary proceeding to be referred to the
United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division. In
support thereof, Plaintiff respectfully states as follows:

 1. On or about January 31, 2000, Plaintiff filed a Complaint against, among other
defendants, the Secretary of Housing and Urban Development ("HUD") and Condor One, Inc.
("Condor"), seeking declaratory relief under certain loan documents between Oakland Lakes and
HUD (the "Adversary"). In the Adversary, Plaintiff seeks to set aside a certain Provisional Workout

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 00-6147-CIV-LENAR~~D~~/OFF

**00- 2530**

**BKC-RBR-A**

813268 ONTARIO, INC., as
General Partner of OAKLAND
PARK (FLORIDA) LIMITED PARTNERSHIP,
an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;
             Plaintiff,

(Bankruptcy Case: In re Oakland
Lakes, Ltd., Case No. 00-25351-
BKC-RBR, Fort Lauderdale Division)

vs.

OAKLAND LAKES, LTD.,
a Florida Limited Partnership,
WILLIAM O. BRISBEN, W.O. BRISBEN
COMPANIES, INC., and ROBERT E. SCHULER,
as General Partners of OAKLAND LAKES, LTD.,
THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,
             Defendants.
_____/



US BANKRUPTCY COURT
SO. DISTRICT OF FLORIDA

NOV 2 8 2000

FILED          RECEIVED

## NOTICE OF REMOVAL PURSUANT TO FED. R. BANKR. P. 9027

Plaintiff, 813268 Ontario, Inc., as General Partner of Oakland Park (Florida) Limited
Partnership, an Ontario limited partnership, as limited partner of and on behalf of Oakland Lakes,
Ltd., a Florida Limited Partnership ("Oakland Lakes" or "Debtor"), by and through the undersigned
counsel, hereby files this Notice of Removal of the within adversary proceeding to be referred to the
United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division. In
support thereof, Plaintiff respectfully states as follows:

1.       On or about January 31, 2000, Plaintiff filed a Complaint against, among other
defendants, the Secretary of Housing and Urban Development ("HUD") and Condor One, Inc.
("Condor"), seeking declaratory relief under certain loan documents between Oakland Lakes and
HUD (the "Adversary"). In the Adversary, Plaintiff seeks to set aside a certain Provisional Workout

Arrangement (the "PWA") between Oakland Lakes and HUD, and the subsequent assignment of the PWA and other loan documents from HUD to Condor.  It is the position of Oakland Lakes that HUD, and not Condor, is its appropriate lender.

2.     The Adversary was filed as a limited partner derivative action, and named Oakland Lakes and its then general partners, William O. Brisben, W.O. Brisben Companies, Inc. and Robert Schuler (the "Brisben Parties") as defendants.  Thereafter, the limited partners entered into a settlement agreement with the Brisben Parties whereby they transferred their interest in Oakland Lakes to the limited partners on June 30, 2000.

3.     On August 31, 2000, Oakland Lakes filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The case is currently pending before the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division, Case Number 00-25351-BKC-RBR.  Since that time, Oakland Lakes has operated as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.     On October 24, 2000, the Debtor filed its Plan of Reorganization and Disclosure Statement.  The Plan provides for the treatment of the alleged secured and unsecured claims of either Condor or HUD, depending on the outcome of the Adversary.  If Condor is determined to be the appropriate party in interest, it will receive treatment of its claims against the bankruptcy estate.  Alternatively, if HUD is determined to be the appropriate party in interest, it will receive treatment of its claims against the bankruptcy estate.

5.     The Debtor is entitled to remove the Adversary to the Bankruptcy Court pursuant to Fed. R. Bank. P. 9027.  Upon removal, the Adversary will be a core proceeding within the meaning of 28 U.S.C. § 157 (b)(A), (K) and (O).  Adjudication of the Adversary will resolve the validity, extent and priority of the claims of either Condor or HUD against the estate, will affect the

administration of the bankruptcy estate, and will determine the adjustment of the debtor-creditor

relationship as between the Debtor, Condor and HUD.

      6.     Accompanied with this Notice is a copy of all process and pleadings in the Adversary.

Respectfully submitted this 28 day of November, 2000

> Genovese Lichtman Joblove & Battista, PA
> Counsel to the Debtor
> Bank of America Tower
> 100 SouthEast Second Street 36th floor
> Miami, Florida 33131
> (305) 349-2300
> (305) 349-2310 (telecopier)

> By: _____
> John H. Genovese
> Florida Bar # 280852

> Glenn D. Moses
> Florida Bar # 174556

X:\Documents\WORK\Oakland Lakes\Pleading\Notice of Removal

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
_____DIVISION

CO JAN 31  PM 12: 36

Case No._____-_____

CLERK U.S. DIST. CT.
S.D. OF FLA.-FTL

813268 ONTARIO, INC., as
General Partner of OAKLAND
PARK (FLORIDA) LIMITED PARTNERSHIP,
an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;

       Plaintiff,

**00-6147
CIV-LENARD

MAGISTRATE
TURNOFF**

vs.

OAKLAND LAKES, LTD.,
a Florida Limited Partnership,
WILLIAM O. BRISBEN, W.O. BRISBEN
COMPANIES, INC., and ROBERT E. SCHULER,
as General Partners of OAKLAND LAKES, LTD.,
THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,

       Defendants.

_____/

## COMPLAINT

Plaintiff, 813268 ONTARIO, INC., as general partner of OAKLAND PARK

(FLORIDA) LIMITED PARTNERSHIP, an Ontario limited partnership; as limited partner of,

1

and on behalf of OAKLAND LAKES, LTD., a Florida Limited Partnership; sues OAKLAND

LAKES, LTD., a Florida Limited Partnership, WILLIAM O. BRISBEN, W.O. BRISBEN

COMPANIES, INC., and ROBERT E. SCHULER, as General Partners of OAKLAND

LAKES, LTD., THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT, and

CONDOR ONE, INC., a Delaware Corporation, and alleges:

## I. INTRODUCTION

1.      This is a limited partner derivative action pursuant to Florida Statute Section

620.163, seeking declaratory relief pursuant to Florida Statutes Chapter 86, as

authorized by 28 U.S.C. § 2201, to set aside a provisional workout arrangement (the

"Workout Arrangement") effective February 1, 1995, by and between the Secretary

of the United States Department of Housing and Urban Development ("HUD") and

Oakland Lakes Ltd., a limited partnership organized and existing under the laws of

the State of Florida (Oakland Lakes), whose primary place of business is 2325 N.W.

33rd Street, Fort Lauderdale, Florida 33309 and for damages against Defendants

William O. Brisben, W.O. Brisben Companies, Inc. and Robert E. Schuler.

## II. JURISDICTION

2.      This action is properly before this Court pursuant to 12 U.S.C. § 1702 because the

subject of the Workout Arrangement and HUD's participation as a party thereto

were undertaken by HUD pursuant to its administration of the National Housing Act.

2

3.     Federal question jurisdiction is proper under 28 U.S.C. § 1331, in that this action arises under laws of the United States.

4.     Diversity of citizenship jurisdiction is proper under 28 U.S.C. § 1332, in that Plaintiff, 813268 ONTARIO, INC. is a Canadian corporation and is the general partner of Oakland Park (Florida) Limited Partnership ("Oakland Park"). a limited partnership organized and existing under the laws of the Province of Ontario, Canada; Defendant Oakland Lakes is a limited partnership organized and existing under the laws of the State of Florida; Defendant William O. Brisben is a resident of Ohio, Defendant W.O. Brisben Companies, Inc. is an Ohio Corporation, Defendant Robert E. Schuler is a resident of Ohio; Defendant, Condor One, Inc. ("Condor"), is a corporation that was organized and is validly existing under the laws of the State of Delaware; Defendant, HUD, is deemed to be a federal corporation and a citizen of the District of Columbia for purposes of diversity jurisdiction; and the amount in controversy exceeds $75,000.00.

## III. VENUE

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (e).

## IV. PARTIES

6.     Plaintiff Oakland Park is an Ontario Limited Partnership formed for the purpose of investing capital in Defendant Oakland Lakes, and which did in fact invest in excess of 1.8 million dollars in Oakland Lakes, and executed the Amended Limited

3

Partnership Agreement described in paragraph 23 herein, as the investor limited partner, with an ownership interest in Defendant Oakland Lakes of 50%.

7.      Defendant Oakland Lakes is a Florida limited partnership formed for the primary purpose of ownership and development of certain real and personal property as an apartment complex of approximately 387 units located in Oakland Park, Broward County, Florida, which apartment complex is currently owned and titled in Oakland Lakes and is presently known or does business as the "Sailboat Pointe Apartments". The apartment complex owned and operated by Oakland Lakes was formerly known and did business originally as the "Lakes of Casablanca Apartments".

8.      Defendant William O. Brisben is a General and limited Partner of Oakland Lakes, holding a 5% ownership interest as general partner and a 30% or greater interest as limited partner. William O. Brisben, as general partner, had all of the rights and obligations of a general partner as provided in the Amended Limited Partnership Agreement described in paragraph 23 herein.

9.      Defendant W. O. Brisben Companies, Inc. is a General Partner of Oakland Lakes, holding a 0.1% ownership interest, and, as general partner, had all of the rights and obligations of a general partner as provided in the Amended Limited Partnership Agreement described in paragraph 23 herein.

10.     Defendant Robert E. Schuler is a General Partner of Oakland Lakes, holding a 4.9% ownership interest, and, as general partner, had all of the rights and obligations of a general partner as provided in the Amended Limited Partnership Agreement described in paragraph 23 herein.

11.    HUD is an agency of the United States government charged with administering the National Housing Act.

12.    Condor is a Delaware Corporation to which HUD purportedly assigned the Mortgage and Loan Documents described herein, which are the subject of the Workout Arrangement.

## V. GENERAL ALLEGATIONS

13.    Beginning in or about 1989, Oakland Lakes initiated negotiations to obtain favorable, low interest mortgage financing for the development, construction, ownership, and operation of the Lakes of Casablanca apartment project on the property owned by Oakland Lakes and located at 2325 N.W. 33rd Street, Fort Lauderdale, FL 33309, Oakland Park, Broward County, Florida; principally, through a mortgage loan extended by Cincinnati Mortgage Corporation ("Cincinnati Mortgage").

14.    Cincinnati Mortgage was a corporation that had been approved by HUD to originate and service mortgage loans insured by HUD under the National Housing Act, and had been further approved by HUD to co-insure mortgages under the provisions set forth in Section 221(d)(4) of the National Housing Act and 24 C.F.R. Part 244.

15.    Cincinnati Mortgage issued its commitment for insurance of advances (the "Firm Commitment") to Oakland Lakes, which Firm Commitment obligated Cincinnati Mortgage to: a) co-insure a first mortgage loan (the "Insured Loan") concerning the Project under the provisions set forth in Section 221(d)(4) of the National Housing Act and 24 C.F.R. Part 244; and b) cause the Government National Mortgage

5

Association ("GNMA"), an agency of HUD, to issue its mortgage backed securities ("MBS") concerning the Insured Loan.

16.  The Florida Housing Financing Agency ("FHFA") agreed to issue tax-exempt revenue bonds (the "Bonds") for the purpose of funding the Insured Loan, and upon the condition that the MBS issued by GNMA be pledged as collateral for the Bonds. The proceeds from the sale of the Bonds were used to fund the Insured Loan.

17.  On information and belief, FHFA and a group of underwriters headed by Kidder Peabody & Co. Incorporated and Dean Witter Reynolds, Inc. (the "Underwriters") entered into a bond purchase agreement (the "Bond Purchase Agreement") which obligated the Underwriters to purchase the Bonds from FHFA.

18.  On information and belief, on or about October 5, 1989, Oakland Lakes and Cincinnati Mortgage closed the Insured Loan, which closing entailed the execution by Oakland Lakes and delivery to Cincinnati Mortgage of the following loan documents (collectively, the "Loan Documents"), to wit:  a)  a mortgage note, as amended, (the "Note") dated October 5, 1989, evidencing the Insured Loan in the original principal amount of $22,779,600.00);  b)  a mortgage, as amended and restated, (the "Mortgage") encumbering the real, personal and intangible property comprising the Project and constituting a first mortgage lien against the property; and c)  the following documents: a regulatory agreement; the Limited Partnership Agreement including resolutions of all general and limited partners authorizing the Insured Loan; a land use restriction agreement; lender's policy of title insurance; evidence of zoning compliance; copies of all land use and building permits; survey and surveyor's report;  building loan agreement;  mortgagee's certificate;

6

mortgagor's certificate; mortgagor's oath; agreement and certification; attorney's opinion letter; construction contract – cost plus; payment and performance bond; contractor's certification; owner – architect agreement; mortgagor and architect certificate; design architect certification; state and county uniform commercial code filing forms; security agreement; letters certifying availability of utility services to the project; certificates of insurance; notice of commencement; escrow agreements concerning working capital, minor non-realty items and operating deficits; draw request; and construction progress schedule. True and correct copies of the Note and Mortgage, as amended, are attached hereto as Exhibits "A" and "B" and by this reference are made a part of this Complaint.

19.  Prior to closing the loan, on information and belief, Cincinnati Mortgage delivered copies of all Loan Documents, including but not limited to the Limited Partnership Agreement, to HUD.

20.  On information and belief, On October 5, 1989, the mortgage note was endorsed for coinsurance under the provisions of Section 221(d)(4) of the National Housing Act and pursuant to 24 C.F.R. Part 244, FHA mortgage number 06636650, and Cincinnati Mortgage delivered final copies of all Loan Documents, including but not limited to the Limited Partnership Agreement, to HUD.

21.  On or about October 5, 1989, Oakland Lakes commenced construction of the apartment complex.

22.  On or about October 13, 1989, Cincinnati Mortgage delivered an assignment in blank of the mortgage and copies of all Loan Documents, including but not limited to the Limited Partnership Agreement, to a custodian of GNMA, for the benefit and

security of GNMA; and caused GNMA's MBS to be delivered to the trustee of the Bonds.

23.    On or about June 29, 1990, the Limited and General Partners of Oakland Lakes executed, by and amongst all of such partners, a Second Amended and Restated Agreement of Limited Partnership for Oakland Lakes ("the Amended Limited Partnership Agreement"). A true and correct copy of the Amended Limited Partnership Agreement is attached hereto as Exhibit "C", and by this reference is made a part of this Complaint. The terms and provisions of the Amended Limited Partnership Agreement have not been further amended, revised, and/or superceded through the date of filing this Complaint.

24.    On information and belief, Oakland Lakes delivered a copy of the Amended Limited Partnership Agreement to HUD and/or Cincinnati Mortgage as required under the National Housing Act and the Loan Documents.

25.    On information and belief, on or about November 8, 1990 GNMA declared Cincinnati Mortgage in default of the guarantee agreement by and between Cincinnati Mortgage and GNMA; thereafter the custodian delivered all Loan Documents, including but not limited to, the Amended Limited Partnership Agreement, to GNMA, and Cincinnati Mortgage delivered all Loan Documents, and a complete loan file to GNMA.

26.    The insured mortgage was converted from coinsurance to full insurance on January 31, 1992, under new FHA project number 066-94026, and at the time of the conversion, a complete copy of Cincinnati Mortgage's loan file, and Loan

Documents, including but not limited to, the Amended Limited Partnership Agreement, were delivered to HUD.

27.   Almost immediately after completion of construction of the apartment complex, Oakland Lakes apparently defaulted in one or more of its obligations under the Loan Documents.  Said apparent event(s) of default were not cured and continued to exist at the time of the assignment of the Loan documents by Cincinnati Mortgage to GNMA.

28.   At the time of the assignment of the Loan Documents to HUD and HUD's ownership and administration of the loan, HUD elected not to exercise the rights and remedies set forth and provided in the Loan Documents, specifically the right to accelerate and to demand payment of the balance of all sums due and payable under the Note, Mortgage, and other Loan Documents.  As an alternative, HUD elected in such event(s) of default to enter into settlement - workout negotiations with William O. Brisben, as the general partner of Oakland Lakes.

29.   Effective February 1, 1995, HUD and William O. Brisben, as General Partner of Oakland Lakes, executed a written, provisional Workout Arrangement (the "Workout Arrangement").  A true and correct copy of the Workout Arrangement is attached hereto as Exhibit "D", and by this reference made a part of this Complaint.

30.   Brisben, as general partner of Oakland Lakes, lacked authority under the terms and provisions of the Amended Limited Partnership Agreement, to enter into the Workout Arrangement without the prior written consent of and/or joinder of certain of the other partners, both limited and general, of Oakland Lakes.

9

31.   At all times, during the workout negotiations with Brisben, acting in his capacity as general partner of Oakland Lakes, HUD had copies, or should have had copies, of all Loan documents and knew or should have known that Brisben was acting in his capacity as general partner of Oakland Lakes, and knew or should have known that the General Partner did not have authority to enter into the Workout Arrangement.

32.   On or about May 8, 1995, HUD attempted to assign by written assignment all of its rights under the terms and provisions of the Loan Documents, including, upon information and belief, the Workout Arrangement, to Condor. A true and correct copy of the purported Assignment from HUD to Condor is attached hereto as Exhibit "E" and by this reference is made a part of this Complaint.

33.   On information and belief, at the time William O. Brisben entered into the workout negotiations with HUD, Oakland Park provided both verbal and written notice to William O. Brisben that the consent and authorization of certain of the other general and limited partners was required before William O. Brisben, as general partner, could bind Oakland Park under the Workout Arrangement, and that Oakland Park did not so consent or authorize William O. Brisben, as general partner, to enter into the Workout Arrangement.

34.   On information and belief, subsequent to the effective date of the Workout Arrangement, Oakland Park became aware the Workout Arrangement was entered into without Oakland Park's authorization, and Oakland Park again raised its objections concerning the Workout Arrangement to William O. Brisben, as general partner.

10

35.  Subsequently, by letter dated April 29, 1999, counsel for Oakland Park notified William O. Brisben of its position that he had entered into the Workout Arrangement without authority, and tendered an offer to purchase the 50% interest of William O. Brisben and the other partners in the Oakland Lakes Limited Partnership, as was its right under the Amended Limited Partnership Agreement, so that Oakland Park could gain control of the Oakland Lakes Limited Partnership and take appropriate action regarding the unauthorized Workout Arrangement, as well as improve the operation and management of the apartment complex.  A copy of the letter is attached hereto as Exhibit "F",   and by this reference is made a part of this Complaint.

36.  William O. Brisben, as well as the other general and limited partners, refused to take any action in regard to the unauthorized execution of the Workout Arrangement, and have refused to sell their 50% interest in the Limited Partnership as required under the Amended Limited Partnership Agreement.

37.  As a result, Oakland Park initiated suit in the Circuit Court for the 17th Judicial Circuit in Broward County Florida, in case number 99-10831 (13) ("the State Court Action"), in an effort to enforce the Amended Limited Partnership Agreement and thereby acquire the interests of William O. Brisben and the other partners in Oakland Lakes, in order to gain control of the Limited Partnership.

38.  Oakland Park, in the State Court Action, moved to appoint a receiver to stabilize the operation determine the financial status of the apartment complex, and also attempted to expedite trial in order to gain control of the Limited Partnership so as to be able to bring this suit as the Limited Partnership, rather than on its behalf.

11

39. As a consequence and in consideration of the State Court Action, any further efforts made by Oakland Park to secure initiation of this action by Oakland Lakes would have been unsuccessful, due to the fact that William O. Brisben, as general partner, was the very individual who entered into the Workout Arrangement, and remains adverse to Oakland Park in the above referenced State Court Action.

40. As required by Florida Statute Section 620.164, at the time of bringing this action, Oakland Park is a partner of Oakland Lakes, and was also a partner at the time William O. Brisben, as general partner, entered into the unauthorized Workout Arrangement.

41. As a result of the General Partners' actions, Plaintiff has been forced to engage the undersigned counsel, and is obligated to pay them a reasonable fee for their services.

42. Plaintiff is entitled to recover its attorneys fees in this action from William O. Brisben W.O. Brisben Companies, Inc. Robert E. Schuler and/or Oakland Lakes, pursuant to Florida Statute Section 620.166.

43. All conditions precedent to the bringing of this action have occurred, been satisfied by Plaintiff, or have been waived by defendants.

## COUNT I

44. This is a count for declaratory relief and the allegations set forth in paragraphs 1 through 43 above are hereby realleged and incorporated into this Count I.

45. For reason of the failure of HUD and/or Brisben, as general partner, to obtain the prior written consent and authority of certain of the other general and limited partners of Oakland Lakes in connection with the Workout Arrangement, as

12

required under the terms and provisions of the Amended Limited Partnership Agreement, the Workout Arrangement is invalid and of no effect and is unenforceable as to its terms and provisions. It is a position of Plaintiff, that the terms and provisions of the original Mortgage and Loan Documents continue to control the loan transaction consummated by and between Oakland Lakes and Cincinnati Mortgage, and as subsequently assigned by Cincinnati Mortgage to GNMA.

46.    A dispute exists between Oakland Park and HUD and/or Condor concerning each parties' respective rights under the Workout Arrangement, Mortgage and Loan Documents regarding HUD's and/or Condor's rights to enforce the Workout Arrangement, Mortgage and Loan Documents, and whether Oakland Park must comply with the Workout Arrangement.

47.    Oakland Lakes is in doubt as to its rights under the Workout Arrangement, and how the workout Arrangement affects Oakland Lakes' rights and responsibilities under the Mortgage, Note and Loan Documents, and is entitled to a judicial declaration as to its rights in order to remove such doubt.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes, Ltd., requests that this Court enter judgment declaring the rights of the parties under the provisional Workout Arrangement and corresponding Loan Documents; declare that the provisional Workout Arrangement is of no force and effect and reinstate the terms of the original Mortgage and Loan Documents; award Plaintiff its reasonable attorneys' fees and

13

costs incurred in bringing this action; and award any other relief the Court deems necessary and proper.

## COUNT II

48.    This is a second count for declaratory relief, and paragraphs 1 through 43 above are hereby realleged and incorporated into this Count II.

49.    The attempted assignment from HUD to Condor on May 8, 1995 provides that HUD:

> assigns, transfers, sets over and conveys to [Condor], its successors and assigns, the [Amended Mortgage and Note], all as they may have been modified, consolidated, assigned, amended, restated, or supplemented (whether or not of record) through and including May 8, 1995.

50.    The Workout Arrangement, effective February 1, 1995, is an amendment and/or modification of the Mortgage and other Loan Documents.

51.    The attempted assignment by HUD to Condor on May 8, 1995 contemplated the assignment of the Mortgage and other Loan Documents, as modified by the Workout Arrangement.

52.    Because the Workout Arrangement was entered into without the authority of Oakland Lakes, the attempted assignment by HUD to Condor is a nullity, and Oakland Lakes is entitled to a reinstatement of the original terms of the Mortgage and other Loan Documents, as held by HUD, with the Mortgage reverting to HUD ownership.

53.    A dispute exists between Oakland Park and HUD and/or Condor concerning each parties' respective rights under the Assignment, Workout Arrangement, Mortgage and Loan Documents and as to whether HUD or Condors is the true party in interest

under the Mortgage and Loan Documents, and whether Oakland Park must comply with the Workout Arrangement.

54.     Oakland Lakes is in doubt as to its rights under the Assignment and Workout Arrangement, and how the workout Arrangement affects Oakland Lakes' rights and responsibilities under the Mortgage, Note and Loan Documents, and is entitled to a judicial declaration as to its rights in order to remove such doubt.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes. Ltd., requests that this Court enter judgment declaring the rights of the parties under the Assignment from HUD to Condor, the provisional Workout Arrangement and corresponding Mortgage Loan Documents; declare that the attempted assignment from HUD to Condor is of no force and effect and reinstate the terms of the original Mortgage and Loan Documents, as being held and owned by HUD, effective the date of entry of the Court's order; award Plaintiff its reasonable attorneys' fees and costs incurred in bringing this action; and award any other relief the Court deems necessary and proper.

## COUNT III

55.     This is a third Count for declaratory relief, and paragraphs 1 through 43 are hereby realleged and incorporated into this Count III.

56.     The Workout Arrangement specifically states:

> To afford an opportunity to effect reinstatement, the Secretary, Department of Housing and Urban Development, will hold the defaulted Note and Mortgage on the subject project under the terms and conditions stated herein.

15

57.   The Workout Arrangement, according to its own terms, required HUD to hold the subject Note and Mortgage.

58.   HUD, rather than holding the Note and Mortgage after entering into the Workout Arrangement, almost immediately assigned HUD's interest to Condor, in direct violation of the terms of the Workout Arrangement.

59.   A dispute exists between Oakland Park and HUD and/or Condor concerning each parties' respective rights under the Workout Arrangement, Mortgage, Loan Documents and Assignment, regarding HUD's and/or Condor's rights to enforce the Workout Arrangement, Mortgage and Loan Documents, and whether Oakland Park must comply with the Workout Arrangement.

60.   Oakland Lakes is in doubt as to its rights under the Workout Arrangement, and how the workout Arrangement affects Oakland Lakes' rights and responsibilities under the Mortgage, Note and Loan Documents, and is entitled to a judicial declaration as to its rights in order to remove such doubt.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes. Ltd., respectfully requests that this Court declare the rights of the parties under the Workout Arrangement, Mortgage and corresponding Loan Documents; enter judgment setting aside the assignment of the Mortgage to Condor, and reinstating the terms of the original Mortgage and Loan Documents, effective the date of entry of the Court's order: award Plaintiff its reasonable attorneys' fees and costs incurred in bringing this action; and award any other relief the Court deems necessary and proper.

16

## COUNT IV

61.  This is an action for damages in excess of $75,000.00 against Defendants William O. Brisben, W.O. Brisben Companies, Inc. and Robert E. Schuler as general partners of Oakland Lakes (collectively, "the General Partners"), for breach of fiduciary duty.

62.  Plaintiff repeats and realleges Paragraphs 1 through 43 as if fully stated herein.

63.  The General Partners owed a duty of care and loyalty to Oakland Lakes and to Oakland Park as a limited partner of Oakland Lakes.

64.  The General Partners breached this duty of care and loyalty as more particularly described below.

65.  As a result of the breaches of duty described below, Oakland Park has been damaged.

66.  Specifically, William O. Brisben breached his fiduciary duty by entering into the Workout Arrangement without authority to do so, and in so doing, attempted to bind Oakland Lakes to an unfavorable agreement which deprived Oakland Lakes of 25% of the equity in the subject property.

67.  W.O. Brisben Companies, Inc. and Robert E. Schuler, as general partners, breached their fiduciary duty by either acquiescing in, consenting to or encouraging William O. Brisben's entry, as general partner, into the unauthorized Workout Arrangement, or in abdicating their rights as general partners by surrendering control of Oakland Lakes to William O. Brisben.

17

68.  The general partners have been in possession of and operating the apartment complex owned by Oakland Lakes, since the inception of the project, and in their operations, have failed to maintain the books and records of the property in Florida as required under the Limited Partnership Agreement.

69.  The General Partners have also improperly utilized funds of Oakland Lakes to pay their own legal fees in the State Court Action referenced above and have failed to reimburse those payments to the Oakland Lakes.

70.  The General Partners have depleted the operating accounts of Oakland Lakes through the payment of their personal legal expenses, and otherwise, to the point where Oakland Lakes is or may be unable to meet its ongoing obligations.

71.  The General Partners' depletion of the operating accounts has placed Oakland Lakes in default of its obligations under the Workout Arrangement with the holder of the first mortgage on the property.

72.  Oakland Lakes is facing imminent payment default under the Loan Documents concerning the real property encumbered by and securing such loan, which property is Oakland Lakes' sole asset.

73.  The General Partners have also failed to provide Oakland Park, as required, bank reconciliations and other financial information and records of Oakland Lakes.

74. Based upon the deposition testimony of the General Partners taken in the State Court Action referenced above, there is no plan either in place or under consideration or development to avoid the imminent default of the limited partnership under its obligations to its first mortgage lender and others.

75. The general partners are unable to even determine a budget or financial projections for Oakland Lakes, so as to determine when Oakland Lakes would be unable to meet its financial obligations.

76. On information and belief, the General Partners have mismanaged the subject apartment complex and failed to maintain and preserve partnership assets.

77. The general partners have completely abdicated their fiduciary responsibilities to Oakland Lakes.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes, Ltd., requests that this Court enter judgment against Defendants William O. Brisben, W.O. Brisben Companies, Inc. and Robert E. Schuler for damages, attorneys' fees, the costs of bringing this suit, and for any other relief this Court deems necessary and proper and demands trial by jury.

BUNNELL, WOULFE, KIRSCHBAUM,
KELLER, COHEN & McINTYRE, P.A.
P. O. Drawer 030340
888 E. Las Olas Blvd., Suite 400
Ft. Lauderdale, FL 33303-0340
Telephone: 954-761-8600
Co-Counsel for Plaintiff

By: _____
RICHARD T. WOULFE
Florida Bar No. 222313

ICARD, MERRILL, CULLIS, TIMM,
FUREN & GINSBURG, P.A.
2033 Main Street, Suite 600
Sarasota, Florida 34237
Telephone: 941/366-8100
Co-Counsel for Plaintiff

By: _____
ROBERT E. MESSICK
Florida Bar No. 314773

20

## AMENDED AND RESTATED
## RENEWAL MORTGAGE NOTE

$22,779,600.00                                Oakland Park, Florida

                                              October 5 1989

FOR VALUE RECEIVED, the undersigned, Oakland Lakes, Ltd., a Florida limited partnership, ("Mortgagor"), promises to pay to or upon the order of CINCINNATI MORTGAGE CORPORATION, an Ohio Corporation (the "Holder", as hereinafter defined), the principal sum of Twenty Two Million Seven Hundred Seventy Nine Thousand Six Hundred and no/100 Dollars ($22,779,600.00) with interest from the date hereof at the rate of eight and one-quarter percent (8.25%) per annum on the outstanding principal hereof until paid.  The said principal and interest shall be payable in lawful money of the United States of America in monthly installments as follows:

Interest in arrears payable monthly beginning on the first day of November, 1989 and on the first day of each month thereafter up to and including December 1, 1991.  Commencing on January 1, 1992, monthly installments of interest and principal shall be paid in the sum of One Hundred Sixty-Two Thousand Six Hundred Seventy Seven and 97/100 Dollars ($162,677.97) each, such payments to continue monthly on the first day of each succeeding month until the entire indebtedness has been paid.  In any event, the balance of principal, if any remaining unpaid, plus accrued interest, shall be due and payable on December 1, 2031.  The payments of principal and interest shall be applied first to interest at the applicable rate upon the principal sum or so much thereof as shall from time to time remain unpaid and the balance thereof shall be applied on account of principal.

In addition to the foregoing, the Mortgagor shall aggregate with the monthly installments of principal and interest all other payments payable pursuant to the Mortgage (as hereinafter defined).

Until further notice from the Holder, all payments by the Mortgagor of any sums due hereunder shall be by check payable to Cincinnati Mortgage Corporation, 2368 Victory Parkway, Suite #210, Cincinnati, Ohio 45206.

Except as hereinafter provided, there shall be no payments made hereunder, other than regularly scheduled payments of principal hereunder, to reduce the principal amount of the debt evidenced hereby in whole or in part prior to October 31, 1999.

-1-

EXHIBIT
A

On or after October 31, 1999, provided that there is no default under this Note or the Mortgage, privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due, on the last day of any month prior to maturity upon at least thirty (30) days' prior written notice to the Holder.

Notwithstanding any prepayment prohibitions imposed and/or penalties required by this Note with respect to prepayments made prior to October 31, 1999 the indebtedness may be prepaid in part or in full without the consent of the Holder and without a prepayment penalty if the Secretary of Housing and Urban Development (the "Secretary") determines in writing that prepayment will avoid a mortgage coinsurance claim and is therefore in the best interest of the United States Government, which determination shall be made by the Secretary only if:

> (a) the Mortgagor has defaulted in the payments due under this Note and the Secretary has received notice of such default, as required by 24 CFR Section 251.810;

> (b) the Secretary determines that the Project has been experiencing a net income deficiency which has not been caused solely by management inadequacy or lack of owner interest, and which is of such a magnitude that the Mortgagor is currently unable to make required debt service payments, pay all Project operating expenses and fund all reserves required by the Secretary;

> (c) the Secretary determines that there is a reasonable likelihood that the Mortgagor can arrange to refinance this Note at a lower interest rate or otherwise reduce the debt service payments due hereunder through partial prepayment; and

> (d) the Secretary determines that refinancing this Note at a lower rate or partial prepayment is necessary to restore the Project to a financially viable condition and to avoid a coinsurance claim.

All payments to reduce the principal balance hereunder (including all penalty or penalties required pursuant hereto), other than regularly scheduled payments of principal, must be made to the Holder hereof in Federal Funds.

In the event of any partial prepayment of this Note for any reason, including but not limited to a pre-payment as a result of (i) an award in condemnation, (ii) an insurance payment on the property subject to the Mortgage, (iii) the imposition of any requirement of the Secretary, or (iv) any voluntary prepayment,

-2-

the Holder shall have the right, in its sole discretion, to apply such prepayment to the payments last due hereunder or to recast the remaining principal payments hereunder so that the required monthly payments of principal and interest shall be in equal amounts sufficient to pay the remaining principal balance of this Note over the then remaining term hereof.

In the event any installment or part of any installment due hereunder becomes delinquent for more than fifteen (15) days, there shall be due at the option of the Holder, in addition to other sums then due hereunder, a sum equal to four percent (4%) of the amount of principal and interest so delinquent for each month, or portion thereof, that such amount remains unpaid as liquidated damage for losses due to cash flow disruption and accounting and other expenses incident to handling such delinquent payment. Whenever, under the laws of the State of Florida, the amount of any such late penalty is considered to be additional interest, this provision shall not be used to the extent that the rate of interest specified is in excess of the maximum rate of interest permitted and would constitute usury.

This Note is secured by a Mortgage, Assignment of Rents and Security Agreement (the "Mortgage") of even date herewith made by the Mortgagor, upon certain property and premises situate and lying in Broward County, Florida, and being more particularly described in said Mortgage. The terms, covenants, conditions, provisions, stipulations and agreements contained in the Mortgage are hereby made a part hereof to the same extent and with the same effect as if fully set forth herein; and without limiting the foregoing, reference is hereby made to the Mortgage for a description of the property conveyed thereunder, definition of certain terms, the nature and extent of the security and the rights of the Holder in respect of such security. It is expressly agreed that upon the occurrence of any default under this Note or Event of Default under the Mortgage, the whole principal sum hereof or so much thereof as shall remain unpaid, with interest thereon, together with all other sums secured under the Mortgage shall at the option of the Holder hereof, become immediately due and payable. Any capitalized term used herein, but not herein defined, shall have the meaning set forth in the Mortgage.

Mortgagor further agrees to pay to the order of the Holder immediately on demand any advancements and/or expenditures made by such Holder in accordance with the Mortgage including, without limitation, those for the payment of taxes, special assessments, insurance penalties, mortgage insurance penalties, lender's penalties, and costs of maintenance and preservation of property mortgaged or pledged in connection with the loan evidenced by this Note. At the option of Holder, without notice or demand (which notice and demand are expressly waived by Mortgagor), all or any part of the advancements and/or expenditures described in this paragraph may be added to the unpaid principal balance

hereof and become a part of and on a parity with the principal indebtedness secured by the Mortgage, and all other instruments executed in connection herewith, and the same shall accrue interest, until paid, at the highest rate permitted to be penaltied on delinquent installments of principal and interest under this Note.

Each payment shall be applied:  first, to the payment of such additional advancements and expenditures as Holder may make in accordance with the terms of the Mortgage including, without limitation, advancements for taxes, mortgage coinsurance penalty, insurance and the like; second, to the payment of accrued but unpaid interest; and third, to the payment of principal.  Late penalties will not be deducted from any monthly mortgage payment but will be separately penaltied to and collected from the Mortgagor.

If default be made in the payment of any installment under this Note (or any other amount due under the Mortgage) and if such default is not made good prior to the due date of the next such installment, or if any other Event of Default should occur, then, in addition to any other action permitted to be taken by the Holder hereunder or under the Mortgage or any other Loan Documents, the entire principal sum hereof and accrued interest hereon shall at once become due and payable without notice, at the option of the Holder, and the Holder shall have the remedies of a secured party under the laws of the State of Florida with respect to all property mortgaged or pledged as security for this Note and all of the rights and remedies available under the Mortgage or any other Loan Documents.  When this Note becomes due, by acceleration or otherwise, the Holder may, at its option, demand, sue for, collect, or make any compromise or settlement it deems desirable with reference to property held as security herefor.  The Holder shall not be bound to take any steps necessary to preserve any rights in the property held as security herefor against prior parties, which the Mortgagor hereby assumes to do.  The failure to exercise any option to declare the maturity of the principal debt or to exercise any other rights under any of the covenants or conditions contained in the Loan Documents, shall not be taken or deemed to be a waiver of the right to exercise such option or to declare such maturity after such past or any subsequent violation of any such covenants or conditions.  All remedies provided for herein upon any default by the Mortgagor shall be cumulative and not exclusive.

In the event of default in the payment of this Note, and if the same is collected by an attorney at law, the undersigned hereby agree(s)' to pay all costs of collection, including reasonable attorneys fees.

Mortgagor and Holder intend that this Note shall be in compliance with all applicable laws and shall be enforceable in

-4-

accordance with its terms.  If any provision of this Note shall be illegal or unenforceable, such provision shall be deemed cancelled to the extent of such illegality or enforceability, but the remaining provisions shall not be affected thereby.

All agreements herein are expressly limited so that in no event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forebearance or detention of the money to be advanced hereunder exceed the highest lawful rate permissible under applicable law.  If, due to any circumstances whatsoever, fulfillment of any provision hereof, or of any of the Loan Documents, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction deems applicable hereto, then ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if under any circumstances the Holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest.

At the option of Holder, if a court of competent jurisdiction determines that any amounts otherwise to be paid hereunder exceed the highest permissible lawful rate or if Mortgagor or any guarantor asserts the amounts otherwise to be paid hereunder exceed the highest permissible lawful rate, then Holder shall have the right to accelerate the maturity of the entire unpaid principal balance and accrued interest due under this Note, immediately upon notice to the Mortgagor.

Funds representing the proceeds of the indebtedness evidenced hereby and disbursed for any purpose permitted hereunder by the Holder by mail, wire transfer or other delivery to Mortgagor, to escrows or in any way for the benefit of Mortgagor, for any purpose, shall be deemed outstanding hereunder and to have been received by Mortgagor as of the date of such mailing, wire transfer or other delivery, and interest shall accrue and be payable upon such funds from and after the date of such wire transfer, mailing or delivery and until repaid, notwithstanding the fact that such funds may not at any time have been remitted from such escrows to Mortgagor or for its benefit.  Funds paid hereunder by or on behalf of Mortgagor shall be deemed received by the Holder on the next business day if not received by 2:00 p.m. local time at the location where payments hereunder are to be made.

Each maker and endorser jointly and severally hereby consents to any extensions or renewals of this Note or any part thereof without notice, and each maker and endorser agrees that he/she/it will remain liable as such during any extension or renewal hereof until the debt represented hereby is paid in full.

All parties to this Note, whether principal, surety, guar-
antor or endorser, hereby waive all applicable exemption rights
(whether under the State Constitution, Homestead laws, or other-
wise), valuation, appraisement, presentment for payment, demand,
protest, notice of protest and notice of dishonor.

As used herein, the term "Holder" means the payee of this
Note, so long as it shall own the same, and such other person or
entity to whom the Note shall have been endorsed, transferred,
pledged and by whom, as the lawful holder thereof, the Note is
then held, subject, however, to the terms of any agreement for
any such transfer or pledge.

This Note and the Mortgage are made and delivered in and
shall be construed in accordance with the laws of the State of
Florida.

The covenants set forth in this Mortgage Note shall not be
deemed as varying the terms or conditions of the contract of
mortgage coinsurance between the Secretary and Cincinnati Mort-
gage Corporation.

Mortgagor and the partners thereof assume no personal lia-
bility for the payment hereof, except as set out in the Mortgage.

This Amended and Restated Renewal Mortgage Note amends,
restates and renews in its entirety, and shall be in substitution
of, but does not enlarge the face principal amount of, that
certain Mortgage Note from Mortgagor to the Florida Housing
Finance Agency ("FHFA") dated October ___, 1989, which Mortgage
Note was assigned by FHFA to Citizens and Southern Trust Company
(Florida), National Association (the "Trustee") by an Assignment
of Mortgage Note and Mortgage and Security Agreement dated
October 4, 1989 and recorded October 5, 1989 as Clerk's File
No. 89399809 in the Public Records of Broward County, Florida,
and which Mortgage Note was further assigned by the Trustee to
Cincinnati Mortgage Corporation by an Assignment of Mortgage Note
and Mortgage and Security Agreement dated October 4, 1989 and
recorded October 5, 1989, as Clerk's File No. 89399810 in the
Public Records of Broward County, Florida.

IN WITNESS WHEREOF, the Mortgagor has caused this Note to be executed by its duly authorized general partner as of the day and year first above written.

WITNESS/ATTEST:

OAKLAND LAKES, LTD., a
Florida limited partnership

By: _____
    William O. Brisben,
    General Partner

THIS IS TO CERTIFY that this is the Note described in and secured by the Mortgage of even date herewith and in the same principal amount as herein stated and secured by real estate situated in the City of Oakland Park, County of Broward, State of Florida.

Dated:  October  **5**, 1989

_____
Notary Public                           (Munch)

22450-74-S

JENNIFER L MUNCH
Notary Public, State of Ohio
My Commission Expires March 2 1994

**-7-**

1.2                                                          9/28/89

After Recordation, please forward this document to:

Charles C. Bissinger, Jr., Esq.
Strauss & Troy
2100 Central Trust Center
201 East Fifth Street
Cincinnati, Ohio 45202-4186

89299812

---

AMENDED AND RESTATED RENEWAL

MORTGAGE, ASSIGNMENT OF RENTS
AND
SECURITY AGREEMENT

BY AND BETWEEN

OAKLAND LAKES, LTD.

AND

CINCINNATI MORTGAGE CORPORATION

Section 221(d)(4) pursuant to Section 244 of
the National Housing Act as amended

October _5_, 1989

---

        This Amended and Restated Renewal Mortgage, Assignment of
Rents and Security Agreement amends, restates and renews in its
entirety, and shall be in substitution of, that certain Mortgage
and Security Agreement from Mortgagor to the Florida Housing
Finance Agency ("FHFA") dated October _1_, 1989 and recorded
October _5_, 1989 as Clerk's File No. 89-309803 in the Public
Records of Broward County, Florida, which Mortgage and Security
Agreement was assigned by FHFA to Citizens and Southern Trust
Company (Florida), National Association (the "Trustee") by
Assignment of Mortgage Note and Mortgage and Security Agreement
dated October _4_, 1989 and recorded October _5_, 1989 as Clerk's
File No. 89-309809 in the Public Records of Broward County,
Florida, and which Mortgage and Security Agreement was further
assigned by the Trustee to Cincinnati Mortgage Corporation by
Assignment of Mortgage Note and Mortgage and Security Agreement
dated October _4_, 1989 and recorded October _5_, 1989 as Clerk's
File No.89309810in the Public Records of Broward County, Florida.

THIS INSTRUMENT PREPARED BY:
CHARLES C. BISSINGER JR., ESQ.
STRAUSS & TROY, CO., L.P.A.
2100 CENTRAL TRUST CENTER
201 EAST FIFTH STREET

RETURN TO:
PATRICK NEWTON
ATKINSON, JENNE,
STONE & COHEN, P.A.
P.S. DRAWER 2096

WILL CALL



EXHIBIT
B

### AMENDED AND RESTATED RENEWAL MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

THIS AMENDED AND RESTATED RENEWAL MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT, (the "Mortgage") is made and entered into as of the ___5___ day of October, 1989 and between Oakland Lakes, Ltd., a limited partnership organized and existing under the laws of the State of Florida and having its principal place of business at 4750 Ashwood Drive, Suite 300, Cincinnati, Ohio 45241 (the "Mortgagor"), and CINCINNATI MORTGAGE CORPORATION, a corporation organized and existing under the laws of the State of Ohio and having its principal place of business at 2368 Victory Parkway, Suite 210, Cincinnati, Ohio 45206 and any successors thereof as the holder or holders of the Note, as hereinafter defined ("Mortgagee").

### R E C I T A L S

WHEREAS, the Mortgagor is indebted to the Mortgagee, in the sum of Twenty Two Million Seven Hundred Seventy Nine Thousand Six Hundred and no/100 Dollars ($22,779,600.00), (the "Mortgage Loan"), with interest thereon from the date hereof at the rate of eight and one-quarter percent (8.25%) per annum on the unpaid balance until paid; as evidenced by a Mortgage Note of even date herewith which matures on December 1, 2031, and all extensions thereof, however evidenced (the "Note"); and

WHEREAS, Mortgagee has obtained two Commitments to Guarantee Mortgage Backed Securities from the Government National Mortgage Association ("GNMA") based upon the Mortgage Loan and the pledge of this Mortgage as required by GNMA (the "GNMA Commitments"), one of which relates to construction loan certificates ("CLC's") and the other of which relates to permanent loan certificates ("PLC's"); and

WHEREAS, Mortgagee intends to issue and present to GNMA for its guarantee "fully modified pass through" mortgage-backed CLC's and PLC's guaranteed as to timely payment of principal and interest by GNMA (the "GNMA Securities"); and

WHEREAS, the Mortgage Loan is made to provide for the construction of certain premises and consisting of a 376-unit apartment project located in the State of Florida (the "State"), including related parking and other ancillary facilities (the "Project"), pursuant to an agreement between Mortgagee and Mortgagor dated January 13, 1989, and including any amendments thereto (the "Coinsured Loan Commitment"); and

-1-

WHEREAS, this Mortgage shall be a valid first lien on the real and personal property comprising the Project; and

WHEREAS, the advances of the Mortgage Loan proceeds made, and to be made, to Mortgagor, shall be coinsured by Mortgagee and the Secretary of Housing and Urban Development of Washington, D.C. ("HUD") under Section 221(d)(4) and pursuant to Section 244 of the National Housing Act, as amended (the "Housing Act"), and the regulations thereunder (the "Coinsurance Regulations"), such coinsurance being evidenced by HUD's endorsement of the Note; and

WHEREAS, all things necessary to make the Note a valid, binding and legal obligation of the Mortgagor, and to make this Mortgage a valid, binding and legal instrument for the security of the Note and the performance of Mortgagor's obligations thereunder and hereunder, have been duly performed.

NOW, THEREFORE, THIS MORTGAGE WITNESSETH:

That, for good and valuable consideration, including the indebtedness herein recited, the receipt of which is hereby acknowledged, Mortgagor has granted and conveyed, and does hereby grant, convey, and warrant unto Mortgagee, its successors and assigns forever, for the benefit and security of the Mortgagee, its successors and assigns, in order to secure performance of its obligations under the Note, this Mortgage and the other Loan Documents, all of that certain real estate situated in the County of Broward and State of Florida and more particularly described in Exhibit A, attached hereto incorporated herein and made a part hereof (the "Real Estate"); being the same property conveyed to Mortgagor by deeds recorded in Official Records Book 16203 , Pages 517 & , of the Public Records of Broward County, Florida.
 & 519, 521, 567, 571 & 575, respectively,
TOGETHER WITH all of the collateral described in Exhibit B, attached hereto incorporated herein and made a part hereof;

AND TOGETHER WITH all easements, rights-of-way and rights used in connection therewith or as a means of access thereto, and all tenements, hereditaments and appurtenances thereof and thereto, all water rights and all right, title and interest of Mortgagor, now owned or hereafter acquired, in and to any land lying within the right-of-way of any street, open or proposed, adjoining said land, and any and all sidewalks, alleys, strips and gores of land adjacent to or used in connection with the said land and the improvements thereon;

AND TOGETHER WITH all of the rents, issues and profits and insurance or condemnation proceeds which may arise or be had from any of the foregoing, and all articles of personal property now or hereafter attached to or used in and about the building or buildings now erected or hereafter to be erected on said land which are necessary to the complete and comfortable use and

-2-

occupancy of such building or buildings for the purposes for which they were or are to be erected, including all goods and chattels and personal property as are ever used or furnished in operating a building or the activities conducted therein, similar to the one(s) herein described and referred to, and all renewals or replacements thereof or articles in substitution therefor, whether or not the same are, or shall be attached to said building or buildings in any manner except property belonging to the tenants (Mortgagor agrees that, to the extent permitted by law, the foregoing property shall be deemed to be real estate and affixed to the realty);

AND TOGETHER WITH all right, title and interest of Mortgagor in and to all leases or subleases covering the Project or any portion thereof now or hereafter existing or entered into, any and all right, title and interest of Mortgagor thereunder, including, and without limitation, all cash and, subject to the rights of tenants therein, all security deposits, advance deposits, advance rentals and deposits or payments of similar nature;

TO HAVE AND TO HOLD the above granted Property as described in the aforesaid granting clauses unto and to the use and benefit of Mortgagee, its successors and assigns, forever, for the uses and purposes hereinafter set forth.

AND THIS MORTGAGE FURTHER WITNESSETH, that to protect the security of this Mortgage, Mortgagor, for itself, its successors and assigns, has covenanted and agreed and does hereby covenant and agree with Mortgagee, and its successors and assigns, as follows.

## ARTICLE I

### DEFINITIONS

Section 1.01. **Defined Terms.** Capitalized terms defined in the recitals hereto shall have the meanings specified therein, certain capitalized terms not defined herein shall have the meanings specified in the Building Loan Agreement, and the following capitalized terms shall have the following meanings:

"Building Loan Agreement" means the Building Loan Agreement of even date herewith between Mortgagor and Mortgagee with respect to the Project.

"Coinsurance Contract" means the agreement between Mortgagee and HUD of coinsurance for the Mortgage Loan under Section 221(d)(4) pursuant to Section 244 of the National Housing Act and the Coinsurance Regulations, created by HUD's endorsement of the Note.

-3-

"Event of Default" is defined in Section 6.01.

"HUD Regulatory Agreement" means the agreement entitled Regulatory Agreement for Multifamily Housing Projects Coinsured by HUD of even date herewith, between Mortgagee and Mortgagor with respect to the operation of the Project.

"Indebtedness Hereby Secured" means, as of any particular time, the then unpaid balance of the principal sum of the Note together with interest thereon, all other payments due under the Note and/or hereunder and such additional unrepaid sums as shall have been paid or advanced by or on behalf of Mortgagee, on behalf of Mortgagor, pursuant to the Note, the Building Loan Agreement or hereunder, or which shall otherwise be payable by Mortgagor to Mortgagee, with interest thereon, all as herein and in the Loan Documents provided, as well as all documentary and intangible taxes on the Note and Mortgage as may be imposed by State law, which taxes Mortgagor covenants and agrees to pay.

"Loan Documents" means this Mortgage, the Note, the Coinsured Loan Commitment, the HUD Regulatory Agreement, the Building Loan Agreement, and any other instrument given to evidence or further secure the payment or performance of any obligations secured under this Mortgage.

"Mortgagee" means Cincinnati Mortgage Corporation, as payee of the Note as long as it shall own the same, and such other person, firm or corporation to whom the Note shall have been endorsed, pledged, transferred or assigned and by whom, as the lawful holder thereof, the Note is then held, subject, however, to the terms of any agreement for any such pledge, transfer or assignment and provided that HUD is under no obligation to recognize any entity as the beneficiary of the Coinsurance Contract unless it is an approved coinsured lender pursuant to applicable regulations.

"Property" means and shall include the Real Estate, all property of the Mortgagor as is described in the granting clauses hereof, all of the property set forth on Exhibit B and any and all other property which is or becomes subject to the lien of this Mortgage or any security interest created pursuant to the provisions of this Mortgage.

## ARTICLE II

## MORTGAGOR'S REPRESENTATIONS AND WARRANTIES

Section 2.01 Due Authorization, Etc.  Mortgagor represents and warrants that it has duly authorized, executed and delivered the Note and has duly authorized, executed, acknowledged and delivered the other Loan Documents to secure the repayment of the

-4-

Indebtedness Hereby Secured, and to secure the performance of the covenants, agreements and conditions contained therein and here-in.

Section 2.02 <u>Validity of Loan Documents</u>. Mortgagor represents and warrants that all things necessary to make the Loan Documents valid, binding and legal obligations of Mortgagor for the security of the Indebtedness Hereby Secured, in accordance with their respective terms, have been duly performed.

ARTICLE III

PAYMENT BY MORTGAGOR

Section 3.01 <u>Covenant to Pay</u>. Mortgagor hereby expressly covenants, promises and agrees that it will duly and punctually pay the Indebtedness Hereby Secured at the times and in the manner herein or in the Note or in the other Loan Documents provided, according to the true intent and meaning hereof and thereof, time being of the essence for such payments. Any remittance by check or draft shall be made subject to the condition that such check or draft may be handled for collection in accordance with the practice of the collecting bank or banks, and any receipt issued therefor shall be ineffective until the amount due is actually received by the Mortgagee.

Section 3.02 <u>Limitation on Liability</u>. The covenant of the Mortgagor to pay principal and interest is included in the Note secured hereby for the purpose of establishing and continuing the existence of the indebtedness. However, it is a condition of said covenant and those contained herein that in the event of a default under the terms hereof, the Mortgagee shall take no action against the Mortgagor, or its partners, except such as may be necessary to subject to the satisfaction of the Indebtedness Hereby Secured, the Property described herein and any chattels appurtenant to the use thereof, provided, that nothing in this covenant and no action so taken shall operate to impair any obligation of the Mortgagor under the Building Loan Agreement and/or the HUD Regulatory Agreement herein referred to and made a part hereof (including, with respect thereto, the rights of HUD) or to deprive the Mortgagee of any rights it may have by law which are not expressly waived. This Section shall not be deemed to limit the remedies of the Mortgagee, its successors or assigns, in law or in equity, pursuant to this Mortgage, provided that the exercise of any such remedies, including the obtaining of any judgments or decrees at law or in equity or other orders shall not impose any personal liability on Mortgagor or any partner of Mortgagor.

-5-

The provisions of this Section shall not be deemed to limit claims by Mortgagee or HUD for the following:

(a) Misapplication of insurance or condemnation proceeds;

(b) Misapplication of Mortgage Loan proceeds;

(c) Improper application of tenant security deposits or pre-paid rents;

(d) Failure, prior to Mortgagor's default hereunder, to properly apply rents and other revenue of the Property actually collected by Mortgagor to necessary and proper expenses of the Property, including the Indebtedness Hereby Secured or failure, after Mortgagor's default hereunder, to properly apply rents and other revenue of the Property actually collected by the Mortgagor (i) to necessary and proper expenses of the Property or (ii) to reduce the Indebtedness Hereby Secured by applying such amounts first to costs permitted to be paid from Project revenues by this Mortgage and by HUD regulations, then to unpaid interest due and finally to the principal balance outstanding on the Note or other Indebtedness Hereby Secured; and

(e) Failure to pay valid mechanic's and/or materialmen's liens filed against the Property prior to Mortgagor's default under the Indebtedness Hereby Secured or filed after Mortgagor's default under the Indebtedness Hereby Secured to the extent the claim set forth in such lien relates to labor performed or materials supplied prior to the date of Mortgagor's default under the Indebtedness Hereby Secured.

## ARTICLE IV

### PARTICULAR COVENANTS



Section 4.01 Title to Property and Authority to Convey. Mortgagor covenants that, at the time of the execution, delivery and recording of this Mortgage, it is the absolute and lawful owner of the legal and beneficial title to, and is lawfully seized and possessed of, and has good title to all of the Property, and it has good right and lawful authority to bargain, sell, grant and convey the same as provided in this Mortgage, in fee simple as to all real property described in Exhibit A, and that said Property is free and clear of all encumbrances except for those encumbrances approved by Mortgagee as specified in Exhibit C attached hereto and made a part hereof. Mortgagor hereby covenants, agrees and warrants that it will defend the

-6-



title of such property, and every part thereof, unto Mortgagee and its successors and assigns, against all claims and demands by any person or persons, and will execute such further assurances thereof as may be required by Mortgagee.

Section 4.02 Recordation and Filings. At any and all times, Mortgagor will promptly do, prepare, execute, acknowledge, deliver, file and record and will cause to be done, prepared, executed, acknowledged, delivered, filed and recorded all and every such actions, deeds, indentures, conveyances, transfers, assignments, instruments and financing statements under the Uniform Commercial Code and assurances in law as Mortgagor shall reasonably require for the better assuring, conveying, transferring, assigning and confirming unto Mortgagee all and singular the hereditaments and premises, estates and Property, real and personal, hereby granted, conveyed or transferred, or intended to be; and Mortgagor will bear all expenses, charges and taxes in connection therewith. Mortgagor shall promptly take all actions necessary to perfect and maintain the priority and validity of Mortgagee's interest in the Property as a first and paramount lien and charge against the rights, claims and interests of all other persons and parties. Upon failure by Mortgagor to do so, Mortgagee may make, execute, record, file, re-record or refile any such actions, deeds, indentures, conveyances, transfers, assignments, instruments and financing statements under the Uniform Commercial Code and assurances in law for and in the name of Mortgagor, and Mortgagor hereby appoints Mortgagee its agent and attorney-in-fact to do so, such appointment to stand irrevocable as being coupled with an interest.

Section 4.03 Use or Alteration of the Project. Mortgagor covenants that it will not permit or suffer the use of the Project, the Property or any portion thereof for any purpose other than for a multifamily apartment housing project (including the commercial and other ancillary uses permitted or approved in writing by Mortgagee), and as is further provided in the HUD Regulatory Agreement. Mortgagor covenants that it shall not without the prior written consent of Mortgagee remove any Property from the Real Estate unless such removal is of personal property in the ordinary course of business and the personal property so removed is simultaneously replaced with like property of equal or greater value. Mortgagor covenants that it shall not, without the prior written consent of Mortgagee, permit any material alterations of or additions to buildings or other improvements now existing or hereafter constructed with respect to the Project. For purposes of this Section any expenditure in excess of Fifty Thousand and No/100 Dollars ($50,000.00) shall be considered material.

Mortgagor covenants to comply with all present and future statutes, laws, ordinances and governmental rules, regulations and orders which are applicable to the Property.

-7-




**Section 4.04 HUD Regulatory Agreement.** Mortgagor agrees that the HUD Regulatory Agreement shall be recorded immediately following this instrument, and that it is incorporated in and hereby made a part of this Mortgage. Upon default under the HUD Regulatory Agreement, and with the prior written approval of HUD as long as the Coinsurance Contract is in effect, Mortgagee may declare such default to be an Event of Default under this Mortgage as provided in Article VI hereof and may proceed as provided in Article VI hereof.

**Section 4.05 Restriction on Transfer; Leases.** Anything herein to the contrary notwithstanding, Mortgagor shall not convey, sell, assign, lease, (except commercial space leases previously approved in writing by Mortgagee and leases for residential units in the ordinary course of business), transfer or otherwise dispose of, or obtain secondary financing on, the Property or any part thereof or any interest therein, whether voluntary or involuntary, by operation of law or otherwise, without the prior written consent of the Mortgagee and, if such approval is required under the Coinsurance Contract, the Secretary of HUD.

All commercial leases now existing or hereafter entered into shall be subordinate and subject to the lien of this Mortgage and Mortgagor shall require any and all tenants of commercial space to enter into a subordination and attornment agreement in a form satisfactory to Mortgagee. Mortgagee may at its option, permit the Mortgagor to include a non-disturbance provision in any such subordination and attornment agreement.

Whether in violation of the provisions of this section or pursuant to consent, if Mortgagor has demised, or shall hereafter demise, the Property or any part thereof by leases subordinate or junior either by the date thereof or by the express terms thereof to the lien of this Mortgage, any such lease shall be subject to the condition that in the event of any foreclosure sale or sales hereunder, by virtue of judicial proceedings or otherwise, such leases shall, at the option of the Mortgagee, continue in full force and effect and the tenants thereunder will, upon request, attorn to and acknowledge the foreclosure purchaser or purchasers at such sale as landlord thereunder. The Mortgagee may, at its option and in its sole discretion, require that any or all of the leases affecting the Property, other than leases for individual rental units, be made subject and subordinate to the lien of this Mortgage. In the absence of a recorded agreement expressly subordinating this Mortgage to any or all of such leases, said leases shall be deemed to be subordinate in all respects to this Mortgage.

**Section 4.06 Aggregate Monthly Payments.** In order more fully to protect the security of this Mortgage, Mortgagor, toget-

-8-



her with and in addition to the monthly payments of principal and interest (or interest only until the first payment to principal) under the terms of the Note, beginning with the first payment to principal under the Note and monthly thereafter until the Note is fully paid, will pay to Mortgagee the following sums:

(a)     So long as the Mortgage Loan is coinsured under the provisions of the Housing Act and the Coinsurance Regulations, an amount sufficient to accumulate in the hands of Mortgagee one month prior to the due date the annual mortgage co-insurance premium (including any lender's premium) payable to HUD and Mortgagee aggregating 0.75% per year calculated on the average daily principal balance of the Mortgage Loan scheduled to be outstanding during the year covered thereby (without taking into account delinquent payments or prepayments).

(b)     A sum equal to the ground rents, if any, next due, plus the premiums next due on all required insurance policies, plus sewer and water rates, taxes and special assessments next due on the Property (all as estimated by the Mortgagee), less all sums already paid therefor, divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, water rates, taxes and assessments will become delinquent, such sums to be held by Mortgagee in trust to pay said ground rents, premiums, sewer and water rates, taxes and special assessments.

(c)     All monthly payments required to be made under the HUD Regulatory Agreement to the reserve for replacements.

All payments mentioned in the three preceding clauses and all other payments to be made under the Note shall be added together and the aggregate amount shall be paid each month in a single payment to be applied by Mortgagee in the following order:

(i)     amounts payable under clause (a) above;

(ii)    amounts payable under clause (b) above;

(iii)   interest on the Note;

(iv)    amortization of the principal sum of the Note; and

(v)     amounts payable under clause (c) above.

The amounts paid to Mortgagee under clauses (a), (b) and (c) above (the "Funds") shall be held in one or more accounts with Mortgagee. Unless applicable law requires interest, earnings or

-9-

profits to be paid, Mortgagee shall not be required to pay Mort-
gagor any interest, earnings or profits on the Funds except that
Mortgagee, shall, upon Mortgagor's written request invest for
Mortgagor's benefit that portion of the Funds consisting of the
reserve for replacements in a manner consistent with applicable
HUD requirements.   Mortgagee shall give to Mortgagor, without
charge, an annual accounting of the Funds in Mortgagee's normal
format showing credits and debits to the Funds and the purpose
for which each debit to the Funds was made.

Section 4.07 **Treatment of Accumulations of Monthly Pay-
ments.**  Any excess funds paid by Mortgagor pursuant to Sections
4.06(a) and (b) remaining after payment of the items herein
provided on an annual basis, shall be credited to subsequent
monthly payments of the same nature; but if any such item shall
exceed the estimate therefor, Mortgagor shall without demand
forthwith make good the deficiency.   In the event the Indebted-
ness Hereby Secured is paid in full by Mortgagor in accordance
with the terms of the Note, accumulations under Section 4.06 not
required to meet obligations due for which the payments were
collected shall be refunded to Mortgagor.   If the Property is
sold through foreclosure or is acquired by Mortgagee after de-
fault, any then remaining balance of the accumulation under
Section 4.06 hereof shall be credited against the Indebtedness
Hereby Secured.

Section 4.08 **Payment of Impositions.**

(a)  Mortgagor will pay all ground rents, if any, taxes,
special assessments, sewer and water rates and other governmental
or municipal charges or impositions, to the extent provision
therefor has not been made by monthly payments as hereinabove
provided, before the same become delinquent or subject to inter-
est or penalties, and in default thereof Mortgagee may pay the
same without waiving or affecting its option to foreclose or any
other rights hereunder.   All such sums paid by Mortgagee, plus
any sums which Mortgagee has advanced to pay mortgage insurance
premiums or other insurance premiums not paid for by monthly
payment hereunder or otherwise paid by Mortgagor, shall be added
to the Indebtedness Hereby Secured, shall bear interest at the
Mortgage Loan rate specified in the Note from the date of the
advance and shall be due and payable to Mortgagee upon demand.
Nothing contained in this paragraph shall be construed as re-
quiring Mortgagee to advance or expend monies for any purposes
mentioned in this paragraph.

(b)  In the event of the passage after the date of this
Mortgage of any law deducting from the value of real property for
the purposes of taxation any lien thereon or changing in any way
the laws for the taxation of mortgages or debts secured by mort-
gage for federal, state or local purposes or the manner of the
collection of any such taxes, and imposing a tax, either directly

-10-

or indirectly, on this Mortgage, the Note or the debt which it secures, the Mortgagee shall have the right to declare the principal sum and the interest due on the date to be specified by not less than thirty (30) days' written notice to be given to Mortgagor by Mortgagee; provided, however, that such election shall be ineffective if Mortgagor is permitted by law to pay the whole of such tax in addition to all other payments required hereunder, and if Mortgagor, prior to such specified date, does pay such tax and agrees to pay any such tax when thereafter levied or assessed against the premises, and such agreement shall constitute a modification of this Mortgage. This Section 4.08(b) shall not be applicable so long as this Mortgage is coinsured by HUD.

Section 4.09 **Permitted Contests.** Mortgagor may in good faith contest, by proper legal proceedings, the validity or amount of any tax, special assessment or other charge or imposition which Mortgagor has agreed to pay pursuant to the provisions of Section 4.08 hereof and may delay payment or discharge thereof during the period in which the same is being contested; provided, however, that if payment is delayed: (i) such proceedings shall suspend the collection thereof from Mortgagor, Mortgagee, or either of them, and from the Property; (ii) in any such event, Mortgagor shall deposit with Mortgagee, as security for the payment or discharge of such contested item, an amount equal thereto plus interest, penalties and costs (to the extent such amount is not already in the hands of Mortgagee); and (iii) such contested item and all costs and penalties, if any, shall have been paid at least sixty (60) days before the date on which the Property, or any portion thereof, may be sold in order to satisfy any such contested item.

Section 4.10 **Insurance.** Mortgagor will at all times keep the Property insured against loss by fire and all of the other risks ordinarily covered by insurance of the type known as "fire and extended coverage" in such amounts, in such form and with such coverages and endorsements as may be required from time to time by Mortgagee. All such insurance shall be carried for such periods as may be required by Mortgagee, and shall be in an amount which will comply with the Coinsurance Regulations but if required by Mortgagee, as to losses other than loss of rental income, such insurance shall be in an amount which is not less than the greatest of (i) eighty percent (80%) of the actual cash value of the Property, (ii) the unpaid principal amount of the Mortgage Loan, and (iii) such amount as will avoid treatment of Mortgagor as a coinsurer with the issuer of the policy. Mortgagor will at all times keep and maintain public liability and property damage insurance covering injury and damage to persons and property with limits of not less than $1,000,000 per occurrence. Mortgagee reserves the right to increase said limits should sound business practice so dictate. Mortgagor shall also maintain, at any and all times required by Mortgagee, rental interruption insurance in such amount as may be required from

-11-

time to time by Mortgagee.  Mortgagor shall also maintain, at any and all times required by Mortgagee, broad form builders' risk insurance with respect to the Property and the construction and reconstruction of any improvements thereto.  All such policies as aforesaid shall be in standard form and endorsed with standard mortgagee clauses with loss payable to Mortgagee, the Secretary of HUD and such other parties as may be designated by Mortgagee, as their interests may appear, and shall contain a clause providing, that the policy may not be cancelled or modified without thirty (30) days' prior written notice to Mortgagee.  Mortgagor shall deliver all such policies evidencing the insurance required hereunder to Mortgagee, and will likewise deliver renewals of such policies not less than thirty (30) days in advance of the expiration of same, stamped "paid" by the issuer thereof.  The carriers providing the insurance shall be chosen by Mortgagor subject to approval by Mortgagee provided that such approval shall not be unreasonably withheld.

Mortgagor shall at all times comply (and cause its agents, contractors and subcontractors to comply) with all applicable worker's compensation insurance requirements.

Section 4.11 *Maintenance and Repairs*.  Mortgagor shall keep the Property in good condition and repair, and will not permit or suffer any waste of the Property.  Mortgagor will, at its sole cost and expense, promptly and in a good workmanlike manner make all needful and proper renewals, replacements and repairs to the property, including alterations and repairs as may be required by laws, ordinances and regulations necessary to insure that the value of the Property as security shall not be impaired.

In the event the Property suffers an uninsured loss, Mortgagor if required to do so by Mortgagee, shall use its own funds to repair and restore the Property.  If, in any such event, Mortgagor fails to make such repairs or restoration, Mortgagee may advance sums necessary to complete such repair and restoration.  Any such advance by Mortgagee shall become part of the Indebtedness Hereby Secured, shall bear interest at the Mortgage Loan rate specified in the Note from the date of the advance, and shall be due and payable to Mortgagee upon demand.

Section 4.12 *Indemnification by Mortgagor*.  Subject to the provisions of Section 3.02 hereof, Mortgagor will protect, indemnify and save harmless Mortgagee and the Secretary of HUD (the party being indemnified is sometimes called the "indemnitee") from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including, without limitation, attorneys' fees and expenses at or prior to trial and on appeal) imposed upon or incurred by or asserted against any such indemnitee by reason of (i) any accident, injury to or death of persons or loss of or damage to property occurring on or about the Property or the adjoining sidewalks, curbs,

-12-

streets, or ways; (ii) any use, nonuse or condition of any of the Property or the adjoining sidewalks, curbs, streets or ways; (iii) any failure on the part of Mortgagor to perform or comply with any of the terms of this Mortgage or the Building Loan Agreement; or (iv) performance of any labor or services or the furnishing of any materials or other property in respect of any portion of the Property or the use thereof. In case any action, suit or proceeding is brought against any such indemnitee by reason of any such occurrence, Mortgagor, upon the request of any such indemnitee, will at Mortgagor's expense resist and defend such action, suit or proceeding or will cause the same to be resisted or defended by counsel designated by the Mortgagee and reasonably acceptable to the indemnitee, provided that such approval shall not be required in the case of defense by counsel designated by any insurance company undertaking such defense pursuant to any applicable policy of insurance. Any amounts payable to Mortgagee by reason of the application of this paragraph shall become immediately due and payable, shall be secured by the Property as if part of the Indebtedness Hereby Secured, and shall bear interest at the Mortgage Loan rate specified in the Note from the date loss or damage is sustained by Mortgagee until paid. This obligation of Mortgagor shall survive any termination or satisfaction of this Mortgage.

Section 4.13 Operation of the Property to be Sole Activity of Mortgagor. So long as any of the Indebtedness Hereby Secured remains outstanding, Mortgagor shall not engage in any business or activity other than, or in addition to, the ownership, operation and management of the Property. This Section shall not apply to the general or limited partners of Mortgagor.

Section 4.14 Permitted Liens. Mortgagor will not create or permit a lien to exist against the Property inferior or superior to the lien of this Mortgage, other than liens for real estate taxes and assessments not yet due and payable, and inferior liens for which the prior written consent of Mortgagee has been obtained in accordance with the Coinsurance Regulations.

Section 4.15 Assignment of Rents and Leases and Profits.

(a) To further secure the obligations of Mortgagor under the Note and this Mortgage, as collateral security therefor, Mortgagor hereby irrevocably assigns to Mortgagee all the rents, profits, issue and income of the Property, and any and all leases and/or subleases (together the "Leases") thereof, which are in force on the date hereof, or which may be hereafter entered into, as further security for the Indebtedness Hereby Secured, and the Mortgagor shall not further assign nor encumber the rents of the Property, or any part thereof, without the prior written consent of the Mortgagee. Mortgagee shall not be obligated to perform or discharge any obligation or duty to be performed or discharged by Mortgagor under any of said Leases, and this assignment shall not



-13-



place any responsibility upon Mortgagee for the control, care, management, or repair of the Property or make the Mortgagee derivatively responsible or liable for any negligence in the management, operation, upkeep, repair, or control of the Property, whenever occurring. At the option of the Mortgagee, this assignment shall become effective immediately upon the occurrence of an Event of Default hereunder. Provided, however, that all such rents, and all rents, profits and payments due Mortgagor under such Leases shall be payable to Mortgagor and be its sole property until such time as an Event of Default as hereafter described shall occur, provided, further, that no rent more than one month in advance plus a security deposit shall be collected or accepted without the prior written consent of Mortgagee, and no rent shall be collected or accepted in violation of any law, ordinance, rule, regulation or order. Mortgagor agrees that said assignment of rents and leases is an essential consideration for the making of the Mortgage Loan by Mortgagee. Mortgagor agrees that it will faithfully perform and comply with all terms, conditions and covenants of any Lease covering any part of the Property. Upon Mortgagee's request from time to time, Mortgagor shall furnish Mortgagee a statement, in affidavit form and in such reasonable detail as Mortgagee may require, of all Leases on the Property and the status thereof and, on demand, to furnish Mortgagee executed counterparts of any and all such Leases.

(b)  Upon the occurrence of any Event of Default, Mortgagee may at its option at any time thereafter: (i) proceed to enter upon, take possession of, and manage and operate the Property under the foregoing assignment without becoming a mortgagee in possession; (ii) proceed to perform any or all obligations of the Mortgagor under the Leases, and exercise the rights of the Mortgagor contained therein as fully as the Mortgagor itself could, without regard to the adequacy of security for the indebtedness hereby secured and with or without bringing any legal action or causing any receiver to be appointed by any court; (iii) let or re-let the Property or any part thereof and enforce, modify, cancel or accept the surrender of any of the Leases; (iv) evict lessees pursuant to appropriate legal proceedings; (v) bring or defend any suits in connection with the possession of the Property or any part thereof, in the name of the Mortgagor and/or Mortgagee; (vi) make such repairs as the Mortgagee may reasonably deem appropriate; (vii) pay out of rents, income, profits, reserves, escrows and/or security deposits (or from other sources of funds) any liens, taxes, assessments, insurance premiums, management fees, utility charges, costs of keeping the Property in good condition and repair and/or any other fees, expenses, premiums, costs or charges which Mortgagee deems to be necessary or appropriate in connection with the Note, Mortgage, Leases, the Property and/or the operation of the Property; (viii) fix or modify rent; (ix) in the name of either the Mortgagor and/or the Mortgagee sue for or otherwise collect and receive all rents, issues and profits, including those past due and unpaid, and

-14-

apply the same first against all costs and expenses of the operation of the Property, of the performance of the Mortgagor's obligations under the Leases and of such collection, including reasonable attorneys' fees, and any amounts remaining after such application will be applied next to accrued and unpaid interest and the remainder thereof, if any, to the payment of principal of the Indebtedness Hereby Secured; (x) without regard to the adequacy of security for the Indebtedness Hereby Secured, have a receiver appointed to manage and collect income and rents from the Property; (xi) cancel or terminate any or all of the Leases; and (xi i) do all other things the Mortgagee may deem necessary or proper to protect its security. Entry upon and taking possession of the Property and the collection of the rents and the application thereof will not operate to cure or waive any default under any instrument given by the Mortgagor to the Mortgagee or prohibit the taking of any other action by the Mortgagee under any such other instrument, or at law or in equity to enforce the payment of the Indebtedness Hereby Secured or to realize on any other security or guarantee.  The existence and/or exercise of the rights of Mortgagee set forth in this Section 4.15 shall not create any obligations on the part of the Mortgagee other than for Mortgagee's gross negligence or willful misconduct.

(c)  Mortgagee may give notice of the foregoing assignment at any time to any of the lessees.  Lessees may rely on any notice given them by Mortgagee pursuant to the foregoing assignment and Mortgagor agrees to hold harmless any lessee with respect to any payment made or action taken in reliance on any such notice.

Section 4.16  **Books and Records; Financial Statements.** Mortgagor hereby agrees that Mortgagee shall have the right to inspect the books and records of the operation of the Property and make copies thereof at all reasonable times and upon reasonable notice to Mortgagor. Mortgagor shall furnish to Mortgagee, within ninety (90) days after the end of each fiscal year of Mortgagor, a balance sheet, statement of income and expenses of the Property and a statement of changes in financial position, all prepared in accordance with generally accepted accounting principals consistently applied, and which shall be certified by the chief financial officer of Mortgagor. Such financial statements shall set forth, in reasonable detail, rents received and total operating expenses of the Property and shall be accompanied by a certificate executed by the chief financial officer of Mortgagor certifying that there exists no Event of Default under this Mortgage or any of the Loan Documents (and no circumstances which, with the passage of time, the giving of notice, or both, would constitute an Event of Default). Such financial statements shall be audited by an independent certified accountant.  In addition, Mortgagor shall promptly provide to Mortgagee such other financial statements and information with respect to the Property, Mortgagor and/or Project as Mortgagee may, from time to

-15-





time, request. All expenses in connection with financial state-
ments shall be borne by the Mortgagor.

Section 4.17 Zoning Changes. Mortgagor agrees not to parti-
cipate in any proceedings for, or acquiesce in, any change or
proposed change of, zoning laws or regulations governing the
Property, the creation of a subdivision of or cut-up involving
the Property, consolidation of the Property with any other prop-
erty, nor to subject the Property to any declaration of condo-
minium, "time-share" ownership or other provisions for subdivided
or common ownership, without the prior written consent and parti-
cipation of Mortgagee. Promptly after Mortgagor becomes aware
thereof, Mortgagor shall notify Mortgagee of any proposed change
in the zoning of the Property or any portion thereof.

Section 4.18 Coinsurance Regulations and Housing Act.
Mortgagor shall comply in a timely fashion with any and all
obligations of Mortgagor under the Coinsurance Regulations and
National Housing Act which are applicable to Mortgagor and/or the
Project.

## ARTICLE V

### CASUALTY AND CONDEMNATION; CERTAIN PREPAYMENTS

Section 5.01 Casualty. If the Property, or any part there-
of, shall be damaged by fire or other hazard against which insur-
ance is held, the amount paid by any insurance company pursuant
to the contract of insurance shall, to the extent of the In-
debtedness Hereby Secured then remaining unpaid, be paid to
Mortgagee, and at Mortgagee's election, may be applied to reduc-
tion of the Indebtedness Hereby Secured as set forth in Section
5.03 hereof or released for the repair or restoration of the
Property to substantially the same condition as existed before
the casualty. In the event of such loss or damage, all proceeds
of insurance shall be payable to Mortgagee, and Mortgagor hereby
authorizes and directs any affected insurance company to make
payment of such proceeds directly to Mortgagee. Mortgagee is
hereby authorized and empowered by Mortgagor to settle, adjust,
or compromise any claims for loss, damage, or destruction under
any policy or policies of insurance. All such amounts together
with amounts, if any, earned thereon pending the decisions wheth-
er to repair and restore are herein referred to as the "Insurance
Fund." Mortgagor will give immediate notice by mail to the
Mortgagee and the Secretary of Housing and Urban Development,
acting by and through the Federal Housing Commissioner, of any
fire damage or other casualty to the Property.

Section 5.02 Condemnation: Application of Proceeds. Mort-
gagor agrees that if the Property, or any part thereof, is con-
demned under any power of eminent domain or acquired for any



-16-



public use or quasi-public use, Mortgagor shall give prompt written notice thereof to Mortgagee, and the damages, proceeds, and consideration for such acquisition to the extent of the full amount of Indebtedness Hereby Secured remaining unpaid are hereby assigned by Mortgagor to Mortgagee and shall be paid forthwith to Mortgagee for the account of Mortgagor, to be applied by Mortgagee on account of the Indebtedness Hereby Secured as set forth in Section 5.03 hereof. Mortgagee shall be entitled, at its option, to appear in its own name in any action or proceeding relating to such condemnation and shall have the right to compromise or settle such proceeding subject to reasonable approval by the Mortgagor. In case of any partial condemnation, Mortgagee may in its sole discretion, elect to release a portion or all of the proceeds to Mortgagor for repairs and restoration of the Property. All such amounts together with amounts, if any, earned thereon pending the decision whether to repair and restore are herein referred to as the "Condemnation Fund."

Section 5.03 <u>Prepayment from Amounts in the Insurance or Condemnation Funds.</u> Within thirty (30) days after Mortgagee's receipt of any insurance or condemnation proceeds pursuant to Sections 5.01 and 5.02 as applicable Mortgagee shall give to Mortgagor notice of Mortgagee's election to apply the Insurance Fund or Condemnation Fund to either (i) reduction of the Indebtedness Hereby Secured or (ii) pay costs and expenses for the repair and restoration of the Property. Upon any election by Mortgagee to apply the insurance Fund or Condemnation Fund to a reduction of the Indebtedness Hereby Secured, Mortgagee shall give notice to Mortgagor that the Indebtedness Hereby Secured, or so much of the principal thereof as can be paid from the Insurance Fund or Condemnation Fund must be prepaid as hereinafter set forth. The amount of such fund shall be deemed to have been received on the date of such notice. The effective date of such prepayment (the "effective date"), in case of any such notice which has been given prior to the 25th day of any month, shall be the 16th day of the next following month, or in case of any such notice given on or after the 25th day of any month, the 16th day of the second following month. If the entire Indebtedness Hereby Secured shall be discharged from such insurance or condemnation proceeds, Mortgagee shall not be required to release the lien of this Mortgage from the Property until the date which is ninety-five (95) days after the effective date of such discharge of the Indebtedness Hereby Secured so as to protect the Mortgagee against any loss of security if such discharge of the Indebtedness Hereby Secured is subsequently rescinded by a trustee in bankruptcy with respect to the Mortgagor. On the applicable effective date, the Indebtedness Hereby Secured shall be deemed prepaid to the extent hereinafter provided. If, after giving effect to such prepayment, the entire amount of the Indebtedness Hereby Secured has not been discharged, the amount of the applicable fund shall be deemed to have been applied first to the accrued and unpaid interest on the amount prepaid through the

-17-



effective date, and then to the prepayment of the principal balance of the Mortgage Loan. In the event of any partial prepayment of the principal balance of the Mortgage Loan pursuant to the provisions of this section, an amount equal to (i) the amount of interest on the principal balance of the Mortgage Loan prepaid pursuant to the provisions of this section from the first day of the month in which the effective date occurs to the effective date, plus (ii) all interest actually earned by Mortgagee from investment of the Insurance Fund or Condemnation Fund, as applicable, from the date of the initial notice of the prepayment by Mortgagee to Mortgagor through the day immediately preceding the effective date, shall be credited to Mortgagor's next scheduled installment of principal and interest on the Mortgage Loan. Following any prepayment which discharges the entire amount of the Indebtedness Hereby Secured, Mortgagee shall refund to Mortgagor the amount referred to in clause (ii) of the immediately preceding sentence.

Section 5.04 <u>Due Diligence by Mortgagor to Complete Repairs or Restoration; Disbursement.</u> If, at Mortgagee's election, insurance or condemnation proceeds are released for repair or restoration of the Property, Mortgagor shall promptly commence and diligently prosecute the completion of such repairs or restoration. Such repairs shall be effected in accordance with all appropriate HUD requirements. Mortgagor if required to do so by Mortgagee, shall use its own funds to complete repair or restoration of the Property if insurance or condemnation proceeds, as applicable, are insufficient to accomplish same. If, in order to complete repair or restoration of the Property to the satisfaction of Mortgagee, it is necessary for Mortgagor to use its own funds, and Mortgagor fails to do so, Mortgagee may at its option and election advance sums necessary to complete such repair and restoration. Any such advance by Mortgagee shall become part of the Indebtedness Hereby Secured, shall bear interest at the Mortgage Loan rate specified in the Note from the date of the advance and shall be due and payable to Mortgagee upon demand.

Section 5.05 <u>Release of Amounts in the Insurance or Condemnation Funds.</u> If, at Mortgagee's election, insurance or condemnation proceeds are released for repair or restoration of the Property pursuant to this Article V, such proceeds shall be disbursed by the Mortgagee from time to time as work progresses, provided that prior to any disbursement, Mortgagee is in receipt of proof, satisfactory to it, that the work has been completed, and further provided that the Mortgagee is in receipt of proof, reasonably satisfactory to it, that there are no outstanding mechanics' liens or materialmen's liens and that all charged costs and expenses incurred with respect to work completed have been paid for in full. Mortgagor shall provide Mortgagee with such contractors' and subcontractors' affidavits and materialmen's certificates and such other evidences of payment as Mortgagee may require in connection with the disbursement of such

-18-



proceeds.  In addition, Mortgagee may, at Mortgagee's option,
condition disbursement of said proceeds, from time to time as
construction progresses, on Mortgagee's approval of plans and
specifications of an architect reasonably satisfactory to Mort-
gagee, contractor's cost estimates, architect's certificates,
title insurance policies and endorsements, and such other evi-
dence of costs, percentage of completion of construction, appli-
cation of payments, satisfaction of liens and evidence of title
as Mortgagee may require, and the provisions of the Building Loan
Agreement shall, to the extent deemed applicable by Mortgagee,
apply to such restoration.  Repair, restoration, or reconstruc-
tion of any portion(s) of the Property must be substantially
equal in size, quality and value to such portion(s) of the Prop-
erty immediately before the loss, damage, or condemnation.  Any
proceeds remaining after the completion of such repair, restora-
tion, or replacement may, at the option of the Mortgagee, be
applied by the Mortgagee as a partial prepayment under Section
5.03.



## ARTICLE VI

### EVENTS OF DEFAULT AND REMEDIES

   Section 6.01 Event of Default.  The occurrence of any one of
the following events shall constitute an Event of Default:

   (a)  Any default in any payment on the Note or hereunder, as
        set forth in Section 4.06 hereof, or any renewal or
        extension thereof or of any note or notes hereafter
        given for interest covering any extension, with inter-
        est thereon from maturity of the same, when and as the
        same shall become due and payable, and if such default
        is not made good prior to the due date of the next
        installment payment under the Note.

   (b)  Any default in payment, when due (except under circum-
        stances expressly provided for in Section 4.09 hereof),
        of any tax, sewer or water rate or special assessment
        now or hereafter assessed against the Property, or any
        part thereof, while this Mortgage exists, or any de-
        fault in failing to maintain any insurance required
        hereunder or under any other of the Loan Documents,
        while this Mortgage exists, or default in payment on
        demand of any sum or sums advanced by Mortgagee on
        account of any costs and expenses of this Mortgage, or
        on account of any such tax or special assessment, sewer
        and water rate or insurance, or expense of litigation,
        or on account of any lien on said land and premises,
        with interest thereon at the Mortgage Loan rate speci-
        fied in the Note from date of advance, or upon default
        of any other payment provided for in this Mortgage or

-19-

under any other of the Loan Documents, when and as due, or any default under the Building Loan Agreement, and the continuation of any such default for a period of thirty (30) days or more following written notice given to Mortgagor by Mortgagee specifying the default, provided that (i) a default in payment as provided in Section 4.06 hereof shall not require notice to Mortgagor, but shall be treated in accordance with clause (a) above and (ii) a default in failing to maintain any insurance required hereunder or under any other of the Loan Documents shall not require notice to Mortgagor, but shall be treated as an Event of Default immediately upon such default.

(c) Any default in the observance or performance of any other of the covenants or agreements contained herein or under the Note, or any other of the Loan Documents if such default shall continue for thirty (30) days after written notice given to Mortgagor by Mortgagee specifying the default.

(d) Mortgagor having filed a voluntary petition or having been adjudicated as bankrupt or insolvent after the filing of a voluntary petition, or having filed any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors; or seeking or consenting to or acquiescing in the appointment of any trustee, receiver or liquidator of Mortgagor or of all or any part of its properties or assets, or making any general assignment for the benefit of creditors, or admitting in writing its inability to pay its debts generally as they become due.

(e) A court of competent jurisdiction having entered an order, judgment or decree approving a petition filed against Mortgagor seeking any reorganization, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, and such order, judgment or decree remaining unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the first date of entry thereof; or any trustee, receiver or liquidator of Mortgagor or of all or any part of its properties or assets, being appointed without the consent or acquiescence of Mortgagor and such appointment remaining unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive).

-20-



(f)  For the purpose of clauses (d) or (e) above, any refer-
     ence to Mortgagor shall be deemed to separately apply
     to any general partner.

(g)  Final judgment for the payment of money in excess of
     Twenty Thousand Dollars ($20,000.00) having been ren-
     dered against Mortgagor and such judgment not being
     discharged or bonded to Mortgagee's satisfaction, or a
     stay of execution thereon not procured, within thirty
     (30) days after the date of entry thereof, or if there-
     after such judgment remains unsatisfied for a period of
     fifteen (15) days after the termination of any such
     stay of execution.

     Section 6.02 Acceleration.  If any Event of Default shall
occur, then, at the option and election of Mortgagee, the entire
Indebtedness Hereby Secured shall become due, payable and col-
lectible at once and thereafter as Mortgagee may elect, regard-
less of the date of maturity and without notice, and may be
enforced and recovered at once.

     Section 6.03 Remedies.  If any Event of Default shall have
occurred, Mortgagee may elect to exercise or cause to be exer-
cised any or all of the remedies provided for in this Mortgage
and at law, including without limitation the following:

(a)  Mortgagee shall be entitled to apply at any time prior
     to or during any foreclosure suit to the court having
     jurisdiction thereof for the appointment of a receiver
     of all or a portion of the Property, and all rents,
     incomes, profits, issues, and revenues thereof, derived
     from any source.  It is hereby expressly covenanted and
     agreed that thereupon the court shall forthwith appoint
     such receiver with the usual powers and duties of
     receivers in similar cases, and the appointment shall
     be made by the court as a matter of Mortgagee's strict
     right, and without reference to the adequacy or inade-
     quacy of the value of the Property hereby mortgaged, or
     to the solvency or insolvency of the Mortgagor or any
     other party defendant to such suit.  The Mortgagor
     hereby specifically waives the right to object to the
     appointment of a receiver as described herein and
     hereby expressly consents that such appointment shall
     be made as an admitted equity and is Mortgagee's abso-
     lute right, and that the appointment may be done with-
     out notice to the Mortgagor.  Mortgagor further con-
     sents to the appointment of the Mortgagee or any of-
     ficer or employee of Mortgagee as receiver.

(b)  Mortgagee may foreclose this Mortgage and sell the
     Property as an entirety or in separate parcels or

-21-



parts, under the judgment or decree of a court or courts of competent jurisdiction.

(c) Mortgagee may, either after foreclosure and/or the appointment of a receiver as hereinbefore provided, or without same, proceed by suit or suits at law or equity or by any other appropriate remedy to protect and enforce the rights of Mortgagee whether for the specific performance of any covenant or agreement contained herein, or in aid of the execution of any power herein granted, or to foreclose the Mortgage, or to sell, as an entirety or in several parcels or parts, the Property under the judgment or decree of a court or courts of competent jurisdiction, or otherwise. Mortgagee's remedies shall not be exhausted by any single exercise thereof, and may be pursued concurrently, consecutively and repeatedly until all of the Indebtedness Hereby Secured is paid in full.

(d) Mortgagee shall apply the proceeds of sale, or foreclosure of the Property, first, to the payment of reasonable attorney's fees and expenses prior to, and at trial and on appeal, if any; secondly, to discharge all taxes, levies and assessments, with costs and interest if they have priority over the lien of the Mortgage, including the due pro rata portion thereof for the current year; thirdly , to discharge in the order of their priority, if any, the remaining debts and obligations secured by the Mortgage and any liens of record inferior to the Mortgage under which sale is made, with lawful interest; and, fourthly, the residue of the proceeds shall be paid to Mortgagor, or its assigns; provided, however, that Mortgagee as to such residue shall not be bound by any inheritance, devise, conveyance, assignment or lien of or upon Mortgagor's equity, without actual notice thereof prior to distribution.

(e) In the case of any receivership, insolvency, bankruptcy, liquidation or other judicial proceeding relative to Mortgagor or affecting the Property, Mortgagee may pursue and perfect claims against the Property arising under this Mortgage and the Note.

(f) Mortgagee may take such other and further actions as may be required and permitted, it being understood that no remedy under this Mortgage is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or as now or hereinafter existing at law or in equity or by statute.

-22-




Section 6.04 <u>Reinstatement</u>. If, after the occurrence of an Event of Default, Mortgagor cures the default prior to completion of foreclosure, receivership or other proceedings pursuant to Section 6.03 above, and Mortgagor pays to Mortgagee all reasonable and actual expenses incurred by Mortgagee in connection with the foreclosure, receivership or other proceedings, including, without limitation, all reasonable attorney's fees and expenses prior to and at trial and on appeal, advertising costs, Mortgagee's fees, auctioneer's commissions and payments or reimbursements made by Mortgagee on account of the GNMA Securities (in the event that Mortgagee has issued mortgage-backed securities as described in Section 4.10), the Mortgage Loan shall with the prior written consent of the Mortgagee in accordance with the Coinsurance Contract be reinstated as if an Event of Default had not occurred.

Section 6.05 <u>Mortgagee's Role at Sale</u>. Upon any foreclosure sale, Mortgagee may bid and become the purchaser of the Property, and upon compliance with the terms of sale, may hold, retain and possess and dispose of such Property in its own absolute right, without further accountability.

Section 6.06 <u>Waiver by Mortgagor</u>. Mortgagor agrees, to the extent that it may lawfully so agree, that in the case of an Event of Default on its part, as aforesaid, neither Mortgagor nor anyone claiming through or under it shall, or will, set up, seek or claim to take advantage of any exemption laws (whether under the State Constitution, Homestead laws, or otherwise), or laws providing for any appraisement, apportionment, valuation, stay, extension or redemption now or hereafter in force in the locality where the Property is situated, in order to prevent or hinder the enforcement or foreclosure of the Mortgage, or the final or absolute putting into possession thereof, immediately after such foreclosure, of the purchaser thereof. Mortgagor, for itself and all who claim through or under it, hereby waives, to the fullest extent that it may lawfully do so, the benefit of all such laws and any and all right to have the estate comprising the security intended to be created hereby marshalled upon any foreclosure of the lien hereof and agrees that Mortgagee or any court having jurisdiction to foreclose such lien may sell the Property as an entirety or in parts, and further hereby waives any right to assert in any bankruptcy proceeding in which Mortgagor is debtor: (i) that the Property should be valued by any method other than liquidation value where Mortgagee seeks "adequate protection" or relief from the automatic stay under the Bankruptcy Code, (ii) that Mortgagee's security interest in cash proceeds of the Property, including rent payments received, is limited to any amount less than the actual amount of such proceeds deposited in deposit accounts of Mortgagor and commingled with other funds, (iii) use of cash proceeds of the Property, including rent payments received, without consent of Mortgagee unless authorized by the bankruptcy court in which such bank-

-23-



ruptcy is pending, after notice and a hearing, and (iv) use of cash proceeds of the Property, including rent payments received, unless Mortgagee is granted an additional substitute lien in other property to the extent such cash proceeds are used by Mortgagor. If an Event of Default occurs, Mortgagor shall pay all costs and expenses including reasonable attorneys' fees at and prior to trial and on appeal, incurred in the collection of the Note, the Indebtedness Hereby Secured or obligations under this Mortgage.

Section 6.07 **No Waiver, Etc.** Any waiver of any Event of Default hereunder shall not extend to or affect any subsequent or other then existing Event of Default, nor shall it impair any rights or remedies relating to any such subsequent or other then existing Event of Default. No delay or omission of Mortgagee to exercise any right or power accruing upon any Event of Default shall impair any such right or power or shall be construed to be a waiver of any such Event of Default or an acquiescence therein, or shall extend to any subsequent Event of Default, and every power and remedy given by the Mortgage may be exercised, from time to time, and as often as may be deemed expedient by Mortgagee.

Section 6.08 **Costs and Expenses.** In any suit to foreclose the lien of this Mortgage, there shall be allowed and included as additional indebtedness in the decree of sale, to the extent permitted by law, all expenditures and expenses that may be paid or incurred by or on behalf of Mortgagee, for reasonable attorneys' fees, court costs, appraisers' fees, sheriff's fees, documentary and expert evidence, stenographers' charges, publication costs and such other costs and expenses as Mortgagee may deem reasonably necessary to prosecute such suit or to evidence to bidders at any sale that may be had pursuant to such decree the true condition of the title to or the value of the Property. To the extent permitted by law, all such expenditures and expenses shall become payable on demand with interest thereon from the date of expenditure at the interest rate charged under the Note.

In addition, Mortgagor shall pay to Mortgagee promptly upon demand all expenditures and expenses incurred by Mortgagee in connection with (a) any proceeding to which Mortgagee shall be a party, either as plaintiff, claimant or defendant, by reason of this Mortgage or any of the indebtedness; (b) preparations for the commencement of any suit for foreclosure after accrual of such right to foreclosure, whether or not actually commenced; and/or (c) preparation for the defense of or investigation of any threatened suit, claim or proceeding that might affect the Property, whether or not actually commenced.

Section 6.09 **Certain Remedies Subject to HUD Approval.** Before Mortgagee may accelerate and declare the Indebtedness Hereby Secured due and payable for an Event of Default hereunder

-24-



arising from (i) a default under the HUD Regulatory Agreement, (ii) a violation of the restrictions on transfers under Section 4.05, (iii) a failure to make monthly payments to the Replacement Reserve Fund, (iv) a violation of Section 4.13 as to sole business of Borrower being operation of the Property, or (v) a failure to provide financial statements under Section 4.16; Mortgagee shall obtain the prior written consent of the Secretary of HUD.

## ARTICLE VII

### MISCELLANEOUS PROVISIONS

Section 7.01 _Assignment of Mortgage._ Subject to any applicable requirements of HUD, Mortgagee may sell, assign, transfer, convey, pledge or encumber the Note or all or any part of its interest, rights and obligations thereunder or under this Mortgage to one or more persons or parties, and Mortgagor hereby consents to any such sale, assignment, transfer, conveyance, pledge or encumbrance and agrees upon the request of Mortgagee or its assignee to execute and deliver promptly any instrument confirming Mortgagor's consent as effectuating, as necessary, such sale, assignment, transfer, conveyance, pledge or encumbrance.

Section 7.02 _Notices._ Any notice, demand or request required or permitted hereunder to be given to Mortgagor or Mortgagee shall be sufficiently given if in writing and personally delivered or mailed by registered or certified first class mail, postage prepaid, addressed to:

Mortgagor:      Oakland Lakes, Ltd.
                4750 Ashwood Drive, Suite 300
                Cincinnati, Ohio 45241
                Attention: William O. Brisben

Mortgagee:      Cincinnati Mortgage Corporation
                2368 Victory Parkway, Suite 210
                Cincinnati, Ohio 45206
                Attention: Robert W. Jorden

or at such other address as either Mortgagor or Mortgagee may have furnished to the other in writing, and shall be deemed to be given when mailed.

-25-




Section 7.03 <u>Security Agreement</u>.

(a)  In addition to being a mortgage, this Mortgage is intended to be a security agreement pursuant to the Uniform Commercial Code for any of the items specified herein as part of the Property, which under applicable law may be subject to a security interest pursuant to the Uniform Commercial Code, and Mortgagor hereby grants Mortgagee a security interest in said items, and all substitutions, replacements, replacement parts, additions, repairs, repair parts, accessions and accessories incorporated therein or affixed thereto in which Mortgagor acquires an interest, and the proceeds thereof (sometimes referred to herein as the "Collateral").  Mortgagor agrees that Mortgagee may file this Mortgage, or a reproduction thereof, in the real estate records or other appropriate index, as a financing statement for any of the items specified above as part of the Property.  Any reproduction of this Mortgage or of any other security agreement or financing statement shall be sufficient as a financing statement.  In addition, Mortgagor agrees to execute and deliver to Mortgagee, upon Mortgagee's request, any financing statements, as well as extensions, renewals and amendments thereof, and reproductions of this Mortgage in such form as Mortgagee may require, to perfect or protect the security interest hereby created with respect to the Collateral, or to more fully describe the Collateral.  Mortgagor shall pay all costs of and expenses (including reasonable expenses of counsel and filing fees) relative to the preparation and filing of any financing statements and any extensions, renewals, amendments and releases thereof, and shall pay all reasonable costs and expenses of any record searches for financing statements Mortgagee may reasonably require.  Mortgagor hereby irrevocably authorizes Mortgagee as Mortgagor's agent and attorney in fact to execute and file any UCC Financing Statements and similar instruments signed by Mortgagee alone.

(b)  Upon Mortgagor's breach of any covenant or agreement of Mortgagor contained in this Mortgage, including the covenants to pay when due all sums secured by this Mortgage, Mortgagee shall have the remedies of a secured party under the Uniform Commercial Code and, at Mortgagee's option, may also invoke all other remedies as provided herein.  In exercising any of said remedies, Mortgagee may proceed against the items of real property and any items of personal property specified herein as part of the Property separately or together and in any order whatsoever, without in any way affecting the availability of Mortgagee's remedies under the Uniform Commercial Code or any of the other remedies provided herein.  Mortgagor hereby agrees that a notice sent to it at least ten (10) days before the time of any intended public sale or of the time after which any private sale or other disposition of the Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition.  Until any default hereunder, Mortgagor may have possession of the Collater-

-26-



al and use it in any lawful manner not inconsistent with this Section 7.03 and not inconsistent with any policy of insurance thereon.

(c) Mortgagor will, at its own cost and expense, keep the Collateral in as good and substantial repair as the same is in at this date, or as the same is when acquired, reasonable wear and tear excepted, making replacements when and where necessary.

(d) At its option, Mortgagee may discharge taxes, liens or secured interests or other encumbrances at any time levied or placed on the Collateral, may pay for insurance on the Collateral and may pay for the maintenance and preservation of the Collateral. Mortgagor agrees to reimburse Mortgagee on demand for any payment made, or any expense incurred by Mortgagee pursuant to the foregoing authorization together with interest thereon at the interest rate set forth in the Note.

(e) Mortgagor will not later than thirty (30) days after acquiring additional Collateral promptly advise Mortgagee of the type, description, nature, cost and quantity thereof. Should Mortgagor at any time fail to advise Mortgagee of any such acquisition, such failure shall not affect, diminish, modify or limit Mortgagee's lien or security interest in all Collateral which the Mortgagor may acquire from time to time hereafter.

Section 7.04 _Governing Law._ The Note and this Mortgage are made and delivered in and shall be governed by and construed in accordance with the laws of the State. In the event that any provision of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provisions, and to this end the provisions of the Mortgage and the Note are declared to be severable.

Section 7.05 _Nondiscrimination._ Mortgagor covenants and agrees that so long as this Mortgage and the Note secured hereby are coinsured by HUD, or held under the provisions of the Housing Act, it will not execute or file for record any instrument which imposes a restriction upon the sale or occupancy of the Property on the basis of race, color or creed. Upon any violation of this undertaking, Mortgagee may, at its option, and with the prior written consent of HUD, declare the Indebtedness Hereby Secured immediately due and payable.

Section 7.06 _Amendments._ This Mortgage may be amended or modified only by a written instrument executed by Mortgagor and Mortgagee and any purported modification or amendment hereof, by whatever means, which is not in strict conformance with the foregoing shall be null and void and absolutely ineffective.



Section 7.07 _Third Parties._  The Mortgagor and Mortgagee intend that there are no third party beneficiaries to this Mortgage except for HUD.

Section 7.08 _Rights of Mortgagee._  Mortgagee may, at its option, do all things provided or permitted to be done by a mortgagee under the laws of the State of Florida for the protection of Mortgagee's interest in the property.

Section 7.09 _Mortgagor's Obligations Unconditional._  The obligations of the Mortgagor to make payments of any and all amounts due hereunder shall be absolute and unconditional without defense or set-off by reason of any default whatsoever, including, without limitation a default by any tenant of the Property under any lease with the Mortgagor or under any other agreement or instrument between the Mortgagee and the Mortgagor, and such payments to Mortgagee shall not be decreased, abated, postponed or delayed for any reason whatsoever, including without limitation, any acts or circumstances that may constitute failure of consideration, destruction of or damage to the Property, the taking of any part of the Property, commercial frustration of purpose, failure of any person to perform or observe any agreement, whether expressed or implied, or any duty, liability or obligation arising out of or connected with this Mortgage, the Note, or any of the other Loan Documents, or failure of any tenant of the Property to pay the fees, rentals or other charges owed to Mortgagor, and irrespective of whether or not any such tenant of the Property receives either partial or total reimbursement as a credit against such payment, it being the intention of the parties that the payments required of the Mortgagor hereunder will be paid in full when due without any delay or diminution whatsoever.

Section 7.10 _Additional Limitations on Mortgagee's Duties._  Mortgagor hereby acknowledges and agrees that the undertaking of Mortgagee under this Mortgage is limited as follows:

Except as specifically appointed herein as attorney-in-fact to act on behalf of Mortgagor, Mortgagee shall not act in any way as the agent for or trustee of Mortgagor.  Mortgagee does not intend to act in any way for or on behalf of Mortgagor with respect to disbursement of the proceeds of the indebtedness secured hereby.  Its purpose in making the requirements set forth herein and in the Building Loan Agreement and Loan Documents is that of a lender protecting the priority of its mortgage and the value of its security.  Mortgagee assumes no responsibility for the completion of any improvements erected or to be erected upon the Property, the payment of bills or any other details in connection with the Property, any plans and specifications in connection with the Property, or Mortgagor's relations with any contractors.  This Mortgage is not to be construed by Mortgagor or anyone furnishing labor, materials, or any other work or

-28-



product for improving the Property as an agreement upon the part of Mortgagee to assure anyone that he will be paid for furnishing such labor, materials or any other work or product; any such person must look entirely to Mortgagor for such payment. Mortgagee assumes no responsibility to Mortgagor for the architectural or structural soundness of any improvements on or to be erected upon the Property or for the approval of any plans and specifications in connection therewith or for any improvements as finally completed.

Section 7.11 Mortgage; Building Loan Agreement; Construction.

(a) It is agreed between the Mortgagor and Mortgagee that this Mortgage is intended to secure the balance of obligatory loan advances to be made after the Mortgage is delivered to the Recorder for record, said loan advances to be made pursuant to the provisions of the Building Loan Agreement. The maximum amount of unpaid balances of such loan advances in the aggregate and exclusive of interest accrued thereon is Twenty Two Million Seven Hundred Seventy Nine Thousand Six Hundred and no/100 Dollars ($22,779,600.00). The Mortgagor understands and agrees that Mortgagor may not reborrow amounts of principal under the Note which have already been repaid without the prior written consent of HUD. In addition to the foregoing advances, the Mortgage shall secure unpaid balances of advances made by Mortgagee to protect said premises including but not limited to advances to pay taxes, assessments, and all other amounts which Mortgagor herein agrees to pay for the protection of the premises and any and all other advances that may be made by Mortgagee under this Mortgage, together with interest thereon.

(b) Mortgagor warrants and represents that the funds to be advanced herein are to be used in the construction of certain improvements on the lands herein described, in accordance with the Building Loan Agreement which Building Loan Agreement (except such part or parts thereof as may be inconsistent herewith) is incorporated herein by reference to the same extent and effect as if fully set forth and made a part of this Mortgage; and if the construction of the improvements to be made pursuant to said Building Loan Agreement shall not be carried on with reasonable diligence, or shall be discontinued at any time for any reason, the Mortgagee, after due notice to the Mortgagor or any subsequent owner, is hereby invested with full and complete authority to enter upon the Property, employ watchmen to protect such improvements from depredation or injury and to preserve and protect the personal property therein, and to continue any and all outstanding contracts for the erection and completion of said building or buildings, to make and enter into any contracts and and obligations wherever necessary, either in its own name or in the name of the Mortgagor, and to pay and discharge all debts, obligations, and liabilities incurred thereby. All such sums so

-29-



advanced by the Mortgagee (exclusive of advances of the principal of the indebtedness secured hereby) shall be added to the principal of the indebtedness secured hereby and shall be secured by this Mortgage and shall be due and payable on demand with interest at the rate specified in the Note. The principal sum and other charges provided for herein shall, at the option of the Mortgagee or holder of this Mortgage and the Note securing the same, become due and payable on the failure of the Mortgagor to keep and perform any of the covenants, conditions, and agreements of said Building Loan Agreement.

(c) This Mortgage secures an obligation incurred for the construction of improvements to the Property and, as such, is a "construction mortgage" as said term is used and defined under Article 9 of the Uniform Commercial Code as effective in the State.

Section 7.12 **Binding Effect**. All the terms, covenants and conditions of this Mortgage shall bind Mortgagor, its partners and their respective heirs, successors and assigns and shall inure to the benefit of and be available to the Mortgagee, its successors and assigns.

Section 7.13 **Interpretation; Time of the Essence**. All references to Mortgagor and Mortgagee shall be read in the singular or plural, and in the masculine, feminine or neuter gender, as the sense may require. Time is of the essence with respect to each and every obligation of Mortgagor under the Note, the Mortgage and the other Loan Documents.

Section 7.14 **Estoppel Certificate**. Mortgagor shall, within ten days of a written request from Mortgagee, furnish Mortgagee with a written statement, duly acknowledged, setting forth the sums secured by this Mortgage and such other information as Mortgagee may reasonably request.

Section 7.15 **Right to Inspect and/or Enter Property**. Mortgagee and its agents, representatives and employees are authorized subject to applicable state and federal laws and regulations, to enter at any reasonable time or times upon or in any part of the Property for the purpose of inspecting the same and for the purpose of performing any of the acts that Mortgagee is authorized to perform under the terms of this Mortgage.

PROVIDED ALWAYS that if Mortgagor shall (i) pay according to the tenor and effect thereof all principal and interest evidenced by the Note and any extensions, replacements, modifications or renewals thereof and (ii) pay and perform all obligations of this Mortgage, and all other security agreements, supplements and other instruments now or hereafter executed by Mortgagor for the purpose of further evidencing or securing all or any part of the indebtedness under or secured by this Mortgage, then this Mortgage shall be void; otherwise to remain in full force and effect.

-30-



IN WITNESS WHEREOF, the said Mortgagor has caused these presents to be signed in its name by its General Partner as of the date first above written.

WITNESS/ATTEST:

OAKLAND LAKES, LTD., a Florida limited partnership

*Charles C. Brisben*

*Jennifer L. Jones*

By: *[signature]*
William O. Brisben,
General Partner

STATE OF OHIO                  )
                               )  SS:
COUNTY OF HAMILTON             )

Before me, a Notary Public in and for said County, personally appeared William O. Brisben, to me known and known to me to be the person who, as General Partner of Oakland Lakes, Ltd., a Florida limited partnership, which executed the foregoing instrument, signed the same and acknowledged to me that he did so sign said instrument in the name and on behalf of said partnership, that the same is his free act and deed as such partner and the free act and deed of said partnership.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my official seal in said County and State, this 2nd day of October 1989.



*[signature]* (Notary)
(Notary Public)

This Instrument Prepared By:  Barrett N. WEINBERGER, Esq.
Strauss & Troy, a Legal
      Professional Association
2100 Central Trust Center
201 East Fifth Street
Cincinnati, Ohio  45202-4186
(513) 621-2120

22459-77-S
Fla.
1/23/89

-31-



## EXHIBIT "A"

**PARCEL I:**

TRACT A OAKLAND LAKES, according to the Plat thereof, recorded in Plat Book 111, Page 7, of the Public Records of Broward County, Florida.

- and -

**PARCEL II:**

TRACT B, OAKLAND LAKES, according to the Plat thereof, recorded in Plat Book 111, Page 7, of the Public Records of Broward County, Florida.

- and -

**PARCEL III:**

A portion of the North one-half (N1/2) of the Southeast one-quarter (SE1/4) of SECTION 20, TOWNSHIP 49 SOUTH, RANGE 42 EAST, being more particularly described as follows:

Commencing at the Southeast corner of the said North one-half (N1/2) of the Southeast one-quarter (SE1/4) of Section 20; thence South 89°07'10" West, along the South line of the said North one-half (N1/2) of the Southeast one-quarter (SE1/4), a distance of 498.42 feet, to the POINT OF BEGINNING of this description, said point also being the Northeast corner of said Tract B; thence continue South 89°07'10" West, along the last described course and the North line of said Tract B, a distance of 1937.45 feet; thence North 01°50'43" East, a distance of 25.03 feet; thence North 89°07'10" East, along a line parallel with and 25.00 feet North of, as measured at right angles to the South line of the North one-half (N1/2) of the Southeast one-quarter (SE1/4) of Section 20, a distance of 1936.65 feet; thence South 00°00'00" East along a northerly projection of the East line of said Tract B, a distance of 25.00 feet to the POINT OF BEGINNING.

- and -

**PARCEL IV:**

A parcel of land lying in the City of Oakland Park, Broward County, Florida, being a portion of Tract G of "OAKLAND LAKES," according to the Plat thereof, as recorded in Plat Book 111, at Page 7, of the Public Records of Broward County, Florida, and being more particularly described as follows:

Commence at the Northeast corner of said Tract G; thence run S 89°05'55" W along the North line of said Tract G for 113.19 feet to the Point of Beginning; thence run South for 335.04 feet to a point; thence run S 89°05'55" W for 30.03 feet to a point; thence run S 00°54'05" E for 1.07 feet to a point; thence run N 84°03'31" W for 29.67 feet to a point; thence run N 00°54'05" W for 30.54 feet to a point; thence run N 89°05'55" E for 35.00 feet to a point; thence run South for 32.01 feet to a point; thence run N 89°05'55" E for 24.00 feet to a point; thence run North for 335.04 feet to a Point of Intersection with said North line of Tract G; thence run N 89°05'55" E along said North line of Tract G for 1.00 foot to the Point of Beginning.

Said lands situate, lying and being in Broward County, Florida.





EXHIBIT A
(CONTINUED)

SAID PROPERTY ALSO BEING DESCRIBED AS:

DESCRIPTION:

A PORTION OF THE N½ OF THE SE¼ OF SECTION 20, TOWNSHIP 49 SOUTH, RANGE 42 EAST, TOGETHER WITH ALL OF TRACTS "A", "B" AND A PORTION OF TRACT "G", "OAKLAND LAKES", ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 111, PAGE 7 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, ALL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT "A";   THENCE N 89°07'10" E, ALONG THE NORTH LINE OF SAID TRACT "A", A DISTANCE OF 175.15 FEET;   THENCE N 01°50'43" E, A DISTANCE OF 25.03 FEET; THENCE N 89°07'10" E, ALONG A LINE PARALLEL WITH AND 25.00 FEET NORTH OF, AS MEASURED AT RIGHT ANGLES TO THE SOUTH LINE OF THE NORTH ONE-HALF (N½) OF THE SOUTHEAST ONE-QUARTER (SE¼) OF SECTION 20, A DISTANCE OF 1936.65 FEET; THENCE S 00°00'00" E, ALONG A NORTHERLY PROJECTION OF THE EAST LINE OF SAID TRACT "B" AND THE EAST LINE OF SAID TRACT "B", A DISTANCE OF 999.87 FEET TO THE SOUTHEAST CORNER OF SAID TRACT "B"; THENCE S 89°05'55" W ALONG THE SOUTH LINE OF SAID TRACT "B", A DISTANCE OF 460.00 FEET TO THE NORTHEAST CORNER OF SAID TRACT "G";   THENCE CONTINUE S 89°05'55" W ALONG THE NORTH LINE OF SAID TRACT "G" AND THE SOUTH LINE OF SAID TRACT "A", A DISTANCE OF 113.19 FEET; THENCE RUN SOUTH FOR 336.04 FEET TO A POINT; THENCE RUN S 89°05'55" W FOR 30.03 FEET TO A POINT;   THENCE RUN S 00°54'05" E FOR 1.07 FEET TO A POINT; THENCE RUN N 84°03'31" W FOR 29.67 FEET TO A POINT; THE LAST THREE DESCRIBED COURSES BEING ALONG THE NORTH RIGHT OF WAY LINE OF OAKLAND PARK BOULEVARD AS RECORDED IN OFFICIAL RECORD BOOK 13439, PAGE 730 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA;   THENCE RUN N 00°54'05" W FOR 30.54 FEET TO A POINT; THENCE RUN N 89°05'55" E FOR 35.00 FEET TO A POINT; THENCE RUN SOUTH FOR 32.01 FEET TO A POINT;   THENCE RUN N 89°05'55" E FOR 24.00 FEET TO A POINT; THENCE RUN NORTH FOR 335.04 FEET TO A POINT OF INTERSECTION WITH SAID NORTH LINE OF TRACT "G" AND THE SOUTH   LINE   OF   SAID   TRACT   "A";   THENCE S 89°05'55" W, ALONG THE SOUTH LINE OF SAID TRACT "A", A DISTANCE OF 1512.81 FEET TO THE SOUTHWEST CORNER OF SAID TRACT "A"; THENCE N 00°19'45" W,   A DISTANCE OF 7.34 FEET; THENCE N 03°49'07" W, A DISTANCE OF 328.61 FEET; THENCE N 00°19'45" W, A DISTANCE OF 640.02 FEET TO THE POINT OF BEGINNING, THE LAST THREE DESCRIBED COURSES BEING ALONG THE WEST LINE OF SAID TRACT "A" AND THE EAST RIGHT OF WAY LINE OF N.W. 27TH AVENUE AS SHOWN ON SAID "OAKLAND LAKES" PLAT.

SAID LANDS SITUATE, LYING AND BEING IN THE CITY OF OAKLAND PARK, BROWARD COUNTY, FLORIDA, CONTAINING 2,103,817 SQUARE FEET OR 48.297 ACRES, MORE OR LESS.





## EXHIBIT B

As used herein, the term "Debtor" shall mean and include the terms "Mortgagor," "Grantor" and "Borrower"; and the term "Creditor" shall mean and include the terms "Lender," "Beneficiary" and "Secured Party."

This Exhibit B refers to the following, which may be located on the premises of, relate to, or be used in connection with, the acquisition, construction, rehabilitation, reconstruction, equipping, repair, ownership, management, or operation of a multifamily apartment complex known as **Lakes of Casablanca** (the "Project), FHA Project No. 066-36650 located in the County of Broward, State of Florida, in which Debtor has an interest now or hereafter existing or acquired:

1.    All materials now owned or hereafter acquired by the Debtor and intended for construction, rehabilitation, reconstruction, alteration and/or repair of any building, structure or improvement now or hereafter erected or placed on the Real Estate, all of which materials shall be deemed to be included within the Project immediately upon the delivery thereof to the Project.

2.    All of the walks, fences, shrubbery, driveways, fixtures, machinery, apparatus, equipment, fittings, chattels and other goods and other personal property of every kind and description whatsoever, now owned or hereafter acquired by the Debtor and attached to or contained in and used or usable in connection with any present or future operation of the Project, including, by way of example rather than of limitation, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, motors, furnaces, compressors and transformers; all generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment and fixtures, fans and switchboards; all telephone equipment; all piping, tubing, plumbing equipment and fixtures; all heating, refrigeration, air conditioning, cooling, ventilating, sprinkling, water, power and communications equipment, systems and apparatus, all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture installed or to be installed or used or usable in the operation of any part of the Project or facilities erected or to be erected in or upon the Real Estate; and every renewal or replacement thereof or articles in substitution therefor, whether or not the same are now or hereafter attached to the

-1-



Real Estate in any manner; all except for any right, title or interest therein owned by any tenant (it being agreed by the Debtor and Secured Party that all personal property owned by the Debtor and placed by it on the Real Estate shall, so far as permitted by law, be deemed to be affixed to the Real Estate, appropriated to its use, and covered by the Mortgage and/or any Financing Statements, as applicable).

3.    All of the Debtor's right, title and interest in and to any and all judgments, awards of damages (including but not limited to severance and consequential damages), payments, proceeds, settlements or other compensation (collectively, the "Awards") heretofore or hereafter made, including interest thereon, and the right to receive the same, as a result of, in connection with, or in lieu of (i) any taking of the Property or any part thereof by the exercise of the power of condemnation or eminent domain, or the police power, (ii) any change or alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Property or any part thereof (including but not limited to destruction or decrease in value by fire or other casualty), all of which Awards, rights thereto and shares therein are hereby assigned to the Secured Party, who is hereby authorized to collect and receive the proceeds thereof and to give property receipts and acquittances therefor and to apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the indebtedness secured hereby.

4.    All of the Debtor's right, title and interest in any and all payments, proceeds, settlements or other compensation heretofore or hereafter made, including any interest thereon, and the right to receive the same from any and all insurance policies covering the Property or any portion thereof, or any of the other property described herein.

5.    The interest of the Debtor in all of the rents, royalties, issues, profits, revenues, income and other benefits of the Property, or arising from the use or enjoyment of all or any portion thereof, or from any lease or agreement pertaining thereto, and all right, title and interest of the Debtor in and to, and remedies under, all contract rights, accounts receivable and general intangibles arising out of or in connection with any and all leases and subleases of the Property, or any part thereof, and of the other property described herein, or any part thereof, both now in existence or hereafter entered into, together with all proceeds (cash and non-cash) thereof; and including, without limitation, all cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder.

6.    All of the Debtor's rights, options, powers and privileges in and to (but not the Debtor's obligations and burdens under) any construction contract, architectural and engineering

-2-



agreements and management contracts pertaining to the construction, development, ownership, equipping and management of the Property and all of the Debtor's right, title and interest in and to (but not the Debtor's obligations and burdens under) all architectural, engineering and similar plans, specifications, drawings, reports, surveys, plats, permits and the like, contracts for construction, operation and maintenance of, or provision of services to, the Property or any of the other property described herein, and all sewer taps and allocations, agreements for utilities, bonds and the like, all relating to the Property.

7.    All of the records and books of account now or hereafter maintained by or on behalf of Mortgagor in connection with the Project.

8.    All names now or hereafter used in connection with the Project and the goodwill associated therewith.

9.    All intangible personal property, accounts, licenses, permits, instruments, contract rights, and chattel paper of the Debtor, including but not limited to cash; accounts receivable; bank accounts; certificates of deposit; securities; promissory notes, rents; rights (if any) to amounts held in escrow; insurance proceeds; condemnation rights; deposits judgments, liens and causes of action; warranties and guarantees.

10.    The interest of the Debtor in any cash escrow fund and in any and all funds, securities, instruments, documents and other property which are at any time paid to, deposited with, under the control of, or in the possession of the Secured Party, or any of its agents, branches, affiliates, correspondents or others acting on its behalf, which rights shall be in addition to any right of set-off or right of lien that the Secured Party may otherwise enjoy under applicable law, regardless of whether the same arose out of or relates in any way, whether directly or indirectly, to the Project located upon the Real Estate.

11.    The interest of the Debtor in any and all funds created or established and held by any trustee pursuant to any indenture of trust or similar instrument authorizing the issuance of bonds or notes for the purpose of financing the Project located upon the Real Estate.

12.    Any collateral provided by the Debtor for its account to each and every issuer of a letter of credit, subject to the prior claim of the issuer of any such letter of credit to such collateral.

13.    All inventory, including raw materials, components, work-in-process, finished merchandise and packing and shipping materials.

-3-



14.    Proceeds, products, returns, additions, accessions and substitutions of and to any or all of the above.

15.    Any of the above arising or acquired by the Debtor or to which the Debtor may have a legal or beneficial interest in on the date hereof and at any time in the future.

16.    Any of the above which may become fixtures by virtue of attachment to the Real Estate.

22450-77-S

-4-



**EXHIBIT C**

(1)  Taxes for the year 1989, and subsequent years which are not yet due and payable.

(2)  Easements and other matters as shown on the Plat of OAKLAND LAKES, recorded in Plat Book 111, Page 7; as modified by Resolution of the City of Oakland Park No. R-88-187 recorded January 18, 1989 in Official Records Book 16120, Page 58 and Resolution of Broward County recorded July 5, 1989 in Official Records Book 16571, Page 993, which Resolutions abandon 20 feet utility and drainage easement over the north 20 feet of Tracts A and B and further modified by that certain Agreement to Place Notation on Plat recorded in Official Records Book 16112, Page 566.

(3)  Agreement with the CITY OF OAKLAND PARK, recorded September 23, 1981 in Official Records Book 9809, Page 661.

(4)  Utility Easement(s) granted to the CITY OF OAKLAND PARK recorded July 16, 1987 in Official Records Book 14625, Page 291.

(5)  Roadway Easement recorded in Official Records Book 13439, Page 773, as set forth in Resolution NO. R-86-44 recorded May 30, 1986 in Official Records Book 13439, Page 730.

(6)  Master Development Plan for Oakland Lakes recorded September 7, 1988 in Official Records Book 15760, Page 500.

(7)  Agreement Governing Land Development for Oakland Lakes Planned Unit Development recorded September 7, 1988 in Official Records Book 15760, Page 494.

AS TO PARCELS I AND III ONLY;

(8)   Drainage Easements recorded February 16, 1989 in Official Records Book 16203, Page 524; in Official Records Book 16203, Page 528; in Official Records Book 16203, Page 532; and in Official Records Book 16203, Page 536.

AS TO PARCEL III ONLY:

(9)  Reservations for fill and minerals together with an easement for purposes of dredging and removing fill and minerals, in favor of HPAV, a Florida general partnership, set forth in that certain Warranty Deed dated June 15, 1981, recorded September 21, 1981 in Official Records Book 9804, Page 807.



(10)  Easement recorded September 17, 1971 in Official Records Book 4612, Page 887.

(11)  Riparian and littoral rights are neith guaranteed nor insured.

(12)  Submerged land is not insured.

AS TO PARCEL IV ONLY:

(13)  Private Easement Agreement for access recorded March 18, 1982 in Official Records Book 10087, Page 363.

(14)  Resolution No. R-86-21 recorded in Official Records Book 13436, Page 558, which resolution abandons existing non-vehicular access lines on the aforesaid Plat of Oakland Lakes along southerly boundary of Tract G thereto.

(15)  Road Contribution Agreement recorded in Official Records Book 9802, Page 677.

AS TO PARCEL I ONLY:

(16)  Utility Easement in favor of the City of Oakland Park recorded in Official Records Book 14625, Page 295.

RECORDED IN THE OFFICIAL RECORDS BOOK
OF BROWARD COUNTY, FLORIDA
L. A. HESTER
COUNTY ADMINISTRATOR



## OAKLAND LAKES, LTD.
### SECOND AMENDED AND RESTATED
### AGREEMENT OF LIMITED PARTNERSHIP

THIS SECOND AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP AGREEMENT made and entered into as of the 29th day of June, 1990, by and among William O. Brisben, Robert E. Schuler and W. O. Brisben Companies, Inc., an Ohio corporation, (hereinafter referred to as the "General Partners"), Gray Construction Co., Inc., a Texas corporation (the "Special Limited Partner"), and Oakland Park (Florida) Limited Partnership, an Ontario limited partnership (the "Investor Limited Partner"), William O. Brisben and the Brisben Family Trust (collectively the "Limited Partners"), all of said parties being hereinafter sometimes referred to collectively as the "Partners" and individually as a "Partner", is intended to evidence the mutual agreement of the General Partners, Special Limited Partner and Limited Partners under the provisions of Chapter 620 of the Florida Statutes for the purposes and upon the terms and conditions hereinafter set forth.

WHEREAS, the Partnership (hereinafter defined) was formed among some of the Partners pursuant to an Agreement of Limited Partnership dated as of February 1, 1989, and continued pursuant to an Amended and Restated Agreement of Limited Partnership dated as of September 18, 1989.

WHEREAS, the Partners desire to admit the Investor Limited Partner into the Partnership as a Limited Partner pursuant to the terms hereof, William O. Brisben, in his capacity as the Original Limited Partner, will be withdrawn upon such admission, William O. Brisben will hold some of his remaining interest as a Limited Partner, and the Special Limited Partner will withdraw as hereinafter provided.

NOW, THEREFORE, intending to be legally bound hereby, the parties hereto agree as follows:



EXHIBIT

INTRODUCTION

DEFINED TERMS

Capitalized words and phrases used in this Agreement have the following meanings:

(a)  "Act" means the Florida Revised Uniform Limited Partnership Act, as set forth in Chapter 620 of the Florida Statutes, as amended from time to time (or any corresponding provisions of succeeding law).

(b)  "Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i)  Credit to such Capital Account any amounts which such Partner is obligated to restore pursuant to Section 4.5 or is deemed to be obligated to restore pursuant to the penultimate sentence of Regulations Section 1.704-1(b)(4)(iv)(f); and

(ii)  Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations with the approval of the Investor Limited Partner.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(c)  "Affiliate" means, with respect to any Person, any other Person which either directly or indirectly controls, is controlled by or is under common control with such Person. For this purpose, control means ownership of fifty percent or more of the outstanding equity interest of such Person.

(d)  "Agreement" or "Partnership Agreement" means this Second Amended and Restated Agreement of Limited Partnership, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder," refer to this Agreement as a whole, unless the context otherwise requires.

(e)  "Auditors" means Spaeth & Batterberry, Certified Public Accountants, Cincinnati, Ohio, U.S.A., or any other firm of independent certified public accountants selected by the General Partner. *with the approval of the Investor Limited Partner*

(f)  "Capital Account" means, with respect to any Partner, the Capital Account maintained for such Partner at any time and from time to time in accordance with the following provisions:

- 2 -

(i)  To each Partner's Capital Account there shall be credited such Partner's Capital Contributions, such Partner's distributive share of Profits and any items in the nature of income or gain which are specially allocated to such Partner, and the amount of any Partnership liabilities assumed by such Partner or which are secured by any Partnership Assets distributed to such Partner.

(ii)  To each Partner's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Partnership Assets distributed to such Partner pursuant to any provision of this Agreement, and such Partner's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated to such Partner.

(iii)  In the event any interest in the Partnership is transferred in accordance with the terms of this Agreement, the assignee shall succeed to the Capital Account of the assignor to the extent it relates to the transferred interest.

(iv)  In determining the amount of any liability for purposes of Subparagraphs (i) and (ii) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the General Partners shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Partnership or the General Partners) are computed in order to comply with such Regulations, the General Partners may, upon prior notice to the Limited Partners and after written approval thereof by the Auditors, make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Partner upon the dissolution, winding up and termination of the Partnership. The General Partners also shall make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

(g)  "Capital Contribution" means, with respect to any Partner, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Partnership by such Partner, less the amount of any liabilities of such Partner assumed by the Partnership or which are secured by the property contributed by such Partner.

- 3 -

(h)  "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

(i)  "Coinsuring Lender" means Cincinnati Mortgage Corporation, an Ohio corporation, which will be making the Mortgage Loan to the Partnership.

(j)  "Construction Contract" means any construction contract entered into by the Partnership, providing for the construction of the Project.

(k)  "Contributed Equity" means the capital contribution to the Partnership in the amount of $1,852,000 made and to be made by the Investor Limited Partner.

(l)  "Cumulative Priority Return" means, at any time, an aggregate amount equal to 12 - 1/2% per year (compounded annually on January 1 of each year) on the Contributed Equity from September 1, 1991 to the relevant time, pro-rated for any partial year and adjusted at any time for payments to the Investor Limited Partner on account of the Contributed Equity as a result of a distribution or distributions to the Investor Limited Partner of Net Cash Receipts in excess of the cumulative Preferred Return or any Net Proceeds of Refinancing or New Proceeds of Sale in excess of the cumulative Preferred Return.

(m)  "Depreciation" means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis unless the Partners agree to some other reasonable amount of Depreciation for an asset.

(n)  "Development Group" means the General Partners and their associates and affiliates holding an aggregate 50% interest in the Partnership after admission of the Investor Limited Partner, namely W.O. Brisben Companies, Inc. as to a 0.1% interest, William O. Brisben (in his capacity as a General Partner) as to a 5.0% interest (inclusive of the interest of the Special Limited Partner), Gray Construction Co., Inc., the Special Limited Partner, as to a 0.01% interest, the Brisben Family Trust as to a 10.0% interest, Robert E. Schuler as to a 4.9% interest, and William O. Brisben (in his capacity as a Limited Partner) as to a 30% interest (a 5.0% interest may be transferred to Eileen R. Brisben, as a Limited Partner, out of such 30% interest at any time) and includes any and all successors and permitted assigns of such persons in respect of their interests in the Partnership.

(o) "General Partner" means any Person who (i) is referred to as such in the first paragraph of this Agreement or is designated as such in Exhibit A hereto or has become a General Partner pursuant to the terms of this Agreement, in any case in such Person's capacity as a General Partner of the Partnership, and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement. "General Partners" means all such Persons.

(p) "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the Partnership;

(ii) The Gross Asset Value of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partners, as of the following times: (a) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership Assets as consideration for a reduction in an interest in the Partnership if the General Partners reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership; and (c) the liquidation of the Partnership within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g);

(iii) The Gross Asset Value of any Partnership asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution; and

(iv) The Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted to the extent the General Partners determine that an adjustment is not necessary or appropriate in connection with a transaction that would otherwise result in an adjustment.

If the Gross Asset Value of an asset has been determined or adjusted, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

- 5 -

(q)  "HUD" means the United States Department of Housing and Urban Development, including the Federal Housing Administration ("FHA") and any other instrumentality thereof.

(r)  "Immediate Family" means, with respect to any Person, his spouse, parents, parents-in-law, descendants, nephews, nieces, brothers, sisters, brothers-in-law, sisters-in-law, children-in-law, and grandchildren-in-law or a trust for the primary benefit of any such immediate family or a custodianship for such minor immediate family.

(s)  "Limited Partner" means any Person, including the Investor Limited Partner, (i) whose name is set forth in the first paragraph of this Agreement as a Limited Partner or is designated as such in Exhibit A hereto or who has been admitted as an additional or Substitute Limited Partner pursuant to the terms of this Agreement, in such Person's capacity as a Limited Partner of the Partnership, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement. "Limited Partners" means all such Persons.

(t)  "Limited Partnership Interests" means the Partnership Interests of the Limited Partners in the Partnership as determined from time to time and reflected herein and on Exhibit A.

(u)  "Managing General Partner" means W.O. Brisben Companies, Inc., as hereinafter provided in Article 3.

(v)  "Mortgage Loan" means any indebtedness of the Partnership evidenced by a promissory note ("Note") of the Partnership to the Coinsured Lender and secured by a mortgage ("Mortgage") creating a lien on Partnership Assets, including the Property, as the same may be amended from time to time.

(w)  "Net Cash Receipts" means the gross cash proceeds from Partnership operations (exclusive of any cash described in (x) and (y) below) less the portion thereof used to pay or establish reasonable reserves for all Partnership expenses, debt service payments, capital improvements, and any necessary replacements and contingencies, all as determined by the Managing General Partner. "Net Cash Receipts" shall not be reduced by depreciation, amortization, cost recovery deductions or similar allowances.

(x)  "Net Proceeds of Refinancing" means the net proceeds received by the Partnership on any upward refinancing of all of the Partnership Assets or any substantial part thereof after deduction of all costs associated with the refinancing and any existing financing on the Partnership Assets and repayment of any advances under any Optional Deficiency Loans or Optional LP Deficiency Loans.

- 6 -

(y)  "Net Proceeds of Sale" means the net proceeds received by the Partnership from the sale of all or any substantial part of the Partnership Assets after deduction of all costs associated with the sale, any mortgage financing then outstanding on Partnership Assets and all other obligations of the Partnership including repayment of any Optional Deficiency Loans or Optional LP Deficiency Loans.

(z)  "Nonrecourse Deductions" has the meaning set forth in Section 1.704-1(b)(4)(iv)(b) of the Regulations.  The amount of Nonrecourse Deductions for a Partnership fiscal year equals the net increase, if any, in the amount of Partnership Minimum Gain during that fiscal year, determined according to the provisions of Section 1.704-1(b)(4)(iv)(b) of the Regulations.

(aa)  "Optional Deficiency Loans" means any loans advanced to the Partnership from time to time by any Partner or Partners of the Development Group to cover any deficiencies in Net Cash Receipts excluding any funds advanced by the Managing General Partner or any of the Development Group to the Partnership pursuant to any contractual obligation to advance money to the Partnership.

(bb)  "Optional LP Deficiency Loans" means any additional funds advanced to the Partnership from time to time by the Investor Limited Partner to cover any deficiencies in Net Cash Receipts, excluding, however, the Contributed Equity amount.

(cc)  "Ordinary Resolution" of the Investor Limited Partner means:

> (i)   a resolution passed by its Partners holding, in the aggregate, more than 50% of the aggregate number of votes held by those Partners who, being entitled to do so, vote in person or by proxy at a duly convened meeting of its Partners or any adjournment thereof; or

> (ii)  a written resolution in one or more counterparts consented to in writing by its Partners holding, in the aggregate, more than 50% of the aggregate number of votes held by those Partners who are entitled to vote.

(dd)  "Partners" means all General Partners and all Limited Partners, where no distinction is required by the context in which the term is used herein.  "Partner" means any one of the Partners.

- 7 -

(ee) "Partnership" means the limited partnership formed and continued pursuant to this Agreement and any limited partnership continuing the business of this Partnership in the event of dissolution as herein provided.

(ff) "Partnership Minimum Gain" has the meaning set forth in Section 1.704-1(b)(4)(iv)(c) of the Regulations.

(gg) "Partnership Assets" means all real and personal property acquired by the Partnership and any improvements thereto, and shall include both tangible and intangible property.

(hh) "Person" means any individual, partnership, corporation, trust or other entity.

(ii) "Preferred Return" means an annual preferred return (for distribution by the Investor Limited Partner to its partners) from distributions payable by the Partnership, of $280,000 of Net Cash Receipts in each calendar year, commencing on the earlier of substantial completion of construction of the Project (as defined in the Construction Contract between the Partnership and the Special Limited Partner) and September 1, 1991 (pro-rated for the partial calendar year ending December 31, 1991) together with accrued interest at the U.S. Prime Rate plus 3% per annum on any unpaid Preferred Return outstanding from time to time, such interest to commence to accrue, with respect to any unpaid Preferred Return for any particular year on January 1 of the following year and continue until payment of such Preferred Return has been made to the Investor Limited Partner.

(jj) "Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Partnership's taxable income or loss, respectively, for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i) Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(ii) Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or loss;

(iii)  In the event the Gross Asset Value of any Partnership Asset is adjusted, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such Asset for purposes of computing Profits or Losses;

(iv)  Gain or loss resulting from any disposition of Partnership Assets with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)  In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period; and

(vi)  Notwithstanding any other provision herein, any items which are specially allocated shall not be taken into account in computing Profits or Losses.

(kk)  "Project" means the Property and the buildings and other improvements constructed thereon pursuant to any Construction Contract.

(ll)  "Property" means the property described in the instruments securing the Mortgage Loan and more particularly described in Exhibit B attached hereto.

(mm)  "Recourse Liabilities" means those liabilities of the Partnership that are not taken into account for purposes of determining Partnership Minimum Gain.

(nn)  "Refinancing" means a borrowing on the security of the Partnership Assets which does not constitute a current obligation, where such borrowing is advanced after full advance of the Mortgage Loan and includes any renewal, replacement, supplementary or additional financing.

(oo)  "Regulations" means the Treasury Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

(pp)  "Sale" means the sale or other disposition of all or substantially all of the Partnership Assets by the Partnership.

(qq)  "Special Resolution" of the Investor Limited Partner means:

- 9 -

(i)    a resolution passed by its Partners holding, in the aggregate, not less than 66-2/3% of the aggregate number of votes held by those Partners who, being entitled to do so, vote in person or by proxy at a duly convened meeting of its Partners or any adjournment thereof; or

(ii)   a written resolution in one or more counterparts consented to in writing by its Partners holding, in the aggregate, not less than 66-2/3% of the aggregate number of votes held by those Partners who are entitled to vote.

(rr)   "Subordinated Return" means a distribution payable by the Partnership to the Development Group in any given year equal to the amount distributed in that year by the Partnership on account of the Preferred Return in respect of that fiscal year, which entitlement will only be payable in the event that the distribution for the Preferred Return for that year and any unpaid deficiency from previous years' Preferred Returns have been fully paid in that fiscal year, and then only to the extent of any Net Cash Receipts available for such purpose.

(ss)   "Substitute Limited Partner" means any Person admitted to the Partnership as a Limited Partner pursuant to Article 5 hereof.

(tt)   "Syndication Expenses" means all expenditures classified as syndication expenses pursuant to Section 1.709-2(b) of the Regulations. Syndication Expenses shall be taken into account under this Agreement at the time they would be taken into account under the Partnership's method of accounting if they were deductible expenses.

(uu)   "U.S. Prime Rate" means, at any time during any month, the annual rate of interest declared to the Managing General Partner by its bankers in Florida as the prime rate of interest charged by such bank to its most creditworthy commercial customers for short-term unsecured loans in U.S. funds payable on demand.

## ARTICLE 1

## NAME AND PURPOSES

Section 1.1 <u>Formation</u>. The parties hereby form and continue a limited partnership pursuant to the Uniform Limited Partnership Act of the State of Florida, Chapter 620 of the Florida Statutes.

- 10 -

Section 1.2  **Name and Office**.  The Partnership shall be conducted under the name of Oakland Lakes, Ltd.  The Partnership's registered agent and also the agent of the Partnership for service of process is Wilson C. Atkinson, Esq., whose address is c/o Atkinson, Jenne, Stone & Cohen, 1946 Tyler Street, Hollywood, Florida 33022-2088.  The record-keeping office in Florida of the Partnership is c/o W. O. Brisben Companies, Inc., 1451 West Cypress Creek Road, Suite 300, Ft. Lauderdale, Florida 33309.

Section 1.3  **Purposes and Powers**.

(a)  The purposes of the Partnership and the business to be carried on and the objectives to be effected by it are:

(1)  To acquire and purchase the Property and to construct, own, develop, maintain and operate the Project.

(2)  To enter into, perform and carry out contracts of any kind necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Partnership.

(3)  To acquire any property, real or personal, in fee or under lease, or any rights therein or appurtenant thereto, necessary for the construction and operation of the Project.

(4)  To borrow money, and to issue evidence of indebtedness and to secure the same by mortgage, deed of trust, pledge or other lien, in furtherance of any or all of the purposes of the Partnership, provided that each such borrowing shall be permitted hereby.

(5)  To carry on any other activities necessary to, in connection with or incidental to the foregoing.

(b)  The Partnership shall not engage in any other business without the prior consent of all the Partners.

Section 1.4  **Term**.  The Partnership shall commence on the date upon which the Certificate of Limited Partnership is duly filed in the Florida Secretary of State's Office and shall continue in full effect until December 31, 2039, unless sooner dissolved and terminated as herein provided.

Section 1.5  **Limited Partners**.  The General Partners shall have the authority on behalf of the Partnership and each Partner (without notice and consent from any other Partner) to admit additional Limited Partners as provided in Article 2.

## ARTICLE 2

## CAPITAL CONTRIBUTIONS

Section 2.1  <u>Capital</u>.

(a)  The General Partners have contributed to the capital of the Partnership the aggregate sum of $100 plus interests in various commitments and agreements relating to the Project which interests have an agreed capital value of $0.00.

(b)  The Original Limited Partner and the Special Limited Partner have each contributed the sum of $50 to the capital of the Partnership.  The Limited Partners, other than the Investor Limited Partner, have contributed to the capital of the Partnership the aggregate sum of $600.

(c)  The Investor Limited Partner will acquire a 50% Limited Partnership Interest for an aggregate capital contribution (the "Contributed Equity") in an amount of $1,852,000, payable as follows:

$1,000,000 on or before June 30, 1990, $213,000 on or before September 30, 1990, $213,000 on or before December 31, 1990, $213,000 on or before March 31, 1991, and $213,000 on or before June 30, 1991.  The first installment of $213,000 shall also be conditioned on at least $12,000,000 having been then disbursed or advanced under the Mortgage Loan, the second installment of $213,000 shall also be conditioned on at least $15,000,000 having been then disbursed or advanced under the Mortgage Loan, the third installment of $213,000 shall also be conditioned on at least $18,000,000 having been then disbursed or advanced under the Mortgage Loan, and the final installment of $213,000 shall also be conditioned on at least $19,000,000 having been then disbursed or advanced under the Mortgage Loan.  The conditions for the payment of each of the last four installments shall be deemed satisfied upon receipt by the Investor Limited Partner of a certificate or certificates from the Coinsuring Lender that the applicable amounts of the Mortgage Loan have been disbursed or advanced, after which the Investor Limited Partner shall have five business days within which to pay each such installment.

At such time as the Investor Limited Partner makes each payment in accordance with this Agreement its capital account shall be credited with the amounts of such payments.  The amount of the capital contribution by each Partner and the interest in the Partnership represented by such contribution shall be set forth herein and opposite each Partner's name and address in Exhibit A attached hereto. Such capital contributions shall be used and applied by the Partnership as follows and in the order set forth:

- 12 -

(i)  To pay all costs, fees and expenses incurred or to be incurred by the Partnership in connection with the acquisition of the Property and the construction,development and rent-up of the Project which are in excess of total Mortgage Loan proceeds, including without limitation advances and loans made at any time and from time to time by one or more of the Partners in the Development Group with respect to such costs, fees and expenses, the General Partners representing that all loans and advances made by them to the Partnership were for uses related to the Project.

(ii) To the extent that the total development costs of the Project, including land, construction, equipment, financial and bond issue costs and pre-development costs through the date of substantial completion of construction of the Project (as defined in the Construction Contract between the Partnership and the Special Limited Partner), are determined at final endorsement of the Mortgage Loan to be less than $25,237,491, an amount equal to such difference shall, to the extent of any unused amount of the Contributed Equity, be paid to the Managing General Partner and William O. Brisben (as a General Partner) as an incentive fee.

Contemporaneously with its execution and delivery of this Agreement the Investor Limited Partner shall contribute to the capital of the Partnership the amount of $1,000,000.  The four remaining installments of $213,000 shall be evidenced by four promissory notes of the Investor Limited Partner payable to the Partnership.  Any promissory notes given to the Partnership by the Investor Limited Partner to evidence unpaid installments of the agreed capital contributions may be used by the Partnership and/or the General Partners as collateral for borrowings or other Partnership obligations.

(d)  In the event the Investor Limited Partner shall fail to make a scheduled payment under the terms of any promissory note or notes executed by the Investor Limited Partner when such shall become due, the Partnership after 30 days written notice to the Investor Limited Partner of such failure, may avail itself of any or all remedies at law or in equity which it may have to collect such payment.  In any event, the Investor Limited Partner shall not thereafter be entitled to exercise any of its rights, including any voting rights (which shall be exercised by the General Partners) nor to receive any allocations or distributions from the Partnership until the amount of such Investor Limited Partner's delinquent notes, plus interest at the U.S. Prime Rate plus 3% per annum from the date such payment became delinquent, is paid in full.  Any allocations and distributions so withheld shall belong to and shall be given to the General Partners.

(e)  The specific present capital contributions of all Partners are as set forth on Exhibit A hereto.

- 13 -

Section 2.2  <u>Additional Loans and Funds</u>.

(a)  <u>Completion Cost Funding</u>.  To the extent that the total development costs of the Project, including land, construction, equipment, financial and bond issue costs and pre-development costs through the date of substantial completion of construction of this Project are determined at final endorsement of the Mortgage Loan to exceed $25,237,491, the Managing General Partner and William O. Brisben, as a General Partner, are jointly and severally obligated to make a capital contribution or contributions to the Partnership in the amount of such costs in excess of said $25,237,491.

(b)  <u>Optional Deficiency Loans</u>.  In the event of any deficiencies from time to time in operating revenues of the Project, the Managing General Partner or any of its Affiliates may, at its option, make Optional Deficiency Loans to the Partnership, which loans will bear interest at the U.S. Prime Rate plus 3% per annum.  Neither the Managing General Partner nor any Affiliate has any obligation to make any Optional Deficiency Loans other than in the event and to the extent that the Managing General Partner is required to make loans to the Partnership pursuant to its legal obligation as a General Partner of the Partnership.  Repayments of any such Optional Deficiency Loans will be made by the Partnership from time to time from future Net Cash Receipts, proceeds of Refinancing or proceeds of a Sale prior to any distributions to the Investor Limited Partner except in the case of any Optional LP Deficiency Loans which will be repaid pro rata with Optional Deficiency Loans.

(c)  <u>Optional LP Deficiency Loans</u>.  In the event of any deficiencies from time to time in operating revenues of the Project, the Investor Limited Partner may, at its option, make Optional LP Deficiency Loans to the Partnership, which funding will bear interest at the U.S. Prime Rate plus 3% per annum, but which will not increase the base on which Preferred Returns and Cumulative Priority Returns are calculated.  The Investor Limited Partner does not have any obligation to make any Optional LP Deficiency Loans.  Repayments of any such Optional LP Deficiency Loans will be made by the Partnership from time to time from future Net Cash Receipts, proceeds of Refinancing or proceeds of a Sale pro rata with any Optional Deficiency Loans outstanding at that time.

Section 2.3  <u>General Provisions</u>.

(a)  No Limited Partner, Investor Limited Partner or Special Limited Partner shall be liable for any of the debts of the Partnership or be required to contribute any capital or lend any funds to the Partnership other than as expressly provided in Section 2.1. No General Partner shall have any personal liability for the repayment of the capital contributions of any Limited Partner, except as provided to the contrary in this Agreement.

(b)  No interest shall be paid on any capital contributed to the Partnership.

(c)  No Limited Partner, Investor Limited Partner or Special Limited Partner shall have the right to demand and receive property other than cash in return for his or its capital contribution.

Section 2.4  <u>Partnership Borrowings</u>.  In addition to the Mortgage Loan and advances made pursuant to Section 2.2 hereof, the Partnership may borrow sums for partnership purposes from any source, including any Partner, provided that such additional borrowing is not secured by any lien or other charge upon the assets of the Partnership, except any such borrowing may be secured upon the promissory notes receivable from the Investor Limited Partner, and provided further that such loans shall bear interest at rates which are competitive with then market rates.  No Limited Partner shall have any personal liability with respect to any indebtedness of the Partnership for borrowed money, and each instrument evidencing any such indebtedness shall contain a provision to such effect.

Section 2.5  <u>Additional Partners; Additional Capital</u>.  The Managing General Partner may admit additional Limited Partners to the Partnership for the purpose of meeting additional capital needs of the Partnership, provided, however, that the Investor Limited Partner shall have the first right, to be exercised within 120 days of written notice from the Managing General Partner of such intent, to make such additional capital contributions which shall increase the initial amount of the Contributed Equity.  Any such additional capital contributions by third parties shall adjust the existing percentage Limited Partnership Interests of all Partners, in a manner acceptable both to the Development Group and to the Investor Limited Partner.

Section 2.6  <u>Withholding Tax Capital Contribution</u>.  In the event that the Partnership is required to remit to the Internal Revenue Service withholding taxes pursuant to Section 1446 of the Code with respect to a foreign Partner's allocable share of the Partnership's Profits at any time, such withholding taxes shall first be paid out of such Partner's allocable share of available Net Cash Receipts at such time, and thereafter each foreign Partner shall be required to make a capital contribution to the Partnership (a "Withholding Tax Capital Contribution") in an amount equal to such Partner's allocable share of the difference, if any, between:

   (a)  the aggregate Section 1446 withholding taxes required to be remitted by the Partnership and

   (b)  the Partner's allocable share of the Partnership's available Net Cash Receipts.

- 15 -

Under no circumstances shall Withholding Tax Capital
Contributions accrue to the benefit of any third party and no
third party may enforce the payment of such capital
contribution by any such foreign Limited Partner.

   Section 2.7  Code Sections 1441 and 1446 Withholding.  Any
amounts required to be withheld by the Partnership pursuant to
Sections 1441 and 1446 shall reduce any amounts otherwise to be
distributed to such foreign Partners.

ARTICLE 3

RIGHTS, POWERS AND DUTIES OF PARTNERS

   Section 3.1  Management of Partnership Business.  The
General Partners shall have the sole right to manage the
business of the Partnership.  The Managing General Partner
shall direct and control the day-to-day operations and
activities of the Project and the Partnership.  The General
Partners shall use their best efforts to carry out the
purposes, business and objectives of the Partnership referred
to in Section 1.3, and shall devote to the Partnership business
such time as shall be reasonably required for its welfare and
success. The General Partners shall receive no compensation for
their services as General Partners other than as may be
provided in Section 2.1 and in Article 4 hereof.

   Section 3.2  Powers of General Partners.  The General
Partners shall have all necessary powers to carry out the
purposes, business and objectives referred to in Section 1.3,
and shall possess and enjoy all the rights and powers of
Partners of a partnership without limited partners except as
otherwise provided by Florida law and by this Agreement;
provided, however, that the express written consent of the
Investor Limited Partner, expressed by Special Resolution, but
not the consent of any other Limited Partners, shall be
required before the General Partners may (a) sell or exchange
substantially all of the assets of the Partnership or (b)
refinance any mortgage indebtedness which is a lien and
encumbrance on the Project for an amount in excess of the
aggregate amount of the Mortgage Loan, the capital
contributions of the Partners (including the Contributed
Equity), any outstanding Optional Deficiency Loans and Optional
LP Deficiency Loans, any outstanding Preferred Return and any
outstanding Cumulative Priority Return, the General Partners
having the right to consummate any Refinancing for a lesser
amount without obtaining any consent from any Limited Partner
(including the Investor Limited Partner).  Unless otherwise
provided in this Agreement, the consent of the General Partners
shall be required to approve any matter with respect to which
Limited Partners have any right of consent and/or approval
hereunder.

- 16 -

Section 3.3  <u>Exercise of Rights and Powers by General Partners</u>.  The General Partners, if there is more than one, shall have proportional rights in the management of the Partnership business in accordance with the percentages set forth in Section 4.2.  Any one or more of such General Partners is and are authorized to enter into and execute any document or instrument for and on behalf of the Partnership.

Section 3.4  <u>Special Duties and Obligations of General Partners</u>.

(a)  In addition to their usual and customary duties and obligations the General Partners shall perform the following special duties and obligations:

(1)  The General Partners shall use their best efforts to cause the Partnership at all times to perform and comply substantially with the provisions of the Mortgage Loan.

(2)  The General Partners shall cause the Partnership at all times to maintain such insurance, in such amounts and against such risks as the General Partners deem advisable.

(3)  The General Partners shall:

(i)  make any decision relating to the design of the buildings (including but not limited to the facade) or the layout of the Project, provided, however, that any substantial and material change in such design shall also require the written consent of the Investor Limited Partner; and

(ii)  approve any deviation from the original Plans and Specifications of the Project.

In order to facilitate such activities, the General Partners shall meet periodically with the architects and any contractor for the Project.

(4)  Subject to any requirement by the mortgagee under the Mortgage Loan the General Partners shall supervise the proper establishment, maintenance and investment of any and all reserve funds, with a view to the required degree of safety as well as return on such invested funds.

(5)  The General Partners may employ such contractors as they deem appropriate in the construction of the Project and supervise such construction, and they may employ such agents as they deem appropriate in the management of the Project.

Section 3.5  <u>Liabilities of General Partners</u>.  In carrying out their duties hereunder, the General Partners shall not be liable to the Partnership or to any other Partner for any actions taken in good faith and reasonably believed to be in the best interests of the Partnership, or for errors of

- 17 -

judgment, neglect, omission or wrongdoing, but shall only be liable for willful misconduct, gross negligence, breach of their obligations under this Agreement or other breach of their fiduciary duties.

Section 3.6  <u>Reliance on Act of General Partners</u>.  No financial institution or any other person, firm or corporation dealing with the General Partners shall be required to ascertain whether they are acting in accordance with this Agreement, but such financial institution or such other person, firm or corporation shall be protected in relying solely upon the deed, transfer, or assurance of and the execution of such instrument or instruments by such General Partners.

Section 3.7  <u>Prohibitions with Respect of Limited Partners</u>.  No Limited Partner, including the Investor Limited Partner, shall have the right:

(a)  To take part in the control of the Partnership business or to sign for or to bind the Partnership, such power being vested in the General Partners;

(b)  To have his or its capital contribution repaid except to the extent provided in this Agreement;

(c)  To require partition of Partnership property or to compel any sale or appraisement of Partnership assets or sale of a deceased Partner's interests therein, notwithstanding any other provisions of Florida law to the contrary; or

(d)  To sell or assign his or its interest in the Partnership or to constitute the vendee or assignee thereunder a substituted Limited Partner, except as provided in Article 7 hereof.

Section 3.8  <u>Limited Partners</u>.  Neither the Partnership nor any Partner shall disclose the name of any Limited Partner to any person not a Partner, except (i) with the consent of such Limited Partner, or (ii) to comply with the provisions of this Agreement, or (iii) as may be required by applicable laws or governmental rules or regulations, or (iv) as the Investor Limited Partner may consider necessary or advisable for the purposes of raising capital.

Section 3.9  <u>Other Interests of Partners</u>.  Any of the Partners may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including, but not limited to, the real estate business in all its phases, which shall include, without limitation, ownership, operation, management, syndication and development of real property.  Neither the Partnership nor the other Partners shall have any rights in and to such independent ventures or the income or profits derived therefrom. The Partnership may employ or transact business with any person,

notwithstanding the fact that any Partner or member of his family may be one of, or may have an interest in or connection with, such persons and neither the Partnership nor the other Partners shall have any rights in or to any income or profits derived therefrom.

Section 3.10  <u>Original Limited Partner and Special Limited Partner</u>.  Upon the execution and delivery of this Agreement by all of the Partners, the Original Limited Partner shall be deemed withdrawn and his capital contribution returned to him. His share of profits, losses, capital and equity of the Partnership shall be deemed included in the interest of William O. Brisben in his capacity as a General Partner.  The Special Limited Partner shall be withdrawn and its capital contribution returned to it immediately after the consummation of final endorsement by the Coinsuring Lender and/or HUD of the Mortgage Loan.  Its share of profits, losses, capital and equity of the Partnership shall be deemed included in the interest of William O. Brisben in his capacity as a General Partner.  All Limited Partners, including the Investor Limited Partner, hereby consent to these withdrawals which shall in all respects be in accordance with the provisions of this Agreement.

Section 3.11  <u>Tax Matters Partner</u>.  The Managing General Partner shall be the Tax Matters Partner for purposes of Section 6231(a)(7) of the Code and shall have all of the authority granted by the Code to the Tax Matters Partner.

## ARTICLE 4

### ALLOCATIONS AND DISTRIBUTIONS

Section 4.1  <u>Special Allocations</u>.

(a)  Except as provided in Section 4.1(d) hereof, in the event any Partner who is not a General Partner unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Regulations, items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the regulations, the Adjusted Capital Account Deficit of such Partner as quickly as possible.

(b)  Except as provided in Section 4.1(d) hereof, in the event any Partner who is not a General Partner has an Adjusted Capital Account Deficit at the end of any Partnership fiscal year which is in excess of the sum of (i) the amount such Partner is obligated to restore and (ii) the amount such Partner is obligated to restore pursuant to the penultimate sentence of Regulations Section 1.704-1(b)(4)(iv)(f), each such Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible.

- 19 -

(c)  Notwithstanding any other provision of this Article 4, if there is a net decrease in Partnership Minimum Gain during any Partnership fiscal year, each Partner who would otherwise have an Adjusted Capital Account Deficit at the end of such year shall be specially allocated items of Partnership income and gain for such year (and, if necessary, subsequent years) in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible.  The items to be so allocated shall be determined in accordance with Section 1.704-1 (b)(4)(iv)(e) of the Regulations.  This Section 4.1(c) is intended to comply with the minimum gain chargeback requirement in such Section of the Regulations and shall be interpreted consistently therewith.

(d)  To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(e)  Syndication Expenses for any fiscal year or other period shall be specially allocated to the Partners in accordance with the percentages for sharing Losses set forth in Section 4.2(b)(2).

Section 4.2  <u>Allocation of Profits and Losses</u>.

(a)  <u>Profits</u>.  Except as provided in Section 4.1 hereof, Profits for any fiscal year shall be allocated in the following order and priority:

(1)  First, to the General Partners up to the amount of any Losses allocated pursuant to Section 4.2(c), and then to the Partners in the percentages set forth in Section 4.2(b)(2) until the cumulative Profits allocated pursuant to this Section 4.2(a)(1) are equal to the total Losses allocated pursuant to Section 4.2(b)(2) hereof for all prior periods.

(2)  Second, any remaining Profits shall be allocated in the following order of priority:

(A)  To the Investor Limited Partner until the cumulative Profits allocated pursuant to this Section 4.2(a)(2)(A) are equal to the amount of distributions made on account of the Preferred Return in such year for such year and for all prior periods, to the extent not previously allocated.

- 20 -

(B)  To the Development Group up to the amount of distributions made of the Subordinated Return in such year.

It is agreed that allocations under Sections 4.2(a)(2)(A) and 4.2(a)(2)(B) shall be deemed to be made simultaneously and pro rata.

(C)  In the event that Profits include taxable gain from a Sale, to the Investor Limited Partner up to the amount of distributions made of Cumulative Priority Return.

(D)  If Profits are allocated under (C) above, then to the Development Group up to the amount of distributions made to the Development Group pursuant to Section 4.6(b)(5).

(3)  Third, any remaining Profits shall be allocated as follows:

<u>Profits</u>

General Partners:
William O. Brisben .   .   .   .   5.0%
W. O. Brisben Companies, Inc. .   0.1%
Robert E. Schuler .   .   .   .   4.9%

(Including Special Limited Partner     0.01%)


Limited Partners:
Investor Limited Partner   .   .   50.0%
William O. Brisben .   .   .   .   30.0%
The Brisben Family Trust   .   .   10.0%

(b)  <u>Losses</u>.  Except as otherwise provided in Section 4.1, Losses for any fiscal year shall be allocated in the following order and priority:

(1)  To the extent Profits have been allocated pursuant to Sections 4.1 or 4.2(a)(3) hereof for any prior period, Losses shall be allocated first to offset any Profits allocated pursuant to Section 4.2(a)(3) hereof, and then to offset Profits allocated under Section 4.1 hereof and until the cumulative Profits allocated pursuant to this Section 4.2(b)(1) are equal to the total Profits allocated pursuant to Sections 4.2(a)(3) and 4.1 for all prior periods.  For this purpose, Losses will be allocated in the same proportion as the Profits that the Losses offset were allocated.

(2)  Except as limited by Section 4.2(c), after Losses have been allocated in accordance with Section 4.2(b)(1), any remaining Losses shall be allocated in the following percentages:

<u>Losses</u>

- 21 -

General Partners:
     William O. Brisben . . . .   5.0%
     W. O. Brisben Companies, Inc. .   0.1%
     Robert E. Schuler . . . .   4.9%

(Including Special Limited Partner    0.01%)


Limited Partners:
     Investor Limited Partner . .   50.0%
     William O. Brisben . . .   30.0%
     The Brisben Family Trust . .   10.0%

(c)  The Losses allocated pursuant to Section 4.2(b) shall
not exceed the maximum amount of Losses that can be so
allocated without causing any Partner who is not a General
Partner to have an Adjusted Capital Account Deficit at the end
of any fiscal year.  Any Losses that are subject to the
foregoing limitation will be allocated to the General Partners.

Section 4.3  **Tax Allocations: Code Section 704(c)**.  In
accordance with Code Section 704(c) and the Regulations
thereunder, income, gain, loss and deduction with respect to
any property contributed to the capital of the Partnership
shall, solely for tax purposes, be allocated among the Partners
so as to take account of any variation between the adjusted
basis of such property to the Partnership for federal income
tax purposes and its initial Gross Asset Value.

In the event the Gross Asset Value of any Partnership asset
is adjusted, subsequent allocations of income, gain, loss and
deduction with respect to such asset shall take account of any
variation between the adjusted basis of such asset for federal
income tax purposes and its Gross Asset Value in the same
manner as under Code Section 704(c) and the Regulations
thereunder.

Any elections or other decisions relating to such
allocations shall be made by the General Partners in any manner
that reasonably reflects the purpose and intention of this
Agreement.  Allocations pursuant to this Section 4.3 are solely
for purposes of federal, state and local taxes and shall not
affect, or in any way be taken into account in computing, any
Partner's Capital Account or share of Profits, Losses, other
items or distributions pursuant to any other provision of this
Agreement.

Section 4.4  **Other Allocations Rules**.

(a)  In the event additional Partners are admitted to the
Partnership on different dates during any fiscal year, the
Profits (or Losses) shall be allocated to the Partners in
accordance with Code Section 706, using any convention
permitted by law and selected by the General Partners.

(b)  For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly, or other basis, as determined by the General Partners using any permissible method under Code Section 706 and the Regulations thereunder.

(c)  Except as otherwise provided in this Agreement, all items of Partnership income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Partners in the same proportions as they share Profits or Losses, as the case may be, for the year.

(d)  The Partners are aware of the income tax consequences of the allocations made by this Article 4 and hereby agree to be bound by the provisions of this Article 4 in reporting their shares of Partnership income and loss for income tax purposes.

Section 4.5  <u>Obligation to Restore Deficits</u>.  Upon liquidation of the Partnership, any Partner with a deficit in its Capital Account will restore such deficit to the Partnership in a manner that comports with Section 1.704-1(b)(2)(ii) of the Regulations provided, however, that no Limited Partner will be required to restore any deficit that exceeds the maximum amount the Limited Partner can be required to provide to the Partnership as a Capital Contribution as set forth in Section 2.2 hereof.

Section 4.6  <u>Distributions</u>.

(a)  Net Cash Receipts shall be distributed semi-annually by the Managing General Partner as follows and in the following order of priority:

(1)  To pay any outstanding balance (together with interest thereon) on any Optional Deficiency Loans and any Optional LP Capital Funding, pro rata.

(2)  To the Investor Limited Partner to pay the Preferred Return for the current or any applicable previous fiscal years, together with interest accrued thereon, if any.

(3)  To the Development Group to pay the Subordinated Return in an amount equal to the amount distributed in such year to the Investor Limited Partner on account of its Preferred Return in respect of the current fiscal year.

(4)  Pro rata 50% to the Investor Limited Partner and 50% to the Development Group.

(b)  Net Proceeds of Refinancing or Net Proceeds of Sale, as the case may be, will be distributed by the Partnership as follows and in the following order of priority:

- 23 -

(1)  To pay any outstanding balance (together with interest thereon) on any Optional Deficiency Loans and any Optional LP Capital Funding, pro rata.

(2)  To the Investor Limited Partner to complete payment of Preferred Returns for all periods up to and including the current fiscal year, together with interest accrued thereon, if any.

(3)  To the Investor Limited Partner up to the amount of any unpaid balance of the Contributed Equity.

(4)  To the Investor Limited Partner to pay the Cumulative Priority Return, net of any distributions from operations actually paid to the Investor Limited Partner prior to such date that are in excess of the Preferred Returns and any previous distributions actually paid to the Investor Limited Partner on account of the Cumulative Priority Return.

(5)  To the Development Group in an amount equal to the aggregate distributions made pursuant to Sections 4.6 (b) (3) and 4.6 (b) (4).

(6)  Pro rata 50% to the Investor Limited Partner and 50% to the Development Group.

Section 4.7  <u>Effect on Capital Accounts</u>.  All allocations of Profits and Losses, any special allocations of items and any distributions made to the Partners under or pursuant to Article 4 shall be credited or debited, as the case may be, to the respective Capital Accounts of the Partners receiving such allocations and/or distributions.

Section 4.8  <u>Distributions as Return of Capital</u>.

(a)  A distribution made to Partners under this Article and under Section 8.2(b) shall be deemed a "return of contribution" to the extent that the distribution to the Partners reduces their share of the fair value of the net assets of the Partnership below the value, as set forth in the certificate of limited partnership, of their contributions that had not been distributed to them.

(b)  No "return of contribution" shall be made to a Partner unless the distribution is made pursuant to either Section 4.6 or Section 8.2(b).

Section 4.9  <u>Development Group Allocations</u>.  Profits and Losses allocated and any distributions made to the Development Group pursuant to this Agreement shall be allocated and divided among the Partners comprising the Development Group in accordance with their respective partnership interests in the Partnership at the date or dates of such allocations and/or distributions as set forth herein and on Exhibit A hereto.

— 24 —

Section 4.10  <u>Calculations for Canadian Income Tax Purposes</u>.  In order to enable the Investor Limited Partner to calculate its taxable income or loss for Canadian income tax purposes, but without affecting in any way the calculations or allocations for United States federal or state income tax purposes, the Partnership shall as at the end of each fiscal year:

(a)   calculate any loss for Canadian income tax purposes and allocate same pursuant to Section 4.2(b)(2), or

(b)   calculate any taxable income for Canadian income tax purposes and allocate same on a cumulative basis:

(1)   pursuant to Section 4.2(a)(3) to the extent of any cumulative losses allocated pursuant to Section 4.10(a), and

(2)   thereafter, pursuant to Sections 4.2(a)(2) and (3).

## ARTICLE 5

### EVENTS OF WITHDRAWAL AND ASSIGNMENTS OF INTEREST OF GENERAL PARTNERS

Section 5.1  <u>General Restrictions</u>.  Except as herein otherwise provided, the General Partners may not assign, sell, pledge, encumber or otherwise transfer an interest in the Partnership, or any part thereof, and may not voluntarily withdraw or otherwise retire as General Partners without the prior consent of the Investor Limited Partner.

Section 5.2  <u>Procedure Following Event of Withdrawal</u>.  Upon the occurrence of an Event of Withdrawal, the General Partner concerned shall cease to be a member of the Partnership and the remaining Partners shall have the option to liquidate the Partnership interest of such General Partner or to convert such interest to that of an assignee.  The Partnership and all its Partners shall be notified of an Event of Withdrawal by the involved General Partner or its legal representative or by any remaining General Partner.

Section 5.3  <u>Exercise of Option</u>.  The remaining Partners shall exercise their option to liquidate the interest of a General Partner or to convert such interest to that of an assignee by serving notice upon the involved General Partner or the legal representative of such General Partner within ninety (90) days from the date it receives notification of the Event of Withdrawal.  If the remaining Partners choose to liquidate the interest of such General Partner, the purchase price to be paid by the remaining Partners for the interest shall be the value of such interest (determined as set forth in Article 7) as of the date of such notice, and shall be paid in cash at a closing to be held within 30 days of the determination of such value.

Section 5.4  Continuation of Partnership.  If the remaining Partners exercise one of the options set forth in Section 5.3, the Partnership shall not dissolve, wind up and terminate but its business shall be continued if there is a remaining General Partner or, if there is not a remaining General Partner, if the Limited Partners unanimously consent to the appointment of a new General Partner within ninety (90) days of the Event of Withdrawal.  If necessary, the interests of the Partners shall be adjusted appropriately to reflect the liquidation of the General Partner's interest and, if applicable, the admission of a new General Partner.  If the remaining Partners do not exercise their option to liquidate the interest of the General Partner but convert the interest of the General Partner to that of an assignee, the Partnership shall not dissolve, wind up and terminate but its business shall be continued if there is a remaining General Partner or, if there is no remaining General Partner, if the Limited Partners unanimously consent to the continuance of the Partnership and unanimously appoint a new General Partner within ninety (90) days of the Event of Withdrawal.

Section 5.5  Termination.  Upon the occurrence of an Event of Withdrawal at such time as the Partnership has a sole General Partner, the Partnership shall be dissolved, wound up and terminated unless all of the Limited Partners consent to the continuance of the Partnership as contemplated in Section 5.4.

Section 5.6  Event of Withdrawal Defined.  For purposes of this Agreement, the term "Event of Withdrawal" shall mean:

(a)  Any one of the following being done or permitted by the General Partner:

(1)  making an assignment for the benefit of creditors;

(2)  filing a voluntary petition in bankruptcy;

(3)  being adjudicated bankrupt or insolvent;

(4)  filing a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or rule;

(5)  filing an answer or other pleading admitting or failing to contest the material allegations against it in any proceeding described in item (4), above; or

(6)  seeking, consenting to or acquiescing in the appointment of a trustee, receiver, or liquidator for it or for all or any substantial part of its properties;

(b)  the death or adjudication of incompetency of a General Partner who is a natural person;

(c)   the termination of the trust in the case of a General Partner that is trustee of the trust;

(d)   the dissolution and commencement of the winding up of a separate partnership in the case of a General Partner that is a separate partnership;

(e)   the filing of a certificate of dissolution, or the equivalent, or the revocation of its charter in the case of a corporate General Partner;

(f)   the distribution by the fiduciary of an estate's entire interest in the Partnership in the case of a General Partner that is an estate; or

(g)   the permitted withdrawal or retirement of a General Partner.

The commencement of a proceeding against a General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or rule without the consent to or acquiescence in the appointment of a trustee, receiver or liquidator by such General Partner will not be deemed to be an Event of Withdrawal and will not result in such General Partner ceasing to be a General Partner or otherwise dissolve the Partnership, provided that such proceeding is contested and continues to be contested by such General Partner.

Section 5.7  Substitute Limited Partner.  An assignee of all or any portion of a General Partner's interest in the Partnership shall be admitted as a Substitute Limited Partner only upon compliance with the following conditions:

(a)   The assignee must deliver to the Partnership an executed counterpart of the instrument of transfer, which may be a conversion notice, satisfactory in substance and form to the General Partners that contains a statement of the assignee's desire to be admitted as a Substitute Limited Partner and the assignee's agreement to be bound by this Agreement.

(b)   All of the General Partners and the Investor Limited Partner, in their sole discretion, consent to the admission of the assignee as a Substitute Limited Partner.

(c)   The assigning General Partner and the assignee execute and acknowledge such instruments as the General Partners may deem necessary or desirable to effect such admission, and the assignee agrees to pay all expenses in connection with such admission.

- 27 -

Section 5.8  **Absolute Restrictions**.  Notwithstanding any other provision of this Agreement to the contrary, without the prior written consent of all Limited Partners a General Partner shall not voluntarily withdraw or otherwise retire as a General Partner of the Partnership and shall not transfer, assign, sell, give, pledge, alienate, encumber or otherwise dispose of all or any part of its Partnership interest, whether voluntarily or by operation of law, or at judicial sale or otherwise, if the effect of same would result in the dissolution of the Partnership or would cause such General Partner to cease to be a General Partner of the Partnership under the Act, except to the extent such dissolution and/or cessation are permitted or provided for by the provisions of this Article 5.

## ARTICLE 6

### ASSIGNMENT OF INTEREST OF LIMITED PARTNER

Section 6.1  **Assignment**.

(a)  The Partnership interest of a Limited Partner, including the Investor Limited Partner, may be assigned only as permitted by the provisions of this Article 6.  Neither the Partnership nor any Partner shall be bound by any such assignment until a counterpart of the instrument of assignment, executed and acknowledged by the parties thereto, is delivered to the Partnership.

(b)  No assignee of all or part of the Partnership interest or any part thereof of any Limited Partner shall have the right to become a substitute or additional Limited Partner unless (i) his or its assignor has stated such intention in the instrument or assignment (ii) the General Partners have consented to such admission, the granting or denial of which consent shall be within the sole and absolute discretion of the General Partners, and (iii) the assignee has executed an instrument satisfactory in form and substance to the General Partners, whereby such assignee accepts and agrees to be bound by all the terms and provisions of this Agreement.  Notwithstanding the foregoing, the consent of the General Partners shall not be required if the assignee is a person who is otherwise a Partner. The substitution of a Limited Partner may be effected without the consent of any of the Limited Partners. The failure or refusal of the General Partners to consent to any such admission shall not affect the validity and effectiveness of any such instrument of assignment delivered to the Partnership as an assignment of the right to receive Partnership profits, losses or distributions with respect to the Partnership interest or part thereof transferred. At the time of admission of a substitute or additional Limited Partner, the Partnership may require the payment of a sum to reimburse it, or to provide

– 28 –

it with funds, for the payment of any reasonable expenses in
connection with such admission, including the expenses of
preparing an amendment to this Agreement and the expenses of
preparing and filing an amendment to the Certificate of Limited
Partnership of the Partnership.

(c)  Without the consent of the General Partners, no part
of the Partnership Interest of a Limited Partner may be
assigned or transferred to a minor or incompetent but the
consent of the General Partners shall not be required for any
assignment or transfer in trust for the benefit of any member
(including a minor or an incompetent) of such Limited Partner's
Immediate Family.

Section 6.2  Absolute Restrictions.

(a)  The assignment, sale, transfer or pledge of an
interest by a Limited Partner to any person is prohibited,
unless (i) the Partnership causes such interest to be
registered under the Securities Act of 1933, as amended, (ii)
counsel satisfactory to the General Partners has consented to
the Partnership an opinion that anu exemption from registration
is available and that such transfer will not otherwise violate
federal or state securities laws, or (iii) the General Partners
consent to the assignment, sale, transfer or pledge.

(b)  For a period of one (1) year from the date of its
execution of this Agreement, the Investor Limited Partner shall
not sell, assign or otherwise transfer its Limited Partnership
interest within the boundaries of the United States of America
or its territories or possessions, or to citizens, residents or
nationals thereof, or to any institution organized, chartered
or resident in the United States of America or its territories
or possessions.

Section 6.3  Capital Account Carryover.  Upon the transfer,
sale or other disposition of a Partner's interest, the capital
account of such transferor Partner shall carry over and become
the capital account of the transferee Partner and shall be
adjusted to reflect any adjustments to the basis of Partnership
assets that may result from such transfer.

Section 6.4  Bankruptcy and Other Events.  The Partnership
shall not be dissolved, wound up and terminated upon the death,
incapacity, dissolution, merger or bankruptcy of a Limited
Partner.

Section 6.5  Right of First Opportunity concerning
Bankruptcy and Other Events.  Within 30 days after the death,
incapacity, dissolution, merger or bankruptcy of a Limited
Partner, the Partnership is permitted to offer to acquire the
entire interest of such Limited Partner for an amount equal to
the value of the interest held by the Limited Partner
determined in accordance with Article 7.  If the Partnership

- 29 -

does not exercise its right to make an offer, the other
Partners will have an additional 120 days to make the same
offer. If one or more or all of the other Partners exercise
their right to make offers and such Partners cannot agree on
the proportions of such interest each will acquire, then they
will acquire the interests in the same relative proportions
that they share Profits. Payment for such interest may be made
in the manner described in Section 5.3. If an offer is made by
either the Partnership or one or more or all of the other
Partners to acquire the entire interest in the Partnership held
by such Limited Partner, the Limited Partner must accept the
offer.

Section 6.6 <u>Withdrawal of Limited Partner</u>. No Limited
Partner may withdraw from the Partnership at any time, except
as expressly provided in this Agreement.

Section 6.7 <u>Conversion to Limited Partner</u>. An assignee
(including an assignee of an interest formerly held by a
General Partner) cannot be required to make any additiona
Capital Contributions to the Partnership without first be
admitted as a Substitute Limited Partner.

Section 6.8 <u>Section 6050K</u>. Upon the transfer or
assignment of any Partnership Interest, including that of
General Partner, the assignor must provide to the Partners
the information set forth in Section 6050 K of the Code, a
the Partnership shall furnish the required information to
Internal Revenue Service, the assignor and the assignee as
required by such section.

Section 6.9 <u>Buy/Sell Arrangements; First Refusals</u>.
Notwithstanding any other provisions of this Agreement to t
contrary, the Investor Limited Partner and the Development
Group and each and every Partner that is a member thereof
hereby agree as follows:

(a) Each of the Investor Limited Partner and the
Development Group has a right of first refusal to purchase the
other's interest in the Partnership in the event of any bona
fide offer therefor made by any third party, which on the same
terms and conditions as are contained in such offer, right must
be exercised within 120 days of notice of such offer.

(b) Neither the Investor Limited Partner nor any
member of the Development Group shall be entitled to pledge,
hypothecate, mortgage or otherwise encumber its Partnership
interest in the Partnership without the other's prior written
consent.

(c) Each of the Development Group and the Investor
Limited Partner shall have the right to offer to purchase the
other's 50% interest in the Partnership provided that the other
party is given the option (to be exercised by written notice

- 30 -

within 120 days of receipt of such offer) to either agree to sell its Partnership interest for the price and on the terms and conditions provided in such offer or alternatively to purchase the offeror's 50% interest in the Partnership (a "Reversal") for the price and on the same terms and conditions contained in such offer, provided, however, that any offer to purchase the interest of the Investor Limited Partner (including pursuant to a Reversal of an offer by the Investor Limited Partner at a lower price) must be for a price not less than the aggregate of the Contributed Equity, any Optional LP Deficiency Loan (including accrued interest), any outstanding Preferred Return (including accrued interest) and any outstanding Cumulative Priority Return.

(d)   If either the Development Group or the member thereof or the Investor Limited Partner receives a bona fide offer acceptable to the recipient from an arm's length third party for the purchase of the entire Project, then such recipient can   require the other Partner, after written notice of such offer, to agree (by written notice to be given within 120 days of receipt of notice of the offer) either to have the Partnership sell the Project to such third party or to purchase the recipient's 50% interest in the Partnership for the same price the recipient would have received on the sale to the third party and otherwise the same terms and conditions contained in the offer, provided, however, that the net proceeds of sale of the Project, as applicable, must be sufficient to pay to the Investor Limited Partner the aggregate of the Contributed Equity, any Optional LP Deficiency Loans (including accrued interest), any outstanding Preferred Return (including accrued interest) and any outstanding Cumulative Priority Return.

(e)   The parties agree that the rights conferred in Sections 6.1, 6.9 (a), 6.9 (c) and 6.9 (d) may not be exercised or required to be exercised until after October 1, 1996.

ARTICLE 7

VALUE

Section 7.1 <u>Valuation of Interest</u>.   The "value" of a Partner's interest shall be such Partner's interest in the Partnership, determined from the books and records of the Partnership by the Auditors of the Partnership subject to the following adjustments to be made by such Auditors:

(a)   No allowance shall be made for goodwill, trade names or other similar intangible assets, except such which may have been specifically acquired by the Partnership with funds after the date of this Agreement, in which case such intangible assets shall be valued at their remaining unamortized cost.

- 31 -

(b)  All accounts payable shall be taken at their face amount, less discounts deductible therefrom, including any appraisal costs as set forth below, and all accounts or rents receivable shall be taken at their face amount, less a reasonable reserve for bad debts.

(c)  All real and tangible property or interests therein shall be appraised as herein provided, and the fair market value thereof, as determined by such appraisal (which shall be in writing), shall be used for purposes of determining "value." Within sixty (60) days of the event causing such appraisal, the selling or withdrawing Partner and the remaining Partner(s) shall agree on one appraiser; provided, however, that if they cannot agree on one appraiser, each side shall select one appraiser and the appraisers thus chosen will appoint a third appraiser.  The fair market value determined by the one appraiser if the parties have agreed on one appraiser, or, the average of the two closest fair market values determined by the three appraisers, shall be the fair market value of such property or property interests.

(d)  The value of the interest of the Partner shall be the amount the Partner would receive upon termination of the Partnership following a sale of all Partnership Assets at their values (as adjusted herein) as of the date of the sale or transfer of such interest.

(e)  The expense of the accounting and appraisal shall be borne by the selling or withdrawing Partner in the case of a sale, transfer or withdrawal due to assignments or other transfer of Partnership interest of such Partner and by the Partnership in the case of a sale due to the bankruptcy of a Partner.

(f)  Such determination (which shall be in writing), when made and delivered to the Partnership, shall be binding upon all concerned parties.

### ARTICLE 8

### DISSOLUTION AND TERMINATION OF THE PARTNERSHIP

Section 8.1  _Events Causing Dissolution_.  The Partnership shall dissolve, wind up and terminate upon the first to occur of the following:

(a)  The expiration of the term of the Partnership;

(b)  the occurrence of an Event of Withdrawal unless the business of the Partnership is continued as provided in Article 5;

(c)  the sale of all or substantially all of the assets of the Partnership and the collection and distribution of all proceeds (including interest on deferred payments) from such sale;

- 32 -

(d) upon the express written consent of all Partners.

Section 8.2 <u>Procedure on Termination</u>. Upon the occurrence of an event described in Section 8.1, the General Partners (or, if none, the person or persons required by law to carry out the winding up) shall proceed to liquidate and wind up the business of the Partnership. Upon 120 days' prior written notice to all of the Partners identifying the assets to be sold, the liquidating Partner or other required person may, in lieu of selling the Partnership Assets, convey undivided interests in the assets to the Partners or distribute the Assets in kind to the Partners. The Partnership Assets and the proceeds of any liquidation sale shall be applied and distributed at the closing of any sale in the following order of priority:

(a) To the payment of all debts and liabilities of the Partnership and all expenses of liquidation.

(b) To the setting up of such reserves as the liquidating Partner or other required person may deem necessary for any contingent liabilities of the Partnership. Any reserves shall be deposited with an attorney-at-law of the State of Florida, as escrowee, to be applied to the discharge of any contingent liabilities, and, at the expiration of whatever period the liquidating Partner or other required person may deem advisable, the balance shall be distributed as provided in clause (c) below.

(c) The balance, if any, shall be distributed to the Partners in accordance with their Capital Accounts after allocation of Profits, Losses, Gains and Liquidation Gains in accordance with Article 4 hereof.

Section 8.3 <u>Compliance With Timing Requirements of Regulations</u>. In the event the Partnership is "liquidated" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), (i) distributions shall be made to the Partners who have positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2), and (ii) if any Partner's Capital Account has a deficit balance (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which such liquidation occurs), such Partner shall contribute to the capital of the Partnership the amount necessary to restore such deficit balance to zero in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(3), provided, however, that no Limited Partner will be required to restore any deficit that exceeds the maximum amount the Limited Partner can be required to provide to the Partnership as a Capital Contribution as set forth in Article 2 hereof. In the discretion of the General Partners, a pro rata portion of the distributions that would otherwise be made to the Partners pursuant to the preceding sentence may be:

- 33 -

(a) distributed to a trust established for the benefit of the Partners for the purposes of liquidating Partnership assets, collecting amounts owed to the Partnership, and paying any contingent or unforeseen liabilities or obligations of the Partnership or of the Partners arising out of or in connection with the Partnership. The assets of any such trust shall be distributed to the Partners from time to time, in the reasonable discretion of the General Partners, in the same proportions as the amount distributed to such trust by the Partnership would otherwise have been distributed to the Partners pursuant to this Agreement; or

(b) withheld to provide a reasonable reserve for Partnership liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Partnership, provided that such withheld amounts shall be distributed to the Partners as soon as practicable.

Section 8.4 <u>Rights of Partners</u>. Except as otherwise provided in this Agreement, each Partner shall look solely to the assets of the Partnership for the return of its Capital Contribution and for any Partnership distributions to which it is entitled, shall have no right or power to demand or receive any distributions from the Partnership except as provided in Article 4 hereof, and shall have no right or power to demand or receive property other than cash from the Partnership.

ARTICLE 9

FISCAL MATTERS

Section 9.1 <u>Books and Records</u>. The General Partners shall maintain full and accurate books of the Partnership at the Partnership's principal place of business, showing all receipts and expenditures, assets and liabilities, profits and losses, and all other records necessary for recording the Partnership's business and affairs, including those sufficient to record the allocations and distributions provided for in Article 4. The books of the Partnership shall be kept on an accrual basis. Each Partner and his duly authorized representatives shall at all times during regular business hours have access to and may inspect and copy any of such books and records.

Section 9.2 <u>Fiscal Year</u>. The fiscal year of the Partnership shall be the calendar year unless otherwise required by Section 706 of the Code.

Section 9.3 <u>Reports</u>. Annual statements showing the income and expenses of the Partnership for the fiscal year and the balance sheets thereof as of the end of such year shall be reported upon by the Auditors. The Partnership shall have an annual audit of its books by the Auditors. Each Partner shall be furnished copies of such statements of income and expenses and of such audit, within seventy-five (75) days after the end

- 34 -

of each fiscal year of the Partnership. The Partnership, at its expense, shall also furnish to each Partner all necessary reports in sufficient detail to enable each Partner to prepare his tax return.  The Managing General Partner shall also cause the Partnership to provide to the Investor Limited Partner within 20 days after the last day of each such month unaudited monthly management/operating reports from the manager of the Project detailing the operations of the Project for the previous month.  The Partnership shall also furnish to any Partner, at such Partner's expense, such other reports on the Partnership's operations and condition as such Partner may reasonably request.

Section 9.4 <u>Bank Accounts and Investment of Funds</u>.  All funds of the Partnership shall be deposited in its name in such checking and savings accounts or time deposits or certificates of deposit as shall be designated by the General Partners from time to time.  Withdrawals therefrom shall be made upon such signature or signatures as the General Partners may designate.

Section 9.5 <u>Accounting Decisions</u>.  All decisions as to accounting matters, except as specifically provided to the contrary herein, shall be made by the General Partners in accordance with generally accepted accounting principles consistently applied.  Such decisions shall be acceptable to the Auditors, and the General Partners may rely upon the advice of the Auditors as to whether such decisions are in accordance with generally accepted accounting principles.

Section 9.6  <u>Federal Income Tax Elections</u>.

(a)  The Partnership shall elect to treat as an expense for Federal income tax purposes all amounts incurred for rent, real estate taxes, interest and other charges during or relating to the construction of the Project which may, in accordance with applicable law and regulations, be considered as expenses.

(b)  The Partnership shall, to the extent permitted by applicable statutes and regulations and upon obtaining any necessary approval of the Commissioner of Internal Revenue, elect to use such methods of accelerated depreciation on each depreciable unit of the assets of the Partnership as shall be most favorable to Limited Partners unless the General Partners determine, upon advice of the Auditors, that another method of depreciation will be more favorable to Limited Partners.

(c)  In the event of a transfer of all or part of the Partnership Interest of any Partner, the Partnership may elect pursuant to Section 754 of the Code (or corresponding provisions of future law) to adjust the basis of the assets of the Partnership.

- 35 -

## ARTICLE 10

### GENERAL PROVISIONS

Section 10.1  <u>Notices</u>. Except as otherwise provided in this Agreement, any and all notices, consents, waivers, requests, votes or other instruments or communications provided for under this Agreement shall be in writing, signed by the party giving the same and shall be deemed properly given only if hand-delivered, delivered by recognized overnight couriers, given or furnished by facsimile or other means of permanent visible communication, or sent by registered or certified mail, postage prepaid, return receipt requested, addressed:  (a) in the case of the Partnership, to the Partnership at the principal place of business of the Partnership, (b) in the case of a General Partner, or any Limited Partner, to such Partner at his or its address set forth in Exhibit A hereto.  Each Partner may, by notice to the Partnership, specify any other address for the receipt of such instruments or communications. Any such communication sent by telegram shall be properly given when received by the Person to whom it is sent.

Section 10.2  <u>Indemnification and Liability of General Partners</u>.  The Partnership shall indemnify the General Partners against any claim or liability incurred by them in connection with the business of the Partnership.  Neither the Partnership nor any Partner shall have any claim against the General Partners by reason of any acts or omissions that were performed in the good faith belief that they were acting within the scope of their authority under this Agreement and that such General Partners were not grossly negligent or guilty of misconduct with respect to such actions or omissions.  Except as provided herein or required by law, no General Partner shall have any obligation or liability to any other Partner or to make any advance to, or contribution to the capital of, the Partnership.  The right to indemnification provided in this Section 10.2 shall not extend to personal liability, if any, imposed on the General Partners under state or federal securities laws.

Section 10.3  <u>Integration</u>.  This Agreement embodies the entire agreement and understanding among the Partners relating to the subject matter hereof, and supersedes all prior agreements and understandings relating to such subject matter.

Section 10.4  <u>Applicable Law</u>.  This Agreement and the rights of the Partners shall be governed by and construed and enforced in accordance with the laws of the State of Florida.

Section 10.5  <u>Counterparts</u>.  This Agreement may be executed in several counterparts and all so executed shall constitute one Agreement binding on all the parties hereto, notwithstanding that all the parties are not signatory to the original counterpart, except that no counterpart shall be authentic unless signed by a General Partner.

Section 10.6  <u>Separability</u>.  In case any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and any other application thereof shall not in any way be affected or impaired thereby.

Section 10.7  <u>Binding Effect</u>.  Except as herein otherwise provided to the contrary, this Agreement shall be binding upon, and inure to the benefit of, the Partners and their respective heirs, executors, administrators, successors and permitted assigns.

Section 10.8  <u>Agreement for Further Execution</u>.  At any time or times upon the request of the General Partners, the Limited Partners agree to sign and acknowledge the certificate required by Chapter 620 of the Florida Statutes, to sign and acknowledge any amendment to or cancellation of such certificate as required by law, to sign and acknowledge similar certificates or affidavits or certificates of fictitious firm name or the like (and any amendments or cancellations thereof) required by the laws of Florida, or any other jurisdiction in which the Partnership does, or proposes to do, business, and cause the filing of any of the same for record wherever such filing shall be required by law.  This Section 10.8 shall not prejudice or affect the rights of Limited Partners to approve certain amendments to the Agreement pursuant to Section 11.1.

Section 10.9  <u>Certificate of Limited Partnership</u>.  The General Partners are not required to deliver or mail a copy of the Partnership's Certificate of Limited Partnership and any amendments thereto to any of the Limited Partners, except the Investor Limited Partner.

## ARTICLE 11

### AMENDMENTS

Section 11.1  <u>Authority to Amend</u>.  Amendments to this Agreement shall require the approval of the General Partners and the approval of the Limited Partners holding 60% or more of the Limited Partnership Interests held by all of the Limited Partners.

Section 11.2  <u>Notice of Amendments</u>.  A copy of any amendment to be approved by the Limited Partners pursuant to Section 11.1 shall be mailed in advance to the Limited Partners.

## ARTICLE 12

## REGISTRATION

Section 12.1  <u>Federal</u>.

All Limited Partners hereby represent and covenant that they are acquiring their interests solely for investment purposes and not with a view to the distribution or resale thereof.

All Limited Partners further represent and covenant that they are relying on their own professional tax, legal and other business advisors in making their decision to enter into and execute this Agreement.

Notwithstanding any statements contained in other Articles in this Agreement, no Limited Partnership Interest may be offered or sold and no transfer of such Limited Partnership Interest will be made either by the Partnership or the Partners unless:  (a) such interest is registered under the Securities Act of 1933, or (b) an opinion of counsel for the Partnership is obtained to the effect that registration is not necessary.

## ARTICLE 13

## DOCUMENTS AND ACKNOWLEDGMENT

Section 13.1  <u>Acknowledgments</u>.

(a)  Each of the Limited Partners and the Substitute Limited Partners signatory hereto, if any, acknowledges that prior to the date of execution of a counterpart of this Agreement, copies of any and all forms and statements filed with any applicable state division of securities or similar agency in connection with the sale of Limited Partnership Interests and all copies of any and all documents relating to this transaction have been and are available for inspection at the office of the Partnership or at the office of the Partnership's counsel.

(b)  Each of the parties hereto and each of the Substitute Limited Partners signatory hereto, if any, acknowledges that he has been advised of and hereby approves of the application of Partnership funds to pay all expenses incurred in connection with the formation of the Partnership and the sale of the Limited Partnership Interests, including, without limitation, legal fees, accounting fees, registration fees and filing and recording charges.

- 38 -

## ARTICLE 14

### POWER OF ATTORNEY

Section 14.1 <u>Power</u>. Except to the extent otherwise required by Florida law, each of the Limited Partners, including the Investor Limited Partner, irrevocably constitutes and appoints the General Partner, jointly and severally, with full power of substitution, his or its true and lawful attorneys in his or its name, place and stead to make, execute, swear to, acknowledge, deliver and file:

(a) Any certificates or other instruments which may be required to be filed by the Partnership under the laws of the State of Florida, or of any other state or jurisdiction in which the Partnership shall transact business or in which the General Partners shall deem it advisable to file;

(b) Any documents, certificates or other instruments, including, without limiting the generality of the foregoing, any and all amendments and modifications of this Agreement or the instruments described in Section 14.1(a) which may be required or deemed desirable by the General Partners to effectuate the provisions of any part of this Agreement, and, by way of extension and not in limitation, to do all such other things as shall be necessary to continue and to carry on the business of the Partnership; and

(c) All documents, certificates or other instruments which may be required to effectuate the dissolution and termination of the Partnership, to the extent such dissolution and termination is authorized hereby.

The power of attorney granted hereby shall not constitute a waiver of, or be used to avoid, the rights of the Limited Partners to approve certain amendments to this Agreement pursuant to Section 11.1 or be used in any other manner inconsistent either with Florida law or with the status of the Partnership as a limited partnership.

Section 14.2 <u>Survival of Power</u>. It is expressly intended by each of the Limited Partners that the foregoing power of attorney is coupled with an interest, is irrevocable and shall survive the death, incompetence, dissolution, adjudication of insanity, or disability of each such Limited Partner. The foregoing power of attorney shall survive the delivery of an assignment by any of the Limited Partners of his or its entire interest in the Partnership, except that where an assignee of such entire interest has become a substitute Limited Partner, then the foregoing power of attorney of the assignor Limited Partner shall survive the delivery of such assignment for the sole purpose of enabling the General Partners to execute, acknowledge and file any and all instruments necessary to effectuate such substitution.

ARTICLE 15

OTHER REQUIREMENTS
AND INCORPORATIONS BY REFERENCE

Section 15.1  HUD and Coinsuring Lender Requirements.  The Partnership is authorized to execute the Note and Mortgage in order to obtain the Mortgage Loan to be coinsured by the Coinsuring Lender and HUD and to execute a certain regulatory agreement ("Regulatory Agreement") between the Partnership and the Coinsuring Lender and such other documents as may be required by the Coinsuring Lender and/or HUD in connection with said Mortgage Loan.  Any incoming Partner, as a condition of receiving an interest in the Partnership, shall agree to be bound by the Note, Mortgage and Regulatory Agreement and other documents required in connection with said Mortgage Loan and to the same extent and on the same terms as the other Partners. Upon any dissolution, no title or right to possession and control of any of the Partnership's property, and no right to collect the rents therefrom, shall pass to any person who is not bound by the Regulatory Agreement in a manner satisfactory to the Coinsuring Lender and HUD.  The provisions of the Regulatory Agreement shall be controlling over any inconsistent provisions of this Agreement or other agreements among the Partners.  So long as the Coinsuring Lender and/or HUD or their successors and assigns have any interest in the Mortgage Loan or the Partnership property, this Agreement shall not be amended so as to alter or delete this Section 15.1 without the written consent of the Coinsuring Lender and HUD.

IN WITNESS WHEREOF, the parties have hereunto set their hands as of the day and year first above written.

ORIGINAL LIMITED PARTNER:
(WITHDRAWN)

_____
William O. Brisben

GENERAL PARTNERS:

_____
William O. Brisben

SPECIAL LIMITED PARTNER:

GRAY CONSTRUCTION CO., INC.

By:_____
    David F. Gray
    Chairman

W. O. BRISBEN COMPANIES, INC.

By:_____
    William O. Brisben,
    President

_____
Robert E. Schuler

6593a

- 40 -

# EXHIBIT A TO AGREEMENT OF LIMITED PARTNERSHIP

## GENERAL PARTNERS

| Names of Partner | Partnership Admission Date | Class | Interest |
|---|---|---|---|
| William O. Brisben | 9/18/89 | General | 5.0% |
| W.O. Brisben Companies, Inc. | 9/18/89 | General | 0.1% |
| Robert E. Schuler | 6/29/90 | General | 4.9% |

Aggregate Cash Contribution:    $100 Cash

## LIMITED PARTNERS

| | | | |
|---|---|---|---|
| Gray Construction Co., Inc. | 9/18/89 | Special Limited | 0.01% * |
| | Contribution: | $50 Cash | |
| Brisben Family Trust | 9/18/89 | Limited | 10% |
| | Contribution | $500 Cash | |
| William O. Brisben | 9/18/89 | Limited | 30% |
| | Contribution | $100 Cash | |
| Oakland Park (Florida) Limited Partnership | 6/29/90 | Investor Limited | 50% |
| | | $1,852,000 | |

* Included in William O. Brisben's 5.0% General Partner Interest

6593a/35

– 41 –

## LIMITED PARTNER SIGNATURE PAGE

The undersigned, desiring to become a Limited Partner of Oakland Lakes, Ltd. (the "Partnership"), hereby agrees to all of the terms of the Agreement of Limited Partnership of the Partnership (the "Agreement") and agrees to be bound by all of the terms and provisions thereof. The undersigned further constitutes and appoints the General Partners of the Partnership, jointly and severally, with full power of substitution, its true and lawful attorney for it in accordance with Article 14 of the Agreement. The power of attorney hereby granted shall be deemed to be coupled with an interest and shall be irrevocable. The place of residence or business address of the undersigned is as shown below. This power of attorney shall not be affected by any disability of the party granting it.

Executed, acknowledged and sworn to by the undersigned.

Limited Partner:

BRISBEN FAMILY TRUST

(To be completed by a General Partner)

By: _____, Trustee
(Signature of Limited Partner)

Capital Contribution
$ _____

_____
(Name of Limited Partner-Please Print)

_____
(Address)

_____
(City          State        Zip Code)

_____
(Taxpayer Identification or Social Security Number)

- 42 -

STATE OF _Ohio_ )
)ss:
COUNTY OF _Hamilton_ )

On this _5th_ day of _July_ _____, 1990, before me, the undersigned notary, personally appeared the Brisben Family Trust, by _W.O. Brisben_ _____, Trustee, known to me to be the person whose name is subscribed to the within instrument, and who subscribed and swore to such instrument and acknowledged that he executed the same as his free and voluntary act and deed, individually and as such trustee.

_____
Notary Public
KAREN L HARRIS
Notary Public, State of Ohio
My Commission Expires Nov. 13, 1991

My commission expires _____

Accepted:

_____
General Partner


## LIMITED PARTNER SIGNATURE PAGE


The undersigned, desiring to become the Investor Limited Partner of Oakland Lakes, Ltd. (the "Partnership"), hereby agrees to all of the terms of the Agreement of Limited Partnership of the Partnership (the "Agreement") and agrees to be bound by all of the terms and provisions thereof. The undersigned further constitutes and appoints the General Partners of the Partnership, jointly and severally, with full power of substitution, its true and lawful attorney for it in accordance with Article 14 of the Agreement. The power of attorney hereby granted shall be deemed to be coupled with an interest and shall be irrevocable. The place of residence or business address of the undersigned is as shown below. This power of attorney shall not be affected by any disability of the party granting it.

Executed, acknowledged and sworn to by the undersigned.

Limited Partner:

OAKLAND PARK (FLORIDA) LIMITED PARTNERSHIP
By:  Oakland Park (Florida) General Partner
     Ltd., an Ontario Corporation

(To be completed by          By:_____
 a General Partner)          (Signature of Officer)

Capital Contribution         OAKLAND PARK (FLORIDA) LIMITED PARTNERSHIP
$ 1,852,000                  (Name of Limited Partner-Please
                              Print)


                             #500, 330 University Avenue
                             (Address)


                             Toronto, Ontario          M5G 1S1
                             (City            State     Zip Code)


                             _____
                             (Taxpayer Identification or
                              Social Security Number)


Province  OF  Ontario   )
                        )ss:
 City    OF  Toronto    )

     On this  29th day of June, 1990, before me, the undersigned
notary, personally appeared the Oakland Park (Florida) Limited
Partnership, an Ontario limited partnership, by Oakland Park
(Florida) General Partner Ltd., an Ontario corporation,
by  Peter Simmie        , its    President            ,
known to me to be the person whose name is subscribed to the

- 44 -

within instrument, and who subscribed and swore to such instrument and acknowledged that he executed the same as his free and voluntary act and deed, individually and as such officer on behalf of said corporation and said limited partnership.

_____

Notary Public

My commission expires __N/A_____

Accepted:

_____

General Partner

6593a/0772o

- 45 -

## LIMITED PARTNER SIGNATURE PAGE

The undersigned, desiring to become the Investor Limited Partner of Oakland Lakes, Ltd. (the "Partnership"), hereby agrees to all of the terms of the Agreement of Limited Partnership of the Partnership (the "Agreement") and agrees to be bound by all of the terms and provisions thereof. The undersigned further constitutes and appoints the General Partners of the Partnership, jointly and severally, with full power of substitution, his true and lawful attorney for him in accordance with Article 14 of the Agreement. The power of attorney hereby granted shall be deemed to be coupled with an interest and shall be irrevocable. The place of residence or business address of the undersigned is as shown below. This power of attorney shall not be affected by any disability of the party granting it.

Executed, acknowledged and sworn to by the undersigned.

Limited Partner:

(To be completed by
 a General Partner)

_____
(Signature of Limited Partner)

Capital Contribution          William O. Brisben
$_____100.00_____           (Name of Limited Partner-Please
                               Print)

                              Suite 300, Ashwood Drive
                              (Address)

                              Cincinnati      OH      45241
                              (City          State   Zip Code)

                              ___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___
                              (Taxpayer Identification or
                               Social Security Number)

- 45 -

STATE OF OHIO –    )
                   )ss:
COUNTY OF HAMILTON)

On this 5th day of ~~June~~ July, 1990, before me, the undersigned notary, personally appeared the known to me to be the person whose name is subscribed to the within instrument, and who subscribed and swore to such instrument and acknowledged that he executed the same as his free and voluntary act and deed.

_____
Notary Public

KAREN L HARRIS
Notary Public, State of Ohio
My Commission Expires Nov. 13, 1991

My commission expires _____

Accepted:

W.O. Brisben Companies, Inc.,
General Partner

By:_____
   President

6593a/0772o

– 47 –

PROJECT NAME: **LAKES OF CASABLANCA**

PROJECT NO: <u>066-94026</u>          EFFECTIVE DATE: <u>February 1, 1995</u>

LOCATION:    <u>Oakland Park, FL</u> EXPIRATION DATE: <u>January 1, 2001</u>

# PROVISIONAL WORKOUT ARRANGEMENT

The undersigned mortgagor hereby expressly acknowledges that the Mortgage and Note secured by the above project is in default. To afford an opportunity to effect reinstatement, the Secretary, Department of Housing and Urban Development, will hold the defaulted Note and Mortgage on the subject project under the terms and conditions stated herein. Failure of the property to perform as projected will not excuse performance of any clauses in this Arrangement. The written terms of the workout are complete and there are no oral side agreements or verbal understandings which might affect the workout at some future date.

1. <u>Possession</u>. The mortgagor acknowledges that the default entitles HUD to assume possession of the encumbered premises, but that possession has not been demanded. As an inducement for HUD approval of this Arrangement, the mortgagor agrees that it will not oppose or interfere in any way should HUD demand possession by reason of subsequent default under the terms of this arrangement.

2. <u>Junior Obligations.</u> The mortgagor agrees that project revenues will not be used to repay either interest or principal for any project obligations, other than reasonable and necessary operating expenses, that are junior to the Secretary's lien.

3. <u>Payment Provision</u>. All payments will be made to the lock box and copies of each check will be sent to the Field Office in Jacksonville, Florida. The mortgagor agrees to make monthly payments in a timely manner until this Arrangement is accepted by all parties. Unless otherwise identified, at HUD's option, these remittances will be applied in the sequence illustrated on form HUD-2771, Statement of Multifamily Mortgage Account. The source of the amounts used in this Arrangement is form HUD-2771, Statement Of Multifamily Mortgage Account, payment due date 08/01/94. If the amounts on form HUD-2771 change, the mortgagor will pay the new amount billed monthly, with the exception that only the required percent of interest, as identified below, will be paid.

```
┌─────────────────────┐
│      EXHIBIT        │
│  _____   │
│                     │
│        D            │
│                     │
└─────────────────────┘
```

2

a.1. For the two (2) year period beginning February 1, 1995, and continuing through January 31, 1997, the mortgagor will remit by the first of each month $166,368.09, which consists of Service Charges of $9,405.90, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 70 percent of interest, which is $109,598.00.

a.2. Beginning February 1, 1997, and continuing through January 31, 1998, the mortgagor will remit by the first of each month $182,024.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 80 percent of interest, which is $125,255.00.

a.3. Beginning February 1, 1998, and continuing through January 31, 1999, the mortgagor will remit by the first of each month $197,680.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 90 percent of interest, which is $140,911.00.

a.4. Beginning February 1, 1999, and continuing through January 31, 2000, the mortgagor will remit by the first of each month $213,337.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 100 percent of interest, which is $156,568.00.

a.5. Beginning February 1, 2000, and continuing through January 31, 2001, the mortgagor will remit by the first of each month $228,994.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 110 percent of interest, which is $172,225.00.

b.  Failure to remit net cash is cause for HUD to proceed with foreclosure.   Net cash in excess of $25,000 remaining in the property accounts each month after payment of necessary and reasonable project operating expenses, and payment of the minimum monthly payment as noted in paragraphs 3(a)(1) through 3(a)(5) above, will be remitted to HUD within 15 days.   At HUD's option, these funds may first be applied against delinquent Other (Late) Charges and then against other accrued delinquencies in the payment sequence outlined as "Account Items" of form HUD-2771.

c.  At no time will the owner permit any delinquency to accrue in either the service charge due HUD or the tax escrow as billed by HUD each month.

     d.    A four percent late charge will be assessed against payments not received by the fifteenth of the month. In addition to the above payments, the owner will remit $2,000.00 monthly until Other Charges have been eliminated. Future Late Charges will be paid monthly as incurred. Any Late Charges not resolved upon completion of this Arrangement will be paid in full prior to Mortgage Modification.

4. **Lump Sum Payments.**  The owner will not remit any additional funds as a lump sum payment to meet equity capital requirements.

5. **Balance Sheet Reclassification.**  Owner agrees to reclassify $580,900 listed as Accounts Payable General Partner on the Balance Sheet to Equity. Owner certifies these funds were advanced to fund operating shortages since final endorsement and were used for necessary and reasonable operating expenses. These funds may only be recovered after successful completion of this Arrangement and may only be taken from Surplus Cash as that term is defined by the Regulatory Agreement. These funds do not represent a lien on the property.

6. **Mortgage Modification**

     a.    If the mortgagor has fully complied with the terms of this Arrangement and HUD has determined that it is financially feasible, as of February 1, 2001, HUD agrees to recast any delinquent principal and interest equal to or less than ten (10) percent of the original mortgage amount at the current mortgage interest rate of 8.25 percent, amortized over the remaining term of the mortgage, but not less than 180 months. The amount of delinquent interest and principal together cannot exceed ten percent of the original mortgage amount.

     b.    The mortgagor agrees to modify the Note and Mortgage to insert a call provision. The call provision gives the mortgagee the option to declare the entire indebtedness due and payable at or after ten (10) years from the date of the modification.

     c.    In the event the mortgage and note is considered for modification, the property must demonstrate that net operating income can support the increased debt service. If it cannot, the mortgagor agrees to fund the amount necessary to buy down the mortgage to an amount supportable by net operating income.

4

d.   If, at the time of recast, a delinquency in excess of the 10 percent HUD allowance remains, the owner will make a lump sum payment to fund the deficit.

7.   **Equity Kicker.**   If, at any time, Maker sells, assigns, transfers, converts or conveys the Property (collectively a "Sale") or, if Maker refinances the indebtedness secured by the Property (a "Refinancing"), twenty five and one quarter (25.25) percent of the Gross Sale, Conversion or Refinancing Proceeds shall be paid by Maker to Mortgagee or its successors and assigns at the closing of the Sale or Refinancing (the "Sale or Refinancing Obligation").   If none of the above circumstances occur and the Mortgagor pays the note in full through normal amortization, twenty five and one quarter (25.25) percent of the mutually agreed upon appraised value or twenty five and one quarter (25.25) percent of the original mortgage value, whichever is greater, shall be paid by Maker to Mortgagee or its successors and assigns on the date of Mortgage Satisfaction.

"Proceeds" are defined as the amount needed to payoff or refinance the note securing the real estate plus any equity "pulled", minus the mortgage balance and minus reasonable closing costs. Gross Sale, Conversion or Refinancing Proceeds shall also mean consideration of any kind directly or indirectly received by Maker, or its principals, in connection with a Sale, Conversion or Refinancing.

The obligation set forth above shall be effective until one of the stated conditions has been fulfilled and shall apply to the first Sale, Conversion, Mortgage Satisfaction or Refinancing, after the date of this Arrangement, which Mortgagee determines is an arms-length transaction for full value. No Sale or Refinancing shall occur unless Mortgagee consents in writing. Maker must certify (subject to 18 U.S.C. 1001) to Mortgagee that the Sale, Conversion or Refinancing is not an identity of interest transaction.

8.   **Repairs.**   Past delinquency in the Reserve for Replacement is hereby forgiven. The physical property will be maintained in accordance with the requirements of the Regulatory Agreement. All disbursements from the RFR Account will be approved by the Jacksonville Field Office in accordance with the Regulatory Agreement. The mortgagor agrees to monthly escrow $6,560.86 to the Reserve For Replacement account and acknowledges this amount may be increased at any time during this Arrangement if the Field Office determines an increase is necessary to maintain the property in a manner acceptable to HUD. Separate remittance checks must be written monthly, clearly identifying the payment to assure proper application by HUD. These checks will be submitted in addition to the minimum mortgage payment.

9.  **Accounting Reports.** During the term of this Arrangement, the mortgagor will submit monthly Reports for Establishing Net Income (Forms HUD-93479, 93480, and 93481). The reports will be mailed to the HUD Office in Jacksonville, Florida.

10. **Distributions.** The mortgagor agrees not to take any distributions while the mortgage is being held in default under the terms of this Arrangement and of the original Note, Mortgage and Regulatory Agreement.

11. **Cancellation Clause.** This Arrangement is on a month-to-month basis. The Secretary agrees to take no action because of the existing monetary default, provided the mortgagor remits the required minimum monthly payment and satisfactorily performs the other requirements of this Arrangement. Failure of the mortgagor to meet the terms of this Arrangement will be sufficient cause for the Secretary to immediately terminate this Arrangement and to commence foreclosure action. Failure of the mortgagor to meet the terms of the Arrangement is also grounds for the Department to consider taking administrative sanctions against the mortgagor including, but not limited to, suspension or debarment from participation in HUD programs.

12. **Criminal Sanctions for Misuse of Project Funds.** The mortgagor acknowledges that the use of project funds derived from the project covered by this Arrangement for any purpose other than to meet actual and necessary project expenses may be a criminal offense punishable by a fine of not more than $5,000 and imprisonment of not more than three (3) years or both.

DATE APPROVED: ___December 22, 1994___
_____Oakland Lakes, Ltd._____

MORTGAGOR SIGNATURE: _____

MORTGAGOR TITLE: ___William O. Brisben_____
_____General Partner_____

**ASSISTANT SECRETARY FOR HOUSING-FEDERAL HOUSING COMMISSIONER:**

BY: ___Ferdinand R. Juluke Jr.___

TITLE: ___Ferdinand R. Juluke, Jr., Director, Multifamily Division, 4HHS___

DATE: ___Jun 5, 1995___

95-198510   70005
05-11-95   02:48PM

PREPARED (IN CONSULTATION WITH
A MEMBER OF THE FLORIDA BAR) BY
AND AFTER RECORDING PLEASE RETURN TO:

Latham & Watkins
885 Third Avenue, Suite 1000
New York, New York 10022-4802
Attn: Joshua Stein, Esq.

Former FHA Project No.:        066-94026
Asset No.:                     10026
Project Name:                  LAKES OF CASABLANCA
County, State:                 Broward, Florida

ASSIGNMENT OF AMENDED AND RESTATED RENEWAL MORTGAGE, ASSIGNMENT
OF RENTS AND SECURITY AGREEMENT AND
OTHER COLLATERAL LOAN DOCUMENTS

The SECRETARY OF HOUSING AND URBAN DEVELOPMENT, solely in its capacity as
mortgagee ("HUD"), pursuant to the terms of that certain Amended and Restated Loan Sale Agreement
dated as of March 28, 1995 (the "Loan Sale Agreement") between HUD and Condor One, Inc., a Delaware
corporation ("Assignee"), having a mailing address of c/o General Electric Capital Corporation, 292 Long
Ridge Road, Stamford (Fairfield County), Connecticut  06927, Attention: Legal Operation, and in
consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by Assignee, hereby
assigns, transfers, sets over and conveys to Assignee, its successors and assigns, the following, all as they
may have been modified, consolidated, assigned, amended, restated, or supplemented (whether or not of
record) through and including May 8, 1995.



That certain Amended and Restated Renewal Mortgage, Assignment of Rents and Security
Agreement executed by Oakland Lakes, Ltd., a Florida limited partnership, for the benefit
of Cincinnati Mortgage Corporation, an Ohio corporation, as Mortgagee, dated October 5,
1989, and recorded on October 5, 1989, at Book 16818, Page 609, in the Official Records
of Broward County, Florida (the "Mortgage"), which Mortgage secures, that certain
Amended and Restated Renewal Mortgage Note dated October 5, 1989, made by Oakland
Lakes, Ltd., a Florida limited partnership, in favor of Cincinnati Mortgage Corporation, an
Ohio corporation ("Note"), together with the indebtedness secured by said Mortgage and
evidenced by said Note, and any right, title, and interest of HUD (if any) in and to the
property described in said Mortgage; and

FL 52-66-94026  ASSIGNMENT 1



EXHIBIT
E

Case 0:04-cv-xxxxx-xxx   Document xxx   Entered on FLSD Docket 02/05/xxxx   Page 216 of 456

- Such other documents, agreements, instruments, and other collateral (excluding the Regulatory Agreement referenced in the Mortgage) which evidence, secure or otherwise relate to HUD's right, title or interest in and to the Mortgage and/or the Note, including without limitation the Security Agreement, if any, and the title insurance policies and hazard insurance policies that may presently be in effect.

The Note was endorsed by HUD to Assignee without "FHA Mortgage Insurance" (as such term is defined in the Loan Sale Agreement).

IN WITNESS WHEREOF, HUD has caused this Assignment to be executed and delivered by its duly authorized agent as of May 8, 1995.

Witness:                                        SECRETARY OF HOUSING AND URBAN
                                                DEVELOPMENT


_____                         By _____
                                                   (Authorized Agent)
                                                   William Richbourg

                        ACKNOWLEDGMENT

DISTRICT OF COLUMBIA            )
                                )
                                )

BEFORE ME, _Rita R Ross_ a Notary Public in and for the jurisdiction aforesaid, on this _1st_ day of _MAY_, 1995, personally appeared _William Richbourg_, who is personally well known to me (or sufficiently proven) to be an authorized agent of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT and the person who executed the foregoing instrument by virtue of the authority vested in him/her and he/she did acknowledge the signing of the foregoing instrument to be his/her free and voluntary act and deed as the agent of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT, for and on behalf of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT for the uses, purposes and consideration therein set forth.

Witness my hand and official seal, this _1st_ day of _MAY_, 1995.


RECORDED IN THE OFFICIAL RECORDS BOOK
OF BROWARD COUNTY, FLORIDA
COUNTY ADMINISTRATOR
                                                _____
                                                Notary Public

                        Rita R. Ross
                        Notary Public, District of Columbia
My Commission expires: _____   My Commission Expires April 14, 1998


                                FL 52-66-94026  ASSIGNMENT 2

ICARD, MERRILL, CULLIS, TIMM,

FUREN & GINSBURG, P.A.

ATTORNEYS AND COUNSELLORS

2033 MAIN STREET, SUITE 600

SARASOTA, FLORIDA 34237

FACSIMILE (941) 366-6384

TELEPHONE (941) 366-8100

TAMPA TELEPHONE
(813) 221-2100

ROBERT E. MESSICK

REPLY TO:
P.O. BOX 4195
SARASOTA, FLORIDA 34230

April 29, 1999

VIA FAX TO (345) 489-2780,
CERTIFIED MAIL R/R/R,
AND REGULAR U.S. MAIL

Mr. William O. Brisben, individually and as
President of W.O. Brisben Companies, Inc.
7800 E. Kemper Road
Cincinnati, OH 45249

Re:    Oakland Lakes, Ltd., a Florida Limited Partnership

Dear Gentlemen:

The undersigned attorneys represent 813268 Ontario, Inc., an Ontario Corporation, being the newly appointed General Partner of Oakland Park (Florida) Limited Partnership, an Ontario Limited Partnership (the "Canadian Limited Partnership"). We would advise you that, pursuant to the enclosed Consent Order, 813268 Ontario, Inc., is the duly authorized General Partner of the Canadian Limited Partnership.

We have been requested by 813268 Ontario, Inc., as General partner of the Canadian Limited Partnership, to prepare and forward to you this correspondence which shall respond to your correspondence of April 13, 1999, to Mr. A. Peter Simmie at Nigel Stephens Counsel, Inc., Willowdale, Ontario, as well as your correspondence of April 20, 1999, to Mr. Peter Browning, Trinity Wood Capital Corporation, Toronto, Ontario. This will further respond to your follow up correspondence of April 23, 1999, to Mr. Browning and to the Canadian counsel of the General Partner, Mark L. Goodman of Solmon, Rothbart, Goodman, Toronto, Ontario.

It is the position of the Canadian Limited Partnership that the General Partner of the Florida Limited Partnership, Oakland Lakes, Ltd., is not authorized, pursuant to the terms and provisions of the Second Amended and Restated Agreement of Limited Partnership of Oakland Lakes, Ltd., to enter into or to consummate any negotiations, as contemplated by the above-specified correspondence. As stated by Mr. Browning in his correspondence to you of April 22, 1999, the Limited Partnership Agreement of the Florida Limited Partnership clearly does not authorize or permit the cash call requirements as set forth in your request. This correspondence constitutes a written direction on behalf of the Canadian Limited Partnership to you as the General Partner of the Florida Partnership that you are specifically not authorized to enter into any further negotiations and/or agreements of any nature with AMRESCO Capital or any other takeout lender.

We have had the opportunity to review with our client the terms and provisions of the provisional workout arrangements which were apparently executed by you as General Partner of the Florida Partnership dated February 1, 1995, with the Department of Housing and Urban Development/Condor/GE. We would



EXHIBIT
F

Mr. William O. Brisben, individually and as
President of W.O. Brisben Companies, Inc.
April 29, 1999
Page 2

further advise you that it is the position of the Canadian Limited Partner that that agreement and all related agreements were executed by you without authority and without the required consent of the Canadian Limited Partnership under the terms and provisions of the Second Amended and Restated Agreement of Limited Partnership of Oakland Lakes, Ltd.

On behalf of the Canadian Limited Partnership, we are requesting that a meeting be scheduled at your earliest possible convenience to review and to discuss with you the matters detailed in your correspondence referenced hereinabove, and to address the serious concerns of the Canadian Limited Partnership with respect to Oakland Park, the Florida Partnership, as noted hereinabove. Additionally, we would advise you of the election of the Canadian Limited Partnership to complete a comprehensive review and audit of all books, records, and operations of the Florida Limited Partnership at the earliest possible date and time. We would hope that the General Partner will fully and timely cooperate with each and all of these requests and demands of the Canadian Partnership. We await your prompt response in that regard.

Finally, this correspondence shall constitute written notice of the Canadian Limited Partnership's election to exercise its right to offer to purchase the 50% interest of the "Development Group" (as that term is defined in Subparagraph (n), Defined Terms, of the Second Amended and Restated Agreement of Limited Partnership of Oakland Lakes, Ltd.) for the price of $100.00. The purchase terms are cash payment in full at closing, with closing to be effective within 10 days of the date of receipt of this correspondence; excepting, specifically, the election of the Development Group to exercise its option to purchase the interests of the "Investor Limited Partner" (as that term is defined in the Second Amended and Restated Agreement of Limited Partnership of Oakland Lakes, Ltd.); any offer of the Development Group to purchase the interests of the Investment Limited Partner must be in compliance with Article 6, Section 6.9(c). Specifically, the offer to purchase the interests of the Investment Limited Partner must be for a price not less than aggregate of the Contributed Equity, any option L.P. Deficiency Loan (including accrued interest through the date of such purchase and closing), any outstanding Preferred Return (including accrued interest through the date of closing), and any outstanding Cumulative Priority Return.

Please review and provide the response of the Development Group to this offer of purchase made and exercised on this date by the Canadian Limited Partnership at your earliest possible convenience.

Very truly yours,

ICARD, MERRILL, CULLIS, TIMM,
FUREN & GINSBURG, P.A.

Robert E. Messick
For the Firm

# United States District Court

_____ DISTRICT OF _____

813268 ONTARIO, INC. as General
Partner of OAKLAND PARK (FLORIDA)
LIMITED PARTNERSHIP, an Ontario
limited partnership; as limited
partner of, and on behalf of
OAKLAND LAKES, LTD., a Florida
Partnership,         v.
                    Plaintiff,

v.

OAKLAND LAKES, LTD., a Florida
Limited Partnership, WILLIAMO.
BRISBEN, W.O. BRISBESN COMPANIES,
INC., and ROBERT E. SCHULER, as
General Partners of OAKLAND LAKES,
LTD, THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and CONDOR ONE,
INC., a Delaware Corporation,

                    Defendants.

### SUMMONS IN A CIVIL ACTION

CASE NUMBER: 00-6147 CIV LENARD
              Magistrate Turnoff

TO:    CT Corporation System, Registered Agent/Condor One, Inc., 1200 South
       Pine Island Road, Plantation, FL 33324

YOU ARE HEREBY SUMMONED and required to file with the Clerk of this Court and serve upon

PLAINTIFF'S ATTORNEY (name and address)

Richard T. Woulfe, Esquire
Bunnell, Woulfe, Kirschbaum,
  Keller, Cohen & McIntyre, P.A.
888 East Las Olas Boulevard, Suite 400
Fort Lauderdale, FL 33301

**20**

an answer to the complaint which is herewith served upon you, within _____ days after service of
this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint.

Clarence Maddox

FEB - 4 2000

CLERK

DATE

BY DEPUTY CLERK

AO 440 (Rev. 5/85) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and Complaint was made by me[1] | 2/7/00  2~ |
| NAME OF SERVER VALERIE ESTES | TITLE PROCESS SERVER |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served : _____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.
Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

☑ Other (specify): _Corporate — Ann Bautelur_
_Reg. Agent_

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on __2/7/00__    _Valerie Estes_
Date    Signature of Server

_200 S.E. 6 St_
Address of Server

_Fort Landy Fla_

1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

# United States District Court

_____ DISTRICT OF _____

813268 ONTARIO, INC., as General
Partner of OAKLAND PARK (FLORIDA)
LIMITED PARTNERSHIP, an Ontario
limited partnership; as limited
partner of, and on behalf of
OAKLAND LAKES, LTD., a Florida
Limited Partnership,

                              Plaintiff,

v.

OAKLAND LAKES, LTD., a Florida
Limited Partnership, WILLIAM O.
BRISBEN, W.O. BRISBEN COMPANIES,
INC., and ROBERT E. SCHULER, as
General Partners of OAKLAND LAKES,
LTD., THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and CONDOR ONE,
INC., a Delaware Corporation,

                              Defendants.

COMPLACNT EEXM

## SUMMONS IN A CIVIL ACTION

CASE NUMBER:    00-6147 CIV LENARD
                Magistrate Turnoff

RECD _2-4-00_

SERVED _W.C. ATKINSON, III_

DATE _2-8-00_  TIME _2:38 P.m_

PS _NEAL COCKER_

(Printed Name Here)

CERTIFIED IN THE CIRCUIT COURT OF
_12TH_ JUDICIAL CIRCUIT CERT # _168_

TO:  Atkinson, Wilson C., III, Registered Agent/W.O. BRISBEN COMPANIES, INC.,
     1946 Tyler Street, Hollywood, FL 33022

     **YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court and serve upon

PLAINTIFF'S ATTORNEY (name and address)

          Richard T. Woulfe, Esquire
          Bunnell, Woulfe, Kirschbaum,
            Keller, Cohen & McIntyre, P.A.
          888 East Las Olas Boulevard, Suite 400
          Fort Lauderdale, FL 33301

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of
this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint.

RECEIVED BY  W.C. ATKINSON, III

X _____ 2/8/00

**Clarence Maddox**                              FEB 2 4 2000

_____          _____
CLERK                                DATE

_____                                    B
BY DEPUTY CLERK

# RETURN OF SERVICE

| Service of the Summons and Complaint was made by me[1] | DATE  2-8-00    2:38 P.M |
|---|---|
| NAME OF SERVER  NEAL LOCHER | TITLE  S.P.S.  #168 |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served : _____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

☑ Other (specify):  CORPORATE SERVICE ON REGISTERED AGENT
WILSON C. ATKINSON, III

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on  2-8-00
      *Date*

*Signature of Server*  Neal Locher

200 S.E. 6 St. #300
FT. LAUDERDALE, FL. 33301
*Address of Server*

1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

# United States District Court

_____ DISTRICT OF _____

813268 ONTARIO, INC., as General
Partner of OAKLAND PARK (FLORIDA)
LIMITED PARTNERSHIP, an Ontario
limited partnership; as limited
partner of, and on behalf of OAKLAND
LAKES, LTD., a Florida Limited Partnership
                    v.        Plaintiff,

v.

OAKLAND LAKES, LTD., a Florida
Limited Partnership, WILLIAM O.
BRISBEN, W.O. BRISBEN COMPANIES,
INC., and ROBERT E. SCHULER, as
General Partners of OAKLAND LAKES, LTD.,
THE SECRETARY OF HOUSING AND URBAN
DEVELOPMENT, and CONDOR ONE, INC., a
Delaware Corporation.,
                              Defendants.

COMPLAINT €EXH

## SUMMONS IN A CIVIL ACTION

CASE NUMBER:   00-6147 CIV LENARD
               Magistrate Turnoff

REC'D 2-4-00

SERVED W.C. ATKINSON, III

DATE 2-8-00  TIME 2:3PP.~

PS  NEAL LOCHER
    (Printed Name Here)

CERTIFIED IN THE CIRCUIT COURT OF

17th JUDICIAL CIRCUIT CERT # 668

TO:  Atkinson, Wilson c. III, Registered Agent/Oakland Lakes, Ltd., 1946
     Tyler Street, Hollywooed, FL 33020
                     925-5501

YOU ARE HEREBY SUMMONED and required to file with the Clerk of this Court and serve upon

PLAINTIFF'S ATTORNEY (name and address)

Richard T. Woulfe, Esquire
Bunnell, Woulfe, Kirschbaum,
    Keller, Cohen & McIntyre, P.A.
888 East Las Olas Boulevard, Suite 400
Fort Lauderdale, FL 33301

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of
this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint.

RECEIVED BY W.C. ATKINSON, III

X _____  2/8/00

Clarence Maddox

CLERK

_____

BY DEPUTY CLERK

FEB 2 4 2000

DATE

AO 440 (Rev. 4/88) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and Complaint was made by me[1] | 2-8-00  2:38 P.~ |

| NAME OF SERVER | TITLE |
|---|---|
| NEAL LOCHER | S.P.S,  #16P |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served : _____
_____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.
Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____
_____
_____

☑ Other (specify): CORPORATE SERVICE ON REGISTERED AGENT
WILSON C. ATKINSON, III.
_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on   2-8-00          Neal Loche  #16P
              *Date*          *Signature of Server*
                             200 S. E. 6 ST.  #304
                             FT. LAUDERDALE, FL. 3330(
                             *Address of Server*

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|
| 10 Feb 00 | Brisben Companie,Inc.<br>7800 East Kemper Rd.<br>Cincinnati,Oh, 45210 |

| SERVED UPON | MANNER OF SERVICE |
|-------------|-------------------|
| William Brisben | personal |

| SERVED BY | TITLE |
|-----------|-------|
| Jeff Hildebrand | process server |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ___10 Feb 00___
                Date

_____
        Signature of Server

1212 Sycamore
Cincinnati,Oh 45210-

        Address of Server

# United States District Court

_____ DISTRICT OF _____

8:3268 ONTARIO, INC., as General
Partner of OAKLAND PARK (FLORIDA)
LIMITED PARTNERSHIP, an Ontario
limited partnership; as limited
partner of, and on behalf of OAKLAND
LAKES, LTD., a Florida Limited Partnership,
              v.        Plaintiff,

v.

OAKLAND LAKES, LTD., a Florida
Limited Partnership, WILLIAM O.
BRISBEN, W.O. BRISBEN COMPANIES,
INC., and ROBERT E. SCHULER, AS
General Partners of OAKLAND LAKES,
LTD., THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT adn CONDOR ONE, INC.,
a Delaware Corporation,
                    Defendants.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:    00-6147 CIV LENARD
                Magistrate Turnoff

TO:  WILLIAM O. BRISBEN, Brisben Companies, Inc., 7800 E. Kemper Road,
     Cincinnarti, Ohio 45249

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court and serve upon

PLAINTIFF'S ATTORNEY (name and address)

Richard T. Woulfe, Esquire
Bunnell, Woulfe, Kirschbaum,
  Keller, Cohen & McIntyre, P.A.
888 East Las Olas Boulevard, Suite 400
Fort Lauderdale, FL 33301

answer to the complaint which is herewith served upon you, within _____20_____ days after service of
this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint.

Clarence Maddox                              FEB 2 4 2000

CLERK                                        DATE

DEPUTY CLERK

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|
| 17 Feb 00 | 7800 E.Kemper Rd. Cincinnati Oh 45210 |

| SERVED UPON | MANNER OF SERVICE |
|-------------|-------------------|
| Robert Schuler | personal |

| SERVED BY | TITLE |
|-----------|-------|
| Jeff Hildebrand | process server |

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on __17 FEb 00__
　　　　　　Date

Signature of Server
1212 Sycamore
Cincinnati Oh 45210
Address of Server

# United States District Court

———————————— DISTRICT OF ————————————

813268 ONTARIO, INC., as General
Partner of OAKLAND PARK (FLORIDA)
LIMITED PARTNERSHIP, an Ontario
limited partnership; as limited
partner of, and on behalf of OAKLAND
LAKES, LTD., a Floydia Limtied
Partnership;

**SUMMONS IN A CIVIL ACTION**

Plaintif,

CASE NUMBER:   00-6147 CIV-LENARD
Magistrate Turnoff

v.

OAKLAND LAKES, LTD., a Florida Limited
Partnership; WILLIAM O. BRISBEN, W.O.
BRISBEN COMPANIES, INC., and ROBERT E.
SCHULER, as General Partners of OAKLAND
LAKES, LTD., THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and CONDOR ONE , INC.,
a Delaware Corporation,

Defendants.

TO:  ROBERT E. SCHULER, W.O. Brisben Companies, Inc., 7800 E. Kemper Road,
Cincinnati, Ohio 45249

YOU ARE HEREBY SUMMONED and required to file with the Clerk of this Court and serve upon

PLAINTIFF'S ATTORNEY (name and address)

Richard T. Woulfe, Esquire
Bunnell, Woulfe, Kirschbaum,
 Keller, Cohen & McIntyre, P.A.
888 East Las Olas Boulevard, Suite 400
Fort Lauderdale, FL 33301

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of
this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint.

Clarence Maddox

FEB - 4 2000

CLERK

DATE

BY DEPUTY CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

813268 ONTARIO, INC., as General
Partner of OAKLAND PARK (FLORIDA)
LIMITED PARTNERSHIP, an Ontario limited
partnership; as limited partner of, and on behalf of
OAKLAND LAKES, LTD., a Florida Limited
Partnership,

Case Number: 00-6147-CIV-LENARD
(Magistrate Judge Turnoff)

        Plaintiff,

vs.

OAKLAND LAKES, LTD., a Florida Limited
Partnership, WILLIAM O. BRISBEN, W.O.
BRISBEN COMPANIES, INC., and ROBERT E.
SCHULER, as General Partners of OAKLAND LAKES,
LTD., THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and CONDOR ONE,
INC., a Delaware Corporation,

        Defendants.

_____/

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM

Defendants, OAKLAND LAKES, LTD., a Florida Limited Partnership; WILLIAM O.

BRISBEN, W.O. BRISBEN COMPANIES, INC., and ROBERT E. SCHULER, as General

Partners of OAKLAND LAKES, LTD., by and through their undersigned attorney, answer the

Complaint of the Plaintiff and state:

## 1. INTRODUCTION

1.    Defendants admit that Plaintiff's have purportedly brought a limited partner

derivative action, but deny that Plaintiff is proceeding with and/or that it has stated a cause of

action under Florida Statute §620.163. Specifically Defendants allege that Plaintiff has failed to

Document Number 72911-1

1

comply with conditions precedent to Fla. Stat. §620.163 by failing to make demand on

Defendant to bring said action or to plead sufficient ultimate facts in support of said allegations

in accordance with Fla. Stat. §620.165. Defendants admit that Plaintiff is allegedly seeking

declaratory relief, but deny that Plaintiff has stated a cause of action under Florida Statute,

Chapter 86, and/or that the action is authorized by 28 U.S.C. §2201. Defendants admit that the

property location of the subject premises owned by Oakland Lakes, Ltd. is situated at 2325

Northwest 33rd Street, Fort Lauderdale, Florida; however, Defendants aver that the general

partner(s) is domiciled in Ohio. Defendants deny all other allegations not specifically admitted

in Paragraph 1.

## II. JURISDICTION

2.      Defendants deny the allegations of Paragraph 2.

3.      Defendants deny the allegations of Paragraph 3 and further aver that Plaintiff fails

to allege sufficient ultimate facts to plead a "Federal question" within this Court's jurisdiction.

4.      In answer to Paragraph 4, Defendants are without knowledge as to the Plaintiff's

domicile and/or whether it is the properly authorized general partner of Oakland Park (Florida)

Limited Partnership ("Oakland Park") and/or whether or not Oakland Park is a presently

constituted limited partnership under the laws of the province of Ontario, Canada. Defendants

admit that Oakland Lakes is a limited partnership presently organized and existing under the laws

of Florida. Defendants admit the residencies of the Defendants, W.O. BRISBEN COMPANIES,

INC., and ROBERT E. SCHULER. Defendants deny the allegation as to WILLIAM O.

BRISBEN. Defendants are without knowledge as to the organization and/or domicile of the

named Defendant, Condor One, Inc. (Condor). Defendants admit that HUD is a federal

CASE NO.: 00-6147-CIV-LENARD

corporation and a citizen of the District of Columbia. Defendants deny that the amount in controversy exceeds $75,000.00. Defendants deny all other allegations of Paragraph 4 not specifically admitted.

## III. VENUE

5.    Defendants deny the allegations of Paragraph 5.

## IV. PARTIES

6.    Defendants admit that Oakland Park "invested in excess of 1.8 million dollars in Oakland Lakes," and that Oakland Park executed the Amended Limited Partnership Agreement as described in Paragraph 23 and pursuant thereto it has a 50% limited partnership interest in Oakland Lakes. Defendants are without knowledge of the remaining allegations of Paragraph 16.

7.    Defendants admit that Oakland Lakes was formed for the development and ownership of certain real and personal property, including an apartment complex in Oakland Park, Florida, initially known as Lakes of Casablanca Apartments, and presently known as Sailboat Pointe Apartments, and denies all other allegations not specifically admitted.

8.    Defendants admit the ownership interest of WILLIAM O. BRISBEN as alleged in Paragraph 8. Defendants admit that the general partners, including WILLIAM O. BRISBEN have all the rights and obligations as further specified and set forth by the Second Amended Limited Partnership Agreement. Defendants deny all other allegations not specifically admitted in Paragraph 8.

CASE NO.: 00-6147-CIV-LENARD

9.    Defendants admit the ownership interest of W.O. BRISBEN COMPANIES INC. as alleged in Paragraph 9. Defendants admit that W.O. BRISBEN COMPANIES INC, as general partner has all the rights and obligations as further specified and set forth by the Second Amended Limited Partnership Agreement. Defendants deny all other allegations not specifically admitted in Paragraph 9.

10.    Defendants admit the ownership interest of ROBERT E. SCHULER as alleged in Paragraph 10. Defendants admit ROBERT E. SCHULER, is a general partner and has the rights and obligations as further specified and set forth by the Second Amended Limited Partnership Agreement. Defendants deny all other allegations not specifically admitted in Paragraph 10.

11.    Defendants admit the allegations of Paragraph 11.

12.    In response to Paragraph 12, Defendants admit that Condor purportedly holds an assigned interest and/or as a holder/holder in due course but are without knowledge of the documents alleged by Plaintiff and purportedly assigned by HUD. Defendants deny all other allegations of Paragraph 12 not otherwise admitted.

## V. GENERAL ALLEGATIONS

13.    Defendants admit that in or about 1989 Oakland Lakes, Ltd. obtained certain mortgage financing for the development and construction, ownership and operation of the "Project", and that a loan was extended, *inter alia*, through Cincinnati Mortgage Corporation. Defendants deny all other allegations of Paragraph 13 not specifically admitted.

14.    Defendants are without knowledge of Paragraph 14, as alleged.

CASE NO.: 00-6147-CIV-LENARD

15.    Defendants admit that Cincinnati Mortgage issued a commitment for "insurance of advances", (the "Firm Commitment") and further avers that said documents speak for themselves. Defendants deny all other allegations of Paragraph 15 not specifically admitted.

16.    In response to Paragraph 16, Defendants admit that the Florida Housing Financing Agency ("FHFA") participated in the financing and funding of the insured loan, and further avers that the documents incident thereto speak for themselves. Defendants deny all other allegations of Paragraph 16 not admitted.

17.    Defendants are without knowledge as to the agreements by and between Kidder Peabody & Co. Incorporated and Dean Witter Reynolds, Inc. and/or as to the "Bond Purchase Agreement" other than to aver that the documents speak for themselves. Defendants deny all other allegations of Paragraph 17 not otherwise admitted.

18.    In response to Paragraph 18, Defendants admit that on or about October 5, 1989, Oakland Lakes, Ltd. executed and delivered to Cincinnati Mortgage certain "Loan Documents" and aver that  the documents speak for themselves, Said Loan Documents include  (the "Note") dated October 5, 1989, evidencing a loan in the original principal amount of $22,779,600.00 together with a mortgage, as amended and restated (the "Mortgage") encumbering the real and personal property and intangible property therein described, and said mortgage constituted a first mortgage lien against the property.  Defendants further admit that Oakland Lakes executed certain collateral and other related loan documents including a Regulatory Agreement and a Land Use Restriction Agreement. Defendants can neither admit or deny the allegations referenced in Paragraph 18(c) of Plaintiff's

5

CASE NO.: 00-6147-CIV-LENARD

Complaint, as the documents are not attached.    Defendants admit that attached to Plaintiff's

Complaint are true and correct copies of the Note and Mortgage, as amended, specifically <u>Exhibits</u>

<u>"A"</u> and <u>"B"</u> to the Complaint.  Defendants admit that Oakland Lakes entered into a Limited

Partnership Agreement for the Oakland Lakes project, not attached to Plaintiff's Complaint, which

Agreement was subsequently amended as further described in Paragraph 23 known as the "Amended

Limited Partnership Agreement", and further amended and referred to as the Second Amended and

Restated Agreement of Limited Partnership for Oakland Lakes, dated on or about June 29, 1990.

Defendants deny all other allegations of Paragraph 18 not specifically admitted.

19.    Defendants are without knowledge as to the allegations of Paragraph 19, deny same

and demand strict proof thereof.

20.    Defendants admit that on or about October 5, 1989, the Mortgage Note was endorsed

for co-insurance and are without knowledge as to delivery by Cincinnati Mortgage of "Loan

Documents" as alleged and demand strict proof thereof.

21.    Defendants admit that on or about October 5, 1989 or prior thereto, Oakland Lakes

commenced construction of the apartment complex.

22.    Defendants are without knowledge as to the date and/or delivery by Cincinnati

Mortgage, as alleged, of the documents referred to in Paragraph 22 and/or the "custodian" of GNMA

and/or Trustee of the Bonds as alleged.  Defendants deny all other allegations of Paragraph 22 not

specifically admitted.

23.    Defendants admit that on or about June 29, 1990, the Limited and General Partners of Oakland Lakes, as alleged in Paragraph 23, executed the ("Second"), "Amended Limited Partnership Agreement", which is attached as Exhibit "C" to the Complaint. Defendants admit that the written terms and provisions of the Second Amended Limited Partnership Agreement have not been further amended in writing and that the parties have conducted business as further set forth by the Agreement, as well as by oral agreement and understanding(s) and/or with the knowledge/approval between the parties as to the development and financing/workout financing of the Property. Defendants deny all allegations of Paragraph 23 not otherwise admitted.

24.    Defendants deny the allegations of Paragraph 24, as alleged and aver the "Loan Documents" speak for themselves.

25.    Defendants are without knowledge as to the allegations of Paragraph 25 and/or as to the date and/or delivery of the Loan Documents as alleged in Paragraph 25. Defendants deny all other allegations of Paragraph 25 not specifically admitted.

26.    Defendants are without knowledge as to the date and/or conversion from co-insurance to full insurance and/or delivery of the loan file and/or Loan Documents as alleged. Defendants deny all other allegations of Paragraph 26 not specifically admitted.

27.    Defendants admit that on or about the time of completion of construction of the apartment complex, there were insufficient funds for the payment in full of the mortgage obligations under the loan documents and that a default occurred. Defendants are without knowledge as to the second sentence of the allegations of Paragraph 27 as alleged, and demands strict proof thereof. Defendants deny all allegations of Paragraph 27 not specifically admitted.

28.    Defendants admit that HUD entered into settlement-workout negotiations with Oakland Lakes through its general partner(s).  Defendants deny all other allegations of Paragraph 28 not specifically admitted.

29.    In response to Paragraph 29, Defendants aver that on or about December 22, 1994, Oakland Lakes by its general partner William O. Brisben, executed a written provisional Workout Arrangement Agreement (the "Workout Arrangement") and that HUD executed same on or about January 5, 1995 and as further set forth by Exhibit "D" to Plaintiff's Complaint.  Defendants further admit that a true and correct copy of the Workout Arrangement is attached as Exhibit "D" to the Complaint.  Defendants deny all other allegations of Paragraph 29 as alleged not specifically admitted.

30.    Defendants deny the allegations of Paragraph 30 as alleged, and further aver that the (Second) Amended Limited Partnership Agreement speaks for itself.  Defendants further aver that the Workout Arrangement was entered into with the knowledge of the partners, both limited and general of Oakland Lakes.  Defendants deny all other allegations of Paragraph 30 not otherwise admitted.

31.    Defendants deny the allegations of Paragraph 31.

32.    In response to Paragraph 32, Defendants are without knowledge of the allegations, as alleged.  Defendants admit that a copy of a document purporting to be an assignment from HUD to Condor and referring to a date of May 8, 1995 is attached as Exhibit "E" and that the Note was endorsed/assigned by HUD.  Defendants further aver that the document speaks for itself and deny all other allegations of Paragraph 32 not specifically admitted.

33.    Defendants deny the allegations of Paragraph 33, as alleged.

34.    Defendants deny the allegations of Paragraph 34, as alleged.

35.    Defendants deny the allegations of Paragraph 35, as alleged; admit that attached to Plaintiff's Complaint as Exhibit "F" is a letter dated April 29, 1999 and aver that the document speaks for itself. However, Defendants deny the characterization of the document, and its content.

36.    In answer to Paragraph 36, Defendants admit that they did not accept the purported "offer", as set forth in the April 29, 1999 letter, to sell their interests for $100.00 in the Project, and further aver that they were not required to do so. Defendants further aver that the parties are presently in litigation, *inter alia*, on said issue before the Honorable Leroy H. Moe , Case Number: 99-10831 CACE (13) in and for the Seventeenth Judicial Circuit. Defendants deny all other allegations of Paragraph 36 not specifically admitted.

37.    In response to Paragraph 37, Defendants admit that Oakland Park initiated a suit in the Circuit Court, as alleged, Case Number: 99-10831 CACE (13) and that the action speaks for itself. Defendants deny all allegations of Paragraph 37 not specifically admitted.

38.    In response to Paragraph 38, Defendants admit that there is a pending Motion to Appoint a Receiver in the State Court Action, and avers that there is a pending trial date the week of April 10, 2000. Defendants deny all allegations of Paragraph 38 not specifically admitted.

39.    Defendants deny the allegations of Paragraph 39, as alleged.

40.    Defendants admit that at the time of the bringing of this action, Oakland Park is a partner of Oakland Lakes and was also a partner at the time of the Workout Arrangement. Defendants deny Plaintiff, 813268 Ontario Inc. was a partner of Oakland Park at the time of the

Workout Arrangement, and is without knowledge as to whether 813268 Ontario Inc. is a partner/general partner of Oakland Park and further aver on information and belief that it does not have standing under the Second Amended Limited Partnership Agreement to be a limited partner/general partner. Defendants deny all other allegations of Paragraph 40.

41. Defendants deny the allegations of Paragraph 41.

42. Defendants deny the allegations of Paragraph 42.

43. Defendants specifically deny the allegations of Paragraph 43 and further adopt the affirmative defenses as set forth below and the specific averments set forth above.

### COUNT I

44. Defendants, in response to Paragraph 44, re-aver and reallege the responses and matters set forth in Paragraphs 1 through 43 above which are herein incorporated.

45. In response to Paragraph 45, Defendants deny the allegations, as alleged, and further aver that the documents including the Workout Arrangement, (Second) Amended Limited Partnership Agreement, Mortgage and Loan Documents speak for themselves. Defendants further incorporate the matters set forth in the affirmative defenses below.

46. In response to Paragraph 46, Defendants are without knowledge as to whether Oakland Park, HUD and/or Condor have a disagreement and/or whether or not the parties, specifically HUD and/or Condor One have communicated with Oakland Park regarding the parties respective rights, duties and obligations under the Workout Arrangement, Mortgage and Loan Documents and/or collateral Loan Documents. Defendants deny all other allegations of Paragraph 46 not otherwise admitted.

47.    Defendants deny the allegations of Paragraph 47.

## COUNT II

48.    Defendants in response to Paragraph 48, re-aver and reallege the responses and the matters set forth in Paragraphs 1 through 43 above which are herein incorporated.

49.    Defendants are without knowledge as to the purported terms of an assignment from HUD to Condor and whether or not on or about May 8, 1995, and aver that any such documents speak for themselves. Defendants deny all allegations of Paragraph 49 not specifically admitted.

50.    Defendants deny the allegations of Paragraph 50, as alleged, and further aver that the Workout Arrangement, as attached to Plaintiff's Complaint speaks for itself.

51.    Defendants deny the allegations of Paragraph 51, as alleged, and aver that any documents, including an "assignment by HUD" to Condor, whether or not on May 8, 1995, speak for themselves.

52.    Defendants deny the allegations of Paragraph 52, as alleged.

53.    Defendants deny the allegations of Paragraph 53, as alleged.

54.    Defendants deny the allegations of Paragraph 54, as alleged.

## COUNT III

55.    In response to Paragraph 55, Defendants re-aver and reallege the responses and the matters set forth in Paragraphs 1 through 43 above which are herein incorporated.

56.    In response to Paragraph 56, Defendants aver that the Workout Arrangement speaks for itself as attached to Plaintiff's Complaint and denies the remaining allegations.

57.    Defendants deny the allegations of Paragraph 57, as alleged, and further aver that the Workout Arrangement speaks for itself, as well as the subject Note, Mortgage and other Loan Documents.

58.    Defendants deny the allegations of Paragraph 58, as alleged.

59.    Defendants deny the allegations of Paragraph 59, as alleged.

60.    Defendants deny the allegations of Paragraph 60, as alleged.

## COUNT IV

61.    Defendants deny the allegations of Paragraph 61, as alleged.

62.    Defendants repeat and reallege their response to Paragraphs 1 through 43 and the matters set forth therein as if fully stated herein.

63.    Defendants, in response to Paragraph 63, aver that the Defendants, as general partners, exercised the requisite duty of care and loyalty to Oakland Lakes in accordance with the (Second) Amended Limited Partnership Agreement and deny all allegations not specifically admitted.

64.    Defendants deny the allegations of Paragraph 64, as alleged.

65.    Defendants deny the allegations of Paragraph 65, as alleged.

66.    Defendants deny the allegations of Paragraph 66, as alleged.

67.    Defendants deny the allegations of Paragraph 67, as alleged.

68.    Defendants deny the allegations of Paragraph 68, as alleged.

69.    Defendants deny the allegations of Paragraph 69, as alleged.

70.    Defendants deny the allegations of Paragraph 70, as alleged.

71.   Defendants deny the allegations of Paragraph 71, as alleged.

72.   Defendants deny the allegations of Paragraph 72, as alleged.

73.   Defendants deny the allegations of Paragraph 73, as alleged.

74.   Defendants deny the allegations of Paragraph 74, and further aver that, in fact, Plaintiff by its action(s) and inaction(s) has prevented efforts to restructure the existing first mortgage loan and related Loan Documents.

75.   Defendants deny the allegations of Paragraph 75, as alleged.

76.   Defendants deny the allegations of Paragraph 76, as alleged.

77.   Defendants deny the allegations of Paragraph 77, as alleged.

## AFFIRMATIVE DEFENSES

78.   **I. STATUTE OF LIMITATIONS** - Plaintiff's cause(s) of action(s) is barred by Fla. Stat., §95.11(2) and §95.11 (3).  The "Workout Arrangement", which is the subject matter of Plaintiff's Counts I, II and III and on which Plaintiff premises its damage claim in Count IV was executed by Oakland Lakes on December 22, 1994 and HUD on January 5, 1995.  Plaintiff's action was filed January 31, 2000.  The Workout Arrangement was executed and delivered, and the action(s) of HUD and Oakland Lakes occurred more than five years prior to the initiation of this lawsuit.  Moreover, Plaintiff as a Limited Partner of Oakland Lakes knew and/or had knowledge of the Workout Arrangement as well as the underlying default and negotiations by and between Oakland Lakes and HUD which were the subject matter of said Workout Arrangement prior thereto. Further, upon information and belief, Defendants allege that Oakland Park had engaged counsel in or about 1992 to monitor the negotiations by and between HUD and Oakland Lakes and had

knowledge of the substance and financial condition(s) of Oakland Lakes as stated in said Workout Arrangement as well as the execution and delivery thereof. Moreover, Oakland Park after the execution of the Workout Arrangement received and reviewed the documents and substantive matters addressed therein.

79. **II. FAILURE OF CONDITIONS PRECEDENT** - Plaintiff has failed to allege, as a condition precedent(s) to its Action, the statutory requisites of Fla. Stat., §620.163 and/or §620.165. Plaintiff fails to allege a demand on HUD or to Oakland Lakes to initiate an action and/or that it took such action as may have been required, if any, with HUD and/or Condor to determine the applicability of the Workout Arrangement and/or effect of the assignment/endorsement of the Loan Documents and/or as may be required by the Workout Arrangement, Note and/or Mortgage Loan Documents. Further, Plaintiff fails to allege the reasons for its failure to comply with the statutory requirements.

80. **III. STANDING** - Plaintiff has failed to allege sufficient ultimate facts to establish that it has complied with Fla. Stat., §620.163, in order to seek declaratory relief and/or damages against Defendants, for and on behalf of Oakland Lakes, and specifically as a limited partner derivative action and/or that the alleged action is in the best interest of the partnership. Further, Plaintiff as the alleged general partner of Oakland Park, does not have standing as it purports to claim an interest in the alleged Oakland Lakes/Oakland Park Partnership contrary to the terms of the (Second) Amended Limited Partnership Agreement, Paragraph 6.1 and further fails to allege compliance with the conditions set forth therein.

81.    **IV. ESTOPPEL/PROMISSORY ESTOPPEL** - Plaintiff, with full knowledge of the lack of sufficient operating rental income to meet mortgage payments and the initial default under the loan documents, on or about February 1, 1992, and thereafter the extensive negotiations by Oakland Lakes and HUD for a period of more than two years resulting in the HUD Workout Arrangement failed to object to the terms and conditions thereof following its execution and delivery, and moreover, failed to object and/or to take any action that would have indicated Plaintiff's objection thereto. Said action or inaction, omission or commission, by Plaintiff was with knowledge, and receipt by it, of the benefits of the Workout Arrangement, including the consideration(s) stated therein and resulting, *inter alia*, in waiver by HUD of its foreclosure rights. The Workout Arrangement benefited Oakland Lakes and resulted in the protection and preservation of the Partnership Assets. Moreover, Plaintiff benefitted in the performance by Oakland Lakes of the Workout Arrangement. But for the Workout Arrangement, the Property would have been foreclosed by HUD unless Plaintiff and/or Defendants had made substantial additional "capital" investments and/or "Optional Limited Partnership Deficiency Loans" and/or "Optional Deficiency Loans".

82.    **V. WAIVER** - Plaintiff, with knowledge and intent, waived any objection, or right to object, to the HUD Workout Arrangement as alleged in Paragraph 81 above.

83.    **VI. LATCHES** - Plaintiff is barred by latches and Defendants incorporate the allegations and matters set forth in Paragraphs 78 and 81 above.

84.    **VII. RATIFICATION** - Plaintiff ratified the actions of Oakland Lakes and the Workout Arrangement. Defendants incorporate the allegations and matters set forth in Paragraphs 78 and 81 above.

85.  **VIII. BREACH OF CONTRACT: ATTORNEYS' FEES: SET OFF** - Plaintiff's action(s) is a breach of the (Second) Amended Limited Partnership Agreement and of Plaintiff's covenant of good faith and fair dealing as required pursuant thereto. Plaintiff's action(s) has resulted in damages to Defendants including any claims by HUD and/or Condor for indemnity, fees and expenses including their respective attorneys' fees pursuant to the Loan Documents, if any, for which Defendant seeks set off and recovery including Oakland Lakes' reasonable attorneys' fees and costs.

86.  **IX. UNCLEAN HANDS** - Defendants incorporate paragraphs 78 - 85 above, and further allege that Plaintiff's have failed and refused to participate in, or assist in, obtaining alternative financing.

87.  **X. INDEMNITY: SET OFF**

A.  Oakland Lakes, Defendants and Oakland Park entered into the Second Amended and Restated Agreement of Limited Partnership of Oakland Lakes, Ltd., dated June 29, 1990, which is attached as Exhibit "C" to Plaintiff's Complaint. Pursuant to the Second Amended and Restated Agreement of Limited Partnership, *inter alia*, the General Partners/Defendants pursuant to Section 3.1, "Management of Partnership Business" and Section 3.2, "Powers of General Partners" and Section 3.3, "Exercise of Rights and Powers by General Partners" had the right and duty to manage the business of the Partnership and further to use their best efforts to carry out the purposes, business and objectives of the Partnership. Pursuant thereto, the General Partners had all the necessary powers to carry out the purposes, business and objectives referred to in Section 1.3 of the Partnership Agreement and possessed and enjoyed all of the rights and powers of partners of a Partnership, without limited partners, except as otherwise provided by Florida Law and/or as limited

by the Agreement. Said rights, powers and duties authorized the general partners to enter into the Workout Arrangement in order to preserve, protect and maintain the property and prevent a foreclosure resulting from the default under the terms of the Note, Mortgage and Loan Documents. Said rights included pursuant to Section 3.2, "Powers of General Partners," to refinance any mortgage indebtedness which is a lien and encumbrance on the project for the aggregate amount of the Mortgage Loan, "capital contributions" of the partners (including the contributed equity); any outstanding "optional deficiency loans" and/or "optional LP deficiency loans," any outstanding "preferred return" and any outstanding "cumulative priority return". The general partners had/have the right to consummate any refinancing for a lesser amount without obtaining consent from any limited partner, including but not limited to the Investor Limited Partner. Defendants aver that to the extent the Workout Arrangement required Limited Partner approval and/or exceeded said aggregate sum, if applicable, the Plaintiff, as Limited Partner, waived any written requirement. Defendants allege and re-aver the matters set forth in paragraphs 78 through 86 above.

      B.    Pursuant to the Second Amended and Restated Limited Partnership Agreement, Section 3.5, "Liabilities of General Partners":

> "In carrying out their duties hereunder, the General Partners shall not be liable to the Partnership or to any other Partner for any actions taken in good faith and reasonably believed to be in the best interest of the Partnership or for errors of judgment, neglect, omission or wrongdoing, but shall only be liable for willful misconduct, gross negligence, breach of their obligations under this Agreement or other breach of their fiduciary duties."

      C.    Pursuant to Section 3.6 of the Second Amended and Restated Limited Partnership Agreement, "Reliance on Act of General Partners":

CASE NO.: 00-6147-CIV-LENARD

"No financial institution or any other person, firm or corporation dealing with the General Partner shall be required to ascertain whether they are acting in accordance with this Agreement, but such financial institution or such other person, firm or corporation shall be protected in relying solely upon the deed, transfer, or assurance of and the execution of such instrument or instruments by such General Partners".

     D.     Pursuant to Section 10.2, "Indemnification and Liability of General Partners":

"The Partnership shall indemnify the General Partners against any claim or liability incurred by them in connection with the business of the Partnership. Neither the Partnership nor any Partner shall have any claim against the General Partners by reason of any acts or omissions that were performed in the good faith belief that they were acting within the scope of their authority under this Agreement and that such General Partners were not grossly negligent or guilty of misconduct with respect to such actions or omissions. Except as provided herein or required by law, no General Partner shall have any obligation or liability to any other Partner or to make any advance to, or contribution to the capital of, the Partnership. The right to indemnification provided in this Section 10.2 shall not extend to personal liability, if any, imposed on the General Partners under state or federal securities laws."

     E.     Condor on March 3, 2000, demanded indemnification under the terms of the Note, Mortgage and Loan Documents to defend the actions of Plaintiff. Said demand and indemnification is further set forth in the letter from its counsel, Bilzin, Sumberg, et al., attached hereto and made a part hereof as Exhibit 1.

     F.     Pursuant to the Second Amended and Restated Agreement of Limited Partnership, Defendants allege that the General Partners/Defendants acted within the scope of their duties and obligations as General Partners and are entitled to indemnity by Oakland Lakes for the action(s) of Plaintiffs, as Limited Partners, and resulting in the claims/demands by Condor and expenses, including reasonable attorneys' fees incurred and/or to be incurred by Defendants in protecting and preserving the Oakland Lakes properties.

Document Number: 72911-1

18

CASE NO.: 00-6147-CIV-LENARD

WHEREFORE, Defendants respectfully request that the Court dismiss Plaintiff's Complaint, with prejudice, and award to Defendants reasonable attorneys' fees and court costs and such other, and further relief as the Court may deem proper including damages incident thereto.

## COUNTERCLAIM

## COUNT I - INDEMNITY

88.    Defendants/Counter-Plaintiffs sue Plaintiff/Counter-Defendant for Indemnity and allege:

A.    Oakland Lakes, Defendants and Oakland Park entered into the Second Amended and Restated Agreement of Limited Partnership of Oakland Lakes, Ltd., dated June 29, 1990, which is attached as Exhibit "C" to Plaintiff's Complaint. Pursuant to the Second Amended and Restated Agreement of Limited Partnership, *inter alia*, the General Partners/Defendants pursuant to Section 3.1, "Management of Partnership Business" and Section 3.2, "Powers of General Partners" and Section 3.3, "Exercise of Rights and Powers by General Partners" had the right and duty to manage the business of the Partnership and further to use their best efforts to carry out the purposes, business and objectives of the Partnership. Pursuant thereto, the General Partners had all the necessary powers to carry out the purposes, business and objectives referred to in Section 1.3 of the Partnership Agreement and possessed and enjoyed all of the rights and powers of partners of a Partnership, without limited partners, except as otherwise provided by Florida Law and/or as limited by the Agreement. Said rights, powers and duties authorized the general partners to enter into the Workout Arrangement in order to preserve, protect and maintain the property and prevent a

19

CASE NO.: 00-6147-CIV-LENARD

foreclosure resulting from the default under the terms of the Note, Mortgage and Loan Documents. Said rights included pursuant to Section 3.2, "Powers of General Partners," to refinance any mortgage indebtedness which is a lien and encumbrance on the project for the aggregate amount of the Mortgage Loan, "capital contributions" of the partners (including the contributed equity); any outstanding "optional deficiency loans" and/or "optional LP deficiency loans," any outstanding "preferred return" and any outstanding "cumulative priority return". The general partners had/have the right to consummate any refinancing for a lesser amount without obtaining consent from any limited partner, including but not limited to the Investor Limited Partner. Defendants aver that to the extent the Workout Arrangement required Limited Partner approval and/or exceeded said aggregate sum, if applicable, the Plaintiff, as Limited Partner, waived any written requirement. Defendants allege and re-aver the matters set forth in paragraphs 78 through 86 above.

B.    Pursuant to the Second Amended and Restated Limited Partnership Agreement, Section 3.5, "Liabilities of General Partners":

"In carrying out their duties hereunder, the General Partners shall not be liable to the Partnership or to any other Partner for any actions taken in good faith and reasonably believed to be in the best interest of the Partnership or for errors of judgment, neglect, omission or wrongdoing, but shall only be liable for willful misconduct, gross negligence, breach of their obligations under this Agreement or other breach of their fiduciary duties."

C.    Pursuant to Section 3.6 of the Second Amended and Restated Limited Partnership Agreement, "Reliance on Act of General Partners":

"No financial institution or any other person, firm or corporation dealing with the General Partner shall be required to ascertain whether they are acting in accordance with this Agreement, but such financial institution or such other person, firm or corporation shall be protected in relying solely upon the deed, transfer, or assurance of and the execution of such instrument or instruments by such General Partners".

D.    Pursuant to Section 10.2, "Indemnification and Liability of General Partners":

"The Partnership shall indemnify the General Partners against any claim or liability incurred by them in connection with the business of the Partnership. Neither the Partnership nor any Partner shall have any claim against the General Partners by reason of any acts or omissions that were performed in the good faith belief that they were acting within the scope of their authority under this Agreement and that such General Partners were not grossly negligent or guilty of misconduct with respect to such actions or omissions. Except as provided herein or required by law, no General Partner shall have any obligation or liability to any other Partner or to make any advance to, or contribution to the capital of, the Partnership. The right to indemnification provided in this Section 10.2 shall not extend to personal liability, if any, imposed on the General Partners under state or federal securities laws."

E.    Condor on March 3, 2000, demanded indemnification under the terms of the Note, Mortgage and Loan Documents to defend the actions of Plaintiff. Said demand and indemnification is further set forth in the letter from its counsel, Bilzin, Sumberg, et al., attached hereto and made a part hereof as Exhibit 1.

F.    Pursuant to the Second Amended and Restated Agreement of Limited Partnership, Defendants allege that the General Partners/Defendants acted within the scope of their duties and obligations as General Partners and are entitled to indemnity by Oakland Lakes for the action(s) of Plaintiffs, as Limited Partners, and resulting in the claims/demands by Condor and expenses, including reasonable attorneys' fees incurred and/or to be incurred by Defendants in protecting and preserving the Oakland Lakes properties.

WHEREFORE, Defendants/Counter-Plaintiffs demand judgment for damages and indemnity against Plaintiff/Counter-Defendant, including reasonable attorneys' fees, court costs and such other and further relief as the Court may deem proper.

Document Number: 72911-1

21

CASE NO.: 00-6147-CIV-LENARD

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was telefaxed and mailed to CHARLES J. BARTLETT, ESQ., Icard, Merrill, et al., 2033 Main Street, Suite 600, Sarasota, Florida 34237; RICHARD T. WOULFE, ESQ., Bunnell, Woulfe, et al., 888 East Last Olas Boulevard, 4th Floor, Fort Lauderdale, Florida 33301; DAVID W. TRENCH, ESQ., Bilzin, Sumberg, Dunn, et al., 200 South Biscayne Boulevard, Suite 2500, Miami, Florida 33131-2310, this 13 day of March, 2000.

ELLIS, SPENCER & BUTLER
Attorneys for Defendants
4601 Sheridan Street, Suite 505
Hollywood, FL 33021
(954) 986-2291 Broward
(305) 947-0620 Dade

BY: _William Spencer_

WILLIAM S. SPENCER, ESQ.
Florida Bar No. 100310

Document Number: 72911-1

22

A PARTNERSHIP OF PROFESSIONAL ASSOCIATIONS

ALAN O. AXELROD, P.A.
BRIAN L. BILZIN, P.A.*
J. RONALD DENMAN, P.A.
ALBERT E. DOTSON, JR., P.A.
RICHARD DUNN, P.A.
AUDREY A. ELLIS, P.A.
A. VICKY GARCIA-TOLEDO, P.A.
LESTER L. GOLDSTEIN, P.A.
RICHARD M. GOLDSTEIN, P.A.
ALAN J. KAZAN, P.A.*
SCOTT D. KRAVETZ, P.A.
JOHN M. KUHN, P.A.
STEVEN D. LEAR, P.A.
ALVIN D. LODISH, P.A.**
CARTER N. McDOWELL, P.A.
EILEEN BALL MEHTA, P.A.
HOWARD E. NELSON, P.A.
MARJIE C. NEALON, P.A.
STANLEY B. PRICE, P.A.
MARTIN A. SCHWARTZ, P.A.*
JAMES W. SHINDELL, P.A.
JOHN C. SUMBERG, P.A.*
DAVID W. TRENCH, P.A.
MITCHELL E. WIDOM, P.A.

*ALSO A MEMBER OF NEW YORK BAR
**ALSO A MEMBER OF DC BAR

200 SOUTH BISCAYNE BOULEVARD • MIAMI, FLORIDA 33131-2336
TELEPHONE: (305) 374-7580 • FAX: (305) 374-7593
E-MAIL: INFO@BILZIN.COM

ONE EAST BROWARD BOULEVARD • SUITE 700
FORT LAUDERDALE, FLORIDA 33301
TELEPHONE: (954) 356-0030

BRIAN S. ADLER
SUZANNE M. AMADUCCI
CHRISTOPHER D. BROWN
SHERRIL M. COLOMBO
ALLYN S. DANZEISEN
NANCY B. GLIMCHER
RAQUEL M. GONZALEZ
FRANK GUERRA
ADAM D. LUSTIG
DEBORAH R. MAYO
JERRY B. PROCTOR
CHARLES H. RATNER
CHRISTOPHER H. SAIA
ERIC SAIDA
WILLIAM A. SALGADO
TERESA J. URDA
LYNN S. WATERMAN

OF COUNSEL
ARNOLD A. BROWN
RICHARD D. MONDRE, P.A.*
MARC J. STERNBAUM
MARC J. STONE

March 3, 2000

<u>Via Registered Mail</u>
<u>Return Receipt Requested</u>

Mr. William O. Brisben
Oakland Lakes, Ltd.
4750 Ashwood Drive, Suite 300
Cincinnati, Ohio 45241

    Re:    813268 Ontario, Inc., etc. vs. Oakland Lakes, Ltd., et al.
United States District Court Case No. 00-6147 CIV-Lenard
(the "Action")

Dear Mr. Brisben:

    This firm represents Condor One, Inc., a Delaware corporation ("Condor One"), one of the defendants in the Action. This letter is sent to you on behalf of Oakland Lakes, Ltd. ("Oakland Lakes"). To the extent the Action triggers the indemnification rights under Section 4.12 of the Amended and Restated Renewal Mortgage, Assignment of Rents and Security Agreement by and between Oakland Lakes and Cincinnati Mortgage Corporation as that instrument may have been amended, modified or assigned (the "Mortgage"), this letter will serve as Condor One's formal request for indemnification.

    Condor One desires to retain its own counsel in the Action and it appears to be appropriate that the determination of the propriety and extent of Condor One's right to indemnification be deferred until the conclusion of the Action. In that regard, I suggest that Condor One and Oakland Lakes agree that 1) Condor One has provided Oakland Lakes such notice of its request for indemnification as is required by the Mortgage, 2) Condor One may engage and pay this firm or such other firm as it may choose as its counsel in the Action and direct such firm in the defense of Condor One's interests without any waiver of or jeopardy to Condor One's right to indemnification, 3) the



EXHIBIT NO. 1

Mr. William O. Brisben
March 3, 2000
Page 2

deferral of the determination of the issues involved in Condor One's claim for indemnification shall not be the basis of any defense by Oakland Lakes of laches or any other form of limitation of Condor One's right, 4) during the pendency of the Action, Oakland Lakes, Ltd. shall have no obligation to provide counsel for the defense of Condor One in the Action or pay the attorney's fees incurred by Condor One, 5) the entitlement and scope of Condor One's claim for indemnification as well as the amount of any indemnification payment shall be determined at the conclusion of the Action, 6) if no agreement can be reached by Condor One and Oakland Lakes with respect to such issues, they will then be submitted to an appropriate tribunal for determination, and 7) this agreement shall constitute no waiver of any rights of either party under the Mortgage or any other loan documents.

I am providing a copy of the letter to your counsel for his review and consideration. I ask that you respond to this letter through him promptly so that defense of the Action can proceed expeditiously.

Sincerely,

David W. Trench, Esq.

DWT:gmi
Enclosure

cc:   William S. Spencer, Esq.

G:\DMS\72644\13375\0281951.01
2/25/2000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 00-6147 CIV-LENARD
Magistrate Turnoff

813268 ONTARIO, INC., as
General Partner of OAKLAND
PARK (FLORIDA) LIMITED PARTNERSHIP,
an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;

        Plaintiff,

vs.

OAKLAND LAKES, LTD.,
a Florida Limited Partnership,
WILLIAM O. BRISBEN, W.O. BRISBEN
COMPANIES, INC., and ROBERT E. SCHULER,
as General Partners of OAKLAND LAKES, LTD.,
THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,

        Defendants.

_____/

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM

Defendant Condor One, Inc., a Delaware corporation, by and through undersigned counsel,

files this its answer and affirmative defenses to the complaint and counterclaim against Plaintiff and

alleges:

G:\DMS\72644\13375\0281675.01
2/24/2000



BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER · MIAMI, FLORIDA 33131-2336

## ANSWER

1.    In answer to paragraph 1, Condor One admits that the complaint purports to be an action as described in paragraph 1 of the complaint.

2.    Condor One admits the allegations in paragraph 2.

3.    Condor One admits the allegations in paragraph 3.

4.    In answer to paragraph 3, Condor One admits that it is a corporation organized and existing under the laws of the State of Delaware, but is without knowledge as to the truth or falsity of the remaining allegations in paragraph 4.

5.    Condor One admits the allegations in paragraph 5.

6.    Condor One is without knowledge as to the truth or falsity of the allegations contained in paragraph 6.

7.    In answer to paragraph 7, Condor One admits that Defendant Oakland Lakes is the owner of the apartment complex described in paragraph 7.

8.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 8.

9.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 9.

10.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 10.

11.    Condor One admits the allegations in paragraph 11.

12.    In answer to paragraph 12, Condor One admits that it is a Delaware corporation to which HUD assigned the mortgage and other documents described in the assignment, a copy of

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER · MIAMI, FLORIDA 33131-2336

which is attached to the complaint as Exhibit "E."

13.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 13.

14.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 14.

15.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 15.

16.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 16.

17.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 17.

18.    In answer to paragraph 18, Condor One admits that the Note and Mortgage, as those terms are defined in the complaint, were created as part of a loan transaction with Defendant Oakland Lakes as borrower, but is without knowledge as to the truth or falsity of the remaining allegations.

19.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 19.

20.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 20.

21.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 21.

22.    Condor One is without knowledge as to the truth or falsity of the allegations in

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

paragraph 22 except that Condor One denies that the Limited Partnership Agreement is a loan document as that term is defined in the Mortgage.

23.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 23.

24.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 24.

25.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 25.

26.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 26.

27.    In answer to paragraph 27, Condor One admits that Oakland Lakes defaulted in one or more of its obligations under the Loan Documents as that term is defined in the complaint, but is without knowledge as to the time or duration of such default or defaults.

28.    In answer to paragraph 28, Condor One admits that HUD entered into negotiations which resulted in the execution of the Provisional Workout Arrangement, a copy of which is attached to the complaint as Exhibit "D."

29.    In answer to paragraph 29, Condor One admits that HUD and William O. Brisben, as General Partner of Oakland Lakes, executed the Provisional Workout Arrangement, a copy of which is attached as Exhibit "D" to the complaint.

30.    Condor One denies the allegations in paragraph 30.

31.    In answer to paragraph 31, Condor One is without knowledge of whether HUD had copies of all of the Loan Documents, as that term is defined in the complaint, and denies the

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

remaining allegations in paragraph 31.

32.    In answer to paragraph 32, Condor One admits that HUD assigned the Note and Mortgage and other documents described in the assignment from HUD to Condor One, a copy of which is attached as Exhibit "E" to the complaint.

33.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 33.

34.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 34.

35.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 35.

36.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 36.

37.    In answer to paragraph 37, Condor One admits that a suit involving Defendant Oakland Park is pending in the Circuit Court for the Seventeenth Judicial Circuit of Broward County, Florida, but is without knowledge of the remaining allegations.

38.    In answer to paragraph 38, Condor One admits that a motion to appoint a receiver is pending in the State Court Action, but is without knowledge of the remaining allegations.

39.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 39.

40.    Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 40.

41.    Condor One is without knowledge as to the truth or falsity of the allegations in

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

paragraph 41.

42.     Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 42.

43.     Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 43.

44.     In answer to paragraph 44, Condor One realleges its answers to paragraph 1 through 43 of the complaint.

45.     Condor One denies the allegations contained in paragraph 45.

46.     Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 46.

47.     Condor One is without knowledge as to the truth or falsity of the allegations in paragraph 47.

48.     In answer to paragraph 48, Condor One realleges its answers to paragraphs 41 through 43 of the complaint.

49.     In answer to paragraph 49, Condor One admits that Plaintiff restates some of the provisions contained in the assignment attached as Exhibit "E" to the complaint and further states that the full and complete language of the assignment is set forth in Exhibit "E."

50.     Condor One denies the allegations in paragraph 50.

51.     In answer to paragraph 51, Condor One admits that the assignment, a copy of which is attached to the complaint as Exhibit "E," contemplated the assignment of the Note and Mortgage and other documents as more specifically set forth in Exhibit "E."

52.     Condor One denies the allegations in paragraph 52.

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER · MIAMI, FLORIDA 33131-2336

53.    Condor One denies the allegations in paragraph 53.

54.    Condor One denies the allegations in paragraph 54.

55.    In answer to paragraph 55, Condor One realleges its answers to paragraphs 1 through 43 of the complaint.

56.    Condor One admits that paragraph 56 accurately quotes a portion of the Provisional Workout Arrangement, a copy of which is attached as Exhibit "D" to the complaint.

57.    Condor One denies the allegations in paragraph 57.

58.    In answer to paragraph 58, Condor One admits that HUD assigned its interest in the Note and Mortgage and other documents described in the assignment from HUD to Condor One, but denies that such assignment is a violation of the terms of the Provisional Workout Arrangement.

59.    Condor One denies the allegations in paragraph 59.

60.    Condor One denies the allegations in paragraph 60.

61.    Condor One is without knowledge of the allegations in Count IV of the complaint and provides no other answer on the grounds that Count IV seeks no relief against Condor One.

62.    Except as expressly admitted above, Condor One denies each and every allegation in the complaint.

## AFFIRMATIVE DEFENSES

63.    For and as its first affirmative defense, Condor One alleges that Plaintiff's claims against Condor One are barred by the statute of limitations. Specifically, the Provisional Workout Arrangement, which is the subject of Plaintiff's claims against Condor One, was executed by Oakland Lakes on December 22, 1994 and by HUD on January 5, 1995. Plaintiff's complaint was filed on January 31, 2000, more than five years after the Provisional Workout Arrangement was

G:\DMS\72655\13375\0284112.01
3/10/2000

7

executed and delivered.

64.    For and as its second affirmative defense, Condor One alleges that Plaintiff's claims against Condor One are barred by the doctrine of estoppel. Specifically, Plaintiff had full knowledge of the circumstances leading to and surrounding the execution of the Provisional Workout Arrangement and accepted its benefits without objection for a substantial period of time. Condor One relied to its detriment upon the lack of any objection in its purchase of the Note and Mortgage and other loan documents and in its administration of the loan.

65.    For and as its third affirmative defense, Condor One alleges that Plaintiff's claims against Condor One are barred by the doctrine of waiver. Specifically, Plaintiff had full knowledge of the circumstances leading to and surrounding the execution of the Provisional Workout Arrangement and accepted its benefits without objection for a substantial period of time. Plaintiff waived its rights to contest the validity of the Provisional Workout Arrangement.

66.    For and as its fourth affirmative defense, Condor One alleges that Plaintiff's claims against Condor One are barred by Plaintiff's inequitable conduct. Specifically, Plaintiff had full knowledge of the circumstances leading to and surrounding the execution of the Provisional Workout Arrangement and accepted its benefits without objection for a substantial period of time. It is inequitable for Plaintiff to seek to avoid the Provisional Workout Arrangement's obligations after accepting its full benefits.

67.    For and as its fifth affirmative defense, Condor One alleges that Plaintiff has no standing or right to challenge HUD's assignment of the Note and Mortgage and other loan documents to Condor One. HUD sold the Note and Mortgage and other loan documents pursuant to its authority to do so under federal statutes and regulations. Borrowers, including Plaintiff, have

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER · MIAMI, FLORIDA 33131-2336

no standing under such federal statutes or regulations to challenge any such a sale.

68. For and as its sixth affirmative defense, Condor One asserts that Plaintiff's claims against Condor One are barred by the fact that the Provisional Workout Agreement was executed by a general partner of Oakland Lakes who acted with apparent authority to execute such document.

## COUNTERCLAIM

Defendant/Counter-Plaintiff Condor One, Inc. sues Plaintiff/Counter-Defendant 813268 Ontario, Inc., as General Partner of Oakland Park (Florida) Limited Partnership, an Ontario limited partnership, and alleges:

1. This is an action seeking damages for interference with an advantageous business relationship and is within the jurisdiction of this Court.

2. Defendant/Counter-Plaintiff Condor One, Inc. ("Condor One") is a corporation, organized and existing under the laws of the state of Delaware.

3. Plaintiff/Counter-Defendant 813268 Ontario, Inc. is a Canadian corporation and is the general partner of Oakland Park (Florida) Limited Partnership ("Oakland Park") which is a limited partnership organized and existing under the laws of the province of Ontario, Canada. Oakland Park is a limited partner in Oakland Lakes, Ltd. ("Oakland Lakes"), a limited partnership organized and existing under the laws of the state of Florida.

4. This court has subject matter jurisdiction over this action because there is a complete diversity of citizenship between Defendant/Counter-Plaintiff Condor One and Plaintiff/Counter-Defendant Oakland Park under 28 U.S.C. § 1332 and the amount in controversy exceeds $75,000.00.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

6. Prior to 1995, the Secretary of the United States Department of Housing and Urban

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER · MIAMI, FLORIDA 33131-2336

Development ("HUD") was the owner of that certain Amended and Restated Renewal Mortgage, Assignment of Rents and Security Agreement executed by Oakland Lakes for the benefit of Cincinnati Mortgage Corporation, an Ohio corporation, as Mortgagee, dated October 5, 1989, and recorded on October 5, 1989, at Book 16818, Page 609, in the Official Records of Broward County, Florida (the "Mortgage"), which Mortgage secures the repayment of that certain Amended and Restated Renewal Mortgage Note dated October 5, 1989, made by Oakland Lakes in favor of Cincinnati Mortgage Corporation, an Ohio corporation ("Note") and other documents, agreements, instruments, and other collateral which evidence, secure or otherwise relate to HUD's right, title of interest in and to the Mortgage and/or the Note. Copies of the Note and Mortgage are attached to the complaint as Exhibits "A" and "B" respectively and are incorporated herein by reference.

7. On or about December 24, 1994, Oakland Lakes executed a document entitled Provisional Workout Arrangement between it and HUD in which Oakland Lakes acknowledged that the Note and Mortgage were in default and agreed to certain terms and conditions to be met by Oakland Lakes in order to avoid a foreclosure action by HUD. The Provisional Workout Arrangement was executed by HUD on January 5, 1995. A copy of the Provisional Workout Arrangement is attached as Exhibit "D" to the complaint and incorporated herein by reference.

8. On or about May 8, 1995, HUD assigned the Note and Mortgage and other loan documents to Condor One. A true and correct copy of the assignment from HUD to Condor One is attached as Exhibit "E" to Plaintiff's complaint and is incorporated herein by this reference.

9. From and after the assignment of the Note and Mortgage to Condor One, all payments made under the Note and Mortgage were delivered to Condor One pursuant to the terms of the Provisional Workout Arrangement without any objection by Plaintiff.

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER · MIAMI, FLORIDA 33131-2336

10.     Nearly four years later, on or about May 6, 1999, Condor One received a bid from Ocwen Federal Bank ("Ocwen") to purchase the Note and Mortgage and other loan documents.

11.     Condor One's negotiations with Ocwen proceeded rapidly and favorably. By early June, 1999, Ocwen advised Condor One that it anticipated receiving approval of the purchase by its committee at its meeting on June 11, 1999 and anticipated closing the purchase on June 15, 1999. The contract for purchase and all other documents regarding the sale were to be executed on June 15, 1999 at the closing.

12.     Upon information and belief, Oakland Park became aware of Condor One's negotiations to sell the Note and Mortgage and other loan documents and wrongfully, purposefully and without justification sought to prevent such sale.

13.     On or about June 7, 1999, in furtherance of its wrongful efforts to prevent the sale from occurring, Oakland Park caused its counsel to send Condor One a letter asserting that the Provisional Workout Arrangement, the benefits of which Plaintiff had knowingly accepted for over three years, had been executed by Oakland Lakes without authorization. Oakland Park knew or should have known such assertions were baseless and made them solely to prevent the sale from occurring.

14.     Oakland Park did not know the identify of Condor One's prospective purchaser, but knew that Condor One was obligated to disclose its letter to any prospective purchaser in the course of its negotiations.

15.     On or about June 11, 1999, the day of Ocwen's committee meeting to approve the sale, Condor One disclosed Oakland Park's letter to Ocwen.

16.     After reviewing the content of Plaintiff/Counter-Defendant's letter, Ocwen advised

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER · MIAMI, FLORIDA 33131-2336

Condor One that, as a consequence of the content of this letter, Ocwen would not purchase the Note and Mortgage.

17.    Since that time, interest rates have risen and the market for such loans has changed. As a consequence, Condor One is unable to sell the Note and Mortgage at as favorable a price.

18.    Had Oakland Park not wrongfully interfered with the business relationship between Ocwen and Condor One, the sale by Condor One to Ocwen would have been completed.

19.    As a consequence to the foregoing, Condor One has been damaged by Oakland Park's wrongful, purposeful and unjustified interference with the advantageous business relationship between Condor One and Ocwen in an amount in excess the jurisdictional limits of this Court.

20.    All conditions precedent to the bringing of this action have incurred, been satisfied by Condor One or have been waived by Oakland Park.

WHEREFORE, Defendant/Counter-Plaintiff Condor One, Inc. demands judgment against Plaintiff/Counter-Defendant 813268 Oakland Park, Inc., as General Partner of Oakland Park (Florida) Limited Partnership, an Ontario limited partnership, for damages in excess of $75,000.00, costs and such other and further relief as this Court deems just and proper.

Respectfully submitted,

**BILZIN SUMBERG DUNN PRICE & AXELROD LLP**
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By: _____
David W. Trench
Florida Bar No. 202975

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was furnished via U.S. Mail on this 13th day of March, 2000 to: Richard T. Woulfe, Esq., Co-Counsel for Plaintiff, Bunnell, Woulfe, Kirschbaum, Keller, Cohen & McIntyre, P.A., P.O. Drawer 030340, 888 E. Las Olas Boulevard, Suite 400, Ft. Lauderdale, Florida 33303-0340; Robert E. Messick, Esq., Co-Counsel for Plaintiff, Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A., 2033 Main Street, Suite 600, Sarasota, Florida 34237; and William S. Spencer, Esq., Ellis, Spencer & Butler, 4601 Sheridan, Hollywood, Florida 33021.

David W. Trench

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.00-6147-CIV-LENARD/TURNOFF

813268 ONTARIO, INC., as
General Partner of OAKLAND
PARK (FLORIDA) LIMITED PARTNERSHIP,
an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;

        Plaintiff,

vs.

OAKLAND LAKES, LTD.,
a Florida Limited Partnership,
WILLIAM O. BRISBEN, W.O. BRISBEN
COMPANIES, INC., and ROBERT E. SCHULER,
as General Partners of OAKLAND LAKES, LTD.,
THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,

        Defendants.

_____/

## PLAINTIFF'S REPLY TO DEFENDANT CONDOR ONE'S COUNTERCLAIM

Plaintiff, 813268 ONTARIO, INC., as general partner of OAKLAND PARK (FLORIDA) LIMITED PARTNERSHIP, an Ontario limited partnership, as limited partner of, and on behalf of OAKLAND LAKES, LTD., a Florida Limited Partnership, by and through its undersigned attorneys, replies to the Counterclaim of Defendant Condor One, Inc. ("Condor"), and alleges:

1. In reply to paragraph 1, Plaintiff admits that the Counterclaim purports to be an action as described in paragraph 1 of the Counterclaim.

2. Plaintiff admits the allegations of paragraph 2.

1

3.    Plaintiff admits the allegations of paragraph 3.

4.    Plaintiff admits the allegations of paragraph 4.

5.    Plaintiff admits the allegations of paragraph 5.

6.    Plaintiff admits that the Secretary of the United States Department of Housing and Urban Development ("HUD") held the Amended and Restated Renewal Mortgage and Assignment of Rents and Security Agreement executed by Oakland Lakes prior to 1995, and admits that the mortgage secured repayment of the Amended and Restated Renewal Mortgage Note.  Plaintiff is without knowledge as to the other documents, agreements, instruments, and other collateral which evidence, secure or otherwise, relate to HUD's right, title or interest in and to the mortgage and/or the note to which Condor refers in paragraph 6.

7.    Plaintiff admits that William O. Brisben, acting as General Partner of Oakland Lakes, without the authority required under the Second Amended and Restated Agreement of Limited Partnership of Oakland Lakes Limited, attached to Plaintiff's Complaint as Exhibit "C" and incorporated herein, executed the Provisional Workout Arrangement, and further admits the terms of the Provisional Workout Arrangement speak for themselves.  The remainder of the allegations in paragraph 7 are denied.

8.    Plaintiff admits the allegations in paragraph 8.

9.    Plaintiff denies the allegations in paragraph 9.

10.    Plaintiff is without knowledge as to the allegations in paragraph 10.

11.    Plaintiff is without knowledge as to  the allegations in paragraph 11.

12.    Plaintiff denies the allegations in paragraph 12.

13.    Plaintiff admits that Plaintiff's counsel, on or about June 7, 1999 sent a letter to G.E. Capital Corporation advising them that Plaintiff was taking the legal position that William

O. Brisben was not authorized to enter into, execute, or deliver the Provisional Workout Arrangement on behalf of Oakland Lakes Ltd. Plaintiff denies that such action was taken in furtherance of any wrongful efforts to prevent any sale from occurring and further denies that Plaintiff knew or should have known that such assertions were baseless and made to prevent any sale from occurring.

14.    Plaintiff admits that it did not know the identity of any purchaser, and is without knowledge and therefore denies that Condor One was obligated to disclose Plaintiff's letter with respect to any purchaser.

15.    Plaintiff is without knowledge as to the allegations in paragraph 15.

16.    Plaintiff is without knowledge as to the allegations in paragraph 16.

17.    Plaintiff is without knowledge as to the allegations in paragraph 17.

18.    Plaintiff denies the allegations in paragraph 18.

19.    Plaintiff denies the allegations in paragraph 19.

20.    Plaintiff denies the allegations in paragraph 20.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

1.    For its First Affirmative Defense, Plaintiff states that Condor cannot recover from Plaintiff on its claim because Condor's injuries and damages, if any, were caused by the acts, omissions and/or conduct of third parties over whom Plaintiff had no control, including, but not limited to, William O. Brisben, Brisben Companies, Inc., and Robert E. Schuler.

3

## SECOND AFFIRMATIVE DEFENSE

2.      For its Second Affirmative Defense, Plaintiff states that Condor cannot recover on its claim against Plaintiff because Condor had actual or constructive knowledge of the facts which Plaintiff disclosed, including, but not limited to, the fact that William O. Brisben entered into the provisional workout arrangement without requisite authority. Condor has therefore waived and/or is estopped from asserting its claim against Plaintiff.

## THIRD AFFIRMATIVE DEFENSE

3.      For its Third Affirmative Defense, Plaintiff states that Condor cannot recover from Plaintiff for its claims in that any damages Condor suffered were caused by Condor's own negligence, actions, and/or omissions or by the negligent actions and/or omissions of its predecessor(s) in interest under the subject loan, including without limitation, The Secretary of Housing and Urban Development,  and such negligence, actions an/or omissions were the sole and/or contributing cause of the damages alleged by Condor.

## FOURTH AFFIRMATIVE DEFENSE

4.      For its Fourth Affirmative Defense, Plaintiff states that Condor cannot recover from Plaintiff in that Condor's damages, if any, are due in whole or in part to their own comparative negligence or by the negligent actions and/or omissions of its predecessor(s) in interest under the subject loan, including without limitation, The Secretary of Housing and Urban Development.  As a consequence, Condor's damages, if any, must be reduced in accordance with the Doctrine of Comparative Negligence

**FIFTH AFFIRMATIVE DEFENSE**

5.    For its Fifth Affirmative Defense, Plaintiff states that Condor cannot recover from Plaintiff because Condor has failed to mitigate its damages, if any, by failing to find a purchaser for the loan.

## SIXTH AFFIRMATIVE DEFENSE

6.    For its Sixth Affirmative Defense, Plaintiff states that Condor's claims are barred by the Economic Loss Rule.

## SEVENTH AFFIRMATIVE DEFENSE

7.    For its Seventh Affirmative Defense, Plaintiff states that Condor's right to recovery in this matter, if any, is limited, set off against, and/or reduced by any and all collateral source benefits of indemnity, or contribution that it may be entitled to from any third party, including, but not limited to, Oakland Lakes Ltd., William O. Brisben, Brisben Companies, Inc., and Robert E. Schuler.

## NOTICE OF RIGHT TO SEEK ATTORNEY'S FEES

The loan documents which are the subject of this dispute provide for an award of attorney's fees to the prevailing party in any litigation arising out of the documents.  Plaintiff has engaged counsel to defend it in this action and has agreed to pay them a reasonable fee for their services.

WHEREFORE, Plaintiff and Counter-defendant respectfully requests that this Court dismiss Condor's Counterclaim with prejudice, award Plaintiff its costs and attorney's fees in this action, and award Plaintiff any other relief the Court deems necessary and proper.

5

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to: **WILLIAM SPENCER, ESQ.**, 4601 Sheridan Street, Hollywood, Florida 33021 and **DAVID TRENCH, ESQ.**, 2500 First Union Financial Center, Miami, FL 33131-2336, this _____ day of _____, 2000.

BUNNELL, WOULFE, KIRSCHBAUM,
KELLER, COHEN & McINTYRE, P.A.
P. O. Drawer 030340
888 E. Las Olas Blvd., Suite 400
Ft. Lauderdale, FL 33303-0340
Telephone: 954-761-8600
Counsel for Plaintiff

By:_____
    RICHARD T. WOULFE
    Florida Bar No. 222313


ICARD, MERRILL, CULLIS, TIMM,
  FUREN & GINSBURG, P.A.
2033 Main Street, Suite 600
Sarasota, Florida   34237
Telephone: (941) 366-8100
Attorneys for Plaintiffs

By:_____
    ROBERT E. MESSICK
    Florida Bar #31477

6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.00-6147-CIV-LENARD/TURNOFF

813268 ONTARIO, INC., as
General Partner of OAKLAND
PARK (FLORIDA) LIMITED PARTNERSHIP,
an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;
        Plaintiff,

vs.

OAKLAND LAKES, LTD.,
a Florida Limited Partnership,
WILLIAM O. BRISBEN, W.O. BRISBEN
COMPANIES, INC., and ROBERT E. SCHULER,
as General Partners of OAKLAND LAKES, LTD.,
THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,
        Defendants.
_____/

### PLAINTIFF'S MOTION TO DISMISS THE COUNTERCLAIM OF DEFENDANTS OAKLAND LAKES, LTD, WILLIAM O. BRISBEN, W. O. BRISBEN COMPANIES, INC. AND ROBERT E. SCHULER FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED, OR IN THE ALTERNATIVE, A MOTION FOR MORE DEFINITE STATEMENT

Plaintiff, 813268 ONTARIO, INC., as general partner of OAKLAND PARK (FLORIDA) LIMITED PARTNERSHIP, an Ontario limited partnership, as limited partner of, and on behalf of OAKLAND LAKES, LTD., a Florida Limited Partnership, by and through its undersigned attorneys, and pursuant to Federal Rule of Civil Procedure 12(b)(6) and 12(e), moves to dismiss the Counterclaim of Defendants, OAKLAND LAKES, LTD., WILLIAM O. BRISBEN, W.O. BRISBEN COMPANIES, INC., and ROBERT E. SCHULER, as General Partners of OAKLAND LAKES, LTD. (collectively the "Defendants"), for failure to state a claim upon which relief can be granted, or in the alternative for a more definite statement, and as grounds therefor would show:

Plaintiff has brought as shareholder's derivative action on behalf of Oakland Lakes,

Ltd, a Florida Limited Partnership (the "Partnership"), seeking declaratory relief and also suing

William O. Brisben, W. O. Brisben Companies, Inc. and Robert E. Schuler, as General Partners

of Oakland Lakes, Ltd., for breach of fiduciary duties owed to Oakland Lakes, Ltd.

2. A partnership in a partnership derivative action is an indispensable party to the

action and Plaintiff has therefore named the Partnership as a Defendant.

3. The Defendants, including the Partnership, have answered Plaintiff's Complaint and

filed a Counterclaim against Plaintiff for indemnity.

4. The basis of the Counterclaim is the indemnification provision in the Second

Amended Restated Agreement of Limited Partnership of Oakland Lakes, Ltd., attached to

Plaintiff's Complaint, and incorporated herein (the "Limited Partnership Agreement"), whereby the

members of the Partnership agreed that the Partnership would indemnify the general partners

against certain claims.

5. The Defendants' Counterclaim, however, seeks indemnity from Plaintiff, as a limited

partner of the Partnership, but alleges no factual basis whereby Plaintiff would be required to

indemnify the general partners. The allegations of the counterclaim, if taken as true, only address

a factual scenario where the Partnership would be required to indemnify the general partners.

6. Moreover, Defendants' Counterclaim is brought on behalf of the general partners,

but also on behalf of the Partnership. A plain reading of the Counterclaim reveals that Oakland

Lakes, Ltd. is suing itself for indemnification.

7. Finally, due to the fact that the Partnership is a defendant, if the general partners

wish to assert an indemnification claim against the Partnership, they would need to do so in the

form of a Cross-claim, rather than a Counterclaim.

WHEREFORE, Plaintiff respectfully requests that this Court dismiss the Defendants'

Counterclaim for failure to state a claim upon which relief can be granted, or in the alternative,

-2-

require the Defendants to furnish more definite statement regarding which Defendants are actually seeking indemnity against which legal entity, and/or properly designate any indemnity claim against Oakland Lakes, Ltd. as a cross-claim.

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS THE COUNTERCLAIM OF DEFENDANTS OAKLAND LAKES, LTD, WILLIAM O. BRISBEN, W. O. BRISBEN COMPANIES, INC. AND ROBERT E. SCHULER FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED, OR IN THE ALTERNATIVE, A MOTION FOR MORE DEFINITE STATEMENT

A motion to dismiss an affirmative claim should be sustained where the pleading party cannot establish any meritorious claim under any theory proposed in the pleading. Nevels v. Wilson, 402 F.2d 479 (5th CIR. 1968). Under Florida Statute Section 620.129 (1999), a limited partner is not liable for the obligations of a limited partnership. The Defendants have sought indemnification from Plaintiff based on the language of the Limited Partnership Agreement, which indicates that Oakland Lakes, Ltd. shall indemnify the general partners for certain claims. The counterclaim provides no basis, either factual or legal, whereby a limited partner would be required to indemnify the general partners.

Furthermore, Oakland Lakes, Ltd. is a defendant in the action brought by Plaintiff. Plaintiff, in bringing a derivative action, must join the limited partnership as a party to the action because the limited partnership is an indispensable party. Bivens Gardens Office Building, Inc. v. Barnett Banks of Florida, Inc., 140 F.3d 898 (11th CIR. 1998). The limited partnership, as is often the case with a corporation in a stockholders' derivative suit, is the real party in interest. The limited partnership, however, is initially named as a defendant and its position may later be realigned, according to its true interest. Liddy v. Urbanek, 707 F.2d 1222 (11th CIR. 1983). It is therefore possible, that after the parties are before the Court, the limited partnership would be realigned as a plaintiff. If, however, the controlling interest of the partnership is aligned against the plaintiff

-3-

limited partner, the limited partnership should remain a defendant (citations omitted).

In the present case, the general partners of Oakland Lakes, Ltd., as the controlling interest of Oakland Lakes, are adverse to Plaintiff's derivative action. This is readily apparent from the fact that the parties are engaged in separate litigation in State Court over interpretation of the Limited Partnership Agreement. Furthermore, Plaintiff's allegations against the general partners in this action involve their failure to properly manage the partnership property, and failure to comply with the terms of the Limited Partnership Agreement by entering into unauthorized transactions. Oakland Lakes, Ltd. should therefore remain a defendant in this action.

Since Oakland Lakes, Ltd. is a defendant, any indemnity action based on the indemnification provisions of the Limited Partnership Agreement which is brought by the general partners against Oakland Lakes, Ltd. would need to be pled as a cross-claim, rather than a counterclaim against Plaintiff. Furthermore, the fact that Oakland Lakes, Ltd. is a named counter-claimant, amounts to a factual scenario whereby Oakland Lakes, Ltd. is suing itself for indemnification. Under Federal Rule of Civil Procedure 12(e), this amounts to a pleading which is vague or ambiguous to the extent that Plaintiff should not be reasonably required to file a responsive pleading. Plaintiff would therefore respectfully request that the Court grant the Motion to Dismiss, or at a minimum, require the Defendants to re-plead and provide a more definite statement as to their basis for suing Plaintiff for indemnity, or to properly plead their indemnity claim against Oakland Lakes, Ltd. as a cross claim.

-4-

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to: **WILLIAM SPENCER, ESQ.**, 4601 Sheridan Street, Hollywood, Florida 33021 and **DAVID TRENCH, ESQ.**, 2500 First Union Financial Center, Miami, FL 33131-2336, this _____ day of _____, 2000.

BUNNELL, WOULFE, KIRSCHBAUM,
KELLER, COHEN & McINTYRE, P.A.
P. O. Drawer 030340
888 E. Las Olas Blvd., Suite 400
Ft. Lauderdale, FL 33303-0340
Telephone: 954-761-8600
Counsel for Plaintiff

By:_____
RICHARD T. WOULFE
Florida Bar No. 222313

ICARD, MERRILL, CULLIS, TIMM,
 FUREN & GINSBURG, P.A.
2033 Main Street, Suite 600
Sarasota, Florida  34237
Telephone: (941) 366-8100
Attorneys for Plaintiffs

By:_____
ROBERT E. MESSICK
Florida Bar #31477

F:\USERS\CJB\CJBC\OAKLAND\Hud-fed.cl\MOT-TO.DIS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FILED _____ D.C.

00 APR 10 PM 3: 52

CLAR....C MADDOX
CLERK U. S. DIST. CT.
S.D. OF FLA - MIA

Case No. 00-6147 CIV-LENARD
Magistrate Turnoff

813268 Ontario, Inc., as
General Partner of OAKLAND
PARK (FLORIDA) LIMITED PARTNERSHIP,
an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;

        Plaintiff,

v.

OAKLAND LAKES, LTD.,
a Florida Limited Partnership,
WILLIAM O. BRISBEN, W.O. BRISBEN
COMPANIES, INC., and ROBERT E. SCHULER,
as General Partners of OAKLANDS LAKES, LTD.,
THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,

        Defendants.

_____/

## SECRETARY OF HOUSING AND URBAN DEVELOPMENT'S MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

        The United States Attorney, on behalf of the Secretary of the United States

Department of Housing and Urban Development ("HUD") moves to dismiss this action

pursuant to Fed. R. Civ. P. 12 (b) (1) and 12 (b) (6). Plaintiff has failed to state valid

grounds for jurisdiction against HUD or to state a claim against HUD for which relief can be granted. A memorandum of law in support of this motion is submitted herewith.

## I.    INTRODUCTION

Plaintiff filed its complaint on behalf of a commercial mortgagor to set aside a Provisional Workout Arrangement ("PWA"). Complaint at ¶ 1. Plaintiff admittedly defaulted on its original mortgage obligations, id. at ¶ 27, and also on its obligations under the PWA, id. at ¶ 71, which became effective on February 1, 1995. See id. at Exhibit D at 1. However, having accepted the benefits of the PWA since 1995, Plaintiff seeks to have the original mortgage terms reinstated, claiming that the general partner of the mortgagor was not authorized to enter into the PWA. Id. At Count I, Prayer for Relief; Id. at ¶ ¶ 30 and 45. Plaintiff also seeks to set aside the May 8, 1995 mortgage assignment, see id. at Exhibit E, from the Secretary of Housing and Urban Development ("HUD") to co-defendant Condor One, Inc. Id. at Count II and III, Prayer for Relief.

As will be shown in section II.A., the National Housing Act ( "NHA") waiver relied upon by Plaintiff, 12 U.S.C. § 1702, see id. at ¶ 2, is unavailable to Plaintiff, because Plaintiff fails to identify under the NHA the breach of even a single statutory or regulatory duty conceivably owed to Plaintiff by HUD.

## II.  ARGUMENT AND CITATION OF AUTHORITY

### A.    THIS COURT DOES NOT HAVE JURISDICTION OVER PLAINTIFF'S CLAIMS AGAINST HUD BECAUSE THERE HAS BEEN NO APPLICABLE WAIVER OF SOVEREIGN IMMUNITY

It is well settled that the United States may only be sued to the extent to

2

which it has waived sovereign immunity. Jackson v. Romney, 355 F. Supp. 737 (D.D.C. 1973), aff'd, 506 F.2d 233 (D.C. Cir. 1974). A waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign. Department of the Army v. Blue Fox, Inc., ____ U.S. ____, 119 S. Ct. 687 (1999). Moreover, a waiver of sovereign immunity must be unequivocally expressed in the statutory text. Id. A sue and be sued clause, such as 12 U.S.C. § 1702 relied upon by Plaintiff in this case, is not a carte blanche waiver of sovereign immunity; rather it is a limited waiver.[1] "Courts should not lightly imply that the United States has consented to forego the normal immunity of the sovereign from suit. Jackson, 506 F. 2d 233, 236 (D.C. Cir. 1974).

   In Jackson, like the instant case, the plaintiffs sought a declaratory judgment action alleging that the Secretary of Housing and Urban Development was acting in violation of the National Housing Act. The Court held that the plaintiff must show standing and demonstrate that they were arguably within the zone of interests to be protected or regulated by the statute. 355 F. Supp. At 741. (See also United States v. Neustadt, 366 U.S. 696, 81 S. Ct. 1294, 6 L. Ed. 2d 614 (1961) (holding that purchasers of homes could not sue for inaccurate FHA appraisals since the predominant objective of the appraisal system was the "protection of the Government and its insurance funds" and that the mortgage insurance program was not designed to insure anything other than the repayment of loans made by lender-mortgagees.) The Court in Jackson concluded that

---

[1]To the extent that Plaintiff is alleging a contract action against the United States for damages in excess of $10,000, exclusive jurisdiction lies in the Court of Claims 28 U.S.C.§1346 (a) (2).

3

the restrictions placed on HUD before it may insure a mortgage does not create a private

cause of action against the Government **on behalf of the mortgagor,** and the Court

dismissed the plaintiff's complaint on the grounds that it failed to state a claim upon

which relief could be granted. The Court of Appeals affirmed, stating that the provisions

relied upon by the plaintiffs did not create a private cause of action nor did they waive

sovereign immunity.

An action may be brought against the Government only to the extent that

the plaintiff can show that the statute, properly construed, was intended to create a private

cause of action and that the plaintiff was within the "zone of interests" which Congress

intended to protect in creating the statute. Touche Ross & Co. v. Redington, 442 U.S.

560, (1979); Resident Council of Allen Parkway Village v. United States Department of

Housing and Urban Dev., 980 F. 2d. 1043, 1054 (5th Cir. 1993) (to establish an implied right

of action under a federal statute, the plaintiff has the burden of demonstrating that Congress

affirmatively intended to create a private right of action); Falzarano v. U.S., 607 F. 2d 506

(1st Cir. 1979) (holding National Housing Act's language neither created rights in favor of

any private party nor proscribed behavior herein complained of, tenants were not sole

beneficiaries of Act, there was no indication of legislative intent to create or deny private

remedy, and private right of action would not be consonant with overall legislative scheme.

The National Housing Act section, which states that Secretary of Housing and Urban

Development shall be authorized to sue and be sued in any court of competent jurisdiction,

state or federal, does not operate as basis for private right of action.)

The "zone of interests" requirement reflects a policy of judicial self-restraint

4

relating to standing, apart from the bare demands of Article III of the Constitution. Whether a litigant possesses standing must be determined from the intent of Congress. Roadway Inns of America v. Frank, 541 F. 2d 759, 766 (8th Cir. 1976) cert. denied, 97 S. Ct. 1580, 430 U.S. 945, 51 L. Ed. 2d 792.

In the present action, plaintiff does not rely on any particular provision of the NHA or HUD's regulations, nor has it made a showing that investment oriented or commercial mortgagors were intended to be protected by any provision of the NHA.

In U.S. v. OCCI, 758 F.2d 1160 (7th Cir. 1985)[2] the Seventh Circuit held:

> There is little doubt that HUD, in its dealings with defaulting mortgagors, is obliged to follow the mandates and policies of the National Housing Act, see, e.g., United States v. Winthrop Towers, 628 F. 2d at 1035, and " ' [a] action taken without consideration of them, or in conflict with them, will not stand.'"Id. (citation omitted). One of the objective of the national housing policy, as pointed out by OCCI, is that "private enterprise shall be encouraged to serve as large a part of the total need as it can ....." 42 U.S.C. § 1441. **However, once a mortgagor defaults, " ' [t] he federal policy to protect the treasury and promote the security of federal investment which is turn promotes the prime purpose of the Act - - to facilitate the building of homes by use of federal credit - - becomes predominant.' "** United States v. Victory Highway Village, Inc., 662 F.2d at 494, quoting United States v. Stadium Apts., Inc., 425 F.2d 358, 363 (9th Cir.), cert. denied, 400 U.S. 926, 91 S. Ct. 187, 27 L. Ed. 2d 926 (1970).

758 F.2d at 1163 (emphasis supplied).

---

[2] This decision was written prior to 1992 and the creation of non-judicial foreclosure proceedings by Congress. Under the pre-1992 system, HUD filed with the Court to enforce foreclosure. OCCI, raising grounds similar to those raised by Plaintiff in the present case, was not permitted to avoid foreclosure and the Court entered judgment for HUD as a matter of law holding that OCCI failed to raise sufficient factual allegations to halt foreclosure proceedings.

After a default, as admittedly occurred with Plaintiff's loan, the courts have repeatedly stated that the purpose of the NHA is the protection of the United States Treasury so that the money recouped through these defaulted multifamily housing projects can be rerouted to those individuals, families and those in need whom the Act was intended to benefit. In a similar action, <u>Bayvue Apt. Joint Venture v. Ocwen Federal Bank</u>, 971 F. Supp. 129, 132 (D.D.C. 1997), owners of three multi-family housing projects sued HUD and the bank, seeking declaratory and equitable relief in connection with HUD's sale to a bank of notes executed to refinance the projects. On defendants' motions to dismiss, the district court held the plaintiffs lacked standing to assert their demand that HUD's auction sale of notes executed to refinance the projects be set aside. The court held the plaintiff's asserted injuries were not within the "zone of interests" protected by the statute or regulation in question, specifically, the National Housing Act and HUD's operating regulations.

In the present action, Plaintiff has not demonstrated any provision under the National Housing Act which provides a private cause of action, nor could it ever do so under the facts as alleged. Neither has Plaintiff taken the additional step of demonstrating that it was intended to be a beneficiary of any particular provision of the statute. To the contrary, recent case law demonstrates that plaintiff will never be able to show that it is within the "zone of interests" to be protected by any section of the NHA which deals with multifamily housing and commercial mortgagors. Accordingly, Plaintiff lacks standing to pursue an action under the NHA and has failed to state a claim for which relief can be granted.

6

## III. CONCLUSION

Plaintiff's complaint against HUD should be dismissed because this Court lacks jurisdiction over Plaintiff's claim against HUD, and because Plaintiff has failed to state a claim against HUD for which relief can be granted because there has been no applicable waiver of sovereign immunity.

Respectfully submitted,

THOMAS E. SCOTT
UNITED STATES ATTORNEY


WILLIAM C. HEALY
ASSISTANT UNITED STATE ATTORNEY
99 N.E. 4th Street
Third Floor/Civil Division
Miami, FL 33132-2111
Tel. (305) 961-9438
Fax (305) 530-7135
Email: william.healy@doj.com
FL Bar No: 0848395

OF COUNSEL:
JUD. E. MCNATT
Trial Attorney
U.S. Department of Housing
    And Urban Development
40 Marietta Street
Atlanta, GA 30303-2806

7

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was mailed on this 10th

day of April, 2000 to: David W. Trench, Esq., Bilzin Sumberg Dunn Price & Axelrod

L.L.P., 2500 First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida

33131; Richard T. Woulfe, Esq., Co-Counsel for Plaintiff, Bunnell, Woulfe, Kirschbaum,

Keller, Cohen & McIntyre, P.A., P. O. Drawer 030340, 888 E. Las Olas Boulevard, Suite

400, Ft. Lauderdale, Florida 33303-0340; Robert E. Messick, Esq., Co-Counsel for

Plaintiff, Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A., 2033 Main Street, Suite

600, Sarasota, Florida 34237; and William S. Spencer, Esq., Ellis, Spencer & Butler, 4601

Sheridan, Hollywood, Florida 33021.

WILLIAM C. HEALY
ASSISTANT UNITED STATE ATTORNEY

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.00-6147-CIV-LENARD/TURNOFF

813268 ONTARIO, INC., as
General Partner of OAKLAND
PARK (FLORIDA) LIMITED PARTNERSHIP,
an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;
       Plaintiff,

vs.

OAKLAND LAKES, LTD.,
a Florida Limited Partnership,
WILLIAM O. BRISBEN, W.O. BRISBEN
COMPANIES, INC., and ROBERT E. SCHULER,
as General Partners of OAKLAND LAKES, LTD.,
THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,
       Defendants.
_____/

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO HUD'S MOTION TO DISMISS

Plaintiff, 813268 ONTARIO, INC., as general partner of OAKLAND PARK (FLORIDA) LIMITED PARTNERSHIP, an Ontario limited partnership, as limited partner of, and on behalf of OAKLAND LAKES, LTD., a Florida Limited Partnership, by and through its undersigned attorneys, files its Memorandum of Law in Opposition to the motion to dismiss filed by The Secretary of United States Department of Housing and Urban Development ("HUD") and states:

## I.    INTRODUCTION

Plaintiff, as a limited partner of Oakland Lakes Ltd., has brought a Limited Partner's derivative action on behalf of Oakland Lakes. Plaintiff brought suit, for purposes of HUD's motion to dismiss, due to the actions of the general partner of Oakland Lakes, Defendant William O. Brisben, in entering into a Provisional Workout Arrangement with HUD after the original mortgage held by HUD had gone into default. Plaintiff contends that Brisben did not have Plaintiff's authority to enter into the Provisional Workout Arrangement, which authority was required under the Limited Partnership Agreement between Plaintiff and Brisben, and of which HUD was aware. Plaintiff also contends the Provisional Workout Arrangement required HUD to hold the subject note and mortgage, and that HUD violated the express terms of the Provisional Workout Arrangement by assigning it almost immediately after entering into it. Plaintiff seeks declaratory relief against HUD, in the nature of a ruling construing the rights and responsibilities of the parties under the Provisional Workout Arrangement, and the underlying note and mortgage.

HUD has moved to dismiss, claiming that this Court does not have jurisdiction over Plaintiff's claims against HUD because there has been no waiver of Sovereign immunity. As will be shown below, Plaintiff's claims are clearly authorized by the waiver of sovereign immunity contained in the National Housing Act, and HUD's citations to authority in its motion are wholly inapplicable to this case.

## II.    ARGUMENT

A.    **12 U.S.C. § 1702 PROVIDES A WAIVER OF SOVEREIGN IMMUNITY FOR PLAINTIFF'S CLAIMS BECAUSE PLAINTIFF AND HUD WERE IN PRIVITY UNDER THE NOTE, MORTGAGE, AND PROVISIONAL WORKOUT ARRANGEMENT, WHICH INCORPORATED PROVISIONS OF THE NATIONAL HOUSING ACT.**

-2-

For purposes of HUD's motion to dismiss, all of the allegations in the complaint should be taken as true. Plaintiff has alleged:

1.  HUD originally coinsured the mortgage which is the subject of this dispute. (complaint paragraph 20).

2.  HUD took action in regard to the Note, Mortgage and Provisional Workout Arrangement pursuant to its administration of the National Housing Act (complaint paragraph 2).

3.  HUD received a copy of the Limited Partnership Agreement, which required Plaintiff's consent to enter into the Provisional Workout Arrangement. (Complaint paragraph 24, 30)

4.  Cincinnati Mortgage, the private co-insurance lender under the original mortgage defaulted on its guarantee obligations and HUD assumed ownership of the note and mortgage. (Complaint paragraphs 25, 26)

5.  The Mortgage was in default and HUD elected not to initiate foreclosure proceedings, rather, electing to enter into the Provisional Workout Arrangement. (Complaint paragraph 28).

6.  The Provisional workout Arrangement was entered into without proper authority, and HUD knew, or should have known as much.  (Complaint paragraph 31).

Section 1702 of the National Housing Act states in pertinent part:

> The Secretary shall, in carrying out the provisions of [the National Housing Act], be authorized, in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal.

12 U.S.C. § 1702.

-3-

Congress, in enacting the National Housing Act (the Act), and recognizing that HUD would be involving itself in loan transactions, saw the need to allow for a waiver of sovereign immunity so that disputes over such loan transactions could be addressed. This case is just such a dispute. Plaintiff is suing based on an agreement to which HUD was a party. The mortgage which is the subject of the Provisional Workout Arrangement incorporates the relevant sections of the Act. (Complaint, Exhibit B, page 2). HUD had co-insured the mortgage as authorized by the Act. HUD then removed the co-insurance mortgagee, again, as authorized by the Act and the regulations HUD established to administer the Act. HUD stepped into the shoes of the mortgagee, and into direct privity with Plaintiff. HUD then negotiated with Plaintiff and improperly entered into the Provisional Workout Arrangement with Plaintiff's general partner.

HUD is now attempting to suggest that Plaintiff cannot sue HUD because there is no waiver of sovereign immunity. Plaintiff's claims against HUD are the exact type of situation Congress envisioned when it drafted the sue and be sued language contained in Section 1702 of the Act. If Congress had truly only wanted to allow HUD to sue to foreclose mortgages, it would not have included HUD's right to "be sued" with its right to "sue." Congress established HUD, authorized it to engage in business transactions with the public and included in the legislation authority to "sue and be sued". Accordingly, restrictions on such authority should not be implied. Federal Housing Administration Region No. 4 v. Burr, 309 US 242, 245, 60 S. Ct. 488, 490, 84 L. Ed. 724 (1940).

Counsel for HUD, in it Motion to Dismiss, has also attempted to confuse the issues in this case by claiming that jurisdiction and a waiver of sovereign immunity are one in the same issue when in truth they are not. While sovereign immunity and subject matter jurisdiction are closely

-4-

related, they are two separate requirements. York Associates, Inc. v. The Secretary of Housing and Urban Development, 815 F.Supp. 16, 19 (D.D.C. 1993).

In United States of America v. American National Bank & Trust Co., 443 F.Supp. 167 (N.D. IL. 1977), the owner of an apartment complex subject to a note and mortgage held by HUD brought a counterclaim against the United States after the United States had initiated foreclosure proceedings. The counterclaim alleged that HUD had failed to follow the Act by failing to supervise the original owner of the property, thereby allowing it to divert funds from the project and causing the property to fail. The United States moved to dismiss the counterclaim based on sovereign immunity, lack of jurisdiction, and failure to state a claim upon which relief could be granted.

The Court ruled that 12 U.S.C. § 1702 operated as a waiver of sovereign immunity in such a case, and that jurisdiction existed under 28 U.S.C. § 1331. Id. at 171. In so doing, the court noted that federal common law governed HUD's alleged failure to follow the provisions of the Act by failing to properly supervise a mortgage insured under federal law.[1] In the present case, Plaintiff has alleged that HUD failed, pursuant to the requirements imposed on it by the Act, to properly enter into and perform The Provisional Workout Arrangement. Accordingly, 12 U.S.C § 1702 would waive sovereign immunity for such a claim, and jurisdiction would exist under 28 U.S.C § 1331.

Furthermore, the Court in York Associates, Inc. v. The Secretary of Housing and Urban Development, 815 F.Supp. 16 (D.D.C. 1993), ruled that Section 1702 waived sovereign immunity

---

[1] Notwithstanding the above discussed holdings, the American National Court ruled that the counterclaim failed to state a claim upon which relief could be granted because it sought to hold HUD responsible for failing to monitor the counterclaimant's predecessor in interest. The Court, finding that an assignee could not sue if the assignor could not have maintained the action, dismissed the counterclaim. No such defect exists in the present case.

for equitable claims. In that case, York, a multifamily housing mortgage lender, sought relief concerning whether HUD was required to pay interest on cash reimbursements to York. HUD then moved to dismiss. The Court noted the provisions of the Act were incorporated into the terms of the contracts between the parties (as they are in the present case), and that York's alleged injuries under the National Housing Act and Administrative Procedure Act, 5 U.S.C. §§ 702. 704, established federal subject matter jurisdiction under 28 U.S.C. § 1331.[2]

**B.    HUD'S CITATIONS TO AUTHORITY MISCONSTRUE THE REQUIREMENTS IMPOSED BY SECTION 1702 OF THE NATIONAL HOUSING ACT UNDER THE FACTS OF THE PRESENT CASE**

Counsel for HUD attempts to create additional confusion by claiming Plaintiff in this case must demonstrate "standing," demonstrate it is within "the zone of interest to be protected by the Act," and that the Act includes "a private right of action." These concepts are simply inapplicable to the present situation. HUD's citations to authority involve situations where a third party, not in privity with HUD, attempted to sue HUD based on the Act. In those situations, a party may very well need to demonstrate standing, a private right of action, and that the party was in the zone of interest to be protected by the statute. In the present case, however, where Plaintiff is in direct privity with HUD and the note and mortgage incorporate the provisions of the Act, Plaintiff need not meet the tests enunciated by counsel for HUD in its Motion to Dismiss. Counsel for HUD also

---

[2] Plaintiff contends that this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331. In addition, diversity jurisdiction is proper under 28 U.S.C. § 1332. Garden Homes, Inc. v. Mason, 238 F.2d 651 (1st Cir. 1956) (Holding for diversity purposes HUD is to be treated as a Federal corporation and citizen of the District of Columbia). If this Court, however, were to rule that subject matter jurisdiction did not exist under federal question or diversity jurisdiction, Plaintiff would be able to sustain its jurisdictional burden under the Administrative Procedure Act, 5 U.S.C. §§ 701-706. York at 20. Furthermore, jurisdiction would be proper under 28 U.S.C. § 1337. Davis v. Romney, 490 F.2d 1360, 1365 (3d Cir. 1974).

attempts to equate the term "mortgagor" with a party not in privity with HUD. In this case, however, Plaintiff, as mortgagor, is suing HUD as mortgagee. In the cases relied on by HUD in its Motion to Dismiss, HUD was not in privity with the mortgagor, but instead with the mortgagee, as only an insurer of the mortgage.

HUD, in trying to convince this Court that it should dismiss this action, cites authority which is tenuous at best. HUD cites the case of Jackson v. Romney, 355 F.Supp. 737 (D.D.C. 1973), aff'd 506 F.2d 233 (D.C. Cir. 1974), as similar to this case, in support of its arguments that Plaintiff must demonstrate standing and that HUD's insurance restrictions did not create a private cause of action.   In Jackson, however, private homeowner's sought relief against HUD as the insurer of their mortgages. In the present case, Plaintiff seeks relief against HUD as the mortgagee.  The homeowners in Jackson sought damages and a declaratory judgment that HUD should only guarantee mortgages on homes which met local housing codes. Id. at 738.   The Court, in ruling that the homeowners could not obtain relief, found:

> 1)   HUD had since amended its regulations to include such a requirement;
>
> 2)   HUD's mortgage insurance requirements involved the lender and not the actual purchaser of the home;
>
> 3)   The homeowners' damage claims for the defects in the home were more properly brought against the sellers of the homes; and
>
> 4)   The Act did not authorize HUD to reimburse private owners for defects.

Moreover, the Court's ruling that the homeowner's lacked standing related only to the fact that the homeowners had mortgages insured under prior regulations which had since been amended to reflect the changes sought by the homeowners. The Court therefore ruled that HUD's current regulations could not inflict harm on them, thereby depriving them of standing.  Plaintiff

in this case has standing because it is in privity with HUD. If HUD cannot be sued in the present case, one would be challenged to find any case, under any factual circumstance that would justify action under the sue and be sued clause contained in 12 U.S.C § 1702.

HUD also cites the case of <u>United States v. Neustadt</u>, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed. 2d 614 (1961), as authority that Plaintiff must demonstrate it is within the zone of interest to be protected by the Act. The Court in the <u>United States of America v. American National Bank & Trust Co.</u>, 443 F.Supp. 167 (N.D. IL. 1977), discussed above, however, pointed to the fact that <u>Neustadt</u> dealt with a claim brought against the Fair Housing Administration for failure to properly inspect a home, which was inapplicable to a situation where a mortgagor sought to hold HUD accountable for the proper functioning of its mortgage insurance procedures. Likewise, <u>Neustadt</u> is inapplicable to the present case because Plaintiff seeks relief against HUD pursuant to the note, mortgage and Provisional Workout Arrangement to which HUD is a party, and which incorporate the Act.

HUD also cites <u>Falzarano v. U.S.</u>, 607 F.2d 506 (1st Cir. 1979), and other cases, claiming Plaintiff, must show that the statute was intended to create a private cause of action, and that Plaintiff is in the zone of interest to be protected by the statute. In so doing, HUD misconstrues the law. In <u>Falzarano</u>, tenants in a federally subsidized housing project brought a class action suit against HUD and the owners of the project, claiming the owners had improperly siphoned funds, and that HUD had improperly allowed such events. The Court ruled that 12 U.S.C. § 1715l(d)(3) of the Act did not create a private cause of action on behalf of the tenants.

The _Falzarano_ ruling again addresses a situation where a third party, involved in, but not a party to a HUD regulated transaction, attempts to assert a cause of action against HUD. In the present case, Plaintiff does not need to find a private cause of action within the statute because it is in privity with HUD under a note and mortgage incorporating the Act, and HUD's actions were taken pursuant to the Act. The _Falzarano_ court even identified the fact that the plaintiffs in that case attempted to argue violations of HUD regulatory agreements could be enforced via judicial review. The court distinguished such cases on the basis that the party suing to enforce the agreement was one of the parties to the agreement. _Id._ At 513 N.5. In this case, Plaintiff is a party to the statutorily authorized transaction on which it seeks judicial review, and as such, no "private right of action" need be authorized by the statute.

HUD's argument that Plaintiff lacks standing to bring suit is also misplaced. HUD relies on the case of _Bayvue Apt. Joint Venture v. Ocwen Federal Bank_, 971 F.Supp. 129 (D.D.C 1997), to suggest that Plaintiff may not bring the instant action because Plaintiff is not within the "zone of interest" specifically contemplated by the Act. _Bayvue_, however, dealt with a situation where the owners of multi family housing projects attempted to get a third party to bid on the owners' defaulted notes at a HUD controlled auction. The Court ruled that the owners lacked standing because they did not participate as bidders, and because the bidding restrictions were designed to allow HUD to control the bidding process, not to protect the bidders. In the present case, Plaintiff is asserting claims arising out of HUD's administration of a HUD controlled mortgage which itself incorporates the applicable provisions of the Act. The "zone of interest" test is simply inapplicable to the present case. Moreover, HUD's reliance on the language of _United States v. OCCI Co._, 758 F.2d 1160 (7th Cir. 1985), is also misguided. IN _OCCI_, HUD was foreclosing a

mortgage, and the mortgagors attempted to assert a defense that HUD's denial of the mortgagor's offer to sell the property to a third party was arbitrary and capricious. The quote cited by HUD in its motion points out that HUD must comply with the Act. While promotion of the building of homes by use of federal credit may be "predominant," it does not obviate HUD's responsibility to exercise reasonable diligence in exercising its duties under the Act, as Plaintiff has alleged in the present case.


## CONCLUSION

12 U.S.C. § 1702 provides a waiver of sovereign immunity, allowing Plaintiff to bring suit against HUD under the facts of this case. Subject matter jurisdiction of these claims is proper under 28 U.S.C. § 1331 and 1332. Plaintiff need not demonstrate standing, a private cause of action, or that it is within the zone of interest as claimed by HUD, because Plaintiff is in privity with HUD under a note and mortgage incorporating provisions of the Act.

-10-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to: **WILLIAM S. SPENCER, ESQ.**, 4601 Sheridan Street, Hollywood, Florida 33021, **DAVID W. TRENCH, ESQ.**, 2500 First Union Financial Center, Miami, FL 33131-2336, **WILLIAM C. HEALY, ESQ.**, 99 N.E. 4th Street, Third Floor/civil Division, Miami, FL  33132-2111, and **RICHARD T. WOULFE, ESQ.**, P.O. Drawer 03040, 888 E. Las Olas Blvd., Suite 400 Ft. Lauderdale, FL  33303-0340, this __19th__ day of May, 2000.

ICARD, MERRILL, CULLIS, TIMM,
 FUREN & GINSBURG, P.A.
2033 Main Street, Suite 600
Sarasota, Florida   34237
Telephone: (941) 366-8100
Attorneys for Plaintiff

By: _____
ROBERT E. MESSICK
Florida Bar #31477
JASON A. LESSINGER
Florida Bar #0091601

F:\USERS\CJB\CJB\OAKLAND\HUD-FED.CT\MEM-LAW.HUD

-11-

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
Case No. 00-6147-CIV-LENARD/TURNOFF

813268 ONTARIO, INC., as General
Partner of OAKLAND PARK
( F L O R I D A )   L I M I T E D
PARTNERSHIP, an Ontario limited
partnership; as limited partner of, and
on behalf of OAKLAND LAKES, LTD.,
a Florida limited partnership,

      Plaintiff,

vs.

OAKLAND LAKES, LTD., a Florida
limited partnership; WILLIAM O.
BRISBEN;  W.O.  BRISBEN
COMPANIES, INC.; and ROBERT E.
SCHULER, as General Partners of
OAKLAND LAKES, LTD.; THE
SECRETARY OF HOUSING AND
URBAN DEVELOPMENT; and
CONDOR ONE, INC., a Delaware
corporation,

      Defendants.

_____/



## ORDER DENYING SECRETARY OF HOUSING AND URBAN DEVELOPMENT'S MOTION TO DISMISS

THIS CAUSE is before the Court on Defendant Secretary of Housing and Urban

Development's Motion to Dismiss, filed April 10, 2000. (D.E. # 28.) Plaintiff has filed a

Memorandum of Law in Opposition to the Motion. (D.E. # 36.) Having reviewed the

1

CC: REM
   Client

Motion, the Opposition and the record in this case, and having been otherwise advised in the premises, the Court finds as follows.

## I.    Introduction

Plaintiff 813268 Ontario, Inc. ("Ontario") brings this limited partner derivative action pursuant to Fla. Stat. § 620.163, seeking declaratory relief to set aside a Provisional Workout Agreement (the "PWA"). Defendant Secretary of Housing and Urban Development ("HUD") and Oakland Lakes, Ltd. ("Oakland Lakes"), a Florida limited partnership in which Ontario was a limited partner,[1] entered into the PWA, effective February 1, 1995, after Oakland Lakes defaulted on one or more of its obligations under mortgage financing for the development, construction, ownership and operation of the Lakes of Casablanca apartment project (the "Project").

Oakland Lakes was formed for the primary purpose of ownership and development of an apartment complex in Oakland Park, Broward County, Florida. On October 5, 1989, Oakland Lakes obtained its initial mortgage financing for the Project from Cincinnati Mortgage, a corporation approved and insured by HUD under the National Housing Act, 12 U.S.C. § 1701 et seq. One week later, Cincinnati Mortgage delivered an assignment in blank of the mortgage and copies of all the loan documents (the "loan documents") to the Government National Mortgage Association ("GNMA"), an agency of HUD.

---

[1]Ontario brings this action (1) as general partner of Oakland Park (Florida) Limited Partnership and (2) as limited partner and on behalf of Oakland Lakes.

2

Immediately following completion of construction of the Project, Oakland Lakes defaulted on one or more of its obligations under the mortgage with Cincinnati Mortgage. On or about November 8, 1990, GNMA declared Cincinnati Mortgage to be in default of the guarantee agreement between GNMA and Cincinnati Mortgage, thereby assigning the mortgage to HUD and vesting ownership and administration of the mortgage in HUD. At the time of GNMA's declaration, Oakland Lakes' default had not been cured and continued to exist.

Although HUD had the right to accelerate the mortgage and demand payment of the balance of the mortgage, HUD elected to enter into workout negotiations with Defendant William O. Brisben, who holds a 5% ownership interest in Oakland Lakes as general partner, and a 30% or greater interest as limited partner of Oakland Lakes. At the time of the negotiations, Oakland Park,[2] an investor and limited partner in Oakland Lakes, notified Brisben that the consent and authorization of the other general and limited partners was required before Brisben could bind Oakland Park under the PWA, and that Oakland Park did not give such authorization.

Effective February 1, 1995, HUD and Brisben executed the PWA. On or about May 8, 1995, HUD attempted to assign all of its rights under the terms and provisions of the loan documents and the PWA to Defendant Condor One, Inc. ("Condor"). Oakland Park thereafter notified Brisben that he had entered into the PWA without authorization and

---

[2]Ontario is a general partner of Oakland Park.

3

tendered an offer to purchase Brisben's interest in Oakland Lakes. After Brisben refused the offer, Oakland Park initiated suit in the 17th Judicial Circuit, Broward County, Florida, to enforce the Amended Limited Partnership Agreement (the "State Court Action").[1]

In this action, Plaintiff alleges that the failure of HUD and Brisben to obtain the prior written consent and authority of the other general and limited partners of Oakland Lakes in entering into the PWA renders the PWA invalid and of no effect, and therefore, the terms and provisions of the original mortgage and loan documents continue to control the mortgage between Oakland Lakes and Cincinnati Mortgage, subsequently assigned to GNMA. Therefore, Plaintiff seeks judgment: (1) declaring the rights of the parties under the PWA; - (2) declaring the PWA of no force and effect and reinstating the terms of the original mortgage and loan documents; (3) declaring the rights of the parties under the assignment from HUD to Condor; (4) declaring the assignment from HUD to Condor of no force and effect and reinstating the terms of the original mortgage and loan documents as being held by HUD; and (5) seeking damages against Defendants Brisben, W.O. Brisben Companies, Inc., and Robert E. Schuler as general partners of Oakland Lakes for breach of the duties of care and loyalty.

## II.    Analysis

In evaluating a motion to dismiss, a district court must view the complaint in the light

_____

[1] The parties have not advised the Court of the current status of the State Court Action.

4

most favorable to the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232 (1974).  A complaint may not be dismissed for failure to state a cause of action "unless it appears beyond doubt that plaintiff can prove no set of facts in support of h[er] claim which would entitle him to relief." Bank v. Pitt, 928 F.2d 1108, 1111-12 (11th Cir. 1991) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

Defendant HUD moves to dismiss the Complaint on the grounds that the Court lacks jurisdiction over HUD because there has been no applicable waiver of sovereign immunity, and therefore, Plaintiff has failed to state grounds for jurisdiction or a claim against HUD for which relief may be granted.  (Def. Mot. at 1-2.) Waiver of sovereign immunity and federal subject matter jurisdiction are two distinct issues which the Court shall address separately. See J.C. Driskill Inc. v. Abdnor, 901 F.2d 383, 385 n.4 (4th Cir. 1990) ("Waiver of sovereign immunity is a jurisdictional prequisite in the nature of, but not the same as, subject matter jurisdiction in that unless sovereign immunity be waived, there may be no consideration of the subject matter."); Industrial Indemnity, Inc. v. Landrieu, 615 F.2d 644, 647 (5th Cir. 1980) (rejecting analysis of § 1702 that confused waiver of sovereign immunity and subject matter jurisdiction).[4]

A.    **Waiver of Sovereign Immunity**

Under the doctrine of sovereign immunity, the United States is immune from suit save

---

[4]In Bonner v. City of Pritchard, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all cases decided by the former Fifth Circuit prior to October 1, 1981.

5

to the extent it consents to be sued. See Library of Congress v. Shaw, 478 U.S. 310, 315

(1986). Unless sovereign immunity has been waived or does not apply, the doctrine bars

equitable as well as legal remedies against the United States. See Jaffee v. United States, 592

F.2d 712, 717 n.10 (3d Cir. 1979) (citing Malone v. Bowdoin, 369 U.S. 643 (1962)).

Plaintiff's Complaint alleges claims for declaratory relief against Defendant HUD

arising out of the PWA and HUD's participation as a party thereto pursuant to HUD's

authority to administer the National Housing Act ("NHA"), 12 U.S.C. § 1701 et seq.

(Compl. ¶ 2.) In the NHA, Congress provided that

> [t]he Secretary shall, in carrying out the provisions of this subchapter, and
> subchapters II [Mortgage Insurance], III, IV, V [Miscellaneous], VI, VII, VII,
> IX-A, IX-B, and X of this chapter, be authorized in his official capacity, to sue
> and be sued in any court of competent jurisdiction, State or Federal.

12 U.S.C. § 1702. The Eleventh Circuit has held that § 1702 waives HUD's immunity from

suits for damages stemming from HUD's administration of the NHA. See Mann v. Pierce,

803 F.2d 1554, 1557 (11th Cir. 1986) (holding that § 1702 waived HUD's immunity from

damages action arising out of maintenance and management of HUD owned properties

insofar as such damages were payable from HUD's General Insurance Fund).

To date, the Eleventh Circuit has not directly addressed the extent to which Congress,

in enacting § 1702, has waived HUD's immunity from actions seeking declaratory relief.

At least one other district court, however, has interpreted § 1702 to waive HUD's immunity

in a declaratory judgment action arising out of a contract with HUD made pursuant to the

6

NHA. See 133-24 Sanford Ave. Realty Corp. v. Cisneros, 940 F. Supp. 83, 85 n.2 (S.D.N.Y. 1996). In Sanford Ave., a mortgagor brought an action seeking a declaration that HUD had overstated the principal balance due on a mortgage, directing HUD to account for monies received on account of the mortgage, and declaring (1) that the mortgage was not in default and (2) that the mortgage should be recast in accordance with the terms of a related workout agreement. See id. at 84. In determining that federal law governed the mortgagor's claims, the court noted that § 1702 operated as a waiver of HUD's immunity from the lawsuit. See id. at 85 n.2.

As explained above, Plaintiff here seeks a declaration of the rights of the parties under the PWA, which HUD entered into in the course of its administration of the NHA. Therefore, the concern that a plaintiff not be permitted to recover money damages from the United States Treasury does not arise in this case. See Mann, 803 F.2d at 1557 (determining that HUD's immunity had been waived as to action for damages payable from HUD's General Insurance fund rather than U.S. Treasury); Industrial Indemnity, 615 F.2d at 646 (determining that action against HUD Secretary for damages would be recoverable from funds in possession and control of Secretary severed from Treasury funds and control). In addition, the Court finds that allowing Plaintiff to maintain this action is not inconsistent with the NHA's goals of providing decent housing and allaying the fears of lenders that would otherwise refrain from extending loans secured by NHA insurance if HUD could not be sued in the event of default. See Mann, 803 F.2d at 1557 (citing Korman v. Federal Housing

7

Administrator, 113 F.2d 743, 746 & n.15 (D.C. Cir. 1940) (discussing legislative history)). Therefore, the Court finds that § 1702 waives HUD's immunity from Plaintiff's claims for declaratory relief in this action. See Sanford Ave., 940 F. Supp. at 85.

**B.    Subject Matter Jurisdiction**

Plaintiff has alleged that this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this action arises out of HUD's administration of the NHA. (Compl. ¶ 2.) Pursuant to the NHA, HUD has authority to enter into contracts related to the insurance of mortgages. See 12 U.S.C. § 1709 (authorizing Secretary to insure mortgages eligible under the NHA). Plaintiff has alleged that HUD's negotiation of and entry into the PWA was pursuant to HUD's ownership and administration of the insured mortgage. (Compl. ¶ 28.) The Court finds that this action arises out of a contract with HUD entered into pursuant to its authority to administer the NHA, and therefore is an action involving a federal question over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331. See Industrial Indemnity, 615 F.2d at 647 (holding that district court had jurisdiction pursuant to § 1331 over action arising out of HUD's administration of insured mortgage under NHA); Sanford Ave., 940 F. Supp. at 85 n.2 (finding that federal law governed claims for declaratory relief arising out of contract with HUD pursuant to NHA).

**III.    Conclusion**

The Court finds that 12 U.S.C. § 1702 waives HUD's immunity from Plaintiff's claims for declaratory relief in this action, and that the Court has subject matter jurisdiction

8

over Plaintiff's claims pursuant to 28 U.S.C. § 1331. Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant Secretary of Housing and Urban

Development's Motion to Dismiss, filed April 10, 2000 (D.E. # 28) is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida this ___24___ day of

August, 2000.

JOAN A. LENARD
**UNITED STATES DISTRICT JUDGE**

cc: U.S. Magistrate Judge William C. Turnoff

Robert E. Messick, Esq.
Icard Merrill et al.
2033 Main Street, Suite 600
Sarasota, Florida 34237

William S. Spencer, Esq.
4601 Sheridan Street
Hollywood, Florida 33021

David W. Trench, Esq.
2500 First Union Financial Center
Miami, Florida 33131-2336

William C. Healy, AUSA
99 NE 4th Street, 3d Floor
Miami, Florida 33132-2111

Richard T. Woulfe, Esq.
P.O. Drawer 03040
888 East Las Olas Blvd., Suite 400
Fort Lauderdale, Florida 33303-0340

Case No. 00-6147-CIV-LENARD/TURNOFF

9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6147-CIV-LENARD/Turnoff

813268 ONTARIO, INC, AS GENERAL  )
PARTNER OF OAKLAND PARK (FLORIDA))
LIMITED PARTNERSHIP, AN ONTARIO  )
LIMITED PARTNERSHIP OF AND ON    )
BEHALF OF OAKLAND LAKES. LTD.,   )
A FLORIDA LIMITED PARTNERSHIP,   )
                                 )
    Plaintiff,                   )
                                 )
v.                               )
                                 )
                                 )
THE SECRETARY OF HOUSING         )
AND URBAN DEVELOPMENT, AND       )
CONDOR ONE, INC., A DELAWARE     )
CORPORATION,                     )
                                 )
    Defendants.                  )
_____)

ANSWER AND AFFIRMATIVE DEFENSES

The defendant, the Secretary of Housing and Urban Development (hereinafter "HUD"), by and through the undesigned Assistant United States Attorney, files this Answer and Affirmative Defenses to the plaintiff's Complaint, and states as follows:

FIRST DEFENSE

1.    HUD admits that the complaint purports to be an action as described in paragraph 1 of the complaint.

2.    Deny.

3.    Deny.

4.    This paragraph is a legal conclusion to which no

OCT 3 0 2000

CC: 591 Pop

CC TO JAL

answer is required except to aver that HUD is an agency of the United States.

5.    Admit.

6.    Admit the allegations in this paragraph except that Defendant is without sufficient information to either admit or deny why Defendant Oakland Lakes was formed.

7.    Defendant is without sufficient information to either admit or deny the allegation in this paragraph except that Defendant Oakland Lakes is the owner of the apartment complex described in paragraph seven.

8.    Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

9.    Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

10.    Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

11.    Admit.

12.    Defendant admits that Condor One is a Delaware Corporation to which HUD assigned the mortgage.

13.    Admit.

14.    Admit.

15.    Admit.

16.    Admit.

17.    Admit.

2

18.  Admit that the Note and Mortgage were created as part of a loan transaction with Defendant Oakland Lakes as borrower but denies that the Limited Partnership Agreement including resolutions of all general and limited partners authorizing the insured loan is a loan document as that term is defined in the mortgage.

19.  Admit but denies that the loan documents included the Limited Partnership Agreement.

20.  Admit but denies that the loan documents included the Limited Partnership Agreement.

21.  Admit.

22.  Admit but denies that the loan documents included the Limited Partnership Agreement.

23.  Admit that Exhibit C of the complaint purports to be the Second Amended Limited Partnership Agreement.

24.  Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

25.  Admit but denies that the loan documents included the Second Limited Partnership Agreement.

26.  Admit but denies that the loan documents included the Second Limited Partnership Agreement.

27.  Admit.

28.  Deny except to admit HUD entered into settlement negotiations with Brisben.

3

29. Admit.

30. Deny.

31. Defendant is without sufficient information to either admit or deny the allegation in this paragraph but denies that Brisben was without authority to enter into the Workout Arrangement.

32. Admit that HUD assigned the note.

33. Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

34. Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

35. Admit that Exhibit F which is attached to the complaint purports to be a letter dated April 29, 1999 from Robert E. Messick to William O. Brisben.

36. Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

37. Defendant is without sufficient information to either admit or deny the remaining allegations in this paragraph.

38. Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

39. Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

40. Admit except to deny that William O. Brisben entered into an unauthorized Workout Arrangement.

4

41.  Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

42.  Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

43.  Deny.

44.  See defendant's answers to paragraphs 1 to 43 above.

45.  Deny.

46.  Deny.

47.  Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

48.  See defendant's answers to paragraphs 1 to 43 above.

49.  Admits that Plaintiff restates some of the provisions contained in the assignment which is attached to the complaint as Exhibit E but that the full language of the assignment is contained in Exhibit E.

50.  Deny.

51.  Admit that the assignment, a copy of which is attached to the complaint as Exhibit E, contemplated the assignment of the Note and Mortgage and other documents.

52.  Deny.

53.  Deny.

54.  Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

55.  See defendant's answers to paragraphs 1 to 43 above.

5

56. Admit.

57. Deny.

58. Admit that HUD assigned its interest in the Note and Mortgage and other documents described in the assignment to Condor One but denies that the assignment was a violation of the terms of the Provisional Workout Arrangement.

59. Deny.

60. Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

61. Admit.

62. See defendant's answers to paragraphs 1 to 43 above.

63. This paragraph is a legal conclusion to which no answer is required.

64. Deny.

65. Deny.

66. Deny.

67. Deny.

68. Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

69. Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

70. Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

71. Defendant is without sufficient information to either

6

admit or deny the allegation in this paragraph.

72. Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

73. Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

74. Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

75. Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

76. Defendant is without sufficient information to either admit or deny the allegation in this paragraph.

77. Deny.

78. Except as expressly admitted above, Defendant denies each and every allegation in the complaint

## AFFIRMATIVE DEFENSES

### First Defense

79. HUD alleges that Plaintiff's claims against HUD are barred by the doctrine of estoppel. Specifically, Plaintiff had full knowledge of the circumstances leading to and surrounding the execution of the Provisional Workout Arrangement and accepted its benefits without objection for a substantial period of time. Had HUD known that Brisben allegedly was without authority to enter into the PWA, it would not have executed the PWA.

## Second Defense

80.  HUD alleges that Plaintiff's claims against HUD are barred by the doctrine of waiver.  Specifically, Plaintiff had full knowledge of the circumstances leading to and surrounding the execution of the Provisional Workout Arrangement and accepted its benefits without objection for a substantial period of time and thereby waived its rights to contest the validity of the Provisional Workout Arrangement.

## Third Defense

81.  HUD alleges that Plaintiff's claims against HUD are barred by Plaintiff's inequitable conduct.  Specifically, Plaintiff had full knowledge of the circumstances leading to and surrounding the execution of the Provisional Workout Arrangement and accepted its benefits without objection for a substantial period of time.  It is inequitable for Plaintiff to seek to avoid the Provisional Workout Arrangement's obligations after accepting its full benefits.

## Fourth Defense

82.  HUD alleges that Plaintiff has no standing or right to challenge HUD's assignment of the Note and Mortgage and other loan documents to Condor One.  HUD sold the Note and Mortgage and other loan documents pursuant to its authority to do so under federal statutes and regulations.  Borrowers, including

8

Plaintiff, have no standing under such federal statutes or regulations to challenge any such a sale.

### Fifth Defense

83. HUD asserts that Plaintiff's claims against HUD are barred by the fact that the Provisional Workout Agreement was executed by a general partner of Oakland Lakes who acted with apparent authority to execute such document.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _William C. Healy_
WILLIAM C. HEALY
Assistant United States Attorney
Florida Bar No.  0848395
99 N.E. 4th Street
Miami, Florida 33132
TEL: (305) 961-9438
FAX: (305) 530-7139

Of Counsel
Jud E. McNatt
Trial Attorney
U.S. Department of Housing
and Urban Development
40 Marietta Street
Atlanta, GA 30303-2806

9

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this 25th day of October, 2000, to David W. Trench, Esq., Bilzin Sumberg Dunn Price & Axelrod, L.L.P., 2500 First Union Financial Center 200 South Biscayne Boulevard, Miami, Florida 33131; Richard T. Woulfe, Esq., Bunnell, Woulfe, Kirschbaum, Keller, Cohen & McIntyre, P.A., P.O. Drawer 030340, 888 Las Olas Boulevard, Suite 400, Ft. Lauderdale, Florida 33303-0304; Robert E. Messick, Esq., Icard, Merrill, Cullis, Timm, Furen & Ginsberg, P.A. 2033 Main Street, Suite 600, Sarasota, Florida 34237 and William S. Spencer, Esq., Ellis Spencer & Butler, 4601 Sheridan Blvd., Hollywood, Florida 33021.

WILLIAM C. HEALY
Assistant U.S. Attorney

10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.00-6147-CIV-LENARD/TURNOFF

813268 ONTARIO, INC., as
General Partner of OAKLAND
PARK (FLORIDA) LIMITED PARTNERSHIP,
an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;
        Plaintiff,

vs.

OAKLAND LAKES, LTD.,
a Florida Limited Partnership,
WILLIAM O. BRISBEN, W.O. BRISBEN
COMPANIES, INC., and ROBERT E. SCHULER,
as General Partners of OAKLAND LAKES, LTD.,
THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,
        Defendants.
                                /

## PLAINTIFF'S MOTION TO AMEND
## ITS COMPLAINT TO ASSERT ADDITIONAL
## CLAIMS AGAINST DEFENDANTS CONDOR ONE, INC.
## AND THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT

Plaintiff, 813268 ONTARIO, INC., as general partner of OAKLAND PARK (FLORIDA)

LIMITED PARTNERSHIP, an Ontario limited partnership, as limited partner of, and on behalf of

OAKLAND LAKES, LTD., a Florida Limited Partnership, by and through its undersigned attorneys,

and pursuant to Federal Rule of Civil Procedure 15(a) and Rule 15.1 of the Local Rules of the

United States District Court for the Southern District of Florida, moves to amend its complaint in

this cause, and as grounds therefor, would show:

    1.     Plaintiff originally brought a limited partner's derivative action on behalf of Oakland

Lakes, Ltd, a Florida Limited Partnership, seeking declaratory relief against Condor One, Inc.

("Condor") and the Secretary of Housing and Urban Development ("HUD"), and also seeking

general partners of Oakland Lakes (the "Former General Partners").

2.    Prior to the filing of this action, Plaintiff was in state court litigation with the Former General Partners in an effort to enforce the terms and provisions of the Limited Partnership Agreement, as amended, between Plaintiff and the Former General Partners.

3.    Since the filing of the original complaint in this Federal Court action, Plaintiff and the former General Partners have settled the state court litigation, and as a result, the former General Partners have been replaced by Oakland Park G.P. Corporation, as the new General Partner of Oakland Lakes.

4.    The Former General Partners, pursuant to the state court settlement, were also dismissed from this litigation as well, pursuant to this Court's order dated August 31, 2000.

5.    Also since the filing of the original complaint, Plaintiff has become aware of additional causes of action against HUD and Condor, as more particularly described in the proposed amended complaint attached hereto as Exhibit "A."

6.    Federal Rule of Civil Procedure 15 states that leave of Court to amend a pleading shall be freely given when justice so requires.

7.    Justice requires that Plaintiff be allowed to assert its additional claims to ensure that all of Plaintiff's potential causes of action are brought in the same action, thereby conserving judicial resources and avoiding prejudice to Plaintiff's rights.

8.    No party will be prejudiced if the Court grants Plaintiff's motion to amend at this stage in the proceeding.

WHEREFORE, Plaintiff respectfully requests that this Court grant Plaintiff's motion to amend its complaint, and for any other relief the Court deems necessary and proper.

Plaintiff filed its original complaint in this action on or about January 31, 2000. Since that time, as discussed in the Motion To Amend, Plaintiff has settled its claims against some of the defendants herein, and a new general partner has taken over the operations of Oakland Lakes. Plaintiff has also become aware of additional facts which support additional damage claims against both Condor and HUD. This Court entered its Order Adopting Joint Scheduling Report, Setting pretrial Conference and Trial, Establishing Pretrial and Trial Procedures and Establishing Pretrial Deadlines on May 5, 2000. The Order reflects a date of November 1, 2000 as a target date by which any motions to amend shall be served in this action. Plaintiff's motion to amend is within this time limit. In addition, HUD just served its answer to the complaint on October 25, 2000. Accordingly, no prejudice will result in allowing Plaintiff to amend its complaint at this time. Leave to amend shall be freely given when justice so requires. <u>Fed. R. Civ. P.</u> 15. Moreover the rule allowing amendment should be heeded so long as the movant has not acted with undue delay, bad faith or dilatory motive. <u>International Ship Repair v. St. Paul Fire and Marine Ins. Co.</u>, 944 F.Supp 887 (M.D. Fla. 1996). Justice requires that Plaintiff be given leave to amend its complaint, and no legal justification exists for denial of the motion. Accordingly, Plaintiff would respectfully request that this Court grant its Motion to Amend.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to: **DAVID W. TRENCH, ESQ.**, 2500 First Union Financial Center, Miami, FL 33131-2336, **WILLIAM C. HEALY, ESQ.**, 99 N.E. 4th Street, Third Floor/civil Division, Miami, FL 33132-2111, and **RICHARD T. WOULFE, ESQ.**, P.O. Drawer 03040, 888 E. Las Olas Blvd., Suite 400 Ft. Lauderdale, FL 33303-0340, this __30__ day of November, 2000.

ICARD, MERRILL, CULLIS, TIMM,
  FUREN & GINSBURG, P.A.
2033 Main Street, Suite 600
Sarasota, Florida 34237
Telephone: (941) 366-8100
Attorneys for Plaintiff

By: _____
  ROBERT E. MESSICK
  Florida Bar #31477

F:\USERS\CJBC\JBC\OAKLAND\HUD-FED.CT\JAL-AMD.WPD

-4-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.00-6147-CIV-LENARD/TURNOFF

813268 ONTARIO, INC., as
General Partner of OAKLAND
PARK (FLORIDA) LIMITED PARTNERSHIP,
an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;
        Plaintiff,

vs.

OAKLAND LAKES, LTD.,
a Florida Limited Partnership,
WILLIAM O. BRISBEN, W.O. BRISBEN
COMPANIES, INC., and ROBERT E. SCHULER,
as General Partners of OAKLAND LAKES, LTD.,
THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,
        Defendants.
_____/

## AMENDED COMPLAINT

Plaintiff, 813268 ONTARIO, INC., as general partner of OAKLAND PARK

(FLORIDA) LIMITED PARTNERSHIP, an Ontario limited partnership; as limited partner of,

and on behalf of OAKLAND LAKES, LTD., a Florida Limited Partnership; sues THE

SECRETARY OF HOUSING AND URBAN DEVELOPMENT, and CONDOR ONE, INC.,

a Delaware Corporation, and alleges:

1



## I. INTRODUCTION

1.     This is a limited partner derivative action pursuant to Florida Statute Section 620.163, seeking declaratory relief pursuant to Florida Statutes Chapter 86, as authorized by 28 U.S.C. § 2201, to set aside a provisional workout arrangement (the "Workout Arrangement") effective February 1, 1995, by and between the Secretary of the United States Department of Housing and Urban Development ("HUD") and Oakland Lakes Ltd., a limited partnership organized and existing under the laws of the State of Florida (Oakland Lakes), whose primary place of business is 2325 N.W. 33rd Street, Fort Lauderdale, Florida 33309 and for damages against Defendants Condor and HUD.

## II. JURISDICTION

2.     This action is properly before this Court pursuant to 12 U.S.C. § 1702 because the subject of the Workout Arrangement and HUD's participation as a party thereto were undertaken by HUD pursuant to its administration of the National Housing Act.

3.     Federal question jurisdiction is proper under 28 U.S.C. § 1331, in that this action arises under laws of the United States.

4.     Diversity of citizenship jurisdiction is proper under 28 U.S.C. § 1332, in that Plaintiff, 813268 ONTARIO, INC. is a Canadian corporation and is the general partner of Oakland Park (Florida) Limited Partnership ("Oakland Park"), a limited partnership organized and existing under the laws of the Province of Ontario, Canada; Defendant Oakland Lakes is a limited partnership organized and existing under the laws of the State of Florida; Defendant, Condor One, Inc. ("Condor"), is a corporation that was organized and is validly existing under the laws of the State of Delaware;  Defendant, HUD, is

2

deemed to be a federal corporation and a citizen of the District of Columbia for purposes of diversity jurisdiction; and the amount in controversy exceeds $75,000.00.

## III. VENUE

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (e).

## IV. PARTIES

6.     Plaintiff Oakland Park is an Ontario Limited Partnership formed for the purpose of investing capital in Defendant Oakland Lakes, and which did in fact invest in excess of 1.8 million dollars in Oakland Lakes, and executed the Amended Limited Partnership Agreement described in paragraph 23 herein, as the investor limited partner, with an ownership interest in Defendant Oakland Lakes of 50%.

7.     Defendant Oakland Lakes is a Florida limited partnership formed for the primary purpose of ownership and development of certain real and personal property as an apartment complex of approximately 387 units located in Oakland Park, Broward County, Florida, which apartment complex is currently owned and titled in Oakland Lakes and is presently known or does business as the "Sailboat Pointe Apartments". The apartment complex owned and operated by Oakland Lakes was formerly known and did business originally as the "Lakes of Casablanca Apartments" (the apartment complex and real property shall be referred to herein as "the Property").

8.     HUD is an agency of the United States government charged with administering the National Housing Act.

3

9.      Condor is a Delaware Corporation to which HUD purportedly assigned the Mortgage and Loan Documents described herein, which are the subject of the Workout Arrangement.

## V. GENERAL ALLEGATIONS

10.     Beginning in or about 1989, Oakland Lakes initiated negotiations to obtain favorable, low interest mortgage financing for the development, construction, ownership, and operation of the Lakes of Casablanca apartment project on the property owned by Oakland Lakes and located at 2325 N.W. 33rd Street, Fort Lauderdale, FL 33309, Oakland Park, Broward County, Florida; principally, through a mortgage loan extended by Cincinnati Mortgage Corporation ("Cincinnati Mortgage").

11.     Cincinnati Mortgage was a corporation that had been approved by HUD to originate and service mortgage loans insured by HUD under the National Housing Act, and had been further approved by HUD to co-insure mortgages under the provisions set forth in Section 221(d)(4) of the National Housing Act and 24 C.F.R. Part 244.

12.     Cincinnati Mortgage issued its commitment for insurance of advances (the "Firm Commitment") to Oakland Lakes, which Firm Commitment obligated Cincinnati Mortgage to: a) co-insure a first mortgage loan (the "Insured Loan") concerning the Project under the provisions set forth in Section 221(d)(4) of the National Housing Act and 24 C.F.R. Part 244; and b) cause the Government National Mortgage Association ("GNMA"), an agency of HUD, to issue its mortgage backed securities ("MBS") concerning the Insured Loan.

4

13.    The Florida Housing Financing Agency ("FHFA") agreed to issue tax-exempt revenue bonds (the "Bonds") for the purpose of funding the Insured Loan, and upon the condition that the MBS issued by GNMA be pledged as collateral for the Bonds. The proceeds from the sale of the Bonds were used to fund the Insured Loan.

14.    On information and belief, FHFA and a group of underwriters headed by Kidder Peabody & Co. Incorporated and Dean Witter Reynolds, Inc. (the "Underwriters") entered into a bond purchase agreement (the "Bond Purchase Agreement") which obligated the Underwriters to purchase the Bonds from FHFA.

15.    On information and belief, on or about October 5, 1989, Oakland Lakes and Cincinnati Mortgage closed the Insured Loan, which closing entailed the execution by Oakland Lakes and delivery to Cincinnati Mortgage of the following loan documents (collectively, the "Loan Documents"), to wit: a) a mortgage note, as amended, (the "Note") dated October 5, 1989, evidencing the Insured Loan in the original principal amount of $22,779,600.00); b) a mortgage, as amended and restated, (the "Mortgage") encumbering the real, personal and intangible property comprising the Project and constituting a first mortgage lien against the property; and c) the following documents: a regulatory agreement; the Limited Partnership Agreement including resolutions of all general and limited partners authorizing the Insured Loan; a land use restriction agreement; lender's policy of title insurance; evidence of zoning compliance; copies of all land use and building permits; survey and surveyor's report; building loan agreement; mortgagee's certificate; mortgagor's certificate; mortgagor's oath; agreement and certification; attorney's opinion letter; construction contract – cost plus; payment and performance bond; contractor's certification; owner – architect agreement; mortgagor and architect

5

certificate; design architect certification; state and county uniform commercial code filing forms; security agreement; letters certifying availability of utility services to the project; certificates of insurance; notice of commencement; escrow agreements concerning working capital, minor non-realty items and operating deficits; draw request; and construction progress schedule. True and correct copies of the Note and Mortgage, as amended, are attached hereto as Exhibits "A" and "B" and by this reference are made a part of this Complaint.

16.    Prior to closing the loan, on information and belief, Cincinnati Mortgage delivered copies of all Loan Documents, including but not limited to the Limited Partnership Agreement, to HUD.

17.    On information and belief, On October 5, 1989, the mortgage note was endorsed for coinsurance under the provisions of Section 221(d)(4) of the National Housing Act and pursuant to 24 C.F.R. Part 244, FHA mortgage number 06636650, and Cincinnati Mortgage delivered final copies of all Loan Documents, including but not limited to the Limited Partnership Agreement, to HUD.

18.    On or about October 5, 1989, Oakland Lakes commenced construction of the apartment complex.

19.    On or about October 13, 1989, Cincinnati Mortgage delivered an assignment in blank of the mortgage and copies of all Loan Documents, including but not limited to the Limited Partnership Agreement, to a custodian of GNMA, for the benefit and security of GNMA; and caused GNMA's MBS to be delivered to the trustee of the Bonds.

20.    On or about June 29, 1990, the Limited and General Partners of Oakland Lakes executed, by and amongst all of such partners, a Second Amended and Restated

6

Agreement of Limited Partnership for Oakland Lakes ("the Amended Limited Partnership Agreement"). A true and correct copy of the Amended Limited Partnership Agreement is attached hereto as Exhibit "C", and by this reference is made a part of this Complaint. The terms and provisions of the Amended Limited Partnership Agreement have not been further amended, revised, and/or superceded through the date of filing this Complaint.

21.    On information and belief, Oakland Lakes delivered a copy of the Amended Limited Partnership Agreement to HUD and/or Cincinnati Mortgage as required under the National Housing Act and the Loan Documents.

22.    On information and belief, on or about November 8, 1990 GNMA declared Cincinnati Mortgage in default of the guarantee agreement by and between Cincinnati Mortgage and GNMA; thereafter the custodian delivered all Loan Documents, including but not limited to, the Amended Limited Partnership Agreement, to GNMA, and Cincinnati Mortgage delivered all Loan Documents, and a complete loan file to GNMA.

23.    The insured mortgage was converted from coinsurance to full insurance on January 31, 1992, under new FHA project number 066-94026, and at the time of the conversion, a complete copy of Cincinnati Mortgage's loan file, and Loan Documents, including but not limited to, the Amended Limited Partnership Agreement, were delivered to HUD.

24.    Almost immediately after completion of construction of the apartment complex, Oakland Lakes apparently defaulted in one or more of its obligations under the Loan Documents. The apparent event(s) of default were not cured and continued to exist at the time of the assignment of the Loan documents by Cincinnati Mortgage to GNMA.

7

25.    At the time of the assignment of the Loan Documents to HUD and HUD's ownership and administration of the loan, HUD elected not to exercise the rights and remedies set forth and provided in the Loan Documents, specifically the right to accelerate and to demand payment of the balance of all sums due and payable under the Note, Mortgage, and other Loan Documents. As an alternative, HUD elected in such event(s) of default to enter into settlement - workout negotiations with William O. Brisben, as the then general partner of Oakland Lakes.

26.    Effective February 1, 1995, HUD and William O. Brisben, as the then General Partner of Oakland Lakes, executed a written, provisional Workout Arrangement (the "Workout Arrangement"). A true and correct copy of the Workout Arrangement is attached hereto as Exhibit "D", and by this reference made a part of this Complaint.

27.    Brisben, as general partner of Oakland Lakes, lacked authority under the terms and provisions of the Amended Limited Partnership Agreement, to enter into the Workout Arrangement without the prior written consent of and/or joinder of certain of the other partners, both limited and general, of Oakland Lakes.

28.    At all times, during the workout negotiations with Brisben, acting in his capacity as general partner of Oakland Lakes, HUD had copies, or should have had copies, of all Loan documents and knew or should have known that Brisben was acting in his capacity as general partner of Oakland Lakes, and knew or should have known that the General Partner did not have authority to enter into the Workout Arrangement.

29.    On or about May 8, 1995, HUD attempted to assign by written assignment all of its rights under the terms and provisions of the Loan Documents, including, upon information and belief, the Workout Arrangement, to Condor. A true and correct copy of

8

the purported Assignment from HUD to Condor is attached hereto as Exhibit "E" and by this reference is made a part of this Complaint.

30.    On information and belief, at the time William O. Brisben entered into the workout negotiations with HUD, Oakland Park provided both verbal and written notice to William O. Brisben that the consent and authorization of certain of the other general and limited partners was required before William O. Brisben, as general partner, could bind Oakland Park under the Workout Arrangement, and that Oakland Park did not so consent or authorize William O. Brisben, as general partner, to enter into the Workout Arrangement.

31.    On information and belief, subsequent to the effective date of the Workout Arrangement, Oakland Park became aware the Workout Arrangement was entered into without Oakland Park's authorization, and Oakland Park again raised its objections concerning the Workout Arrangement to William O. Brisben, as general partner.

32.    Subsequently, by letter dated April 29, 1999, counsel for Oakland Park notified William O. Brisben of its position that he had entered into the Workout Arrangement without authority, and tendered an offer to purchase the 50% interest of William O. Brisben and the other partners in the Oakland Lakes Limited Partnership, as was its right under the Amended Limited Partnership Agreement, so that Oakland Park could gain control of the Oakland Lakes Limited Partnership and take appropriate action regarding the unauthorized Workout Arrangement, as well as improve the operation and management of the apartment complex. A copy of the letter is attached hereto as Exhibit "F", and by this reference is made a part of this Complaint.

9

33.    William O. Brisben, as well as the other general and limited partners, refused to take any action in regard to the unauthorized execution of the Workout Arrangement, and refused to sell their 50% interest in the Limited Partnership as required under the Amended Limited Partnership Agreement.

34.    As a result, Oakland Park initiated suit in the Circuit Court for the 17th Judicial Circuit in Broward County Florida, in case number 99-10831 (13) ("the State Court Action"), in an effort to enforce the Amended Limited Partnership Agreement and thereby acquire the interests of William O. Brisben and the other partners in Oakland Lakes, in order to gain control of the Limited Partnership.

35.    Oakland Park, in the State Court Action, moved to appoint a receiver to stabilize the operation determine the financial status of the apartment complex, and also attempted to expedite trial in order to gain control of the Limited Partnership so as to be able to bring this suit as the Limited Partnership, rather than on its behalf.

36.    After this Federal Court action was initiated, Oakland Park and William O. Brisben, W.O. Brisben Companies, Inc. and Robert E. Schuler settled the State Court Action. The settlement was entered into to enforce the buy out provisions of the Amended Limited Partnership Agreement, which Oakland Lakes found necessary to enforce in great part due to the unauthorized actions of William O. Brisben as alleged herein. Pursuant to the settlement,    William O. Brisben and all other former general partners have been replaced as General Partner of Oakland Lakes.

37.    Subsequent to and as a part of the settlement of the State Court Action, Oakland Park G.P. Corporation became the new General Partner of Oakland Lakes. Oakland Park G.P. Corporation consents to and supports this action.

38.     On August 31, 2000, Oakland Park filed a voluntary petition for Chapter 11 reorganization under the United States Bankruptcy Code, in case Number 00-25351-BKC-RBR, in the United States Bankruptcy Court for the Southern District of Florida, Ft. Lauderdale Division.

39.     As required by Florida Statute Section 620.164, at the time of bringing this action, Oakland Park is a partner of Oakland Lakes, and was also a partner at the time William O. Brisben, as general partner, entered into the unauthorized Workout Arrangement.

40.     As a result of the General Partners' actions, Plaintiff has been forced to engage the undersigned counsel, and is obligated to pay them a reasonable fee for their services.

41.     Plaintiff is entitled to recover its attorneys fees in this action from Oakland Lakes, pursuant to Florida Statute Section 620.166, and is also entitled to recover its attorneys' fees from Condor and HUD, pursuant to the note and mortgage which are the subject of this action.

42.     All conditions precedent to the bringing of this action have occurred, been satisfied by Plaintiff, or have been waived by defendants.

## COUNT I

43.     This is a count for declaratory relief and the allegations set forth in paragraphs 1 through 42 above are hereby realleged and incorporated into this Count I.

44.     For reason of the failure of HUD and/or Brisben, as general partner, to obtain the prior written consent and authority of certain of the other general and limited partners

11

of Oakland Lakes in connection with the Workout Arrangement, as required under the terms and provisions of the Amended Limited Partnership Agreement, the Workout Arrangement is invalid and of no effect and is unenforceable as to its terms and provisions. It is a position of Plaintiff, that the terms and provisions of the original Mortgage and Loan Documents continue to control the loan transaction consummated by and between Oakland Lakes and Cincinnati Mortgage, and as subsequently assigned by Cincinnati Mortgage to GNMA.

45.    A dispute exists between Oakland Park and HUD and/or Condor concerning each parties' respective rights under the Workout Arrangement, Mortgage and Loan Documents regarding HUD's and/or Condor's rights to enforce the Workout Arrangement, Mortgage and Loan Documents, and whether Oakland Park must comply with the Workout Arrangement.

46.    Oakland Lakes is in doubt as to its rights under the Workout Arrangement, and how the workout Arrangement affects Oakland Lakes' rights and responsibilities under the Mortgage, Note and Loan Documents, and is entitled to a judicial declaration as to its rights in order to remove such doubt.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes, Ltd., requests that this Court enter judgment declaring the rights of the parties under the provisional Workout Arrangement and corresponding Loan Documents; declare that the provisional Workout Arrangement is of no force and effect and reinstate the terms of the original Mortgage and Loan Documents; award Plaintiff its reasonable attorneys' fees and

12

costs incurred in bringing this action; and award any other relief the Court deems necessary and proper.

## COUNT II

47.    This is a second count for declaratory relief, and paragraphs 1 through 42 above are hereby realleged and incorporated into this Count II.

48.    The attempted assignment from HUD to Condor on May 8, 1995 provides that HUD:

> assigns, transfers, sets over and conveys to [Condor], its successors and assigns, the [Amended Mortgage and Note], all as they may have been modified, consolidated, assigned, amended, restated, or supplemented (whether or not of record) through and including May 8, 1995.

49.    The Workout Arrangement, effective February 1, 1995, is an amendment and/or modification of the Mortgage and other Loan Documents.

50.    The attempted assignment by HUD to Condor on May 8, 1995 contemplated the assignment of the Mortgage and other Loan Documents, as modified by the Workout Arrangement.

51.    Because the Workout Arrangement was entered into without the authority of Oakland Lakes, the attempted assignment by HUD to Condor is a nullity, and Oakland Lakes is entitled to a reinstatement of the original terms of the Mortgage and other Loan Documents, as held by HUD, with the Mortgage reverting to HUD ownership.

52.    A dispute exists between Oakland Park and HUD and/or Condor concerning each parties' respective rights under the Assignment, Workout Arrangement, Mortgage and Loan Documents and as to whether HUD or Condors is the true party in interest under the

13

Mortgage and Loan Documents, and whether Oakland Park must comply with the Workout Arrangement.

53.    Oakland Lakes is in doubt as to its rights under the Assignment and Workout Arrangement, and how the workout Arrangement affects Oakland Lakes' rights and responsibilities under the Mortgage, Note and Loan Documents, and is entitled to a judicial declaration as to its rights in order to remove such doubt.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes, Ltd., requests that this Court enter judgment declaring the rights of the parties under the Assignment from HUD to Condor, the provisional Workout Arrangement and corresponding Mortgage Loan Documents; declare that the attempted assignment from HUD to Condor is of no force and effect and reinstate the terms of the original Mortgage and Loan Documents, as being held and owned by HUD, effective the date of entry of the Court's order; award Plaintiff its reasonable attorneys' fees and costs incurred in bringing this action; and award any other relief the Court deems necessary and proper.

## COUNT III

54.    This is a third Count for declaratory relief, and paragraphs 1 through 42 are hereby realleged and incorporated into this Count III.

55.    The Workout Arrangement specifically states:

> To afford an opportunity to effect reinstatement, the Secretary, Department of Housing and Urban Development, will hold the defaulted Note and Mortgage on the subject project under the terms and conditions stated herein.

14

56.   The Workout Arrangement, according to its own terms, required HUD to hold the subject Note and Mortgage.

57.   HUD, rather than holding the Note and Mortgage after entering into the Workout Arrangement, almost immediately assigned HUD's interest to Condor, in direct violation of the terms of the Workout Arrangement.

58.   A dispute exists between Oakland Park and HUD and/or Condor concerning each parties' respective rights under the Workout Arrangement, Mortgage, Loan Documents and Assignment,  regarding HUD's and/or Condor's rights to enforce the Workout Arrangement, Mortgage and Loan Documents, and whether Oakland Park must comply with the Workout Arrangement.

59.   Oakland Lakes is in doubt as to its rights under the Workout Arrangement, and how the workout Arrangement affects Oakland Lakes' rights and responsibilities under the Mortgage, Note and Loan Documents, and is entitled to a judicial declaration as to its rights in order to remove such doubt.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes, Ltd., respectfully requests that this Court declare the rights of the parties under the Workout Arrangement, Mortgage and corresponding Loan Documents; enter judgment setting aside the assignment of the Mortgage to Condor, and reinstating the terms of the original Mortgage and Loan Documents, effective the date of entry of the Court's order; award Plaintiff its reasonable attorneys' fees and costs incurred in bringing this action; and award any other relief the Court deems necessary and proper.

## COUNT IV

60.    This is an action for damages in excess of $75,000.00 against HUD and Condor for breach of contract.

61.    Plaintiff repeats and realleges Paragraphs 1 through 42 as if fully stated herein.

62.    The Workout Arrangement, in Paragraph 8, requires payments of $6,560.84 per month, to be made to the "Reserve for Replacement account" ("the Reserve Account") by the mortgagor.

63.    The Reserve Account was originally established pursuant to the Regulatory Agreement for Multifamily Housing Projects Coinsured by HUD ("the Regulatory Agreement"), a copy of which is attached hereto as Exhibit 1, and by this reference made a part hereof.

64.    Pursuant to the Regulatory Agreement, the Reserve Account was to create a fund to cover the cost of major replacements for the project, thereby ensuring that the condition of the property was maintained at an acceptable level.

65.    The funds in the Reserve Account were only to be used for capital improvements, unless HUD otherwise approved, and such approval was in accordance with HUD's administrative procedures.

66.    When HUD attempted to assign the loan documents in dispute herein to Condor, the Assignment specifically excluded the Regulatory Agreement, which remained with HUD.

16

67.    Pursuant to the terms of the Regulatory Agreement, HUD continues to be obligated to receive Reserve Account payments and maintain the Reserve Account for the benefit of the Property.

68.    On information and belief, when HUD attempted to assign its interest in the subject property to Condor, HUD, in violation of the Regulatory Agreement, turned over the Reserve Account to Condor.

69.    On information and belief, Condor has used, or permitted the use of the Reserve Account funds as payments on the loan indebtedness evidenced by the Loan Documents, thereby depleting the Reserve Account, and as a result, the lack of capital funds in the Reserve Account has resulted in the Property falling into a state of disrepair.

70.    On information and belief, Condor has taken such action without the knowledge and/or authority of HUD.

71.    HUD, by failing to maintain control over the Reserve Account has abrogated its duties under Regulatory Agreement, Workout Arrangement and Loan Documents.

72.    Condor, by improperly and without authorization using or permitting the use of the Reserve Account funds to make payments on the subject loan indebtedness, has breached its duties under the Loan Documents.

73.    As a result of HUD's and Condor's actions, the lack of available funds in the Reserve Account has prevented normal maintenance and upkeep on the

Property, and resulted in the lack of available funds with which necessary repairs and improvements to the Property could be made, and further inhibited the Property from being adequately maintained by Oakland Lakes, thereby damaging Oakland Lakes and Plaintiff.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes, Ltd., requests that this Court enter judgment against Defendants Condor and HUD for damages, attorneys' fees, the costs of bringing this suit, and for any other relief this Court deems necessary and proper, and demands trial by jury on all issues so triable.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to: **DAVID W. TRENCH, ESQ.**, 2500 First Union Financial Center, Miami, FL 33131-2336, **WILLIAM C. HEALY, ESQ.**, 99 N.E. 4th Street, Third Floor/civil Division, Miami, FL 33132-2111, and **RICHARD T. WOULFE, ESQ.**, P.O. Drawer 03040, 888 E. Las Olas Blvd., Suite 400 Ft. Lauderdale, FL 33303-0340, this ____ day of November, 2000.

ICARD, MERRILL, CULLIS, TIMM,
FUREN & GINSBURG, P.A.
2033 Main Street, Suite 600
Sarasota, Florida 34237
Telephone: (941) 366-8100
Attorneys for Plaintiff

By:_____
ROBERT E. MESSICK
Florida Bar #31477

F:\USERS\CJB\CJB\OAKLAND\HUD-FED\CT\AMDCOMP.WPD

18

## AMENDED AND RESTATED
## RENEWAL MORTGAGE NOTE

$22,779,600.00                          Oakland Park, Florida

October 5 1989

FOR VALUE RECEIVED, the undersigned, Oakland Lakes, Ltd., a Florida limited partnership, ("Mortgagor"), promises to pay to or upon the order of CINCINNATI MORTGAGE CORPORATION, an Ohio Corporation (the "Holder", as hereinafter defined), the principal sum of Twenty Two Million Seven Hundred Seventy Nine Thousand Six Hundred and no/100 Dollars ($22,779,600.00) with interest from the date hereof at the rate of eight and one-quarter percent (8-.25%) per annum on the outstanding principal hereof until paid. The said principal and interest shall be payable in lawful money of the United States of America in monthly installments as follows:

Interest in arrears payable monthly beginning on the first day of November, 1989 and on the first day of each month thereafter up to and including December 1, 1991. Commencing on January 1, 1992, monthly installments of interest and principal shall be paid in the sum of One Hundred Sixty-Two Thousand Six Hundred Seventy Seven and 97/100 Dollars ($162,677.97) each, such payments to continue monthly on the first day of each succeeding month until the entire indebtedness has been paid. In any event, the balance of principal, if any remaining unpaid, plus accrued interest, shall be due and payable on December 1, 2031. The payments of principal and interest shall be applied first to interest at the applicable rate upon the principal sum or so much thereof as shall from time to time remain unpaid and the balance thereof shall be applied on account of principal.

In addition to the foregoing, the Mortgagor shall aggregate with the monthly installments of principal and interest all other payments payable pursuant to the Mortgage (as hereinafter defined).

Until further notice from the Holder, all payments by the Mortgagor of any sums due hereunder shall be by check payable to Cincinnati Mortgage Corporation, 2368 Victory Parkway, Suite #210, Cincinnati, Ohio 45206.

Except as hereinafter provided, there shall be no payments made hereunder, other than regularly scheduled payments of principal hereunder, to reduce the principal amount of the debt evidenced hereby in whole or in part prior to October 31, 1999.

-1-

EXHIBIT A

On or after October 31, 1999, provided that there is no default under this Note or the Mortgage, privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due, on the last day of any month prior to maturity upon at least thirty (30) days' prior written notice to the Holder.

Notwithstanding any prepayment prohibitions imposed and/or penalties required by this Note with respect to prepayments made prior to October 31, 1999 the indebtedness may be prepaid in part or in full without the consent of the Holder and without a pre-payment penalty if the Secretary of Housing and Urban Development (the "Secretary") determines in writing that prepayment will avoid a mortgage coinsurance claim and is therefore in the best interest of the United States Government, which determination shall be made by the Secretary only if:

> (a)  the Mortgagor has defaulted in the payments due under this Note and the Secretary has received notice of such default, as required by 24 CFR Section 251.810;

> (b)  the Secretary determines that the Project has been experiencing a net income deficiency which has not been caused solely by management inade-quacy or lack of owner interest, and which is of such a magnitude that the Mortgagor is currently unable to make required debt service payments, pay all Project operating expenses and fund all reserves required by the Secretary;

> (c)  the Secretary determines that there is a reasonable likelihood that the Mortgagor can ar-range to refinance this Note at a lower interest rate or otherwise reduce the debt service payments due hereunder through partial prepayment; and

> (d)  the Secretary determines that refinancing this Note at a lower rate or partial prepayment is necessary to restore the Project to a financially viable condition and to avoid a coinsurance claim.

All payments to reduce the principal balance hereunder (in-cluding all penalty or penalties required pursuant hereto), other than regularly scheduled payments of principal, must be made to the Holder hereof in Federal Funds.

In the event of any partial prepayment of this Note for any reason, including but not limited to a pre-payment as a result of (i) an award in condemnation, (ii) an insurance payment on the property subject to the Mortgage, (iii) the imposition of any requirement of the Secretary, or (iv) any voluntary prepayment,

-2-

the Holder shall have the right, in its sole discretion, to apply such prepayment to the payments last due hereunder or to recast the remaining principal payments hereunder so that the required monthly payments of principal and interest shall be in equal amounts sufficient to pay the remaining principal balance of this Note over the then remaining term hereof.

In the event any installment or part of any installment due hereunder becomes delinquent for more than fifteen (15) days, there shall be due at the option of the Holder, in addition to other sums then due hereunder, a sum equal to four percent (4%) of the amount of principal and interest so delinquent for each month, or portion thereof, that such amount remains unpaid as liquidated damage for losses due to cash flow disruption and accounting and other expenses incident to handling such delinquent payment. Whenever, under the laws of the State of Florida, the amount of any such late penalty is considered to be additional interest, this provision shall not be used to the extent that the rate of interest specified is in excess of the maximum rate of interest permitted and would constitute usury.

This Note is secured by a Mortgage, Assignment of Rents and Security Agreement (the "Mortgage") of even date herewith made by the Mortgagor, upon certain property and premises situate and lying in Broward County, Florida, and being more particularly described in said Mortgage. The terms, covenants, conditions, provisions, stipulations and agreements contained in the Mortgage are hereby made a part hereof to the same extent and with the same effect as if fully set forth herein; and without limiting the foregoing, reference is hereby made to the Mortgage for a description of the property conveyed thereunder, definition of certain terms, the nature and extent of the security and the rights of the Holder in respect of such security. It is expressly agreed that upon the occurrence of any default under this Note or Event of Default under the Mortgage, the whole principal sum hereof or so much thereof as shall remain unpaid, with interest thereon, together with all other sums secured under the Mortgage shall at the option of the Holder hereof, become immediately due and payable. Any capitalized term used herein, but not herein defined, shall have the meaning set forth in the Mortgage.

Mortgagor further agrees to pay to the order of the Holder immediately on demand any advancements and/or expenditures made by such Holder in accordance with the Mortgage including, without limitation, those for the payment of taxes, special assessments, insurance penalties, mortgage insurance penalties, lender's penalties, and costs of maintenance and preservation of property mortgaged or pledged in connection with the loan evidenced by this Note. At the option of Holder, without notice or demand (which notice and demand are expressly waived by Mortgagor), all or any part of the advancements and/or expenditures described in this paragraph may be added to the unpaid principal balance

-3-

hereof and become a part of and on a parity with the principal
indebtedness secured by the Mortgage, and all other instruments
executed in connection herewith, and the same shall accrue inter-
est, until paid, at the highest rate permitted to be penaltied on
delinquent installments of principal and interest under this
Note.

Each payment shall be applied:  first, to the payment of
such additional advancements and expenditures as Holder may make
in accordance with the terms of the Mortgage including, without
limitation, advancements for taxes, mortgage coinsurance penalty,
insurance and the like; second, to the payment of accrued but
unpaid interest; and third, to the payment of principal.  Late
penalties will not be deducted from any monthly mortgage payment
but will be separately penaltied to and collected from the Mort-
gagor.

If default be made in the payment of any installment under
this Note (or any other amount due under the Mortgage) and if
such default is not made good prior to the due date of the next
such installment, or if any other Event of Default should occur,
then, in addition to any other action permitted to be taken by
the Holder hereunder or under the Mortgage or any other Loan
Documents, the entire principal sum hereof and accrued interest
hereon shall at once become due and payable without notice, at
the option of the Holder, and the Holder shall have the remedies
of a secured party under the laws of the State of Florida with
respect to all property mortgaged or pledged as security for this
Note and all of the rights and remedies available under the
Mortgage or any other Loan Documents.  When this Note becomes
due, by acceleration or otherwise, the Holder may, at its option,
demand, sue for, collect, or make any compromise or settlement it
deems desirable with reference to property held as security
herefor.  The Holder shall not be bound to take any steps neces-
sary to preserve any rights in the property held as security
herefor against prior parties, which the Mortgagor hereby assumes
to do.  The failure to exercise any option to declare the maturi-
ty of the principal debt or to exercise any other rights under
any of the covenants or conditions contained in the Loan Docu-
ments, shall not be taken or deemed to be a waiver of the right
to exercise such option or to declare such maturity after such
past or any subsequent violation of any such covenants or condi-
tions.  All remedies provided for herein upon any default by the
Mortgagor shall be cumulative and not exclusive.

In the event of default in the payment of this Note, and if
the same is collected by an attorney at law, the undersigned
hereby agree(s)' to pay all costs of collection, including rea-
sonable attorneys fees.

Mortgagor and Holder intend that this Note shall be in com-
pliance with all applicable laws and shall be enforceable in

-4-

accordance with its terms. If any provision of this Note shall be illegal or unenforceable, such provision shall be deemed cancelled to the extent of such illegality or enforceability, but the remaining provisions shall not be affected thereby.

All agreements herein are expressly limited so that in no event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forebearance or detention of the money to be advanced hereunder exceed the highest lawful rate permissible under applicable law. If, due to any circumstances whatsoever, fulfillment of any provision hereof, or of any of the Loan Documents, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction deems applicable hereto, then ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if under any circumstances the Holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest.

At the option of Holder, if a court of competent jurisdiction determines that any amounts otherwise to be paid hereunder exceed the highest permissible lawful rate or if Mortgagor or any guarantor asserts the amounts otherwise to be paid hereunder exceed the highest permissible lawful rate, then Holder shall have the right to accelerate the maturity of the entire unpaid principal balance and accrued interest due under this Note, immediately upon notice to the Mortgagor.

Funds representing the proceeds of the indebtedness evidenced hereby and disbursed for any purpose permitted hereunder by the Holder by mail, wire transfer or other delivery to Mortgagor, to escrows or in any way for the benefit of Mortgagor, for any purpose, shall be deemed outstanding hereunder and to have been received by Mortgagor as of the date of such mailing, wire transfer or other delivery, and interest shall accrue and be payable upon such funds from and after the date of such wire transfer, mailing or delivery and until repaid, notwithstanding the fact that such funds may not at any time have been remitted from such escrows to Mortgagor or for its benefit. Funds paid hereunder by or on behalf of Mortgagor shall be deemed received by the Holder on the next business day if not received by 2:00 p.m. local time at the location where payments hereunder are to be made.

Each maker and endorser jointly and severally hereby consents to any extensions or renewals of this Note or any part thereof without notice, and each maker and endorser agrees that he/she/it will remain liable as such during any extension or renewal hereof until the debt represented hereby is paid in full.

-5-

All parties to this Note, whether principal, surety, guarantor or endorser, hereby waive all applicable exemption rights (whether under the State Constitution, Homestead laws, or otherwise), valuation, appraisement, presentment for payment, demand, protest, notice of protest and notice of dishonor.

As used herein, the term "Holder" means the payee of this Note, so long as it shall own the same, and such other person or entity to whom the Note shall have been endorsed, transferred, pledged and by whom, as the lawful holder thereof, the Note is then held, subject, however, to the terms of any agreement for any such transfer or pledge.

This Note and the Mortgage are made and delivered in and shall be construed in accordance with the laws of the State of Florida.

The covenants set forth in this Mortgage Note shall not be deemed as varying the terms or conditions of the contract of mortgage coinsurance between the Secretary and Cincinnati Mortgage Corporation.

Mortgagor and the partners thereof assume no personal liability for the payment hereof, except as set out in the Mortgage.

This Amended and Restated Renewal Mortgage Note amends, restates and renews in its entirety, and shall be in substitution of, but does not enlarge the face principal amount of, that certain Mortgage Note from Mortgagor to the Florida Housing Finance Agency ("FHFA") dated October __1__, 1989, which Mortgage Note was assigned by FHFA to Citizens and Southern Trust Company (Florida), National Association (the "Trustee") by an Assignment of Mortgage Note and Mortgage and Security Agreement dated October __4__, 1989 and recorded October __5__, 1989 as Clerk's File No. __89399809__ in the Public Records of Broward County, Florida, and which Mortgage Note was further assigned by the Trustee to Cincinnati Mortgage Corporation by an Assignment of Mortgage Note and Mortgage and Security Agreement dated October __4__, 1989 and recorded October __5__, 1989, as Clerk's File No. __89399810__ in the Public Records of Broward County, Florida.

IN WITNESS WHEREOF, the Mortgagor has caused this Note to be executed by its duly authorized general partner as of the day and year first above written.

WITNESS/ATTEST:

OAKLAND LAKES, LTD., a
Florida limited partnership

By: _____
    William O. Brisben,
    General Partner

THIS IS TO CERTIFY that this is the Note described in and secured by the Mortgage of even date herewith and in the same principal amount as herein stated and secured by real estate situated in the City of Oakland Park, County of Broward, State of Florida.

Dated:   October  5, 1989

Notary Public

(NOTARIAL SEAL)

JENNIFER L MUNCH
Notary Public, State of Ohio
My Commission Expires March 2 1994

22450-74-S

-7-

1.2                                                          9/28/89

After Recordation, please forward this document to:

Charles C. Bissinger, Jr., Esq.
Strauss & Troy
2100 Central Trust Center
201 East Fifth Street
Cincinnati, Ohio 45202-4186

89299812

---

AMENDED AND RESTATED RENEWAL

MORTGAGE, ASSIGNMENT OF RENTS
AND
SECURITY AGREEMENT

BY AND BETWEEN

OAKLAND LAKES, LTD.

AND

CINCINNATI MORTGAGE CORPORATION

Section 221(d)(4) pursuant to Section 244 of
the National Housing Act as amended

October 5, 1989

---

This Amended and Restated Renewal Mortgage, Assignment of
Rents and Security Agreement amends, restates and renews in its
entirety, and shall be in substitution of, that certain Mortgage
and Security Agreement from Mortgagor to the Florida Housing
Finance Agency ("FHFA") dated October 1, 1989 and recorded
October 5, 1989 as Clerk's File No. 89349903 in the Public
Records of Broward County, Florida, which Mortgage and Security
Agreement was assigned by FHFA to Citizens and Southern Trust
Company (Florida), National Association (the "Trustee") by
Assignment of Mortgage Note and Mortgage and Security Agreement
dated October 4, 1989 and recorded October 5, 1989 as Clerk's
File No. 89349904 in the Public Records of Broward County,
Florida, and which Mortgage and Security Agreement was further
assigned by the Trustee to Cincinnati Mortgage Corporation by
Assignment of Mortgage Note and Mortgage and Security Agreement
dated October 4, 1989 and recorded October 5, 1989 as Clerk's
File No. 89349910 in the Public Records of Broward County, Florida.

THIS INSTRUMENT PREPARED BY:
CHARLES C. BISSINGER JR., ESQ.
STRAUSS & TROY, CO., L.P.A.
2100 CENTRAL TRUST CENTER
201 EAST FIFTH STREET

WILL CALL

RETURN TO: 
PATRICK NEWTON
ATKINSON, JENNE, & ...
STONE & COHEN, P.A.
P.O. DRAWER 2018



EXHIBIT
B

## AMENDED AND RESTATED RENEWAL
## MORTGAGE, ASSIGNMENT OF RENTS
## AND SECURITY AGREEMENT

THIS AMENDED AND RESTATED RENEWAL MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT, (the "Mortgage") is made and entered into as of the _____ day of October, 1989 and between Oakland Lakes, Ltd., a limited partnership organized and existing under the laws of the State of Florida and having its principal place of business at 4750 Ashwood Drive, Suite 300, Cincinnati, Ohio 45241 (the "Mortgagor"), and CINCINNATI MORTGAGE CORPORATION, a corporation organized and existing under the laws of the State of Ohio and having its principal place of business at 2368 Victory Parkway, Suite 210, Cincinnati, Ohio 45206 and any successors thereof as the holder or holders of the Note, as hereinafter defined ("Mortgagee").

### R E C I T A L S

WHEREAS, the Mortgagor is indebted to the Mortgagee, in the sum of Twenty Two Million Seven Hundred Seventy Nine Thousand Six Hundred and no/100 Dollars ($22,779,600.00), (the "Mortgage Loan"), with interest thereon from the date hereof at the rate of eight and one-quarter percent (8.25%) per annum on the unpaid balance until paid; as evidenced by a Mortgage Note of even date herewith which matures on December 1, 2031, and all extensions thereof, however evidenced (the "Note"); and

WHEREAS, Mortgagee has obtained two Commitments to Guarantee Mortgage Backed Securities from the Government National Mortgage Association ("GNMA") based upon the Mortgage Loan and the pledge of this Mortgage as required by GNMA (the "GNMA Commitments"), one of which relates to construction loan certificates ("CLC's") and the other of which relates to permanent loan certificates ("PLC's"); and

WHEREAS, Mortgagee intends to issue and present to GNMA for its guarantee "fully modified pass through" mortgage-backed CLC's and PLC's guaranteed as to timely payment of principal and interest by GNMA (the "GNMA Securities"); and

WHEREAS, the Mortgage Loan is made to provide for the construction of certain premises and consisting of a 376-unit apartment project located in the State of Florida (the "State"), including related parking and other ancillary facilities (the "Project"), pursuant to an agreement between Mortgagee and Mortgagor dated January 13, 1989, and including any amendments thereto (the "Coinsured Loan Commitment"); and

-1-

WHEREAS, this Mortgage shall be a valid first lien on the real and personal property comprising the Project; and

WHEREAS, the advances of the Mortgage Loan proceeds made, and to be made, to Mortgagor, shall be coinsured by Mortgagee and the Secretary of Housing and Urban Development of Washington, D.C. ("HUD") under Section 221(d)(4) and pursuant to Section 244 of the National Housing Act, as amended (the "Housing Act"), and the regulations thereunder (the "Coinsurance Regulations"), such coinsurance being evidenced by HUD's endorsement of the Note; and

WHEREAS, all things necessary to make the Note a valid, binding and legal obligation of the Mortgagor, and to make this Mortgage a valid, binding and legal instrument for the security of the Note and the performance of Mortgagor's obligations thereunder and hereunder, have been duly performed.

NOW, THEREFORE, THIS MORTGAGE WITNESSETH:

That, for good and valuable consideration, including the indebtedness herein recited, the receipt of which is hereby acknowledged, Mortgagor has granted and conveyed, and does hereby grant, convey, and warrant unto Mortgagee, its successors and assigns forever, for the benefit and security of the Mortgagee, its successors and assigns, in order to secure performance of its obligations under the Note, this Mortgage and the other Loan Documents, all of that certain real estate situated in the County of Broward and State of Florida and more particularly described in Exhibit A, attached hereto incorporated herein and made a part hereof (the "Real Estate"); being the same property conveyed to Mortgagor by deeds recorded in Official Records Book _16203_, Pages _517 *_, of the Public Records of Broward County, Florida.
* 519, 521, 567, 571 & 575, respectively.
TOGETHER WITH all of the collateral described in Exhibit B, attached hereto incorporated herein and made a part hereof;

AND TOGETHER WITH all easements, rights-of-way and rights used in connection therewith or as a means of access thereto, and all tenements, hereditaments and appurtenances thereof and thereto, all water rights and all right, title and interest of Mortgagor, now owned or hereafter acquired, in and to any land lying within the right-of-way of any street, open or proposed, adjoining said land, and any and all sidewalks, alleys, strips and gores of land adjacent to or used in connection with the said land and the improvements thereon;

AND TOGETHER WITH all of the rents, issues and profits and insurance or condemnation proceeds which may arise or be had from any of the foregoing, and all articles of personal property now or hereafter attached to or used in and about the building or buildings now erected or hereafter to be erected on said land which are necessary to the complete and comfortable use and

-2-

occupancy of such building or buildings for the purposes for which they were or are to be erected, including all goods and chattels and personal property as are ever used or furnished in operating a building or the activities conducted therein, similar to the one(s) herein described and referred to, and all renewals or replacements thereof or articles in substitution therefor, whether or not the same are, or shall be attached to said building or buildings in any manner except property belonging to the tenants (Mortgagor agrees that, to the extent permitted by law, the foregoing property shall be deemed to be real estate and affixed to the realty);

AND TOGETHER WITH all right, title and interest of Mortgagor in and to all leases or subleases covering the Project or any portion thereof now or hereafter existing or entered into, any and all right, title and interest of Mortgagor thereunder, including, and without limitation, all cash and, subject to the rights of tenants therein, all security deposits, advance deposits, advance rentals and deposits or payments of similar nature;

TO HAVE AND TO HOLD the above granted Property as described in the aforesaid granting clauses unto and to the use and benefit of Mortgagee, its successors and assigns, forever, for the uses and purposes hereinafter set forth.

AND THIS MORTGAGE FURTHER WITNESSETH, that to protect the security of this Mortgage, Mortgagor, for itself, its successors and assigns, has covenanted and agreed and does hereby covenant and agree with Mortgagee, and its successors and assigns, as follows.

## ARTICLE I

### DEFINITIONS

Section 1.01.  Defined Terms.  Capitalized terms defined in the recitals hereto shall have the meanings specified therein, certain capitalized terms not defined herein shall have the meanings specified in the Building Loan Agreement, and the following capitalized terms shall have the following meanings:

"Building Loan Agreement" means the Building Loan Agreement of even date herewith between Mortgagor and Mortgagee with respect to the Project.

"Coinsurance Contract" means the agreement between Mortgagee and HUD of coinsurance for the Mortgage Loan under Section 221(d)(4) pursuant to Section 244 of the National Housing Act and the Coinsurance Regulations, created by HUD's endorsement of the Note.

-3-

"Event of Default" is defined in Section 6.01.

"HUD Regulatory Agreement" means the agreement entitled Regulatory Agreement for Multifamily Housing Projects Coinsured by HUD of even date herewith, between Mortgagee and Mortgagor with respect to the operation of the Project.

"Indebtedness Hereby Secured" means, as of any particular time, the then unpaid balance of the principal sum of the Note together with interest thereon, all other payments due under the Note and/or hereunder and such additional unrepaid sums as shall have been paid or advanced by or on behalf of Mortgagee, on behalf of Mortgagor, pursuant to the Note, the Building Loan Agreement or hereunder, or which shall otherwise be payable by Mortgagor to Mortgagee, with interest thereon, all as herein and in the Loan Documents provided, as well as all documentary and intangible taxes on the Note and Mortgage as may be imposed by State law, which taxes Mortgagor covenants and agrees to pay.

"Loan Documents" means this Mortgage, the Note, the Coin-sured Loan Commitment, the HUD Regulatory Agreement, the Building Loan Agreement, and any other instrument given to evidence or further secure the payment or performance of any obligations secured under this Mortgage.

"Mortgagee" means Cincinnati Mortgage Corporation, as payee of the Note as long as it shall own the same, and such other person, firm or corporation to whom the Note shall have been endorsed, pledged, transferred or assigned and by whom, as the lawful holder thereof, the Note is then held, subject, however, to the terms of any agreement for any such pledge, transfer or assignment and provided that HUD is under no obligation to recog-nize any entity as the beneficiary of the Coinsurance Contract unless it is an approved coinsured lender pursuant to applicable regulations.

"Property" means and shall include the Real Estate, all property of the Mortgagor as is described in the granting clauses hereof, all of the property set forth on Exhibit B and any and all other property which is or becomes subject to the lien of this Mortgage or any security interest created pursuant to the provisions of this Mortgage.

## ARTICLE II

## MORTGAGOR'S REPRESENTATIONS AND WARRANTIES

Section 2.01 Due Authorization, Etc. Mortgagor represents and warrants that it has duly authorized, executed and delivered the Note and has duly authorized, executed, acknowledged and delivered the other Loan Documents to secure the repayment of the

-4-

Indebtedness Hereby Secured, and to secure the performance of the covenants, agreements and conditions contained therein and herein.

Section 2.02 <u>Validity of Loan Documents.</u>  Mortgagor represents and warrants that all things necessary to make the Loan Documents valid, binding and legal obligations of Mortgagor for the security of the Indebtedness Hereby Secured, in accordance with their respective terms, have been duly performed.

### ARTICLE III

### PAYMENT BY MORTGAGOR

Section 3.01 <u>Covenant to Pay.</u>  Mortgagor hereby expressly covenants, promises and agrees that it will duly and punctually pay the Indebtedness Hereby Secured at the times and in the manner herein or in the Note or in the other Loan Documents provided, according to the true intent and meaning hereof and thereof, time being of the essence for such payments.  Any remittance by check or draft shall be made subject to the condition that such check or draft may be handled for collection in accordance with the practice of the collecting bank or banks, and any receipt issued therefor shall be ineffective until the amount due is actually received by the Mortgagee.

Section 3.02 <u>Limitation on Liability.</u>  The covenant of the Mortgagor to pay principal and interest is included in the Note secured hereby for the purpose of establishing and continuing the existence of the indebtedness.  However, it is a condition of said covenant and those contained herein that in the event of a default under the terms hereof, the Mortgagee shall take no action against the Mortgagor, or its partners, except such as may be necessary to subject to the satisfaction of the Indebtedness Hereby Secured, the Property described herein and any chattels appurtenant to the use thereof, provided, that nothing in this covenant and no action so taken shall operate to impair any obligation of the Mortgagor under the Building Loan Agreement and/or the HUD Regulatory Agreement herein referred to and made a part hereof (including, with respect thereto, the rights of HUD) or to deprive the Mortgagee of any rights it may have by law which are not expressly waived.  This Section shall not be deemed to limit the remedies of the Mortgagee, its successors or assigns, in law or in equity, pursuant to this Mortgage, provided that the exercise of any such remedies, including the obtaining of any judgments or decrees at law or in equity or other orders shall not impose any personal liability on Mortgagor or any partner of Mortgagor.

-5-

The provisions of this Section shall not be deemed to limit claims by Mortgagee or HUD for the following:

(a) Misapplication of insurance or condemnation proceeds;

(b) Misapplication of Mortgage Loan proceeds;

(c) Improper application of tenant security deposits or pre-paid rents;

(d) Failure, prior to Mortgagor's default hereunder, to properly apply rents and other revenue of the Property actually collected by Mortgagor to necessary and proper expenses of the Property, including the Indebtedness Hereby Secured or failure, after Mortgagor's default hereunder, to properly apply rents and other revenue of the Property actually collected by the Mortgagor (i) to necessary and proper expenses of the Property or (ii) to reduce the Indebtedness Hereby Secured by applying such amounts first to costs permitted to be paid from Project revenues by this Mortgage and by HUD regulations, then to unpaid interest due and finally to the principal balance outstanding on the Note or other Indebtedness Hereby Secured; and

(e) Failure to pay valid mechanic's and/or materialmen's liens filed against the Property prior to Mortgagor's default under the Indebtedness Hereby Secured or filed after Mortgagor's default under the Indebtedness Hereby Secured to the extent the claim set forth in such lien relates to labor performed or materials supplied prior to the date of Mortgagor's default under the Indebtedness Hereby Secured.

## ARTICLE IV

### PARTICULAR COVENANTS

Section 4.01 <u>Title to Property and Authority to Convey.</u> Mortgagor covenants that, at the time of the execution, delivery and recording of this Mortgage, it is the absolute and lawful owner of the legal and beneficial title to, and is lawfully seized and possessed of, and has good title to all of the Property, and it has good right and lawful authority to bargain, sell, grant and convey the same as provided in this Mortgage, in fee simple as to all real property described in Exhibit A, and that said Property is free and clear of all encumbrances except for those encumbrances approved by Mortgagee as specified in Exhibit C attached hereto and made a part hereof. Mortgagor hereby covenants, agrees and warrants that it will defend the

-6-



title of such property, and every part thereof, unto Mortgagee and its successors and assigns, against all claims and demands by any person or persons, and will execute such further assurances thereof as may be required by Mortgagee.

Section 4.02 Recordation and Filings. At any and all times, Mortgagor will promptly do, prepare, execute, acknowledge, deliver, file and record and will cause to be done, prepared, executed, acknowledged, delivered, filed and recorded all and every such actions, deeds, indentures, conveyances, transfers, assignments, instruments and financing statements under the Uniform Commercial Code and assurances in law as Mortgagee shall reasonably require for the better assuring, conveying, transferring, assigning and confirming unto Mortgagee all and singular the hereditaments and premises, estates and Property, real and personal, hereby granted, conveyed or transferred, or intended to be; and Mortgagor will bear all expenses, charges and taxes in connection therewith. Mortgagor shall promptly take all actions necessary to perfect and maintain the priority and validity of Mortgagee's interest in the Property as a first and paramount lien and charge against the rights, claims and interests of all other persons and parties. Upon failure by Mortgagor to do so, Mortgagee may make, execute, record, file, re-record or refile any such actions, deeds, indentures, conveyances, transfers, assignments, instruments and financing statements under the Uniform Commercial Code and assurances in law for and in the name of Mortgagor, and Mortgagor hereby appoints Mortgagee its agent and attorney-in-fact to do so, such appointment to stand irrevocable as being coupled with an interest.

Section 4.03 Use or Alteration of the Project. Mortgagor covenants that it will not permit or suffer the use of the Project, the Property or any portion thereof for any purpose other than for a multifamily apartment housing project (including the commercial and other ancillary uses permitted or approved in writing by Mortgagee), and as is further provided in the HUD Regulatory Agreement. Mortgagor covenants that it shall not without the prior written consent of Mortgagee remove any Property from the Real Estate unless such removal is of personal property in the ordinary course of business and the personal property so removed is simultaneously replaced with like property of equal or greater value. Mortgagor covenants that it shall not, without the prior written consent of Mortgagee, permit any material alterations of or additions to buildings or other improvements now existing or hereafter constructed with respect to the Project. For purposes of this Section any expenditure in excess of Fifty Thousand and No/100 Dollars ($50,000.00) shall be considered material.

Mortgagor covenants to comply with all present and future statutes, laws, ordinances and governmental rules, regulations and orders which are applicable to the Property.

-7-

Section 4.04 <u>HUD Regulatory Agreement.</u>    Mortgagor agrees that the HUD Regulatory Agreement shall be recorded immediately following this instrument, and that it is incorporated in and hereby made a part of this Mortgage. Upon default under the HUD Regulatory Agreement, and with the prior written approval of HUD as long as the Coinsurance Contract is in effect, Mortgagee may declare such default to be an Event of Default under this Mortgage as provided in Article VI hereof and may proceed as provided in Article VI hereof.

Section 4.05 <u>Restriction on Transfer; Leases.</u>    Anything herein to the contrary notwithstanding, Mortgagor shall not convey, sell, assign, lease, (except commercial space leases previously approved in writing by Mortgagee and leases for residential units in the ordinary course of business), transfer or otherwise dispose of, or obtain secondary financing on, the Property or any part thereof or any interest therein, whether voluntary or involuntary, by operation of law or otherwise, without the prior written consent of the Mortgagee and, if such approval is required under the Coinsurance Contract, the Secretary of HUD.

All commercial leases now existing or hereafter entered into shall be subordinate and subject to the lien of this Mortgage and Mortgagor shall require any and all tenants of commercial space to enter into a subordination and attornment agreement in a form satisfactory to Mortgagee. Mortgagee may at its option, permit the Mortgagor to include a non-disturbance provision in any such subordination and attornment agreement.

Whether in violation of the provisions of this section or pursuant to consent, if Mortgagor has demised, or shall hereafter demise, the Property or any part thereof by leases subordinate or junior either by the date thereof or by the express terms thereof to the lien of this Mortgage, any such lease shall be, subject to the condition that in the event of any foreclosure sale or sales hereunder, by virtue of judicial proceedings or otherwise, such leases shall, at the option of the Mortgagee, continue in full force and effect and the tenants thereunder will, upon request, attorn to and acknowledge the foreclosure purchaser or purchasers at such sale as landlord thereunder. The Mortgagee may, at its option and in its sole discretion, require that any or all of the leases affecting the Property, other than leases for individual rental units, be made subject and subordinate to the lien of this Mortgage. In the absence of a recorded agreement expressly subordinating this Mortgage to any or all of such leases, said leases shall be deemed to be subordinate in all respects to this Mortgage.

Section 4.06 <u>Aggregate Monthly Payments.</u>    In order more fully to protect the security of this Mortgage, Mortgagor, toget-

-8-



her with and in addition to the monthly payments of principal and interest (or interest only until the first payment to principal) under the terms of the Note, beginning with the first payment to principal under the Note and monthly thereafter until the Note is fully paid, will pay to Mortgagee the following sums:

(a)     So long as the Mortgage Loan is coinsured under the provisions of the Housing Act and the Coinsurance Regulations, an amount sufficient to accumulate in the hands of Mortgagee one month prior to the due date the annual mortgage co-insurance premium (including any lender's premium) payable to HUD and Mortgagee aggregating 0.75% per year calculated on the average daily principal balance of the Mortgage Loan scheduled to be outstanding during the year covered thereby (without taking into account delinquent payments or prepayments).

(b)     A sum equal to the ground rents, if any, next due, plus the premiums next due on all required insurance policies, plus sewer and water rates, taxes and special assessments next due on the Property (all as estimated by the Mortgagee), less all sums already paid therefor, divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, water rates, taxes and assessments will become delinquent, such sums to be held by Mortgagee in trust to pay said ground rents, premiums, sewer and water rates, taxes and special assessments.

(c)     All monthly payments required to be made under the HUD Regulatory Agreement to the reserve for replacements.

All payments mentioned in the three preceding clauses and all other payments to be made under the Note shall be added together and the aggregate amount shall be paid each month in a single payment to be applied by Mortgagee in the following order:

(i)       amounts payable under clause (a) above;

(ii)      amounts payable under clause (b) above;

(iii)     interest on the Note;

(iv)      amortization of the principal sum of the Note; and

(v)       amounts payable under clause (c) above.

The amounts paid to Mortgagee under clauses (a), (b) and (c) above (the "Funds") shall be held in one or more accounts with Mortgagee.  Unless applicable law requires interest, earnings or

-9-

profits to be paid, Mortgagee shall not be required to pay Mortgagor any interest, earnings or profits on the Funds except that Mortgagee, shall, upon Mortgagor's written request invest for Mortgagor's benefit that portion of the Funds consisting of the reserve for replacements in a manner consistent with applicable HUD requirements.   Mortgagee shall give to Mortgagor, without charge, an annual accounting of the Funds in Mortgagee's normal format showing credits and debits to the Funds and the purpose for which each debit to the Funds was made.

Section 4.07  Treatment of Accumulations of Monthly Payments.   Any excess funds paid by Mortgagor pursuant to Sections 4.06(a) and (b) remaining after payment of the items herein provided on an annual basis, shall be credited to subsequent monthly payments of the same nature; but if any such item shall exceed the estimate therefor, Mortgagor shall without demand forthwith make good the deficiency.   In the event the Indebtedness Hereby Secured is paid in full by Mortgagor in accordance with the terms of the Note, accumulations under Section 4.06 not required to meet obligations due for which the payments were collected shall be refunded to Mortgagor.   If the Property is sold through foreclosure or is acquired by Mortgagee after default, any then remaining balance of the accumulation under Section 4.06 hereof shall be credited against the Indebtedness Hereby Secured.

Section 4.08  Payment of Impositions.

(a)  Mortgagor will pay all ground rents, if any, taxes, special assessments, sewer and water rates and other governmental or municipal charges or impositions, to the extent provision therefor has not been made by monthly payments as hereinabove provided, before the same become delinquent or subject to interest or penalties, and in default thereof Mortgagee may pay the same without waiving or affecting its option to foreclose or any other rights hereunder.   All such sums paid by Mortgagee, plus any sums which Mortgagee has advanced to pay mortgage insurance premiums or other insurance premiums not paid for by monthly payment hereunder or otherwise paid by Mortgagor, shall be added to the Indebtedness Hereby Secured, shall bear interest at the Mortgage Loan rate specified in the Note from the date of the advance and shall be due and payable to Mortgagee upon demand. Nothing contained in this paragraph shall be construed as requiring Mortgagee to advance or expend monies for any purposes mentioned in this paragraph.

(b)  In the event of the passage after the date of this Mortgage of any law deducting from the value of real property for the purposes of taxation any lien thereon or changing in any way the laws for the taxation of mortgages or debts secured by mortgage for federal, state or local purposes or the manner of the collection of any such taxes, and imposing a tax, either directly

-10-

or indirectly, on this Mortgage, the Note or the debt which it secures, the Mortgagee shall have the right to declare the principal sum and the interest due on the date to be specified by not less than thirty (30) days' written notice to be given to Mortgagor by Mortgagee; provided, however, that such election shall be ineffective if Mortgagor is permitted by law to pay the whole of such tax in addition to all other payments required hereunder, and if Mortgagor, prior to such specified date, does pay such tax and agrees to pay any such tax when thereafter levied or assessed against the premises, and such agreement shall constitute a modification of this Mortgage. This Section 4.08(b) shall not be applicable so long as this Mortgage is coinsured by HUD.

Section 4.09 <u>Permitted Contests.</u>  Mortgagor may in good faith contest, by proper legal proceedings, the validity or amount of any tax, special assessment or other charge or imposition which Mortgagor has agreed to pay pursuant to the provisions of Section 4.08 hereof and may delay payment or discharge thereof during the period in which the same is being contested; provided, however, that if payment is delayed: (i) such proceedings shall suspend the collection thereof from Mortgagor, Mortgagee, or either of them, and from the Property; (ii) in any such event, Mortgagor shall deposit with Mortgagee, as security for the payment or discharge of such contested item, an amount equal thereto plus interest, penalties and costs (to the extent such amount is not already in the hands of Mortgagee); and (iii) such contested item and all costs and penalties, if any, shall have been paid at least sixty (60) days before the date on which the Property, or any portion thereof, may be sold in order to satisfy any such contested item.

Section 4.10 <u>Insurance.</u>  Mortgagor will at all times keep the Property insured against loss by fire and all of the other risks ordinarily covered by insurance of the type known as "fire and extended coverage" in such amounts, in such form and with such coverages and endorsements as may be required from time to time by Mortgagee. All such insurance shall be carried for such periods as may be required by Mortgagee, and shall be in an amount which will comply with the Coinsurance Regulations, but if required by Mortgagee, as to losses other than loss of rental income, such insurance shall be in an amount which is not less than the greatest of (i) eighty percent (80%) of the actual cash value of the Property, (ii) the unpaid principal amount of the Mortgage Loan, and (iii) such amount as will avoid treatment of Mortgagor as a coinsurer with the issuer of the policy. Mortgagor will at all times keep and maintain public liability and property damage insurance covering injury and damage to persons and property with limits of not less than $1,000,000 per occurrence. Mortgagee reserves the right to increase said limits should sound business practice so dictate. Mortgagor shall also maintain, at any and all times required by Mortgagee, rental interruption insurance in such amount as may be required from

-11-

time to time by Mortgagee. Mortgagor shall also maintain, at any and all times required by Mortgagee, broad form builders' risk insurance with respect to the Property and the construction or reconstruction of any improvements thereto. All such policies as aforesaid shall be in standard form and endorsed with standard mortgagee clauses with loss payable to Mortgagee, the Secretary of HUD and such other parties as may be designated by Mortgagee, as their interests may appear, and shall contain a clause providing, that the policy may not be cancelled or modified without thirty (30) days' prior written notice to Mortgagee. Mortgagor shall deliver all such policies evidencing the insurance required hereunder to Mortgagee, and will likewise deliver renewals of such policies not less than thirty (30) days in advance of the expiration of same, stamped "paid" by the issuer thereof. The carriers providing the insurance shall be chosen by Mortgagor subject to approval by Mortgagee provided that such approval shall not be unreasonably withheld.

Mortgagor shall at all times comply (and cause its agents, contractors and subcontractors to comply) with all applicable worker's compensation insurance requirements.

Section 4.11 **Maintenance and Repairs.** Mortgagor shall keep the Property in good condition and repair, and will not permit or suffer any waste of the Property. Mortgagor will, at its sole cost and expense, promptly and in a good workmanlike manner make all needful and proper renewals, replacements and repairs to the property, including alterations and repairs as may be required by laws, ordinances and regulations necessary to insure that the value of the Property as security shall not be impaired.

In the event the Property suffers an uninsured loss, Mortgagor if required to do so by Mortgagee, shall use its own funds to repair and restore the Property. If, in any such event, Mortgagee fails to make such repairs or restoration, Mortgagee may advance sums necessary to complete such repair and restoration. Any such advance by Mortgagee shall become part of the Indebtedness Hereby Secured, shall bear interest at the Mortgage Loan rate specified in the Note from the date of the advance, and shall be due and payable to Mortgagee upon demand.

Section 4.12 **Indemnification by Mortgagor.** Subject to the provisions of Section 3.02 hereof, Mortgagor will protect, indemnify and save harmless Mortgagee and the Secretary of HUD (the party being indemnified is sometimes called the "Indemnitee") from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including, without limitation, attorneys' fees and expenses at or prior to trial and on appeal) imposed upon or incurred by or asserted against any such indemnitee by reason of (i) any accident, injury to or death of persons or loss of or damage to property occurring on or about the Property or the adjoining sidewalks, curbs,

-12-






streets, or ways; (ii) any use, nonuse or condition of any of the Property or the adjoining sidewalks, curbs, streets or ways; (iii) any failure on the part of Mortgagor to perform or comply with any of the terms of this Mortgage or the Building Loan Agreement; or (iv) performance of any labor or services or the furnishing of any materials or other property in respect of any portion of the Property or the use thereof. In case any action, suit or proceeding is brought against any such indemnitee by reason of any such occurrence, Mortgagor, upon the request of any such indemnitee, will at Mortgagor's expense resist and defend such action, suit or proceeding or will cause the same to be resisted or defended by counsel designated by the Mortgagor and reasonably acceptable to the indemnitee, provided that such approval shall not be required in the case of defense by counsel designated by any insurance company undertaking such defense pursuant to any applicable policy of insurance. Any amounts payable to Mortgagee by reason of the application of this paragraph shall become immediately due and payable, shall be secured by the Property as if part of the Indebtedness Hereby Secured, and shall bear interest at the Mortgage Loan rate specified in the Note from the date loss or damage is sustained by Mortgagee until paid. This obligation of Mortgagor shall survive any termination or satisfaction of this Mortgage.

Section 4.13 <u>Operation of the Property to be Sole Activity of Mortgagor.</u> So long as any of the Indebtedness Hereby Secured remains outstanding, Mortgagor shall not engage in any business or activity other than, or in addition to, the ownership, operation and management of the Property. This Section shall not apply to the general or limited partners of Mortgagor.

Section 4.14 <u>Permitted Liens.</u> Mortgagor will not create or permit a lien to exist against the Property inferior or superior to the lien of this Mortgage, other than liens for real estate taxes and assessments not yet due and payable, and inferior liens for which the prior written consent of Mortgagee has been obtained in accordance with the Coinsurance Regulations.

Section 4.15 <u>Assignment of Rents and Leases and Profits.</u>

(a) To further secure the obligations of Mortgagor under the Note and this Mortgage, as collateral security therefor, Mortgagor hereby irrevocably assigns to Mortgagee all the rents, profits, issue and income of the Property, and any and all leases and/or subleases (together the "Leases") thereof, which are in force on the date hereof, or which may be hereafter entered into, as further security for the Indebtedness Hereby Secured, and the Mortgagor shall not further assign nor encumber the rents of the Property, or any part thereof, without the prior written consent of the Mortgagee. Mortgagee shall not be obligated to perform or discharge any obligation or duty to be performed or discharged by Mortgagor under any of said Leases, and this assignment shall not

-13-



place any responsibility upon Mortgagee for the control, care, management, or repair of the Property or make the Mortgagee derivatively responsible or liable for any negligence in the management, operation, upkeep, repair, or control of the Property, whenever occurring. At the option of the Mortgagee, this assignment shall become effective immediately upon the occurrence of an Event of Default hereunder. Provided, however, that all such rents, and all rents, profits and payments due Mortgagor under such Leases shall be payable to Mortgagor and be its sole property until such time as an Event of Default as hereafter described shall occur, provided, further, that no rent more than one month in advance plus a security deposit shall be collected or accepted without the prior written consent of Mortgagee, and no rent shall be collected or accepted in violation of any law, ordinance, rule, regulation or order. Mortgagor agrees that said assignment of rents and leases is an essential consideration for the making of the Mortgage Loan by Mortgagee. Mortgagor agrees that it will faithfully perform and comply with all terms, conditions and covenants of any Lease covering any part of the Property. Upon Mortgagee's request from time to time, Mortgagor shall furnish Mortgagee a statement, in affidavit form and in such reasonable detail as Mortgagee may require, of all Leases on the Property and the status thereof and, on demand, to furnish Mortgagee executed counterparts of any and all such Leases.

(b)   Upon the occurrence of any Event of Default, Mortgagee may at its option at any time thereafter: (i) proceed to enter upon, take possession of, and manage and operate the Property under the foregoing assignment without becoming a mortgagee in possession; (ii) proceed to perform any or all obligations of the Mortgagor under the Leases, and exercise the rights of the Mortgagor contained therein as fully as the Mortgagor itself could, without regard to the adequacy of security for the indebtedness hereby secured and with or without bringing any legal action or causing any receiver to be appointed by any court; (iii) let or re-let the Property or any part thereof and enforce, modify, cancel or accept the surrender of any of the Leases; (iv) evict lessees pursuant to appropriate legal proceedings; (v) bring or defend any suits in connection with the possession of the Property or any part thereof, in the name of the Mortgagor and/or Mortgagee; (vi) make such repairs as the Mortgagee may reasonably deem appropriate; (vii) pay out of rents, income, profits, reserves, escrows and/or security deposits (or from other sources of funds) any liens, taxes, assessments, insurance premiums, management fees, utility charges, costs of keeping the Property in good condition and repair and/or any other fees, expenses, premiums, costs or charges which Mortgagee deems to be necessary or appropriate in connection with the Note, Mortgage, Leases, the Property and/or the operation of the Property; (viii) fix or modify rent; (ix) in the name of either the Mortgagor and/or the Mortgagee sue for or otherwise collect and receive all rents, issues and profits, including those past due and unpaid, and

-14-

apply the same first against all costs and expenses of the opera-
tion of the Property, of the performance of the Mortgagor's
obligations under the Leases and of such collection, including
reasonable attorneys' fees, and any amounts remaining after such
application will be applied next to accrued and unpaid interest
and the remainder thereof, if any, to the payment of principal of
the Indebtedness Hereby Secured; (x) without regard to the ade-
quacy of security for the Indebtedness Hereby Secured, have a
receiver appointed to manage and collect income and rents from
the Property; (xi) cancel or terminate any or all of the Leases;
and (xii) do all other things the Mortgagee may deem necessary or
proper to protect its security. Entry upon and taking possession
of the Property and the collection of the rents and the appli-
cation thereof will not operate to cure or waive any default
under any instrument given by the Mortgagor to the Mortgagee or
prohibit the taking of any other action by the Mortgagee under
any such other instrument, or at law or in equity to enforce the
payment of the Indebtedness Hereby Secured or to realize on any
other security or guarantee. The existence and/or exercise of
the rights of Mortgagee set forth in this Section 4.15 shall not
create any obligations on the part of the Mortgagee other than
for Mortgagee's gross negligence or willful misconduct.

     (c) Mortgagee may give notice of the foregoing assignment
at any time to any of the lessees. Lessees may rely on any
notice given them by Mortgagee pursuant to the foregoing assign-
ment and Mortgagor agrees to hold harmless any lessee with re-
spect to any payment made or action taken in reliance on any such
notice.

     Section 4.16 <u>Books and Records; Financial Statements</u>.
Mortgagor hereby agrees that Mortgagee shall have the right to
inspect the books and records of the operation of the Property
and make copies thereof at all reasonable times and upon reason-
able notice to Mortgagor. Mortgagor shall furnish to Mortgagee,
within ninety (90) days after the end of each fiscal year of
Mortgagor, a balance sheet, statement of income and expenses of
the Property and a statement of changes in financial position,
all prepared in accordance with generally accepted accounting
principals consistently applied, and which shall be certified by
the chief financial officer of Mortgagor. Such financial state-
ments shall set forth, in reasonable detail, rents received and
total operating expenses of the Property and shall be accompanied
by a certificate executed by the chief financial officer of
Mortgagor certifying that there exists no Event of Default under
this Mortgage or any of the Loan Documents (and no circumstances
which, with the passage of time, the giving of notice, or both,
would constitute an Event of Default). Such financial statements
shall be audited by an independent certified accountant. In
addition, Mortgagor shall promptly provide to Mortgagee such
other financial statements and information with respect to the
Property, Mortgagor and/or Project as Mortgagee may, from time to

time, request. All expenses in connection with financial statements shall be borne by the Mortgagor.

Section 4.17 Zoning Changes. Mortgagor agrees not to participate in any proceedings for, or acquiesce in, any change or proposed change of, zoning laws or regulations governing the Property, the creation of a subdivision of or cut-up involving the Property, consolidation of the Property with any other property, nor to subject the Property to any declaration of condominium, "time-share" ownership or other provisions for subdivided or common ownership, without the prior written consent and participation of Mortgagee. Promptly after Mortgagor becomes aware thereof, Mortgagor shall notify Mortgagee of any proposed change in the zoning of the Property or any portion thereof.

Section 4.18 Coinsurance Regulations and Housing Act. Mortgagor shall comply in a timely fashion with any and all obligations of Mortgagor under the Coinsurance Regulations and National Housing Act which are applicable to Mortgagor and/or the Project.

## ARTICLE V

### CASUALTY AND CONDEMNATION; CERTAIN PREPAYMENTS

Section 5.01 Casualty. If the Property, or any part thereof, shall be damaged by fire or other hazard against which insurance is held, the amount paid by any insurance company pursuant to the contract of insurance shall, to the extent of the Indebtedness Hereby Secured then remaining unpaid, be paid to Mortgagee, and at Mortgagee's election, may be applied to reduction of the Indebtedness Hereby Secured as set forth in Section 5.03 hereof or released for the repair or restoration of the Property to substantially the same condition as existed before the casualty. In the event of such loss or damage, all proceeds of insurance shall be payable to Mortgagee, and Mortgagor hereby authorizes and directs any affected insurance company to make payment of such proceeds directly to Mortgagee. Mortgagee is hereby authorized and empowered by Mortgagor to settle, adjust, or compromise any claims for loss, damage, or destruction under any policy or policies of insurance. All such amounts together with amounts, if any, earned thereon pending the decisions whether to repair and restore are herein referred to as the "Insurance Fund." Mortgagor will give immediate notice by mail to the Mortgagee and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, of any fire damage or other casualty to the Property.

Section 5.02 Condemnation; Application of Proceeds. Mortgagor agrees that if the Property, or any part thereof, is condemned under any power of eminent domain or acquired for any

-16-




public use or quasi-public use, Mortgagor shall give prompt
written notice thereof to Mortgagee, and the damages, proceeds,
and consideration for such acquisition to the extent of the full
amount of Indebtedness Hereby Secured remaining unpaid are hereby
assigned by Mortgagor to Mortgagee and shall be paid forthwith to
Mortgagee for the account of Mortgagor, to be applied by Mort-
gagee on account of the Indebtedness Hereby Secured as set forth
in Section 5.03 hereof.  Mortgagee shall be entitled, at its
option, to appear in its own name in any action or proceeding
relating to such condemnation and shall have the right ,to com-
promise or settle such proceeding subject to reasonable approval
by the Mortgagor.  In case of any partial condemnation, Mortgagee
may in its sole discretion, elect to release a portion or all of
the proceeds to Mortgagor for repairs and restoration of the
Property.  All such amounts together with amounts, if any, earned
thereon pending the decision whether to repair and restore are
herein referred to as the "Condemnation Fund."

     Section 5.03 Prepayment from Amounts in the Insurance or
Condemnation Funds.  Within thirty (30) days after Mortgagee's
receipt of any insurance or condemnation proceeds pursuant to
Sections 5.01 and 5.02 as applicable Mortgagee shall give to
Mortgagor notice of Mortgagee's election to apply the Insurance
Fund or Condemnation Fund to either (i) reduction of the Indebt-
edness Hereby Secured or (ii) pay costs and expenses for the
repair and restoration of the Property.  Upon any election by
Mortgagee to apply the  'surance Fund or Condemnation Fund to a
reduction of the Indebt..ness Hereby Secured, Mortgagee shall
give notice to Mortgagor that the Indebtedness Hereby Secured, or
so much of the principal thereof as can be paid from the Insur-
ance Fund or Condemnation Fund must be prepaid as hereinafter set
forth.  The amount of such fund shall be deemed to have been
received on the date of such notice.  The effective date of such
prepayment (the "effective date"), in case of any such notice
which has been given prior to the 25th day of any month, shall be
the 16th day of the next following month, or in case of any such
notice given on or after the 25th day of any month, the 16th day
of the second following month.  If the entire Indebtedness Hereby
Secured shall be discharged from such insurance or condemnation
proceeds, Mortgagee shall not be required to release the lien of
this Mortgage from the Property until the date which is ninety-
five (95) days after the effective date of such discharge of the
Indebtedness Hereby Secured so as to protect the Mortgagee
against any loss of security if such discharge of the Indebted-
ness Hereby Secured is subsequently rescinded by a trustee in
bankruptcy with respect to the Mortgagor.  On the applicable
effective date, the Indebtedness Hereby Secured shall be deemed
prepaid to the extent hereinafter provided.  If, after giving
effect to such prepayment, the entire amount of the Indebtedness
Hereby Secured has not been discharged, the amount of the applic-
able fund shall be deemed to have been applied first to the
accrued and unpaid interest on the amount prepaid through the

-17-

effective date, and then to the prepayment of the principal balance of the Mortgage Loan. In the event of any partial prepayment of the principal balance of the Mortgage Loan pursuant to the provisions of this section, an amount equal to (i) the amount of interest on the principal balance of the Mortgage Loan prepaid pursuant to the provisions of this section from the first day of the month in which the effective date occurs to the effective date, plus (ii) all interest actually earned by Mortgagee from investment of the Insurance Fund or Condemnation Fund, as applicable, from the date of the initial notice of the prepayment by Mortgagee to Mortgagor through the day immediately preceding the effective date, shall be credited to Mortgagor's next scheduled installment of principal and interest on the Mortgage Loan. Following any prepayment which discharges the entire amount of the Indebtedness Hereby Secured, Mortgagee shall refund to Mortgagor the amount referred to in clause (ii) of the immediately preceding sentence.

Section 5.04 <u>Due Diligence by Mortgagor to Complete Repairs or Restoration; Disbursement.</u> If, at Mortgagee's election, insurance or condemnation proceeds are released for repair or restoration of the Property, Mortgagor shall promptly commence and diligently prosecute the completion of such repairs or restoration. Such repairs shall be effected in accordance with all appropriate HUD requirements. Mortgagor if required to do so by Mortgagee, shall use its own funds to complete repair or restoration of the Property if insurance or condemnation proceeds, as applicable, are insufficient to accomplish same. If, in order to complete repair or restoration of the Property to the satisfaction of Mortgagee, it is necessary for Mortgagor to use its own funds, and Mortgagor fails to do so, Mortgagee may at its option and election advance sums necessary to complete such repair and restoration. Any such advance by Mortgagee shall become part of the Indebtedness Hereby Secured, shall bear interest at the Mortgage Loan rate specified in the Note from the date of the advance and shall be due and payable to Mortgagee upon demand.

Section 5.05 <u>Release of Amounts in the Insurance or Condemnation Funds.</u> If, at Mortgagee's election, insurance or condemnation proceeds are released for repair or restoration of the Property pursuant to this Article V, such proceeds shall be disbursed by the Mortgagee from time to time as work progresses, provided that prior to any disbursement, Mortgagee is in receipt of proof, satisfactory to it, that the work has been completed, and further provided that the Mortgagee is in receipt of proof, reasonably satisfactory to it, that there are no outstanding mechanics' liens or materialmen's liens and that all charged costs and expenses incurred with respect to work completed have been paid for in full. Mortgagor shall provide Mortgagee with such contractors' and subcontractors' affidavits and materialmen's certificates and such other evidences of payment as Mortgagee may require in connection with the disbursement of such

-18-




proceeds. In addition, Mortgagee may, at Mortgagee's option, condition disbursement of said proceeds, from time to time as construction progresses, on Mortgagee's approval of plans and specifications of an architect reasonably satisfactory to Mortgagee, contractor's cost estimates, architect's certificates, title insurance policies and endorsements, and such other evidence of costs, percentage of completion of construction, application of payments, satisfaction of liens and evidence of title as Mortgagee may require, and the provisions of the Building Loan Agreement shall, to the extent deemed applicable by Mortgagee, apply to such restoration. Repair, restoration, or reconstruction of any portion(s) of the Property must be substantially equal in size, quality and value to such portion(s) of the Property immediately before the loss, damage, or condemnation. Any proceeds remaining after the completion of such repair, restoration, or replacement may, at the option of the Mortgagee, be applied by the Mortgagee as a partial prepayment under Section 5.03.



### ARTICLE VI

### EVENTS OF DEFAULT AND REMEDIES

Section 6.01 _Event of Default_. The occurrence of any one of the following events shall constitute an Event of Default:

(a)    Any default in any payment on the Note or hereunder, as set forth in Section 4.06 hereof, or any renewal or extension thereof or of any note or notes hereafter given for interest covering any extension, with interest thereon from maturity of the same, when and as the same shall become due and payable, and if such default is not made good prior to the due date of the next installment payment under the Note.

(b)    Any default in payment, when due (except under circumstances expressly provided for in Section 4.09 hereof), of any tax, sewer or water rate or special assessment now or hereafter assessed against the Property, or any part thereof, while this Mortgage exists, or any default in failing to maintain any insurance required hereunder or under any other of the Loan Documents, while this Mortgage exists, or default in payment on demand of any sum or sums advanced by Mortgagee on account of any costs and expenses of this Mortgage, or on account of any such tax or special assessment, sewer and water rate or insurance, or expense of litigation, or on account of any lien on said land and premises, with interest thereon at the Mortgage Loan rate specified in the Note from date of advance, or upon default of any other payment provided for in this Mortgage or

-19-

under any other of the Loan Documents, when and as due, or any default under the Building Loan Agreement, and the continuation of any such default for a period of thirty (30) days or more following written notice given to Mortgagor by Mortgagee specifying the default, provided that (i) a default in payment as provided in Section 4.06 hereof shall not require notice to Mortgagor, but shall be treated in accordance with clause (a) above and (ii) a default in failing to maintain any insurance required hereunder or under any other of the Loan Documents shall not require notice to Mortgagor, but shall be treated as an Event of Default immediately upon such default.

(c)     Any default in the observance or performance of any other of the covenants or agreements contained herein or under the Note, or any other of the Loan Documents if such default shall continue for thirty (30) days after written notice given to Mortgagor by Mortgagee specifying the default.

(d)     Mortgagor having filed a voluntary petition or having been adjudicated as bankrupt or insolvent after the filing of a voluntary petition, or having filed any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors; or seeking or consenting to or acquiescing in the appointment of any trustee, receiver or liquidator of Mortgagor or of all or any part of its properties or assets, or making any general assignment for the benefit of creditors, or admitting in writing its inability to pay its debts generally as they become due.

(e)     A court of competent jurisdiction having entered an order, judgment or decree approving a petition filed against Mortgagor seeking any reorganization, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, and such order, judgment or decree remaining unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the first date of entry thereof; or any trustee, receiver or liquidator of Mortgagor or of all or any part of its properties or assets, being appointed without the consent or acquiescence of Mortgagor and such appointment remaining unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive).

-20-



(f) For the purpose of clauses (d) or (e) above, any reference to Mortgagor shall be deemed to separately apply to any general partner.

(g) Final judgment for the payment of money in excess of Twenty Thousand Dollars ($20,000.00) having been rendered against Mortgagor and such judgment not being discharged or bonded to Mortgagee's satisfaction, or a stay of execution thereon not procured, within thirty (30) days after the date of entry thereof, or if thereafter such judgment remains unsatisfied for a period of fifteen (15) days after the termination of any such stay of execution.

Section 6.02 Acceleration. If any Event of Default shall occur, then, at the option and election of Mortgagee, the entire Indebtedness Hereby Secured shall become due, payable and collectible at once and thereafter as Mortgagee may elect, regardless of the date of maturity and without notice, and may be enforced and recovered at once.

Section 6.03 Remedies. If any Event of Default shall have occurred, Mortgagee may elect to exercise or cause to be exercised any or all of the remedies provided for in this Mortgage and at law, including without limitation the following:

(a) Mortgagee shall be entitled to apply at any time prior to or during any foreclosure suit to the court having jurisdiction thereof for the appointment of a receiver of all or a portion of the Property, and all rents, incomes, profits, issues, and revenues thereof, derived from any source. It is hereby expressly covenanted and agreed that thereupon the court shall forthwith appoint such receiver with the usual powers and duties of receivers in similar cases, and the appointment shall be made by the court as a matter of Mortgagee's strict right, and without reference to the adequacy or inadequacy of the value of the Property hereby mortgaged, or to the solvency or insolvency of the Mortgagor or any other party defendant to such suit. The Mortgagor hereby specifically waives the right to object to the appointment of a receiver as described herein and hereby expressly consents that such appointment shall be made as an admitted equity and is Mortgagee's absolute right, and that the appointment may be done without notice to the Mortgagor. Mortgagor further consents to the appointment of the Mortgagee or any officer or employee of Mortgagee as receiver.

(b) Mortgagee may foreclose this Mortgage and sell the Property as an entirety or in separate parcels or

-21-



parts, under the judgment or decree of a court or courts of competent jurisdiction.

(c) Mortgagee may, either after foreclosure and/or the appointment of a receiver as hereinbefore provided, or without same, proceed by suit or suits at law or equity or by any other appropriate remedy to protect and enforce the rights of Mortgagee whether for the specific performance of any covenant or agreement contained herein, or in aid of the execution of any power herein granted, or to foreclose the Mortgage, or to sell, as an entirety or in several parcels or parts, the Property under the judgment or decree of a court or courts of competent jurisdiction, or otherwise. Mortgagee's remedies shall not be exhausted by any single exercise thereof, and may be pursued concurrently, consecutively and repeatedly until all of the Indebtedness Hereby Secured is paid in full.

(d) Mortgagee shall apply the proceeds of sale, or foreclosure of the Property, first, to the payment of reasonable attorney's fees and expenses prior to, and at trial and on appeal, if any; secondly, to discharge all taxes, levies and assessments, with costs and interest if they have priority over the lien of the Mortgage, including the due pro rata portion thereof for the current year; thirdly , to discharge in the order of their priority, if any, the remaining debts and obligations secured by the Mortgage and any liens of record inferior to the Mortgage under which sale is made, with lawful interest; and, fourthly, the residue of the proceeds shall be paid to Mortgagor, or its assigns; provided, however, that Mortgagee as to such residue shall not be bound by any inheritance, devise, conveyance, assignment or lien of or upon Mortgagor's equity, without actual notice thereof prior to distribution.

(e) In the case of any receivership, insolvency, bankruptcy, liquidation or other judicial proceeding relative to Mortgagor or affecting the Property, Mortgagee may pursue and perfect claims against the Property arising under this Mortgage and the Note.

(f) Mortgagee may take such other and further actions as may be required and permitted, it being understood that no remedy under this Mortgage is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or as now or hereinafter existing at law or in equity or by statute.

-22-



Section 6.04 <u>Reinstatement.</u>  If, after the occurrence of an Event of Default, Mortgagor cures the default prior to completion of foreclosure, receivership or other proceedings pursuant to Section 6.03 above, and Mortgagor pays to Mortgagee all reasonable and actual expenses incurred by Mortgagee in connection with the foreclosure, receivership or other proceedings, including, without limitation, all reasonable attorney's fees and expenses prior to and at trial and on appeal, advertising costs, Mortgagee's fees, auctioneer's commissions and payments or reimbursements made by Mortgagee on account of the GNMA Securities (in the event that Mortgagee has issued mortgage-backed securities as described in Section 4.10), the Mortgage Loan shall with the prior written consent of the Mortgagee in accordance with the Coinsurance Contract be reinstated as if an Event of Default had not occurred.

Section 6.05 <u>Mortgagee's Role at Sale.</u>  Upon any foreclosure sale, Mortgagee may bid and become the purchaser of the Property, and upon compliance with the terms of sale, may hold, retain and possess and dispose of such Property in its own absolute right, without further accountability.

Section 6.06 <u>Waiver by Mortgagor.</u>  Mortgagor agrees, to the extent that it may lawfully so agree, that in the case of an Event of Default on its part, as aforesaid, neither Mortgagor nor anyone claiming through or under it shall, or will, set up, seek or claim to take advantage of any exemption laws (whether under the State Constitution, Homestead laws, or otherwise), or laws providing for any appraisement, apportionment, valuation, stay, extension or redemption now or hereafter in force in the locality where the Property is situated, in order to prevent or hinder the enforcement or foreclosure of the Mortgage, or the final or absolute putting into possession thereof, immediately after such foreclosure, of the purchaser thereof. Mortgagor, for itself and all who claim through or under it, hereby waives, to the fullest extent that it may lawfully do so, the benefit of all such laws and any and all right to have the estate comprising the security intended to be created hereby marshalled upon any foreclosure of the lien hereof and agrees that Mortgagee or any court having jurisdiction to foreclose such lien may sell the Property as an entirety or in parts, and further hereby waives any right to assert in any bankruptcy proceeding in which Mortgagor is debtor:  (i) that the Property should be valued by any method other than liquidation value where Mortgagee seeks "adequate protection" or relief from the automatic stay under the Bankruptcy Code, (ii) that Mortgagee's security interest in cash proceeds of the Property, including rent payments received, is limited to any amount less than the actual amount of such proceeds deposited in deposit accounts of Mortgagor and commingled with other funds, (iii) use of cash proceeds of the Property, including rent payments received, without consent of Mortgagee unless authorized by the bankruptcy court in which such bank-

-23-



ruptcy is pending, after notice and a hearing, and (iv) use of cash proceeds of the Property, including rent payments received, unless Mortgagee is granted an additional substitute lien in other property to the extent such cash proceeds are used by Mortgagor. If an Event of Default occurs, Mortgagor shall pay all costs and expenses including reasonable attorneys' fees at and prior to trial and on appeal, incurred in the collection of the Note, the Indebtedness Hereby Secured or obligations under this Mortgage.

Section 6.07 <u>No Waiver, Etc.</u> Any waiver of any Event of Default hereunder shall not extend to or affect any subsequent or other then existing Event of Default, nor shall it impair any rights or remedies relating to any such subsequent or other then existing Event of Default. No delay or omission of Mortgagee to exercise any right or power accruing upon any Event of Default shall impair any such right or power or shall be construed to be a waiver of any such Event of Default or an acquiescence therein, or shall extend to any subsequent Event of Default, and every power and remedy given by the Mortgage may be exercised, from time to time, and as often as may be deemed expedient by Mortgagee.

Section 6.08 <u>Costs and Expenses.</u> In any suit to foreclose the lien of this Mortgage, there shall be allowed and included as additional indebtedness in the decree of sale, to the extent permitted by law, all expenditures and expenses that may be paid or incurred by or on behalf of Mortgagee, for reasonable attorneys' fees, court costs, appraisers' fees, sheriff's fees, documentary and expert evidence, stenographers' charges, publication costs and such other costs and expenses as Mortgagee may deem reasonably necessary to prosecute such suit or to evidence to bidders at any sale that may be had pursuant to such decree the true condition of the title to or the value of the Property. To the extent permitted by law, all such expenditures and expenses shall become payable on demand with interest thereon from the date of expenditure at the interest rate charged under the Note.

In addition, Mortgagor shall pay to Mortgagee promptly upon demand all expenditures and expenses incurred by Mortgagee in connection with (a) any proceeding to which Mortgagee shall be a party, either as plaintiff, claimant or defendant, by reason of this Mortgage or any of the indebtedness; (b) preparations for the commencement of any suit for foreclosure after accrual of such right to foreclosure, whether or not actually commenced; and/or (c) preparation for the defense of or investigation of any threatened suit, claim or proceeding that might affect the Property, whether or not actually commenced.

Section 6.09 <u>Certain Remedies Subject to HUD Approval.</u> Before Mortgagee may accelerate and declare the Indebtedness Hereby Secured due and payable for an Event of Default hereunder

-24-



arising from (i) a default under the HUD Regulatory Agreement, (ii) a violation of the restrictions on transfers under Section 4.05, (iii) a failure to make monthly payments to the Replacement Reserve Fund, (iv) a violation of Section 4.13 as to sole business of Borrower being operation of the Property, or (v) a failure to provide financial statements under Section 4.16; Mortgagee shall obtain the prior written consent of the Secretary of HUD.

## ARTICLE VII

### MISCELLANEOUS PROVISIONS

Section 7.01 <u>Assignment of Mortgage.</u> Subject to any applicable requirements of HUD, Mortgagee may sell, assign, transfer, convey, pledge or encumber the Note or all or any part of its interest, rights and obligations thereunder or under this Mortgage to one or more persons or parties, and Mortgagor hereby consents to any such sale, assignment, transfer, conveyance, pledge or encumbrance and agrees upon the request of Mortgagee or its assignee to execute and deliver promptly any instrument confirming Mortgagor's consent as effectuating, as necessary, such sale, assignment, transfer, conveyance, pledge or encumbrance.

Section 7.02 <u>Notices.</u>  Any notice, demand or request required or permitted hereunder to be given to Mortgagor or Mortgagee shall be sufficiently given if in writing and personally delivered or mailed by registered or certified first class mail, postage prepaid, addressed to:

    Mortgagor:      Oakland Lakes, Ltd.
                    4750 Ashwood Drive, Suite 300
                    Cincinnati, Ohio  45241
                    Attention: William O. Brisben

    Mortgagee:      Cincinnati Mortgage Corporation
                    2368 Victory Parkway, Suite 210
                    Cincinnati, Ohio  45206
                    Attention: Robert W. Jorden

or at such other address as either Mortgagor or Mortgagee may have furnished to the other in writing, and shall be deemed to be given when mailed.





Section 7.03 <u>Security Agreement</u>.

(a) In addition to being a mortgage, this Mortgage is intended to be a security agreement pursuant to the Uniform Commercial Code for any of the items specified herein as part of the Property, which under applicable law may be subject to a security interest pursuant to the Uniform Commercial Code, and Mortgagor hereby grants Mortgagee a security interest in said items, and all substitutions, replacements, replacement parts, additions, repairs, repair parts, accessions and accessories incorporated therein or affixed thereto in which Mortgagor acquires an interest, and the proceeds thereof (sometimes referred to herein as the "Collateral"). Mortgagor agrees that Mortgagee may file this Mortgage, or a reproduction thereof, in the real estate records or other appropriate index, as a financing statement for any of the items specified above as part of the Property. Any reproduction of this Mortgage or of any other security agreement or financing statement shall be sufficient as a financing statement. In addition, Mortgagor agrees to execute and deliver to Mortgagee, upon Mortgagee's request, any financing statements, as well as extensions, renewals and amendments thereof, and reproductions of this Mortgage in such form as Mortgagee may require, to perfect or protect the security interest hereby created with respect to the Collateral, or to more fully describe the Collateral. Mortgagor shall pay all costs of and expenses (including reasonable expenses of counsel and filing fees) relative to the preparation and filing of any financing statements and any extensions, renewals, amendments and releases thereof, and shall pay all reasonable costs and expenses of any record searches for financing statements Mortgagee may reasonably require. Mortgagor hereby irrevocably authorizes Mortgagee as Mortgagor's agent and attorney in fact to execute and file any UCC Financing Statements and similar instruments signed by Mortgagee alone.

(b) Upon Mortgagor's breach of any covenant or agreement of Mortgagor contained in this Mortgage, including the covenants to pay when due all sums secured by this Mortgage, Mortgagee shall have the remedies of a secured party under the Uniform Commercial Code and, at Mortgagee's option, may also invoke all other remedies as provided herein. In exercising any of said remedies, Mortgagee may proceed against the items of real property and any items of personal property specified herein as part of the Property separately or together and in any order whatsoever, without in any way affecting the availability of Mortgagee's remedies under the Uniform Commercial Code or any of the other remedies provided herein. Mortgagor hereby agrees that a notice sent to it at least ten (10) days before the time of any intended public sale or of the time after which any private sale or other disposition of the Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. Until any default hereunder, Mortgagor may have possession of the Collater-

-26-






al and use it in any lawful manner not inconsistent with this Section 7.03 and not inconsistent with any policy of insurance thereon.

(c) Mortgagor will, at its own cost and expense, keep the Collateral in as good and substantial repair as the same is in at this date, or as the same is when acquired, reasonable wear and tear excepted, making replacements when and where necessary.

(d) At its option, Mortgagee may discharge taxes, liens or secured interests or other encumbrances at any time levied or placed on the Collateral, may pay for insurance on the Collateral and may pay for the maintenance and preservation of the Collateral. Mortgagor agrees to reimburse Mortgagee on demand for any payment made, or any expense incurred by Mortgagee pursuant to the foregoing authorization together with interest thereon at the interest rate set forth in the Note.

(e) Mortgagor will not later than thirty (30) days after acquiring additional Collateral promptly advise Mortgagee of the type, description, nature, cost and quantity thereof. Should Mortgagor at any time fail to advise Mortgagee of any such acquisition, such failure shall not affect, diminish, modify or limit Mortgagee's lien or security interest in all Collateral which the Mortgagor may acquire from time to time hereafter.

Section 7.04 <u>Governing Law</u>. The Note and this Mortgage are made and delivered in and shall be governed by and construed in accordance with the laws of the State. In the event that any provision of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provisions, and to this end the provisions of the Mortgage and the Note are declared to be severable.

Section 7.05 <u>Nondiscrimination</u>. Mortgagor covenants and agrees that so long as this Mortgage and the Note secured hereby are coinsured by HUD, or held under the provisions of the Housing Act, it will not execute or file for record any instrument which imposes a restriction upon the sale or occupancy of the Property on the basis of race, color or creed. Upon any violation of this undertaking, Mortgagee may, at its option, and with the prior written consent of HUD, declare the Indebtedness Hereby Secured immediately due and payable.

Section 7.06 <u>Amendments</u>. This Mortgage may be amended or modified only by a written instrument executed by Mortgagor and Mortgagee and any purported modification or amendment hereof, by whatever means, which is not in strict conformance with the foregoing shall be null and void and absolutely ineffective.



-27-



Section 7.07 <u>Third Parties.</u>  The Mortgagor and Mortgagee intend that there are no third party beneficiaries to this Mortgage except for HUD.

Section 7.08 <u>Rights of Mortgagee.</u>  Mortgagee may, at its option, do all things provided or permitted to be done by a mortgagee under the laws of the State of Florida for the protection of Mortgagee's interest in the property.

Section 7.09 <u>Mortgagor's Obligations Unconditional.</u>  The obligations of the Mortgagor to make payments of any and all amounts due hereunder shall be absolute and unconditional without defense or set-off by reason of any default whatsoever, including, without limitation a default by any tenant of the Property under any lease with the Mortgagor or under any other agreement or instrument between the Mortgagee and the Mortgagor, and such payments to Mortgagee shall not be decreased, abated, postponed or delayed for any reason whatsoever, including without limitation, any acts or circumstances that may constitute failure of consideration, destruction of or damage to the Property, the taking of any part of the Property, commercial frustration of purpose, failure of any person to perform or observe any agreement, whether expressed or implied, or any duty, liability or obligation arising out of or connected with this Mortgage, the Note, or any of the other Loan Documents, or failure of any tenant of the Property to pay the fees, rentals or other charges owed to Mortgagor, and irrespective of whether or not any such tenant of the Property receives either partial or total reimbursement as a credit against such payment, it being the intention of the parties that the payments required of the Mortgagor hereunder will be paid in full when due without any delay or diminution whatsoever.

Section 7.10 <u>Additional Limitations on Mortgagee's Duties.</u>  Mortgagor hereby acknowledges and agrees that the undertaking of Mortgagee under this Mortgage is limited as follows:

Except as specifically appointed herein as attorney-in-fact to act on behalf of Mortgagor, Mortgagee shall not act in any way as the agent for or trustee of Mortgagor. Mortgagee does not intend to act in any way for or on behalf of Mortgagor with respect to disbursement of the proceeds of the indebtedness secured hereby. Its purpose in making the requirements set forth herein and in the Building Loan Agreement and Loan Documents is that of a lender protecting the priority of its mortgage and the value of its security. Mortgagee assumes no responsibility for the completion of any improvements erected or to be erected upon the Property, the payment of bills or any other details in connection with the Property, any plans and specifications in connection with the Property, or Mortgagor's relations with any contractors. This Mortgage is not to be construed by Mortgagor or anyone furnishing labor, materials, or any other work or

-28-



product for improving the Property as an agreement upon the part
of Mortgagee to assure anyone that he will be paid for furnishing
such labor, materials or any other work or product; any such
person must look entirely to Mortgagor for such payment. Mort-
gagee assumes no responsibility to Mortgagor for the architec-
tural or structural soundness of any improvements on or to be
erected upon the Property or for the approval of any plans and
specifications in connection therewith or for any improvements as
finally completed.

Section 7.11 <u>Mortgage; Building Loan Agreement; Construc-
tion.</u>

(a)  It is agreed between the Mortgagor and Mortgagee that
this Mortgage is intended to secure the balance of obligatory
loan advances to be made after the Mortgage is delivered to the
Recorder for record, said loan advances to be made pursuant to
the provisions of the Building Loan Agreement. The maximum
amount of unpaid balances of such loan advances in the aggregate
and exclusive of interest accrued thereon is Twenty Two Million
Seven Hundred Seventy Nine Thousand Six Hundred and no/100 Dol-
lars ($22,779,600.00). The Mortgagor understands and agrees that
Mortgagor may not reborrow amounts of principal under the Note
which have already been repaid without the prior written consent
of HUD. In addition to the foregoing advances, the Mortgage
shall secure unpaid balances of advances made by Mortgagee to
protect said premises including but not limited to advances to
pay taxes, assessments, and all other amounts which Mortgagor
herein agrees to pay for the protection of the premises and any
and all other advances that may be made by Mortgagee under this
Mortgage, together with interest thereon.

(b)  Mortgagor warrants and represents that the funds to be
advanced herein are to be used in the construction of certain
improvements on the lands herein described, in accordance with
the Building Loan Agreement which Building Loan Agreement (except
such part or parts thereof as may be inconsistent herewith) is
incorporated herein by reference to the same extent and effect as
if fully set forth and made a part of this Mortgage; and if the
construction of the improvements to be made pursuant to said
Building Loan Agreement shall not be carried on with reasonable
diligence, or shall be discontinued at any time for any reason,
the Mortgagee, after due notice to the Mortgagor or any subse-
quent owner, is hereby invested with full and complete authority
to enter upon the Property, employ watchmen to protect such
improvements from depredation or injury and to preserve and
protect the personal property therein, and to continue any and
all outstanding contracts for the erection and completion of said
building or buildings, to make and enter into any contracts and
and obligations wherever necessary, either in its own name or in
the name of the Mortgagor, and to pay and discharge all debts,
obligations, and liabilities incurred thereby. All such sums so

-29-






advanced by the Mortgagee (exclusive of advances of the principal of the indebtedness secured hereby) shall be added to the principal of the indebtedness secured hereby and shall be secured by this Mortgage and shall be due and payable on demand with interest at the rate specified in the Note. The principal sum and other charges provided for herein shall, at the option of the Mortgagee or holder of this Mortgage and the Note securing the same, become due and payable on the failure of the Mortgagor to keep and perform any of the covenants, conditions, and agreements of said Building Loan Agreement.

(c) This Mortgage secures an obligation incurred for the construction of improvements to the Property and, as such, is a "construction mortgage" as said term is used and defined under Article 9 of the Uniform Commercial Code as effective in the State.

Section 7.12 **Binding Effect**. All the terms, covenants and conditions of this Mortgage shall bind Mortgagor, its partners and their respective heirs, successors and assigns and shall inure to the benefit of and be available to the Mortgagee, its successors and assigns.

Section 7.13 **Interpretation; Time of the Essence**. All references to Mortgagor and Mortgagee shall be read in the singular or plural, and in the masculine, feminine or neuter gender, as the sense may require. Time is of the essence with respect to each and every obligation of Mortgagor under the Note, the Mortgage and the other Loan Documents.

Section 7.14 **Estoppel Certificate**. Mortgagor shall, within ten days of a written request from Mortgagee, furnish Mortgagee with a written statement, duly acknowledged, setting forth the sums secured by this Mortgage and such other information as Mortgagee may reasonably request.

Section 7.15 **Right to Inspect and/or Enter Property**. Mortgagee and its agents, representatives and employees are authorized subject to applicable state and federal laws and regulations, to enter at any reasonable time or times upon or in any part of the Property for the purpose of inspecting the same and for the purpose of performing any of the acts that Mortgagee is authorized to perform under the terms of this Mortgage.

PROVIDED ALWAYS that if Mortgagor shall (i) pay according to the tenor and effect thereof all principal and interest evidenced by the Note and any extensions, replacements, modifications or renewals thereof and (ii) pay and perform all obligations of this Mortgage, and all other security agreements, supplements and other instruments now or hereafter executed by Mortgagor for the purpose of further evidencing or securing all or any part of the indebtedness under or secured by this Mortgage, then this Mortgage shall be void; otherwise to remain in full force and effect.

IN WITNESS WHEREOF, the said Mortgagor has caused these presents to be signed in its name by its General Partner as of the date first above written.

WITNESS/ATTEST:

OAKLAND LAKES, LTD., a
Florida limited partnership

*Charles C. Brisben Jr.*

*Jennifer L. Ferris*

By: _____
William O. Brisben,
General Partner

STATE OF OHIO       )
                    )  SS:
COUNTY OF HAMILTON  )

Before me, a Notary Public in and for said County, personally appeared William O. Brisben, to me known and known to me to be the person who, as General Partner of Oakland Lakes, Ltd., a Florida limited partnership, which executed the foregoing instrument, signed the same and acknowledged to me that he did so sign said instrument in the name and on behalf of said partnership, that the same is his free act and deed as such partner and the free act and deed of said partnership.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my official seal in said County and State this __2nd__ day of October 1989.



_____ (Notary)

This Instrument Prepared By: Barrett N. Montel Munch, Esq.
Strauss & Troy, a Legal Professional Association
2100 Central Trust Center
201 East Fifth Street
Cincinnati, Ohio 45202-4186
(513) 621-2120

22459-77-S
Fla.
1/23/89

-31-



## EXHIBIT "A"

**PARCEL I:**

TRACT A OAKLAND LAKES, according to the Plat thereof, recorded in Plat Book 111, Page 7, of the Public Records of Broward County, Florida.

- and -

**PARCEL II:**

TRACT B, OAKLAND LAKES, according to the Plat thereof, recorded in Plat Book 111, Page 7, of the Public Records of Broward County, Florida.

- and -

**PARCEL III:**

A portion of the North one-half (N1/2) of the Southeast one-quarter (SE1/4) of SECTION 20, TOWNSHIP 49 SOUTH, RANGE 42 EAST, being more particularly described as follows:

Commencing at the Southeast corner of the said North one-half (N1/2) of the Southeast one-quarter (SE1/4) of Section 20; thence South 89°07'10" West, along the South line of the said North one-half (N1/2) of the Southeast one-quarter (SE1/4), a distance of 498.42 feet, to the POINT OF BEGINNING of this description, said point also being the Northeast corner of said Tract B; thence continue South 89°07'10" West, along the last described course and the North line of said Tract B and Tract "A", a distance of 1937.45 feet; thence North 01°50'43" East, a distance of 25.03 feet; thence North 89°07'10" East, along a line parallel with and 25.00 feet North of, as measured at right angles to the South line of the North one-half (N1/2) of the Southeast one-quarter (SE1/4) of Section 20, a distance of 1936.65 feet; thence South 00°00'00" East along a northerly projection of the East line of said Tract B, a distance of 25.00 feet to the POINT OF BEGINNING.

- and -

**PARCEL IV:**

A parcel of land lying in the City of Oakland Park, Broward County, Florida, being a portion of Tract G of "OAKLAND LAKES," according to the Plat thereof, as recorded in Plat Book 111, at Page 7, of the Public Records of Broward County, Florida, and being more particularly described as follows:

Commence at the Northeast corner of said Tract G; thence run S 89°05'55" W along the North line of said Tract G for 113.19 feet to the Point of Beginning; thence run South for 335.04 feet to a point; thence run S 89°05'55" W for 30.03 feet to a point; thence run S 00°54'05" E for 1.07 feet to a point; thence run N 84°03'31" W for 29.67 feet to a point; thence run N 00°54'05" W for 30.54 feet to a point; thence run N 89°05'55" E for 35.00 feet to a point; thence run South for 32.01 feet to a point; thence run N 89°05'55" E for 24.00 feet to a point; thence run North for 335.04 feet to a Point of Intersection with said North line of Tract G; thence run N 89°05'55" E along said North line of Tract G for 1.00 foot to the Point of Beginning.

Said lands situate, lying and being in Broward County, Florida.



EXHIBIT __A__
(CONTINUED)

SAID PROPERTY ALSO BEING DESCRIBED AS:

DESCRIPTION:

A PORTION OF THE N½ OF THE SE¼ OF SECTION 20, TOWNSHIP 49 SOUTH, RANGE 42 EAST, TOGETHER WITH ALL OF TRACTS "A", "B" AND A PORTION OF TRACT "G", "OAKLAND LAKES", ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 111, PAGE 7 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, ALL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT "A"; THENCE N 89°07'10" E, ALONG THE NORTH LINE OF SAID TRACT "A", A DISTANCE OF 175.15 FEET; THENCE N 01°50'43" E, A DISTANCE OF 25.03 FEET; THENCE N 89°07'10" E, ALONG A LINE PARALLEL WITH AND 25.00 FEET NORTH OF, AS MEASURED AT RIGHT ANGLES TO THE SOUTH LINE OF THE NORTH ONE-HALF (N½) OF THE SOUTHEAST ONE-QUARTER (SE¼) OF SECTION 20, A DISTANCE OF 1936.65 FEET; THENCE S 00°00'00" E, ALONG A NORTHERLY PROJECTION OF THE EAST LINE OF SAID TRACT "B" AND THE EAST LINE OF SAID TRACT "B", A DISTANCE OF 999.87 FEET TO THE SOUTHEAST CORNER OF SAID TRACT "B"; THENCE S 89°05'55" W ALONG THE SOUTH LINE OF SAID TRACT "B", A DISTANCE OF 460.00 FEET TO THE NORTHEAST CORNER OF SAID TRACT "G"; THENCE CONTINUE S 89°05'55" W ALONG THE NORTH LINE OF SAID TRACT "G" AND THE SOUTH LINE OF SAID TRACT "A", A DISTANCE OF 113.19 FEET; THENCE RUN SOUTH FOR 336.04 FEET TO A POINT; THENCE RUN S 89°05'55" W FOR 30.03 FEET TO A POINT; THENCE RUN S 00°54'05" E FOR 1.07 FEET TO A POINT; THENCE RUN N 84°03'31" W FOR 29.67 FEET TO A POINT, THE LAST THREE DESCRIBED COURSES BEING ALONG THE NORTH RIGHT OF WAY LINE OF OAKLAND PARK BOULEVARD AS RECORDED IN OFFICIAL RECORD BOOK 13439, PAGE 730 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA; THENCE RUN N 00°54'05" W FOR 30.54 FEET TO A POINT; THENCE RUN N 89°05'55" E FOR 35.00 FEET TO A POINT; THENCE RUN SOUTH FOR 32.01 FEET TO A POINT; THENCE RUN N 89°05'55" E FOR 24.00 FEET TO A POINT; THENCE RUN NORTH FOR 335.04 FEET TO A POINT OF INTERSECTION WITH SAID NORTH LINE OF TRACT "G" AND THE SOUTH LINE OF SAID TRACT "A"; THENCE S 89°05'55" W, ALONG THE SOUTH LINE OF SAID TRACT "A", A DISTANCE OF 1512.81 FEET TO THE SOUTHWEST CORNER OF SAID TRACT "A"; THENCE N 00°19'45" W, A DISTANCE OF 7.34 FEET; THENCE N 03°49'07" W, A DISTANCE OF 328.61 FEET; THENCE N 00°19'45" W, A DISTANCE OF 640.02 FEET TO THE POINT OF BEGINNING, THE LAST THREE DESCRIBED COURSES BEING ALONG THE WEST LINE OF SAID TRACT "A" AND THE EAST RIGHT OF WAY LINE OF N.W. 27TH AVENUE AS SHOWN ON SAID "OAKLAND LAKES" PLAT.

SAID LANDS SITUATE, LYING AND BEING IN THE CITY OF OAKLAND PARK, BROWARD COUNTY, FLORIDA, CONTAINING 2,103,817 SQUARE FEET OR 48.297 ACRES, MORE OR LESS.




## EXHIBIT B

As used herein, the term "Debtor" shall mean and include the terms "Mortgagor," "Grantor" and "Borrower"; and the term "Creditor" shall mean and include the terms "Lender," "Beneficiary" and "Secured Party."

This Exhibit B refers to the following, which may be located on the premises of, relate to, or be used in connection with, the acquisition, construction, rehabilitation, reconstruction, equipping, repair, ownership, management, or operation of a multifamily apartment complex known as Lakes of Casablanca (the "Project"), FHA Project No. 066-36650 located in the County of Broward, State of Florida, in which Debtor has an interest now or hereafter existing or acquired:

1.    All materials now owned or hereafter acquired by the Debtor and intended for construction, rehabilitation, reconstruction, alteration and/or repair of any building, structure or improvement now or hereafter erected or placed on the Real Estate, all of which materials shall be deemed to be included within the Project immediately upon the delivery thereof to the Project.

2.    All of the walks, fences, shrubbery, driveways, fixtures, machinery, apparatus, equipment, fittings, chattels and other goods and other personal property of every kind and description whatsoever, now owned or hereafter acquired by the Debtor and attached to or contained in and used or usable in connection with any present or future operation of the Project, including, by way of example rather than of limitation, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, motors, furnaces, compressors and transformers; all generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment and fixtures, fans and switchboards; all telephone equipment; all piping, tubing, plumbing equipment and fixtures; all heating, refrigeration, air conditioning, cooling, ventilating, sprinkling, water, power and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture installed or to be installed or used or usable in the operation of any part of the Project or facilities erected or to be erected in or upon the Real Estate; and every renewal or replacement thereof or articles in substitution therefor, whether or not the same are now or hereafter attached to the

-1-



Real Estate in any manner; all except for any right, title or interest therein owned by any tenant (it being agreed by the Debtor and Secured Party that all personal property owned by the Debtor and placed by it on the Real Estate shall, so far as permitted by law, be deemed to be affixed to the Real Estate, appropriated to its use, and covered by the Mortgage and/or any Financing Statements, as applicable).

3.    All of the Debtor's right, title and interest in and to any and all judgments, awards of damages (including but not limited to severance and consequential damages), payments, proceeds, settlements or other compensation (collectively, the "Awards") heretofore or hereafter made, including interest thereon, and the right to receive the same, as a result of, in connection with, or in lieu of (i) any taking of the Property or any part thereof by the exercise of the power of condemnation or eminent domain, or the police power, (ii) any change or alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Property or any part thereof (including but not limited to destruction or decrease in value by fire or other casualty), all of which Awards, rights thereto and shares therein are hereby assigned to the Secured Party, who is hereby authorized to collect and receive the proceeds thereof and to give property receipts and acquittances therefor and to apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the indebtedness secured hereby.

4.    All of the Debtor's right, title and interest in any and all payments, proceeds, settlements or other compensation heretofore or hereafter made, including any interest thereon, and the right to receive the same from any and all insurance policies covering the Property or any portion thereof, or any of the other property described herein.

5.    The interest of the Debtor in all of the rents, royalties, issues, profits, revenues, income and other benefits of the Property, or arising from the use or enjoyment of all or any portion thereof, or from any lease or agreement pertaining thereto, and all right, title and interest of the Debtor in and to, and remedies under, all contract rights, accounts receivable and general intangibles arising out of or in connection with any and all leases and subleases of the Property, or any part thereof, and of the other property described herein, or any part thereof, both now in existence or hereafter entered into, together with all proceeds (cash and non-cash) thereof; and including, without limitation, all cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder.

6.    All of the Debtor's rights, options, powers and privileges in and to (but not the Debtor's obligations and burdens under) any construction contract, architectural and engineering

-2-



agreements and management contracts pertaining to the construc-
tion, development, ownership, equipping and management of the
Property and all of the Debtor's right, title and interest in and
to (but not the Debtor's obligations and burdens under) all
architectural, engineering and similar plans, specifications,
drawings, reports, surveys, plats, permits and the like, con-
tracts for construction, operation and maintenance of, or provi-
sion of services to, the Property or any of the other property
described herein, and all sewer taps and allocations, agreements
for utilities, bonds and the like, all relating to the Property.

7.    All of the records and books of account now or here-
-after maintained by or on behalf of Mortgagor in connection with
the Project.

8.    All names now or hereafter used in connection with the
Project and the goodwill associated therewith.

9.    All intangible personal property, accounts, licenses,
permits, instruments, contract rights, and chattel paper of the
Debtor, including but not limited to cash; accounts receivable;
bank accounts; certificates of deposit; securities; promissory
notes, rents; rights (if any) to amounts held in escrow; insur-
ance proceeds; condemnation rights; deposits judgments, liens and
causes of action; warranties and guarantees.

10.    The interest of the Debtor in any cash escrow fund and
in any and all funds, securities, instruments, documents and
other property which are at any time paid to, deposited with,
under the control of, or in the possession of the Secured Party,
or any of its agents, branches, affiliates, correspondents or
others acting on its behalf, which rights shall be in addition to
any right of set-off or right of lien that the Secured Party may
otherwise enjoy under applicable law, regardless of whether the
same arose out of or relates in any way, whether directly or
indirectly, to the Project located upon the Real Estate.

11.    The interest of the Debtor in any and all funds created
or established and held by any trustee pursuant to any indenture
of trust or similar instrument authorizing the issuance of bonds
or notes for the purpose of financing the Project located upon
the Real Estate.

12.    Any collateral provided by the Debtor for its account
to each and every issuer of a letter of credit, subject to the
prior claim of the issuer of any such letter of credit to such
collateral.

13.    All inventory, including raw materials, components,
work-in-process, finished merchandise and packing and shipping
materials.

-3-



14.    Proceeds, products, returns, additions, accessions and substitutions of and to any or all of the above.

15.    Any of the above arising or acquired by the Debtor or to which the Debtor may have a legal or beneficial interest in on the date hereof and at any time in the future.

16.    Any of the above which may become fixtures by virtue of attachment to the Real Estate.

22450-77-S



## EXHIBIT C

(1)  Taxes for the year 1989, and subsequent years which are not yet due and payable.

(2)  Easements and other matters as shown on the Plat of OAKLAND LAKES, recorded in Plat Book 111, Page 7; as modified by Resolution of the City of Oakland Park No. R-88-187 recorded January 18, 1989 in Official Records Book 16120, Page 58 and Resolution of Broward County recorded July 5, 1989 in Official Records Book 16571, Page 993, which Resolutions abandon 20 feet utility and drainage easement over the north 20 feet of Tracts A and B and further modified by that certain Agreement to Place Notation on Plat recorded in Official Records Book 16212, Page 566.

(3)  Agreement with the CITY OF OAKLAND PARK, recorded September 23, 1981 in Official Records Book 9809, Page 661.

(4)  Utility Easement(s) granted to the CITY OF OAKLAND PARK recorded July 16, 1987 in Official Records Book 14625, Page 291.

(5)  Roadway Easement recorded in Official Records Book 13439, Page 773, as set forth in Resolution NO. R-86-44 recorded May 30, 1986 in Official Records Book 13439, Page 730.

(6)  Master Development Plan for Oakland Lakes recorded September 7, 1988 in Official Records Book 15760, Page 500.

(7)  Agreement Governing Land Development for Oakland Lakes Planned Unit Development recorded September 7, 1988 in Official Records Book 15760, Page 494.

AS TO PARCELS I AND III ONLY;

(8)  Drainage Easements recorded February 16, 1989 in Official Records Book 16203, Page 524; in Official Records Book 16203, Page 528; in Official Records Book 16203, Page 532; and in Official Records Book 16203, Page 536.

AS TO PARCEL III ONLY:

(9)  Reservations for fill and minerals together with an easement for purposes of dredging and removing fill and minerals, in favor of HPAV, a Florida general partnership, set forth in that certain Warranty Deed dated June 15, 1981, recorded September 21, 1981 in Official Records Book 9804, Page 807.



(10)  Easement recorded September 17, 1971 in Official Records Book 4612, Page 887.

(11)  Riparian and littoral rights are neith guaranteed nor insured.

(12)  Submerged land is not insured.

AS TO PARCEL IV ONLY:

(13)  Private Easement Agreement for access recorded March 18, 1982 in Official Records Book 10087, Page 363.

(14)  Resolution No. R-86-21 recorded in Official Records Book 13436, Page 558, which resolution abandons existing non-vehicular access lines on the aforesaid Plat of Oakland Lakes along southerly boundary of Tract G thereto.

(15)  Road Contribution Agreement recorded in Official Records Book 9802, Page 677.

AS TO PARCEL I ONLY:

(16)  Utility Easement in favor of the City of Oakland Park recorded in Official Records Book 14625, Page 295.

RECORDED IN THE OFFICIAL RECORDS BOOK
OF BROWARD COUNTY, FLORIDA
L. A. HESTER
COUNTY ADMINISTRATOR



## OAKLAND LAKES, LTD.
### SECOND AMENDED AND RESTATED
### AGREEMENT OF LIMITED PARTNERSHIP

THIS SECOND AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP AGREEMENT made and entered into as of the 29th day of June, 1990, by and among William O. Brisben, Robert E. Schuler and W. O. Brisben Companies, Inc., an Ohio corporation, (hereinafter referred to as the "General Partners"), Gray Construction Co., Inc., a Texas corporation (the "Special Limited Partner"), and Oakland Park (Florida) Limited Partnership, an Ontario limited partnership (the "Investor Limited Partner"), William O. Brisben and the Brisben Family Trust (collectively the "Limited Partners"), all of said parties being hereinafter sometimes referred to collectively as the "Partners" and individually as a "Partner", is intended to evidence the mutual agreement of the General Partners, Special Limited Partner and Limited Partners under the provisions of Chapter 620 of the Florida Statutes for the purposes and upon the terms and conditions hereinafter set forth.

WHEREAS, the Partnership (hereinafter defined) was formed among some of the Partners pursuant to an Agreement of Limited Partnership dated as of February 1, 1989, and continued pursuant to an Amended and Restated Agreement of Limited Partnership dated as of September 18, 1989.

WHEREAS, the Partners desire to admit the Investor Limited Partner into the Partnership as a Limited Partner pursuant to the terms hereof, William O. Brisben, in his capacity as the Original Limited Partner, will be withdrawn upon such admission, William O. Brisben will hold some of his remaining interest as a Limited Partner, and the Special Limited Partner will withdraw as hereinafter provided.

NOW, THEREFORE, intending to be legally bound hereby, the parties hereto agree as follows:



INTRODUCTION

DEFINED TERMS

Capitalized words and phrases used in this Agreement have the following meanings:

(a)  "Act" means the Florida Revised Uniform Limited Partnership Act, as set forth in Chapter 620 of the Florida Statutes, as amended from time to time (or any corresponding provisions of succeeding law).

(b)  "Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i)  Credit to such Capital Account any amounts which such Partner is obligated to restore pursuant to Section 4.5 or is deemed to be obligated to restore pursuant to the penultimate sentence of Regulations Section 1.704-1(b)(4)(iv)(f); and

(ii)  Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations with the approval of the Investor Limited Partner.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(c)  "Affiliate" means, with respect to any Person, any other Person which either directly or indirectly controls, is controlled by or is under common control with such Person. For this purpose, control means ownership of fifty percent or more of the outstanding equity interest of such Person.

(d)  "Agreement" or "Partnership Agreement" means this Second Amended and Restated Agreement of Limited Partnership, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder," refer to this Agreement as a whole, unless the context otherwise requires.

(e)  "Auditors" means Spaeth & Batterberry, Certified Public Accountants, Cincinnati, Ohio, U.S.A., or any other firm of independent certified public accountants selected by the General Partners with the approval of the Investor Limited Partner

(f)  "Capital Account" means, with respect to any Partner, the Capital Account maintained for such Partner at any time and from time to time in accordance with the following provisions:

~ 2 ~

(h) "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

(i) "Coinsuring Lender" means Cincinnati Mortgage Corporation, an Ohio corporation, which will be making the Mortgage Loan to the Partnership.

(j) "Construction Contract" means any construction contract entered into by the Partnership, providing for the construction of the Project.

(k) "Contributed Equity" means the capital contribution to the Partnership in the amount of $1,852,000 made and to be made by the Investor Limited Partner.

(l) "Cumulative Priority Return" means, at any time, an aggregate amount equal to 12 - 1/2% per year (compounded annually on January 1 of each year) on the Contributed Equity from September 1, 1991 to the relevant time, pro-rated for any partial year and adjusted at any time for payments to the Investor Limited Partner on account of the Contributed Equity as a result of a distribution or distributions to the Investor Limited Partner of Net Cash Receipts in excess of the cumulative Preferred Return or any Net Proceeds of Refinancing or New Proceeds of Sale in excess of the cumulative Preferred Return.

(m) "Depreciation" means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis unless the Partners agree to some other reasonable amount of Depreciation for an asset.

(n) "Development Group" means the General Partners and their associates and affiliates holding an aggregate 50% interest in the Partnership after admission of the Investor Limited Partner, namely W.O. Brisben Companies, Inc. as to a 0.1% interest, William O. Brisben (in his capacity as a General Partner) as to a 5.0% interest (inclusive of the interest of the Special Limited Partner), Gray Construction Co., Inc., the Special Limited Partner, as to a 0.01% interest, the Brisben Family Trust as to a 10.0% interest, Robert E. Schuler as to a 4.9% interest, and William O. Brisben (in his capacity as a Limited Partner) as to a 30% interest (a 5.0% interest may be transferred to Eileen R. Brisben, as a Limited Partner, out of such 30% interest at any time) and includes any and all successors and permitted assigns of such persons in respect of their interests in the Partnership.

(o) "General Partner" means any Person who (i) is referred to as such in the first paragraph of this Agreement or is designated as such in Exhibit A hereto or has become a General Partner pursuant to the terms of this Agreement, in any case in such Person's capacity as a General Partner of the Partnership, and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement. "General Partners" means all such Persons.

(p) "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the Partnership;

(ii) The Gross Asset Value of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partners, as of the following times: (a) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership Assets as consideration for a reduction in an interest in the Partnership if the General Partners reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership; and (c) the liquidation of the Partnership within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g);

(iii) The Gross Asset Value of any Partnership asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution; and

(iv) The Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted to the extent the General Partners determine that an adjustment is not necessary or appropriate in connection with a transaction that would otherwise result in an adjustment.

If the Gross Asset Value of an asset has been determined or adjusted, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

- 5 -

(q)  "HUD" means the United States Department of Housing and Urban Development, including the Federal Housing Administration ("FHA") and any other instrumentality thereof.

(r)  "Immediate Family" means, with respect to any Person, his spouse, parents, parents-in-law, descendants, nephews, nieces, brothers, sisters, brothers-in-law, sisters-in-law, children-in-law, and grandchildren-in-law or a trust for the primary benefit of any such immediate family or a custodianship for such minor immediate family.

(s)  "Limited Partner" means any Person, including the Investor Limited Partner, (i) whose name is set forth in the first paragraph of this Agreement as a Limited Partner or is designated as such in Exhibit A hereto or who has been admitted as an additional or Substitute Limited Partner pursuant to the terms of this Agreement, in such Person's capacity as a Limited Partner of the Partnership, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement. "Limited Partners" means all such Persons.

(t)  "Limited Partnership Interests" means the Partnership Interests of the Limited Partners in the Partnership as determined from time to time and reflected herein and on Exhibit A.

(u)  "Managing General Partner" means W.O. Brisben Companies, Inc., as hereinafter provided in Article 3.

(v)  "Mortgage Loan" means any indebtedness of the Partnership evidenced by a promissory note ("Note") of the Partnership to the Coinsured Lender and secured by a mortgage ("Mortgage") creating a lien on Partnership Assets, including the Property, as the same may be amended from time to time.

(w)  "Net Cash Receipts" means the gross cash proceeds from Partnership operations (exclusive of any cash described in (x) and (y) below) less the portion thereof used to pay or establish reasonable reserves for all Partnership expenses, debt service payments, capital improvements, and any necessary replacements and contingencies, all as determined by the Managing General Partner.  "Net Cash Receipts" shall not be reduced by depreciation, amortization, cost recovery deductions or similar allowances.

(x)  "Net Proceeds of Refinancing" means the net proceeds received by the Partnership on any upward refinancing of all of the Partnership Assets or any substantial part thereof after deduction of all costs associated with the refinancing and any existing financing on the Partnership Assets and repayment of any advances under any Optional Deficiency Loans or Optional LP Deficiency Loans.

- 6 -

(y) "Net Proceeds of Sale" means the net proceeds received by the Partnership from the sale of all or any substantial part of the Partnership Assets after deduction of all costs associated with the sale, any mortgage financing then outstanding on Partnership Assets and all other obligations of the Partnership including repayment of any Optional Deficiency Loans or Optional LP Deficiency Loans.

(z) "Nonrecourse Deductions" has the meaning set forth in Section 1.704-1(b)(4)(iv)(b) of the Regulations. The amount of Nonrecourse Deductions for a Partnership fiscal year equals the net increase, if any, in the amount of Partnership Minimum Gain during that fiscal year, determined according to the provisions of Section 1.704-1(b)(4)(iv)(b) of the Regulations.

(aa) "Optional Deficiency Loans" means any loans advanced to the Partnership from time to time by any Partner or Partners of the Development Group to cover any deficiencies in Net Cash Receipts excluding any funds advanced by the Managing General Partner or any of the Development Group to the Partnership pursuant to any contractual obligation to advance money to the Partnership.

(bb) "Optional LP Deficiency Loans" means any additional funds advanced to the Partnership from time to time by the Investor Limited Partner to cover any deficiencies in Net Cash Receipts, excluding, however, the Contributed Equity amount.

(cc) "Ordinary Resolution" of the Investor Limited Partner means:

(i) a resolution passed by its Partners holding, in the aggregate, more than 50% of the aggregate number of votes held by those Partners who, being entitled to do so, vote in person or by proxy at a duly convened meeting of its Partners or any adjournment thereof; or

(ii) a written resolution in one or more counterparts consented to in writing by its Partners holding, in the aggregate, more than 50% of the aggregate number of votes held by those Partners who are entitled to vote.

(dd) "Partners" means all General Partners and all Limited Partners, where no distinction is required by the context in which the term is used herein. "Partner" means any one of the Partners.

- 7 -

(iii)  In the event the Gross Asset Value of any Partnership Asset is adjusted, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such Asset for purposes of computing Profits or Losses;

(iv)  Gain or loss resulting from any disposition of Partnership Assets with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)  In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period; and

(vi)  Notwithstanding any other provision herein, any items which are specially allocated shall not be taken into account in computing Profits or Losses.

(kk)  "Project" means the Property and the buildings and other improvements constructed thereon pursuant to any Construction Contract.

(ll)  "Property" means the property described in the instruments securing the Mortgage Loan and more particularly described in Exhibit B attached hereto.

(mm)  "Recourse Liabilities" means those liabilities of the Partnership that are not taken into account for purposes of determining Partnership Minimum Gain.

(nn)  "Refinancing" means a borrowing on the security of the Partnership Assets which does not constitute a current obligation, where such borrowing is advanced after full advance of the Mortgage Loan and includes any renewal, replacement, supplementary or additional financing.

(oo)  "Regulations" means the Treasury Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

(pp)  "Sale" means the sale or other disposition of all or substantially all of the Partnership Assets by the Partnership.

(qq)  "Special Resolution" of the Investor Limited Partner means:

- 9 -

(i)    a resolution passed by its Partners holding, in the aggregate, not less than 66-2/3% of the aggregate number of votes held by those Partners who, being entitled to do so, vote in person or by proxy at a duly convened meeting of its Partners or any adjournment thereof; or

(ii)    a written resolution in one or more counterparts consented to in writing by its Partners holding, in the aggregate, not less than 66-2/3% of the aggregate number of votes held by those Partners who are entitled to vote.

(rr)    "Subordinated Return" means a distribution payable by the Partnership to the Development Group in any given year equal to the amount distributed in that year by the Partnership on account of the Preferred Return in respect of that fiscal year, which entitlement will only be payable in the event that the distribution for the Preferred Return for that year and any unpaid deficiency from previous years' Preferred Returns have been fully paid in that fiscal year, and then only to the extent of any Net Cash Receipts available for such purpose.

(ss)    "Substitute Limited Partner" means any Person admitted to the Partnership as a Limited Partner pursuant to Article 5 hereof.

(tt)    "Syndication Expenses" means all expenditures classified as syndication expenses pursuant to Section 1.709-2(b) of the Regulations. Syndication Expenses shall be taken into account under this Agreement at the time they would be taken into account under the Partnership's method of accounting if they were deductible expenses.

(uu)    "U.S. Prime Rate" means, at any time during any month, the annual rate of interest declared to the Managing General Partner by its bankers in Florida as the prime rate of interest charged by such bank to its most creditworthy commercial customers for short-term unsecured loans in U.S. funds payable on demand.

ARTICLE 1

NAME AND PURPOSES

Section 1.1 <u>Formation</u>. The parties hereby form and continue a limited partnership pursuant to the Uniform Limited Partnership Act of the State of Florida, Chapter 620 of the Florida Statutes.

- 10 -

Section 1.2  Name and Office.  The Partnership shall be conducted under the name of Oakland Lakes, Ltd.  The Partnership's registered agent and also the agent of the Partnership for service of process is Wilson C. Atkinson, Esq., whose address is c/o Atkinson, Jenne, Stone & Cohen, 1946 Tyler Street, Hollywood, Florida 33022-2088.  The record-keeping office in Florida of the Partnership is c/o W. O. Brisben Companies, Inc., 1451 West Cypress Creek Road, Suite 300, Ft. Lauderdale, Florida 33309.

Section 1.3  Purposes and Powers.

(a)  The purposes of the Partnership and the business to be carried on and the objectives to be effected by it are:

(1)  To acquire and purchase the Property and to construct, own, develop, maintain and operate the Project.

(2)  To enter into, perform and carry out contracts of any kind necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Partnership.

(3)  To acquire any property, real or personal, in fee or under lease, or any rights therein or appurtenant thereto, necessary for the construction and operation of the Project.

(4)  To borrow money, and to issue evidence of indebtedness and to secure the same by mortgage, deed of trust, pledge or other lien, in furtherance of any or all of the purposes of the Partnership, provided that each such borrowing shall be permitted hereby.

(5)  To carry on any other activities necessary to, in connection with or incidental to the foregoing.

(b)  The Partnership shall not engage in any other business without the prior consent of all the Partners.

Section 1.4  Term.  The Partnership shall commence on the date upon which the Certificate of Limited Partnership is duly filed in the Florida Secretary of State's Office and shall continue in full effect until December 31, 2039, unless sooner dissolved and terminated as herein provided.

Section 1.5  Limited Partners.  The General Partners shall have the authority on behalf of the Partnership and each Partner (without notice and consent from any other Partner) to admit additional Limited Partners as provided in Article 2.

## ARTICLE 2

### CAPITAL CONTRIBUTIONS.

Section 2.1  **Capital.**

(a)  The General Partners have contributed to the capital of the Partnership the aggregate sum of $100 plus interests in various commitments and agreements relating to the Project which interests have an agreed capital value of $0.00.

(b)  The Original Limited Partner and the Special Limited Partner have each contributed the sum of $50 to the capital of the Partnership.  The Limited Partners, other than the Investor Limited Partner, have contributed to the capital of the Partnership the aggregate sum of $600.

(c)  The Investor Limited Partner will acquire a 50% Limited Partnership Interest for an aggregate capital contribution (the "Contributed Equity") in an amount of $1,852,000, payable as follows:

$1,000,000 on or before June 30, 1990, $213,000 on or before September 30, 1990, $213,000 on or before December 31, 1990, $213,000 on or before March 31, 1991, and $213,000 on or before June 30, 1991.  The first installment of $213,000 shall also be conditioned on at least $12,000,000 having been then disbursed or advanced under the Mortgage Loan, the second installment of $213,000 shall also be conditioned on at least $15,000,000 having been then disbursed or advanced under the Mortgage Loan, the third installment of $213,000 shall also be conditioned on at least $18,000,000 having been then disbursed or advanced under the Mortgage Loan, and the final installment of $213,000 shall also be conditioned on at least $19,000,000 having been then disbursed or advanced under the Mortgage Loan.  The conditions for the payment of each of the last four installments shall be deemed satisfied upon receipt by the Investor Limited Partner of a certificate or certificates from the Coinsuring Lender that the applicable amounts of the Mortgage Loan have been disbursed or advanced, after which the Investor Limited Partner shall have five business days within which to pay each such installment.

At such time as the Investor Limited Partner makes each payment in accordance with this Agreement its capital account shall be credited with the amounts of such payments.  The amount of the capital contribution by each Partner and the interest in the Partnership represented by such contribution shall be set forth herein and opposite each Partner's name and address in Exhibit A attached hereto. Such capital contributions shall be used and applied by the Partnership as follows and in the order set forth:

- 12 -

(i)  To pay all costs, fees and expenses incurred or to be incurred by the Partnership in connection with the acquisition of the Property and the construction,development and rent-up of the Project which are in excess of total Mortgage Loan proceeds, including without limitation advances and loans made at any time and from time to time by one or more of the Partners in the Development Group with respect to such costs, fees and expenses, the General Partners representing that all loans and advances made by them to the Partnership were for uses related to the Project.

(ii) To the extent that the total development costs of the Project, including land, construction, equipment, financial and bond issue costs and pre-development costs through the date of substantial completion of construction of the Project (as defined in the Construction Contract between the Partnership and the Special Limited Partner), are determined at final endorsement of the Mortgage Loan to be less than $25,237,491, an amount equal to such difference shall, to the extent of any unused amount of the Contributed Equity, be paid to the Managing General Partner and William O. Brisben (as a General Partner) as an incentive fee.

Contemporaneously with its execution and delivery of this Agreement the Investor Limited Partner shall contribute to the capital of the Partnership the amount of $1,000,000.  The four remaining installments of $213,000 shall be evidenced by four promissory notes of the Investor Limited Partner payable to the Partnership.  Any promissory notes given to the Partnership by the Investor Limited Partner to evidence unpaid installments of the agreed capital contributions may be used by the Partnership and/or the General Partners as collateral for borrowings or other Partnership obligations.

(d)  In the event the Investor Limited Partner shall fail to make a scheduled payment under the terms of any promissory note or notes executed by the Investor Limited Partner when such shall become due, the Partnership after 30 days written notice to the Investor Limited Partner of such failure, may avail itself of any or all remedies at law or in equity which it may have to collect such payment.  In any event, the Investor Limited Partner shall not thereafter be entitled to exercise any of its rights, including any voting rights (which shall be exercised by the General Partners) nor to receive any allocations or distributions from the Partnership until the amount of such Investor Limited Partner's delinquent notes, plus interest at the U.S. Prime Rate plus 3% per annum from the date such payment became delinquent, is paid in full.  Any allocations and distributions so withheld shall belong to and shall be given to the General Partners.

(e)  The specific present capital contributions of all Partners are as set forth on Exhibit A hereto.

- 13 -

Section 2.2  Additional Loans and Funds.

(a) Completion Cost Funding.  To the extent that the total development costs of the Project, including land, construction, equipment, financial and bond issue costs and pre-development costs through the date of substantial completion of construction of this Project are determined at final endorsement of the Mortgage Loan to exceed $25,237,491, the Managing General Partner and William O. Brisben, as a General Partner, are jointly and severally obligated to make a capital contribution or contributions to the Partnership in the amount of such costs in excess of said $25,237,491.

(b) Optional Deficiency Loans.  In the event of any deficiencies from time to time in operating revenues of the Project, the Managing General Partner or any of its Affiliates may, at its option, make Optional Deficiency Loans to the Partnership, which loans will bear interest at the U.S. Prime Rate plus 3% per annum.  Neither the Managing General Partner nor any Affiliate has any obligation to make any Optional Deficiency Loans other than in the event and to the extent that the Managing General Partner is required to make loans to the Partnership pursuant to its legal obligation as a General Partner of the Partnership.  Repayments of any such Optional Deficiency Loans will be made by the Partnership from time to time from future Net Cash Receipts, proceeds of Refinancing or proceeds of a Sale prior to any distributions to the Investor Limited Partner except in the case of any Optional LP Deficiency Loans which will be repaid pro rata with Optional Deficiency Loans.

(c) Optional LP Deficiency Loans.  In the event of any deficiencies from time to time in operating revenues of the Project, the Investor Limited Partner may, at its option, make Optional LP Deficiency Loans to the Partnership, which funding will bear interest at the U.S. Prime Rate plus 3% per annum, but which will not increase the base on which Preferred Returns and Cumulative Priority Returns are calculated.  The Investor Limited Partner does not have any obligation to make any Optional LP Deficiency Loans.  Repayments of any such Optional LP Deficiency Loans will be made by the Partnership from time to time from future Net Cash Receipts, proceeds of Refinancing or proceeds of a Sale pro rata with any Optional Deficiency Loans outstanding at that time.

Section 2.3  General Provisions.

(a)  No Limited Partner, Investor Limited Partner or Special Limited Partner shall be liable for any of the debts of the Partnership or be required to contribute any capital or lend any funds to the Partnership other than as expressly provided in Section 2.1. No General Partner shall have any personal liability for the repayment of the capital contributions of any Limited Partner, except as provided to the contrary in this Agreement.

(b)  No interest shall be paid on any capital contributed to the Partnership.

(c)  No Limited Partner, Investor Limited Partner or Special Limited Partner shall have the right to demand and receive property other than cash in return for his or its capital contribution.

Section 2.4  <u>Partnership Borrowings</u>.  In addition to the Mortgage Loan and advances made pursuant to Section 2.2 hereof, the Partnership may borrow sums for partnership purposes from any source, including any Partner, provided that such additional borrowing is not secured by any lien or other charge upon the assets of the Partnership, except any such borrowing maybe secured upon the promissory notes receivable from the Investor Limited Partner, and provided further that such loans shall bear interest at rates which are competitive with then market rates.  No Limited Partner shall have any personal liability with respect to any indebtedness of the Partnership for borrowed money, and each instrument evidencing any such indebtedness shall contain a provision to such effect.

Section 2.5  <u>Additional Partners; Additional Capital</u>.  The Managing General Partner may admit additional Limited Partners to the Partnership for the purpose of meeting additional capital needs of the Partnership, provided, however, that the Investor Limited Partner shall have the first right, to be exercised within 120 days of written notice from the Managing General Partner of such intent, to make such additional capital contributions which shall increase the initial amount of the Contributed Equity.  Any such additional capital contributions by third parties shall adjust the existing percentage Limited Partnership Interests of all Partners, in a manner acceptable both to the Development Group and to the Investor Limited Partner.

Section 2.6  <u>Withholding Tax Capital Contribution</u>.  In the event that the Partnership is required to remit to the Internal Revenue Service withholding taxes pursuant to Section 1446 of the Code with respect to a foreign Partner's allocable share of the Partnership's Profits at any time, such withholding taxes shall first be paid out of such Partner's allocable share of available Net Cash Receipts at such time, and thereafter each foreign Partner shall be required to make a capital contribution to the Partnership (a "Withholding Tax Capital Contribution") in an amount equal to such Partner's allocable share of the difference, if any, between:

(a)  the aggregate Section 1446 withholding taxes required to be remitted by the Partnership and

(b)  the Partner's allocable share of the Partnership's available Net Cash Receipts.

- 15 -

Under no circumstances shall Withholding Tax Capital Contributions accrue to the benefit of any third party and no third party may enforce the payment of such capital contribution by any such foreign Limited Partner.

Section 2.7  <u>Code Sections 1441 and 1446 Withholding</u>.  Any amounts required to be withheld by the Partnership pursuant to Sections 1441 and 1446 shall reduce any amounts otherwise to be distributed to such foreign Partners.

ARTICLE 3

RIGHTS, POWERS AND DUTIES OF PARTNERS

Section 3.1  <u>Management of Partnership Business</u>.  The General Partners shall have the sole right to manage the business of the Partnership.  The Managing General Partner shall direct and control the day-to-day operations and activities of the Project and the Partnership.  The General Partners shall use their best efforts to carry out the purposes, business and objectives of the Partnership referred to in Section 1.3, and shall devote to the Partnership business such time as shall be reasonably required for its welfare and success. The General Partners shall receive no compensation for their services as General Partners other than as may be provided in Section 2.1 and in Article 4 hereof.

Section 3.2  <u>Powers of General Partners</u>.  The General Partners shall have all necessary powers to carry out the purposes, business and objectives referred to in Section 1.3, and shall possess and enjoy all the rights and powers of Partners of a partnership without limited partners except as otherwise provided by Florida law and by this Agreement; provided, however, that the express written consent of the Investor Limited Partner, expressed by Special Resolution, but not the consent of any other Limited Partners, shall be required before the General Partners may (a) sell or exchange substantially all of the assets of the Partnership or (b) — refinance any mortgage indebtedness which is a lien and encumbrance on the Project for an amount in excess of the aggregate amount of the Mortgage Loan, the capital contributions of the Partners (including the Contributed Equity), any outstanding Optional Deficiency Loans and Optional LP Deficiency Loans, any outstanding Preferred Return and any outstanding Cumulative Priority Return, the General Partners having the right to consummate any Refinancing for a lesser amount without obtaining any consent from any Limited Partner (including the Investor Limited Partner).  Unless otherwise provided in this Agreement, the consent of the General Partners shall be required to approve any matter with respect to which Limited Partners have any right of consent and/or approval hereunder.

- 16 -

Section 3.3 <u>Exercise of Rights and Powers by General Partners</u>. The General Partners, if there is more than one, shall have proportional rights in the management of the Partnership business in accordance with the percentages set forth in Section 4.2. Any one or more of such General Partners is and are authorized to enter into and execute any document or instrument for and on behalf of the Partnership.

Section 3.4 <u>Special Duties and Obligations of General Partners</u>.

(a)  In addition to their usual and customary duties and obligations the General Partners shall perform the following special duties and obligations:

(1)  The General Partners shall use their best efforts to cause the Partnership at all times to perform and comply substantially with the provisions of the Mortgage Loan.

(2)  The General Partners shall cause the Partnership at all times to maintain such insurance, in such amounts and against such risks as the General Partners deem advisable.

(3)  The General Partners shall:

(i)  make any decision relating to the design of the buildings (including but not limited to the facade) or the layout of the Project, provided, however, that any substantial and material change in such design shall also require the written consent of the Investor Limited Partner; and

(ii)  approve any deviation from the original Plans and Specifications of the Project.

In order to facilitate such activities, the General Partners shall meet periodically with the architects and any contractor for the Project.

(4)  Subject to any requirement by the mortgagee under the Mortgage Loan the General Partners shall supervise the proper establishment, maintenance and investment of any and all reserve funds, with a view to the required degree of safety as well as return on such invested funds.

(5)  The General Partners may employ such contractors as they deem appropriate in the construction of the Project and supervise such construction, and they may employ such agents as they deem appropriate in the management of the Project.

Section 3.5 <u>Liabilities of General Partners</u>. In carrying out their duties hereunder, the General Partners shall not be liable to the Partnership or to any other Partner for any actions taken in good faith and reasonably believed to be in the best interests of the Partnership, or for errors of

- 17 -

judgment, neglect, omission or wrongdoing, but shall only be liable for willful misconduct, gross negligence, breach of their obligations under this Agreement or other breach of their fiduciary duties.

Section 3.6 <u>Reliance on Act of General Partners</u>. No financial institution or any other person, firm or corporation dealing with the General Partners shall be required to ascertain whether they are acting in accordance with this Agreement, but such financial institution or such other person, firm or corporation shall be protected in relying solely upon the deed, transfer, or assurance of and the execution of such instrument or instruments by such General Partners.

Section 3.7 <u>Prohibitions with Respect of Limited Partners</u>. No Limited Partner, including the Investor Limited Partner, shall have the right:

(a) To take part in the control of the Partnership business or to sign for or to bind the Partnership, such power being vested in the General Partners;

(b) To have his or its capital contribution repaid except to the extent provided in this Agreement;

(c) To require partition of Partnership property or to compel any sale or appraisement of Partnership assets or sale of a deceased Partner's interests therein, notwithstanding any other provisions of Florida law to the contrary; or

(d) To sell or assign his or its interest in the Partnership or to constitute the vendee or assignee thereunder a substituted Limited Partner, except as provided in Article 7 hereof.

Section 3.8 <u>Limited Partners</u>. Neither the Partnership nor any Partner shall disclose the name of any Limited Partner to any person not a Partner, except (i) with the consent of such Limited Partner, or (ii) to comply with the provisions of this Agreement, or (iii) as may be required by applicable laws or governmental rules or regulations, or (iv) as the Investor Limited Partner may consider necessary or advisable for the purposes of raising capital.

Section 3.9 <u>Other Interests of Partners</u>. Any of the Partners may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including, but not limited to, the real estate business in all its phases, which shall include, without limitation, ownership, operation, management, syndication and development of real property. Neither the Partnership nor the other Partners shall have any rights in and to such independent ventures or the income or profits derived therefrom. The Partnership may employ or transact business with any person,

- 18 -

notwithstanding the fact that any Partner or member of his family may be one of, or may have an interest in or connection with, such persons and neither the Partnership nor the other Partners shall have any rights in or to any income or profits derived therefrom.

Section 3.10  Original Limited Partner and Special Limited Partner.  Upon the execution and delivery of this Agreement by all of the Partners, the Original Limited Partner shall be deemed withdrawn and his capital contribution returned to him. His share of profits, losses, capital and equity of the Partnership shall be deemed included in the interest of William O. Brisben in his capacity as a General Partner.  The Special Limited Partner shall be withdrawn and its capital contribution returned to it immediately after the consummation of final endorsement by the Coinsuring Lender and/or HUD of the Mortgage Loan.  Its share of profits, losses, capital and equity of the Partnership shall be deemed included in the interest of William O. Brisben in his capacity as a General Partner.  All Limited Partners, including the Investor Limited Partner, hereby consent to these withdrawals which shall in all respects be in accordance with the provisions of this Agreement.

Section 3.11  Tax Matters Partner.  The Managing General Partner shall be the Tax Matters Partner for purposes of Section 6231(a)(7) of the Code and shall have all of the authority granted by the Code to the Tax Matters Partner.

ARTICLE 4

ALLOCATIONS AND DISTRIBUTIONS

Section 4.1  Special Allocations.

(a)  Except as provided in Section 4.1(d) hereof, in the event any Partner who is not a General Partner unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Regulations, items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the regulations, the Adjusted Capital Account Deficit of such Partner as quickly as possible.

(b)  Except as provided in Section 4.1(d) hereof, in the event any Partner who is not a General Partner has an Adjusted Capital Account Deficit at the end of any Partnership fiscal year which is in excess of the sum of (i) the amount such Partner is obligated to restore and (ii) the amount such Partner is obligated to restore pursuant to the penultimate sentence of Regulations Section 1.704-1(b)(4)(iv)(f), each such Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible.

- 19 -

(c)  Notwithstanding any other provision of this Article 4, if there is a net decrease in Partnership Minimum Gain during any Partnership fiscal year, each Partner who would otherwise have an Adjusted Capital Account Deficit at the end of such year shall be specially allocated items of Partnership income and gain for such year (and, if necessary, subsequent years) in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible.  The items to be so allocated shall be determined in accordance with Section 1.704-1 (b)(4)(iv)(e) of the Regulations.  This Section 4.1(c) is intended to comply with the minimum gain chargeback requirement in such Section of the Regulations and shall be interpreted consistently therewith.

(d)  To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(e)  Syndication Expenses for any fiscal year or other period shall be specially allocated to the Partners in accordance with the percentages for sharing Losses set forth in Section 4.2(b)(2).

Section 4.2  Allocation of Profits and Losses.

(a)  Profits.  Except as provided in Section 4.1 hereof, Profits for any fiscal year shall be allocated in the following order and priority:

(1)  First, to the General Partners up to the amount of any Losses allocated pursuant to Section 4.2(c), and then to the Partners in the percentages set forth in Section 4.2(b)(2) until the cumulative Profits allocated pursuant to this Section 4.2(a)(1) are equal to the total Losses allocated pursuant to Section 4.2(b)(2) hereof for all prior periods.

(2)  Second, any remaining Profits shall be allocated in the following order of priority:

(A)  To the Investor Limited Partner until the cumulative Profits allocated pursuant to this Section 4.2(a)(2)(A) are equal to the amount of distributions made on account of the Preferred Return in such year for such year and for all prior periods, to the extent not previously allocated.

- 20 -

(B)  To the Development Group up to the amount of distributions made of the Subordinated Return in such year.

It is agreed that allocations under Sections 4.2(a)(2)(A) and 4.2(a)(2)(B) shall be deemed to be made simultaneously and pro rata.

(C)  In the event that Profits include taxable gain from a Sale, to the Investor Limited Partner up to the amount of distributions made of Cumulative Priority Return.

(D)  If Profits are allocated under (C) above, then to the Development Group up to the amount of distributions made to the Development Group pursuant to Section 4.6(b)(5).

(3)  Third, any remaining Profits shall be allocated as follows:

<u>Profits</u>

General Partners:
    William O. Brisben  .   .   .   .   5.0%
    W. O. Brisben Companies, Inc.  .   0.1%
    Robert E. Schuler  .   .   .   .   4.9%

(Including Special Limited Partner    0.01%)

Limited Partners:
    Investor Limited Partner   .   .   50.0%
    William O. Brisben  .   .   .   30.0%
    The Brisben Family Trust   .   .   10.0%

(b)  <u>Losses</u>.  Except as otherwise provided in Section 4.1, Losses for any fiscal year shall be allocated in the following order and priority:

(1)  To the extent Profits have been allocated pursuant to Sections 4.1 or 4.2(a)(3) hereof for any prior period, Losses shall be allocated first to offset any Profits allocated pursuant to Section 4.2(a)(3) hereof, and then to offset Profits allocated under Section 4.1 hereof and until the cumulative Profits allocated pursuant to this Section 4.2(b)(1) are equal to the total Profits allocated pursuant to Sections 4.2(a)(3) and 4.1 for all prior periods.  For this purpose, Losses will be allocated in the same proportion as the Profits that the Losses offset were allocated.

(2)  Except as limited by Section 4.2(c), after Losses have been allocated in accordance with Section 4.2(b)(1), any remaining Losses shall be allocated in the following percentages:

<u>Losses</u>

- 21 -

General Partners:
      William O. Brisben . . . . 5.0%
      W. O. Brisben Companies, Inc. . 0.1%
      Robert E. Schuler . . . . 4.9%

(Including Special Limited Partner    0.01%)

Limited Partners:
      Investor Limited Partner . . 50.0%
      William O. Brisben . . . 30.0%
      The Brisben Family Trust . . 10.0%

(c)  The Losses allocated pursuant to Section 4.2(b) shall not exceed the maximum amount of Losses that can be so allocated without causing any Partner who is not a General Partner to have an Adjusted Capital Account Deficit at the end of any fiscal year.  Any Losses that are subject to the foregoing limitation will be allocated to the General Partners.

Section 4.3  Tax Allocations: Code Section 704(c).  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Gross Asset Value.

In the event the Gross Asset Value of any Partnership asset is adjusted, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the General Partners in any manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant to this Section 4.3 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Profits, Losses, other items or distributions pursuant to any other provision of this Agreement.

Section 4.4  Other Allocations Rules.

(a)  In the event additional Partners are admitted to the Partnership on different dates during any fiscal year, the Profits (or Losses) shall be allocated to the Partners in accordance with Code Section 706, using any convention permitted by law and selected by the General Partners.

- 22 -

(b)  For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly, or other basis, as determined by the General Partners using any permissible method under Code Section 706 and the Regulations thereunder.

(c)  Except as otherwise provided in this Agreement, all items of Partnership income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Partners in the same proportions as they share Profits or Losses, as the case may be, for the year.

(d)  The Partners are aware of the income tax consequences of the allocations made by this Article 4 and hereby agree to be bound by the provisions of this Article 4 in reporting their shares of Partnership income and loss for income tax purposes.

Section 4.5  <u>Obligation to Restore Deficits</u>.  Upon liquidation of the Partnership, any Partner with a deficit in its Capital Account will restore such deficit to the Partnership in a manner that comports with Section 1.704-1(b)(2)(ᵍ) of the Regulations provided, however, that no Limited Partner will be required to restore any deficit that exceeds the maximum amount the Limited Partner can be required to provide to the Partnership as a Capital Contribution as set forth in Section 2.2 hereof.

Section 4.6  <u>Distributions</u>.

(a)  Net Cash Receipts shall be distributed semi-annually by the Managing General Partner as follows and in the following order of priority:

(1)  To pay any outstanding balance (together with interest thereon) on any Optional Deficiency Loans and any Optional LP Capital Funding, pro rata.

(2)  To the Investor Limited Partner to pay the Preferred Return for the current or any applicable previous fiscal years, together with interest accrued thereon, if any.

(3)  To the Development Group to pay the Subordinated Return in an amount equal to the amount distributed in such year to the Investor Limited Partner on account of its Preferred Return in respect of the current fiscal year.

(4)  Pro rata 50% to the Investor Limited Partner and 50% to the Development Group.

(b)  Net Proceeds of Refinancing or Net Proceeds of Sale, as the case may be, will be distributed by the Partnership as follows and in the following order of priority:

- 23 -

(1)   To pay any outstanding balance (together with interest thereon) on any Optional Deficiency Loans and any Optional LP Capital Funding, pro rata.

(2)   To the Investor Limited Partner to complete payment of Preferred Returns for all periods up to and including the current fiscal year, together with interest accrued thereon, if any.

(3)   To the Investor Limited Partner up to the amount of any unpaid balance of the Contributed Equity.

(4)   To the Investor Limited Partner to pay the Cumulative Priority Return, net of any distributions from operations actually paid to the Investor Limited Partner prior to such date that are in excess of the Preferred Returns and any previous distributions actually paid to the Investor Limited Partner on account of the Cumulative Priority Return.

(5)   To the Development Group in an amount equal to the aggregate distributions made pursuant to Sections 4.6 (b) (3) and 4.6 (b) (4).

(6)   Pro rata 50% to the Investor Limited Partner and 50% to the Development Group.

Section 4.7   Effect on Capital Accounts.   All allocations of Profits and Losses, any special allocations of items and any distributions made to the Partners under or pursuant to Article 4 shall be credited or debited, as the case may be, to the respective Capital Accounts of the Partners receiving such allocations and/or distributions.

Section 4.8   Distributions as Return of Capital.

(a)   A distribution made to Partners under this Article and under Section 8.2(b) shall be deemed a "return of contribution" to the extent that the distribution to the Partners reduces their share of the fair value of the net assets of the Partnership below the value, as set forth in the certificate of limited partnership, of their contributions that had not been distributed to them.

(b)   No "return of contribution" shall be made to a Partner unless the distribution is made pursuant to either Section 4.6 or Section 8.2(b).

Section 4.9   Development Group Allocations.   Profits and Losses allocated and any distributions made to the Development Group pursuant to this Agreement shall be allocated and divided among the Partners comprising the Development Group in accordance with their respective partnership interests in the Partnership at the date or dates of such allocations and/or distributions as set forth herein and on Exhibit A hereto.

- 24 -

Section 4.10  <u>Calculations for Canadian Income Tax Purposes</u>.  In order to enable the Investor Limited Partner to calculate its taxable income or loss for Canadian income tax purposes, but without affecting in any way the calculations or allocations for United States federal or state income tax purposes, the Partnership shall as at the end of each fiscal year:

(a)  calculate any loss for Canadian income tax purposes and allocate same pursuant to Section 4.2(b)(2), or

(b)  calculate any taxable income for Canadian income tax purposes and allocate same on a cumulative basis:

(1)  pursuant to Section 4.2(a)(3) to the extent of any cumulative losses allocated pursuant to Section 4.10(a), and

(2)  thereafter, pursuant to Sections 4.2(a)(2) and (3).

## ARTICLE 5

### EVENTS OF WITHDRAWAL AND ASSIGNMENTS OF INTEREST OF GENERAL PARTNERS

Section 5.1  <u>General Restrictions</u>.  Except as herein otherwise provided, the General Partners may not assign, sell, pledge, encumber or otherwise transfer an interest in the Partnership, or any part thereof, and may not voluntarily withdraw or otherwise retire as General Partners without the prior consent of the Investor Limited Partner.

Section 5.2  <u>Procedure Following Event of Withdrawal</u>.  Upon the occurrence of an Event of Withdrawal, the General Partner concerned shall cease to be a member of the Partnership and the remaining Partners shall have the option to liquidate the Partnership interest of such General Partner or to convert such interest to that of an assignee.  The Partnership and all its Partners shall be notified of an Event of Withdrawal by the involved General Partner or its legal representative or by any remaining General Partner.

Section 5.3  <u>Exercise of Option</u>.  The remaining Partners shall exercise their option to liquidate the interest of a General Partner or to convert such interest to that of an assignee by serving notice upon the involved General Partner or the legal representative of such General Partner within ninety (90) days from the date it receives notification of the Event of Withdrawal.  If the remaining Partners choose to liquidate the interest of such General Partner, the purchase price to be paid by the remaining Partners for the interest shall be the value of such interest (determined as set forth in Article 7) as of the date of such notice, and shall be paid in cash at a closing to be held within 30 days of the determination of such value.

Section 5.4  <u>Continuation of Partnership</u>.  If the remaining Partners exercise one of the options set forth in Section 5.3, the Partnership shall not dissolve, wind up and terminate but its business shall be continued if there is a remaining General Partner or, if there is not a remaining General Partner, if the Limited Partners unanimously consent to the appointment of a new General Partner within ninety (90) days of the Event of Withdrawal.  If necessary, the interests of the Partners shall be adjusted appropriately to reflect the liquidation of the General Partner's interest and, if applicable, the admission of a new General Partner.  If the remaining Partners do not exercise their option to liquidate the interest of the General Partner but convert the interest of the General Partner to that of an assignee, the Partnership shall not dissolve, wind up and terminate but its business shall be continued if there is a remaining General Partner or, if there is no remaining General Partner, if the Limited Partners unanimously consent to the continuance of the Partnership and unanimously appoint a new General Partner within ninety (90) days of the Event of Withdrawal.

Section 5.5  <u>Termination</u>.  Upon the occurrence of an Event of Withdrawal at such time as the Partnership has a sole General Partner, the Partnership shall be dissolved, wound up and terminated unless all of the Limited Partners consent to the continuance of the Partnership as contemplated in Section 5.4.

Section 5.6  <u>Event of Withdrawal Defined</u>.  For purposes of this Agreement, the term "Event of Withdrawal" shall mean:

(a)  Any one of the following being done or permitted by the General Partner:

(1)  making an assignment for the benefit of creditors;

(2)  filing a voluntary petition in bankruptcy;

(3)  being adjudicated bankrupt or insolvent;  —

(4)  filing a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or rule;

(5)  filing an answer or other pleading admitting or failing to contest the material allegations against it in any proceeding described in item (4), above; or

(6)  seeking, consenting to or acquiescing in the appointment of a trustee, receiver, or liquidator for it or for all or any substantial part of its properties;

(b)  the death or adjudication of incompetency of a General Partner who is a natural person;

(c)  the termination of the trust in the case of a General Partner that is trustee of the trust;

(d)  the dissolution and commencement of the winding up of a separate partnership in the case of a General Partner that is a separate partnership;

(e)  the filing of a certificate of dissolution, or the equivalent, or the revocation of its charter in the case of a corporate General Partner;

(f)  the distribution by the fiduciary of an estate's entire interest in the Partnership in the case of a General Partner that is an estate; or

(g)  the permitted withdrawal or retirement of a General Partner.

The commencement of a proceeding against a General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or rule without the consent to or acquiescence in the appointment of a trustee, receiver or liquidator by such General Partner will not be deemed to be an Event of Withdrawal and will not result in such General Partner ceasing to be a General Partner or otherwise dissolve the Partnership, provided that such proceeding is contested and continues to be contested by such General Partner.

Section 5.7  <u>Substitute Limited Partner</u>.  An assignee of all or any portion of a General Partner's interest in the Partnership shall be admitted as a Substitute Limited Partner only upon compliance with the following conditions:

(a)  The assignee must deliver to the Partnership an executed counterpart of the instrument of transfer, which may be a conversion notice, satisfactory in substance and form to the General Partners that contains a statement of the assignee's desire to be admitted as a Substitute Limited Partner and the assignee's agreement to be bound by this Agreement.

(b)  All of the General Partners and the Investor Limited Partner, in their sole discretion, consent to the admission of the assignee as a Substitute Limited Partner.

(c)  The assigning General Partner and the assignee execute and acknowledge such instruments as the General Partners may deem necessary or desirable to effect such admission, and the assignee agrees to pay all expenses in connection with such admission.

- 27 -

Section 5.8 <u>Absolute Restrictions</u>. Notwithstanding any other provision of this Agreement to the contrary, without the prior written consent of all Limited Partners a General Partner shall not voluntarily withdraw or otherwise retire as a General Partner of the Partnership and shall not transfer, assign, sell, give, pledge, alienate, encumber or otherwise dispose of all or any part of its Partnership interest, whether voluntarily or by operation of law, or at judicial sale or otherwise, if the effect of same would result in the dissolution of the Partnership or would cause such General Partner to cease to be a General Partner of the Partnership under the Act, except to the extent such dissolution and/or cessation are permitted or provided for by the provisions of this Article 5.

# ARTICLE 6

## ASSIGNMENT OF INTEREST OF LIMITED PARTNER

Section 6.1 <u>Assignment</u>.

(a) The Partnership interest of a Limited Partner, including the Investor Limited Partner, may be assigned only as permitted by the provisions of this Article 6. Neither the Partnership nor any Partner shall be bound by any such assignment until a counterpart of the instrument of assignment, executed and acknowledged by the parties thereto, is delivered to the Partnership.

(b) No assignee of all or part of the Partnership interest or any part thereof of any Limited Partner shall have the right to become a substitute or additional Limited Partner unless (i) his or its assignor has stated such intention in the instrument or assignment (ii) the General Partners have consented to such admission, the granting or denial of which consent shall be within the sole and absolute discretion of the General Partners, and (iii) the assignee has executed an instrument satisfactory in form and substance to the General Partners, whereby such assignee accepts and agrees to be bound by all the terms and provisions of this Agreement. Notwithstanding the foregoing, the consent of the General Partners shall not be required if the assignee is a person who is otherwise a Partner. The substitution of a Limited Partner may be effected without the consent of any of the Limited Partners. The failure or refusal of the General Partners to consent to any such admission shall not affect the validity and effectiveness of any such instrument of assignment delivered to the Partnership as an assignment of the right to receive Partnership profits, losses or distributions with respect to the Partnership interest or part thereof transferred. At the time of admission of a substitute or additional Limited Partner, the Partnership may require the payment of a sum to reimburse it, or to provide

- 28 -

it with funds, for the payment of any reasonable expenses in connection with such admission, including the expenses of preparing an amendment to this Agreement and the expenses of preparing and filing an amendment to the Certificate of Limited Partnership of the Partnership.

(c) Without the consent of the General Partners, no part of the Partnership Interest of a Limited Partner may be assigned or transferred to a minor or incompetent but the consent of the General Partners shall not be required for any assignment or transfer in trust for the benefit of any member (including a minor or an incompetent) of such Limited Partner's Immediate Family.

Section 6.2  Absolute Restrictions.

(a) The assignment, sale, transfer or pledge of an interest by a Limited Partner to any person is prohibited, unless (i) the Partnership causes such interest to be registered under the Securities Act of 1933, as amended, (ii) counsel satisfactory to the General Partners has rendered to the Partnership an opinion that anu exemption from registration is available and that such transfer will not otherwise violate federal or state securities laws, or (iii) the General Partners consent to the assignment, sale, transfer or pledge.

(b) For a period of one (1) year from the date of its execution of this Agreement, the Investor Limited Partner shall not sell, assign or otherwise transfer its Limited Partnership interest within the boundaries of the United States of America or its territories or possessions, or to citizens, residents or nationals thereof, or to any institution organized, chartered or resident in the United States of America or its territories or possessions.

Section 6.3  Capital Account Carryover.  Upon the transfer, sale or other disposition of a Partner's interest, the capital account of such transferor Partner shall carry over and become the capital account of the transferee Partner and shall be adjusted to reflect any adjustments to the basis of Partnership assets that may result from such transfer.

Section 6.4  Bankruptcy and Other Events.  The Partnership shall not be dissolved, wound up and terminated upon the death, incapacity, dissolution, merger or bankruptcy of a Limited Partner.

Section 6.5  Right of First Opportunity concerning Bankruptcy and Other Events.  Within 30 days after the death, incapacity, dissolution, merger or bankruptcy of a Limited Partner, the Partnership is permitted to offer to acquire the entire interest of such Limited Partner for an amount equal to the value of the interest held by the Limited Partner determined in accordance with Article 7.  If the Partnership

- 29 -

does not exercise its right to make an offer, the other
Partners will have an additional 120 days to make the same
offer. If one or more or all of the other Partners exercise
their right to make offers and such Partners cannot agree on
the proportions of such interest each will acquire, then they
will acquire the interests in the same relative proportions
that they share Profits. Payment for such interest may be made
in the manner described in Section 5.3. If an offer is made by
either the Partnership or one or more or all of the other
Partners to acquire the entire interest in the Partnership held
by such Limited Partner, the Limited Partner must accept the
offer.

Section 6.6 **Withdrawal of Limited Partner**. No Limited
Partner may withdraw from the Partnership at any time, except
as expressly provided in this Agreement.

Section 6.7 **Conversion to Limited Partner**. An assignee
(including an assignee of an interest formerly held by a
General Partner) cannot be required to make any additional
Capital Contributions to the Partnership without first being
admitted as a Substitute Limited Partner.

Section 6.8 **Section 6050K**. Upon the transfer or
assignment of any Partnership Interest, including that of a
General Partner, the assignor must provide to the Partnership
the information set forth in Section 6050 K of the Code, and
the Partnership shall furnish the required information to the
Internal Revenue Service, the assignor and the assignee as
required by such section.

Section 6.9 **Buy/Sell Arrangements; First Refusals**.
Notwithstanding any other provisions of this Agreement to the
contrary, the Investor Limited Partner and the Development
Group and each and every Partner that is a member thereof
hereby agree as follows:

(a) Each of the Investor Limited Partner and the
Development Group has a right of first refusal to purchase the
other's interest in the Partnership in the event of any bona
fide offer therefor made by any third party, which on the same
terms and conditions as are contained in such offer, right must
be exercised within 120 days of notice of such offer.

(b) Neither the Investor Limited Partner nor any
member of the Development Group shall be entitled to pledge,
hypothecate, mortgage or otherwise encumber its Partnership
interest in the Partnership without the other's prior written
consent.

(c) Each of the Development Group and the Investor
Limited Partner shall have the right to offer to purchase the
other's 50% interest in the Partnership provided that the other
party is given the option (to be exercised by written notice

- 30 -

within 120 days of receipt of such offer) to either agree to sell its Partnership interest for the price and on the terms and conditions provided in such offer or alternatively to purchase the offeror's 50% interest in the Partnership (a "Reversal") for the price and on the same terms and conditions contained in such offer, provided, however, that any offer to purchase the interest of the Investor Limited Partner (including pursuant to a Reversal of an offer by the Investor Limited Partner at a lower price) must be for a price not less than the aggregate of the Contributed Equity, any Optional LP Deficiency Loan (including accrued interest), any outstanding Preferred Return (including accrued interest) and any outstanding Cumulative Priority Return.

(d)  If either the Development Group or the member thereof or the Investor Limited Partner receives a bona fide offer acceptable to the recipient from an arm's length third party for the purchase of the entire Project, then such recipient can  require the other Partner, after written notice of such offer, to agree (by written notice to be given within 120 days of receipt of notice of the offer) either to have the Partnership sell the Project to such third party or to purchase the recipient's 50% interest in the Partnership for the same price the recipient would have received on the sale to the third party and otherwise the same terms and conditions contained in the offer, provided, however, that the net proceeds of sale of the Project, as applicable, must be sufficient to pay to the Investor Limited Partner the aggregate of the Contributed Equity, any Optional LP Deficiency Loans (including accrued interest), any outstanding Preferred Return (including accrued interest) and any outstanding Cumulative Priority Return.

(e)  The parties agree that the rights conferred in Sections 6.1, 6.9 (a), 6.9 (c) and 6.9 (d) may not be exercised or required to be exercised until after October 1, 1996.

ARTICLE 7

VALUE

Section 7.1  Valuation of Interest.  The "value" of a Partner's interest shall be such Partner's interest in the Partnership, determined from the books and records of the Partnership by the Auditors of the Partnership subject to the following adjustments to be made by such Auditors:

(a)  No allowance shall be made for goodwill, trade names or other similar intangible assets, except such which may have been specifically acquired by the Partnership with funds after the date of this Agreement, in which case such intangible assets shall be valued at their remaining unamortized cost.

- 31 -

(b)  All accounts payable shall be taken at their face amount, less discounts deductible therefrom, including any appraisal costs as set forth below, and all accounts or rents receivable shall be taken at their face amount, less a reasonable reserve for bad debts.

(c)  All real and tangible property or interests therein shall be appraised as herein provided, and the fair market value thereof, as determined by such appraisal (which shall be in writing), shall be used for purposes of determining "value." Within sixty (60) days of the event causing such appraisal, the selling or withdrawing Partner and the remaining Partner(s) shall agree on one appraiser; provided, however, that if they cannot agree on one appraiser, each side shall select one appraiser and the appraisers thus chosen will appoint a third appraiser.  The fair market value determined by the one appraiser if the parties have agreed on one appraiser, or, the average of the two closest fair market values determined by the three appraisers, shall be the fair market value of such property or property interests.

(d)  The value of the interest of the Partner shall be the amount the Partner would receive upon termination of the Partnership following a sale of all Partnership Assets at their values (as adjusted herein) as of the date of the sale or transfer of such interest.

(e)  The expense of the accounting and appraisal shall be borne by the selling or withdrawing Partner in the case of a sale, transfer or withdrawal due to assignments or other transfer of Partnership interest of such Partner and by the Partnership in the case of a sale due to the bankruptcy of a Partner.

(f)  Such determination (which shall be in writing), when made and delivered to the Partnership, shall be binding upon all concerned parties.

ARTICLE 8

DISSOLUTION AND TERMINATION OF THE PARTNERSHIP

Section 8.1  Events Causing Dissolution.  The Partnership shall dissolve, wind up and terminate upon the first to occur of the following:

(a)  The expiration of the term of the Partnership;

(b)  the occurrence of an Event of Withdrawal unless the business of the Partnership is continued as provided in Article 5;

(c)  the sale of all or substantially all of the assets of the Partnership and the collection and distribution of all proceeds (including interest on deferred payments) from such sale;

(d)  upon the express written consent of all Partners.

Section 8.2  Procedure on Termination.  Upon the occurrence of an event described in Section 8.1, the General Partners (or, if none, the person or persons required by law to carry out the winding up) shall proceed to liquidate and wind up the business of the Partnership.  Upon 120 days' prior written notice to all of the Partners identifying the assets to be sold, the liquidating Partner or other required person may, in lieu of selling the Partnership Assets, convey undivided interests in the assets to the Partners or distribute the Assets in kind to the Partners.  The Partnership Assets and the proceeds of any liquidation sale shall be applied and distributed at the closing of any sale in the following order of priority:

(a)  To the payment of all debts and liabilities of the Partnership and all expenses of liquidation.

(b)  To the setting up of such reserves as the liquidating Partner or other required person may deem necessary for any contingent liabilities of the Partnership.  Any reserves shall be deposited with an attorney-at-law of the State of Florida, as escrowee, to be applied to the discharge of any contingent liabilities, and, at the expiration of whatever period the liquidating Partner or other required person may deem advisable, the balance shall be distributed as provided in clause (c) below.

(c)  The balance, if any, shall be distributed to the Partners in accordance with their Capital Accounts after allocation of Profits, Losses, Gains and Liquidation Gains in accordance with Article 4 hereof.

Section 8.3  Compliance With Timing Requirements of Regulations.  In the event the Partnership is "liquidated" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), (i) distributions shall be made to the Partners who have positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2), and (ii) if any Partner's Capital Account has a deficit balance (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which such liquidation occurs), such Partner shall contribute to the capital of the Partnership the amount necessary to restore such deficit balance to zero in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(3), provided, however, that no Limited Partner will be required to restore any deficit that exceeds the maximum amount the Limited Partner can be required to provide to the Partnership as a Capital Contribution as set forth in Article 2 hereof.  In the discretion of the General Partners, a pro rata portion of the distributions that would otherwise be made to the Partners pursuant to the preceding sentence may be:

(a)  distributed to a trust established for the benefit of the Partners for the purposes of liquidating Partnership assets, collecting amounts owed to the Partnership, and paying any contingent or unforeseen liabilities or obligations of the Partnership or of the Partners arising out of or in connection with the Partnership. The assets of any such trust shall be distributed to the Partners from time to time, in the reasonable discretion of the General Partners, in the same proportions as the amount distributed to such trust by the Partnership would otherwise have been distributed to the Partners pursuant to this Agreement; or

(b)  withheld to provide a reasonable reserve for Partnership liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Partnership, provided that such withheld amounts shall be distributed to the Partners as soon as practicable.

Section 8.4 <u>Rights of Partners</u>.  Except as otherwise provided in this Agreement, each Partner shall look solely to the assets of the Partnership for the return of its Capital Contribution and for any Partnership distributions to which it is entitled, shall have no right or power to demand or receive any distributions from the Partnership except as provided in Article 4 hereof, and shall have no right or power to demand or receive property other than cash from the Partnership.

ARTICLE 9

FISCAL MATTERS

Section 9.1 <u>Books and Records</u>.  The General Partners shall maintain full and accurate books of the Partnership at the Partnership's principal place of business, showing all receipts and expenditures, assets and liabilities, profits and losses, and all other records necessary for recording the Partnership's business and affairs, including those sufficient to record the allocations and distributions provided for in Article 4. The books of the Partnership shall be kept on an accrual basis. Each Partner and his duly authorized representatives shall at all times during regular business hours have access to and may inspect and copy any of such books and records.

Section 9.2 <u>Fiscal Year</u>.  The fiscal year of the Partnership shall be the calendar year unless otherwise required by Section 706 of the Code.

Section 9.3 <u>Reports</u>.  Annual statements showing the income and expenses of the Partnership for the fiscal year and the balance sheets thereof as of the end of such year shall be reported upon by the Auditors. The Partnership shall have an annual audit of its books by the Auditors.  Each Partner shall be furnished copies of such statements of income and expenses and of such audit, within seventy-five (75) days after the end

- 34 -

of each fiscal year of the Partnership. The Partnership, at its expense, shall also furnish to each Partner all necessary reports in sufficient detail to enable each Partner to prepare his tax return. The Managing General Partner shall also cause the Partnership to provide to the Investor Limited Partner within 20 days after the last day of each such month unaudited monthly management/operating reports from the manager of the Project detailing the operations of the Project for the previous month. The Partnership shall also furnish to any Partner, at such Partner's expense, such other reports on the Partnership's operations and condition as such Partner may reasonably request.

Section 9.4 <u>Bank Accounts and Investment of Funds</u>. All funds of the Partnership shall be deposited in its name in such checking and savings accounts or time deposits or certificates of deposit as shall be designated by the General Partners from time to time. Withdrawals therefrom shall be made upon such signature or signatures as the General Partners may designate.

Section 9.5 <u>Accounting Decisions</u>. All decisions as to accounting matters, except as specifically provided to the contrary herein, shall be made by the General Partners in accordance with generally accepted accounting principles consistently applied. Such decisions shall be acceptable to the Auditors, and the General Partners may rely upon the advice of the Auditors as to whether such decisions are in accordance with generally accepted accounting principles.

Section 9.6 <u>Federal Income Tax Elections</u>.

(a) The Partnership shall elect to treat as an expense for Federal income tax purposes all amounts incurred for rent, real estate taxes, interest and other charges during or relating to the construction of the Project which may, in accordance with applicable law and regulations, be considered as expenses.

(b) The Partnership shall, to the extent permitted by applicable statutes and regulations and upon obtaining any necessary approval of the Commissioner of Internal Revenue, elect to use such methods of accelerated depreciation on each depreciable unit of the assets of the Partnership as shall be most favorable to Limited Partners unless the General Partners determine, upon advice of the Auditors, that another method of depreciation will be more favorable to Limited Partners.

(c) In the event of a transfer of all or part of the Partnership Interest of any Partner, the Partnership may elect pursuant to Section 754 of the Code (or corresponding provisions of future law) to adjust the basis of the assets of the Partnership.

- 35 -

## ARTICLE 10

### GENERAL PROVISIONS

Section 10.1 <u>Notices</u>. Except as otherwise provided in this Agreement, any and all notices, consents, waivers, requests, votes or other instruments or communications provided for under this Agreement shall be in writing, signed by the party giving the same and shall be deemed properly given only if hand-delivered, delivered by recognized overnight couriers, given or furnished by facsimile or other means of permanent visible communication, or sent by registered or certified mail, postage prepaid, return receipt requested, addressed: (a) in the case of the Partnership, to the principal place of business of the Partnership, (b) in the case of a General Partner, or any Limited Partner, to such Partner at his or its address set forth in Exhibit A hereto. Each Partner may, by notice to the Partnership, specify any other address for the receipt of such instruments or communications. Any such communication sent by telegram shall be properly given when received by the Person to whom it is sent.

Section 10.2 <u>Indemnification and Liability of General Partners</u>. The Partnership shall indemnify the General Partners against any claim or liability incurred by them in connection with the business of the Partnership. Neither the Partnership nor any Partner shall have any claim against the General Partners by reason of any acts or omissions that were performed in the good faith belief that they were acting within the scope of their authority under this Agreement and that such General Partners were not grossly negligent or guilty of misconduct with respect to such actions or omissions. Except as provided herein or required by law, no General Partner shall have any obligation or liability to any other Partner or to make any advance to, or contribution to the capital of, the Partnership. The right to indemnification provided in this Section 10.2 shall not extend to personal liability, if any, imposed on the General Partners under state or federal securities laws.

Section 10.3 <u>Integration</u>. This Agreement embodies the entire agreement and understanding among the Partners relating to the subject matter hereof, and supersedes all prior agreements and understandings relating to such subject matter.

Section 10.4 <u>Applicable Law</u>. This Agreement and the rights of the Partners shall be governed by and construed and enforced in accordance with the laws of the State of Florida.

Section 10.5 <u>Counterparts</u>. This Agreement may be executed in several counterparts and all so executed shall constitute one Agreement binding on all the parties hereto, notwithstanding that all the parties are not signatory to the original counterpart, except that no counterpart shall be authentic unless signed by a General Partner.

Section 10.6 **Separability**. In case any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and any other application thereof shall not in any way be affected or impaired thereby.

Section 10.7 **Binding Effect**. Except as herein otherwise provided to the contrary, this Agreement shall be binding upon, and inure to the benefit of, the Partners and their respective heirs, executors, administrators, successors and permitted assigns.

Section 10.8 **Agreement for Further Execution**. At any time or times upon the request of the General Partners, the Limited Partners agree to sign and acknowledge the certificate required by Chapter 620 of the Florida Statutes, to sign and acknowledge any amendment to or cancellation of such certificate as required by law, to sign and acknowledge similar certificates or affidavits or certificates of fictitious firm name or the like (and any amendments or cancellations thereof) required by the laws of Florida, or any other jurisdiction in which the Partnership does, or proposes to do, business, and cause the filing of any of the same for record wherever such filing shall be required by law. This Section 10.8 shall not prejudice or affect the rights of Limited Partners to approve certain amendments to the Agreement pursuant to Section 11.1.

Section 10.9 **Certificate of Limited Partnership**. The General Partners are not required to deliver or mail a copy of the Partnership's Certificate of Limited Partnership and any amendments thereto to any of the Limited Partners, except the Investor Limited Partner.

ARTICLE 11

AMENDMENTS

Section 11.1 **Authority to Amend**. Amendments to this Agreement shall require the approval of the General Partners and the approval of the Limited Partners holding 60% or more of the Limited Partnership Interests held by all of the Limited Partners.

Section 11.2 **Notice of Amendments**. A copy of any amendment to be approved by the Limited Partners pursuant to Section 11.1 shall be mailed in advance to the Limited Partners.

- 37 -

## ARTICLE 12

### REGISTRATION

Section 12.1  **Federal**.

All Limited Partners hereby represent and covenant that they are acquiring their interests solely for investment purposes and not with a view to the distribution or resale thereof.

All Limited Partners further represent and covenant that they are relying on their own professional tax, legal and other business advisors in making their decision to enter into and execute this Agreement.

Notwithstanding any statements contained in other Articles in this Agreement, no Limited Partnership Interest may be offered or sold and no transfer of such Limited Partnership Interest will be made either by the Partnership or the Partners unless:  (a) such interest is registered under the Securities Act of 1933, or (b) an opinion of counsel for the Partnership is obtained to the effect that registration is not necessary.

## ARTICLE 13

### DOCUMENTS AND ACKNOWLEDGMENT

Section 13.1  **Acknowledgments**.

(a)  Each of the Limited Partners and the Substitute Limited Partners signatory hereto, if any, acknowledges that prior to the date of execution of a counterpart of this Agreement, copies of any and all forms and statements filed with any applicable state division of securities or similar agency in connection with the sale of Limited Partnership Interests and all copies of any and all documents relating to this transaction have been and are available for inspection at the office of the Partnership or at the office of the Partnership's counsel.

(b)  Each of the parties hereto and each of the Substitute Limited Partners signatory hereto, if any, acknowledges that he has been advised of and hereby approves of the application of Partnership funds to pay all expenses incurred in connection with the formation of the Partnership and the sale of the Limited Partnership Interests, including, without limitation, legal fees, accounting fees, registration fees and filing and recording charges.

ARTICLE 14

POWER OF ATTORNEY

Section 14.1 <u>Power</u>. Except to the extent otherwise required by Florida law, each of the Limited Partners, including the Investor Limited Partner, irrevocably constitutes and appoints the General Partner, jointly and severally, with full power of substitution, his or its true and lawful attorneys in his or its name, place and stead to make, execute, swear to, acknowledge, deliver and file:

(a) Any certificates or other instruments which may be required to be filed by the Partnership under the laws of the State of Florida, or of any other state or jurisdiction in which the Partnership shall transact business or in which the General Partners shall deem it advisable to file;

(b) Any documents, certificates or other instruments, including, without limiting the generality of the foregoing, any and all amendments and modifications of this Agreement or the instruments described in Section 14.1(a) which may be required or deemed desirable by the General Partners to effectuate the provisions of any part of this Agreement, and, by way of extension and not in limitation, to do all such other things as shall be necessary to continue and to carry on the business of the Partnership; and

(c) All documents, certificates or other instruments which may be required to effectuate the dissolution and termination of the Partnership, to the extent such dissolution and termination is authorized hereby.

The power of attorney granted hereby shall not constitute a waiver of, or be used to avoid, the rights of the Limited Partners to approve certain amendments to this Agreement pursuant to Section 11.1 or be used in any other manner inconsistent either with Florida law or with the status of the Partnership as a limited partnership.

Section 14.2 <u>Survival of Power</u>. It is expressly intended by each of the Limited Partners that the foregoing power of attorney is coupled with an interest, is irrevocable and shall survive the death, incompetence, dissolution, adjudication of insanity, or disability of each such Limited Partner. The foregoing power of attorney shall survive the delivery of an assignment by any of the Limited Partners of his or its entire interest in the Partnership, except that where an assignee of such entire interest has become a substitute Limited Partner, then the foregoing power of attorney of the assignor Limited Partner shall survive the delivery of such assignment for the sole purpose of enabling the General Partners to execute, acknowledge and file any and all instruments necessary to effectuate such substitution.

## ARTICLE 15

### OTHER REQUIREMENTS
### AND INCORPORATIONS BY REFERENCE

Section 15.1  HUD and Coinsuring Lender Requirements.  The Partnership is authorized to execute the Note and Mortgage in order to obtain the Mortgage Loan to be coinsured by the Coinsuring Lender and HUD and to execute a certain regulatory agreement ("Regulatory Agreement") between the Partnership and the Coinsuring Lender and such other documents as may be required by the Coinsuring Lender and/or HUD in connection with said Mortgage Loan.  Any incoming Partner, as a condition of receiving an interest in the Partnership, shall agree to be bound by the Note, Mortgage and Regulatory Agreement and other documents required in connection with said Mortgage Loan and to the same extent and on the same terms as the other Partners. Upon any dissolution, no title or right to possession and control of any of the Partnership's property, and no right to collect the rents therefrom, shall pass to any person who is not bound by the Regulatory Agreement in a manner satisfactory to the Coinsuring Lender and HUD.  The provisions of the Regulatory Agreement shall be controlling over any inconsistent provisions of this Agreement or other agreements among the Partners.  So long as the Coinsuring Lender and/or HUD or their successors and assigns have any interest in the Mortgage Loan or the Partnership property, this Agreement shall not be amended so as to alter or delete this Section 15.1 without the written consent of the Coinsuring Lender and HUD.

IN WITNESS WHEREOF, the parties have hereunto set their hands as of the day and year first above written.


ORIGINAL LIMITED PARTNER:
(WITHDRAWN)


William O. Brisben


GENERAL PARTNERS:


William O. Brisben


SPECIAL LIMITED PARTNER:

GRAY CONSTRUCTION CO., INC.

By: David F. Gray
     Chairman


W. O. BRISBEN COMPANIES, INC.

By: William O. Brisben,
    President


Robert E. Schuler


6593a

- 40 -

# EXHIBIT A TO AGREEMENT OF LIMITED PARTNERSHIP

## GENERAL PARTNERS

| Names of Partner | Partnership Admission Date | Class | Interest |
|---|---|---|---|
| William O. Brisben | 9/18/89 | General | 5.0% |
| W.O. Brisben Companies, Inc. | 9/18/89 | General | 0.1% |
| Robert E. Schuler | 6/29/90 | General | 4.9% |

Aggregate Cash Contribution:    $100 Cash

## LIMITED PARTNERS

| Name | Admission Date | Class | Interest |
|---|---|---|---|
| Gray Construction Co., Inc. | 9/18/89 Contribution: $50 Cash | Special Limited | 0.01% * |
| Brisben Family Trust | 9/18/89 Contribution $500 Cash | Limited | 10% |
| William O. Brisben | 9/18/89 Contribution $100 Cash | Limited | 30% |
| Oakland Park (Florida) Limited Partnership | 6/29/90 $1,852,000 | Investor Limited | 50% |

\* Included in William O. Brisben's 5.0% General Partner Interest

6593a/35

– 41 –

## LIMITED PARTNER SIGNATURE PAGE

The undersigned, desiring to become a Limited Partner of Oakland Lakes, Ltd. (the "Partnership"), hereby agrees to all of the terms of the Agreement of Limited Partnership of the Partnership (the "Agreement") and agrees to be bound by all of the terms and provisions thereof. The undersigned further constitutes and appoints the General Partners of the Partnership, jointly and severally, with full power of substitution, its true and lawful attorney for it in accordance with Article 14 of the Agreement. The power of attorney hereby granted shall be deemed to be coupled with an interest and shall be irrevocable. The place of residence or business address of the undersigned is as shown below. This power of attorney shall not be affected by any disability of the party granting it.

Executed, acknowledged and sworn to by the undersigned.

Limited Partner:

BRISBEN FAMILY TRUST

(To be completed by a General Partner)

By: _____, Trustee
(Signature of Limited Partner)

Capital Contribution
$ _____

_____
(Name of Limited Partner-Please Print)

_____
(Address)

_____
(City          State     Zip Code)

_____
(Taxpayer Identification or Social Security Number)

- 42 -

STATE OF _Ohio_ )
                       )ss:
COUNTY OF _Hamilton_ )

On this _5th_ day of _July_ , 1990, before me,
the undersigned notary, personally appeared the Brisben Family
Trust, by _W.S.O. Brisben_ , Trustee, known to me to be
the person whose name is subscribed to the within instrument,
and who subscribed and swore to such instrument and
acknowledged that he executed the same as his free and
voluntary act and deed, individually and as such trustee.

_Karen L. Graham (Harris)_
Notary Public
KAREN L HARRIS
Notary Public, State of Ohio
My Commission Expires Nov. 13, 1991

My commission expires _____


Accepted:

_[signature]_
General Partner


## LIMITED PARTNER SIGNATURE PAGE


The undersigned, desiring to become the Investor Limited
Partner of Oakland Lakes, Ltd. (the "Partnership"), hereby
agrees to all of the terms of the Agreement of Limited
Partnership of the Partnership (the "Agreement") and agrees to
be bound by all of the terms and provisions thereof.  The
undersigned further constitutes and appoints the General
Partners of the Partnership, jointly and severally, with full
power of substitution, its true and lawful attorney for it in
accordance with Article 14 of the Agreement.  The power of
attorney hereby granted shall be deemed to be coupled with an
interest and shall be irrevocable.  The place of residence or
business address of the undersigned is as shown below.  This
power of attorney shall not be affected by any disability of
the party granting it.

- 43 -

Executed, acknowledged and sworn to by the undersigned.

Limited Partner:

OAKLAND PARK (FLORIDA) LIMITED PARTNERSHIP
By:  Oakland Park (Florida) General Partner
     Ltd., an Ontario Corporation

(To be completed by          By: _____
a General Partner)           (Signature of Officer)


Capital Contribution         OAKLAND PARK (FLORIDA) LIMITED PARTNERSHIP
$ 1,852,000                  (Name of Limited Partner-Please
                              Print)


                             #500, 330 University Avenue_____
                             (Address)


                             Toronto, Ontario          M5G 1S1___
                             (City          State     Zip Code)


                             _____
                             (Taxpayer Identification or
                              Social Security Number)


Province  OF  Ontario___  )
                          )ss:
 City___  OF  Toronto___  )

     On this _29th day of June, 1990, before me, the undersigned
notary, personally appeared the Oakland Park (Florida) Limited
Partnership, an Ontario limited partnership, by Oakland Park
(Florida) General Partner Ltd., an Ontario corporation,
by _Peter Simmie_____, its ___President_____
known to me to be the person whose name is subscribed to the


- 44 -

within instrument, and who subscribed and swore to such instrument and acknowledged that he executed the same as his free and voluntary act and deed, individually and as such officer on behalf of said corporation and said limited partnership.

_____
Notary Public

My commission expires  N/A

Accepted:

_____
General Partner

6593a/0772o

− 45 −

## LIMITED PARTNER SIGNATURE PAGE

The undersigned, desiring to become the Investor Limited Partner of Oakland Lakes, Ltd. (the "Partnership"), hereby agrees to all of the terms of the Agreement of Limited Partnership of the Partnership (the "Agreement") and agrees to be bound by all of the terms and provisions thereof. The undersigned further constitutes and appoints the General Partners of the Partnership, jointly and severally, with full power of substitution, his true and lawful attorney for him in accordance with Article 14 of the Agreement. The power of attorney hereby granted shall be deemed to be coupled with an interest and shall be irrevocable. The place of residence or business address of the undersigned is as shown below. This power of attorney shall not be affected by any disability of the party granting it.

Executed, acknowledged and sworn to by the undersigned.

Limited Partner:

(To be completed by
a General Partner)

_____
(Signature of Limited Partner)

Capital Contribution
$_____100.00_____

William O. Brisben
(Name of Limited Partner-Please
Print)

Suite 300, Ashwood Drive
(Address)

Cincinnati          OH          45241
(City          State     Zip Code)

_____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_____
(Taxpayer Identification or
Social Security Number)

STATE OF OHIO  -  )
                  )ss:
COUNTY OF HAMILTON)

On this 5th day of ~~June~~ July, 1990, before me, the undersigned notary, personally appeared the known to me to be the person whose name is subscribed to the within instrument, and who subscribed and swore to such instrument and acknowledged that he executed the same as his free and voluntary act and deed.

_____
Notary Public

KAREN L. HARRIS
Notary Public, State of Ohio
My Commission Expires Nov. 13, 1991

My commission expires _____

Accepted:

W.O. Brisben Companies, Inc.,
General Partner

By: _____
    President

6593a/0772o

- 47 -

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

PROJECT NAME:  **LAKES OF CASABLANCA**

PROJECT NO:  **066-94026**          EFFECTIVE DATE:  **February 1, 1995**

LOCATION:  **Oakland Park, FL** EXPIRATION DATE:  **January 1, 2001**

# PROVISIONAL WORKOUT ARRANGEMENT

The undersigned mortgagor hereby expressly acknowledges that the Mortgage and Note secured by the above project is in default.  To afford an opportunity to effect reinstatement, the Secretary, Department of Housing and Urban Development, will hold the defaulted Note and Mortgage on the subject project under the terms and conditions stated herein.  Failure of the property to perform as projected will not excuse performance of any clauses in this Arrangement.  The written terms of the workout are complete and there are no oral side agreements or verbal understandings which might affect the workout at some future date.

1.  Possession.  The mortgagor acknowledges that the default entitles HUD to assume possession of the encumbered premises, but that possession has not been demanded.  As an inducement for HUD approval of this Arrangement, the mortgagor agrees that it will not oppose or interfere in any way should HUD demand possession by reason of subsequent default under the terms of this arrangement.

2.  Junior Obligations.  The mortgagor agrees that project revenues will not be used to repay either interest or principal for any project obligations, other than reasonable and necessary operating expenses, that are junior to the Secretary's lien.

3.  Payment Provision.  All payments will be made to the lock box and copies of each check will be sent to the Field Office in Jacksonville, Florida.  The mortgagor agrees to make monthly payments in a timely manner until this Arrangement is accepted by all parties.  Unless otherwise identified, at HUD's option, these remittances will be applied in the sequence illustrated on form HUD-2771, Statement of Multifamily Mortgage Account. The source of the amounts used in this Arrangement is form HUD-2771, Statement Of Multifamily Mortgage Account, payment due date 08/01/94.  If the amounts on form HUD-2771 change, the mortgagor will pay the new amount billed monthly, with the exception that only the required percent of interest, as identified below, will be paid.

EXHIBIT

D

a.1. For the two (2) year period beginning February 1, 1995, and continuing through January 31, 1997, the mortgagor will remit by the first of each month $166,368.09, which consists of Service Charges of $9,405.90, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 70 percent of interest, which is $109,598.00.

a.2. Beginning February 1, 1997, and continuing through January 31, 1998, the mortgagor will remit by the first of each month $182,024.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 80 percent of interest, which is $125,255.00.

a.3. Beginning February 1, 1998, and continuing through January 31, 1999, the mortgagor will remit by the first of each month $197,680.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 90 percent of interest, which is $140,911.00.

a.4. Beginning February 1, 1999, and continuing through January 31, 2000, the mortgagor will remit by the first of each month $213,337.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 100 percent of interest, which is $156,568.00.

a.5. Beginning February 1, 2000, and continuing through January 31, 2001, the mortgagor will remit by the first of each month $228,994.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 110 percent of interest, which is $172,225.00.

b.    Failure to remit net cash is cause for HUD to proceed with foreclosure. Net cash in excess of $25,000 remaining in the property accounts each month after payment of necessary and reasonable project operating expenses, and payment of the minimum monthly payment as noted in paragraphs 3(a)(1) through 3(a)(5) above, will be remitted to HUD within 15 days. At HUD's option, these funds may first be applied against delinquent Other (Late) Charges and then against other accrued delinquencies in the payment sequence outlined as "Account Items" of form HUD-2771.

c.    At no time will the owner permit any delinquency to accrue in either the service charge due HUD or the tax escrow as billed by HUD each month.

d. A four percent late charge will be assessed against payments not received by the fifteenth of the month. In addition to the above payments, the owner will remit $2,000.00 monthly until Other Charges have been eliminated. Future Late Charges will be paid monthly as incurred. Any Late Charges not resolved upon completion of this Arrangement will be paid in full prior to Mortgage Modification.

4. <u>Lump Sum Payments</u>. The owner will not remit any additional funds as a lump sum payment to meet equity capital requirements.

5. <u>Balance Sheet Reclassification</u>. Owner agrees to reclassify $580,900 listed as Accounts Payable General Partner on the Balance Sheet to Equity. Owner certifies these funds were advanced to fund operating shortages since final endorsement and were used for necessary and reasonable operating expenses. These funds may only be recovered after successful completion of this Arrangement and may only be taken from Surplus Cash as that term is defined by the Regulatory Agreement. These funds do not represent a lien on the property.

6. <u>Mortgage Modification</u>.

a. If the mortgagor has fully complied with the terms of this Arrangement and HUD has determined that it is financially feasible, as of <u>February 1, 2001</u>, HUD agrees to recast any delinquent principal and interest equal to or less than ten <u>(10)</u> percent of the original mortgage amount at the current mortgage interest rate of <u>8.25</u> percent, amortized over the remaining term of the mortgage, but not less than <u>180</u> months. The amount of delinquent interest and principal <u>together</u> cannot exceed ten percent of the original mortgage amount.

b. The mortgagor agrees to modify the Note and Mortgage to insert a call provision. The call provision gives the mortgagee the option to declare the entire indebtedness due and payable at or after ten (10) years from the date of the modification.

c. In the event the mortgage and note is considered for modification, the property must demonstrate that net operating income can support the increased debt service. If it cannot, the mortgagor agrees to fund the amount necessary to buy down the mortgage to an amount supportable by net operating income.

d.    If, at the time of recast, a delinquency in excess of the 10 percent HUD allowance remains, the owner will make a lump sum payment to fund the deficit.

7.    Equity Kicker.    If, at any time, Maker sells, assigns, transfers, converts or conveys the Property (collectively a "Sale") or, if Maker refinances the indebtedness secured by the Property (a "Refinancing"), twenty five and one quarter (25.25) percent of the Gross Sale, Conversion or Refinancing Proceeds shall be paid by Maker to Mortgagee or its successors and assigns at the closing of the Sale or Refinancing (the "Sale or Refinancing Obligation").    If none of the above circumstances occur and the Mortgagor pays the note in full through normal amortization, twenty five and one quarter (25.25) percent of the mutually agreed upon appraised value or twenty five and one quarter (25.25) percent of the original mortgage value, whichever is greater, shall be paid by Maker to Mortgagee or its successors and assigns on the date of Mortgage Satisfaction.

"Proceeds" are defined as the amount needed to payoff or refinance the note securing the real estate plus any equity "pulled", minus the mortgage balance and minus reasonable closing costs. Gross Sale, Conversion or Refinancing Proceeds shall also mean consideration of any kind directly or indirectly received by Maker, or its principals, in connection with a Sale, Conversion or Refinancing.

The obligation set forth above shall be effective until one of the stated conditions has been fulfilled and shall apply to the first Sale, Conversion, Mortgage Satisfaction or Refinancing, after the date of this Arrangement, which Mortgagee determines is an arms-length transaction for full value.  No Sale or Refinancing shall occur unless Mortgagee consents in writing. Maker must certify (subject to 18 U.S.C. 1001) to Mortgagee that the Sale, Conversion or Refinancing is not an identity of interest transaction.

8.    Repairs. Past delinquency in the Reserve for Replacement is hereby forgiven. The physical property will be maintained in accordance with the requirements of the Regulatory Agreement. All disbursements from the RFR Account will be approved by the Jacksonville Field Office in accordance with the Regulatory Agreement.  The mortgagor agrees to monthly escrow $6,560.84 to the Reserve For Replacement account and acknowledges this amount may be increased at any time during this Arrangement if the Field Office determines an increase is necessary to maintain the property in a manner acceptable to HUD. Separate remittance checks must be written monthly, clearly identifying the payment to assure proper application by HUD. These checks will be submitted in addition to the minimum mortgage payment.

9. <u>Accounting Reports</u>. During the term of this Arrangement, the mortgagor will submit monthly Reports for Establishing Net Income (Forms HUD-93479, 93480, and 93481). The reports will be mailed to the HUD Office in Jacksonville, Florida.

10. <u>Distributions</u>. The mortgagor agrees not to take any distributions while the mortgage is being held in default under the terms of this Arrangement and of the original Note, Mortgage and Regulatory Agreement.

11. <u>Cancellation Clause</u>. This Arrangement is on a month-to-month basis. The Secretary agrees to take no action because of the existing monetary default, provided the mortgagor remits the required minimum monthly payment and satisfactorily performs the other requirements of this Arrangement. Failure of the mortgagor to meet the terms of this Arrangement will be sufficient cause for the Secretary to immediately terminate this Arrangement and to commence foreclosure action. Failure of the mortgagor to meet the terms of the Arrangement is also grounds for the Department to consider taking administrative sanctions against the mortgagor including, but not limited to, suspension or debarment from participation in HUD programs.

12. <u>Criminal Sanctions for Misuse of Project Funds</u>. The mortgagor acknowledges that the use of project funds derived from the project covered by this Arrangement for any purpose other than to meet actual and necessary project expenses may be a criminal offense punishable by a fine of not more than $5,000 and imprisonment of not more than three (3) years or both.

DATE APPROVED: December 22, 1994
                Oakland Lakes, Ltd.

MORTGAGOR SIGNATURE:

MORTGAGOR TITLE: William O. Brisben
                 General Partner

<u>ASSISTANT SECRETARY FOR HOUSING-FEDERAL HOUSING COMMISSIONER</u>:

BY: Ferdinand R. Juluke Jr.

TITLE: Ferdinand R. Juluke, Jr., Director, Multifamily Division, 4HRS

DATE: Jan 5, 1995

95-198310    78003
05-11-95    02:48PM

PREPARED (IN CONSULTATION WITH
A MEMBER OF THE FLORIDA BAR) BY
AND AFTER RECORDING PLEASE RETURN TO:

Latham & Watkins
885 Third Avenue, Suite 1000
New York, New York 10022-4802
Attn: Joshua Stein, Esq.

Former FHA Project No.:    066-94026
Asset No.:    10026
Project Name:    LAKES OF CASABLANCA
County, State:    Broward, Florida

---

### ASSIGNMENT OF AMENDED AND RESTATED RENEWAL MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT AND OTHER COLLATERAL LOAN DOCUMENTS

---

The SECRETARY OF HOUSING AND URBAN DEVELOPMENT, solely in its capacity as mortgagee ("HUD"), pursuant to the terms of that certain Amended and Restated Loan Sale Agreement dated as of March 28, 1995 (the "Loan Sale Agreement") between HUD and Condor One, Inc., a Delaware corporation ("Assignee"), having a mailing address of c/o General Electric Capital Corporation, 292 Long Ridge Road, Stamford (Fairfield County), Connecticut 06927, Attention: Legal Operation, and in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by Assignee, hereby assigns, transfers, sets over and conveys to Assignee, its successors and assigns, the following, all as they may have been modified, consolidated, assigned, amended, restated, or supplemented (whether or not of record) through and including May 8, 1995.

That certain Amended and Restated Renewal Mortgage, Assignment of Rents and Security Agreement executed by Oakland Lakes, Ltd., a Florida limited partnership, for the benefit of Cincinnati Mortgage Corporation, an Ohio corporation, as Mortgagee, dated October 5, 1989, and recorded on October 5, 1989, at Book 16818, Page 609, in the Official Records of Broward County, Florida (the "Mortgage"), which Mortgage secures, that certain Amended and Restated Renewal Mortgage Note dated October 5, 1989, made by Oakland Lakes, Ltd., a Florida limited partnership, in favor of Cincinnati Mortgage Corporation, an Ohio corporation ("Note"), together with the indebtedness secured by said Mortgage and evidenced by said Note, and any right, title, and interest of HUD (if any) in and to the property described in said Mortgage; and

WILL CALL 23781
CHICAGO TITLE INSURANCE CO.

FL 52-66-94026  ASSIGNMENT 1 


EXHIBIT

- Such other documents, agreements, instruments, and other collateral (excluding the Regulatory Agreement referenced in the Mortgage) which evidence, secure or otherwise relate to HUD's right, title or interest in and to the Mortgage and/or the Note, including without limitation the Security Agreement, if any, and the title insurance policies and hazard insurance policies that may presently be in effect.

The Note was endorsed by HUD to Assignee without "FHA Mortgage Insurance" (as such term is defined in the Loan Sale Agreement).

IN WITNESS WHEREOF, HUD has caused this Assignment to be executed and delivered by its duly authorized agent as of May 8, 1995.

Witness:                                    SECRETARY OF HOUSING AND URBAN
                                            DEVELOPMENT


_____          By _____
                                            (Authorized Agent)
                                            William Richbourg

                              ACKNOWLEDGMENT

DISTRICT OF COLUMBIA           )
                               )
                               )

     BEFORE ME, Rita R Ross, a Notary Public in and for the jurisdiction aforesaid, on this 1st day of MAY, 1995. personally appeared William Richbourg, who is personally well known to me (or sufficiently proven) to be an authorized agent of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT and the person who executed the foregoing instrument by virtue of the authority vested in him/her and he/she did acknowledge the signing of the foregoing instrument to be his/her free and voluntary act and deed as the agent of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT, for and on behalf of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT for the uses, purposes and consideration therein set forth.

     Witness my hand and official seal, this 1st day of May, 1995.


_____
                                            Notary Public

RECORDED IN THE OFFICIAL RECORDS BOOK
OF BROWARD COUNTY, FLORIDA
COUNTY ADMINISTRATOR

                         Rita R. Ross
                 Notary Public, District of Columbia
                 My Commission Expires April 14, 1998

My Commission expires: _____


                              FL 52-66-94026  ASSIGNMENT 2

ICARD, MERRILL, CULLIS, TIMM,
FUREN & GINSBURG, P.A.
ATTORNEYS AND COUNSELLORS
2033 MAIN STREET, SUITE 600
SARASOTA, FLORIDA 34237
FACSIMILE (941) 366-6384
TELEPHONE (941) 366-8100

ROBERT E. MESSICK

TAMPA TELEPHONE
(813) 221-2100
——
REPLY TO:
P.O. BOX 4195
SARASOTA, FLORIDA 34230

April 29, 1999

VIA FAX TO (515) 489-2780,
CERTIFIED MAIL R/R/R,
AND REGULAR U.S. MAIL

Mr. William O. Brisben, individually and as
President of W.O. Brisben Companies, Inc.
7800 E. Kemper Road
Cincinnati, OH 45249

Re:    Oakland Lakes, Ltd., a Florida Limited Partnership

Dear Gentlemen:

The undersigned attorneys represent 813268 Ontario, Inc., an Ontario Corporation, being the newly appointed General Partner of Oakland Park (Florida) Limited Partnership, an Ontario Limited Partnership (the "Canadian Limited Partnership"). We would advise you that, pursuant to the enclosed Consent Order, 813268 Ontario, Inc., is the duly authorized General Partner of the Canadian Limited Partnership.

We have been requested by 813268 Ontario, Inc., as General partner of the Canadian Limited Partnership, to prepare and forward to you this correspondence which shall respond to your correspondence of April 13, 1999, to Mr. A. Peter Simmie at Nigel Stephens Counsel, Inc., Willowdale, Ontario, as well as your correspondence of April 20, 1999, to Mr. Peter Browning, Trinity Wood Capital Corporation, Toronto, Ontario. This will further respond to your follow up correspondence of April 23, 1999, to Mr. Browning and to the Canadian counsel of the General Partner, Mark L. Goodman of Solmon, Rothbart, Goodman, Toronto, Ontario.

It is the position of the Canadian Limited Partnership that the General Partner of the Florida Limited Partnership, Oakland Lakes, Ltd., is not authorized, pursuant to the terms and provisions of the Second Amended and Restated Agreement of Limited Partnership of Oakland Lakes, Ltd., to enter into or to consummate any negotiations, as contemplated by the above-specified correspondence. As stated by Mr. Browning in his correspondence of April 22, 1999, the Limited Partnership Agreement of the Florida Limited Partnership clearly does not authorize or permit the cash call requirements as set forth in your request. This correspondence constitutes a written direction on behalf of the Canadian Limited Partnership to you as the General Partner of the Florida Partnership that you are specifically <u>not</u> authorized to enter into any further negotiations and/or agreements of any nature with AMRESCO Capital or any other takeout lender.

We have had the opportunity to review with our client the terms and provisions of the provisional workout arrangements which were apparently executed by you as General Partner of the Florida Partnership dated February 1, 1995, with the Department of Housing and Urban Development/Condor/GE. We would



EXHIBIT
F

Mr. William O. Brisben, individually and as
President of W.O. Brisben Companies, Inc.
April 29, 1999
Page 2

further advise you that it is the position of the Canadian Limited Partner that that agreement and all related agreements were executed by you without authority and without the required consent of the Canadian Limited Partnership under the terms and provisions of the Second Amended and Restated Agreement of Limited Partnership of Oakland Lakes, Ltd.

On behalf of the Canadian Limited Partnership, we are requesting that a meeting be scheduled at your earliest possible convenience to review and to discuss with you the matters detailed in your correspondence referenced hereinabove, and to address the serious concerns of the Canadian Limited Partnership with respect to Oakland Park, the Florida Partnership, as noted hereinabove. Additionally, we would advise you of the election of the Canadian Limited Partnership to complete a comprehensive review and audit of all books, records, and operations of the Florida Limited Partnership at the earliest possible date and time. We would hope that the General Partner will fully and timely cooperate with each and all of these requests and demands of the Canadian Partnership. We await your prompt response in that regard.

Finally, this correspondence shall constitute written notice of the Canadian Limited Partnership's election to exercise its right to offer to purchase the 50% interest of the "Development Group" (as that term is defined in Subparagraph (n), Defined Terms, of the Second Amended and Restated Agreement of Limited Partnership of Oakland Lakes, Ltd.) for the price of $100.00. The purchase terms are cash payment in full at closing, with closing to be effective within 10 days of the date of receipt of this correspondence; excepting, specifically, the election of the Development Group to exercise its option to purchase the interests of the "Investor Limited Partner" (as that term is defined in the Second Amended and Restated Agreement of Limited Partnership of Oakland Lakes, Ltd.); any offer of the Development Group to purchase the interests of the Investment Limited Partner must be in compliance with Article 6, Section 6.9(c). Specifically, the offer to purchase the interests of the Investment Limited Partner must be for a price not less than aggregate of the Contributed Equity, any option L.P. Deficiency Loan (including accrued interest through the date of such purchase and closing), any outstanding Preferred Return (including accrued interest through the date of closing), and any outstanding Cumulative Priority Return.

Please review and provide the response of the Development Group to this offer of purchase made and exercised on this date by the Canadian Limited Partnership at your earliest possible convenience.

Very truly yours,

ICARD, MERRILL, CULLIS, TIMM,
FUREN & GINSBURG, P.A.

Robert E. Messick
For the Firm

# REGULATORY AGREEMENT FOR MULTIFAMILY HOUSING PROJECTS
## COINSURED BY HUD

Project Name:  **LAKES OF CASABLANCA**   Project No.: 066-36650
              (the "Project")

Mortgagee:    **CINCINNATI MORTGAGE**  PM
              **CORPORATION**

Mortgage Note: $22,779,600.00        Dated: October  _5_ , 1989

Mortgage Recorded:                    Dated: October  _5_ , 1989

- County:    Broward                 State: Florida
  ~~Book~~:   *Clerk's File No. 89399812*
              ~~Page~~:               Date: October  _5_ , 1989

    This Agreement entered into as of this _5th_ day of _October_ ,
1989, between Oakland Lakes, Ltd., a Florida limited partnership
(herein called "Owner") and the undersigned Mortgagee and the
Mortgagee's successors or designates (herein called "Mort-
gagee").   This Agreement and the Mortgage cover the real property
described in **Exhibit A** attached hereto and hereby incorporated
herein by references.

    In return for the endorsement by the Secretary of the United
States Department of Housing and Urban Development (the "Secre-
tary") for mortgage coinsurance of the Note identified above by
the Secretary and the Mortgagee and to comply with the require-
ments of the National Housing Act and the regulations and admin-
istrative requirements adopted by the Secretary pursuant thereto,
the Owner agrees to abide by the provisions of this Agreement.
This Agreement will continue so long as the contract of coinsur-
ance remains in force.   The Owner agrees that this Agreement
shall be binding on its successors, heirs or assigns.   Breach of
this Agreement may be a basis for denial of additional participa-
tion in the Secretary's and/or the Mortgagee's programs.   The
Owner's willingness and ability to prevent or cure violations of
this Agreement may have a bearing on the Secretary's and/or the
Mortgagee's review of any Owner request for additional participa-
tion in the Secretary's and/or the Mortgagee's programs.

A.  UNDERLINE DEFINITIONS

    1.   "Default" means any violation of this Agreement.

    2.   "Distribution" means the withdrawal of any cash or
asset of the Project excluding outlays for:

        a.  mortgage payments;


EXHIBIT

b. reasonable expenses necessary for the proper operation and maintenance of the Project; and

c. repayment of Owner advances authorized by HUD's administrative procedures.

3. "Identity-of-interest" means any relationship which would give the Owner or its Management Agent control or influence over the price paid to an individual or business supplying goods and/or services to the Project. An identity-of-interest is construed to exist when any of the situations listed below exist.

a. When (1) the Project Owner or Management Agent; or (2) any officer or director of the Project Owner or Management Agent; or (3) any person who directly or indirectly controls 10 percent or more of the voting rights or directly or indirectly owns 10 percent or more of the Project Owner or Management Agent; is also (1) the contractor, subcontractor or supplier or (2) an officer or director of the contractor, subcontractor or supplier; or (3) a person who directly or indirectly controls 10 percent or more of the contractor's, subcontractor's or supplier's voting rights or directly or indirectly owns 10 percent or more of the contractor, subcontractor or supplier.

b. When (1) the Project Owner; or (2) any officer or director of the Project Owner; or (3) any person who directly or indirectly controls 10 percent or more of the voting rights or directly or indirectly owns 10 percent or more of the Project Owner; is also (1) an officer or director of the Management Agent; or (2) a person who directly or indirectly controls 10 percent or more of the Management Agent's voting rights or directly or indirectly owns 10 percent or more of the Management Agent.

For purposes of this definition, the term "person" includes any individual, partnership, corporation, or other business entity. Any ownership, control or interest held or possessed by a person's spouse, parent, child, grandchild, brother or sister shall be attributed to such person.

4. "Mortgage" includes "Deed of Trust," "Uniform Commercial Code Security Instrument," and any other security for the note identified herein that is endorsed for mortgage coinsurance by the Secretary.

5. "Mortgaged Property" includes all real and personal property covered by the mortgage or mortgages securing the note endorsed for coinsurance by the Secretary.

6. "Mortgagee" means Cincinnati Mortgage Corporation.

-2-

7.  "Note" means the note which is secured by the Mortgage and which is endorsed for mortgage coinsurance by the Secretary.

8.  "Project" includes the mortgaged property and all of its assets.

9.  "Secretary" refers to the Secretary of the Department of Housing and Urban Development.

10.  "Surplus Cash" means any unrestricted cash remaining after:

    a.  the payment of:

        (1)  All sums due or currently required to be paid under the terms of any mortgage or note coinsured by the Secretary;

        (2)  All amounts required to be deposited in the Reserve for Replacements; and

        (3)  All obligations of the Project other than the coinsured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Mortgagee; and

    b.  the segregation and recording of:

        (1)  An amount equal to the aggregate of all special funds required to be maintained by the Project;

        (2)  An amount equal to the Project's total liability for tenant security deposits.

In computing Surplus Cash as defined above, the Mortgagor must follow the administrative requirements prescribed by the Secretary.

B.  **OBLIGATIONS OF OWNER**

The Owner agrees to do the following:

1.  Establish and maintain a Reserve for Replacements to cover the cost of major replacements which are not provided for in the Project's operating budget.

    a.  Owner agrees to make an initial deposit of $0 with the Mortgagee on the date that the insured Mortgage loan proceeds

---

*  Applies only to projects with 223(f) coninsured loans.

re disbursed.   Owner agrees to make monthly deposits to the
Reserve for Replacements in the amount of $4,968.58 commencing on
the date that amortization is scheduled to begin under the Note
and continuing each month thereafter, unless the Mortgagee estab-
lishes a different amount in accordance with the Secretary's
administrative requirements.   Owner agrees to make the Reserve
for Replacements deposits on the first day of each month.   The
amount of the monthly deposit may be increased or decreased from
time to time without amending this Agreement.

      b.   The Reserve for Replacements will be held by the
Mortgagee or by a safe and responsible depository designated by
the Mortgagee.   Such Reserve for Replacements shall at all times
remain under the control of the Mortgagee.

      c.   Owner acknowledges that, in order to prevent or
cure a default, the Mortgagee may, in accordance with the Secre-
tary's administrative procedures, use Reserve Funds to pay
amounts due under the Mortgage.   If the Mortgage debt is acceler-
ated pursuant to a default under the Mortgage, the Owner agrees
that the Mortgagee may apply the balance in such Reserve for
Replacements to the amount due on the mortgage debt, as acceler-
ated.

      d.   Owner agrees to analyze the adequacy of the Re-
_erve for Replacements when and as required by the Mortgagee.   If
the Mortgagee determines, in accordance with the administrative
requirements of the Secretary, that a higher monthly deposit is
needed to ensure the future adequacy of the Reserve for Replace-
ments, Owner agrees to increase the monthly deposit as directed
by the Mortgagee.

      e.   Owner agrees to direct the Mortgagee to invest the
Reserve for Replacements only in accordance with the administra-
tive requirements of the Secretary.   The Owner acknowledges that
the Mortgagee may charge a reasonable fee for placing and admin-
istering any such investments and Owner agrees to pay such fees
when Mortgagee bills the Owner for such fees.   All earnings
received from investments of the Reserve for Replacement shall
accrue to the benefit of the project.   At the option of the
Owner, such earnings may be deposited in either the Reserve for
Replacements or in the Project operating account.   Amounts earned
on investments are not a substitute for the regular monthly
deposits required by Paragraph B.1.a. of this Agreement.

    2.   a.   Request and implement rent increases only as
provided next to the boxes checked below.   (See instructions at
the end of this appendix and check appropriate box or boxes):

        (1)   /   X   /       Owner may adjust rents for all unsubsi-
                       dized    units    without    obtaining    the
                       lender's approval.

    (2)   /_____/    HUD (or the Public Housing Agency (PHA) Contract administrator in the case of projects assisted under the Section 8 Moderate Rehabilitation Program) will adjust rents for units receiving Section 8 assistance as provided in the HAP Contract and the Secretary's regulations and administrative procedures.

    (3)   /_____/    Owner must obtain the lender's written approval for any rent increase. Rents will be processed in accordance with the Secretary's regulations and administrative procedures, using the

        (a)   /_____/    Cost Approach (See Paragraph 7-5.a. of HUD Handbook 4566.1.)

        (b)   /_____/    Market Approach (See Paragraph 7-5.b. of HUD Handbook 4566.1.)

    b.   For units receiving Section 8 assistance, obtain the Secretary's written approval of charges for facilities and services of the project not included in rent.

    c.   For projects built exclusively for the elderly and handicapped, obtain the Lender s written approval of charges for facilities and services of the project not included in rent. Lender will review and approve such charges according to the Secretary's regulations and administrative procedures.

    d.   Not permit any part of the project to be rented for transient or hotel purposes. The term "rental" for transient or hotel purposes shall mean (1) rental for any period less than 30 days; or (2) any rental, if the occupants of the housing accommodations are provided customary hotel services, such as room service for food and beverages, maid service, furnishing and laundering of linens, and bellboy service.

    e.   Rent commercial facilities only in accordance with applicable regulations and other administrative requirements of the Secretary and upon such terms as approved by the Mortgagee.

    f.   If the Mortgagee has approved rents based on a cost approach, notify the Mortgagee when State or local government action causes a reduction in property taxes, utilities or other project expenses. If the Mortgagee determines that the reduction in those expenses is not offset by an increase in other expenses or by an increase in deposits to the Reserve for Re-

placements, the Owner agrees to reduce rents accordingly. The
Owner agrees to provide the Mortgagee sufficient information to
make the determination discussed in this paragraph. The Owner
agrees to reduce the rents within sixty days of the date of the
Mortgagee's directive to do so.

        g.  Obtain the Mortgagee's written approval before
leasing the Project or any part of it for other than individual
apartment units.

    3.  a.  Deposit all rents and other receipts of the Proj-
ect in the name of the Project in accounts which are fully in-
sured as to principal by an agency of the Federal government.
Project funds in excess of those needed to meet short-term Proj-
ect operating expenses may be invested in accordance with the
administrative requirements of the Secretary.

    b.  Use Project funds only to:

    (1) pay amounts required by the Mortgagee;

    (2) make required deposits to the Reserve for
Replacements;

    (3) pay reasonable expenses necessary to the
proper operation and maintenance of the Project;

    (4) pay distributions of Surplus Cash permitted
by Paragraph B.4.a. of this Agreement; and

    (5) repay Owner advances if such repayments are
authorized by the Secretary's administrative procedures and
approved by the Mortgagee.

Project funds may not be used to liquidate liabilities related to
the construction of the Project, other than the mortgage, unless
the Mortgagee authorizes such use.

    c.  Any Owner receiving funds of the Project other
than through distributions permitted by Paragraph B.4. of this
Agreement must immediately deposit such funds in the Project bank
account and failing so to do in violation of this Agreement shall
hold such funds in trust. Any Owner receiving property of the
project in violation of this Agreement shall immediately deliver
such property to the Project and failing so to do shall hold such
property in trust. At such time as the Owners shall have lost
control and/or possession of the Project, all funds held in trust
shall be delivered to the Mortgagee to the extent that the mort-
gage indebtedness has not been satisfied.

    d.  Deposit and maintain residents' security deposits
in a trust account separate and apart from all other funds of the
Project. This trust account must be held in the name of the

Project and the balance in the account must at all times equal or exceed the Project's liability for residents' security deposits. The Owner must comply with any state or local laws regarding investment of security deposits and distribution of any interest or other income earned thereon. Any earnings received from the investment of security deposits must accrue to the benefit of the Project or the Project residents.

4.  a:  Make, or receive and retain, distributions of cash or other assets of the Project only as authorized by this Agreement.

(1) Distributions may be paid only from Surplus Cash which existed as of the end of a semi-annual or annual fiscal period. The Owner must compute distributions in accordance with the Secretary's administrative requirements.

(2) The first fiscal period's distribution may not be paid until construction has been completed and any required cost certification has been received by the Mortgagee.

(3) Distributions may be paid only after the end of the fiscal period in which the Surplus Cash is generated.

(4) No distribution may be paid from borrowed funds, or when payments due under the Note, Mortgage or this Agreement have not been made.

(5) In the event that the Mortgagee determines that any of the conditions listed below apply, the Owner may distribute Surplus Cash only after obtaining the Mortgagee's written approval to do so.

(a) the Owner has not satisfactorily responded to any Mortgagee Management Review, Physical Inspection Report, annual financial statement correspondence or any other correspondence which requires corrective action and which was received at least 30 days prior to the end of the fiscal period for which the Surplus Cash computation is made;

(b) the Project has significant uncorrected physical deficiencies; or

(c) there is a default under this Agreement.

b.  Limit distributions in any one fiscal period to the amount specified below and calculate distributions in accordance with the administrative requirements of the Secretary.

(1) No distributions are permitted on projects owned by non-profit entities.

(2) On projects owned by limited distribution entities, distributions may not exceed the lesser of Surplus Cash available at the end of the fiscal period or the distributions earned and unpaid as of the end of the prior fiscal period. Distributions shall be earned annually at the rate of N/A% of the initial equity investment.

*If the project is subsidized by HUD, obtain this amount from applicable HUD regulations.

(3) On projects owned by profit-motivated entities not covered by paragraph B.4.b.(2), distributions may be paid up to the amount of Surplus Cash generated during the prior fiscal period.

5. a. Deposit the following amounts with the Mortgagee within sixty days after the end of each annual or semi-annual fiscal period in which Surplus Cash is generated. The funds deposited pursuant to this paragraph shall be referred to as Residual Receipts. The Residual Receipts shall at all times remain under the control of the Mortgagee, who shall have the power and authority to direct that the Residual Receipts, or any part thereof, be used for such purposes as it may determine, subject to the Secretary's administrative requirements.

(1) On projects owned by non-profit entities, all Surplus Cash.

(2) On projects owned by Limited Distribution entities, any Surplus Cash remaining after payment of distributions authorized by Paragraph B.4. of this Agreement.

(3) No deposit is required on projects owned by other profit-motivated entities.

b. Use Residual Receipts only for the purposes for which the Mortgagee authorizes their withdrawal.

c. Invest the Residual Receipts in accordance with the administrative requirements of the Secretary and the Mortgagee and add all earnings on such investments to the Residual Receipts Account. The Owner acknowledges that the Mortgagee may charge a reasonable fee for placing and administering any such investments and Owner agrees to pay such fees when due.

6. Maintain the Mortgaged Property in good repair and condition and promptly complete necessary repairs and maintenance as required by the Mortgagee.

7. a. Assure that all Project expenses are reasonable in amount and necessary to the operation of the Project.

b.    Comply with the Secretary's and Mortgagee's administrative requirements regarding payment and reasonableness of management fees and allocation of management costs between the management fee and the Project account.

c.    Not obligate the Project to pay for costs other than those reasonable and necessary to the operation and maintenance of the Project.

d.    Purchase goods and services from identity-of-interest individuals or companies only if the charges levied by those individuals or companies are not in excess of the costs that would be incurred in making arms-length purchases on the open market.

e.    Exert reasonable effort to take advantage of available discounts and credit the Project with all discounts, rebates or commissions received with respect to purchases, service contracts and other transactions made on behalf of the Project.

f.    Obtain contracts, materials, supplies and services, including the preparation of the annual audit, on terms most advantageous to the Project and at costs not in excess of amounts ordinarily paid for such contracts, materials, supplies and services in the area in which such services are rendered or supplies and materials furnished.

g.    Solicit oral or written cost estimates as necessary to assure compliance with the provisions of this paragraph and document the reasons for selecting other than the lowest estimate or bid. Maintain copies of such documentation and make such documentation available for inspection during normal business hours.

8.    Require any purchaser to assume all of the Owner's obligations under this Agreement.

9.    Comply with the Secretary's administrative procedures for Previous Participation Clearance and Transfers of Physical Assets.

10.    Obtain the Secretary's and the Mortgagee's written approval before engaging, except for natural persons, in any business or activity, including the operation of any other project, or incurring any liability or obligation not in connection with the Project.

11.    Obtain the Mortgagee's written approval before:

a.    Conveying, assigning, transferring, encumbering or disposing of any ownership interest in the Project or any beneficial interest in any trust or other entity holding title to the

Project or any legal interest in the Project including rents and security deposits.

       b.   Remodeling, adding to, reconstructing, or demolishing of any part of the Project.

       c.   Undertaking self-management, contracting for management services or paying, or incurring any obligation to pay, fees for management services.

       d.   Paying, or incurring any obligation to pay, compensation (including wages, supervisory fees or salaries) to themselves, or to any officers, directors, stockholders, trustees, partners, beneficiaries under any trust, or to any of their nominees.

       e.   Permitting the use of the dwelling accommodations for any purposes except the use which was originally intended, or permitting commercial use greater than that originally approved by the Mortgagee.

   12.   Resign or withdraw from the Project only after the Mortgagee has approved a substitute Owner.  Resignation or withdrawal from the Project prior to the Mortgagee approving a substitute Owner shall be considered abandonment and shall place such Owner in default under this Agreement.

   13.   Provide for management satisfactory to the Mortgagee and the Secretary; execute a written management agreement with any management agent; assure that all contracts and management agreements meet the Secretary's and Mortgagee's requirements; and deliver to the Mortgagee such information and certifications regarding Project management as the Secretary and the Mortgagee may require.

       a.   The Owner agrees to include in any management contract entered into on behalf of the Project a provision that the Mortgagee or HUD may terminate the contract for good cause and without penalty effective thirty days after the notice of the Mortgagee's or Secretary's desire to terminate is mailed or otherwise delivered to the contractor.  The Owner agrees to mail such notice within seven days of receipt of the Mortgagee's or Secretary's request to do so.  Owner also agrees to make immediate arrangements for providing new management satisfactory to the Mortgagee and the Secretary.

       b.   The Owner agrees that the following clause will be included in any contract entered into with any individual or business with whom the Owner or Management Agent has an identity f interest for the provision of goods or services to the Project: "Upon request of the Mortgagee or (Name of Owner or Management Agent), (name of Management Agent, Contractor or Supplier) will make available to the Mortgagee, at a reasonable time and

place, its records and records of identity-of-interest companies, which relate to goods and services charged to the project. Records and information will be sufficient to permit the Mortgagee to determine the services performed, the dates performed, the location, the time consumed in providing the service, the charges made for materials, and the per unit and total charges levied for said service." The Owner agrees to request such records within seven days of receipt of the Mortgagee's or HUD's request to do so.

14. Establish and maintain the books and accounts of the Mortgaged Property in accordance with the requirements of the Secretary and the Mortgagee. Such books and accounts shall be kept current and in such form as to permit a speedy and effective audit. Such books and accounts shall be maintained for such periods of time as may be prescribed by the Secretary and the Mortgagee.

15. Permit the Secretary, the Inspector General of HUD, the Comptroller General of the United States, the Mortgagee and their authorized agents to inspect the Project's property, equipment, buildings, plans, offices, apparatus, and devices, books, accounting records, contracts, documents and papers during reasonable business hours.

16. a. Within 60 days following the end of each fiscal year, furnish the Mortgagee with a financial report on the Project's operations unless the Mortgagee authorizes the Owner to submit the report on a later date. The Owner agrees that the report will be prepared, signed and certified in accordance with the requirements of the Secretary and the Mortgagee.

b. If the Owner fails to submit its annual financial report within sixty days of the due date or any other date as may be established in writing by the Mortgagee, the Owner agrees that the Mortgagee may retain a certified public accountant to prepare the report on behalf of the Owner and that the cost of such report will be a Project expense. The Mortgagee may do so only after giving the Owner thirty days' written notice of its intent to do so.

17. Upon request, the Owner shall furnish the Mortgagee with operating budgets, occupancy, accounting and other reports; properly certified copies of minutes of meetings of the directors, officers, stockholders, or beneficiaries of the mortgagor entity; and specific answers to questions raised from time to time by the Mortgagee relative to income, assets, liabilities, contracts, operations, actual cost of repairs and improvements, disposition of mortgage funds, conditions of the Project and the status of the Mortgage. The Owner shall furnish a response to the Mortgagee's management review reports, physical inspection reports and written inquiries regarding annual or monthly financial statements no later than 30 days after receipt of the Mortgagee's report or inquiries.

18. Notify the Mortgagee in writing within five days after instituting litigation seeking recovery, equitable relief, or defense to litigation, excluding litigation related to individual resident evictions. The Owner may use Project funds to pay for such litigation only if the Mortgagee authorizes, or a court directs, the Owner to do so.

19. a. Refrain from utilizing criteria or tenant selection practices that discriminate against any family because of the sex of the household head, or because there are children in the family, unless the Project was designed primarily for occupancy by the elderly.

b. Comply with the provisions of Title VIII of the Civil Rights Act of 1968, as amended, and any regulations or administrative procedures issued pursuant thereto. These laws and regulations prohibit discrimination in the rental or financing of housing on the basis of race, color, national origin, religion (creed), or sex. Owner agrees to administer the Project and related activities in a manner to further fair housing affirmatively. The Owner also agrees to comply with similar State and local fair housing laws and ordinances.

c. Comply with the provisions of Executive Order 11063 on Equal Opportunity in Housing and all regulations issued pursuant thereto. This order and related regulations prohibit discrimination on the basis of race, color, religion (creed), national origin, or sex in housing and related facilities provided through federal financial assistance.

d. Not discriminate on the basis of race, color, religion (creed), national origin, or sex against any employee or applicant for employment. Owner agrees to include a provision to this effect in any contract or subcontract executed for Project repairs and improvements, and to comply with the provisions of Executive Order 11246 and Title 41 CFR Chapter 60, when applicable to such contracts.

20. Issue shares of capital stock, beneficial certificates of interest, or partnership interests as applicable, only in a number and form approved by the Mortgagee.

21. Whether or not the Owner or the individuals comprising the ownership entity assume personal liability for payments due under the Note and Mortgage or for payments to the Reserve for Replacements, these individuals shall remain liable under this Agreement with respect to these matters:

a. For funds or property of the Project which come into their hands and which they are not entitled to retain; and

b.   For their own acts and deeds or acts and deeds of their authorized agents that are in violation of the provisions of this Agreement.

22.  Refrain from executing any document which contains provisions that contradict or oppose the provisions of this Agreement unless the Mortgagee approves such document.  If the Owner executes such a document without the prior written approval of the Mortgagee, this Agreement will be controlling as to the rights and obligations which it sets. forth.

23.  The invalidity of any clause, part or provisions of this Agreement shall not affect the validity of the remaining portions thereof.

C.   RIGHTS OF THE MORTGAGEE AND SECRETARY

1.   If the Owner violates any provisions of this Agreement, the Mortgagee or Secretary may send the Owner written notice of such violation by registered or certified mail.  If such violation is not corrected to the satisfaction of the Mortgagee or Secretary (whichever party issued the notice of violation) within 30 days after the date such notice is mailed or within such further time as the Mortgagee or Secretary, as applicable, establishes in writing, without further notice the Mortgagee or Secretary, as applicable, may initiate any of the following actions:

a.   With the prior written approval of the Secretary, declare the whole indebtedness due and thereupon proceed with foreclosure of the Mortgage.

b.   Collect all rents and other operating receipts of the Project and use such collections to pay the Owner's obligations under this Agreement and under the Note and Mortgage and the necessary expenses of maintaining and operating the Project.

c.   Take possession of the Project, bring any action necessary to enforce any rights of the Owner related to operation of the Project, and operate the Project in accordance with the terms of this Agreement until such time as it determines that the Owner is again in a position to operate the Project in accordance with the terms of this Agreement, the Note and the Mortgage.

d.   Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violations of this Agreement, for the appointment of a Receiver to take over and operate the Project in accordance with the terms of this Agreement, or for such other relief as may be appropriate, given the nature of the default and the damage resulting from the default.

e.   Assess the Owner for the cost of reasonable attorney, audit and other fees incurred in enforcing compliance with

this Agreement. The Owner agrees to pay such fees within 45 days of receipt of the Mortgagee's billing, or within such longer payment period as the Mortgagee approves.

2.    The damage to the Project as a result of Owner's breach of its duties and obligations under this Agreement shall include, but not be limited to, those amounts specified below. Any damages collected or recovered by the Mortgagee or the Secretary shall be payable to the Project account established under Paragraph B.3.a. above.

a.    In the case of unauthorized distributions of Project funds or Project assets, the damages shall be the amount of the unauthorized distributions plus interest from the date the distribution was made.

b.    In the case of failure to provide management satisfactory to the Mortgagee and the Secretary, the damage shall be the cost to the Project resulting from such failure.

c.    In the case of willful or negligent failures to maintain the Project in appropriate physical condition, the damage shall be the cost of the repairs required to return the Project to decent, safe, and sanitary condition.

d.    In the case of incurring costs significantly in excess of amounts ordinarily paid, the damage shall be such excess costs.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the date first herein above written.

WARNING:    18 U.S.C. 1001 provides, among other things, that whoever knowingly and willingly makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

12 U.S.C. 1715z-4 provides in part:    "Whoever, as an owner of a property which is security for a mortgage (covering multi-family housing, as defined in the regulations of the Secretary) or as a stockholder...beneficial owner...trust...or as an officer, director or agent of any such owner (1) willfully uses or authorizes the use of any part of the rents or other funds derived from the property covered by such mortgage in violation of a regulation...(2) willfully and knowingly uses or authorizes the use, while such mortgage is in default, of any part of the rents or expenses...shall be fined not more than $5,000 or imprisoned not more than three years or both."

WITNESS/ATTEST:

OAKLAND LAKES, LTD., a
Florida limited partnership

By: _____
William O. Brisben,
General Partner

CINCINNATI MORTGAGE CORPORATION

By: _____
Robert W. Jorden,
Executive Vice President

STATE OF OHIO        )
                     ) SS:
COUNTY OF HAMILTON   )

Before me, a Notary Public in and for said County, personally appeared William O. Brisben, who, as general partner of Oakland Lakes, Ltd., a Florida limited partnership, who acknowledged to me that he did sign the foregoing instrument in the name and on behalf of said partnership, and that the same is his free act and deed and the free act and deed of said partnership and that he was duly authorized to execute said instrument by the partnership.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my official seal this __2nd__ day of October, 1989.

_____
Notary Public

STATE OF OHIO        )
                     ) SS:
COUNTY OF HAMILTON   )

Before me, a Notary Public in and for said County, personally appeared Robert W. Jorden the person who, as Executive Vice President of CINCINNATI MORTGAGE CORPORATION, an Ohio corporation, acknowledged to me that he did sign the foregoing instrument in the name and on behalf of CINCINNATI MORTGAGE CORPORATION, and that the same is his free act and deed as such officer and the free act and deed of said corporation, and that he was duly authorized to execute said instrument on behalf of such corporation.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my official seal this ___2nd___ day of October, 1989.

Notary Public

This instrument prepared by:    STRAUSS & TROY
2100 Central Trust Center
201 East Fifth Street
Cincinnati, Ohio    45202
(513) 621-2120

CMC-9967

JENNIFER L. MUNCH
Notary Public, State of Ohio
My Commission Expires March 2, 1993