# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6147 CIV-LENARD/TURNOFF

813268 ONTARIO, INC., as General Partner
of OAKLAND PARK (FLORIDA) LIMITED
PARTNERSHIP, an Ontario limited
partnership; as limited partner of, and on
behalf of OAKLAND LAKES, LTD.,
a Florida Limited Partnership;

       Plaintiff,

vs.

OAKLAND LAKES, LTD., a Florida Limited
Partnership, WILLIAM O. BRISBEN,
W.O. BRISBEN COMPANIES, INC., and
ROBERT E. SCHULER, as General Partners
of OAKLAND LAKES, LTD., THE SECRETARY
OF HOUSING AND URBAN DEVELOPMENT,
and CONDOR ONE, INC., a Delaware Corporation,

       Defendants.
_____/

Case No. 00-7847 CIV-LENARD/TURNOFF
(Consolidated and Administratively Closed)

CONDOR ONE, INC., a Delaware Corporation,

       Plaintiff,

vs.

OAKLAND LAKES, LTD., a Florida Limited Partnership,

       Defendant.
_____/

## MOTION FOR SUMMARY JUDGMENT, STATEMENT OF UNCONTESTED FACTS AND SUPPORTING MEMORANDUM OF LAW BY CONDOR ONE, INC.

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

Condor One, Inc. ("Condor One"), plaintiff in consolidated (and administratively closed) Case No. 00-7847 CIV-LENARD/TURNOFF, by and through its undersigned counsel and pursuant to Fed.R.Civ.P. 56 and S.D. Fla. L.R. 7.5, files this motion for summary judgment on Counts I (foreclosure of mortgage) and III (action on promissory note) of the complaint originally filed by Condor One in Broward County Circuit Court. In support thereof, Condor One states that the pleadings, together with affidavits, show that there is no genuine issue as to any material fact and Condor One is entitled to summary judgment as a matter of law.

## PRELIMINARY STATEMENT

This is a mortgage foreclosure action which was filed by Plaintiff Condor One in state court and removed to federal court by Defendant Oakland Lakes, Ltd. ("Oakland Lakes"). Oakland Lakes, the owner of a residential apartment complex located in Fort Lauderdale, Florida, is the maker of a note and mortgage now held by Condor One. The complaint seeks foreclosure of the mortgage, an order of delivery of all rents, and judgment on the note.

Oakland Lakes has failed or refused to remit payments required under (i) the note from before February 1, 1995; or (ii) the month-to-month provisional workout arrangement from and after July 1, 2000. Since July 1, 2000, Oakland Lakes has collected substantial rents from the property and has failed or refused to apply them as required under the mortgage, note and/or provisional workout arrangement. Consequently, Condor One is entitled to foreclosure of the mortgage.

## PROCEDURAL BACKGROUND

1.      This consolidated action commenced on January 31, 2000, when 813268 Ontario, Inc. ("813268 Ontario") filed a complaint (the "Federal Declaratory Action") as the general partner of Oakland Park (Florida) Limited Partnership, one of the limited partners of Oakland Lakes, seeking

2

declaratory relief against, *inter alia*, Condor One and The Secretary of Housing and Urban Development ("HUD").

2.      On March 13, 2000, Condor One filed its answer to the 813268 Complaint, and, on May 5, 2000, this Court entered its pretrial order scheduling pretrial deadlines and the trial in January 2002.

3.      On August 24, 2000, Condor One filed its complaint (the "Condor One Complaint") in the Circuit Court for the 17th Judicial Circuit, in and for Broward County, Florida, Case No. 00-014108 (18) (the "State Court Foreclosure Proceeding"), seeking (i) foreclosure of the mortgage; (ii) delivery of all rents, income, issues, profits and security deposits that have been, and continue to be, generated by the property; and (iii) a judgment on the note.  A copy of the Condor One Complaint is attached hereto as Exhibit A.

4.      On August 24, 2000, Condor One also filed its Emergency Motion to Appoint Receiver and for Turnover of Rents Pursuant to Florida Statutes § 697.07 (the "Motion to Appoint Receiver and Turnover of Rents").  A hearing on that motion was scheduled on an emergency basis for August 31, 2000, at 8:45 a.m.

5.      On August 31, 2000, the day of the emergency hearing, Oakland Lakes filed a petition for relief under chapter 11 of the Bankruptcy Code, which automatically stayed Condor One's prosecution of the State Court Foreclosure Proceeding and the Motion to Appoint Receiver and for Turnover of Rents.

6.      On September 14, 2000, Condor One filed a motion in Oakland Lakes' bankruptcy proceeding to dismiss Oakland Lakes bankruptcy petition for bad faith and to grant relief from the automatic stay (the "Motion to Dismiss Bankruptcy Case").

3

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

7.    On October 25 and November 2, 2000, the Bankruptcy Court conducted an evidentiary hearing on the Motion to Dismiss Bankruptcy Case.

8.    On November 1, 2000, 813268 filed its amended complaint (the "813268 Complaint"), adding a claim for money damages. A copy of the 813268 Complaint is attached hereto as Exhibit B.

9.    On December 11, 2000, the Bankruptcy Court entered its Memorandum Opinion Dismissing Case as Bad Faith Filing and Granting Relief from Stay (the "Order Dismissing Bankruptcy Case"), dismissing Oakland Lakes' bankruptcy case as having been filed in bad faith and granting Condor One immediate and complete relief from the automatic stay. A copy of the Order Dismissing Bankruptcy Case is attached hereto as Exhibit C.

10.    Immediately thereafter, Condor One filed a Supplement to its Emergency Motion to Appoint Receiver and for Turnover of Rents in the State Court Foreclosure Proceeding, updating the state court on the events in Oakland Lakes' bankruptcy case, and noticed its Motion to Appoint Receiver and for Turnover of Rents as supplemented for hearing on December 19, 2000.

11.    On December 18, 2000, the day before the hearing, Oakland Lakes, in an apparent effort to delay and avoid a hearing on the supplemented Motion to Appoint Receiver and for Turnover of Rents, filed a Notice of Removal removing the State Court Foreclosure Proceeding to the United States District Court for the Southern District of Florida based upon a purported federal question.

12.    The removed case was assigned to Judge Aldaberto Jordan and, on December 21, 2000, Condor One filed its Emergency Motion For Sequestration Of Rents Pursuant To Florida Statutes § 697.07 (the "Motion to Sequester Rents").

4

13.    On December 22, 2000, Judge Jordan, after consideration of Motion to Sequester Rents and Oakland Lakes' response thereto, entered the Order Granting Motion To Sequester Rents, requiring Oakland Lakes to deposit all rents received in excess of necessary operating expenses into a segregated trust account. A copy of the Order Granting Motion to Sequester Rents is attached hereto as Exhibit D.

14.    On December 26, 2000, Oakland Lakes filed its answer to the Condor One Complaint (the "Answer to Condor One Complaint"). A copy of the Answer to Condor One Complaint is attached hereto as Exhibit E.

15.    On January 3, 2001, to moot the need for a further hearing scheduled on the Motion to Sequester Rents, the parties consented, and Judge Jordan entered, the Agreed Order Extending Order Granting Motion to Sequester Rents, extending the relief previously granted until modified by further order.

16.    Thereafter, the removed State Court Foreclosure Proceeding was consolidated with 813268 Ontario, Inc. v. Oakland Lakes, Ltd., Case No. 00-6147 CIV-LENARD/TURNOFF, and administratively closed.

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## THERE IS NO GENUINE ISSUE TO BE TRIED

17.    Oakland Lakes is the owner of the Sailboat Pointe Apartments, f/k/a the Lakes of Casablanca apartment project, located at 2325 N.W. 33rd Street, Fort Lauderdale, Florida ("the Property"). *See* Exhibit B, 813268 Ontario Complaint at ¶ 7.

18.    The Property is encumbered by a mortgage dated October 5, 1989 (the "Mortgage") which secures repayment of a promissory note of even date (the "Note") in the original principal amount of $22,779,600, each executed by Oakland Lakes in favor of Cincinnati Mortgage

5

Corporation. *See* Exhibit B, 813268 Ontario Complaint at ¶ 15. A copy of each of the Mortgage and Note are attached hereto as Exhibit F and G respectively.

19.    Cincinnati Mortgage Corporation defaulted under a guarantee agreement with the Government National Mortgage Association ("GNMA") in November 1990, and the Mortgage and Note were assigned to GNMA and ultimately assigned to The Secretary of Housing and Urban Development ("HUD"). *See* Exhibit B, 813268 Ontario Complaint at ¶¶ 11-23.

20.    The Mortgage, in section 7.01, expressly provides that the Mortgage or Note may be sold or assigned and that the mortgagor, Oakland Lakes, consents to any such sale or assignment.

> . . . Mortgagee may sell, assign, transfer, convey, pledge or encumber the Note or all or any part of its interest, rights and obligations thereunder or under this Mortgage to one or more persons or parties, and Mortgagor hereby consents to any such sale, assignment, transfer, conveyance, pledge or encumbrance and agrees upon the request of Mortgagee or its assignee to execute and deliver promptly any instrument conforming Mortgagor's consent as effectuating, as necessary, such sale, assignment, transfer, conveyance, pledge or encumbrance.

*See* Exhibit F, Mortgage at §7.01.

21.    Neither the Mortgage nor Note require mortgagee to provide notice to Oakland Lakes of a default in the payment of any installation due thereunder. *See* Exhibit F, Mortgage at §§6.01 and 6.02; Exhibit G, Note at p. 4.

22.    Prior to January 1992 when HUD became the owner of the Mortgage and Note, Oakland Lakes defaulted on the Mortgage and Note. *See* Exhibit B, 813268 Ontario Complaint at ¶ 24.

23.    As an alternative to its right to accelerate and demand payment of the balance of all sums due and payable under the Note and Mortgage, HUD elected to enter into a Provisional Workout Arrangement ("PWA") with Oakland Lakes. *See* Exhibit B, 813268 Ontario Complaint

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

at ¶ 25. A copy of the PWA is attached hereto as Exhibit H.

24.    Effective February 1, 1995, HUD and William O. Brisben ("Brisben"),[1] as the then general partner of Oakland Lakes, executed the PWA. *See* Exhibit B, 813268 Ontario Complaint at ¶ 26; Exhibit H, PWA.

25.    The PWA commenced on February 1, 1995 and expired on January 31, 2001. *See* Exhibit H, PWA.

26.    The PWA is a month-to-month forbearance arrangement, under which HUD agreed to take no action on the defaulted Note provided Oakland Lakes made specified monthly payments and performed other requirements thereunder. *See* Exhibit C, Order Dismissing Bankruptcy Case at pp. 3-4; Exhibit H, PWA. "The PWA did not amend or modify the Note or Mortgage; rather, it specifically set forth that failure to remit payment would be cause for the holder to proceed with foreclosure." *See* Exhibit C, Order Dismissing Bankruptcy Case at p. 4; Exhibit H, PWA.

27.    The limited partners of Oakland Lakes "received an executed copy of the PWA within months of its execution." *See* Exhibit C, Order Dismissing Bankruptcy Case at p. 4; Exhibit H, PWA. "In addition, the fact of [Oakland Lakes'] default under the [Mortgage and Note] was continuously reported by the [Oakland Lakes'] certified public accountant in [Oakland Lakes'] annual audited financial statements which were furnished to [Oakland Lakes' limited partners] and to Condor One." *See* Exhibit C, Order Dismissing Bankruptcy Case at p. 4; Exhibit H, PWA.

28.    The PWA explicitly contemplates the assignment by the mortgagee where it directs that certain payments "shall be paid by Maker [Oakland Lakes] to Mortgagee [HUD] or its

_____

[1] Originally a defendant to the 813268 Complaint who has since been voluntarily dismissed from the lead case.

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

successors and assigns [Condor One] on the date Mortgage Satisfaction. *See* Exhibit H, PWA at ¶ 7.

29.     On May 8, 1995, HUD assigned of all of its rights under the Mortgage and Note and other collateral loan documents to Condor One ("Assignment of Mortgage"). *See* Exhibit B, 813268 Ontario Complaint at ¶ 29. A copy of the Assignment of Mortgage is attached hereto as Exhibit I.

30.     The Assignment of Mortgage was recorded on May 11, 1995 in Broward County. *See* Exhibit C, Order Dismissing Bankruptcy Case at p. 4; Exhibit I, Assignment of Mortgage.

31.     Oakland Lakes performed under the terms of the PWA for five years, until late June 2000. *See* Exhibit C, Order Dismissing Bankruptcy Case at p. 4; Exhibit H, PWA.

32.     In late June 2000, control of Oakland Lakes changed from Brisben controlled entities to entities controlled by the limited partner of Oakland Lakes who caused the 813268 Complaint to be filed. *See* Exhibit B, 813268 Complaint at ¶¶ 36-37; Exhibit C, Order Dismissing Bankruptcy Case at p. 6.

33.     From and after that change in control, Oakland Lakes made no payments to Condor One. *See* Exhibit C, Order Dismissing Bankruptcy Case at p. 6; Exhibit K, Affidavit of Doug Goldrick.

34.     The PWA does not require the mortgagee to provide notice of a payment default; rather, a payment default results in a cessation of the mortgagee's consensual forbearance from foreclosure. *See* Exhibit H, PWA.

35.     Nevertheless, on July 14, 2000, Condor One served Oakland Lakes with a demand letter reciting Oakland Lakes' default and accelerating all amounts due under the Note and Mortgage (the "Demand Letter"), which demand was renewed in the Condor One Complaint. A copy of the

8

Demand letter is attached hereto as Exhibit J.

36.    As of February 1, 2001, the total debt due under the Note, including accrued interest, was $26,397,303.56, which amount continues to increase at the rate of $5,218.93 per diem.[2] *See* Exhibit K, Affidavit of Doug Goldrick.

## MEMORANDUM OF LAW AND CITATION OF AUTHORITY

Condor One submits the following memorandum of law and citation of authorities in support of its motion for summary judgment.

### I. Jurisdiction on Motion for Summary Judgment

No dispute as to any material fact exists, and judgment should be entered in favor of Condor One as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548 (1986).

### II. Summary Judgment Should Be Entered in Favor of Condor One on Foreclosure of Mortgage, Turnover of Rents and Acceleration of Note

Under the terms of a note and mortgage, the obligation of a mortgagor to pay and the right of a mortgagee to foreclose are absolute and are not contingent upon the personal circumstances affecting the mortgagor's ability to pay, *i.e.* the mortgagor's default in payments gives rise to the mortgagee's claim of foreclosure. *See* First Wisconsin Nat'l Bank of Milwaukee v. Roose, 348 So. 2d 610, 611 (Fla. 4th DCA 1977) (holding that a mortgagor, after having defaulted in its mortgage payment obligations, cannot seek to direct the mortgagee's foreclosure on collateral). Generally, in an event of default, a mortgagor may obtain both a judgment on the note and a judgment of foreclose the mortgage, which remedies are not inconsistent and each are each available the underlying

---

[2] Condor One holds the aggregate sum of $269,424.60 in tax and reserve escrows.

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

obligation evidenced by the note. <u>Mellor v. Goldberg</u>, 658 So. 2d 1162, 1163 (Fla. 2d DCA 1995) (holding that "[a]s a general rule, a holder of a promissory note secured by real property is permitted to pursue both an action on the note and an action to foreclose the mortgage").

Under Florida law, mortgages are assignable, and the assignee stands in the shoes of the assignor receiving those benefits and rights as the assignor would receive. Fla. Stat. § 701.01; <u>Williams, Solomon, Kanner & Damiam v. American Bankers Life Assurance Company of Florida</u>, 379 So. 2d. 119, 121 (Fla. 3d DCA 1979) (holding that "[a] mortgage that is assigned as collateral security may be foreclosed by the assignee"); <u>United of Florida, Inc. v. Illini Fed. S&L Ass'n</u>, 341 So. 2d 793, 794 (Fla. 2d DCA 1977). Moreover, the actual holder of negotiable paper has the right to enforce the terms thereof. *See* Florida Statutes §§ 673.1041 (defining promissory notes as negotiable instruments), 673.2031 (providing that the transfer of a negotiable instrument "vests in the transferee any right of the transferor to enforce the instrument") and 673.3011(1) (providing that a holder may enforce the instrument). *See also* Florida Statutes § 68.06 (providing that "[t]he assignment or endorsement of any instrument vests the assignee or endorsee with the same rights, powers, and capacities as were possessed by the assignor or endorser").

The undisputed facts of this case establish the following: (i) no party contests HUD's ownership of the Mortgage and Note prior to Condor One; (ii) in 1995, HUD executed and delivered to Condor One an assignment of its rights and interests under the Mortgage and Note; (iii) that assignment was properly recorded in the public records of Broward County, Florida, in 1995; (iv) Condor One has been the holder and in actual possession of the original Mortgage and Note since 1995; (v) Oakland Lakes has been in default under the terms of the Mortgage and Note since well before February 1, 1995; (vi) Oakland Lakes admits that amounts are due under the Note; (vii) from

10

and after July 1, 2000, Oakland Lakes has failed or refused to remit any payments under the PWA or otherwise; and (viii) the term of the PWA, the month-to-month forbearance agreement, expired on January 31, 2001. As such, Condor One owns and holds the Mortgage and Note, which Oakland Lakes admits are in default, and has the absolute right to foreclose the Mortgage based upon amounts due under the Note.

### III. Arguments Challenging Condor One's Right To Foreclosure Of Mortgage Are Spurious at Best

Oakland Lakes, in its Answer to Condor One Complaint, asserts five affirmative defenses, none of which impede this Court from entering summary judgment of foreclosure in favor of Condor One: the first defense incorporates the arguments made in the 813268 Complaint, asserting that Condor One does not own or hold the Mortgage or Note; the second defense requests consolidation of the State Court Foreclosure Proceeding with the Federal Declaratory Action (which has been mooted by order of this Court); the third defense argues that public policy denies the right of this assignee to foreclose the Mortgage; the fourth defense contends that Oakland Lakes is entitled to a set-off; and the fifth defense argues that inequitable conduct by HUD and Condor One prohibits foreclosure.

### A.    Oakland Lakes' First Affirmative Defense, Condor One Does Not Properly Own Or Hold Mortgage Or Note

In its first affirmative defense, Oakland Lakes alleges that Condor One does not properly own or hold the Mortgage or Note and incorporates the allegations in the 813268 Ontario Complaint. The 813268 Ontario Complaint seeks a declaration that the PWA is invalid and unenforceable because it was entered into by a general partner of Oakland Lakes (Brisben) who purportedly lacked authority to execute it *(see* Exhibit B, 813268 Ontario Complaint at ¶¶ 43-46) and seeks to have the

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

Assignment of Mortgage declared ineffective because the PWA was entered into without authority *(see* Exhibit B, 813268 Ontario Complaint at ¶¶ 47-53). It also seeks to set aside the Assignment of Mortgage on the contrary assumption that the PWA is effective and the language of the PWA purportedly prohibits assignment (*see* Exhibit B, 813268 Ontario Complaint at ¶¶ 54-59). The following summarizes Condor One's response to the arguments raised in Oakland Lakes' first defense that challenge the Assignment of Mortgage and, therefore, challenge Condor One's ownership of the Mortgage and Note.

In 1994, Congress amended the National Housing Act, 12 U.S.C. §1701 *et seq.* (the "Act"), and authorized HUD to sell mortgage loans. HUD sold the Mortgage and Note to Condor One in 1995 after this amendment. Oakland Lakes lacks standing under the Act to challenge HUD's sale of the Mortgage and Note to Condor One because its interests do not fall within the zone of interests protected by the Act. Even if standing existed, the substantive arguments challenging the validity of the Assignment of Mortgage are without foundation.

Oakland Lakes presents alternative arguments that HUD's assignment to Condor One is invalid. It first argues that the PWA is invalid and that invalidity somehow causes HUD's subsequent Assignment of Mortgage to be invalid as well. If the PWA is invalid, however, the terms of the Mortgage govern the rights of the parties and the Mortgage expressly permits the mortgagee (HUD) to assign the Mortgage and Note. Oakland Lakes then assumes the PWA is valid and is modification of the Mortgage and argues that the terms of the PWA prohibit HUD from transferring the Mortgage and Note. This conclusion, however, contravenes both case law and the Bankruptcy Court's findings. The PWA contains no prohibition against assignment of the Mortgage or Note. The National Housing Act specifically permits HUD to sell loans and the terms of the PWA are

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

consistent with that permission. Furthermore, Florida law, which is selected in the Mortgage as governing law, presumes that mortgages are assignable.

Finally, over five years have lapsed since HUD's sale of the Mortgage and Note to Condor One was completed. HUD received Condor One's payment in exchange for the Mortgage in 1995 and transferred the proceeds (presumably) into the general Treasury, thereby rendering Oakland Lakes' argument to set aside the Assignment of Mortgage moot.

### i.    Oakland Lakes Lacks Standing To Bring A Private Cause Of Action Challenging HUD's Right To Sell Or Assign The Mortgage.

Oakland Lakes has no standing to challenge HUD's right to sell or assign the Mortgage for the following two reasons: (a) the provisions of the National Housing Act do not confer such a right on mortgagors; and (b) commercial mortgagors do not fall within the zone of protected interests created by the statute.

Oakland Lakes alleges this action is properly before this Court pursuant to 12 U.S.C. §1702 because the PWA, and HUD's participation in it, were undertaken pursuant to HUD's administration of the Act. The Act, however, does not create a private cause of action on behalf of a mortgagor. See Jackson v. Romney, 355 F. Supp. 737, 743 (D.D.C. 1973), aff'd, 506 F.2d 233 (D.C. Cir. 1974) (holding that the restrictions placed on HUD by the Act do not create a private cause of action on behalf of a mortgagor).

In addition, the Act expressly provides HUD with unfettered discretion to sell HUD-held mortgages on unsubsidized multifamily projects "on such terms and conditions as the Secretary may prescribe," 12 U.S.C. §1701z-11(k)(4), and in a manner that will, inter alia, "protect the financial interests of the Federal Government." 12 U.S.C. § 1701z-11(a)(2). In 1994, when it authorized

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

HUD to sell mortgages, Congress articulated a number of goals for the program, including the preservation of low income housing and the protection of the government's financial interests. 12 U.S.C. § 1701z-11(a); Bayvue Apartments Joint Venture v. OCWEN Federal Bank FSB, 971 F. Supp. 129, 132-33 (D.D.C. 1997). Oakland Lake's interest of maximizing a return for defaulted mortgagors is not an interest within the zone protected under the Act and, therefore, Oakland Lakes lacks standing to challenge HUD's loan sale program or its implementation.

In Moses v. Banco Mortgage Co., 778 F.2d 267 (5th Cir. 1985), the court considered standing in the context of a challenge to the award of a contract at a HUD mortgage auction. To invoke judicial review of a government procurement decision, the court held that a plaintiff must establish both an injury in fact and an interest arguably within the zone of interests to be regulated. As to the zone of interests, the court held that:

> A party will fall within the zone of interests if he is a member of a class of persons who was intended to be benefitted by the statute or regulation. Conversely, parties who receive only unintended or incidental benefits from the statutes or regulations are outside the zone of interests to be protected, and thus lack standing to, sue. We hold that neither the Federal Housing Act nor the HUD regulation was intended directly to benefit either owners of low income housing projects or parties bidding at the HUD mortgage auction.

Moses, 778 F.2d at 271 (citations omitted).[3] The court concluded that the plaintiff lacked standing to assert a challenge to the mortgage auction because it was not within the zone of interests of the relevant housing statute. Moses, 778 F.2d at 271. See also EMC Holdings, Inc. v. Cisneros, Civ. Action No. 95-561 (CRR) (D.D.C. March 28, 1995), (owner of defaulted property unable to show it has the right to challenge the method HUD uses in selling loan).

---

[3] The court in United States v. OCCI Corp., 758 F.2d 1160, 1163 (7th Cir. 1985) similarly observed that "once a mortgagor defaults, the federal policy to protect the treasury and promote the security of federal investment which, in turn promotes the prime purpose of the [National Housing] Act -- to facilitate the building of homes by use of federal credit -- becomes predominant." (Citations omitted).

14

In an action similar to this one, <u>Bayvue Apartments Joint Venture v. OCWEN Federal Bank FSB</u>, 971 F. Supp. 129 (D.D.C. 1997), a commercial mortgagor sued HUD to set aside HUD's sale of a note. The Court refused to set aside the sale, holding that the private party did not have proper standing to assert such a claim and that the injuries claimed by the private party were not within the zone of interests protected by the Act or HUD's operating regulations. <u>Bayvue</u>, 971 F. Supp. at 132-33.

In this case, the facts alleged by Oakland Lakes fail to establish that (i) the Act provides a private cause of action under which it even has standing to sue to void the Assignment of Mortgage, or (ii) Oakland Lakes was an intended beneficiary under the Act within the protected zone of interests. Accordingly, Oakland Lakes lacks standing to maintain this cause of action to set aside HUD's Assignment of the Mortgage to Condor One.

### ii.   <u>Oakland Lakes' Contention That The Assignment Of Mortgage Is Invalid Or Prohibited Is Without Foundation In Law Or Fact Regardless Of The Validity Of The Provisional Workout Arrangement</u>

#### a.   **If The Provisional Workout Arrangement Is Invalid, HUD Was Permitted To Assign the Mortgage To Condor One.**

Count II of the 813268 Ontario Complaint, adopted by Oakland Lakes in its first affirmative defense, contends that the PWA was entered into without authority and that, as a result, HUD's subsequent Assignment of Mortgage is invalid.[4] *See* Exhibit B, 813268 Ontario Complaint at ¶¶ 47-

---

[4] The PWA allowed Oakland Lakes to make a series of reduced payments to avoid HUD's enforcement of its rights under the defaulted loan. Assuming *arguendo* that 813268 Ontario is correct and the PWA is invalid, then Oakland Lakes' default would include the failure to have made the larger payments required under the Mortgage since prior to February 1, 1995.

15

53. Aside from being a non-sequitur, Oakland Lakes' contention is wrong as a matter of law and fact.

Assuming solely for purposes of this argument that the PWA is invalid, Oakland Lakes remains obligated under and bound by the terms of the Mortgage and Note. The Mortgage clearly and unambiguously permits HUD's sale or assignment of the Mortgage and Note and provides for Oakland Lakes' consent to any such assignment. *See* Exhibit F, Mortgage §7.01.

Pursuant to the terms of the Mortgage, Florida law governs. *See* Exhibit F, §7.04 of the Mortgage. Under Florida law, contracts, such as the Mortgage and Note, are assignable unless the contract specifically prohibits assignment. Florida Statutes § 701.01; W.S. Badcock Corp. v. Webb, 699 So. 2d 859 (Fla. 5th DCA 1997).

> Generally, contract rights can be assigned unless they involve obligations of a personal nature, or there is some public policy against the assignment, or an assignment is specifically prohibited by the contract.

W.S. Badcock Corp., 699 So. 2d at 861 (citations omitted).

The Mortgage and Note are not obligations of a personal nature, and no public policy in Florida prohibits the assignment of mortgages or notes. Waters v. International Precious Metals Corp., 190 F.3d 1291, 1300 (11th Cir. 1999). As the court stated in In re General Development Corp., it is "axiomatic that unless a lender and a borrower have agreed to the contrary (which is not the case here), the lender is free to sell to another a participation interest in its loan to the borrower." In Re General Development Corp., 124 B.R. 376, 377 (Bankr. S.D. Fla.1991).

In addition, in 1994, Congress expressly authorized HUD to sell mortgage loans, providing unequivocally that, "[n]otwithstanding any other provision of law," HUD has the unfettered

16

discretion to sell HUD-held mortgages on unsubsidized multifamily projects "on such terms and conditions as the Secretary may prescribe." 12 U.S.C. §1701z-11(k) (4).

Oakland Lakes' first argument fails. If the PWA is invalid, HUD was permitted to assign the Mortgage and Note and Condor One is the owner and proper holder of the Mortgage and Note.

> **b.     If The Provisional Workout Agreement Is Valid, HUD Was Permitted To Assign The Mortgage To Condor One.**

Oakland Lakes next takes a contrary approach in its attempt to void the Assignment of Mortgage. Oakland Lakes presumes the PWA is a valid agreement and that modifies or amends the Mortgage.[5] Oakland Lakes then concludes the Assignment of Mortgage is invalid because the PWA contains an agreement by HUD not to assign the Mortgage or Note. *See* Exhibit B, 813268 Ontario Complaint at ¶¶ 54-59. While the PWA contains no express prohibition, Oakland Lakes contends that the background recitals in the introductory paragraph implicitly prohibit HUD's assignment of the Mortgage or Note.

Oakland Lakes relies solely on the following language in support of its position:

> . . . . To afford an opportunity to effect reinstatement, the Secretary, Department of Housing and Urban Development, will hold the defaulted Note and Mortgage on the subject project under the terms and conditions stated herein.

*See* Exhibit H, PWA at p.1.[6]

Oakland Lakes interprets the statement that HUD "will hold" the defaulted Note and Mortgage under the terms and conditions set forth in the PWA as an implicit covenant not to transfer

---

[5] In response to these same arguments, the Bankruptcy Court, in the Order Dismissing Bankruptcy Case, specifically found that the PWA did not modify or amend the Mortgage or Note. *See* Exhibit C, Order Dismissing Bankruptcy Case at p. 4.

[6] The remainder of the PWA sets forth the terms and conditions of HUD's forbearance.

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

those instruments. This interpretation, however, defies the natural meaning of the sentence, as well as the Act's directive for HUD to undertake mortgage sales.

First, as a matter of law, provisional workout arrangements, such as the PWA, do not modify or supersede the original mortgages or notes. U.S. v. Victory Highway Village, Inc., 662 F.2d 488, 495 (8th Cir. 1981); U.S. v. Wennick, 645 F. Supp. 103, 105 (D. Del. 1986); U.S. v. 1300 Lafayette East, 445 F. Supp. 988, 991 (E.D. Mich. 1978). Provisional workout arrangements entered into by HUD are "provisional." Victory Highway Village, 662 F.2d at 495. It is error to conclude that such provisional arrangements modify the underlying mortgage contract. Victory Highway Village, 662 F.2d at 495.

Second, even a cursory review of the PWA leads to the inescapable conclusion that the PWA neither modifies nor amends the Mortgage. After consideration of these same arguments, the Bankruptcy Court made specific findings that the PWA does not modify or amend the Mortgage or Note. *See* Exhibit C, Order Dismissing Bankruptcy Case at pp. 3-4. The PWA is solely a forbearance arrangement under which HUD agreed to take no action on the defaulted loan provided that Oakland Lakes made certain minimum monthly payments and satisfactorily performed certain other requirements. *See* Exhibit H, PWA at ¶ 11. In fact, the PWA provides for a later modification of the Mortgage in the event the mortgagor fully complies with the terms of thereof. *See* Exhibit H, PWA at ¶ 6.

Third, a common sense reading of the introduction results in the conclusion that the language cited by Oakland Lakes is not a covenant prohibiting assignment. The sentence merely recites the fact that HUD is the holder of the Mortgage and, despite the default in the loan, agrees to forbear from enforcement so long as Oakland Lakes complies with the terms and conditions of the PWA.

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

The language does not relate to HUD's right to sell or assign the Mortgage and Note. It simply is an agreement to limit the mortgagee's ability to enforce its legal remedies under specified conditions. The same limitations extend to any subsequent holder of the Mortgage, including Condor One. In fact, other provisions of the PWA explicitly contemplate the existence of subsequent holders and contradict any suggestion of a prohibition against assignment. Paragraph 7 of the PWA expressly provides that certain payments be made "to Mortgagee or <u>its successors and assigns</u>." (emphasis added). *See* Exhibit H, PWA at ¶ 7. How can there be successors and assigns if the instruments cannot be assigned?

There is simply no basis to draw the inference that HUD agreed not to sell the Note and Mortgage. Such an inference directly contradicts the express goals of the legislation by which Congress expressly authorized HUD to sell mortgage loans and granted HUD unfettered discretion to sell HUD-held mortgages on such terms and conditions as the Secretary may prescribe. 12 U.S.C. §1701z-11(k) (4).

### iii.     <u>Oakland Lakes Cannot Unwind Sale and Assignment of Mortgage</u>

Once HUD sells a mortgage and deposits the proceeds of such sale into the general Treasury, any equitable claims, including claims to void the sale and assignment, are moot. <u>Presidential Gardens Associates v. U.S.</u>, 175 F.3d 132, 143-44 (2d Cir. 1999). In <u>Presidential Gardens</u>, former owners of multifamily housing projects sued HUD seeking, *inter alia*, to stop the auction sale of their loans. <u>Presidential Gardens</u>, 175 F.3d at 136-38. The court denied all of the plaintiffs' equitable claims, including claims to enjoin the sale of loans or to unwind any sale already complete, on the grounds that they were moot, *i.e.* all proceeds were deposited into the general Treasury and the sale was completed. <u>Presidential Gardens</u>, 175 F.3d at 143-44.

19

Similarly, in this case, HUD's sale and assignment to Condor of the Mortgage and Note occurred over five years ago. All proceeds received by HUD related thereto have been deposited into the general Treasury. HUD's sale and assignment of the Mortgage and Note to Condor One likewise cannot be voided.

In conclusion, regardless of standing or the effectiveness of the PWA, the Assignment of Mortgage is valid and enforceable and cannot be undone. Condor One is the owner and holder of the Mortgage and Note and, as such, is entitled to enforce them.

**B.      Oakland Lakes' Second Affirmative Defense, Consolidation**

Oakland Lakes' second affirmative defense has been mooted by order of this Court consolidating the State Court Foreclosure Proceeding into the Federal Declaratory Action.

**C.      Oakland Lakes' Third Affirmative Defense, Public Policy Prohibition**

As its third affirmative defense, Oakland Lakes asserts that the public policy goals of the Act are better served by denying Condor One its right to foreclose the Mortgage. This argument is without merit. Assuming that Oakland Lakes even has standing to make this argument, which is doubtful, the contention fails for numerous reasons.

The Act explicitly authorizes HUD to sell and assign the Mortgage and Note. HUD's ability to sell any mortgage and note would be completely eviscerated if the assignee did not acquire the ability to enforce the instruments when the mortgagor unilaterally chooses to cease payments. Why would any assignee pay value to HUD to receive a future stream of payments that may be terminated at the sole discretion of the note's maker without consequence? Moreover, the Mortgage is governed by Florida law, which promotes the assignability of mortgages and notes and protects the assignee's rights to enforce those instruments. Fla. Stat. §§ 68.06, 673.1041, 673.2031, 673.3011 and 701.01;

20

<u>Williams, Solomon, Kanner & Damiam v. American Bankers Life Assurance Company of Florida</u>, 379 So. 2d. 119, 121 (Fla. 3d DCA 1979); <u>United of Florida, Inc. v. Illini Fed. S&L Ass'n</u>, 341 So. 2d 793, 794 (Fla. 2d DCA 1977).

**D.    Oakland Lakes' Fourth Affirmative Defense, Offset**

Oakland Lakes provides no substance or support for its claim of offset and, as such, the Court need not address this issue in its consideration of the Motion.

**E.    Oakland Lakes' Fifth Affirmative Defense, Inequitable Conduct**

In its fifth affirmative defense, Oakland Lakes argues that Condor One should be denied foreclosure of the Mortgage based upon alleged inequitable actions taken by HUD and Condor One. Oakland Lakes, however, attributes absolutely none of the alleged "inequitable" conduct to Condor One, except that it acquired the Mortgage and Note from HUD. HUD's conduct, as described, is innocuous. Oakland Lakes appears to impose a nonexistent obligation upon HUD to protect the interests of commercial mortgagors under defaulted loans. No such interest exists under the Act or Florida law. Oakland Lakes' interests are not even within the zone of interests protected under the Act.

21

## IV. Conclusion

As set forth above, each of Oakland Lakes' challenges to Condor One's complaint fails. Condor One is the owner and holder the defaulted Mortgage and Note and entitled to enforce the remedies available to the holder of such instruments, regardless of the enforceability of the PWA. Based upon Oakland Lakes' defaults in its obligations under the Mortgage and Note, Condor One is entitled to a summary judgment of foreclosure of the Mortgage and a summary judgment on the Note.

Respectfully submitted,

**BILZIN SUMBERG DUNN BAENA**
**PRICE & AXELROD LLP**
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By: _____
David W. Trench
Florida Bar No. 202975
Richard J. Bernard
Florida Bar No. 57266

22

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was furnished via U.S. Mail on this 7th day of February, 2001 to: Richard T. Woulfe, Esq., Co-Counsel for 813268 Ontario, Bunnell, Woulfe, Kirschbaum, Keller, Cohen & McIntyre, P.A., P.O. Drawer 030340, 888 E. Las Olas Boulevard, Suite 400, Ft. Lauderdale, Florida 33303-0340; Robert E. Messick, Esq., Co-Counsel for 813268 Ontario/Oakland Lakes, Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A., 2033 Main Street, Suite 600, Sarasota, Florida 34237; and William Healy, Esq., U.S. Attorney's Office, 99 N.E. 4th Street, Third Floor/Civil Division, Miami, Florida 33132-2111.

David W. Trench

23

## LIST OF EXHIBITS

| | |
|---|---|
| 813268 Ontario Complaint | Exhibit B |
| Condor One Complaint | Exhibit A |
| Order Dismissing Bankruptcy Case | Exhibit C |
| Order Granting Motion to Sequester Rents | Exhibit D |
| Answer to Condor One's Complaint | Exhibit E |
| Mortgage | Exhibit F |
| Note | Exhibit G |
| PWA | Exhibit H |
| Assignment of Mortgage | Exhibit I |
| Demand Letter | Exhibit J. |
| Affidavit of Doug Goldrick | Exhibit K |

30087081v1

24

CACE

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT, IN
AND FOR BROWARD COUNTY
FLORIDA

**18**

GENERAL JURISDICTION DIVISION

CASE NO.          00014103

CONDOR ONE, INC.,
a Delaware Corporation,

        **Plaintiff,**

vs.

                                AUG 24 2000

OAKLAND LAKES, LTD.,
a Florida Limited Partnership,

                              A TRUE COPY
                              ED KENNEDY
                       CLERK OF CIRCUIT COURT

        **Defendant.**

_____/

## COMPLAINT

      Plaintiff, Condor One, Inc., a Delaware corporation, hereby sues Defendant Oakland Lakes,

Ltd., a Florida Limited Partnership ("Oakland Lakes") to foreclose a mortgage and to enforce an

assignment of rents owed, and alleges as follows:

### JURISDICTION, PARTIES AND VENUE

    1.     This is an action to foreclose a mortgage on real and personal property located in

Broward County, Florida and to enforce an assignment of rents. The amount in controversy exceeds

the jurisdictional limits of this court.

    2.     Plaintiff Condor One, Inc. ("Condor One") is a corporation organized and existing

under the laws of the State of Delaware.

    3.     Defendant Oakland Lakes is a limited partnership organized and existing under the

laws of the State of Florida. Oakland Lake's primary place of business is 2325 N.W. 33rd Street, Fort

G:\DMS\72655\13375\0307661.01
8/21/2000

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

Lauderdale, Florida, where it owns and operates the Sailboat Pointe Apartments f/k/a the Lakes of Casablanca Apartments.

4.    Venue is proper because the property which is the subject matter of this lawsuit is located in Broward County, Florida.

**FACTUAL BACKGROUND**
**THE LOANS, LOAN DOCUMENTS AND PROPERTY**

5.    On or about October 1, 1989, a loan in the amount of $22,779,600 was issued to Defendant Oakland Lakes ("the Loan"), funded through the issuance of tax exempt revenue bonds by the Florida Housing Financing Agency ("FHFA"), which were collateralized with mortgage backed securities pledged by Government National Mortgage Association ("GNMA").

6.    The Loan was for the development, construction, ownership and operation of the Lakes of Casablanca apartment project on the property owned by Oakland Lakes at 2325 N.W. 33rd Street, Fort Lauderdale, Florida 33309 which is more particularly described in Exhibit "A" attached hereto ("the Property").

7.    On or about October 1, 1989, in exchange for the Loan, Oakland Lakes executed and delivered a note that evidenced the Loan in the original principal amount of $22,779,600 and a mortgage and security agreement encumbering the Property with a first mortgage lien.

8.    The note and mortgage were assigned to Citizens and Southern Trust Company (Florida) National Association ("CST") by an assignment which was recorded on October 5, 1989 in Official Records Book 16818, page 548 of the Public Records of Broward County.

9.    The note and mortgage were subsequently assigned by CST to The Cincinnati Mortgage Corporation ("Cincinnati Mortgage"), which was authorized by the Secretary of Housing and Urban Development ("HUD") to originate and service loans insured by HUD under the National

Housing Act. This assignment was recorded on October 5, 1989 in Official Records Book 16818, page 551 of the Public Records of Broward County.

10.     On or about October 5, 1989, Oakland Lakes executed the Amended and Restated Renewal Mortgage Note in favor of Cincinnati Mortgage in the original principal amount of $22,779,600 (the "Note"). A true and correct copy of the Note is attached hereto as Exhibit "B."

11.     On or about October 5, 1989, Oakland Lakes executed the Amended and Restated Renewal Mortgage ("Mortgage") encumbering the Property with a first mortgage lien. The Mortgage was recorded that same day in Official Records Book 16818, page 609 of the Public Records of Broward County. A true and correct copy of the Mortgage is attached hereto as Exhibit "C."

12.     On October 13, 1989, Cincinnati Mortgage delivered an assignment in blank to GNMA, as part of a guarantee agreement.

13.     Almost immediately after completion of construction of the improvements to the Property, Oakland Lakes defaulted in its obligations under the Loan.

14.     On November 8, 1990, GNMA declared Cincinnati Mortgage to be in default of the guarantee agreement, and the Note and Mortgage were assigned to GNMA pursuant to the October 13, 1989 agreement. This assignment was recorded on November 8, 1990 in Official Records Book 17907, page 884 of the Official Records Book of the Public Records of Broward County.

15.     GNMA subsequently assigned to Note and Mortgage to HUD, and which assignment was recorded on September 11, 1992 in Official Records Book 19852, page 467 of the Public Records of Broward County.

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

16.    At the time of the assignment, HUD elected not to exercise its right to accelerate and demand payment of the remaining balance of all sums due and payable under the Note and Mortgage, and instead entered into a Provisional Workout Arrangement ("PWA") with Oakland Lakes. HUD and Oakland Lakes executed the PWA effective as of February 1, 1995. A true and correct copy of the PWA is attached hereto as Exhibit "D."

17.    The PWA is a month-to-month arrangement of forbearance under which HUD agreed to take no action on a defaulted Loan, provided Oakland Lakes makes the minimum monthly payment and satisfactorily performs the other requirements of the PWA.

18.    Among the terms contained in the PWA is a schedule of monthly payments that Oakland Lakes is required to follow commencing February 1, 1995 and lasting through January 31, 2001. The PWA specifically sets forth that failure to remit a payment would be cause for HUD to proceed with foreclosure.

19.    On May 8, 1995, HUD assigned the Note and Mortgage to Condor One. This assignment was recorded on May 11, 1995 in Official Records Book 23442, page 284 of the Public Records of Broward County.

20.    Both HUD and Condor One separately notified Oakland Lakes of this assignment by letters dated May 8, 1995. A true and correct copy of these letters is attached hereto as Exhibit "E."

21.    From June, 1996 through June, 2000, Oakland Lakes remitted all Loan payments to Condor One.

22.    In July of 2000, Oakland Lakes failed and refused to make any payment on the Loan.

23.    On July 14, 2000, Condor One served Oakland Lakes with a demand letter reciting Oakland Lakes' default and asserting Condor One's rights under the Note and Mortgage and PWA

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER · MIAMI, FLORIDA 33131-2336

and accelerating all amounts due and payable under the Note and Mortgage and, pursuant to Florida

Statutes, §697.07, demanding all rents, income and profits from and of the Property. A true and

correct copy of the demand letter is attached hereto as Exhibit "F."

**COUNT I**

**ACTION TO FORECLOSE $22,779,600, MORTGAGE**

24.    The allegations of paragraphs 1 through 23 are realleged and incorporated by

reference as if the same were fully set forth herein.

25.    This is an action to foreclose a mortgage on real property located in Broward County,

Florida.

26.    Condor One is the owner and holder of the Note and Mortgage.

27.    The Property is now owned by Oakland Lakes.

28.    Oakland Lakes is in default under the Mortgage and is in breach of the PWA for

failing to pay the monthly installment due on July 1, 2000 and by failing to make any payment

thereafter.

29.    As a consequence of the defaults described above and in accordance with the

provisions of the Mortgage, Condor One has accelerated, and hereby accelerates, the indebtedness

due under the Loan and has declared, and hereby declares, the full amount payable to be due.

30.    Oakland Lakes owes Condor One the sum of $22,773,532 that is due in principal, as

well as all accrued interest and costs of this action, including, but not limited to, title search expenses

for ascertaining necessary parties to this action.

31.    By virtue of Oakland Lake's default, Condor One has been required to employ the

undersigned law firm to enforce Condor One's rights under the Note and Mortgage, and for such

employment, Condor One has agreed to pay its counsel a reasonable attorney's fee. All costs and reasonable attorney's fees incurred in attempting to collect the indebtedness due to Condor One are secured by the lien of the Mortgage.

32.    All conditions precedent to the maintenance of this foreclosure action have been performed or have occurred.

WHEREFORE, Condor One, Inc. prays that an accounting be had and taken under the direction of this Court of what is due from Oakland Lakes, Ltd. under the terms and conditions of the Note and Mortgage, plus interest, costs, attorney's fees, title search expenses, taxes, and other expenses and costs that Condor One, Inc. is entitled to recover in this suit, and that in default of payment to Condor One, Inc. by Oakland Lakes, Ltd. of the amounts found to be due, the subject property be sold under the direction of this Court to satisfy the judgment, and that the estate of Oakland Lakes, Ltd. and all persons claiming under or against Oakland Lakes, Ltd. since the filing of the Claim of Lien be found subordinate to Condor One, Inc.'s Claim of Lien and foreclosed.

## COUNT II

## ACTION FOR RENTS

33.    The allegations of paragraphs 1 through 32 are realleged and incorporated by reference as if the same were fully set forth herein.

34.    This is an action to obtain rents generated by the Property.

35.    Pursuant to the terms of the Mortgage, Oakland Lakes assigned to the holder of the Mortgage all rents, profits, issue and income of the Property, and any and all leases and/or subleases

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

thereof as further security for the indebtedness secured by the Mortgage. Condor One is entitled to all rents from the Property during any time at which the Mortgage is in default.

36.    On July 14, 2000, pursuant to Florida Statutes §697.07, Condor One made written demand upon Oakland Lakes that all rents income and profits from the Property be immediately delivered to Condor One. A true and correct copy of the July 14, 2000 demand letter is attached hereto as Exhibit "F."

37.    Condor One hereby renews its demand pursuant to Florida Statutes §697.07 that Oakland Lakes immediately deliver to Condor One all rents income and profits generated from the Property.

38.    Oakland Lakes is collecting rents from tenants in possession of the Property and the rents received by Oakland Lakes are not being delivered to Condor One or applied toward payment of the outstanding amounts due under the Loan.

WHEREFORE, Condor One, Inc. demands that Defendant Oakland Lakes, Ltd. immediately deliver to Plaintiff Condor One, Inc. all rents, income, issues, profits and security deposits that have been generated by the Property and continue to deliver to Condor One, Inc. all rents immediately upon receipt of such monies.

## COUNT III

## ACTION ON PROMISSORY NOTE

39.    The allegations of paragraphs 1 through 38 are realleged and incorporated by reference as if the same were fully set forth herein.

40.    This is an action for damages in excess of $15,000, exclusive of interest, costs and attorney's fees.

BILZIN SUMBERG DUNN PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

41.    During the year 2000, Defendant Oakland Lakes has collected, in breach of the provisions of the Note, approximately $300,000 monthly in rents, issues and profits generated by the Property and, since July 1, 2000, Oakland Lakes has not applied these monies to payment of the amounts due under the Note.

42.    Pursuant to the provisions of the Note and Mortgage, and in particular section 3.02 of the Mortgage, Oakland Lakes is personally liable to Condor One for all rents, issues and profits collected but not applied as required by the terms of the Note and Mortgage.

WHEREFORE, Plaintiff Condor One, Inc. demands judgment against Defendant Oakland Lakes, Ltd, for the sum found to be due to Condor One, Inc. under the Note, accrued interest thereon, costs, reasonable attorney's fees and such other and further relief as is just and proper.

DATED: August 24, 2000.

Respectfully submitted,

**BILZIN SUMBERG DUNN PRICE & AXELROD LLP.**
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 374-7580
Facsimile:  (305) 374-7593

By:_____
    **David W. Trench**
    Florida Bar No. 202975
    **Paul J. Milberg**
    Florida Bar No. 107700

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.00-6147-CIV-LENARD/TURNOFF

813268 ONTARIO, INC., as
General Partner of OAKLAND
PARK (FLORIDA) LIMITED PARTNERSHIP,
an Ontario limited partnership;
as limited partner of, and on behalf of
OAKLAND LAKES, LTD.,
a Florida Limited Partnership;
      Plaintiff,

vs.

OAKLAND LAKES, LTD.,
a Florida Limited Partnership,
WILLIAM O. BRISBEN, W.O. BRISBEN
COMPANIES, INC., and ROBERT E. SCHULER,
as General Partners of OAKLAND LAKES, LTD.,
THE SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,
      Defendants.
_____/

## AMENDED COMPLAINT

Plaintiff, 813268 ONTARIO, INC., as general partner of OAKLAND PARK (FLORIDA) LIMITED PARTNERSHIP, an Ontario limited partnership; as limited partner of, and on behalf of OAKLAND LAKES, LTD., a Florida Limited Partnership; sues THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT, and CONDOR ONE, INC., a Delaware Corporation, and alleges:

1

## I. INTRODUCTION

1.       This is a limited partner derivative action pursuant to Florida Statute Section

620.163, seeking declaratory relief pursuant to Florida Statutes Chapter 86, as authorized

by 28 U.S.C. § 2201, to set aside a provisional workout arrangement (the "Workout

Arrangement") effective February 1, 1995, by and between the Secretary of the United

States Department of Housing and Urban Development ("HUD") and Oakland Lakes Ltd.,

a limited partnership organized and existing under the laws of the State of Florida (Oakland

Lakes), whose primary place of business is 2325 N.W. 33rd Street, Fort Lauderdale, Florida

33309 and for damages against Defendants Condor and HUD.

## II. JURISDICTION

2.       This action is properly before this Court pursuant to 12 U.S.C. § 1702

because the subject of the Workout Arrangement and HUD's participation as a party

thereto were undertaken by HUD pursuant to its administration of the National Housing Act.

3.       Federal question jurisdiction is proper under 28 U.S.C. § 1331, in that this

action arises under laws of the United States.

4.       Diversity of citizenship jurisdiction is proper under 28 U.S.C. § 1332, in that

Plaintiff, 813268 ONTARIO, INC. is a Canadian corporation and is the general partner of

Oakland Park (Florida) Limited Partnership ("Oakland Park"), a limited partnership

organized and existing under the laws of the Province of Ontario, Canada; Defendant

Oakland Lakes is a limited partnership organized and existing under the laws of the State

of Florida; Defendant, Condor One, Inc. ("Condor"), is a corporation that was organized

and is validly existing under the laws of the State of Delaware;  Defendant, HUD, is

2

deemed to be a federal corporation and a citizen of the District of Columbia for purposes

of diversity jurisdiction; and the amount in controversy exceeds $75,000.00.

## III. VENUE

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (e).

## IV. PARTIES

6.      Plaintiff Oakland Park is an Ontario Limited Partnership formed for the

purpose of investing capital in Defendant Oakland Lakes, and which did in fact invest in

excess of 1.8 million dollars in Oakland Lakes, and executed the Amended Limited

Partnership Agreement described in paragraph 23 herein, as the investor limited partner,

with an ownership interest in Defendant Oakland Lakes of 50%.

7.      Defendant Oakland Lakes is a Florida limited partnership formed for the

primary purpose of ownership and development of certain real and personal property as

an apartment complex of approximately 387 units located in Oakland Park, Broward

County, Florida, which apartment complex is currently owned and titled in Oakland Lakes

and is presently known or does business as the "Sailboat Pointe Apartments". The

apartment complex owned and operated by Oakland Lakes was formerly known and did

business originally as the "Lakes of Casablanca Apartments" (the apartment complex and

real property shall be referred to herein as "the Property").

8.      HUD is an agency of the United States government charged with

administering the National Housing Act.

3

9.    Condor is a Delaware Corporation to which HUD purportedly assigned the Mortgage and Loan Documents described herein, which are the subject of the Workout Arrangement.

## V.  GENERAL ALLEGATIONS

10.    Beginning in or about 1989, Oakland Lakes initiated negotiations to obtain favorable, low interest mortgage financing for the development, construction, ownership, and operation of the Lakes of Casablanca apartment project on the property owned by Oakland Lakes and located at 2325 N.W. 33rd Street, Fort Lauderdale, FL 33309, Oakland Park, Broward County, Florida; principally, through a mortgage loan extended by Cincinnati Mortgage Corporation ("Cincinnati Mortgage").

11.    Cincinnati Mortgage  was a corporation that had been approved by HUD to originate and service mortgage loans insured by HUD under the National Housing Act,  and had been further approved by HUD to co-insure mortgages under the provisions set forth in Section 221(d)(4) of the National Housing Act and 24 C.F.R. Part 244.

12.    Cincinnati Mortgage issued its commitment for insurance of advances (the "Firm Commitment") to Oakland Lakes, which Firm Commitment obligated Cincinnati Mortgage to: a) co-insure a first mortgage loan (the "Insured Loan") concerning the Project under the provisions set forth in Section 221(d)(4) of the National Housing Act and 24 C.F.R. Part 244; and b) cause the Government National Mortgage Association ("GNMA"), an agency of HUD, to issue its mortgage backed securities ("MBS") concerning the Insured Loan.

13.    The Florida Housing Financing Agency ("FHFA") agreed to issue tax-exempt revenue bonds (the "Bonds") for the purpose of funding the Insured Loan, and upon the condition that the MBS issued by GNMA be pledged as collateral for the Bonds. The proceeds from the sale of the Bonds were used to fund the Insured Loan.

14.    On information and belief, FHFA and a group of underwriters headed by Kidder Peabody & Co. Incorporated and Dean Witter Reynolds, Inc. (the "Underwriters") entered into a bond purchase agreement (the "Bond Purchase Agreement") which obligated the Underwriters to purchase the Bonds from FHFA.

15.    On information and belief, on or about October 5, 1989, Oakland Lakes and Cincinnati Mortgage closed the Insured Loan, which closing entailed the execution by Oakland Lakes and delivery to Cincinnati Mortgage of the following loan documents (collectively, the "Loan Documents"), to wit: a) a mortgage note, as amended, (the "Note") dated October 5, 1989, evidencing the Insured Loan in the original principal amount of $22,779,600.00); b) a mortgage, as amended and restated, (the "Mortgage") encumbering the real, personal and intangible property comprising the Project and constituting a first mortgage lien against the property; and c)  the following documents: a regulatory agreement; the Limited Partnership Agreement including resolutions of all general and limited partners authorizing the Insured Loan; a land use restriction agreement; lender's policy of title insurance;  evidence of zoning compliance;  copies of all land use and building permits;  survey and surveyor's report;  building loan agreement;  mortgagee's certificate;  mortgagor's certificate;  mortgagor's oath;  agreement and certification; attorney's opinion letter;  construction contract – cost plus;  payment and performance bond;  contractor's certification;  owner – architect agreement;  mortgagor and architect

5

certificate; design architect certification; state and county uniform commercial code filing forms; security agreement; letters certifying availability of utility services to the project; certificates of insurance; notice of commencement; escrow agreements concerning working capital, minor non-realty items and operating deficits; draw request; and construction progress schedule. True and correct copies of the Note and Mortgage, as amended, are attached hereto as Exhibits "A" and "B" and by this reference are made a part of this Complaint.

16.    Prior to closing the loan, on information and belief, Cincinnati Mortgage delivered copies of all Loan Documents, including but not limited to the Limited Partnership Agreement, to HUD.

17.    On information and belief, On October 5, 1989, the mortgage note was endorsed for coinsurance under the provisions of Section 221(d)(4) of the National Housing Act and pursuant to 24 C.F.R. Part 244, FHA mortgage number 06636650, and Cincinnati Mortgage delivered final copies of all Loan Documents, including but not limited to the Limited Partnership Agreement, to HUD.

18.    On or about October 5, 1989, Oakland Lakes commenced construction of the apartment complex.

19.    On or about October 13, 1989, Cincinnati Mortgage delivered an assignment in blank of the mortgage and copies of all Loan Documents, including but not limited to the Limited Partnership Agreement, to a custodian of GNMA, for the benefit and security of GNMA; and caused GNMA's MBS to be delivered to the trustee of the Bonds.

20.    On or about June 29, 1990, the Limited and General Partners of Oakland Lakes executed, by and amongst all of such partners, a Second Amended and Restated

Agreement of Limited Partnership for Oakland Lakes ("the Amended Limited Partnership Agreement"). A true and correct copy of the Amended Limited Partnership Agreement is attached hereto as Exhibit "C", and by this reference is made a part of this Complaint. The terms and provisions of the Amended Limited Partnership Agreement have not been further amended, revised, and/or superceded through the date of filing this Complaint.

21.     On information and belief, Oakland Lakes delivered a copy of the Amended Limited Partnership Agreement to HUD and/or Cincinnati Mortgage as required under the National Housing Act and the Loan Documents.

22.     On information and belief, on or about November 8, 1990 GNMA declared Cincinnati Mortgage in default of the guarantee agreement by and between Cincinnati Mortgage and GNMA; thereafter the custodian delivered all Loan Documents, including but not limited to, the Amended Limited Partnership Agreement, to GNMA, and Cincinnati Mortgage delivered all Loan Documents, and a complete loan file to GNMA.

23.     The insured mortgage was converted from coinsurance to full insurance on January 31, 1992, under new FHA project number 066-94026, and at the time of the conversion, a complete copy of Cincinnati Mortgage's loan file, and Loan Documents, including but not limited to, the Amended Limited Partnership Agreement, were delivered to HUD.

24.     Almost immediately after completion of construction of the apartment complex, Oakland Lakes apparently defaulted in one or more of its obligations under the Loan Documents. The apparent event(s) of default were not cured and continued to exist at the time of the assignment of the Loan documents by Cincinnati Mortgage to GNMA.

25.     At the time of the assignment of the Loan Documents to HUD and HUD's ownership and administration of the loan, HUD elected not to exercise the rights and remedies set forth and provided in the Loan Documents, specifically the right to accelerate and to demand payment of the balance of all sums due and payable under the Note, Mortgage, and other Loan Documents. As an alternative, HUD elected in such event(s) of default to enter into settlement - workout negotiations with William O. Brisben, as the then general partner of Oakland Lakes.

26.     Effective February 1, 1995, HUD and William O. Brisben, as the then General Partner of Oakland Lakes, executed a written, provisional Workout Arrangement (the "Workout Arrangement"). A true and correct copy of the Workout Arrangement is attached hereto as Exhibit "D", and by this reference made a part of this Complaint.

27.     Brisben, as general partner of Oakland Lakes, lacked authority under the terms and provisions of the Amended Limited Partnership Agreement, to enter into the Workout Arrangement without the prior written consent of and/or joinder of certain of the other partners, both limited and general, of Oakland Lakes.

28.     At all times, during the workout negotiations with Brisben, acting in his capacity as general partner of Oakland Lakes, HUD had copies, or should have had copies, of all Loan documents and knew or should have known that Brisben was acting in his capacity as general partner of Oakland Lakes, and knew or should have known that the General Partner did not have authority to enter into the Workout Arrangement.

29.     On or about May 8, 1995, HUD attempted to assign by written assignment all of its rights under the terms and provisions of the Loan Documents, including, upon information and belief, the Workout Arrangement, to Condor. A true and correct copy of

8

the purported Assignment from HUD to Condor is attached hereto as Exhibit "E" and by this reference is made a part of this Complaint.

30.    On information and belief, at the time William O. Brisben entered into the workout negotiations with HUD, Oakland Park provided both verbal and written notice to William O. Brisben that the consent and authorization of certain of the other general and limited partners was required before William O. Brisben, as general partner, could bind Oakland Park under the Workout Arrangement, and that Oakland Park did not so consent or authorize William O. Brisben, as general partner, to enter into the Workout Arrangement.

31.    On information and belief, subsequent to the effective date of the Workout Arrangement, Oakland Park became aware the Workout Arrangement was entered into without Oakland Park's authorization, and Oakland Park again raised its objections concerning the Workout Arrangement to William O. Brisben, as general partner.

32.    Subsequently, by letter dated April 29, 1999, counsel for Oakland Park notified William O. Brisben of its position that he had entered into the Workout Arrangement without authority, and tendered an offer to purchase the 50% interest of William O. Brisben and the other partners in the Oakland Lakes Limited Partnership, as was its right under the Amended Limited Partnership Agreement, so that Oakland Park could gain control of the Oakland Lakes Limited Partnership and take appropriate action regarding the unauthorized Workout Arrangement, as well as improve the operation and management of the apartment complex. A copy of the letter is attached hereto as Exhibit "F",  and by this reference is made a part of this Complaint.

9

33.     William O. Brisben, as well as the other general and limited partners, refused to take any action in regard to the unauthorized execution of the Workout Arrangement, and refused to sell their 50% interest in the Limited Partnership as required under the Amended Limited Partnership Agreement.

34.     As a result, Oakland Park initiated suit in the Circuit Court for the 17th Judicial Circuit in Broward County Florida, in case number 99-10831 (13) ("the State Court Action"), in an effort to enforce the Amended Limited Partnership Agreement and thereby acquire the interests of William O. Brisben and the other partners in Oakland Lakes, in order to gain control of the Limited Partnership.

35.     Oakland Park, in the State Court Action, moved to appoint a receiver to stabilize the operation determine the financial status of the apartment complex, and also attempted to expedite trial in order to gain control of the Limited Partnership so as to be able to bring this suit as the Limited Partnership, rather than on its behalf.

36.     After this Federal Court action was initiated, Oakland Park and William O. Brisben, W.O. Brisben Companies, Inc. and Robert E. Schuler settled the State Court Action. The settlement was entered into to enforce the buy out provisions of the Amended Limited Partnership Agreement, which Oakland Lakes found necessary to enforce in great part due to the unauthorized actions of William O. Brisben as alleged herein. Pursuant to the settlement,   William O. Brisben and all other former general partners have been replaced as  General Partner of Oakland Lakes.

37.     Subsequent to and as a part of the settlement of the State Court Action, Oakland Park G.P. Corporation became the new General Partner of Oakland Lakes. Oakland Park G.P. Corporation consents to and supports this action.

38.     On August 31, 2000, Oakland Park filed a voluntary petition for Chapter 11 reorganization under the United States Bankruptcy Code, in case Number 00-25351-BKC-RBR, in the United States Bankruptcy Court for the Southern District of Florida, Ft. Lauderdale Division.

39.     As required by Florida Statute Section 620.164, at the time of bringing this action, Oakland Park is a partner of Oakland Lakes, and was also a partner at the time William O. Brisben, as general partner, entered into the unauthorized Workout Arrangement.

40.     As a result of the General Partners' actions, Plaintiff has been forced to engage the undersigned counsel, and is obligated to pay them a reasonable fee for their services.

41.     Plaintiff is entitled to recover its attorneys fees in this action from Oakland Lakes, pursuant to Florida Statute Section 620.166, and is also entitled to recover its attorneys' fees from Condor and HUD, pursuant to the note and mortgage which are the subject of this action.

42.     All conditions precedent to the bringing of this action have occurred, been satisfied by Plaintiff, or have been waived by defendants.

## COUNT I

43.     This is a count for declaratory relief and the allegations set forth in paragraphs 1 through 42 above are hereby realleged and incorporated into this Count I.

44.     For reason of the failure of HUD and/or Brisben, as general partner, to obtain the prior written consent and authority of certain of the other general and limited partners

11

of Oakland Lakes in connection with the Workout Arrangement, as required under the terms and provisions of the Amended Limited Partnership Agreement, the Workout Arrangement is invalid and of no effect and is unenforceable as to its terms and provisions. It is a position of Plaintiff, that the terms and provisions of the original Mortgage and Loan Documents continue to control the loan transaction consummated by and between Oakland Lakes and Cincinnati Mortgage, and as subsequently assigned by Cincinnati Mortgage to GNMA.

45.    A dispute exists between Oakland Park and HUD and/or Condor concerning each parties' respective rights under the Workout Arrangement, Mortgage and Loan Documents regarding HUD's and/or Condor's rights to enforce the Workout Arrangement, Mortgage and Loan Documents, and whether Oakland Park must comply with the Workout Arrangement.

46.    Oakland Lakes is in doubt as to its rights under the Workout Arrangement, and how the workout Arrangement affects Oakland Lakes' rights and responsibilities under the Mortgage, Note and Loan Documents, and is entitled to a judicial declaration as to its rights in order to remove such doubt.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes, Ltd., requests that this Court enter judgment declaring the rights of the parties under the provisional Workout Arrangement and corresponding Loan Documents; declare that the provisional Workout Arrangement is of no force and effect and reinstate the terms of the original Mortgage and Loan Documents; award Plaintiff its reasonable attorneys' fees and

costs incurred in bringing this action; and award any other relief the Court deems necessary and proper.

## COUNT II

47.    This is a second count for declaratory relief, and paragraphs 1 through 42 above are hereby realleged and incorporated into this Count II.

48.    The attempted assignment from HUD to Condor on May 8, 1995 provides that HUD:

> assigns, transfers, sets over and conveys to [Condor], its successors and assigns, the [Amended Mortgage and Note], all as they may have been modified, consolidated, assigned, amended, restated, or supplemented (whether or not of record) through and including May 8, 1995.

49.    The Workout Arrangement, effective February 1, 1995, is an amendment and/or modification of the Mortgage and other Loan Documents.

50.    The attempted assignment by HUD to Condor on May 8, 1995 contemplated the assignment of the Mortgage and other Loan Documents, as modified by the Workout Arrangement.

51.    Because the Workout Arrangement was entered into without the authority of Oakland Lakes, the attempted assignment by HUD to Condor is a nullity, and Oakland Lakes is entitled to a reinstatement of the original terms of the Mortgage and other Loan Documents, as held by HUD, with the Mortgage reverting to HUD ownership.

52.    A dispute exists between Oakland Park and HUD and/or Condor concerning each parties' respective rights under the Assignment, Workout Arrangement, Mortgage and Loan Documents and as to whether HUD or Condors is the true party in interest under the

13

Mortgage and Loan Documents, and whether Oakland Park must comply with the Workout Arrangement.

53.    Oakland Lakes is in doubt as to its rights under the Assignment and Workout Arrangement, and how the workout Arrangement affects Oakland Lakes' rights and responsibilities under the Mortgage, Note and Loan Documents, and is entitled to a judicial declaration as to its rights in order to remove such doubt.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes, Ltd., requests that this Court enter judgment declaring the rights of the parties under the Assignment from HUD to Condor, the provisional Workout Arrangement and corresponding Mortgage Loan Documents; declare that the attempted assignment from HUD to Condor is of no force and effect and reinstate the terms of the original Mortgage and Loan Documents, as being held and owned by HUD, effective the date of entry of the Court's order; award Plaintiff its reasonable attorneys' fees and costs incurred in bringing this action; and award any other relief the Court deems necessary and proper.

## COUNT III

54.    This is a third Count for declaratory relief, and paragraphs 1 through 42 are hereby realleged and incorporated into this Count III.

55.    The Workout Arrangement specifically states:

> To afford an opportunity to effect reinstatement, the Secretary, Department of Housing and Urban Development, will hold the defaulted Note and Mortgage on the subject project under the terms and conditions stated herein.

14

56.     The Workout Arrangement, according to its own terms, required HUD to hold the subject Note and Mortgage.

57.     HUD, rather than holding the Note and Mortgage after entering into the Workout Arrangement, almost immediately assigned HUD's interest to Condor, in direct violation of the terms of the Workout Arrangement.

58.     A dispute exists between Oakland Park and HUD and/or Condor concerning each parties' respective rights under the Workout Arrangement, Mortgage, Loan Documents and Assignment, regarding HUD's and/or Condor's rights to enforce the Workout Arrangement, Mortgage and Loan Documents, and whether Oakland Park must comply with the Workout Arrangement.

59.     Oakland Lakes is in doubt as to its rights under the Workout Arrangement, and how the workout Arrangement affects Oakland Lakes' rights and responsibilities under the Mortgage, Note and Loan Documents, and is entitled to a judicial declaration as to its rights in order to remove such doubt.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes, Ltd., respectfully requests that this Court declare the rights of the parties under the Workout Arrangement, Mortgage and corresponding Loan Documents; enter judgment setting aside the assignment of the Mortgage to Condor, and reinstating the terms of the original Mortgage and Loan Documents, effective the date of entry of the Court's order; award Plaintiff its reasonable attorneys' fees and costs incurred in bringing this action; and award any other relief the Court deems necessary and proper.

## COUNT IV

60.     This is an action for damages in excess of $75,000.00 against HUD and Condor for breach of contract.

61.     Plaintiff repeats and realleges Paragraphs 1 through 42 as if fully stated herein.

62.     The Workout Arrangement, in Paragraph 8, requires payments of $6,560.84 per month, to be made to the "Reserve for Replacement account" ("the Reserve Account") by the mortgagor.

63.     The Reserve Account was originally established pursuant to the Regulatory Agreement for Multifamily Housing Projects Coinsured by HUD ("the Regulatory Agreement"), a copy of which is attached hereto as Exhibit 1, and by this reference made a part hereof.

64.     Pursuant to the Regulatory Agreement, the Reserve Account was to create a fund to cover the cost of major replacements for the project, thereby ensuring that the condition of the property was maintained at an acceptable level.

65.     The funds in the Reserve Account were only to be used for capital improvements, unless HUD otherwise approved, and such approval was in accordance with HUD's administrative procedures.

66.     When HUD attempted to assign the loan documents in dispute herein to Condor, the Assignment specifically excluded the Regulatory Agreement, which remained with HUD.

16

67.    Pursuant to the terms of the Regulatory Agreement, HUD continues to be obligated to receive Reserve Account payments and maintain the Reserve Account for the benefit of the Property.

68.    On information and belief, when HUD attempted to assign its interest in the subject property to Condor, HUD, in violation of the Regulatory Agreement, turned over the Reserve Account to Condor.

69.    On information and belief, Condor has used, or permitted the use of the Reserve Account funds as payments on the loan indebtedness evidenced by the Loan Documents, thereby depleting the Reserve Account, and as a result, the lack of capital funds in the Reserve Account has resulted in the Property falling into a state of disrepair.

70.    On information and belief, Condor has taken such action without the knowledge and/or authority of HUD.

71.    HUD, by failing to maintain control over the Reserve Account has abrogated its duties under Regulatory Agreement, Workout Arrangement and Loan Documents.

72.    Condor, by improperly and without authorization using or permitting the use of the Reserve Account funds to make payments on the subject loan indebtedness, has breached its duties under the Loan Documents.

73.    As a result of HUD's and Condor's actions, the lack of available funds in the Reserve Account has prevented normal maintenance and upkeep on the

Property, and resulted in the lack of available funds with which necessary repairs and improvements to the Property could be made, and further inhibited the Property from being adequately maintained by Oakland Lakes, thereby damaging Oakland Lakes and Plaintiff.

WHEREFORE, Plaintiff, 813268 ONTARIO, INC., as general partner of Oakland Park (Florida) Limited Partnership, as a limited partner and on behalf of Oakland Lakes, Ltd., requests that this Court enter judgment against Defendants Condor and HUD for damages, attorneys' fees, the costs of bringing this suit, and for any other relief this Court deems necessary and proper, and demands trial by jury on all issues so triable.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to: **DAVID W. TRENCH, ESQ.**, 2500 First Union Financial Center, Miami, FL 33131-2336, **WILLIAM C. HEALY, ESQ.**, 99 N.E. 4th Street, Third Floor/civil Division, Miami, FL 33132-2111, and **RICHARD T. WOULFE, ESQ.**, P.O. Drawer 03040, 888 E. Las Olas Blvd., Suite 400 Ft. Lauderdale, FL 33303-0340, this ___ day of November, 2000.

ICARD, MERRILL, CULLIS, TIMM,
FUREN & GINSBURG, P.A.
2033 Main Street, Suite 600
Sarasota, Florida 34237
Telephone: (941) 366-8100
Attorneys for Plaintiff

By: _____
ROBERT E. MESSICK
Florida Bar #31477

F:\USERS\CJB\CJBC\OAKLANDHUD-FED.CT\AMDCOMP.WPD

18

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:                                        CASE NO. 00-25351-BKC-RBR

OAKLAND LAKES, LTD.,                          CHAPTER 11

           Debtor.
_____/

## MEMORANDUM OPINION DISMISSING CASE AS BAD
## FAITH FILING AND GRANTING RELIEF FROM STAY

THIS MATTER came before the Court for hearing on October 25

and November 2, 2000, upon the Motion by Condor One, Inc. ("Condor

One") to Dismiss Petition for Bad Faith, or, Alternatively, for

Relief from Stay (the "Motion to Dismiss"; CP 11) and the Debtor's

response thereto (the "Response to Motion to Dismiss"; CP 38); and

the Debtor's Emergency Motion for Authority to Use Cash Collateral

on a Preliminary Basis and Request for Final Hearing (the "Motion

to Use Cash"; CP 3), Condor One's Response to the Debtor's Motion

for Use of Cash Collateral and Motion to Prohibit Use of Cash

Collateral and for Adequate Protection (the "Motion to Prohibit Use

of Cash"; CP 5), and the Debtor's response thereto (CP 8).

The Court, having considered the Motions and the Responses to

each, having reviewed the court file and having heard argument of

counsel, and being otherwise fully informed in the premises, hereby

makes the following findings of fact and conclusions of law:

*Page 1 of  18*

## PROCEDURAL BACKGROUND

On August 31, 2000 (the "Petition Date"), Oakland Lakes, Ltd. (the "Debtor") filed its petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor operates as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  The following day,  the Debtor filed its Motion to Use Cash Collateral, requesting preliminary, and thereafter final, authority to use cash pursuant to a budget to be provided.  In opposition, Condor One filed its Motion to Prohibit Use of Cash Collateral, to which the Debtor filed its Response on September 11, 2000 (the "Response to Motion to Prohibit Use of Cash").

Based upon agreement of Condor One and the Debtor, on September 25, 2000, the Court entered the Agreed Order on Preliminary Use of Cash, authorizing the Debtor to expend cash in accordance with the budget attached thereto on a preliminary basis. Condor One filed its Motion to Dismiss on September 14, 2000 and the Debtor filed its response to this Motion on October 23, 2000. On the following day, the Debtor filed its Disclosure Statement for Plan of Reorganization.

## FINDINGS OF FACT

The Debtor is a limited partnership organized and existing under the laws of the State of Florida.  The Debtor's sole business

is ownership of the Sailboat Pointe Apartments, a 376-unit apartment project located in Fort Lauderdale, Florida (the Property). The Property (and claims in respect thereof) is the Debtor's sole asset. To finance the development of the Property, the Debtor executed (i) the Amended and Restated Renewal Mortgage Note dated October 5, 1989, in the original principal amount of $22,779,600 (the "Note") and (ii) the Amended and Restated Renewal Mortgage, Assignment of Rents and Security Agreement dated October 5, 2000 (the "Mortgage"; the Note and the Mortgage, as well as such other documents and agreements executed in connection therewith are collectively referred to as the "Loan Documents), each in favor of Cincinnati Mortgage Corporation.

Cincinnati Mortgage Corporation defaulted under a guarantee agreement with the Government National Mortgage Corporation in November 1990, and all of the Loan Documents were ultimately delivered or assigned to the Secretary of Housing and Urban Development ("HUD"), which then became the holder of the Loan Documents. Almost immediately after completing construction of the Property, the Debtor defaulted in one or more of its obligations under the Loan Documents. The Debtor's monetary defaults were not cured and continue to exist.

As a result of the Debtor's defaults under the Loan Documents,

the Debtor and HUD entered into a Provisional Workout Arrangement (the "PWA"), a month-to-month forbearance arrangement. Under the PWA, HUD agreed to take no action on the defaulted Loan provided that the Debtor made specified minimum monthly payments and performed other requirements thereunder. The PWA did not amend or modify the Note or Mortgage; rather, it specifically sets forth that failure to remit a payment would be cause for the holder to proceed with foreclosure.

The Debtor's Limited Partners received an executed copy of the PWA within months of its execution. In addition, the fact of the Debtor's default under the Loan Documents and the execution of the PWA were continuously reported by the Debtor's certified public accountant in the Debtor's annual audited financial statements which were furnished to Limited Partners and to Condor One. The Debtor performed under the terms of the PWA for five years until control of the Debtor changed in late June 2000.

HUD assigned the Note and Mortgage to Condor One on May 8, 1995, and this assignment was recorded on May 11, 1995 in Broward County. One of the Debtor's limited partners commenced a derivative action against Brisben, HUD and Condor on January 31, 2000, seeking to set aside the PWA as well as the assignment of the Loan Documents from HUD to Condor. That action is currently

pending in the District Court for the Southern District of Florida, Case Number 00-6147-CIV-LENARD (the "District Court Action"). The Debtor announced its intention to remove that action to the Bankruptcy Court pursuant to Bankruptcy Rule 9027, however, this Court is advised that the Plaintiff has made a demand for jury trial which this Court may not be able to hear.

In the District Court Action, the Debtor seeks a determination that the PWA is of no force and effect; that the purported assignment of the Loan Documents and PWA from HUD to Condor is a nullity; and that the original terms of the Loan Documents be reinstated, with the Mortgage reverting to HUD. It is the Debtor's contention that Condor is not its secured lender. Furthermore, Condor has the right to "put" the loan back to HUD should it appear that any representation made by HUD concerning the validity of the PWA be false.

In 1998, certain Canadian Limited Partners contacted Anchor Securities ("Anchor"), a brokerage firm, for assistance with their investment in the Debtor. In turn, Anchor contacted Peak Equity Corp. ("Peak") for its assistance. Sol Roter serves as president of Peak. Eventually, Peak and Anchor formed 813268 Ontario, Inc., which became the general partner of Oakland Park, solely in consideration for its efforts on behalf of the Canadian investors.

The limited partners commenced a derivative action against Brisben in Broward County Circuit Court. The parties ultimately entered into a Settlement Agreement (the "Settlement Agreement") which provided for a change in control and management of the Debtor. The Settlement Agreement required Brisben and his affiliates to transfer their interest in the Debtor to the limited partners if certain financial conditions were not met. Effective June 30, 2000, at a cost of $100, the Brisben parties transferred their interest in the Debtor to the limited partners and management and control of the Debtor changed.

From June 1995 through June 2000, the Debtor remitted all required payments to Condor One. Immediately upon the change in ownership, the Debtor refused to make any further payments to Condor One despite having sufficient income from the Property to do so.

Subsequent to the Debtor's failure to make the July 2000 payment under the PWA, Condor One received no assurances from Mr. Roter, the Debtor's new spokesperson, that the Debtor intended to remit the July, 2000 PWA payment. Accordingly, on July 14, 2000, Condor One served upon the Debtor, through Mr. Brisben, a demand letter reciting the Debtor's defaults, asserting Condor One's rights under the Loan Documents and the PWA, accelerating all

amounts due and payable under the Note, and, pursuant to F.S.A. §697.07, demanding all rents, income and profits (the "Rents") from and of the Property.

Copies of the demand were also furnished to Oakland Park's counsel and others. It is without dispute that the notice was received by the Debtor's new general partner on or about the day it was provided. The Debtor still has not remitted the July, 2000 payment or any subsequent payments under the PWA.

The Debtor ignored Condor One's notices to remit Rents payable. Instead, during the period July through August, 2000, Mr. Roter directed the Property manager to utilize Rents to make payments to insiders, including Peak, Anchor, Oakland Park and their counsel, aggregating more than $300,000. As a consequence of the Debtor's payments to insiders, the Debtor was unable to pay its vendors and other creditors holding unsecured claims, which would have otherwise been paid on the Petition Date. As of the Petition Date, such claims, which the Debtor does not dispute, were the Debtor's only unpaid obligations save the Debtor's indebtedness to Condor One.

On August 24, 2000, Condor One filed a complaint (the "Complaint") against the Debtor, styled Condor One, Inc. v. Oakland Lakes, Ltd., Case No. 00-014108 (18), in Broward County Circuit

Court, seeking to foreclose the Mortgage and Note and to enforce the assignment of Rents (the "State Court Action"). That same day, in the State Court Action, Condor One filed its Emergency Motion to Appoint Receiver and for Turnover of Rents Pursuant to Florida Statutes 697.07 (the "Motion to Appoint Receiver").

On August 31, 2000, the day of the scheduled emergency hearing on the Motion to Appoint Receiver, the Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code. The record clearly indicates that this action was undertaken primarily for the purpose of preventing Condor One from obtaining the appointment of a receiver.

The Debtor estimates the value of the Property between $21,000,000 to $24,000,000. According to the Debtor's financial statements, as well as the testimony on behalf of Condor One, the total debt due under the Note and Mortgage exceeds $25,540,000. While the Debtor disputes this amount, it does not dispute that the value of the Property is less than the amount owed under the Loan Documents.

### CONCLUSIONS OF LAW

Section 1112(b) of the Bankruptcy Code empowers the Court, upon application of an interested party, to dismiss a case under Chapter 11 for cause. Numerous courts, including the Eleventh

Circuit, have held that cause for dismissal includes a debtor's bad faith filing of its petition for relief. <u>Phoenix Piccadilly, Ltd.</u> <u>v. Future Fed. Savings Bank of Louisville, Kentucky et al. (In re</u> <u>Phoenix Piccadilly, Ltd.)</u>, 849 F.2d 1393, 1394 (11th Cir. 1988); <u>Westbrook v. Albany Partners, Ltd. (In re Albany Partners, Ltd.)</u>, 749 F.2d 670, 674 (11th Cir. 1984). *See also* <u>Barclays-</u> <u>American/Business Credit, Inc. v. Radio WBHP, Inc.</u> (<u>In re Dixie</u> <u>Broadcasting, Inc.</u>), 871 F.2d 1023, 1026 (11th Cir. 1989). "[G]ood faith is an implicit prerequisite to filing a Chapter 11 bankruptcy petition." <u>In re IAMEC Funding, Inc.</u>, 234 B.R. 539, 542 (Bankr. M.D. Fla. 1999) (citation omitted).

The courts have identified numerous factors which are conducive to a finding of bad faith. In <u>Phoenix Piccadilly</u>, the Eleventh Circuit enumerated the following non-exclusive factors that courts should consider in making such a determination:

1.   Whether the debtor has only one asset;

2.   Whether the debtor has few unsecured creditors, whose claims are small in relation to the claims of secured creditors;

3.   Whether the debtor has few, if any, employees;

4.   Whether the debtor's single asset is the subject of court action;

4.   Whether the debtor's single asset is the subject of court action;

5.   Whether the debtor's financial problems involve essentially a two-party dispute which can be resolved in state court litigation; and

6.   Whether the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

Phoenix Piccadilly, 849 F.2d at 1394-95.

In this case, each of the foregoing factors weighs heavily in favor of dismissal.

### Whether the debtor has only one asset

Indisputably, the Property is the Debtor's sole asset.

### Whether the debtor has few unsecured creditors, whose claims are small in relation to the claims of secured creditors

According to the Debtor's Schedules and Statement of Financial Affairs, unsecured claims aggregate approximate $171,000. The Debtor's secured obligation exceeds $25,540,000. The value of the Property and thus, the value of any claim secured by the Property, does not exceed the sum of $24,000,000. Moreover, all of the Debtor's unsecured claims could and would have been paid in full had the Debtor not commenced this case.

### Whether the debtor has few, if any, employees

The Debtor has no employees.   Mr. Roter is solely a

spokesperson. The Debtor has retained the services of Icorr Properties, Inc. ("Icorr") exclusively to operate and manage the Property. The significance of this factor, of course, is whether the dismissal of the case may jeopardize the employment of a significant number of wholly innocent employees.

Where an entity has no employees, courts have determined that protection of the bankruptcy laws is not proper because there are no employees to protect. The Sixth Circuit in Winshall Settlor's Trust, 758 F.2d at 1137, aptly noted that [t]he purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state. See In re Dolton Lodge Trust No. 35188, 22 B.R. 918, 922 (Bankr.N.D.Ill.1982). "[I]f there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its raison d'etre . . .." In re Ironsides, Inc., 34 B.R. 337, 339 (Bankr.W.D.Ky.1983), cited in Matter of Little Creek Development Co. 779 F.2d 1068, 1073 (5th Cir. 1986).

Even if it is assumed that the Property manager's employees should be deemed employees of the Debtor for this purpose, the dismissal of the case should have little impact on the continued employment of those employees by the current or any successor

manager or owner of the Property since it must be presumed that the Property will continue to be operated in any scenario.

**Whether the debtor's single asset is the subject of court action**

The State Court Action and the District Court Action were pending at the Petition Date. Both actions solely relate to the Property and indebtedness under the Note and Mortgage secured by the Property.

**Whether the debtor's financial problems involve essentially
a two-party dispute which can be resolved in state court
litigation**

Despite the Debtor's attempts to implicate HUD and others in litigation, at this juncture, the Debtor's financial problems solely involve two parties, the Debtor and Condor One. Each of the issues raised by the Debtor in its defense against Condor One's motion to dismiss are implicated or raised in the District Court Action and the State Court Action.

**Whether the timing of the debtor's filing evidences an intent to
delay or frustrate the legitimate efforts of the debtor's secured
creditors to enforce their rights**

The timing of the Debtor's filing evidences a clear intent to delay and frustrate the legitimate efforts of Condor One to enforce its rights under the Loan Documents in the State Court Action. As amply indicated in the record, the Debtor has admitted that it filed its petition for relief under Chapter 11, on the same day as

the scheduled hearing to appoint a receiver in the State Court Action, to avert the outcome of that hearing. Even the Property manager is unaware of any reason other than the dispute between the Debtor and Condor One for the Debtor's bankruptcy filing.

### Other Factors

In addition to the foregoing, other factors weigh in favor of the dismissal of the Debtor's Chapter 11 case.

### The Debtor lacks equity in its single asset

The Debtor estimates that the Property has a value between $21,000,000 to 24,000,000. Condor One claims to be owed $25,540,000. While the Debtor's schedules list the debt to Condor One as disputed, the amount in dispute was not clear from the Debtor's evidence. Furthermore, while the Debtor may be hopeful that the value of the Property will increase in the future, in part because of its ability to increase rents, the pertinent inquiry is whether any meaningful equity in the Property existed as of the Petition Date. Therefore, on the basis of the record before the Court, the Debtor appears to lack any meaningful equity in the Property.

### Transfers to Insiders and Their Professionals

During the period July 1 through August 31, 2000, the Property manager, at Mr. Roter's direction, made payments to Peak and

Anchor.   These payments, allegedly in reimbursement of legal fees incurred in connection with the following: litigation involving the former general partner; to Oakland Park purportedly for the same purpose; to Oakland Park's counsel for fees incurred for such legal actions, as well as for future legal services.  The total of such payments exceeded $300,000 and were made from Rents.   The vast majority of such payments occurred after Condor One's Notice of Default and demand for Rents.  As a consequence of these payments, the Debtor could not pay its vendors and unsecured creditors on August 31, 2000, as it ordinarily would have before bankruptcy. The Debtor failed to make any payments to Condor One under the PWA in July and August, 2000.

As the Court observed in Midway Investments, 187 B.R. at 389-90,  transfers to equity interest holders prior to bankruptcy (in that case, some seven months before the petition date) "provides the most salient evidence of bad faith."  The Debtor asserts that the Plan and Disclosure Statement which it filed on the eve of this hearing are evidence of its good faith and ability to reorganize. The Court is unpersuaded by this assertion for several reasons.

First, the filing of a plan is insufficient to overcome the existence of the numerous factors which weigh heavily in favor of dismissal of this case.  The Eleventh Circuit in Phoenix Picadilly

omitted the filing of a plan and the ability of a debtor to reorganize from its list of factors indicating a good faith filing. This is suggestive of the relative unimportance of these factors.

In addition, a plan cannot be confirmed unless it has been proposed in good faith. 11 U.S.C. 1129(a)(3). It would be incongruous to conclude that while a Chapter 11 petition may have been filed in bad faith, a plan in such a case can meet the section 1129(a)(3) good faith requirement for confirmation purposes. Chapter 11 reorganization is not possible if the case should not have been before this Court in the first instance.

Finally, the Plan filed in this instance does not appear to be confirmable. The proposed plan does little to resolve the Debtor's principal problem since, under the Plan, the Debtor's obligation under the Loan Documents continues to depend on the outcome of the District Court Action. The Debtor's Plan also appears to separately classify Condor One's deficiency claim and this may engender assertions of gerrymandering. In re Holywell Corp., 913 F.2d 873, 880 (11th Cir. 1990). Furthermore, this separate classification may violate the absolute priority rule under 11 U.S.C. §1129(b)(2). Bank of America Nat'l Trust and Savings Assn. v. 203 North LaSalle Street Partnership, 119 S.Ct. 1411 (1999). It appears that the Debtor's reorganization is altogether dependent

upon obtaining a reduction of Condor One's claim either by agreement or through litigation; neither of which is imminent.

Condor One is entitled to relief from stay for cause, pursuant to 11 U.S.C. §362(d)(1), and may continue prosecuting the State Court Action. Dixie Broadcasting, Inc., 871 F.2d at 1026; In re Double W Enters., Inc., 240 B.R. 450, 453 (Bankr. M.D. Fla. 1999) ("The Eleventh Circuit Court of Appeals has long recognized that a debtor's lack of good faith constitutes cause for the dismissal of a case . . . and also cause for granting relief from the automatic stay pursuant to §362(d)(1)"). The factors constituting bad faith for purposes of dismissal of a bankruptcy case and relief from the automatic stay are the same. See, e.g., Dixie Broadcasting, 871 F.2d at 1026-27.

As a result of the timing of the Debtor's filing, Condor One was deprived of its hearing to appoint a receiver to collect Rents. To restore the parties to the pre-petition status quo, Condor One seeks immediate and complete relief from the automatic stay, under 11 U.S.C. §§ 362(d)(1) and 105(a), to permit Condor One to prosecute the State Court Action to the fullest extent permitted by applicable law and reschedule appropriate hearings while dismissal becomes final. Such relief is appropriate to prevent the Debtor from depleting Rents collected to date and to protect Condor One's

interest in such Rents.

CONCLUSION

The Court finds that the Debtor filed its petition for relief under Chapter 11 in bad faith. As such, dismissal of the case and immediate stay relief are the appropriate. Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1.    Condor One's Motion For Relief From Automatic Stay is **GRANTED.** Condor One may continue prosecuting the State Court Action, pursuant to 11 U.S.C. § 362(d)(1), effective immediately upon the date of this order.

2.    Condor One's Motion to Dismiss is **GRANTED.** The captioned main bankruptcy case is dismissed, with six months (6 months) prejudice pursuant to 11 U.S.C. §1112(b), effective 10 days from the date of this order.

3.    Final approval of the Motion to Use Cash and the Motion to Prohibit Use of Cash are **DENIED** as moot.

4.    Except as may be agreed to by the Debtor and Condor One, the Debtor's further use of Condor One's cash collateral is **PROHIBITED**.

5.    All pending Motions are **DENIED** as moot.

**DONE AND ORDERED** in the Southern District of Florida on

DEC 1 1 2000
_____

# RAYMOND B. RAY
_____
RAYMOND B. RAY
United States Bankruptcy Judge

Copy to:

Assistant United States Trustee
51 S.W. First Avenue
Room 1204
Miami, FL 33130

Scott L. Baena, Esq.
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131

Glenn D Moses, Esq
100 SE 2 St #3600
Miami, FL 33131

**Attorney Baena** is hereby directed to serve a conformed copy of this order upon all interested parties and to file a certificate of service with the clerk of court.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-7847-CIV-JORDAN

FILED by _____ D.C.

DEC 2 2 2000

CLARENCE MADDOX
CLERK U S DIST. CT.
S.D. OF FLA. MIAMI

CONDOR ONE, INC. )
　　　　Plaintiff )
　 )
vs. )
　 )
OAKLAND LAKES, LTD )
　　　　Defendant )
　 )
_____ )

**ORDER GRANTING MOTION TO SEQUESTER RENTS**

　　　　Condor One, Inc. has filed an emergency motion for sequestration of rents pursuant to Fla. Stat. § 697.07. In its response, which is attached, Oakland Lakes does not oppose the sequestration of rents, and further represents that, per the parties' agreement, the rents have already been segregated. Florida law allows a court of competent jurisdiction, pending final adjudication of the matter, to enter an order requiring the mortgagor to deposit the collected rents, commonly referred to as sequestration of rents. The procedure in § 697.07 creates a simplified procedure for perfection of the right to sequester rent, without creating an outright transfer of ownership where none existed before. *See In re Brackin*, 158 B.R. 249, 251 (Bankr. M.D. Fla. 1993). I find that Condor has met the requirements in the statute. Accordingly, the emergency motion to sequester rents, filed December 21, 2000, is GRANTED, and the rents shall continue to be segregated and deposited in a separate account, pending a hearing on January 3, 2001, at 4:45 p.m. The emergency motion is DENIED in all other respects.

　　　　DONE and ORDERED in chambers in Miami, Florida, this 22nd day of December, 2000.

　　　　　　　　　　　　　　　　　　Adalberto Jordan
　　　　　　　　　　　　　　　　　　United States District Judge

Copy to:　　Richard T. Woulfe, Esq. (Fax: 952-525-2134)
　　　　　　David W. Trench, Esq. (Fax: 305-374-7593)
　　　　　　Robert E. Messick, Esq. (Fax: 941-366-6384)

RECEIVED BY _____
DATE 12/22 TIME 1:45

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-7847-CIV-JORDAN

CONDOR ONE, INC.,
a Delaware corporation,

       Plaintiff,

vs.

OAKLAND LAKES LTD.,
a Florida Limited Partnership,

       Defendant.

_____\

### ANSWER TO PLAINTIFF CONDOR ONE'S COMPLAINT

Defendant OAKLAND LAKES, LTD., a Florida Limited Partnership ("Oakland Lakes),

files this its answer and affirmative defenses to Condor One, Inc.'s ("Condor") complaint, and

alleges:

1.      Admitted that Condor is seeking to foreclose a mortgage.   Jurisdiction is

appropriate in Federal District Court pursuant to Oakland Lakes' Notice of Removal.

2.      Admitted.

3.      Admitted.

4.      Admitted that, but for Oakland Lakes' Notice of Removal of this action to Federal

District Court, venue would have been proper in Broward County, Florida.

5.      Admitted.

6.      Admitted Oakland Lakes obtained the loan for the development, construction and

ownership of the apartment project; otherwise denied.

7.    Admitted.

8.    Admitted.

9.    Admitted.

10.    Admitted.

11.    Admitted.

12.    Admitted.

13.    Admitted.

14.    Admitted.

15.    Admitted.

16.    Admitted that HUD entered into negotiations with William O. Brisben as former general partner of Oakland Lakes, Ltd., and further admitted that HUD and William O. Brisben executed the Provisional Workout Arrangement ("PWA") effective as of February 1, 1995. Denied that the PWA is binding on Oakland Lakes, and denied that same was executed by Oakland Lakes under proper authority and/or approval.

17.    The terms of the PWA are contained in the document, which speaks for itself.

18.    The terms of the PWA are contained in the document, which speaks for itself.

19.    Admitted that on or about May 8, 1995, HUD attempted to assign the note and mortgage to Condor. Denied that this assignment was proper or enforceable.

20.    Admitted that letters which purport to provide notice are attached to the complaint; denied that proper notice was given.

21.    Admitted.

22.    Admitted.

23.    Admitted that Condor One sent a letter on or about July 14, 2000, and admitted that a copy of same is attached to the complaint. Denied that the letter was, under applicable

-2-

law, an effective or proper assertion of Condor One's rights under the note, mortgage and the PWA.

## COUNT I

24.    Oakland Lakes repeats and realleges its answers to paragraphs 1 through 23 as if fully set forth herein.

25.    Admitted that Condor is seeking to foreclose a mortgage on real property located in Broward County, Florida.

26.    Denied that Condor is the owner and holder of the note and mortgage.

27.    Admitted.

28.    Denied.

29.    Denied.

30.    Denied.

31.    Without knowledge.

32.    Denied.

## COUNT II

33.    Oakland Lakes repeats and realleges its answers to paragraphs 1 through 32 as if fully stated herein.

34.    Admitted that Condor has attempted to obtain the rents generated by the property.

35.    The terms of the mortgage speak for themselves. Denied that Condor is entitled to all rents from the property during any time during which the mortgage is in default

36.    Admitted that Condor sent a letter purporting to demand all rents income and profits from the property on or about July 14, 2000. Denied that such demand was timely or proper under applicable law.

-3-

37.    Denied.

38.    Admitted.

## COUNT III

39.    Oakland Lakes repeats and realleges its answers to paragraphs 1 through 38 as if fully stated herein.

40.    Admitted that Condor has brought an action seeking damages in excess of $15,000.00. Denied that Condor is entitled to bring such an action.

41.    Admitted that Oakland Lakes has collected rents monthly since July 1, 2000, and admitted that Oakland Lakes has not made payments under the note and mortgage to Condor.

42.    The terms and provisions of the note and mortgage speak for themselves. Denied that Condor is entitled to any rents, issues and profits under the note and mortgage.


## FIRST AFFIRMATIVE DEFENSE

1.    Condor is not entitled to the relief sought in its compliant because Condor does not properly own or hold the note, mortgage and PWA involved in this case. Oakland Park (Florida) Limited Partnership ("Oakland Park"), as a limited partner of Oakland Lakes, initiated suit on behalf of Oakland Lakes prior to Condor initiating this foreclosure action, in the case styled: 813268 Ontario, Inc. v. Oakland Lakes, Ltd.,et al, Case No. 00-6147-CIV-Lenard/Turnoff, in the Federal District Court of the Southern District of Florida, which has since been removed to bankruptcy court in the bankruptcy case of In re: Oakland Lakes, Case No. 00-25351-BKC-RBR, Adversary No. 00-2530-RBR-A. In that action, Oakland Park has challenged Condor's right to enforce the note, mortgage and PWA. Specifically, Oakland Park alleges that Oakland Lakes' former general partner, William O. Brisben, entered into the PWA without the authority of the limited partners of Oakland Lakes, including Oakland Park, in direct

-4-

violation of the express terms of the Amended and Restated Limited Partnership Agreement

of Oakland Lakes, Ltd. ("The Partnership Agreement").  As a result, the PWA is unenforceable

against Oakland Lakes.  Oakland Park also alleges in that action that the Secretary of Housing

and Urban Development ("HUD") improperly assigned the note, mortgage and PWA to Condor,

and that HUD is the true holder of the note, mortgage and PWA.  Oakland Lakes attaches

hereto as composite Exhibit A, and incorporates by reference, the allegations of the complaint

and amended complaint filed in that proceeding, as more fully set forth therein.

## SECOND AFFIRMATIVE DEFENSE

2.      Defendant, Oakland Lakes is already involved in  Case No. 00-6147-CIV-

Lenard/Turnoff, which raises challenges to Condor's rights to enforce the same loan documents

which are at issue in this cause; therefore this action should be consolidated with the federal

court action referenced above so that all issues may be resolved without the possibility of

conflicting verdicts or inconsistent results. Alternatively, this action should be stayed until Case

No. 00-6147-CIV-Lenard/Turnoff is resolved.

## THIRD AFFIRMATIVE DEFENSE

3.      Condor One, Inc. should be denied its right to foreclosure for public policy

considerations.  The note and mortgage originally delivered by Oakland Lakes was for the

purpose of creating a low income housing project in south Florida, in furtherance of the goals

of the National Housing Act. Upon information and belief, Condor One purchased the subject

note and mortgage at a substantial discount of up to 50% of its actual principal balance, solely

in an effort to gain control of the property and remove the low income housing restrictions

connected with the original loan documents, and thereby convert or resell the property at a

large profit. The public policy goals of the National Housing Act would be best served if Oakland Lakes maintained the property.

## FOURTH AFFIRMATIVE DEFENSE

4.      Oakland lakes is entitled to a set-off of all monies it has paid to all entities who have held the note, mortgage and PWA at issue in this cause, and is further entitled to a set-off of all amounts it has suffered in damages as a result of the improper conduct of Condor and its predecessors in interest in regard to the loan at issue in this cause.

## FIFTH AFFIRMATIVE DEFENSE

5.      Condor is not entitled to foreclosure of the note and mortgage alleged in its complaint due to its own inequitable conduct and the inequitable conduct of its predecessor in interest, HUD. Specifically, Condor obtained the loan from HUD during the same time period HUD was negotiating with Oakland Lakes concerning the PWA, and obtaining Oakland Lakes' unauthorized agreement by its then general partner, William O. Brisben, to the terms of the PWA, including a confirmation of the full principal amount of the debt, plus accrued interest, and an "equity kicker" in favor of HUD, whereby a percentage of any equity in the property securing the loan would be paid to HUD upon any sale of the property. The PWA also included ongoing required operating restrictions, including requiring a reserve account, monthly servicing fees and cash balance forfeiture requirements.

-6-

6.    On information and belief, HUD took such actions only after it had begun to solicit bids and/or enter into negotiations to sell the loans to Condor or a similar "vulture fund" lender at a substantial discount which Oakland Lakes believes amounted to a sale of the loans at less than 50% of the total principal loan value of the loan.

7.    HUD, while negotiating the sale of Oakland Lakes' loan at a substantial discount of their outstanding balance, at the same time required Oakland Lakes to enter into the PWA confirming the full amount of the debt, and providing the "equity kicker." At this time, HUD failed to disclose in any manner the nature of the negotiations to Oakland Lakes so as to allow Oakland Lakes to be able to make an informed decision as to whether it should enter into the PWA with HUD, or instead initiate efforts to obtain alternative financing.

8.    The PWA, by its own terms, contains language requiring HUD to hold the Loan. Oakland Lakes entered into the PWA with the full expectation that HUD would be holding the loan and working with Oakland Lakes in an effort to further the interests of the National Housing Act, by attempting to ensure the viability of the project, in order to maintain affordable low income housing.

9.    Instead, HUD immediately after finalizing the execution of the PWA, sold the loan to Condor One, Inc, a wholly owned subsidiary of G.E. Capital Corporation, and an admitted "vulture fund," who's sole motive was profit, and who, in the event of a default, would seek to foreclose on the property, which would foreclose and eliminate the land use restrictions which ensure low income housing, and other HUD imposed burdens on the property, thereby enabling Condor to re-sell such properties at a considerable profit even beyond the amount Condor would realize as a result of the deeply discounted sale price of the loan.

-7-

10.    HUD, by selling the loans to a vulture fund like Condor, rather than allowing Oakland Lakes the opportunity to obtain alternative financing at a reduced principal amount, effectively maintained unfavorable financial conditions in relation to the property, thereby forcing Oakland Lakes to expend additional funds on debt service, rather than devoting funds to the maintenance and enhancement of the property, which would have more effectively advanced the goals of the National Housing Act to provide for affordable quality low income housing.

## DEMAND FOR ATTORNEYS FEES

11.    The note and mortgage at issue in this cause provide for an award of attorneys fees to the prevailing party in litigation. Oakland Lakes has engaged the undersigned attorneys and agreed to pay them a reasonable fee for their services.   In the event Oakland Lakes prevails in this litigation, it demands payment of it attorneys fees from Condor.

-8-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by U.S. Mail to **DAVID W. TRENCH, ESQ.**, 2500 First Union Financial Center, 200 South Biscayne Blvd., Miami, FL 33131, and **RICHARD T. WOULFE, ESQ.**, P.O. Drawer 03040, 888 E. Las Olas Blvd., Suite 400 Ft. Lauderdale, FL 33303-0340, this 26th day of December, 2000.

Respectfully submitted,

ICARD, MERRILL, CULLIS, TIMM,
FUREN & GINSBURG, P.A.
2033 Main Street, Suite 600
Sarasota, FL 34237
Telephone: (941) 366-8100
Counsel for Defendant

By: _____
ROBERT E. MESSICK
Florida Bar No. 31477
JASON A. LESSINGER
Florida Bar No. 0091601

F:\USERS\CJB\CJBC\OAKLAND\CONDOR\ANSWER

1.2                                                                    9/28/89

After Recordation, please forward this document to:

Charles C. Bissinger, Jr., Esq.
Strauss & Troy
2100 Central Trust Center
201 East Fifth Street
Cincinnati, Ohio 45202-4186

**89399512**

AMENDED AND RESTATED RENEWAL

MORTGAGE, ASSIGNMENT OF RENTS
AND
SECURITY AGREEMENT

BY AND BETWEEN

OAKLAND LAKES, LTD.

AND

CINCINNATI MORTGAGE CORPORATION

Section 221(d)(4) pursuant to Section 244 of
the National Housing Act as amended

October 5, 1989

This Amended and Restated Renewal Mortgage, Assignment of Rents and Security Agreement amends, restates and renews in its entirety, and shall be in substitution of, that certain Mortgage and Security Agreement from Mortgagor to the Florida Housing Finance Agency ("FHFA") dated October 1, 1989 and recorded October 5, 1989 as Clerk's File No. 89399509 in the Public Records of Broward County, Florida, which Mortgage and Security Agreement was assigned by FHFA to Citizens and Southern Trust Company (Florida), National Association (the "Trustee") by Assignment of Mortgage Note and Mortgage and Security Agreement dated October 4, 1989 and recorded October 5, 1989 as Clerk's File No. 89399509 in the Public Records of Broward County, Florida, and which Mortgage and Security Agreement was further assigned by the Trustee to Cincinnati Mortgage Corporation by Assignment of Mortgage Note and Mortgage and Security Agreement dated October 4, 1989 and recorded October 5, 1989 as Clerk's File No. 89399510 in the Public Records of Broward County, Florida.

THIS INSTRUMENT PREPARED BY:
CHARLES C. BISSINGER, JR., ESQ.
STRAUSS & TROY, CO., a P.A.
2100 CENTRAL TRUST CENTER
201 EAST FIFTH STREET

**WILL CALL**

RETURN TO:
PATRICK NEWTON
ATKINSON, HENNE, ...
STONE & COHEN, P.A.
P.A. DRAWER 2010

## AMENDED AND RESTATED RENEWAL
## MORTGAGE, ASSIGNMENT OF RENTS
## AND SECURITY AGREEMENT

THIS AMENDED AND RESTATED RENEWAL MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT, (the "Mortgage") is made and entered into as of the ___5th___ day of October, 1989 and between Oakland Lakes, Ltd., a limited partnership organized and existing under the laws of the State of Florida and having its principal place of business at 4750 Ashwood Drive, Suite 300, Cincinnati, Ohio 45241 (the "Mortgagor"), and CINCINNATI MORTGAGE CORPORATION, a corporation organized and existing under the laws of the State of Ohio and having its principal place of business at 2368 Victory Parkway, Suite 210, Cincinnati, Ohio 45206 and any successors thereof as the holder or holders of the Note, as hereinafter defined ("Mortgagee").

### R E C I T A L S

WHEREAS, the Mortgagor is indebted to the Mortgagees, in the sum of Twenty Two Million Seven Hundred Seventy Nine Thousand Six Hundred and no/100 Dollars ($22,779,600.00), (the "Mortgage Loan"), with interest thereon from the date hereof at the rate of eight and one-quarter percent (8.25%) per annum on the unpaid balance until paid; as evidenced by a Mortgage Note of even date herewith which matures on December 1, 2031, and all extensions thereof, however evidenced (the "Note"); and

WHEREAS, Mortgagee has obtained two Commitments to Guarantee Mortgage Backed Securities from the Government National Mortgage Association ("GNMA") based upon the Mortgage Loan and the pledge of this Mortgage as required by GNMA (the "GNMA Commitments"), one of which relates to construction loan certificates ("CLC's") and the other of which relates to permanent loan certificates ("PLC's"); and

WHEREAS, Mortgagee intends to issue and present to GNMA for its guarantee "fully modified pass through" mortgage-backed CLC's and PLC's guaranteed as to timely payment of principal and interest by GNMA (the "GNMA Securities"); and

WHEREAS, the Mortgage Loan is made to provide for the construction of certain premises and consisting of a 376-unit apartment project located in the State of Florida (the "State"), including related parking and other ancillary facilities (the "Project"), pursuant to an agreement between Mortgagee and Mortgagor dated January 13, 1989, and including any amendments thereto (the "Coinsured Loan Commitment"); and

-1-

WHEREAS, this Mortgage shall be a valid first lien on the real and personal property comprising the Project; and

WHEREAS, the advances of the Mortgage Loan proceeds made, and to be made, to Mortgagor, shall be coinsured by Mortgagee and the Secretary of Housing and Urban Development of Washington, D.C. ("HUD") under Section 221(d)(4) and pursuant to Section 244 of the National Housing Act, as amended (the "Housing Act"), and the regulations thereunder (the "Coinsurance Regulations"), such coinsurance being evidenced by HUD's endorsement of the Note; and

WHEREAS, all things necessary to make the Note a valid, binding and legal obligation of the Mortgagor, and to make this Mortgage a valid, binding and legal instrument for the security of the Note and the performance of Mortgagor's obligations thereunder and hereunder, have been duly performed.

NOW, THEREFORE, THIS MORTGAGE WITNESSETH:

That, for good and valuable consideration, including the indebtedness herein recited, the receipt of which is hereby acknowledged, Mortgagor has granted and conveyed, and does hereby grant, convey, and warrant unto Mortgagee, its successors and assigns forever, for the benefit and security of the Mortgagee, its successors and assigns, in order to secure performance of its obligations under the Note, this Mortgage and the other Loan Documents, all of that certain real estate situated in the County of Broward and State of Florida and more particularly described in Exhibit A, attached hereto incorporated herein and made a part hereof (the "Real Estate"); being the same property conveyed to Mortgagor by deeds recorded in Official Records Book  16203 , Pages  517 #  , of the Public Records of Broward County, Florida. # 519, 521, 567, 571 & 575, Respectively,

TOGETHER WITH all of the collateral described in Exhibit B, attached hereto incorporated herein and made a part hereof;

AND TOGETHER WITH all easements, rights-of-way and rights used in connection therewith or as a means of access thereto, and all tenements, hereditaments and appurtenances thereof and thereto, all water rights and all right, title and interest of Mortgagor, now owned or hereafter acquired, in and to any land lying within the right-of-way of any street, open or proposed, adjoining said land, and any and all sidewalks, alleys, strips and gores of land adjacent to or used in connection with the said land and the improvements thereon;

AND TOGETHER WITH all of the rents, issues and profits and insurance or condemnation proceeds which may arise or be had from any of the foregoing, and all articles of personal property now or hereafter attached to or used in and about the building or buildings now erected or hereafter to be erected on said land which are necessary to the complete and comfortable use and

-2-

occupancy of such building or buildings for the purposes for
which they were or are to be erected, including all goods and
chattels and personal property as are ever used or furnished in
operating a building or the activities conducted therein, similar
to the one(s) herein described and referred to, and all renewals
or replacements thereof or articles in substitution therefor,
whether or not the same are, or shall be attached to said build-
ing or buildings in any manner except property belonging to the
tenants (Mortgagor agrees that, to the extent permitted by law,
the foregoing property shall be deemed to be real estate and
affixed to the realty);

     AND TOGETHER WITH all right, title and interest of Mortgagor
in and to all leases or subleases covering the Project or any
portion thereof now or hereafter existing or entered into, any
and all right, title and interest of Mortgagor thereunder, in-
cluding, and without limitation, all cash and, subject to the
rights of tenants therein, all security deposits, advance depos-
its, advance rentals and deposits or payments of similar nature;

     TO HAVE AND TO HOLD the above granted Property as described
in the aforesaid granting clauses unto and to the use and benefit
of Mortgagee, its successors and assigns, forever, for the uses
and purposes hereinafter set forth.

     AND THIS MORTGAGE FURTHER WITNESSETH, that to protect the
security of this Mortgage, Mortgagor, for itself, its successors
and assigns, has covenanted and agreed and does hereby covenant
and agree with Mortgagee, and its successors and assigns, as
follows.

## ARTICLE I

### DEFINITIONS

     Section 1.01.  **Defined Terms.**  Capitalized terms defined in
the recitals hereto shall have the meanings specified therein,
certain capitalized terms not defined herein shall have the
meanings specified in the Building Loan Agreement, and the fol-
lowing capitalized terms shall have the following meanings:

     "Building Loan Agreement" means the Building Loan Agreement
of even date herewith between Mortgagor and Mortgagee with re-
spect to the Project.

     "Coinsurance Contract" means the agreement between Mortgagee
and HUD of coinsurance for the Mortgage Loan under Section
221(d)(4) pursuant to Section 244 of the National Housing Act and
the Coinsurance Regulations, created by HUD's endorsement of the
Note.

-3-

"Event of Default" is defined in Section 6.01.

"HUD Regulatory Agreement" means the agreement entitled Regulatory Agreement for Multifamily Housing Projects Coinsured by HUD of even date herewith, between Mortgagee and Mortgagor with respect to the operation of the Project.

"Indebtedness Hereby Secured" means, as of any particular time, the then unpaid balance of the principal sum of the Note together with interest thereon, all other payments due under the Note and/or hereunder and such additional unpaid sums as shall have been paid or advanced by or on behalf of Mortgagee, on behalf of Mortgagor, pursuant to the Note, the Building Loan Agreement or hereunder, or which shall otherwise be payable by Mortgagor to Mortgagee, with interest thereon, all as herein and in the Loan Documents provided, as well as all documentary and intangible taxes on the Note and Mortgage as may be imposed by State law, which taxes Mortgagor covenants and agrees to pay.

"Loan Documents" means this Mortgage, the Note, the Coin-sured Loan Commitment, the HUD Regulatory Agreement, the Building Loan Agreement, and any other instrument given to evidence or further secure the payment or performance of any obligations secured under this Mortgage.

"Mortgagee" means Cincinnati Mortgage Corporation, as payee of the Note as long as it shall own the same, and such other person, firm or corporation to whom the Note shall have been endorsed, pledged, transferred or assigned and by whom, as the lawful holder thereof, the Note is then held, subject, however, to the terms of any agreement for any such pledge, transfer or assignment and provided that HUD is under no obligation to recognize any entity as the beneficiary of the Coinsurance Contract unless it is an approved coinsured lender pursuant to applicable regulations.

"Property" means and shall include the Real Estate, all property of the Mortgagor as is described in the granting clauses hereof, all of the property set forth on Exhibit B and any and all other property which is or becomes subject to the lien of this Mortgage or any security interest created pursuant to the provisions of this Mortgage.

ARTICLE II

MORTGAGOR'S REPRESENTATIONS AND WARRANTIES

Section 2.01 Due Authorization, Etc.  Mortgagor represents and warrants that it has duly authorized, executed and delivered the Note and has duly authorized, executed, acknowledged and delivered the other Loan Documents to secure the repayment of the

-4-

Indebtedness Hereby Secured, and to secure the performance of the covenants, agreements and conditions contained therein and here-in.

Section 2.02 Validity of Loan Documents.  Mortgagor repre-sents and warrants that all things necessary to make the Loan Documents valid, binding and legal obligations of Mortgagor for the security of the Indebtedness Hereby Secured, in accordance with their respective terms, have been duly performed.

ARTICLE III

PAYMENT BY MORTGAGOR

Section 3.01 Covenant to Pay.  Mortgagor hereby expressly covenants, promises and agrees that it will duly and punctually pay the Indebtedness Hereby Secured at the times and in the manner herein or in the Note or in the other Loan Documents provided, according to the true intent and meaning hereof and thereof, time being of the essence for such payments.  Any remit-tance by check or draft shall be made subject to the condition that such check or draft may be handled for collection in accor-dance with the practice of the collecting bank or banks, and any receipt issued therefor shall be ineffective until the amount due is actually received by the Mortgagee.

Section 3.02 Limitation on Liability.  The covenant of the Mortgagor to pay principal and interest is included in the Note secured hereby for the purpose of establishing and continuing the existence of the indebtedness.  However, it is a condition of said covenant and those contained herein that in the event of a default under the terms hereof, the Mortgagee shall take no action against the Mortgagor, or its partners, except such as may be necessary to subject to the satisfaction of the Indebtedness Hereby Secured, the Property described herein and any chattels appurtenant to the use thereof, provided, that nothing in this covenant and no action so taken shall operate to impair any obligation of the Mortgagor under the Building Loan Agreement and/or the HUD Regulatory Agreement herein referred to and made a part hereof (including, with respect thereto, the rights of HUD) or to deprive the Mortgagee of any rights it may have by law which are not expressly waived.  This Section shall not be deemed to limit the remedies of the Mortgagee, its successors or as-signs, in law or in equity, pursuant to this Mortgage, provided that the exercise of any such remedies, including the obtaining of any judgments or decrees at law or in equity or other orders shall not impose any personal liability on Mortgagor or any partner of Mortgagor.

-5-

The provisions of this Section shall not be deemed to limit claims by Mortgagee or HUD for the following:

(a) Misapplication of insurance or condemnation proceeds;

(b) Misapplication of Mortgage Loan proceeds;

(c) Improper application of tenant security deposits or pre-paid rents;

(d) Failure, prior to Mortgagor's default hereunder, to properly apply rents and other revenue of the Property actually collected by Mortgagor to necessary and proper expenses of the Property, including the Indebtedness Hereby Secured or failure, after Mortgagor's default hereunder, to properly apply rents and other revenue of the Property actually collected by the Mortgagor (i) to necessary and proper expenses of the Property or (ii) to reduce the Indebtedness Hereby Secured by applying such amounts first to costs permitted to be paid from Project revenues by this Mortgage and by HUD regulations, then to unpaid interest due and finally to the principal balance outstanding on the Note or other Indebtedness Hereby Secured; and

(e) Failure to pay valid mechanic's and/or materialmen's liens filed against the Property prior to Mortgagor's default under the Indebtedness Hereby Secured or filed after Mortgagor's default under the Indebtedness Hereby Secured to the extent the claim set forth in such lien relates to labor performed or materials supplied prior to the date of Mortgagor's default under the Indebtedness Hereby Secured.

## ARTICLE IV

### PARTICULAR COVENANTS



Section 4.01 <u>Title to Property and Authority to Convey.</u> Mortgagor covenants that, at the time of the execution, delivery and recording of this Mortgage, it is the absolute and lawful owner of the legal and beneficial title to, and is lawfully seized and possessed of, and has good title to all of the Property, and it has good right and lawful authority to bargain, sell, grant and convey the same as provided in this Mortgage, in fee simple as to all real property described in Exhibit A, and that said Property is free and clear of all encumbrances except for those encumbrances approved by Mortgagee as specified in Exhibit C attached hereto and made a part hereof. Mortgagor hereby covenants, agrees and warrants that it will defend the

-6-



title of such property, and every part thereof, unto Mortgagee and its successors and assigns, against all claims and demands by any person or persons, and will execute such further assurances thereof as may be required by Mortgagee.

Section 4.02 <u>Recordation and Filings.</u> At any and all times, Mortgagor will promptly do, prepare, execute, acknowledge, deliver, file and record and will cause to be done, prepared, executed, acknowledged, delivered, filed and recorded all and every such actions, deeds, indentures, conveyances, transfers, assignments, instruments and financing statements under the Uniform Commercial Code and assurances in law as Mortgagee shall reasonably require for the better assuring, conveying, transferring, assigning and confirming unto Mortgagee all and singular the hereditaments and premises, estates and Property, real and personal, hereby granted, conveyed or transferred, or intended to be; and Mortgagor will bear all expenses, charges and taxes in connection therewith. Mortgagor shall promptly take all actions necessary to perfect and maintain the priority and validity of Mortgagee's interest in the Property as a first and paramount lien and charge against the rights, claims and interests of all other persons and parties. Upon failure by Mortgagor to do so, Mortgagee may make, execute, record, file, re-record or refile any such actions, deeds, indentures, conveyances, transfers, assignments, instruments and financing statements under the Uniform Commercial Code and assurances in law for and in the name of Mortgagor, and Mortgagor hereby appoints Mortgagee its agent and attorney-in-fact to do so, such appointment to stand irrevocable as being coupled with an interest.

Section 4.03 <u>Use or Alteration of the Project.</u> Mortgagor covenants that it will not permit or suffer the use of the Project, the Property or any portion thereof for any purpose other than for a <u>multifamily apartment housing project</u> (including the commercial and other ancillary uses permitted or approved in writing by Mortgagee), and as is further provided in the HUD Regulatory Agreement. Mortgagor covenants that it shall not without the prior written consent of Mortgagee remove any Property from the Real Estate unless such removal is of personal property in the ordinary course of business and the personal property so removed is simultaneously replaced with like property of equal or greater value. Mortgagor covenants that it shall not, without the prior written consent of Mortgagee, permit any material alterations of or additions to buildings or other improvements now existing or hereafter constructed with respect to the Project. For purposes of this Section any expenditure in excess of Fifty Thousand and No/100 Dollars ($50,000.00) shall be considered material.

Mortgagor covenants to comply with all present and future statutes, laws, ordinances and governmental rules, regulations and orders which are applicable to the Property.

-7-





Section 4.04 **HUD Regulatory Agreement.** Mortgagor agrees that the HUD Regulatory Agreement shall be recorded immediately following this instrument, and that it is incorporated in and hereby made a part of this Mortgage. Upon default under the HUD Regulatory Agreement, and with the prior written approval of HUD as long as the Coinsurance Contract is in effect, Mortgagee may declare such default to be an Event of Default under this Mortgage as provided in Article VI hereof and may proceed as provided in Article VI hereof.

Section 4.05 **Restriction on Transfer; Leases.** Anything herein to the contrary notwithstanding, Mortgagor shall not convey, sell, assign, lease, (except commercial space leases previously approved in writing by Mortgagee and leases for residential units in the ordinary course of business), transfer or otherwise dispose of, or obtain secondary financing on, the Property or any part thereof or any interest therein, whether voluntary or involuntary, by operation of law or otherwise, without the prior written consent of the Mortgagee and, if such approval is required under the Coinsurance Contract, the Secretary of HUD.

All commercial leases now existing or hereafter entered into shall be subordinate and subject to the lien of this Mortgage and Mortgagor shall require any and all tenants of commercial space to enter into a subordination and attornment agreement in a form satisfactory to Mortgagee. Mortgagee may at its option, permit the Mortgagor to include a non-disturbance provision in any such subordination and attornment agreement.

Whether in violation of the provisions of this section or pursuant to consent, if Mortgagor has demised, or shall hereafter demise, the Property or any part thereof by leases subordinate or junior either by the date thereof or by the express terms thereof to the lien of this Mortgage, any such lease shall be subject to the condition that in the event of any foreclosure sale or sales hereunder, by virtue of judicial proceedings or otherwise, such leases shall, at the option of the Mortgagee, continue in full force and effect and the tenants thereunder will, upon request, attorn to and acknowledge the foreclosure purchaser or purchasers at such sale as landlord thereunder. The Mortgagee may, at its option and in its sole discretion, require that any or all of the leases affecting the Property, other than leases for individual rental units, be made subject and subordinate to the lien of this Mortgage. In the absence of a recorded agreement expressly subordinating this Mortgage to any or all of such leases, said leases shall be deemed to be subordinate in all respects to this Mortgage.

Section 4.06 **Aggregate Monthly Payments.** In order more fully to protect the security of this Mortgage, Mortgagor, toget-

-8-



her with and in addition to the monthly payments of principal and interest (or interest only until the first payment to principal) under the terms of the Note, beginning with the first payment to principal under the Note and monthly thereafter until the Note is fully paid, will pay to Mortgagee the following sums:

(a) So long as the Mortgage Loan is coinsured: under the provisions of the Housing Act and the Coinsurance Regulations, an amount sufficient to accumulate in the hands of Mortgagee one month prior to the due date the annual mortgage co-insurance premium (including any lender's premium) payable to HUD and Mortgagee aggregating 0.75% per year calculated on the average daily principal balance of the Mortgage Loan scheduled to be outstanding during the year covered thereby (without taking into account delinquent payments or prepayments).

(b) A sum equal to the ground rents, if any, next due, plus the premiums next due on all required insurance policies, plus sewer and water rates, taxes and special assessments next due on the Property (all as estimated by the Mortgagee), less all sums already paid therefor, divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, water rates, taxes and assessments will become delinquent, such sums to be held by Mortgagee in trust to pay said ground rents, premiums, sewer and water rates, taxes and special assessments.

(c) All monthly payments required to be made under the HUD Regulatory Agreement to the reserve for replacements.

All payments mentioned in the three preceding clauses and all other payments to be made under the Note shall be added together and the aggregate amount shall be paid each month in a single payment to be applied by Mortgagee in the following order:

(i)     amounts payable under clause (a) above;

(ii)    amounts payable under clause (b) above;

(iii)   interest on the Note;

(iv)    amortization of the principal sum of the Note; and

(v)     amounts payable under clause (c) above.

The amounts paid to Mortgagee under clauses (a), (b) and (c) above (the "Funds") shall be held in one or more accounts with Mortgagee. Unless applicable law requires interest, earnings or

-9-

profits to be paid, Mortgagee shall not be required to pay Mort-
gagor any interest, earnings or profits on the Funds except that
Mortgagee, shall, upon Mortgagor's written request invest for
Mortgagor's benefit that portion of the Funds consisting of the
reserve for replacements in a manner consistent with applicable
HUD requirements.  Mortgagee shall give to Mortgagor, without
charge, an annual accounting of the Funds in Mortgagee's normal
format showing credits and debits to the Funds and the purpose
for which each debit to the Funds was made.

Section 4.07  Treatment of Accumulations of Monthly Pay-
ments.  Any excess funds paid by Mortgagor pursuant to Sections
4.06(a) and (b) remaining after payment of the items herein
provided on an annual basis, shall be credited to subsequent
monthly payments of the same nature; but if any such item shall
exceed the estimate therefor, Mortgagor shall without demand
forthwith make good the deficiency.  In the event the Indebted-
ness Hereby Secured is paid in full by Mortgagor in accordance
with the terms of the Note, accumulations under Section 4.06 not
required to meet obligations due for which the payments were
collected shall be refunded to Mortgagor.  If the Property is
sold through foreclosure or is acquired by Mortgagee after de-
fault, any then remaining balance of the accumulation under
Section 4.06 hereof shall be credited against the Indebtedness
Hereby Secured.

Section 4.08  Payment of Impositions.

(a)  Mortgagor will pay all ground rents, if any, taxes,
special assessments, sewer and water rates and other governmental
or municipal charges or impositions, to the extent provision
therefor has not been made by monthly payments as hereinabove
provided, before the same become delinquent or subject to inter-
est or penalties, and in default thereof Mortgagee may pay the
same without waiving or affecting its option to foreclose or any
other rights hereunder.  All such sums paid by Mortgagee, plus
any sums which Mortgagee has advanced to pay mortgage insurance
premiums or other insurance premiums not paid for by monthly
payment hereunder or otherwise paid by Mortgagor, shall be added
to the Indebtedness Hereby Secured, and shall bear interest at the
Mortgage Loan rate specified in the Note from the date of the
advance and shall be due and payable to Mortgagee upon demand.
Nothing contained in this paragraph shall be construed as re-
quiring Mortgagee to advance or expend monies for any purposes
mentioned in this paragraph.

(b)  In the event of the passage after the date of this
Mortgage of any law deducting from the value of real property for
the purposes of taxation any lien thereon or changing in any way
the laws for the taxation of mortgages or debts secured by mort-
gage for federal, state or local purposes or the manner of the
collection of any such taxes, and imposing a tax, either directly

-10-

or indirectly, on this Mortgage, the Note or the debt which it
secures, the Mortgagee shall have the right to declare the prin-
cipal sum and the interest due on the date to be specified by not
less than thirty (30) days' written notice to be given to Mort-
gagor by Mortgagee; provided, however, that such election shall
be ineffective if Mortgagor is permitted by law to pay the whole
of such tax in addition to all other payments required-hereunder,
and if Mortgagor, prior to such specified date, does pay such tax
and agrees to pay any such tax when thereafter levied or, assessed
against the premises, and such agreement shall constitute a
modification of this Mortgage. This Section 4.08(b) shall not be
applicable so long as this Mortgage is coinsured by HUD.

Section 4.09 <u>Permitted Contests</u>.  Mortgagor may in good
faith contest, by proper legal proceedings, the validity or
amount of any tax, special assessment or other charge or imposi-
tion which Mortgagor has agreed to pay pursuant to the provisions
of Section 4.08 hereof and may delay payment or discharge thereof
during the period in which the same is being contested; provided,
however, that if payment is delayed, (i) such proceedings shall
suspend the collection thereof from Mortgagor, Mortgagee, or
either of them, and from the Property; (ii) in any such event,
Mortgagor shall deposit with Mortgagee, as security for the
payment or discharge of such contested item, an amount equal
thereto plus interest, penalties and costs (to the extent such
amount is not already in the hands of Mortgagee); and (iii) such
contested item and all costs and penalties, if any, shall have
been paid at least sixty (60) days before the date on which the
Property, or any portion thereof, may be sold in order to satisfy
any such contested item.

Section 4.10 <u>Insurance</u>.  Mortgagor will at all times keep
the Property insured against loss by fire and all of the other
risks ordinarily covered by insurance of the type known as "fire
and extended coverage" in such amounts, in such form and with
such coverages and endorsements as may be required from time to
time by Mortgagee. All such insurance shall be carried for such
periods as may be required by Mortgagee, and shall be in an
amount which will comply with the Coinsurance Regulations, but if
required by Mortgagee, as to losses other than loss of rental
income, such insurance shall be in an amount which is not less
than the greatest of (i) eighty percent (80%) of the actual cash
value of the Property, (ii) the unpaid principal amount of the
Mortgage Loan, and (iii) such amount as will avoid treatment of
Mortgagor as a coinsurer with the issuer of the policy. Mort-
gagor will at all times keep and maintain public liability and
property damage insurance covering injury and damage to persons
and property with limits of not less than $1,000,000 per occur-
rence. Mortgagee reserves the right to increase said limits
should sound business practice so dictate. Mortgagor shall also
maintain, at any and all times required by Mortgagee, rental
interruption insurance in such amount as may be required from

-11-

time to time by Mortgagee. Mortgagor shall also maintain, at any
and all times required by Mortgagee, broad form builders' risk
insurance with respect to the Property and the construction or
reconstruction of any improvements thereto. All such policies as
aforesaid shall be in standard form and endorsed with standard
mortgagee clauses with loss payable to Mortgagee, the Secretary
of HUD and such other parties as may be designated by Mortgagee,
as their interests may appear, and shall contain a clause pro-
viding, that the policy may not be cancelled or modified without
thirty (30) days' prior written notice to Mortgagee. Mortgagor
shall deliver all such policies evidencing the insurance required
hereunder to Mortgagee, and will likewise deliver renewals of
such policies not less than thirty (30) days in advance of the
expiration of same, stamped "paid" by the issuer thereof. The
carriers providing the insurance shall be chosen by Mortgagor
subject to approval by Mortgagee provided that such approval
shall not be unreasonably withheld.

Mortgagor shall at all times comply (and cause its agents,
contractors and subcontractors to comply) with all applicable
worker's compensation insurance requirements.

Section 4.11 Maintenance and Repairs. Mortgagor shall keep
the Property in good condition and repair, and will not permit or
suffer any waste of the Property. Mortgagor will, at its sole
cost and expense, promptly and in a good workmanlike manner make
all needful and proper renewals, replacements and repairs to the
property, including alterations and repairs as may be required by
laws, ordinances and regulations necessary to insure that the
value of the Property as security shall not be impaired.

In the event the Property suffers an uninsured loss, Mort-
gagor if required to do so by Mortgagee, shall use its own funds
to repair and restore the Property. If, in any such event,
Mortgagor fails to make such repairs or restoration, Mortgagee
may advance sums necessary to complete such repair and restora-
tion. Any such advance by Mortgagee shall become part of the
Indebtedness Hereby Secured, shall bear interest at the Mortgage
Loan rate specified in the Note from the date of the advance, and
shall be due and payable to Mortgagee upon demand.

Section 4.12 Indemnification by Mortgagor. Subject to the
provisions of Section 3.02 hereof, Mortgagor will protect, indem-
nify and save harmless Mortgagee and the Secretary of HUD (the
party being indemnified is sometimes called the "indemnitee")
from and against all liabilities, obligations, claims, damages,
penalties, causes of action, costs and expenses (including,
without limitation, attorneys' fees and expenses at or prior to
trial and on appeal) imposed upon or incurred by or asserted
against any such indemnitee by reason of (i) any accident, injury
to or death of persons or loss of or damage to property occurring
on or about the Property or the adjoining sidewalks, curbs,

-12-



streets, or ways; (ii) any use, nonuse or condition of any of the
Property or the adjoining sidewalks, curbs, streets or ways;
(iii) any failure on the part of Mortgagor to perform or comply
with any of the terms of this Mortgage or the Building Loan
Agreement; or (iv) performance of any labor or services or the
furnishing of any materials or other property in respect of any
portion of the Property or the use thereof.  In case any action,
suit or proceeding is brought against any such indemnitee by
reason of any such occurrence, Mortgagor, upon the request of any
such indemnitee, will at Mortgagor's expense resist and defend
such action, suit or proceeding or will cause the same to be
resisted or defended by counsel designated by the Mortgagor and
reasonably acceptable to the indemnitee, provided that such
approval shall not be required in the case of defense by counsel
designated by any insurance company undertaking such defense
pursuant to any applicable policy of insurance.   Any amounts
payable to Mortgagee by reason of the application of this para-
graph shall become immediately due and payable, shall be secured
by the Property as if part of the Indebtedness Hereby Secured,
and shall bear interest at the Mortgage Loan rate specified in
the Note from the date loss or damage is sustained by Mortgagee
until paid.    This obligation of Mortgagor shall survive any
termination or satisfaction of this Mortgage.

     Section 4.13  Operation of the Property to be Sole Activity
of Mortgagor.  So long as any of the Indebtedness Hereby Secured
remains outstanding, Mortgagor shall not engage in any business
or activity other than, or in addition to, the ownership, opera-
tion and management of the Property.   This Section shall not
apply to the general or limited partners of Mortgagor.

     Section 4.14  Permitted Liens.  Mortgagor will not create or
permit a lien to exist against the Property inferior or superior
to the lien of this Mortgage, other than liens for real estate
taxes and assessments not yet due and payable, and inferior liens
for which the prior written consent of Mortgagee has been ob-
tained in accordance with the Coinsurance Regulations.

     Section 4.15  Assignment of Rents and Leases and Profits.

     (a)  To further secure the obligations of Mortgagor under
the Note and this Mortgage, as collateral security therefor,
Mortgagor hereby irrevocably assigns to Mortgagee all the rents,
profits, issue and income of the Property, and any and all leases
and/or subleases (together the "Leases") thereof, which are in
force on the date hereof, or which may be hereafter entered into,
as further security for the Indebtedness Hereby Secured, and the
Mortgagor shall not further assign nor encumber the rents of the
Property, or any part thereof, without the prior written consent
of the Mortgagee.  Mortgagee shall not be obligated to perform or
discharge any obligation or duty to be performed or discharged by
Mortgagor under any of said Leases, and this assignment shall not

-13-



place any responsibility upon Mortgagee for the control, care, management, or repair of the Property or make the Mortgagee derivatively responsible or liable for any negligence in the management, operation, upkeep, repair, or control of the Property, whenever occurring. At the option of the Mortgagee, this assignment shall become effective immediately upon the occurrence of an Event of Default hereunder. Provided, however, that all such rents, and all rents, profits and payments due Mortgagor under such Leases shall be payable to Mortgagor and be its sole property until such time as an Event of Default as hereafter described shall occur, provided, further, that no rent more than one month in advance plus a security deposit shall be collected or accepted without the prior written consent of Mortgagee, and no rent shall be collected or accepted in violation of any law, ordinance, rule, regulation or order. Mortgagor agrees that said assignment of rents and leases is an essential consideration for the making of the Mortgage Loan by Mortgagee. Mortgagor agrees that it will faithfully perform and comply with all terms, conditions and covenants of any Lease covering any part of the Property. Upon Mortgagee's request from time to time, Mortgagor shall furnish Mortgagee a statement, in affidavit form and in such reasonable detail as Mortgagee may require, of all Leases on the Property and the status thereof and, on demand, to furnish Mortgagee executed counterparts of any and all such Leases.

(b)  Upon the occurrence of any Event of Default, Mortgagee may at its option at any time thereafter: (i) proceed to enter upon, take possession of, and manage and operate the Property under the foregoing assignment without becoming a mortgagee in possession; (ii) proceed to perform any or all obligations of the Mortgagor under the Leases, and exercise the rights of the Mortgagor contained therein as fully as the Mortgagor itself could, without regard to the adequacy of security for the indebtedness hereby secured and with or without bringing any legal action or causing any receiver to be appointed by any court; (iii) let or re-let the Property or any part thereof and enforce, modify, cancel or accept the surrender of any of the Leases; (iv) evict lessees pursuant to appropriate legal proceedings; (v) bring or defend any suits in connection with the possession of the Property or any part thereof, in the name of the Mortgagor and/or Mortgagee; (vi) make such repairs as the Mortgagee may reasonably deem appropriate; (vii) pay out of rents, income, profits, reserves, escrows and/or security deposits (or from other sources of funds) any liens, taxes, assessments, insurance premiums, management fees, utility charges, costs of keeping the Property in good condition and repair and/or any other fees, expenses, premiums, costs or charges which Mortgagee deems to be necessary or appropriate in connection with the Note, Mortgage, Leases, the Property and/or the operation of the Property; (viii) fix or modify rent; (ix) in the name of either the Mortgagor and/or the Mortgagee sue for or otherwise collect and receive all rents, issues and profits, including those past due and unpaid, and

-14-

apply the same first against all costs and expenses of the opera-
tion of the Property, of the performance of the Mortgagor's
obligations under the Leases and of such collection, including
reasonable attorneys' fees, and any amounts remaining after such
application will be applied next to accrued and unpaid interest
and the remainder thereof, if any, to the payment of principal of
the Indebtedness Hereby Secured; (x) without regard to the ade-
quacy of security for the Indebtedness Hereby Secured, have a
receiver appointed to manage and collect income and rents from
the Property; (xi) cancel or terminate any or all of the Leases;
and (xii) do all other things the Mortgagee may deem necessary or
proper to protect its security. Entry upon and taking possession
of the Property and the collection of the rents and the appli-
cation thereof will not operate to cure or waive any default
under any instrument given by the Mortgagor to the Mortgagee or
prohibit the taking of any other action by the Mortgagee under
any such other instrument, or at law or in equity to enforce the
payment of the Indebtedness Hereby Secured or to realize on any
other security or guarantee. The existence and/or exercise of
the rights of Mortgagee set forth in this Section 4.15 shall not
create any obligations on the part of the Mortgagee other than
for Mortgagee's gross negligence or willful misconduct.

    (c)  Mortgagee may give notice of the foregoing assignment
at any time to any of the lessees. Lessees may rely on any
notice given them by Mortgagee pursuant to the foregoing assign-
ment and Mortgagor agrees to hold harmless any lessee with re-
spect to any payment made or action taken in reliance on any such
notice.

    Section  4.16  **Books and Records; Financial Statements.**
Mortgagor hereby agrees that Mortgagee shall have the right to
inspect the books and records of the operation of the Property
and make copies thereof at all reasonable times and upon reason-
able notice to Mortgagor. Mortgagor shall furnish to Mortgagee,
within ninety (90) days after the end of each fiscal year of
Mortgagor, a balance sheet, statement of income and expenses of
the Property and a statement of changes in financial position,
all prepared in accordance with generally accepted accounting
principals consistently applied, and which shall be certified by
the chief financial officer of Mortgagor. Such financial state-
ments shall set forth, in reasonable detail, rents received and
total operating expenses of the Property and shall be accompanied
by a certificate executed by the chief financial officer of
Mortgagor certifying that there exists no Event of Default under
this Mortgage or any of the Loan Documents (and no circumstances
which, with the passage of time, the giving of notice, or both,
would constitute an Event of Default). Such financial statements
shall be audited by an independent certified accountant. In
addition, Mortgagor shall promptly provide to Mortgagee such
other financial statements and information with respect to the
Property, Mortgagor and/or Project as Mortgagee may, from time to

-15-

time, request. All expenses in connection with financial state-
ments shall be borne by the Mortgagor.

Section 4.17 Zoning Changes. Mortgagor agrees not to parti-
cipate in any proceedings for, or acquiesce in, any change or
proposed change of, zoning laws or regulations governing the
Property, the creation of a subdivision of or cut-up involving
the Property, consolidation of the Property with any other prop-
erty, nor to subject the Property to any declaration of condo-
minium, "time-share" ownership or other provisions for subdivided
or common ownership, without the prior written consent and parti-
cipation of Mortgagee. Promptly after Mortgagor becomes aware
thereof, Mortgagor shall notify Mortgagee of any proposed change
in the zoning of the Property or any portion thereof.

Section 4.18 Coinsurance Regulations and Housing Act.
Mortgagor shall comply in a timely fashion with any and all
obligations of Mortgagor under the Coinsurance Regulations and
National Housing Act which are applicable to Mortgagor and/or the
Project.

ARTICLE V

CASUALTY AND CONDEMNATION; CERTAIN PREPAYMENTS

Section 5.01 Casualty. If the Property, or any part there-
of, shall be damaged by fire or other hazard against which insur-
ance is held, the amount paid by any insurance company pursuant
to the contract of insurance shall, to the extent of the In-
debtedness Hereby Secured then remaining unpaid, be paid to
Mortgagee, and at Mortgagee's election, may be applied to reduc-
tion of the Indebtedness Hereby Secured as set forth in Section
5.03 hereof or released for the repair or restoration of the
Property to substantially the same condition as existed before
the casualty. In the event of such loss or damage, all proceeds
of insurance shall be payable to Mortgagee, and Mortgagor hereby
authorizes and directs any affected insurance company to make
payment of such proceeds directly to Mortgagee. Mortgagee is
hereby authorized and empowered by Mortgagor to settle, adjust,
or compromise any claims for loss, damage, or destruction under
any policy or policies of insurance. All such amounts together
with amounts, if any, earned thereon pending the decisions wheth-
er to repair and restore are herein referred to as the "Insurance
Fund." Mortgagor will give immediate notice by mail to the
Mortgagee and the Secretary of Housing and Urban Development,
acting by and through the Federal Housing Commissioner, of any
fire damage or other casualty to the Property.

Section 5.02 Condemnation: Application of Proceeds. Mort-
gagor agrees that if the Property, or any part thereof, is con-
demned under any power of eminent domain or acquired for any

-16-




public use or quasi-public use, Mortgagor shall give prompt
written notice thereof to Mortgagee, and the damages, proceeds,
and consideration for such acquisition to the extent of the full
amount of Indebtedness Hereby Secured remaining unpaid are hereby
assigned by Mortgagor to Mortgagee and shall be paid forthwith to
Mortgagee for the account of Mortgagor, to be applied by Mort-
gagee on account of the Indebtedness Hereby Secured as set forth
in Section 5.03 hereof. Mortgagee shall be entitled, at its
option, to appear in its own name in any action or proceeding
relating to such condemnation and shall have the right to com-
promise or settle such proceeding subject to reasonable approval
by the Mortgagor. In case of any partial condemnation, Mortgagee
may in its sole discretion, elect to release a portion or all of
the proceeds to Mortgagor for repairs and restoration of the
Property. All such amounts together with amounts, if any, earned
thereon pending the decision whether to repair and restore are
herein referred to as the "Condemnation Fund."

     Section 5.03 **Prepayment from Amounts in the Insurance or**
**Condemnation Funds.** Within thirty (30) days after Mortgagee's
receipt of any insurance or condemnation proceeds pursuant to
Sections 5.01 and 5.02 as applicable Mortgagee shall give to
Mortgagor notice of Mortgagee's election to apply the Insurance
Fund or Condemnation Fund to either (i) reduction of the Indebt-
edness Hereby Secured or (ii) pay costs and expenses for the
repair and restoration of the Property. Upon any election by
Mortgagee to apply the insurance Fund or Condemnation Fund to a
reduction of the Indebtedness Hereby Secured, Mortgagee shall
give notice to Mortgagor that the Indebtedness Hereby Secured, or
so much of the principal thereof as can be paid from the Insur-
ance Fund or Condemnation Fund must be prepaid as hereinafter set
forth. The amount of such fund shall be deemed to have been
received on the date of such notice. The effective date of such
prepayment (the "effective date"), in case of any such notice
which has been given prior to the 25th day of any month, shall be
the 16th day of the next following month, or in case of any such
notice given on or after the 25th day of any month, the 16th day
of the second following month. If the entire Indebtedness Hereby
Secured shall be discharged from such insurance or condemnation
proceeds, Mortgagee shall not be required to release the lien of
this Mortgage from the Property until the date which is ninety-
five (95) days after the effective date of such discharge of the
Indebtedness Hereby Secured so as to protect the Mortgagee
against any loss of security if such discharge of the Indebted-
ness Hereby Secured is subsequently rescinded by a trustee in
bankruptcy with respect to the Mortgagor. On the applicable
effective date, the Indebtedness Hereby Secured shall be deemed
prepaid to the extent hereinafter provided. If, after giving
effect to such prepayment, the entire amount of the Indebtedness
Hereby Secured has not been discharged, the amount of the applic-
able fund shall be deemed to have been applied first to the
accrued and unpaid interest on the amount prepaid through the

-17-

BK01504 PG01626



effective date, and then to the prepayment of the principal
balance of the Mortgage Loan. In the event of any partial pre-
payment of the principal balance of the Mortgage Loan pursuant to
the provisions of this section, an amount equal to (i) the amount
of interest on the principal balance of the Mortgage Loan prepaid
pursuant to the provisions of this section from the first day of
the month in which the effective date occurs to the effective
date, plus (ii) all interest actually earned by Mortgagee from
investment of the Insurance Fund or Condemnation Fund, as applic-
able, from the date of the initial notice of the prepayment by
Mortgagee to Mortgagor through the day immediately preceding the
effective date, shall be credited to Mortgagor's next scheduled
installment of principal and interest on the Mortgage Loan.
Following any prepayment which discharges the entire amount of
the Indebtedness Hereby Secured, Mortgagee shall refund to Mort-
gagor the amount referred to in clause (ii) of the immediately
preceding sentence.

Section 5.04 Due Diligence by Mortgagor to Complete Repairs
or Restoration; Disbursement. If, at Mortgagee's election,
insurance or condemnation proceeds are released for repair or
restoration of the Property, Mortgagor shall promptly commence
and diligently prosecute the completion of such repairs or re-
storation. Such repairs shall be effected in accordance with all
appropriate HUD requirements. Mortgagor if required to do so by
Mortgagee, shall use its own funds to complete repair or restora-
tion of the Property if insurance or condemnation proceeds, as
applicable, are insufficient to accomplish same. If, in order to
complete repair or restoration of the Property to the satisfac-
tion of Mortgagee, it is necessary for Mortgagor to use its own
funds, and Mortgagor fails to do so, Mortgagee may at its option
and election advance sums necessary to complete such repair and
restoration. Any such advance by Mortgagee shall become part of
the Indebtedness Hereby Secured, shall bear interest at the
Mortgage Loan rate specified in the Note from the date of the
advance and shall be due and payable to Mortgagee upon demand.

Section 5.05 Release of Amounts in the Insurance or Condem-
nation Funds. If, at Mortgagee's election, insurance or condem-
nation proceeds are released for repair or restoration of the
Property pursuant to this Article V, such proceeds shall be
disbursed by the Mortgagee from time to time as work progresses,
provided that prior to any disbursement, Mortgagee is in receipt
of proof, satisfactory to it, that the work has been completed,
and further provided that the Mortgagee is in receipt of proof,
reasonably satisfactory to it, that there are no outstanding
mechanics' liens or materialmen's liens and that all charged
costs and expenses incurred with respect to work completed have
been paid for in full. Mortgagor shall provide Mortgagee with
such contractors' and subcontractors' affidavits and material-
men's certificates and such other evidences of payment as Mort-
gagee may require in connection with the disbursement of such

-18-






proceeds. In addition, Mortgagee may, at Mortgagee's option, condition disbursement of said proceeds, from time to time as construction progresses, on Mortgagee's approval of plans and specifications of an architect reasonably satisfactory to Mortgagee, contractor's cost estimates, architect's certificates, title insurance policies and endorsements, and such other evidence of costs, percentage of completion of construction, application of payments, satisfaction of liens and evidence of title as Mortgagee may require, and the provisions of the Building Loan Agreement shall, to the extent deemed applicable by Mortgagee, apply to such restoration. Repair, restoration, or reconstruction of any portion(s) of the Property must be substantially equal in size, quality and value to such portion(s) of the Property immediately before the loss, damage, or condemnation. Any proceeds remaining after the completion of such repair, restoration, or replacement may, at the option of the Mortgagee, be applied by the Mortgagee as a partial prepayment under Section 5.03.

## ARTICLE VI

### EVENTS OF DEFAULT AND REMEDIES

Section 6.01 <u>Event of Default</u>. The occurrence of any one of the following events shall constitute an Event of Default:

(a) Any default in any payment on the Note or hereunder, as set forth in Section 4.06 hereof, or any renewal or extension thereof or of any note or notes hereafter given for interest covering any extension, with interest thereon from maturity of the same, when and as the same shall become due and payable, and if such default is not made good prior to the due date of the next installment payment under the Note.

(b) Any default in payment, when due (except under circumstances expressly provided for in Section 4.09 hereof), of any tax, sewer or water rate or special assessment now or hereafter assessed against the Property, or any part thereof, while this Mortgage exists, or any default in failing to maintain any insurance required hereunder or under any other of the Loan Documents, while this Mortgage exists, or default in payment on demand of any sum or sums advanced by Mortgagee on account of any costs and expenses of this Mortgage, or on account of any such tax or special assessment, sewer and water rate or insurance, or expense of litigation, or on account of any lien on said land and premises, with interest thereon at the Mortgage Loan rate specified in the Note from date of advance, or upon default of any other payment provided for in this Mortgage or





under any other of the Loan Documents, when and as due, or any default under the Building Loan Agreement, and the continuation of any such default for a period of thirty (30) days or more following written notice given to Mortgagor by Mortgagee specifying the default, provided that (i) a default in payment as provided in Section 4.06 hereof shall not require notice to Mortgagor, but shall be treated in accordance with clause (a) above and (ii) a default in failing to maintain any insurance required hereunder or under any other of the Loan Documents shall not require notice to Mortgagor, but shall be treated as an Event of Default immediately upon such default.

(c)     Any default in the observance or performance of any other of the covenants or agreements contained herein or under the Note, or any other of the Loan Documents if such default shall continue for thirty (30) days after written notice given to Mortgagor by Mortgagee specifying the default.

(d)     Mortgagor having filed a voluntary petition or having been adjudicated as bankrupt or insolvent after the filing of a voluntary petition, or having filed any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors; or seeking or consenting to or acquiescing in the appointment of any trustee, receiver or liquidator of Mortgagor or of all or any part of its properties or assets, or making any general assignment for the benefit of creditors, or admitting in writing its inability to pay its debts generally as they become due.

(e)     A court of competent jurisdiction having entered an order, judgment or decree approving a petition filed against Mortgagor seeking any reorganization, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, and such order, judgment or decree remaining unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the first date of entry thereof; or any trustee, receiver or liquidator of Mortgagor or of all or any part of its properties or assets, being appointed without the consent or acquiescence of Mortgagor and such appointment remaining unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive).



-20-



(f)   For the purpose of clauses (d) or (e) above, any refer-
      ence to Mortgagor shall be deemed to separately apply
      to any general partner.

(g)   Final judgment for the payment of money in excess of
      Twenty Thousand Dollars ($20,000.00) having been ren-
      dered against Mortgagor and such judgment not being
      discharged or bonded to Mortgagee's satisfaction, or a
      stay of execution thereon not procured, within thirty
      (30) days after the date of entry thereof, or if there-
      after such judgment remains unsatisfied for a period of
      fifteen (15) days after the termination of any such
      stay of execution.

    Section 6.02 Acceleration.  If any Event of Default shall
occur, then, at the option and election of Mortgagee, the entire
Indebtedness Hereby Secured shall become due, payable and col-
lectible at once and thereafter as Mortgagee may elect, regard-
less of the date of maturity and without notice, and may be
enforced and recovered at once.

    Section 6.03 Remedies.  If any Event of Default shall have
occurred, Mortgagee may elect to exercise or cause to be exer-
cised any or all of the remedies provided for in this Mortgage
and at law, including without limitation the following:

(a)   Mortgagee shall be entitled to apply at any time prior
      to or during any foreclosure suit to the court having
      jurisdiction thereof for the appointment of a receiver
      of all or a portion of the Property, and all rents,
      incomes, profits, issues, and revenues thereof, derived
      from any source.  It is hereby expressly covenanted and
      agreed that thereupon the court shall forthwith appoint
      such receiver with the usual powers and duties of
      receivers in similar cases, and the appointment shall
      be made by the court as a matter of Mortgagee's strict
      right, and without reference to the adequacy or inade-
      quacy of the value of the Property hereby mortgaged, or
      to the solvency or insolvency of the Mortgagor or any
      other party defendant to such suit.  The Mortgagor
      hereby specifically waives the right to object to the
      appointment of a receiver as described herein and
      hereby expressly consents that such appointment shall
      be made as an admitted equity and is Mortgagee's abso-
      lute right, and that the appointment may be done with-
      out notice to the Mortgagor.  Mortgagor further con-
      sents to the appointment of the Mortgagee or any of-
      ficer or employee of Mortgagee as receiver.

(b)   Mortgagee may foreclose this Mortgage and sell the
      Property as an entirety or in separate parcels or

-21-



parts, under the judgment or decree of a court or courts of competent jurisdiction.

(c)  Mortgagee may, either after foreclosure and/or the appointment of a receiver as hereinbefore provided, or without same, proceed by suit or suits at law or equity or by any other appropriate remedy to protect and enforce the rights of Mortgagee whether for the specific performance of any covenant or agreement contained herein, or in aid of the execution of any power herein granted, or to foreclose the Mortgage, or to sell, as an entirety or in several parcels or parts, the Property under the judgment or decree of a court or courts of competent jurisdiction, or otherwise. Mortgagee's remedies shall not be exhausted by any single exercise thereof, and may be pursued concurrently, consecutively and repeatedly until all of the Indebtedness Hereby Secured is paid in full.

(d)  Mortgagee shall apply the proceeds of sale, or foreclosure of the Property, first, to the payment of reasonable attorney's fees and expenses prior to, and at trial and on appeal, if any; secondly, to discharge all taxes, levies and assessments, with costs and interest if they have priority over the lien of the Mortgage, including the due pro rata portion thereof for the current year; thirdly, to discharge in the order of their priority, if any, the remaining debts and obligations secured by the Mortgage and any liens of record inferior to the Mortgage under which sale is made, with lawful interest; and, fourthly, the residue of the proceeds shall be paid to Mortgagor, or its assigns; provided, however, that Mortgagee as to such residue shall not be bound by any inheritance, devise, conveyance, assignment or lien of or upon Mortgagor's equity, without actual notice thereof prior to distribution.

(e)  In the case of any receivership, insolvency, bankruptcy, liquidation or other judicial proceeding relative to Mortgagor or affecting the Property, Mortgagee may pursue and perfect claims against the Property arising under this Mortgage and the Note.

(f)  Mortgagee may take such other and further actions as may be required and permitted, it being understood that no remedy under this Mortgage is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or as now or hereinafter existing at law or in equity or by statute.

-22-

Section 6.04 **Reinstatement.** If, after the occurrence of an Event of Default, Mortgagor cures the default prior to completion of foreclosure, receivership or other proceedings pursuant to Section 6.03 above, and Mortgagor pays to Mortgagee all reasonable and actual expenses incurred by Mortgagee in connection with the foreclosure, receivership or other proceedings, including, without limitation, all reasonable attorney's fees and expenses prior to and at trial and on appeal, advertising costs, Mortgagee's fees, auctioneer's commissions and payments or reimbursements made by Mortgagee on account of the GNMA Securities (in the event that Mortgagee has issued mortgage-backed securities as described in Section 4.10), the Mortgage Loan shall with the prior written consent of the Mortgagee in accordance with the Coinsurance Contract be reinstated as if an Event of Default had not occurred.

Section 6.05 **Mortgagee's Role at Sale.** Upon any foreclosure sale, Mortgagee may bid and become the purchaser of the Property, and upon compliance with the terms of sale, may hold, retain and possess and dispose of such Property in its own absolute right, without further accountability.

Section 6.06 **Waiver by Mortgagor.** Mortgagor agrees, to the extent that it may lawfully so agree, that in the case of an Event of Default on its part, as aforesaid, neither Mortgagor nor anyone claiming through or under it shall, or will, set up, seek or claim to take advantage of any exemption laws (whether under the State Constitution, Homestead laws, or otherwise), or laws providing for any appraisement, apportionment, valuation, stay, extension or redemption now or hereafter in force in the locality where the Property is situated, in order to prevent or hinder the enforcement or foreclosure of the Mortgage, or the final or absolute putting into possession thereof, immediately after such foreclosure, of the purchaser thereof. Mortgagor, for itself and all who claim through or under it, hereby waives, to the fullest extent that it may lawfully do so, the benefit of all such laws and any and all right to have the estate comprising the security intended to be created hereby marshalled upon any foreclosure of the lien hereof and agrees that Mortgagee or any court having jurisdiction to foreclose such lien may sell the Property as an entirety or in parts, and further hereby waives any right to assert in any bankruptcy proceeding in which Mortgagor is debtor: (i) that the Property should be valued by any method other than liquidation value where Mortgagee seeks "adequate protection" or relief from the automatic stay under the Bankruptcy Code, (ii) that Mortgagee's security interest in cash proceeds of the Property, including rent payments received, is limited to any amount less than the actual amount of such proceeds deposited in deposit accounts of Mortgagor and commingled with other funds, (iii) use of cash proceeds of the Property, including rent payments received, without consent of Mortgagee unless authorized by the bankruptcy court in which such bank-

-23-



ruptcy is pending, after notice and a hearing, and (iv) use of cash proceeds of the Property, including rent payments received, unless Mortgagee is granted an additional substitute lien in other property to the extent such cash proceeds are used by Mortgagor. If an Event of Default occurs, Mortgagor shall pay all costs and expenses including reasonable attorneys' fees at and prior to trial and on appeal, incurred in the collection of the Note, the Indebtedness Hereby Secured or obligations under this Mortgage.

Section 6.07 No Waiver, Etc. Any waiver of any Event of Default hereunder shall not extend to or affect any subsequent or other then existing Event of Default, nor shall it impair any rights or remedies relating to any such subsequent or other then existing Event of Default. No delay or omission of Mortgagee to exercise any right or power accruing upon any Event of Default shall impair any such right or power or shall be construed to be a waiver of any such Event of Default or an acquiescence therein, or shall extend to any subsequent Event of Default, and every power and remedy given by the Mortgage may be exercised, from time to time, and as often as may be deemed expedient by Mortgagee.

Section 6.08 Costs and Expenses. In any suit to foreclose the lien of this Mortgage, there shall be allowed and included as additional indebtedness in the decree of sale, to the extent permitted by law, all expenditures and expenses that may be paid or incurred by or on behalf of Mortgagee, for reasonable attorneys' fees, court costs, appraisers' fees, sheriff's fees, documentary and expert evidence, stenographers' charges, publication costs and such other costs and expenses as Mortgagee may deem reasonably necessary to prosecute such suit or to evidence to bidders at any sale that may be had pursuant to such decree the true condition of the title to or the value of the Property. To the extent permitted by law, all such expenditures and expenses shall become payable on demand with interest thereon from the date of expenditure at the interest rate charged under the Note.

In addition, Mortgagor shall pay to Mortgagee promptly upon demand all expenditures and expenses incurred by Mortgagee in connection with (a) any proceeding to which Mortgagee shall be a party, either as plaintiff, claimant or defendant, by reason of this Mortgage or any of the indebtedness; (b) preparations for the commencement of any suit for foreclosure after accrual of such right to foreclosure, whether or not actually commenced; and/or (c) preparation for the defense of or investigation of any threatened suit, claim or proceeding that might affect the Property, whether or not actually commenced.

Section 6.09 Certain Remedies Subject to HUD Approval. Before Mortgagee may accelerate and declare the Indebtedness Hereby Secured due and payable for an Event of Default hereunder

-24-



BK16470PG0633

arising from (i) a default under the HUD Regulatory Agreement,
(ii) a violation of the restrictions on transfers under Section
4.05, (iii) a failure to make monthly payments to the Replacement
Reserve Fund, (iv) a violation of Section 4.13 as to sole busi-
ness of Borrower being operation of the Property, or (v) a fail-
ure to provide financial statements under Section 4.16; Mortgagee
shall obtain the prior written consent of the Secretary of HUD.

## ARTICLE VII

### MISCELLANEOUS PROVISIONS

Section 7.01 <u>Assignment of Mortgage</u>.  Subject to any appli-
cable requirements of HUD, Mortgagee may sell, assign, transfer,
convey, pledge or encumber the Note or all or any part of its
interest, rights and obligations thereunder or under this Mort-
gage to one or more persons or parties, and Mortgagor hereby
consents to any such sale, assignment, transfer, conveyance,
pledge or encumbrance and agrees upon the request of Mortgagee or
its assignee to execute and deliver promptly any instrument
confirming Mortgagor's consent as effectuating, as necessary,
such sale, assignment, transfer, conveyance, pledge or encum-
brance.

Section 7.02 <u>Notices</u>.  Any notice, demand or request re-
quired or permitted hereunder to be given to Mortgagor or Mort-
gagee shall be sufficiently given if in writing and personally
delivered or mailed by registered or certified first class mail,
postage prepaid, addressed to:

Mortgagor:        Oakland Lakes, Ltd.
                  4750 Ashwood Drive, Suite 300
                  Cincinnati, Ohio  45241
                  Attention: William O. Brisben

Mortgagee:        Cincinnati Mortgage Corporation
                  2368 Victory Parkway, Suite 210
                  Cincinnati, Ohio  45206
                  Attention: Robert W. Jorden



or at such other address as either Mortgagor or Mortgagee may
have furnished to the other in writing, and shall be deemed to be
given when mailed.

-25-



Section 7.03 Security Agreement.

(a) In addition to being a mortgage, this Mortgage is intended to be a security agreement pursuant to the Uniform Commercial Code for any of the items specified herein as part of the Property, which under applicable law may be subject to a security interest pursuant to the Uniform Commercial Code, and Mortgagor hereby grants Mortgagee a security interest in said items, and all substitutions, replacements, replacement parts, additions, repairs, repair parts, accessions and accessories incorporated therein or affixed thereto in which Mortgagor acquires an interest, and the proceeds thereof (sometimes referred to herein as the "Collateral"). Mortgagor agrees that Mortgagee may file this Mortgage, or a reproduction thereof, in the real estate records or other appropriate index, as a financing statement for any of the items specified above as part of the Property. Any reproduction of this Mortgage or of any other security agreement or financing statement shall be sufficient as a financing statement. In addition, Mortgagor agrees to execute and deliver to Mortgagee, upon Mortgagee's request, any financing statements, as well as extensions, renewals and amendments thereof, and reproductions of this Mortgage in such form as Mortgagee may require, to perfect or protect the security interest hereby created with respect to the Collateral, or to more fully describe the Collateral. Mortgagor shall pay all costs of and expenses (including reasonable expenses of counsel and filing fees) relative to the preparation and filing of any financing statements and any extensions, renewals, amendments and releases thereof, and shall pay all reasonable costs and expenses of any record searches for financing statements Mortgagee may reasonably require. Mortgagor hereby irrevocably authorizes Mortgagee as Mortgagor's agent and attorney in fact to execute and file any UCC Financing Statements and similar instruments signed by Mortgagee alone.

(b) Upon Mortgagor's breach of any covenant or agreement of Mortgagor contained in this Mortgage, including the covenants to pay when due all sums secured by this Mortgage, Mortgagee shall have the remedies of a secured party under the Uniform Commercial Code and, at Mortgagee's option, may also invoke all other remedies as provided herein. In exercising any of said remedies, Mortgagee may proceed against the items of real property and any items of personal property specified herein as part of the Property separately or together and in any order whatsoever, without in any way affecting the availability of Mortgagee's remedies under the Uniform Commercial Code or any of the other remedies provided herein. Mortgagor hereby agrees that a notice sent to it at least ten (10) days before the time of any intended public sale or of the time after which any private sale or other disposition of the Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. Until any default hereunder, Mortgagor may have possession of the Collater-

-26-

al and use it in any lawful manner not inconsistent with this
Section 7.03 and not inconsistent with any policy of insurance
thereon.

(c) Mortgagor will, at its own cost and expense, keep the
Collateral in as good and substantial repair as the same is in at
this date, or as the same is when acquired, reasonable wear and
tear excepted, making replacements when and where necessary.

(d) At its option, Mortgagee may discharge taxes, liens or
secured interests or other encumbrances at any time levied or
placed on the Collateral, may pay for insurance on the Collateral
and may pay for the maintenance and preservation of the Collater-
al.  Mortgagor agrees to reimburse Mortgagee on demand for any
payment made, or any expense incurred by Mortgagee pursuant to
the foregoing authorization together with interest thereon at the
interest rate set forth in the Note.

(e) Mortgagor will not later than thirty (30) days after
acquiring additional Collateral promptly advise Mortgagee of the
type, description, nature, cost and quantity thereof.  Should
Mortgagor at any time fail to advise Mortgagee of any such acqui-
sition, such failure shall not affect, diminish, modify or limit
Mortgagee's lien or security interest in all Collateral which the
Mortgagor may acquire from time to time hereafter.

Section 7.04 Governing Law.  The Note and this Mortgage are
made and delivered in and shall be governed by and construed in
accordance with the laws of the State.  In the event that any
provision of this Mortgage or the Note conflicts with applicable
law, such conflict shall not affect other provisions of this
Mortgage or the Note which can be given effect without the con-
flicting provisions, and to this end the provisions of the Mort-
gage and the Note are declared to be severable.

Section 7.05 Nondiscrimination.  Mortgagor covenants and
agrees that so long as this Mortgage and the Note secured hereby
are coinsured by HUD, or held under the provisions of the Housing
Act, it will not execute or file for record any instrument which
imposes a restriction upon the sale or occupancy of the Property
on the basis of race, color or creed.  Upon any violation of this
undertaking, Mortgagee may, at its option, and with the prior
written consent of HUD, declare the Indebtedness Hereby Secured
immediately due and payable.

Section 7.06 Amendments.  This Mortgage may be amended or
modified only by a written instrument executed by Mortgagor and
Mortgagee and any purported modification or amendment hereof, by
whatever means, which is not in strict conformance with the
foregoing shall be null and void and absolutely ineffective.



-27-

Section 7.07 <u>Third Parties.</u>  The Mortgagor and Mortgagee intend that there are no third party beneficiaries to this Mortgage except for HUD.

Section 7.08 <u>Rights of Mortgagee</u>.  Mortgagee may, at its option, do all things provided or permitted to be done by a mortgagee under the laws of the State of Florida for the protection of Mortgagee's interest in the property.

Section 7.09 <u>Mortgagor's Obligations Unconditional</u>.  The obligations of the Mortgagor to make payments of any and all amounts due hereunder shall be absolute and unconditional without defense or set-off by reason of any default whatsoever, including, without limitation a default by any tenant of the Property under any lease with the Mortgagor or under any other agreement or instrument between the Mortgagee and the Mortgagor, and such payments to Mortgagee shall not be decreased, abated, postponed or delayed for any reason whatsoever, including without limitation, any acts or circumstances that may constitute failure of consideration, destruction of or damage to the Property, the taking of any part of the Property, commercial frustration of purpose, failure of any person to perform or observe any agreement, whether expressed or implied, or any duty, liability or obligation arising out of or connected with this Mortgage, the Note, or any of the other Loan Documents, or failure of any tenant of the Property to pay the fees, rentals or other charges owed to Mortgagor, and irrespective of whether or not any such tenant of the Property receives either partial or total reimbursement as a credit against such payment, it being the intention of the parties that the payments required of the Mortgagor hereunder will be paid in full when due without any delay or diminution whatsoever.

Section 7.10 <u>Additional Limitations on Mortgagee's Duties</u>.  Mortgagor hereby acknowledges and agrees that the undertaking of Mortgagee under this Mortgage is limited as follows:

Except as specifically appointed herein as attorney-in-fact to act on behalf of Mortgagor, Mortgagee shall not act in any way as the agent for or trustee of Mortgagor.  Mortgagee does not intend to act in any way for or on behalf of Mortgagor with respect to disbursement of the proceeds of the indebtedness secured hereby.  Its purpose in making the requirements set forth herein and in the Building Loan Agreement and Loan Documents is that of a lender protecting the priority of its mortgage and the value of its security.  Mortgagee assumes no responsibility for the completion of any improvements erected or to be erected upon the Property, the payment of bills or any other details in connection with the Property, any plans and specifications in connection with the Property, or Mortgagor's relations with any contractors.  This Mortgage is not to be construed by Mortgagor or anyone furnishing labor, materials, or any other work or

-28-



product for improving the Property as an agreement upon the part of Mortgagee to assure anyone that he will be paid for furnishing such labor, materials or any other work or product; any such person must look entirely to Mortgagor for such payment. Mortgagee assumes no responsibility to Mortgagor for the architectural or structural soundness of any improvements on or to be erected upon the Property or for the approval of any plans and specifications in connection therewith or for any improvements as finally completed.

Section 7.11 <u>Mortgage; Building Loan Agreement; Construction</u>.

(a)  It is agreed between the Mortgagor and Mortgagee that this Mortgage is intended to secure the balance of obligatory loan advances to be made after the Mortgage is delivered to the Recorder for record, said loan advances to be made pursuant to the provisions of the Building Loan Agreement.  The maximum amount of unpaid balances of such loan advances in the aggregate and exclusive of interest accrued thereon is Twenty Two Million Seven Hundred Seventy Nine Thousand Six Hundred and no/100 Dollars ($22,779,600.00).  The Mortgagor understands and agrees that Mortgagor may not reborrow amounts of principal under the Note which have already been repaid without the prior written consent of HUD.  In addition to the foregoing advances, the Mortgage shall secure unpaid balances of advances made by Mortgagee to protect said premises including but not limited to advances to pay taxes, assessments, and all other amounts which Mortgagor herein agrees to pay for the protection of the premises and any and all other advances that may be made by Mortgagee under this Mortgage, together with interest thereon.

(b)  Mortgagor warrants and represents that the funds to be advanced herein are to be used in the construction of certain improvements on the lands herein described, in accordance with the Building Loan Agreement which Building Loan Agreement (except such part or parts thereof as may be inconsistent herewith) is incorporated herein by reference to the same extent and effect as if fully set forth and made a part of this Mortgage; and if the construction of the improvements to be made pursuant to said Building Loan Agreement shall not be carried on with reasonable diligence, or shall be discontinued at any time for any reason, the Mortgagee, after due notice to the Mortgagor or any subsequent owner, is hereby invested with full and complete authority to enter upon the Property, employ watchmen to protect such improvements from depredation or injury and to preserve and protect the personal property therein, and to continue any and all outstanding contracts for the erection and completion of said building or buildings, to make and enter into any contracts and and obligations wherever necessary, either in its own name or in the name of the Mortgagor, and to pay and discharge all debts, obligations, and liabilities incurred thereby.  All such sums so

-29-



advanced by the Mortgagee (exclusive of advances of the principal of the indebtedness secured hereby) shall be added to the principal of the indebtedness secured hereby and shall be secured by this Mortgage and shall be due and payable on demand with interest at the rate specified in the Note. The principal sum and other charges provided for herein shall, at the option of the Mortgagee or holder of this Mortgage and the Note securing the same, become due and payable on the failure of the Mortgagor to keep and perform any of the covenants, conditions, and agreements of said Building Loan Agreement.

(c) This Mortgage secures an obligation incurred for the construction of improvements to the Property and, as such, is a "construction mortgage" as said term is used and defined under Article 9 of the Uniform Commercial Code as effective in the State.

Section 7.12 **Binding Effect**. All the terms, covenants and conditions of this Mortgage shall bind Mortgagor, its partners and their respective heirs, successors and assigns and shall inure to the benefit of and be available to the Mortgagee, its successors and assigns.

Section 7.13 **Interpretation; Time of the Essence**. All references to Mortgagor and Mortgagee shall be read in the singular or plural, and in the masculine, feminine or neuter gender, as the sense may require. Time is of the essence with respect to each and every obligation of Mortgagor under the Note, the Mortgage and the other Loan Documents.

Section 7.14 **Estoppel Certificate**. Mortgagor shall, within ten days of a written request from Mortgagee, furnish Mortgagee with a written statement, duly acknowledged, setting forth the sums secured by this Mortgage and such other information as Mortgagee may reasonably request.

Section 7.15 **Right to Inspect and/or Enter Property**. Mortgagee and its agents, representatives and employees are authorized subject to applicable state and federal laws and regulations, to enter at any reasonable time or times upon or in any part of the Property for the purpose of inspecting the same and for the purpose of performing any of the acts that Mortgagee is authorized to perform under the terms of this Mortgage.

PROVIDED ALWAYS that if Mortgagor shall (i) pay according to the tenor and effect thereof all principal and interest evidenced by the Note and any extensions, replacements, modifications or renewals thereof and (ii) pay and perform all obligations of this Mortgage, and all other security agreements, supplements and other instruments now or hereafter executed by Mortgagor for the purpose of further evidencing or securing all or any part of the indebtedness under or secured by this Mortgage, then this Mortgage shall be void; otherwise to remain in full force and effect.

-30-





IN WITNESS WHEREOF, the said Mortgagor has caused these presents to be signed in its name by its General Partner as of the date first above written.

WITNESS/ATTEST:

OAKLAND LAKES, LTD., a Florida limited partnership

By: _____
William O. Brisben,
General Partner

STATE OF OHIO        )
                     )  SS:
COUNTY OF HAMILTON   )

Before me, a Notary Public in and for said County, personally appeared William O. Brisben, to me known and known to me to be the person who, as General Partner of Oakland Lakes, Ltd., a Florida limited partnership, which executed the foregoing instrument, signed the same and acknowledged to me that he did so sign said instrument in the name and on behalf of said partnership, that the same is his free act and deed as such partner and the free act and deed of said partnership.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my official seal in said County and State, this 2nd day of October 1989.



This Instrument Prepared By: Barrett N. _____, Esq.
Strauss & _____
Professional Association
2100 Central Trust Center
201 East Fifth Street
Cincinnati, Ohio  45202-4186
(513) 621-2120

22459-77-S
Fla.
1/23/89

-31-

EXHIBIT "A"

PARCEL I:

TRACT A OAKLAND LAKES, according to the Plat thereof, recorded in Plat Book 111, Page 7, of the Public Records of Broward County, Florida.

- and -

PARCEL II:

TRACT B, OAKLAND LAKES, according to the Plat thereof, recorded in Plat Book 111, Page 7, of the Public Records of Broward County, Florida.

- and -

PARCEL III:

A portion of the North one-half (N1/2) of the Southeast one-quarter (SE1/4) of SECTION 20, TOWNSHIP 49 SOUTH, RANGE 42 EAST, being more particularly described as follows:

Commencing at the Southeast corner of the said North one-half (N1/2) of the Southeast one-quarter (SE1/4) of Section 20; thence South 89°07'10" West, along the South line of the said North one-half (N1/2) of the Southeast one-quarter (SE1/4), a distance of 498.42 feet, to the POINT OF BEGINNING of this description, said point also being the Northeast corner of said Tract B; thence continue South 89°07'10" West, along the last described course and the North line of said Tract B and Tract "A", a distance of 1937.45 feet; thence North 01°50'43" East, a distance of 25.03 feet; thence North 89°07'10" East, along a line parallel with and 25.00 feet North of, as measured at right angles to the South line of the North one-half (N1/2) of the Southeast one-quarter (SE1/4) of Section 20, a distance of 1936.65 feet; thence South 00°00'00" East along a northerly projection of the East line of said Tract B, a distance of 25.00 feet to the POINT OF BEGINNING.

- and -

PARCEL IV:

A parcel of land lying in the City of Oakland Park, Broward County, Florida, being a portion of Tract G of "OAKLAND LAKES," according to the Plat thereof, as recorded in Plat Book 111, at Page 7, of the Public Records of Broward County, Florida, and being more particularly described as follows:

Commence at the Northeast corner of said Tract G; thence run S 89°05'55" W along the North line of said Tract G for 113.19 feet to the Point of Beginning; thence run South for 335.04 feet to a point; thence run S 89°05'55" W for 30.03 feet to a point; thence run S 00°54'05" E for 1.07 feet to a point; thence run N 84°03'31" W for 29.67 feet to a point; thence run N 00°54'05" W for 30.54 feet to a point; thence run N 89°05'55" E for 35.00 feet to a point; thence run South for 32.01 feet to a point; thence run N 89°05'55" E for 24.00 feet to a point; thence run North for 335.04 feet to a Point of Intersection with said North line of Tract G; thence run N 89°05'55" E along said North line of Tract G for 1.00 foot to the Point of Beginning.

Said lands situate, lying and being in Broward County, Florida.





EXHIBIT A
(CONTINUED)

SAID PROPERTY ALSO BEING DESCRIBED AS:

DESCRIPTION:

A PORTION OF THE N½ OF THE SE¼ OF SECTION 20, TOWNSHIP 49 SOUTH, RANGE 42 EAST, TOGETHER WITH ALL OF TRACTS "A", "B" AND A PORTION OF TRACT "G", "OAKLAND LAKES", ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 111, PAGE 7 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, ALL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT "A"; THENCE N 89°07'10" E, ALONG THE NORTH LINE OF SAID TRACT "A", A DISTANCE OF 175.15 FEET; THENCE N 01°50'43" E, A DISTANCE OF 25.03 FEET; THENCE N 89°07'10" E, ALONG A LINE PARALLEL WITH AND 25.00 FEET NORTH OF, AS MEASURED AT RIGHT ANGLES TO THE SOUTH LINE OF THE NORTH ONE-HALF (N½) OF THE SOUTHEAST ONE-QUARTER (SE¼) OF SECTION 20, A DISTANCE OF 1936.65 FEET; THENCE S 00°00'00" E, ALONG A NORTHERLY PROJECTION OF THE EAST LINE OF SAID TRACT "B" AND THE EAST LINE OF SAID TRACT "B", A DISTANCE OF 999.87 FEET TO THE SOUTHEAST CORNER OF SAID TRACT "B"; THENCE S 89°05'55" W ALONG THE SOUTH LINE OF SAID TRACT "B", A DISTANCE OF 460.00 FEET TO THE NORTHEAST CORNER OF SAID TRACT "G"; THENCE CONTINUE S 89°05'55" W ALONG THE NORTH LINE OF SAID TRACT "G" AND THE SOUTH LINE OF SAID TRACT "A", A DISTANCE OF 113.19 FEET; THENCE RUN SOUTH FOR 336.04 FEET TO A POINT; THENCE RUN S 89°05'55" W FOR 30.03 FEET TO A POINT; THENCE RUN S 00°54'05" E FOR 1.07 FEET TO A POINT; THENCE RUN N 84°03'31" W FOR 29.67 FEET TO A POINT; THE LAST THREE DESCRIBED COURSES BEING ALONG THE NORTH RIGHT OF WAY LINE OF OAKLAND PARK BOULEVARD AS RECORDED IN OFFICIAL RECORD BOOK 13439, PAGE 730 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA; THENCE RUN N 00°54'05" W FOR 30.54 FEET TO A POINT; THENCE RUN N 89°05'55" E FOR 35.00 FEET TO A POINT; THENCE RUN SOUTH FOR 32.01 FEET TO A POINT; THENCE RUN N 89°05'55" E FOR 24.00 FEET TO A POINT; THENCE RUN NORTH FOR 335.04 FEET TO A POINT OF INTERSECTION WITH SAID NORTH LINE OF TRACT "G" AND THE SOUTH LINE OF SAID TRACT "A"; THENCE S 89°05'55" W, ALONG THE SOUTH LINE OF SAID TRACT "A", A DISTANCE OF 1512.81 FEET TO THE SOUTHWEST CORNER OF SAID TRACT "A"; THENCE N 00°19'45" W, A DISTANCE OF 7.34 FEET; THENCE N 03°49'07" W, A DISTANCE OF 328.61 FEET; THENCE N 00°19'45" W, A DISTANCE OF 640.02 FEET TO THE POINT OF BEGINNING, THE LAST THREE DESCRIBED COURSES BEING ALONG THE WEST LINE OF SAID TRACT "A" AND THE EAST RIGHT OF WAY LINE OF N.W. 27TH AVENUE AS SHOWN ON SAID "OAKLAND LAKES" PLAT.

SAID LANDS SITUATE, LYING AND BEING IN THE CITY OF OAKLAND PARK, BROWARD COUNTY, FLORIDA, CONTAINING 2,103,817 SQUARE FEET OR 48.297 ACRES, MORE OR LESS.





## EXHIBIT B

As used herein, the term "Debtor" shall mean and include the terms "Mortgagor," "Grantor" and "Borrower"; and the term "Creditor" shall mean and include the terms "Lender," "Beneficiary" and "Secured Party."

This Exhibit B refers to the following, which may be located on the premises of, relate to, or be used in connection with, the acquisition, construction, rehabilitation, reconstruction, equipping, repair, ownership, management, or operation of a multifamily apartment complex known as Lakes of Casablanca (the "Project), FHA Project No. 066-36650 located in the County of Broward, State of Florida, in which Debtor has an interest now or hereafter existing or acquired:

1.  All materials now owned or hereafter acquired by the Debtor and intended for construction, rehabilitation, reconstruction, alteration and/or repair of any building, structure or improvement now or hereafter erected or placed on the Real Estate, all of which materials shall be deemed to be included within the Project immediately upon the delivery thereof to the Project.

2.  All of the walks, fences, shrubbery, driveways, fixtures, machinery, apparatus, equipment, fittings, chattels and other goods and other personal property of every kind and description whatsoever, now owned or hereafter acquired by the Debtor and attached to or contained in and used or usable in connection with any present or future operation of the Project, including, by way of example rather than of limitation, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, motors, furnaces, compressors and transformers; all generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment and fixtures, fans and switchboards; all telephone equipment; all piping, tubing, plumbing equipment and fixtures; all heating, refrigeration, air conditioning, cooling, ventilating, sprinkling, water, power and communications equipment, systems and apparatus, all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture installed or to be installed or used or usable in the operation of any part of the Project or facilities erected or to be erected in or upon the Real Estate; and every renewal or replacement thereof or articles in substitution therefor, whether or not the same are now or hereafter attached to the



-1-



Real Estate in any manner; all except for any right, title or interest therein owned by any tenant (it being agreed by the Debtor and Secured Party that all personal property owned by the Debtor and placed by it on the Real Estate shall, so far as permitted by law, be deemed to be affixed to the Real Estate, appropriated to its use, and covered by the Mortgage and/or any Financing Statements, as applicable).

    3.   All of the Debtor's right, title and interest in and to any and all judgments, awards of damages (including but not limited to severance and consequential damages), payments, proceeds, settlements or other compensation (collectively, the "Awards") heretofore or hereafter made, including interest thereon, and the right to receive the same, as a result of, in connection with, or in lieu of (i) any taking of the Property or any part thereof by the exercise of the power of condemnation or eminent domain, or the police power, (ii) any change or alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Property or any part thereof (including but not limited to destruction or decrease in value by fire or other casualty), all of which Awards, rights thereto and shares therein are hereby assigned to the Secured Party, who is hereby authorized to collect and receive the proceeds thereof and to give property receipts and acquittances therefor and to apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the indebtedness secured hereby.

    4.   All of the Debtor's right, title and interest in any and all payments, proceeds, settlements or other compensation heretofore or hereafter made, including any interest thereon, and the right to receive the same from any and all insurance policies covering the Property or any portion thereof, or any of the other property described herein.

    5.   The interest of the Debtor in all of the rents, royalties, issues, profits, revenues, income and other benefits of the Property, or arising from the use or enjoyment of all or any portion thereof, or from any lease or agreement pertaining thereto, and all right, title and interest of the Debtor in and to, and remedies under, all contract rights, accounts receivable and general intangibles arising out of or in connection with any and all leases and subleases of the Property, or any part thereof, and of the other property described herein, or any part thereof, both now in existence or hereafter entered into, together with all proceeds (cash and non-cash) thereof; and including, without limitation, all cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder.

    6.   All of the Debtor's rights, options, powers and privileges in and to (but not the Debtor's obligations and burdens under) any construction contract, architectural and engineering

-2-



agreements and management contracts pertaining to the construction, development, ownership, equipping and management of the Property and all of the Debtor's right, title and interest in and to (but not the Debtor's obligations and burdens under) all architectural, engineering and similar plans, specifications, drawings, reports, surveys, plats, permits and the like, contracts for construction, operation and maintenance of, or provision of services to, the Property or any of the other property described herein, and all sewer taps and allocations, agreements for utilities, bonds and the like, all relating to the Property.

7.    All of the records and books of account now or here--after maintained by or on behalf of Mortgagor in connection with the Project.

8.    All names now or hereafter used in connection with the Project and the goodwill associated therewith.

9.    All intangible personal property, accounts, licenses, permits, instruments, contract rights, and chattel paper of the Debtor, including but not limited to cash; accounts receivable; bank accounts; certificates of deposit; securities; promissory notes, rents; rights (if any) to amounts held in escrow; insurance proceeds; condemnation rights; deposits judgments, liens and causes of action; warranties and guaranties.

10.    The interest of the Debtor in any cash escrow fund and in any and all funds, securities, instruments, documents and other property which are at any time paid to, deposited with, under the control of, or in the possession of the Secured Party, or any of its agents, branches, affiliates, correspondents or others acting on its behalf, which rights shall be in addition to any right of set-off or right of lien that the Secured Party may otherwise enjoy under applicable law, regardless of whether the same arose out of or relates in any way, whether directly or indirectly, to the Project located upon the Real Estate.

11.    The interest of the Debtor in any and all funds created or established and held by any trustee pursuant to any indenture of trust or similar instrument authorizing the issuance of bonds or notes for the purpose of financing the Project located upon the Real Estate.

12.    Any collateral provided by the Debtor for its account to each and every issuer of a letter of credit, subject to the prior claim of the issuer of any such letter of credit to such collateral.

13.    All inventory, including raw materials, components, work-in-process, finished merchandise and packing and shipping materials.

-3-






14.    Proceeds, products, returns, additions, accessions and substitutions of and to any or all of the above.

15.    Any of the above arising or acquired by the Debtor or to which the Debtor may have a legal or beneficial interest in on the date hereof and at any time in the future.

16.    Any of the above which may become fixtures by virtue of attachment to the Real Estate.

22450-77-S

-4-

EXHIBIT C

(1)    Taxes for the year 1989, and subsequent years which are not yet due and payable.

(2)    Easements and other matters as shown on the Plat of OAKLAND LAKES, recorded in Plat Book 111, Page 7; as modified by Resolution of the City of Oakland Park No. R-88-187 recorded January 18, 1989 in Official Records Book 16120, Page 58 and Resolution of Broward County recorded July 5, 1989 in Official Records Book 16571, Page 993, which Resolutions abandon 20 feet utility and drainage easement over the north 20 feet of Tracts A and B and further modified by that certain Agreement to Place Notation on Plat recorded in Official Records Book 16112, Page 566.

(3)    Agreement with the CITY OF OAKLAND PARK, recorded September 23, 1981 in Official Records Book 9809, Page 661.

(4)    Utility Easement(s) granted to the CITY OF OAKLAND PARK recorded July 16, 1987 in Official Records Book 14625, Page 291.

(5)    Roadway Easement recorded in Official Records Book 13439, Page 773, as set forth in Resolution NO. R-86-44 recorded May 30, 1986 in Official Records Book 13439, Page 730.

(6)    Master Development Plan for Oakland Lakes recorded September 7, 1988 in Official Records Book 15760, Page 500.

(7)    Agreement Governing Land Development for Oakland Lakes Planned Unit Development recorded September 7, 1988 in Official Records Book 15760, Page 494.

AS TO PARCELS I AND III ONLY:

(8)    Drainage Easements recorded February 16, 1989 in Official Records Book 16203, Page 524; in Official Records Book 16203, Page 528; in Official Records Book 16203, Page 532; and in Official Records Book 16203, Page 536.

AS TO PARCEL III ONLY:

(9)    Reservations for fill and minerals together with an easement for purposes of dredging and removing fill and minerals, in favor of HPAV, a Florida general partnership, set forth in that certain Warranty Deed dated June 15, 1981, recorded September 21, 1981 in Official Records Book 9804, Page 807.



(10) Easement recorded September 17, 1971 in Official Records Book 4612, Page 887.

(11) Riparian and littoral rights are neith guaranteed nor insured.

(12) Submerged land is not insured.

AS TO PARCEL IV ONLY:

(13) Private Easement Agreement for access recorded March 18, 1982 in Official Records Book 10087, Page 363.

(14) Resolution No. R-86-21 recorded in Official Records Book 13436, Page 558, which resolution abandons existing non-vehicular access lines on the aforesaid Plat of Oakland Lakes along southerly boundary of Tract G thereto.

(15) Road Contribution Agreement recorded in Official Records Book 9802, Page 677.

AS TO PARCEL I ONLY:

(16) Utility Easement in favor of the City of Oakland Park recorded in Official Records Book 14625, Page 295.

RECORDED IN THE OFFICIAL RECORDS BOOK
OF BROWARD COUNTY, FLORIDA
L. A. HESTER
COUNTY ADMINISTRATOR

   

1.1                                                                9/27/89

AMENDED AND RESTATED
RENEWAL MORTGAGE NOTE

$22,779,600.00                                    Oakland Park, Florida

                                                  October 5 1989

    FOR VALUE RECEIVED, the undersigned, Oakland Lakes, Ltd., a
Florida limited partnership, ("Mortgagor"), promises to pay to or
upon the order of CINCINNATI MORTGAGE CORPORATION, an Ohio
Corporation (the "Holder", as hereinafter defined), the principal
sum of Twenty Two Million Seven Hundred Seventy Nine Thousand Six
Hundred and no/100 Dollars ($22,779,600.00) with interest from
the date hereof at the rate of eight and one-quarter percent
(8.25%) per annum on the outstanding principal hereof until
paid.  The said principal and interest shall be payable in lawful
money of the United States of America in monthly installments as
follows:

        Interest in arrears payable monthly beginning on the
    first day of November, 1989 and on the first day of
    each month thereafter up to and including December 1,
    1991.  Commencing on January 1, 1992, monthly install-
    ments of interest and principal shall be paid in the
    sum of One Hundred Sixty-Two Thousand Six Hundred
    Seventy Seven and 97/100 Dollars ($162,677.97) each,
    such payments to continue monthly on the first day of
    each succeeding month until the entire indebtedness has
    been paid.  In any event, the balance of principal, if
    any remaining unpaid, plus accrued interest, shall be
    due and payable on December 1, 2031.  The payments of
    principal and interest shall be applied first to inter-
    est at the applicable rate upon the principal sum or so
    much thereof as shall from time to time remain unpaid
    and the balance thereof shall be applied on account of
    principal.

    In addition to the foregoing, the Mortgagor shall aggregate
with the monthly installments of principal and interest all other
payments payable pursuant to the Mortgage (as hereinafter de-
fined).

    Until further notice from the Holder, all payments by the
Mortgagor of any sums due hereunder shall be by check payable to
Cincinnati Mortgage Corporation, 2368 Victory Parkway, Suite
#210, Cincinnati, Ohio 45206.

    Except as hereinafter provided, there shall be no payments
made hereunder, other than regularly scheduled payments of prin-
cipal hereunder, to reduce the principal amount of the debt
evidenced hereby in whole or in part prior to October 31, 1999.

-1-

On or after October 31, 1999, provided that there is no default under this Note or the Mortgage, privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due, on the last day of any month prior to maturity upon at least thirty (30) days' prior written notice to the Holder.

Notwithstanding any prepayment prohibitions imposed and/or penalties required by this Note with respect to prepayments made prior to October 31, 1999 the indebtedness may be prepaid in part or in full without the consent of the Holder and without a prepayment penalty if the Secretary of Housing and Urban Development (the "Secretary") determines in writing that prepayment will avoid a mortgage coinsurance claim and is therefore in the best interest of the United States Government, which determination shall be made by the Secretary only if:

(a) the Mortgagor has defaulted in the payments due under this Note and the Secretary has received notice of such default, as required by 24 CFR Section 251.810;

(b) the Secretary determines that the Project has been experiencing a net income deficiency which has not been caused solely by management inadequacy or lack of owner interest, and which is of such a magnitude that the Mortgagor is currently unable to make required debt service payments, pay all Project operating expenses and fund all reserves required by the Secretary;

(c) the Secretary determines that there is a reasonable likelihood that the Mortgagor can arrange to refinance this Note at a lower interest rate or otherwise reduce the debt service payments due hereunder through partial prepayment; and

(d) the Secretary determines that refinancing this Note at a lower rate or partial prepayment is necessary to restore the Project to a financially viable condition and to avoid a coinsurance claim.

All payments to reduce the principal balance hereunder (including all penalty or penalties required pursuant hereto), other than regularly scheduled payments of principal, must be made to the Holder hereof in Federal Funds.

In the event of any partial prepayment of this Note for any reason, including but not limited to a pre-payment as a result of (i) an award in condemnation, (ii) an insurance payment on the property subject to the Mortgage, (iii) the imposition of any requirement of the Secretary, or (iv) any voluntary prepayment,

-2-

the Holder shall have the right, in its sole discretion, to apply such prepayment to the payments last due hereunder or to recast the remaining principal payments hereunder so that the required monthly payments of principal and interest shall be in equal amounts sufficient to pay the remaining principal balance of this Note over the then remaining term hereof.

In the event any installment or part of any installment due hereunder becomes delinquent for more than fifteen (15) days, there shall be due at the option of the Holder, in addition to other sums then due hereunder, a sum equal to four percent (4%) of the amount of principal and interest so delinquent for each month, or portion thereof, that such amount remains unpaid as liquidated damage for losses due to cash flow disruption and accounting and other expenses incident to handling such delinquent payment. Whenever, under the laws of the State of Florida, the amount of any such late penalty is considered to be additional interest, this provision shall not be used to the extent that the rate of interest specified is in excess of the maximum rate of interest permitted and would constitute usury.

This Note is secured by a Mortgage, Assignment of Rents and Security Agreement (the "Mortgage") of even date herewith made by the Mortgagor, upon certain property and premises situate and lying in Broward County, Florida, and being more particularly described in said Mortgage. The terms, covenants, conditions, provisions, stipulations and agreements contained in the Mortgage are hereby made a part hereof to the same extent and with the same effect as if fully set forth herein; and without limiting the foregoing, reference is hereby made to the Mortgage for a description of the property conveyed thereunder, definition of certain terms, the nature and extent of the security and the rights of the Holder in respect of such security. It is expressly agreed that upon the occurrence of any default under this Note or Event of Default under the Mortgage, the whole principal sum hereof or so much thereof as shall remain unpaid, with interest thereon, together with all other sums secured under the Mortgage shall at the option of the Holder hereof, become immediately due and payable. Any capitalized term used herein, but not herein defined, shall have the meaning set forth in the Mortgage.

Mortgagor further agrees to pay to the order of the Holder immediately on demand any advancements and/or expenditures made by such Holder in accordance with the Mortgage including, without limitation, those for the payment of taxes, special assessments, insurance penalties, mortgage insurance penalties, lender's penalties, and costs of maintenance and preservation of property mortgaged or pledged in connection with the loan evidenced by this Note. At the option of Holder, without notice or demand (which notice and demand are expressly waived by Mortgagor), all or any part of the advancements and/or expenditures described in this paragraph may be added to the unpaid principal balance

-3-

hereof and become a part of and on a parity with the principal
indebtedness secured by the Mortgage, and all other instruments
executed in connection herewith, and the same shall accrue inter-
est, until paid, at the highest rate permitted to be penaltied on
delinquent installments of principal and interest under this
Note.

Each payment shall be applied: first, to the payment of
such additional advancements and expenditures as Holder may make
in accordance with the terms of the Mortgage including, without
limitation, advancements for taxes, mortgage coinsurance penalty,
insurance and the like; second, to the payment of accrued but
unpaid interest; and third, to the payment of principal. Late
penalties will not be deducted from any monthly mortgage payment
but will be separately penaltied to and collected from the Mort-
gagor.

If default be made in the payment of any installment under
this Note (or any other amount due under the Mortgage) and if
such default is not made good prior to the due date of the next
such installment, or if any other Event of Default should occur,
then, in addition to any other action permitted to be taken by
the Holder hereunder or under the Mortgage or any other Loan
Documents, the entire principal sum hereof and accrued interest
hereon shall at once become due and payable without notice, at
the option of the Holder, and the Holder shall have the remedies
of a secured party under the laws of the State of Florida with
respect to all property mortgaged or pledged as security for this
Note and all of the rights and remedies available under the
Mortgage or any other Loan Documents. When this Note becomes
due, by acceleration or otherwise, the Holder may, at its option,
demand, sue for, collect, or make any compromise or settlement it
deems desirable with reference to property held as security
herefor. The Holder shall not be bound to take any steps neces-
sary to preserve any rights in the property held as security
herefor against prior parties, which the Mortgagor hereby assumes
to do. The failure to exercise any option to declare the maturi-
ty of the principal debt or to exercise any other rights under
any of the covenants or conditions contained in the Loan Docu-
ments, shall not be taken or deemed to be a waiver of the right
to exercise such option or to declare such maturity after such
past or any subsequent violation of any such covenants or condi-
tions. All remedies provided for herein upon any default by the
Mortgagor shall be cumulative and not exclusive.

In the event of default in the payment of this Note, and if
the same is collected by an attorney at law, the undersigned
hereby agree(s)' to pay all costs of collection, including rea-
sonable attorneys fees.

Mortgagor and Holder intend that this Note shall be in com-
pliance with all applicable laws and shall be enforceable in

-4-

accordance with its terms. If any provision of this Note shall
be illegal or unenforceable, such provision shall be deemed can-
celled to the extent of such illegality or enforceability, but
the remaining provisions shall not be affected thereby.

All agreements herein are expressly limited so that in no
event whatsoever, whether by reason of advancement of the pro-
ceeds hereof, acceleration of maturity of the unpaid principal
balance hereof, or otherwise, shall the amount paid or agreed to
be paid to the Holder for the use, forebearance or detention of
the money to be advanced hereunder exceed the highest lawful rate
permissible under applicable law. If, due to any circumstances
whatsoever, fulfillment of any provision hereof, or of any of the
Loan Documents, at the time performance of such provision shall
be due, shall involve transcending the limit of validity pre-
scribed by law which a court of competent jurisdiction deems
applicable hereto, then ipso facto, the obligation to be ful-
filled shall be reduced to the limit of such validity, and if
under any circumstances the Holder hereof shall ever receive as
interest an amount which would exceed the highest lawful rate,
such amount which would be excessive interest shall be applied to
the reduction of the unpaid principal balance due hereunder and
not to the payment of interest.

At the option of Holder, if a court of competent juris-
diction determines that any amounts otherwise to be paid here-
under exceed the highest permissible lawful rate or if Mortgagor
or any guarantor asserts the amounts otherwise to be paid here-
under exceed the highest permissible lawful rate, then Holder
shall have the right to accelerate the maturity of the entire
unpaid principal balance and accrued interest due under this
Note, immediately upon notice to the Mortgagor.

Funds representing the proceeds of the indebtedness evid-
enced hereby and disbursed for any purpose permitted hereunder by
the Holder by mail, wire transfer or other delivery to Mortgagor,
to escrows or in any way for the benefit of Mortgagor, for any
purpose, shall be deemed outstanding hereunder and to have been
received by Mortgagor as of the date of such mailing, wire trans-
fer or other delivery, and interest shall accrue and be payable
upon such funds from and after the date of such wire transfer,
mailing or delivery and until repaid, notwithstanding the fact
that such funds may not at any time have been remitted from such
escrows to Mortgagor or for its benefit. Funds paid hereunder by
or on behalf of Mortgagor shall be deemed received by the Holder
on the next business day if not received by 2:00 p.m. local time
at the location where payments hereunder are to be made.

Each maker and endorser jointly and severally hereby con-
sents to any extensions or renewals of this Note or any part
thereof without notice, and each maker and endorser agrees that
he/she/it will remain liable as such during any extension or
renewal hereof until the debt represented hereby is paid in full.

-5-

All parties to this Note, whether principal, surety, guarantor or endorser, hereby waive all applicable exemption rights (whether under the State Constitution, Homestead laws, or otherwise), valuation, appraisement, presentment for payment, demand, protest, notice of protest and notice of dishonor.

As used herein, the term "Holder" means the payee of this Note, so long as it shall own the same, and such other person or entity to whom the Note shall have been endorsed, transferred, pledged and by whom, as the lawful holder thereof, the Note is then held, subject, however, to the terms of any agreement for any such transfer or pledge.

This Note and the Mortgage are made and delivered in and shall be construed in accordance with the laws of the State of Florida.

The covenants set forth in this Mortgage Note shall not be deemed as varying the terms or conditions of the contract of mortgage coinsurance between the Secretary and Cincinnati Mortgage Corporation.

Mortgagor and the partners thereof assume no personal liability for the payment hereof, except as set out in the Mortgage.

This Amended and Restated Renewal Mortgage Note amends, restates and renews in its entirety, and shall be in substitution of, but does not enlarge the face principal amount of, that certain Mortgage Note from Mortgagor to the Florida Housing Finance Agency ("FHFA") dated October __1__, 1989, which Mortgage Note was assigned by FHFA to Citizens and Southern Trust Company (Florida), National Association (the "Trustee") by an Assignment of Mortgage Note and Mortgage and Security Agreement dated October __4__, 1989 and recorded October __5__, 1989 as Clerk's File No. __89399809__ in the Public Records of Broward County, Florida, and which Mortgage Note was further assigned by the Trustee to Cincinnati Mortgage Corporation by an Assignment of Mortgage Note and Mortgage and Security Agreement dated October __4__, 1989 and recorded October __5__, 1989, as Clerk's File No. __89399810__ in the Public Records of Broward County, Florida.

-6-

IN WITNESS WHEREOF, the Mortgagor has caused this Note to be executed by its duly authorized general partner as of the day and year first above written.

WITNESS/ATTEST:

OAKLAND LAKES, LTD., a
Florida limited partnership

By: _____
    William O. Brisben,
    General Partner


THIS IS TO CERTIFY that this is the Note described in and secured by the Mortgage of even date herewith and in the same principal amount as herein stated and secured by real estate situated in the City of Oakland Park, County of Broward, State of Florida.

Dated:  October **5**, 1989

_____
Notary Public

22450-74-S

JENNIFER L MUNCH
Notary Public, State of Ohio
My Commission Expires March 2 1994

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

PROJECT NAME: **LAKES OF CASABLANCA**

PROJECT NO: **066-94026**          EFFECTIVE DATE: **February 1, 1995**

LOCATION:    **Oakland Park, FL** EXPIRATION DATE: **January 1, 2001**

# PROVISIONAL WORKOUT ARRANGEMENT

The undersigned mortgagor hereby expressly acknowledges that the Mortgage and Note secured by the above project is in default.  To afford an opportunity to effect reinstatement, the Secretary, Department of Housing and Urban Development, will hold the defaulted Note and Mortgage on the subject project under the terms and conditions stated herein.  Failure of the property to perform as projected will not excuse performance of any clauses in this Arrangement.  The written terms of the workout are complete and there are no oral side agreements or verbal understandings which might affect the workout at some future date.

1.  Possession.   The mortgagor acknowledges that the default entitles HUD to assume possession of the encumbered premises, but that possession has not been demanded.  As an inducement for HUD approval of this Arrangement, the mortgagor agrees that it will not oppose or interfere in any way should HUD demand possession by reason of subsequent default under the terms of this arrangement.

2.  Junior Obligations.   The mortgagor agrees that project revenues will not be used to repay either interest or principal for any project obligations, other than reasonable and necessary operating expenses, that are junior to the Secretary's lien.

3.  Payment Provision.  All payments will be made to the lock box and copies of each check will be sent to the Field Office in Jacksonville, Florida.  The mortgagor agrees to make monthly payments in a timely manner until this Arrangement is accepted by all parties. Unless otherwise identified, at HUD's option, these remittances will be applied in the sequence illustrated on form HUD-2771, Statement of Multifamily Mortgage Account. The source of the amounts used in this Arrangement is form HUD-2771, Statement Of Multifamily Mortgage Account, payment due date 08/01/94.  If the amounts on form HUD-2771 change, the mortgagor will pay the new amount billed monthly, with the exception that only the required percent of interest, as identified below, will be paid.

2

a.1. For the two (2) year period beginning February 1, 1995, and continuing through January 31, 1997, the mortgagor will remit by the first of each month $166,368.09, which consists of Service Charges of $9,405.90, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 70 percent of interest, which is $109,598.00.

a.2. Beginning February 1, 1997, and continuing through January 31, 1998, the mortgagor will remit by the first of each month $182,026.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 80 percent of interest, which is $125,255.00.

a.3. Beginning February 1, 1998, and continuing through January 31, 1999, the mortgagor will remit by the first of each month $197,680.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 90 percent of interest, which is $140,911.00.

a.4. Beginning February 1, 1999, and continuing through January 31, 2000, the mortgagor will remit by the first of each month $213,337.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 100 percent of interest, which is $156,568.00.

a.5. Beginning February 1, 2000, and continuing through January 31, 2001, the mortgagor will remit by the first of each month $228,994.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 110 percent of interest, which is $172,225.00.

b. Failure to remit net cash is cause for HUD to proceed with foreclosure. Net cash in excess of $25,000 remaining in the property accounts each month after payment of necessary and reasonable project operating expenses, and payment of the minimum monthly payment as noted in paragraphs 3(a)(1) through 3(a)(5) above, will be remitted to HUD within 15 days. At HUD's option, these funds may first be applied against delinquent Other (Late) Charges and then against other accrued delinquencies in the payment sequence outlined as "Account Items" of form HUD-2771.

c. At no time will the owner permit any delinquency to accrue in either the service charge due HUD or the tax escrow as billed by HUD each month.

3

d. A four percent late charge will be assessed against payments not received by the fifteenth of the month. In addition to the above payments, the owner will remit $2,000.00 monthly until Other Charges have been eliminated. Future Late Charges will be paid monthly as incurred. Any Late Charges not resolved upon completion of this Arrangement will be paid in full prior to Mortgage Modification.

4. <u>Lump Sum Payments</u>. The owner will not remit any additional funds as a lump sum payment to meet equity capital requirements.

5. <u>Balance Sheet Reclassification</u>. Owner agrees to reclassify $580,900 listed as Accounts Payable General Partner on the Balance Sheet to Equity. Owner certifies these funds were advanced to fund operating shortages since final endorsement and were used for necessary and reasonable operating expenses. These funds may only be recovered after successful completion of this Arrangement and may only be taken from Surplus Cash as that term is defined by the Regulatory Agreement. These funds do not represent a lien on the property.

6. <u>Mortgage Modification</u>.

a. If the mortgagor has fully complied with the terms of this Arrangement and HUD has determined that it is financially feasible, as of <u>February 1, 2001</u>, HUD agrees to recast any delinquent principal and interest equal to or less than ten <u>(10)</u> percent of the original mortgage amount at the current mortgage interest rate of <u>8.25</u> percent, amortized over the remaining term of the mortgage, but not less than <u>180</u> months. The amount of delinquent interest and principal <u>together</u> cannot exceed ten percent of the original mortgage amount.

b. The mortgagor agrees to modify the Note and Mortgage to insert a call provision. The call provision gives the mortgagee the option to declare the entire indebtedness due and payable at or after ten (10) years from the date of the modification.

c. In the event the mortgage and note is considered for modification, the property must demonstrate that net operating income can support the increased debt service. If it cannot, the mortgagor agrees to fund the amount necessary to buy down the mortgage to an amount supportable by net operating income.

d.  If, at the time of recast, a delinquency in excess of the 10 percent HUD allowance remains, the owner will make a lump sum payment to fund the deficit.

7.  Equity Kicker.  If, at any time, Maker sells, assigns, transfers, converts or conveys the Property (collectively a "Sale") or, if Maker refinances the indebtedness secured by the Property (a "Refinancing"), twenty five and one quarter (25.25) percent of the Gross Sale, Conversion or Refinancing Proceeds shall be paid by Maker to Mortgagee or its successors and assigns at the closing of the Sale or Refinancing (the "Sale or Refinancing Obligation").  If none of the above circumstances occur and the Mortgagor pays the note in full through normal amortization, twenty five and one quarter (25.25) percent of the mutually agreed upon appraised value or twenty five and one quarter (25.25) percent of the original mortgage value, whichever is greater, shall be paid by Maker to Mortgagee or its successors and assigns on the date of Mortgage Satisfaction.

"Proceeds" are defined as the amount needed to payoff or refinance the note securing the real estate plus any equity "pulled", minus the mortgage balance and minus reasonable closing costs.  Gross Sale, Conversion or Refinancing Proceeds shall also mean consideration of any kind directly or indirectly received by Maker, or its principals, in connection with a Sale, Conversion or Refinancing.

The obligation set forth above shall be effective until one of the stated conditions has been fulfilled and shall apply to the first Sale, Conversion, Mortgage Satisfaction or Refinancing, after the date of this Arrangement, which Mortgagee determines is an arms-length transaction for full value.  No Sale or Refinancing shall occur unless Mortgagee consents in writing.  Maker must certify (subject to 18 U.S.C. 1001) to Mortgagee that the Sale, Conversion or Refinancing is not an identity of interest transaction.

8.  Repairs.  Past delinquency in the Reserve for Replacement is hereby forgiven.  The physical property will be maintained in accordance with the requirements of the Regulatory Agreement.  All disbursements from the RFR Account will be approved by the Jacksonville Field Office in accordance with the Regulatory Agreement.  The mortgagor agrees to monthly escrow $6,560.84 to the Reserve For Replacement account and acknowledges this amount may be increased at any time during this Arrangement if the Field Office determines an increase is necessary to maintain the property in a manner acceptable to HUD.  Separate remittance checks must be written monthly, clearly identifying the payment to assure proper application by HUD.  These checks will be submitted in addition to the minimum mortgage payment.

5

9. **Accounting Reports.** During the term of this Arrangement, the mortgagor will submit monthly Reports for Establishing Net Income (Forms HUD-93479, 93480, and 93481). The reports will be mailed to the HUD Office in Jacksonville, Florida.

10. **Distributions.** The mortgagor agrees not to take any distributions while the mortgage is being held in default under the terms of this Arrangement and of the original Note, Mortgage and Regulatory Agreement.

11. **Cancellation Clause.** This Arrangement is on a month-to-month basis. The Secretary agrees to take no action because of the existing monetary default, provided the mortgagor remits the required minimum monthly payment and satisfactorily performs the other requirements of this Arrangement. Failure of the mortgagor to meet the terms of this Arrangement will be sufficient cause for the Secretary to immediately terminate this Arrangement and to commence foreclosure action. Failure of the mortgagor to meet the terms of the Arrangement is also grounds for the Department to consider taking administrative sanctions against the mortgagor including, but not limited to, suspension or debarment from participation in HUD programs.

12. **Criminal Sanctions for Misuse of Project Funds.** The mortgagor acknowledges that the use of project funds derived from the project covered by this Arrangement for any purpose other than to meet actual and necessary project expenses may be a criminal offense punishable by a fine of not more than $5,000 and imprisonment of not more than three (3) years or both.

DATE APPROVED: December 22, 1994
                Oakland Lakes, Ltd.

MORTGAGOR SIGNATURE: _____

MORTGAGOR TITLE: _____William O. Brisben_____
                     General Partner

ASSISTANT SECRETARY FOR HOUSING-FEDERAL HOUSING COMMISSIONER:

BY: _____Ferdinand R. Juluke Jr._____

TITLE: Ferdinand R. Juluke, Jr., Director, Multifamily Division, 4HMS

DATE: _____Jun 5, 1995_____



95-198510  78005
05-11-95  02:48PM

PREPARED (IN CONSULTATION WITH
A MEMBER OF THE FLORIDA BAR) BY
AND AFTER RECORDING PLEASE RETURN TO:

Latham & Watkins
885 Third Avenue, Suite 1000
New York, New York 10022-4802
Att'n: Joshua Stein, Esq.

| | |
|---|---|
| Former FHA Project No.: | 066-94026 |
| Asset No.: | 10026 |
| Project Name: | LAKES OF CASABLANCA |
| County, State: | Broward, Florida |

---

### ASSIGNMENT OF AMENDED AND RESTATED RENEWAL MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT AND OTHER COLLATERAL LOAN DOCUMENTS

---

The SECRETARY OF HOUSING AND URBAN DEVELOPMENT, solely in its capacity as mortgagee ("HUD"), pursuant to the terms of that certain Amended and Restated Loan Sale Agreement dated as of March 28, 1995 (the "Loan Sale Agreement") between HUD and Condor One, Inc., a Delaware corporation ("Assignee"), having a mailing address of c/o General Electric Capital Corporation, 292 Long Ridge Road, Stamford (Fairfield County), Connecticut 06927, Attention: Legal Operation, and in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by Assignee, hereby assigns, transfers, sets over and conveys to Assignee, its successors and assigns, the following, all as they may have been modified, consolidated, assigned, amended, restated, or supplemented (whether or not of record) through and including May 8, 1995.



That certain Amended and Restated Renewal Mortgage, Assignment of Rents and Security Agreement executed by Oakland Lakes, Ltd., a Florida limited partnership, for the benefit of Cincinnati Mortgage Corporation, an Ohio corporation, as Mortgagee, dated October 5, 1989, and recorded on October 5, 1989, at Book 16818, Page 609, in the Official Records of Broward County, Florida (the "Mortgage"), which Mortgage secures, that certain Amended and Restated Renewal Mortgage Note dated October 5, 1989, made by Oakland Lakes, Ltd., a Florida limited partnership, in favor of Cincinnati Mortgage Corporation, an Ohio corporation ("Note"), together with the indebtedness secured by said Mortgage and evidenced by said Note, and any right, title, and interest of HUD (if any) in and to the property described in said Mortgage; and

FL 52-66-94026  ASSIGNMENT 1




EXHIBIT



- Such other documents, agreements, instruments, and other collateral (excluding the Regulatory Agreement referenced in the Mortgage) which evidence, secure or otherwise relate to HUD's right, title or interest in and to the Mortgage and/or the Note, including without limitation the Security Agreement, if any, and the title insurance policies and hazard insurance policies that may presently be in effect.

The Note was endorsed by HUD to Assignee without "FHA Mortgage Insurance" (as such term is defined in the Loan Sale Agreement).

IN WITNESS WHEREOF, HUD has caused this Assignment to be executed and delivered by its duly authorized agent as of May 8, 1995.

Witness:                                SECRETARY OF HOUSING AND URBAN
                                        DEVELOPMENT

_____             By _____
                                             (Authorized Agent)
                                           William Richbourg

                        ACKNOWLEDGMENT

DISTRICT OF COLUMBIA        )
                            )
                            )

        BEFORE ME, _Rita R Ross_ a Notary Public in and for the jurisdiction aforesaid, on this _1st_ day of _MAY_ , 1995, personally appeared William Richbourg _____, who is personally well known to me (or sufficiently proven) to be an authorized agent of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT and the person who executed the foregoing instrument by virtue of the authority vested in him/her and he/she did acknowledge the signing of the foregoing instrument to be his/her free and voluntary act and deed as the agent of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT, for and on behalf of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT for the uses, purposes and consideration therein set forth.

        Witness my hand and official seal, this _1st_ day of _May_ , 1995.

_____          _____
OF _____ COUNTY, FLORIDA                                  Notary Public
COUNTY ADMINISTRATOR
                                   Rita R. Ross
                          Notary Public, District of Columbia
My Commission expires: _____  My Commission Expires April 14, 1998

                                        FL 52-66-94026  ASSIGNMENT 2

95-198510    T#005
05-11-95    02:48PM

PREPARED (IN CONSULTATION WITH
A MEMBER OF THE FLORIDA BAR) BY
AND AFTER RECORDING PLEASE RETURN TO:

Latham & Watkins
885 Third Avenue, Suite 1000
New York, New York 10022-4802
Att'n: Joshua Stein, Esq.

| | |
|---|---|
| Former FHA Project No.: | 066-94026 |
| Asset No.: | 10026 |
| Project Name: | LAKES OF CASABLANCA |
| County, State: | Broward, Florida |

---

### ASSIGNMENT OF AMENDED AND RESTATED RENEWAL MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT AND OTHER COLLATERAL LOAN DOCUMENTS

---

The SECRETARY OF HOUSING AND URBAN DEVELOPMENT, solely in its capacity as mortgagee ("HUD"), pursuant to the terms of that certain Amended and Restated Loan Sale Agreement dated as of March 28, 1995 (the "Loan Sale Agreement") between HUD and Condor One, Inc., a Delaware corporation ("Assignee"), having a mailing address of c/o General Electric Capital Corporation, 292 Long Ridge Road, Stamford (Fairfield County), Connecticut 06927, Attention: Legal Operation, and in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by Assignee, hereby assigns, transfers, sets over and conveys to Assignee, its successors and assigns, the following, all as they may have been modified, consolidated, assigned, amended, restated, or supplemented (whether or not of record) through and including May 8, 1995.

- That certain Amended and Restated Renewal Mortgage, Assignment of Rents and Security Agreement executed by Oakland Lakes, Ltd., a Florida limited partnership, for the benefit of Cincinnati Mortgage Corporation, an Ohio corporation, as Mortgagee, dated October 5, 1989, and recorded on October 5, 1989, at Book 16818, Page 609, in the Official Records of Broward County, Florida (the "Mortgage"), which Mortgage secures, that certain Amended and Restated Renewal Mortgage Note dated October 5, 1989, made by Oakland Lakes, Ltd., a Florida limited partnership, in favor of Cincinnati Mortgage Corporation, an Ohio corporation ("Note"), together with the indebtedness secured by said Mortgage and evidenced by said Note, and any right, title, and interest of HUD (if any) in and to the property described in said Mortgage; and

WILL CALL 23787
CHICAGO TITLE INSURANCE CO.

BK 23442 PG 0284

FL 52-66-94026 ASSIGNMENT 1



uch other documents, agreements, instruments, and other collateral (excluding the
gulatory Agreement referenced in the Mortgage) which evidence, secure or otherwise
ite to HUD's right, title or interest in and to the Mortgage and/or the Note, including
bout limitation the Security Agreement, if any, and the title insurance policies and
rd insurance policies that may presently be in effect.

Note was endorsed by HUD to Assignee without "FHA Mortgage Insurance" (as such term is
Loan Sale Agreement).

TNESS WHEREOF, HUD has caused this Assignment to be executed  and delivered by
d agent as of May 8, 1995.

SECRETARY OF HOUSING AND URBAN
DEVELOPMENT

By _William L. Richb_
(Authorized Agent)
William Richbourg

ACKNOWLEDGMENT

D                              )
BIA                            )
                               )

jur _Rita R Ross_____, a Notary Public in and for the
___ this _1st_ day of _MAY_, 1995, personally appeared
to t_____, who is personally well known to me (or sufficiently proven)
the f the SECRETARY OF HOUSING AND URBAN DEVELOPMENT and
did t foregoing instrument by virtue of the authority vested in him/her and he/she
agen_ f the foregoing instrument to be his/her free and voluntary act and deed as the
SEC OF HOUSING AND URBAN DEVELOPMENT, for and on behalf of the
consi NG AND URBAN DEVELOPMENT for the uses, purposes and

icial seal, this _1st_ day of _MAY_, 1995.

Notary Public

My Com     Rita R. Ross
           ry Public, District of Columbia
           mission Expires April 14, 1998

FL 52-66-94026  ASSIGNMENT 2

BILZIN SUMBERG DUNN PRICE & AXELROD LLP

A PARTNERSHIP OF PROFESSIONAL ASSOCIATIONS
2500 FIRST UNION FINANCIAL CENTER
200 SOUTH BISCAYNE BOULEVARD · MIAMI, FLORIDA 33131-2336
TELEPHONE: (305) 374-7580 · FAX: (305) 374-7593
E-MAIL: INFO@BILZIN.COM

ONE EAST BROWARD BOULEVARD · SUITE 700
FORT LAUDERDALE, FLORIDA 33301
TELEPHONE: (954) 356-0030 · FAX: (954) 356-0406

*David W. Trench, Esq.*
*Direct Dial: (305) 350-2359*
*E-Mail: Dtrench@Bilzin.com*

July 14, 2000

Oakland Lakes, Ltd.
4750 Ashwood Drive
Suite 300
Cincinnati, Ohio 45241
Attention: William O. Brisben

> Re:  **That certain Amended and Restated Renewal Mortgage, Assignment of Rents
> and Security Agreement executed by Oakland Lakes, Ltd., a Florida limited
> partnership, for the benefit of Cincinnati Mortgage Corporation, an Ohio
> corporation, as Mortgagee, dated October 5, 1989, and recorded on October 5,
> 1989 at Book 16818, Page 609, in the Official Records Book of Broward County,
> Florida ("Mortgage"), which Mortgage secures that certain Amended and
> Restated Renewal Mortgage Note dated October 5, 1989, made by Oakland
> Lakes, Ltd., a Florida limited partnership, in favor of Cincinnati Mortgage
> Corporation, an Ohio corporation ("Note").**

Dear Mr. Brisben:

We are counsel to Condor One, Inc. ("Condor One"). By virtue of an assignment dated May
8, 1995, from the Secretary of Housing and Urban Development ("HUD"), Condor One is the owner
and holder of the Note and Mortgage referenced above.

Oakland Lakes, Ltd. has been in default under the Note and Mortgage since a date prior to
February 1, 1995, as it acknowledged in that certain Provisional Workout Agreement between it and
HUD bearing the effective date of February 1, 1995 ("PWA"). Oakland Lakes, Ltd. has failed to
make the payment due on July 1, 2000 and such failure is both a violation of the terms of the PWA
as well as an independent event of default under the Note and Mortgage. As a result, all amounts
due under the Note and Mortgage have been accelerated and are now due and payable in full.

In addition, Condor One has been orally advised that the insurance required under the
Mortgage has been canceled and neither we nor Condor One have received evidence of replacement

BILZIN SUMBERG DUNN PRICE & AXELROD LLP

Oakland Lakes, Ltd.
July 14, 2000
Page 2

insurance. The failure to maintain the required insurance is a separate and independent event of default under the Mortgage. Condor One hereby declares the Note and Mortgage in default for such failure.

Pursuant to its rights under the Note and Mortgage, and in accordance with Florida Statutes §697.07, Condor One hereby demands that all rents, income and profits from and of the property encumbered by the Mortgage and any leases or subleases thereof, received and collected by or on behalf of Oakland Lakes, Ltd., be paid to Condor One immediately.

We have been advised that there may have been a conveyance of some or all of the ownership interest in Oakland Lakes, Ltd., but neither we nor Condor One have received written evidence confirming or describing such transfer. In abundance of caution, we are delivering copies of this notice to those who we have been advised may be the recipients or the representatives of the recipients of any such transfer. This notice shall apply to all recipients to the extent they have an interest in the referenced matter as if specifically addressed to them.

Sincerely,

David W. Trench

DWT:gmi

cc:   Jason A. Lessinger, Esq. (via mail and facsimile)
      813268 Ontario, Inc.
      Oakland Park (Florida) Limited Partnership
      Sol Roter (via mail and facsimile)

G:\DMS\72655\13375\0283374.02
4/24/2000

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6147 CIV-LENARD/TURNOFF

813268 ONTARIO, INC., as General Partner
of OAKLAND PARK (FLORIDA) LIMITED
PARTNERSHIP, an Ontario limited
partnership; as limited partner of, and on
behalf of OAKLAND LAKES, LTD.,
a Florida Limited Partnership;

       Plaintiff,

vs.

OAKLAND LAKES, LTD., a Florida Limited
Partnership, WILLIAM O. BRISBEN,
W.O. BRISBEN COMPANIES, INC., and
ROBERT E. SCHULER, as General Partners
of OAKLAND LAKES, LTD., THE SECRETARY
OF HOUSING AND URBAN DEVELOPMENT,
and CONDOR ONE, INC., a Delaware Corporation,

       Defendants.

_____/

Case No. 00-7847 CIV-LENARD/TURNOFF

CONDOR ONE, INC., a Delaware Corporation,

       Plaintiff,

vs.

OAKLAND LAKES, LTD., a Florida Limited Partnership,

       Defendant.

_____/

## AFFIDAVIT OF DOUGLAS M. GOLDRICK IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY CONDOR ONE, INC.

G:\DMS\72655\13375\0308271.01
8/21/2000

STATE OF TEXAS      )
                        ) SS:
COUNTY OF DALLAS   )

BEFORE ME, the undersigned authority, personally appeared Douglas M. Goldrick who, after being duly sworn, deposes and says:

1.      My name is Douglas M. Goldrick and this affidavit is based upon either my personal knowledge or my review of the files and documents related to this matter.

2.      I am a loan asset manager responsible for a portfolio of loans owned and held by Condor One, Inc. ("Condor One")

3.      The loan (the "Loan") to Oakland Lakes, Ltd. ("Oakland Lakes"), that is the subject of this proceeding, is one of the loans for which I am responsible.

4.      With respect to the Loan, Condor One is the owner and holder of a Note in the principal amount of $22,779,600 and a Mortgage securing repayment of that Note each made by Oakland Lakes. The Mortgage encumbers the Lakes of Casablanca apartment project located at 2325 N.W. 33rd Street, Fort Lauderdale, Florida 33309 ("the Property") which is owned by Oakland Lakes.

5.      I have been in charge of the Loan since 1998, and I am familiar with the terms of the Loan.

6.      I submit this affidavit in support of Condor One's Motion for Summary Judgment, seeking to foreclose the Mortgage for amounts past due under the Note.

7.      I have read the allegations contained in Condor One's Complaint in this action, and they are true and correct. Exhibit "A" of the Complaint is the legal description of the Property and Exhibits "B" and "C" of the Complaint are true and correct copies of the Note and Mortgage,

respectively.

8.      Condor One has owned the Note and Mortgage since May 8, 1995. From June, 1995 through June, 2000, Oakland Lakes remitted payments directly to Condor One pursuant to a Provisional Workout Arrangement entered into in connection with the Loan.

9.      In July, 2000, Oakland Lakes failed or refused to make any further payment on the Loan. Oakland Lakes is in default of its obligations under the Loan and its related agreements as more specifically set forth in the Complaint.

10.     On July 14, 2000, Condor One served Oakland Lakes with a demand letter reciting Oakland Lakes' default and accelerating all amounts due under the Note and Mortgage. Exhibit "F" of Condor One's Complaint is a true and correct copy of this demand letter.

11.     In an abundance of caution, Condor One's Complaint, which was also served on Oakland Lakes, makes subsequent demand, reciting defaults and accelerating all amounts due under the Note and Mortgage.

12.     As of February 1, 2001, the total debt due on the Loan, including accrued interest, was $26,397,303.56, which amount continues to increase at the rate of $5,218.93 per diem. With respect to the Loan, Condor One is holding the aggregate sum of $269,424.60 in tax and reserve escrows.

13.     During the year 2000, Oakland Lakes has received an average of approximately $300,000 each month in rents, issues and profits generated by the Property, a sum far exceeding the costs necessary to operate and maintain the Property. Since July 1, 2000, Oakland Lakes has not applied any of these monies to payment of the amounts due under the Loan.

3

FURTHER AFFIANT SAYETH NOT.

_Douglas M. Goldrick_
Douglas M. Goldrick

STATE OF TEXAS )
) SS:
COUNTY OF DALLAS )

The foregoing instrument was acknowledged before me this 5th day of February, 2001, by Douglas M. Goldrick. He is personally known to me ~~or produced~~ _____ ~~as identification.~~

Sign Name: _Carolyn L Sims_
Print Name: _CAROLYN L. SIMS_
NOTARY PUBLIC
Serial No(none, if blank):_____

My Commission Expires: 8·22·03

[NOTARIAL SEAL]

30087083

CAROLYN L. SIMS
MY COMMISSION EXPIRES
August 22, 2003

4