

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 00-6147 CIV-LENARD/TURNOFF

FILED BY_____ D.C.

01 APR 11 PM 3: 27

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FL - MIAMI

813268 ONTARIO, INC., as  General
Partner of OAKLAND PARK (FLORIDA)
LIMITED PARTNERSHIP, an Ontario limited
partnership; as limited partner of, and on behalf
of OAKLAND LAKES, LTD., a Florida Limited
Partnership;

       Plaintiff,

vs.

OAKLAND LAKES, LTD., a Florida Limited
Partnership, WILLIAM O. BRISBEN,
W.O. BRISBEN COMPANIES, INC., and
ROBERT E. SCHULER, as General Partners
of OAKLAND LAKES, LTD., THE SECRETARY
OF HOUSING AND URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,

       Defendants.

_____/

### Case No. 00-7847-CIV-LENARD/TURNOFF

CONDOR ONE, INC.,
a Delaware corporation,

       Plaintiff,

vs.

OAKLAND LAKES, LTD., a Florida Limited
Partnership, THE FLORIDA HOUSING FINANCE
CORPORATION f/k/a THE FLORIDA HOUSING
FINANCE AGENCY, a Florida not-for-profit
corporation, and WILSON C. ATKINSON, III, as Trustee,

       Defendants.

_____/

## AMENDED COMPLAINT

\72655\13375\#501761 v1
4/11/2001

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

Plaintiff, Condor One, Inc., a Delaware corporation, by and through undersigned counsel and pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, files this amended complaint sues Defendant Oakland Lakes, Ltd., a Florida Limited Partnership, Defendant The Florida Housing Finance Corporation f/k/a The Florida Housing Finance Agency, a Florida not-for-profit corporation, and Wilson C. Atkinson, III, as Trustee, to foreclose a mortgage and to enforce an assignment of rents owed, and alleges as follows:

## JURISDICTION, PARTIES AND VENUE

1.    This is an action to foreclose a mortgage on real and personal property located in Broward County, Florida and to enforce an assignment of rents. The amount in controversy exceeds the jurisdictional limits of this court.

2.    This foreclosure action was originally filed in the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida and is in the United States District Court, Southern District of Florida, Miami Division, by virtue of a Notice of Removal, dated December 18, 2000, filed by Oakland Lakes in the United States District Court, Southern District of Florida, Miami Division, Case No. 007847-CIV-Jordan. The grounds for jurisdiction stated therein are incorporated in this amended complaint by this reference.

3.    This foreclosure action was consolidated with Case No. 00-6147 on January 18, 2001, by this Court's Order Consolidating Actions and the higher numbered case, Case No. 00-7847, was administratively closed.

4.    Plaintiff Condor One, Inc. ("Condor One") is a corporation organized and existing under the laws of the State of Delaware.

\72655\13375\#501761 v1
4/11/2001

2

5.        Defendant Oakland Lakes, Ltd.("Oakland Lakes") is a limited partnership organized and existing under the laws of the State of Florida. Oakland Lake's primary place of business is 2325 N.W. 33rd Street, Fort Lauderdale, Florida, where it owns and operates the Sailboat Pointe Apartments f/k/a the Lakes of Casablanca Apartments.

6.        Defendant The Florida Housing Finance Corporation f/k/a The Florida Housing Finance Agency ("FHFA") is a Florida not-for-profit corporation.

7.        Defendant Wilson C. Atkinson, III is a resident of Florida and is subject to the jurisdiction of this Court.

8.        Venue is proper because the property which is the subject matter of this lawsuit is located in Broward County, Florida.

## FACTUAL BACKGROUND

## THE LOANS, LOAN DOCUMENTS AND PROPERTY

9.        On or about October 1, 1989, a loan in the amount of $22,779,600 was issued to Defendant Oakland Lakes ("the Loan"), funded through the issuance of tax exempt revenue bonds by FHFA, which were collateralized with mortgage backed securities pledged by Government National Mortgage Association ("GNMA").

10.        The Loan was for the development, construction, ownership and operation of the Lakes of Casablanca apartment project on the property owned by Oakland Lakes at 2325 N.W. 33rd Street, Fort Lauderdale, Florida 33309 which is more particularly described in Exhibit "A" attached hereto ("the Property").

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

11.    On or about October 1, 1989, in exchange for the Loan, Oakland Lakes executed and delivered a note that evidenced the Loan in the original principal amount of $22,779,600 and a mortgage and security agreement encumbering the Property with a first mortgage lien.

12.    The note and mortgage were assigned to Citizens and Southern Trust Company (Florida) National Association ("CST") by an assignment which was recorded on October 5, 1989 in Official Records Book 16818, page 548 of the Public Records of Broward County.

13.    The note and mortgage were subsequently assigned by CST to The Cincinnati Mortgage Corporation ("Cincinnati Mortgage"), which was authorized by the Secretary of Housing and Urban Development ("HUD") to originate and service loans insured by HUD under the National Housing Act. This assignment was recorded on October 5, 1989 in Official Records Book 16818, page 551 of the Public Records of Broward County.

14.    On or about October 5, 1989, Oakland Lakes executed the Amended and Restated Renewal Mortgage Note in favor of Cincinnati Mortgage in the original principal amount of $22,779,600 (the "Note"). A true and correct copy of the Note is attached hereto as Exhibit "B."

15.    On or about October 5, 1989, Oakland Lakes executed the Amended and Restated Renewal Mortgage ("Mortgage") encumbering the Property with a first mortgage lien. The Mortgage was recorded that same day in Official Records Book 16818, page 609 of the Public Records of Broward County. A true and correct copy of the Mortgage is attached hereto as Exhibit "C."

16.    On October 13, 1989, Cincinnati Mortgage delivered an assignment in blank to GNMA, as part of a guarantee agreement.

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

17.     Almost immediately after completion of construction of the improvements to the Property, Oakland Lakes defaulted in its obligations under the Loan.

18.     On November 8, 1990, GNMA declared Cincinnati Mortgage to be in default of the guarantee agreement, and the Note and Mortgage were assigned to GNMA pursuant to the October 13, 1989 agreement. This assignment was recorded on November 8, 1990 in Official Records Book 17907, page 884 of the Official Records Book of the Public Records of Broward County.

19.     GNMA subsequently assigned to Note and Mortgage to HUD, and which assignment was recorded on September 11, 1992 in Official Records Book 19852, page 467 of the Public Records of Broward County.

20.     At the time of the assignment, HUD elected not to exercise its right to accelerate and demand payment of the remaining balance of all sums due and payable under the Note and Mortgage, and instead entered into a Provisional Workout Arrangement ("PWA") with Oakland Lakes. HUD and Oakland Lakes executed the PWA effective as of February 1, 1995. A true and correct copy of the PWA is attached hereto as Exhibit "D."

21.     The PWA is a month-to-month arrangement of forbearance under which HUD agreed to take no action on a defaulted Loan, provided Oakland Lakes makes the minimum monthly payment and satisfactorily performs the other requirements of the PWA.

22.     Among the terms contained in the PWA is a schedule of monthly payments that Oakland Lakes is required to follow commencing February 1, 1995 and lasting through January 31, 2001. The PWA specifically sets forth that failure to remit a payment would be cause for HUD to proceed with foreclosure.

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

23.     On May 8, 1995, HUD assigned the Note and Mortgage to Condor One. This assignment was recorded on May 11, 1995 in Official Records Book 23442, page 284 of the Public Records of Broward County.

24.     Both HUD and Condor One separately notified Oakland Lakes of this assignment by letters dated May 8, 1995. A true and correct copy of these letters is attached hereto as Exhibit "E."

25.     From June, 1996 through June, 2000, Oakland Lakes remitted all Loan payments to Condor One.

26.     In July of 2000, Oakland Lakes failed and refused to make any payment on the Loan.

27.     On July 14, 2000, Condor One served Oakland Lakes with a demand letter reciting Oakland Lakes' default and asserting Condor One's rights under the Note and Mortgage and PWA and accelerating all amounts due and payable under the Note and Mortgage and, pursuant to Florida Statutes, §697.07, demanding all rents, income and profits from and of the Property. A true and correct copy of the demand letter is attached hereto as Exhibit "F."

**COUNT I**

**ACTION TO FORECLOSE $22,779,600, MORTGAGE**

28.     The allegations of paragraphs 1 through 27 are realleged and incorporated by reference as if the same were fully set forth herein.

29.     This is an action to foreclose a mortgage on real property located in Broward County, Florida.

30.     Condor One is the owner and holder of the Note and Mortgage.

31.     The Property is now owned by Oakland Lakes.

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

32.    Oakland Lakes is in default under the Mortgage and is in breach of the PWA for failing to pay the monthly installment due on July 1, 2000 and by failing to make any payment thereafter.

33.    As a consequence of the defaults described above and in accordance with the provisions of the Mortgage, Condor One has accelerated, and hereby accelerates, the indebtedness due under the Loan and has declared, and hereby declares, the full amount payable to be due.

34.    Oakland Lakes owes Condor One the sum of $22,773,532 that is due in principal, as well as all accrued interest and costs of this action, including, but not limited to, title search expenses for ascertaining necessary parties to this action.

35.    FHFA may claim an interest regarding the Property by virtue of that certain Land Use Restriction Agreement made as of October 1, 1989 among FHFA, Oakland Lakes and CST and recorded in Official Records Book 6821, Page 479 of the Public Records of Broward County, Florida, but the restrictions contained therein automatically terminate pursuant to the provisions of its Section 9(b) and are extinguished by this foreclosure and that interest is subordinate to the lien of the Mortgage.

36.    Defendant Wilson C. Atkinson, III, as Trustee, may claim an interest in the Property by virtue of that certain claim of lien in favor of PBI/Grey Construction Co. filed January 28, 1992 in Official Records Book 19117, Page 452, as amended on February 25, 1992 and filed on February 25, 1992 in Official Records Book 19205, Page 983, and assigned to Wilson C. Atkinson, III, Trustee, by that certain Assignment of Lien filed November 23, 1994 in Official Records Book

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

22806, Page 201 in the Public Records of Broward County, Florida, but that interest is subordinate to the lien of the Mortgage.

37.    By virtue of Oakland Lake's default, Condor One has been required to employ the undersigned law firm to enforce Condor One's rights under the Note and Mortgage, and for such employment, Condor One has agreed to pay its counsel a reasonable attorney's fee. All costs and reasonable attorney's fees incurred in attempting to collect the indebtedness due to Condor One are secured by the lien of the Mortgage.

38.    All conditions precedent to the maintenance of this foreclosure action have been performed or have occurred.

WHEREFORE, Condor One, Inc. prays that an accounting be had and taken under the direction of this Court of what is due from Oakland Lakes, Ltd. under the terms and conditions of the Note and Mortgage, plus interest, costs, attorney's fees, title search expenses, taxes, and other expenses and costs that Condor One, Inc. is entitled to recover in this suit, and that in default of payment to Condor One, Inc. by Oakland Lakes, Ltd. of the amounts found to be due, the subject property be sold under the direction of this Court to satisfy the judgment, and that the estate of Oakland Lakes, Ltd., The Florida Housing Finance Corporation f/k/a The Florida Housing Finance Agency and Wilson C. Atkinson, III, as Trustee, and all persons claiming under or against Oakland Lakes, Ltd., The Florida Housing Finance Corporation f/k/a The Florida Housing Finance Agency or Wilson C. Atkinson, III, as Trustee, since the filing of the Claim of Lien be found subordinate to Condor One, Inc.'s Claim of Lien and foreclosed.

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

## COUNT II

### ACTION FOR RENTS

39.     The allegations of paragraphs 1 through 37 are realleged and incorporated by reference as if the same were fully set forth herein.

40.     This is an action to obtain rents generated by the Property.

41.     Pursuant to the terms of the Mortgage, Oakland Lakes assigned to the holder of the Mortgage all rents, profits, issue and income of the Property, and any and all leases and/or subleases thereof as further security for the indebtedness secured by the Mortgage. Condor One is entitled to all rents from the Property during any time at which the Mortgage is in default.

42.     On July 14, 2000, pursuant to Florida Statutes §697.07, Condor One made written demand upon Oakland Lakes that all rents income and profits from the Property be immediately delivered to Condor One. A true and correct copy of the July 14, 2000 demand letter is attached hereto as Exhibit "F."

43.     Condor One hereby renews its demand pursuant to Florida Statutes §697.07 that Oakland Lakes immediately deliver to Condor One all rents income and profits generated from the Property.

44.     Oakland Lakes is collecting rents from tenants in possession of the Property and the rents received by Oakland Lakes are not being delivered to Condor One or applied toward payment of the outstanding amounts due under the Loan.

45.     All conditions precedent to the maintenance of this action have been performed or have occurred.

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

WHEREFORE, Condor One, Inc. demands that Defendant Oakland Lakes, Ltd. immediately deliver to Plaintiff Condor One, Inc. all rents, income, issues, profits and security deposits that have been generated by the Property and continue to deliver to Condor One, Inc. all rents immediately upon receipt of such monies.

## COUNT III

### ACTION ON PROMISSORY NOTE

46.    The allegations of paragraphs 1 through 37 are realleged and incorporated by reference as if the same were fully set forth herein.

47.    This is an action for damages in excess of $15,000, exclusive of interest, costs and attorney's fees.

48.    During the year 2000, Defendant Oakland Lakes has collected, in breach of the provisions of the Note, approximately $300,000 monthly in rents, issues and profits generated by the Property and, since July 1, 2000, Oakland Lakes has not applied these monies to payment of the amounts due under the Note.

49.    Pursuant to the provisions of the Note and Mortgage, and in particular section 3.02 of the Mortgage, Oakland Lakes is personally liable to Condor One for all rents, issues and profits collected but not applied as required by the terms of the Note and Mortgage.

50.    All conditions precedent to the maintenance of this action have been performed or have occurred.

\72655\1337S\#501761 v1
4/11/2001

10

WHEREFORE, Plaintiff Condor One, Inc. demands judgment against Defendant Oakland Lakes, Ltd, for the sum found to be due to Condor One, Inc. under the Note, accrued interest thereon, costs, reasonable attorney's fees and such other and further relief as is just and proper.

DATED: April _11_, 2001.

Respectfully submitted,

**BILZIN SUMBERG DUNN BAENA**
**PRICE & AXELROD LLP**
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 374-7580
Facsimile:  (305) 374-7593

By: _____
David W. Trench
Florida Bar No. 202975

\72655\13375\#501761 v1
4/11/2001

11

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was furnished via U.S. Mail on this 11th day of April, 2001 to: **Richard T. Woulfe, Esq.**, Co-Counsel for Plaintiff, Bunnell, Woulfe, Kirschbaum, Keller, Cohen & McIntyre, P.A., P.O. Drawer 030340, 888 E. Las Olas Boulevard, Suite 400, Ft. Lauderdale, Florida 33303-0340; and **Robert E. Messick, Esq.**, Co-Counsel for Plaintiff, Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A., 2033 Main Street, Suite 600, Sarasota, Florida 34237.


David W. French

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

EXHIBIT "A"

PARCEL I:

TRACT A OAKLAND LAKES, according to the Plat thereof, recorded in Plat Book 111, Page 7, of the Public Records of Broward County, Florida.

- and -

PARCEL II:

TRACT B, OAKLAND LAKES, according to the Plat thereof, recorded in Plat Book 111, Page 7, of the Public Records of Broward County, Florida.

- and -

PARCEL III:

A portion of the North one-half (N1/2) of the Southeast one-quarter (SE1/4) of SECTION 20, TOWNSHIP 49 SOUTH, RANGE 42 EAST, being more particularly described as follows:

Commencing at the Southeast corner of the said North one-half (N1/2) of the Southeast one-quarter (SE1/4) of Section 20; thence South 89°07'10" West, along the South line of the said North one-half (N1/2) of the Southeast one-quarter (SE1/4), a distance of 498.42 feet, to the POINT OF BEGINNING of this description, said point also being the Northeast corner of said Tract B; thence continue South 89°07'10" West, along the last described course and the North line of said Tract B and Tract "A", a distance of 1837.45 feet; thence North 01°30'43" East, a distance of 25.03 feet; thence North 89°07'10" East, along a line parallel with and 25.00 feet North of, as measured at right angles to the South line of the North one-half (N1/2) of the Southeast one-quarter (SE1/4) of Section 20, a distance of 1836.45 feet; thence South 00°00'00" East along a northerly projection of the East line of said Tract B, a distance of 25.00 feet to the POINT OF BEGINNING.

- and -

PARCEL IV:

A parcel of land lying in the City of Oakland Park, Broward County, Florida, being a portion of Tract G of "OAKLAND LAKES," according to the Plat thereof, as recorded in Plat Book 111, at Page 7, of the Public Records of Broward County, Florida, and being more particularly described as follows:

Commence at the Northeast corner of said Tract G; thence run S 89°05'55" W along the North line of said Tract G for 113.19 feet to the Point of Beginning; thence run South for 336.04 feet to a point; thence run S 89°05'55" W for 30.03 feet to a point; thence run S 00°54'05" E for 1.07 feet to a point; thence run N 84°03'31" W for 20.67 feet to a point; thence run N 00°54'05" W for 30.54 feet to a point; thence run N 89°05'55" E for 35.00 feet to a point; thence run South for 33.01 feet to a point; thence run N 89°05'55" E for 14.00 feet to a point; thence run North for 336.04 feet to a Point of Intersection with said North line of Tract G; thence run N 89°05'55" E along said North line of Tract G for 1.00 feet to the Point of Beginning.

Said lands situate, lying and being in Broward County, Florida.



SAID PROPERTY ALSO BEING DESCRIBED AS:

EXHIBIT A
(CONTINUED)

DESCRIPTION:

A PORTION OF THE N½ OF THE SE¼ OF SECTION 20, TOWNSHIP 49 SOUTH, RANGE 42 EAST, TOGETHER WITH ALL OF TRACTS "A", "B" AND A PORTION OF TRACT "G", 'OAKLAND LAKES', ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 111, PAGE 7 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, ALL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT "A"; THENCE N 89°07'10" E, ALONG THE NORTH LINE OF SAID TRACT "A", A DISTANCE OF 175.15 FEET; THENCE N 01°50'43" E, A DISTANCE OF 25.03 FEET; THENCE N 89°07'10" E, ALONG A LINE PARALLEL WITH AND 25.00 FEET NORTH OF, AS MEASURED AT RIGHT ANGLES TO THE SOUTH LINE OF THE NORTH ONE-HALF (N½) OF THE SOUTHEAST ONE-QUARTER (SE¼) OF SECTION 20, A DISTANCE OF 1936.65 FEET; THENCE S 00°00'00" E, ALONG A NORTHERLY PROJECTION OF THE EAST LINE OF SAID TRACT "B" AND THE EAST LINE OF SAID TRACT "B", A DISTANCE OF 999.87 FEET TO THE SOUTHEAST CORNER OF SAID TRACT "B"; THENCE S 89°05'55" W ALONG THE SOUTH LINE OF SAID TRACT "B", A DISTANCE OF 460.00 FEET TO THE NORTHEAST CORNER OF SAID TRACT "G"; THENCE CONTINUE S 89°05'55" W ALONG THE NORTH LINE OF SAID TRACT "G" AND THE SOUTH LINE OF SAID TRACT "A", A DISTANCE OF 113.19 FEET; THENCE RUN SOUTH FOR 336.04 FEET TO A POINT; THENCE RUN S 89°05'55" W FOR 30.03 FEET TO A POINT; THENCE RUN S 00°54'05" E FOR 1.07 FEET TO A POINT; THENCE RUN N 84°03'31" W FOR 39.67 FEET TO A POINT, THE LAST THREE DESCRIBED COURSES BEING ALONG THE NORTH RIGHT OF WAY LINE OF OAKLAND PARK BOULEVARD AS RECORDED IN OFFICIAL RECORD BOOK 13439, PAGE 730 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA; THENCE RUN N 00°54'05" W FOR 30.54 FEET TO A POINT; THENCE RUN N 89°05'55" E FOR 35.00 FEET TO A POINT; THENCE RUN SOUTH FOR 32.01 FEET TO A POINT; THENCE RUN N 89°05'55" E FOR 24.00 FEET TO A POINT; THENCE RUN NORTH FOR 335.04 FEET TO A POINT OF INTERSECTION WITH SAID NORTH LINE OF TRACT "G" AND THE SOUTH LINE OF SAID TRACT "A"; THENCE S 89°05'55" W, ALONG THE SOUTH LINE OF SAID TRACT "A", A DISTANCE OF 1512.81 FEET TO THE SOUTHWEST CORNER OF SAID TRACT "A"; THENCE N 00°19'45" W, A DISTANCE OF 7.34 FEET; THENCE N 03°49'07" W, A DISTANCE OF 328.61 FEET; THENCE N 00°19'45" W, A DISTANCE OF 640.02 FEET TO THE POINT OF BEGINNING, THE LAST THREE DESCRIBED COURSES BEING ALONG THE WEST LINE OF SAID TRACT "A" AND THE EAST RIGHT OF WAY LINE OF N.W. 27TH AVENUE AS SHOWN ON SAID 'OAKLAND LAKES' PLAT.

SAID LANDS SITUATE, LYING AND BEING IN THE CITY OF OAKLAND PARK, BROWARD COUNTY, FLORIDA, CONTAINING 2,103,817 SQUARE FEET OR 48.297 ACRES, MORE OR LESS.



## EXHIBIT B

As used herein, the term "Debtor" shall mean and include the terms "Mortgagor," "Grantor" and "Borrower"; and the term "Creditor" shall mean and include the terms "Lender," "Beneficiary" and "Secured Party."

This Exhibit B refers to the following, which may be located on the premises of, relate to, or be used in connection with, the acquisition, construction, rehabilitation, reconstruction, equipping, repair, ownership, management, or operation of a multifamily apartment complex known as Lakes of Casablanca (the "Project") FHA Project No. 066-35650 located in the County of Broward, State of Florida, in which Debtor has an interest now or hereafter existing or acquired.

1.  All materials now owned or hereafter acquired by the Debtor and intended for construction, rehabilitation, reconstruction, alteration and/or repair of any building, structure or improvement now or hereafter erected or placed on the Real Estate, all of which materials shall be deemed to be included within the Project immediately upon the delivery thereof to the Project.

2.  All of the walks, fences, shrubbery, driveways, fixtures, machinery, apparatus, equipment, fittings, chattels and other goods and other personal property of every kind and description whatsoever, now owned or hereafter acquired by the Debtor and attached to or contained in and used or usable in connection with any present or future operation of the Project, including, by way of example rather than of limitation, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, motors, furnaces, compressors and transformers; all generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment and fixtures, fans and switchboards; all telephone equipment; all piping, tubing, plumbing equipment and fixtures; all heating, refrigeration, air conditioning, cooling, ventilating, sprinkling, water, power and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture installed or to be installed or used or usable in the operation of any part of the Project or facilities erected or to be erected in or upon the Real Estate; and every renewal or replacement thereof or articles in substitution therefor, whether or not the same are now or hereafter attached to the

-1-



Real Estate in any manner; all except for any right, title or interest therein owned by any tenant (it being agreed by the Debtor and Secured Party that all personal property owned by the Debtor and placed by it on the Real Estate shall, so far as permitted by law, be deemed to be affixed to the Real Estate, appropriated to its use, and covered by the Mortgage and/or any Financing Statements, as applicable).

3.    All of the Debtor's right, title and interest in and to any and all judgments, awards of damages (including but not limited to severance and consequential damages), payments, proceeds, settlements or other compensation (collectively, the "Awards") heretofore or hereafter made, including interest thereon, and the right to receive the same, as a result of, in connection with, or in lieu of (i) any taking of the Property or any part thereof by the exercise of the power of condemnation or eminent domain, or the police power, (ii) any change or alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Property or any part thereof (including but not limited to destruction or decrease in value by fire or other casualty), all of which Awards, rights thereto and shares therein are hereby assigned to the Secured Party, who is hereby authorized to collect and receive the proceeds thereof and to give property receipts and acquittances therefor and to apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the indebtedness secured hereby.

4.    All of the Debtor's right, title and interest in any and all payments, proceeds, settlements or other compensation heretofore or hereafter made, including any interest thereon, and the right to receive the same from any and all insurance policies covering the Property or any portion thereof, or any of the other property described herein.

5.    The interest of the Debtor in all of the rents, royalties, issues, profits, revenues, income and other benefits of the Property, or arising from the use or enjoyment of all or any portion thereof, or from any lease or agreement pertaining thereto, and all right, title and interest of the Debtor in and to, and remedies under, all contract rights, accounts receivable and general intangibles arising out of or in connection with any and all leases and subleases of the Property, or any part thereof, and of the other property described herein, or any part thereof, both now in existence or hereafter entered into, together with all proceeds (cash and non-cash) thereof; and including, without limitation, all cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder.

6.    All of the Debtor's rights, options, powers and privileges in and to (but not the Debtor's obligations and burdens under) any construction contract, architectural and engineering

-2-



agreements and management contracts pertaining to the construction, development, ownership, equipping and management of the Property and all of the Debtor's right, title and interest in and to (but not the Debtor's obligations and burdens under) all architectural, engineering and similar plans, specifications, drawings, reports, surveys, plats, permits and the like, contracts for construction, operation and maintenance of, or provision of services to, the Property or any of the other property described herein, and all sewer taps and allocations, agreements for utilities, bonds and the like, all relating to the Property.

7.     All of the records and books of account now or here--after maintained by or on behalf of Mortgagor in connection with the Project.

8.     All names now or hereafter used in connection with the Project and the goodwill associated therewith.

9.     All intangible personal property, accounts, licenses, permits, instruments, contract rights, and chattel paper of the Debtor, including but not limited to cash; accounts receivable; bank accounts; certificates of deposit; securities; promissory notes, rents; rights (if any) to amounts held in escrow; insurance proceeds; condemnation rights; deposits judgments, liens and causes of action; warranties and guarantees.

10.     The interest of the Debtor in any cash escrow fund and in any and all funds, securities, instruments, documents and other property which are at any time paid to, deposited with, under the control of, or in the possession of the Secured Party, or any of its agents, branches, affiliates, correspondents or others acting on its behalf, which rights shall be in addition to any right of set-off or right of lien that the Secured Party may otherwise enjoy under applicable law, regardless of whether the same arose out of or relates in any way, whether directly or indirectly, to the Project located upon the Real Estate.

11.     The interest of the Debtor in any and all funds created or established and held by any trustee pursuant to any indenture of trust or similar instrument authorizing the issuance of bonds or notes for the purpose of financing the Project located upon the Real Estate.

12.     Any collateral provided by the Debtor for its account to each and every issuer of a letter of credit, subject to the prior claim of the issuer of any such letter of credit to such collateral.

13.     All inventory, including raw materials, components, work-in-process, finished merchandise and packing and shipping materials.



-3-



14.    Proceeds, products, returns, additions, accessions and substitutions of and to any or all of the above.

15.    Any of the above arising or acquired by the Debtor or to which the Debtor may have a legal or beneficial interest in on the date hereof and at any time in the future.

16.    Any of the above which may become fixtures by virtue of attachment to the Real Estate.

22450-77-S



TOGETHER WITH all of the collateral described in Exhibit B, attached hereto incorporated herein and made a part hereof;

AND TOGETHER WITH all easements, rights-of-way and rights used in connection therewith or as a means of access thereto, and all tenements, hereditaments and appurtenances thereof and thereto, all water rights and all right, title and interest of Mortgagor, now owned or hereafter acquired, in and to any land lying within the right-of-way of any street, open or proposed, adjoining said land, and any and all sidewalks, alleys, strips and gores of land adjacent to or used in connection with the said land and the improvements thereon;

AND TOGETHER WITH all of the rents, issues and profits and insurance or condemnation proceeds which may arise or be had from any of the foregoing, and all articles of personal property now or hereafter attached to or used in and about the building or buildings now erected or hereafter to be erected on said land which are necessary to the complete and comfortable use and

occupancy of such building or buildings for the purposes for which they were or are to be erected, including all goods and chattels and personal property as are ever used or furnished in operating a building or the activities conducted therein, similar to the one(s) herein described and referred to, and all renewals or replacements thereof or articles in substitution therefor, whether or not the same are, or shall be attached to said building or buildings in any manner except property belonging to the tenants (Mortgagor agrees that, to the extent permitted by law, the foregoing property shall be deemed to be real estate and affixed to the realty);

AND TOGETHER WITH all right, title and interest of Mortgagor in and to all leases or subleases covering the Project or any portion thereof now or hereafter existing or entered into, any and all right, title and interest of Mortgagor thereunder, including, and without limitation, all cash and, subject to the rights of tenants therein, all security deposits, advance deposits, advance rentals and deposits or payments of similar nature;

1.1                                                                    9/27/99

## AMENDED AND RESTATED
## RENEWAL MORTGAGE NOTE

$22,779,600.00                                         Oakland Park, Florida

October 5 1989

FOR VALUE RECEIVED, the undersigned, Oakland Lakes, Ltd., a Florida limited partnership, ("Mortgagor"), promises to pay to or upon the order of CINCINNATI MORTGAGE CORPORATION, an Ohio Corporation (the "Holder", as hereinafter defined), the principal sum of Twenty Two Million Seven Hundred Seventy Nine Thousand Six Hundred and no/100 Dollars ($22,779,600.00) with interest from the date hereof at the rate of eight and one-quarter percent (8.25%) per annum on the outstanding principal hereof until paid. The said principal and interest shall be payable in lawful money of the United States of America in monthly installments as follows:

Interest in arrears payable monthly beginning on the first day of November, 1989 and on the first day of each month thereafter up to and including December 1, 1991. Commencing on January 1, 1992, monthly installments of interest and principal shall be paid in the sum of One Hundred Sixty-Two Thousand Six Hundred Seventy Seven and 97/100 Dollars ($162,677.97) each, such payments to continue monthly on the first day of each succeeding month until the entire indebtedness has been paid. In any event, the balance of principal, if any remaining unpaid, plus accrued interest, shall be due and payable on December 1, 2031. The payments of principal and interest shall be applied first to interest at the applicable rate upon the principal sum or so much thereof as shall from time to time remain unpaid and the balance thereof shall be applied on account of principal.

In addition to the foregoing, the Mortgagor shall aggregate with the monthly installments of principal and interest all other payments payable pursuant to the Mortgage (as hereinafter defined).

Until further notice from the Holder, all payments by the Mortgagor of any sums due hereunder shall be by check payable to Cincinnati Mortgage Corporation, 2368 Victory Parkway, Suite #210, Cincinnati, Ohio 45206.

Except as hereinafter provided, there shall be no payments made hereunder, other than regularly scheduled payments of principal hereunder, to reduce the principal amount of the debt evidenced hereby in whole or in part prior to October 31, 1999

On or after October 31, 1999, provided that there is no default under this Note or the Mortgage, privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due, on the last day of any month prior to maturity upon at least thirty (30) days' prior written notice to the Holder.

Notwithstanding any prepayment prohibitions imposed and/or penalties required by this Note with respect to prepayments made prior to October 31, 1999 the indebtedness may be prepaid in part or in full without the consent of the Holder and without a prepayment penalty if the Secretary of Housing and Urban Development (the "Secretary") determines in writing that prepayment will avoid a mortgage coinsurance claim and is therefore in the best interest of the United States Government, which determination shall be made by the Secretary only if:

(a) the Mortgagor has defaulted in the payments due under this Note and the Secretary has received notice of such default, as required by 24 CFR Section 251.810;

(b) the Secretary determines that the Project has been experiencing a net income deficiency which has not been caused solely by management inadequacy or lack of owner interest, and which is of such a magnitude that the Mortgagor is currently unable to make required debt service payments, pay all Project operating expenses and fund all reserves required by the Secretary;

(c) the Secretary determines that there is a reasonable likelihood that the Mortgagor can arrange to refinance this Note at a lower interest rate or otherwise reduce the debt service payments due hereunder through partial prepayment; and

(d) the Secretary determines that refinancing this Note at a lower rate or partial prepayment is necessary to restore the Project to a financially viable condition and to avoid a coinsurance claim.

All payments to reduce the principal balance hereunder (including all penalty or penalties required pursuant hereto), other than regularly scheduled payments of principal, must be made to the Holder hereof in Federal Funds.

In the event of any partial prepayment of this Note for any reason, including but not limited to a pre-payment as a result of (i) an award in condemnation, (ii) an insurance payment on the property subject to the Mortgage, (iii) the imposition of any requirement of the Secretary, or (iv) any voluntary prepayment,

the Holder shall have the right, in its sole discretion, to apply such prepayment to the payments last due hereunder or to recast the remaining principal payments hereunder so that the required monthly payments of principal and interest shall be in equal amounts sufficient to pay the remaining principal balance of this Note over the then remaining term hereof.

In the event any installment or part of any installment due hereunder becomes delinquent for more than fifteen (15) days, there shall be due at the option of the Holder, in addition to other sums then due hereunder, a sum equal to four percent (4%) of the amount of principal and interest so delinquent for each month, or portion thereof, that such amount remains unpaid as liquidated damage for losses due to cash flow disruption and accounting and other expenses incident to handling such delinquent payment. Whenever, under the laws of the State of Florida, the amount of any such late penalty is considered to be additional interest, this provision shall not be used to the extent that the rate of interest specified is in excess of the maximum rate of interest permitted and would constitute usury.

This Note is secured by a Mortgage, Assignment of Rents and Security Agreement (the "Mortgage") of even date herewith made by the Mortgagor, upon certain property and premises situate and lying in Broward County, Florida, and being more particularly described in said Mortgage. The terms, covenants, conditions, provisions, stipulations and agreements contained in the Mortgage are hereby made a part hereof to the same extent and with the same effect as if fully set forth herein; and without limiting the foregoing, reference is hereby made to the Mortgage for a description of the property conveyed thereunder, definition of certain terms, the nature and extent of the security and the rights of the Holder in respect of such security. It is expressly agreed that upon the occurrence of any default under this Note or Event of Default under the Mortgage, the whole principal sum hereof or so much thereof as shall remain unpaid, with interest thereon, together with all other sums secured under the Mortgage shall at the option of the Holder hereof, become immediately due and payable. Any capitalized term used herein, but not herein defined, shall have the meaning set forth in the Mortgage.

Mortgagor further agrees to pay to the order of the Holder immediately on demand any advancements and/or expenditures made by such Holder in accordance with the Mortgage including, without limitation, those for the payment of taxes, special assessments, insurance penalties, mortgage insurance penalties, lender's penalties, and costs of maintenance and preservation of property mortgaged or pledged in connection with the loan evidenced by this Note. At the option of Holder, without notice or demand (which notice and demand are expressly waived by Mortgagor), all or any part of the advancements and/or expenditures described in this paragraph may be added to the unpaid principal balance

-3-

hereof and become a part of and on a parity with the principal indebtedness secured by the Mortgage, and all other instruments executed in connection herewith, and the same shall accrue interest, until paid, at the highest rate permitted to be penalized on delinquent installments of principal and interest under this Note.

Each payment shall be applied: first, to the payment of such additional advancements and expenditures as Holder may make in accordance with the terms of the Mortgage including, without limitation, advancements for taxes, mortgage coinsurance penalty, insurance and the like; second, to the payment of accrued but unpaid interest; and third, to the payment of principal. Late penalties will not be deducted from any monthly mortgage payment but will be separately penalized to and collected from the Mortgagor.

If default be made in the payment of any installment under this Note (or any other amount due under the Mortgage) and if such default is not made good prior to the due date of the next such installment, or if any other Event of Default should occur, then, in addition to any other action permitted to be taken by the Holder hereunder or under the Mortgage or any other Loan Documents, the entire principal sum hereof and accrued interest hereon shall at once become due and payable without notice, at the option of the Holder, and the Holder shall have the remedies of a secured party under the laws of the State of Florida with respect to all property mortgaged or pledged as security for this Note and all of the rights and remedies available under the Mortgage or any other Loan Documents. When this Note becomes due, by acceleration or otherwise, the Holder may, at its option, demand, sue for, collect, or make any compromise or settlement it deems desirable with reference to property held as security herefor. The Holder shall not be bound to take any steps necessary to preserve any rights in the property held as security herefor against prior parties, which the Mortgagor hereby assumes to do. The failure to exercise any option to declare the maturity of the principal debt or to exercise any other rights under any of the covenants or conditions contained in the Loan Documents, shall not be taken or deemed to be a waiver of the right to exercise such option or to declare such maturity after such past or any subsequent violation of any such covenants or conditions. All remedies provided for herein upon any default by the Mortgagor shall be cumulative and not exclusive.

In the event of default in the payment of this Note, and if the same is collected by an attorney at law, the undersigned hereby agree(s)' to pay all costs of collection, including reasonable attorneys fees.

Mortgagor and Holder intend that this Note shall be in compliance with all applicable laws and shall be enforceable in

-4-

accordance with its terms. If any provision of this Note shall
be illegal or unenforceable, such provision shall be deemed can-
celled to the extent of such illegality or enforceability, but
the remaining provisions shall not be affected thereby.

All agreements herein are expressly limited so that in no
event whatsoever, whether by reason of advancement of the pro-
ceeds hereof, acceleration of maturity of the unpaid principal
balance hereof, or otherwise, shall the amount paid or agreed to
be paid to the Holder for the use, forebearance or detention of
the money to be advanced hereunder exceed the highest lawful rate
permissible under applicable law. If, due to any circumstances
whatsoever, fulfillment of any provision hereof, or of any of the
Loan Documents, at the time performance of such provision shall
be due, shall involve transcending the limit of validity pre-
scribed by law which a court of competent jurisdiction deems
applicable hereto, then ipso facto, the obligation to be ful-
filled shall be reduced to the limit of such validity, and if
under any circumstances the Holder hereof shall ever receive as
interest an amount which would exceed the highest lawful rate,
such amount which would be excessive interest shall be applied to
the reduction of the unpaid principal balance due hereunder and
not to the payment of interest.

At the option of Holder, if a court of competent juris-
diction determines that any amounts otherwise to be paid here-
under exceed the highest permissible lawful rate or if Mortgagor
or any guarantor asserts the amounts otherwise to be paid here-
under exceed the highest permissible lawful rate, then Holder
shall have the right to accelerate the maturity of the entire
unpaid principal balance and accrued interest due under this
Note, immediately upon notice to the Mortgagor.

Funds representing the proceeds of the indebtedness evid-
enced hereby and disbursed for any purpose permitted hereunder by
the Holder by mail, wire transfer or other delivery to Mortgagor,
to escrows or in any way for the benefit of Mortgagor, for any
purpose, shall be deemed outstanding hereunder and to have been
received by Mortgagor as of the date of such mailing, wire trans-
fer or other delivery, and interest shall accrue and be payable
upon such funds from and after the date of such wire transfer,
mailing or delivery and until repaid, notwithstanding the fact
that such funds may not at any time have been remitted from such
escrows to Mortgagor or for its benefit. Funds paid hereunder by
or on behalf of Mortgagor shall be deemed received by the Holder
on the next business day if not received by 2:00 p.m. local time
at the location where payments hereunder are to be made.

Each maker and endorser jointly and severally hereby con-
sents to any extensions or renewals of this Note or any part
thereof without notice, and each maker and endorser agrees that
he/she/it will remain liable as such during any extension or
renewal hereof until the debt represented hereby is paid in full.

-5-

All parties to this Note, whether principal, surety, guarantor or endorser, hereby waive all applicable exemption rights (whether under the State Constitution, Homestead laws, or otherwise), valuation, appraisement, presentment for payment, demand, protest, notice of protest and notice of dishonor.

As used herein, the term "Holder" means the payee of this Note, so long as it shall own the same, and such other person or entity to whom the Note shall have been endorsed, transferred, pledged and by whom, as the lawful holder thereof, the Note is then held, subject, however, to the terms of any agreement for any such transfer or pledge.

This Note and the Mortgage are made and delivered in and shall be construed in accordance with the laws of the State of Florida.

The covenants set forth in this Mortgage Note shall not be deemed as varying the terms or conditions of the contract of mortgage coinsurance between the Secretary and Cincinnati Mortgage Corporation.

Mortgagor and the partners thereof assume no personal liability for the payment hereof, except as set out in the Mortgage.

This **Amended and Restated Renewal Mortgage Note** amends, restates and renews in its entirety, and shall be in substitution of, but does not enlarge the face principal amount of, that certain Mortgage Note from Mortgagor to the Florida Housing Finance Agency ("FHFA") dated October __1__, 1989, which Mortgage Note was assigned by FHFA to Citizens and Southern Trust Company (Florida), National Association (the "Trustee") by an Assignment of Mortgage Note and Mortgage and Security Agreement dated October __4__, 1989 and recorded October __5__, 1989 as Clerk's File No. __89399809__ in the Public Records of Broward County, Florida, and which Mortgage Note was further assigned by the Trustee to Cincinnati Mortgage Corporation by an Assignment of Mortgage Note and Mortgage and Security Agreement dated October __4__, 1989 and recorded October __5__, 1989, as Clerk's File No. __89399810__ in the Public Records of Broward County, Florida.

IN WITNESS WHEREOF, the Mortgagor has caused this Note to be executed by its duly authorized general partner as of the day and year first above written.

WITNESS/ATTEST:

OAKLAND LAKES, LTD., a
Florida limited partnership

By: _____
    William O. Brisben,
    General Partner

THIS IS TO CERTIFY that this is the Note described in and secured by the Mortgage of even date herewith and in the same principal amount as herein stated and secured by real estate situated in the City of Oakland Park, County of Broward, State of Florida.

Dated: October **5**, 1989

Notary Public                      (Munch)

22450-74-S

JENNIFER L MUNCH
Notary Public, State of Ohio
My Commission Expires March 2, 1994

-7-

1.2                                                                    9/29/89

After Recordation, please forward this document to:

Charles C. Bissinger, Jr., Esq.
Strauss & Troy
2100 Central Trust Center
201 East Fifth Street
Cincinnati, Ohio 45202-4186

89399612

---

AMENDED AND RESTATED RENEWAL

MORTGAGE, ASSIGNMENT OF RENTS
AND
SECURITY AGREEMENT

BY AND BETWEEN

OAKLAND LAKES, LTD.

AND

CINCINNATI MORTGAGE CORPORATION

Section 221(d)(4) pursuant to Section 244 of
the National Housing Act as amended

October 5, 1989

---

This Amended and Restated Renewal Mortgage, Assignment of
Rents and Security Agreement amends, restates and renews in its
entirety, and shall be in substitution of, that certain Mortgage
and Security Agreement from Mortgagor to the Florida Housing
Finance Agency ("FHFA") dated October 1, 1989 and recorded
October 5, 1989 as Clerk's File No. _____ in the Public
Records of Broward County, Florida, which Mortgage and Security
Agreement was assigned by FHFA to Citizens and Southern Trust
Company (Florida), National Association (the "Trustee") by
Assignment of Mortgage Note and Mortgage and Security Agreement
dated October 4, 1989 and recorded October 5, 1989 as Clerk's
File No. _____ in the Public Records of Broward County,
Florida, and which Mortgage and Security Agreement was further
assigned by the Trustee to Cincinnati Mortgage Corporation by
Assignment of Mortgage Note and Mortgage and Security Agreement
dated October 4, 1989 and recorded October 5, 1989 as Clerk's
File No. _____ in the Public Records of Broward County, Florida.

THIS INSTRUMENT PREPARED BY:
CHARLES C. BISSINGER, JR., ESQ.
STRAUSS & TROY, CO., L PA.
2100 CENTRAL TRUST CENTER
201 EAST 5TH STREET

WILL CALL

## AMENDED AND RESTATED RENEWAL MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

THIS AMENDED AND RESTATED RENEWAL MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT, (the "Mortgage") is made and entered into as of the ___ 5th ___ day of October, 1989 and between Oakland Lakes, Ltd., a limited partnership organized and existing under the laws of the State of Florida and having its principal place of business at 4750 Ashwood Drive, Suite 300, Cincinnati, Ohio 45241 (the "Mortgagor"), and CINCINNATI MORTGAGE CORPORATION, a corporation organized and existing under the laws of the State of Ohio and having its principal place of business at 2368 Victory Parkway, Suite 210, Cincinnati, Ohio 45206 and any successors thereof as the holder or holders of the Note, as hereinafter defined ("Mortgagee").

## R E C I T A L S

WHEREAS, the Mortgagor is indebted to the Mortgagee, in the sum of Twenty Two Million Seven Hundred Seventy Nine Thousand Six Hundred and no/100 Dollars ($22,779,600.00), (the "Mortgage Loan"), with interest thereon from the date hereof at the rate of eight and one-quarter percent (8.25%) per annum on the unpaid balance until paid; as evidenced by a Mortgage Note of even date herewith which matures on December 1, 2031, and all extensions thereof, however evidenced (the "Note"); and

WHEREAS, Mortgagee has obtained two Commitments to Guarantee Mortgage Backed Securities from the Government National Mortgage Association ("GNMA") based upon the Mortgage Loan and the pledge of this Mortgage as required by GNMA (the "GNMA Commitments"), one of which relates to construction loan certificates ("CLC's") and the other of which relates to permanent loan certificates ("PLC's"); and

WHEREAS, Mortgagee intends to issue and present to GNMA for its guarantee "fully modified pass through" mortgage-backed CLC's and PLC's guaranteed as to timely payment of principal and interest by GNMA (the "GNMA Securities"); and

WHEREAS, the Mortgage Loan is made to provide for the construction of certain premises and consisting of a 378-unit apartment project located in the State of Florida (the "State"), including related parking and other ancillary facilities (the "Project"), pursuant to an agreement between Mortgagee and Mortgagor dated January 13, 1989, and including any amendments thereto (the "Coinsured Loan Commitment"); and

-1-

WHEREAS, this Mortgage shall be a valid first lien on the real and personal property comprising the Project; and

WHEREAS, the advances of the Mortgage Loan proceeds made, and to be made, to Mortgagor, shall be coinsured by Mortgagee and the Secretary of Housing and Urban Development of Washington, D.C. ("HUD") under Section 221(d)(4) and pursuant to Section 244 of the National Housing Act, as amended (the "Housing Act"), and the regulations thereunder (the "Coinsurance Regulations"), such coinsurance being evidenced by HUD's endorsement of the Note; and

WHEREAS, all things necessary to make the Note a valid, binding and legal obligation of the Mortgagor, and to make this Mortgage a valid, binding and legal instrument for the security of the Note and the performance of Mortgagor's obligations thereunder and hereunder, have been duly performed.

NOW, THEREFORE, THIS MORTGAGE WITNESSETH:

That, for good and valuable consideration, including the indebtedness herein recited, the receipt of which is hereby acknowledged, Mortgagor has granted and conveyed, and does hereby grant, convey, and warrant unto Mortgagee, its successors and assigns forever, for the benefit and security of the Mortgagee, its successors and assigns, in order to secure performance of its obligations under the Note, this Mortgage and the other Loan Documents, all of that certain real estate situated in the County of Broward and State of Florida and more particularly described in Exhibit A, attached hereto incorporated herein and made a part hereof (the "Real Estate"); being the same property conveyed to Mortgagor by deed, recorded in Official Records Book _____ , Pages _____ , of the Public Records of Broward County, Florida.

TOGETHER WITH all of the collateral described in Exhibit B, attached hereto incorporated herein and made a part hereof;

AND TOGETHER WITH all easements, rights-of-way and rights used in connection therewith or as a means of access thereto, and all tenements, hereditaments and appurtenances thereof and thereto, all water rights and all right, title and interest of Mortgagor, now owned or hereafter acquired, in and to any land lying within the right-of-way of any street, open or proposed, adjoining said land, and any and all sidewalks, alleys, strips and gores of land adjacent to or used in connection with the said land and the improvements thereon;

AND TOGETHER WITH all of the rents, issues and profits and insurance or condemnation proceeds which may arise or be had from any of the foregoing, and all articles of personal property now or hereafter attached to or used in and about the building or buildings now erected or hereafter to be erected on said land which are necessary to the complete and comfortable use and

-2-

occupancy of such building or buildings for the purposes for which they were or are to be erected, including all goods and chattels and personal property as are ever used or furnished in operating a building or the activities conducted therein, similar to the one(s) herein described and referred to, and all renewals or replacements thereof or articles in substitution therefor, whether or not the same are, or shall be attached to said building or buildings in any manner except property belonging to the tenants (Mortgagor agrees that, to the extent permitted by law, the foregoing property shall be deemed to be real estate and affixed to the realty);

AND TOGETHER WITH all right, title and interest of Mortgagor in and to all leases or subleases covering the Project or any portion thereof now or hereafter existing or entered into, any and all right, title and interest of Mortgagor thereunder, including, and without limitation, all cash and, subject to the rights of tenants therein, all security deposits, advance deposits, advance rentals and deposits or payments of similar nature;

TO HAVE AND TO HOLD the above granted Property as described in the aforesaid granting clauses unto and to the use and benefit of Mortgagee, its successors and assigns, forever, for the uses and purposes hereinafter set forth.

AND THIS MORTGAGE FURTHER WITNESSETH, that to protect the security of this Mortgage, Mortgagor, for itself, its successors and assigns, has covenanted and agreed and does hereby covenant and agree with Mortgagee, and its successors and assigns, as follows.

## ARTICLE I

## DEFINITIONS

Section 1.01. <u>Defined Terms</u>. Capitalized terms defined in the recitals hereto shall have the meanings specified therein, certain capitalized terms not defined herein shall have the meanings specified in the Building Loan Agreement, and the following capitalized terms shall have the following meanings:

"Building Loan Agreement" means the Building Loan Agreement of even date herewith between Mortgagor and Mortgagee with respect to the Project.

"Coinsurance Contract" means the agreement between Mortgagee and HUD of coinsurance for the Mortgage Loan under Section 221(d)(4) pursuant to Section 244 of the National Housing Act and the Coinsurance Regulations, created by HUD's endorsement of the Note.

-3-

"Event of Default" is defined in Section 6.01.

"HUD Regulatory Agreement" means the agreement entitled Regulatory Agreement for Multifamily Housing Projects Coinsured by HUD of even date herewith, between Mortgagee and Mortgagor with respect to the operation of the Project.

"Indebtedness Hereby Secured" means, as of any particular time, the then unpaid balance of the principal sum of the Note together with interest thereon, all other payments due under the Note and/or hereunder and such additional unrepaid sums as shall have been paid or advanced by or on behalf of Mortgagee, on behalf of Mortgagor, pursuant to the Note, the Building Loan Agreement or hereunder, or which shall otherwise be payable by Mortgagor to Mortgagee, with interest thereon, all as herein and in the Loan Documents provided, as well as all documentary and intangible taxes on the Note and Mortgage as may be imposed by State law, which taxes Mortgagor covenants and agrees to pay.

"Loan Documents" means this Mortgage, the Note, the Coinsured Loan Commitment, the HUD Regulatory Agreement, the Building Loan Agreement, and any other instrument given to evidence or further secure the payment or performance of any obligations secured under this Mortgage.

"Mortgagee" means Cincinnati Mortgage Corporation, as payee of the Note as long as it shall own the same, and such other person, firm or corporation to whom the Note shall have been endorsed, pledged, transferred or assigned and by whom, as the lawful holder thereof, the Note is then held, subject, however, to the terms of any agreement for any such pledge, transfer or assignment and provided that HUD is under no obligation to recognize any entity as the beneficiary of the Coinsurance Contract unless it is an approved coinsured lender pursuant to applicable regulations.

"Property" means and shall include the Real Estate, all property of the Mortgagor as is described in the granting clauses hereof, all of the property set forth on Exhibit B and any and all other property which is or becomes subject to the lien of this Mortgage or any security interest created pursuant to the provisions of this Mortgage.

## ARTICLE II

## MORTGAGOR'S REPRESENTATIONS AND WARRANTIES

Section 2.01 Due Authorization, Etc. Mortgagor represents and warrants that it has duly authorized, executed and delivered the Note and has duly authorized, executed, acknowledged and delivered the other Loan Documents to secure the repayment of the

-4-

Indebtedness Hereby Secured, and to secure the performance of the covenants, agreements and conditions contained therein and herein.

Section 2.02 Validity of Loan Documents. Mortgagor represents and warrants that all things necessary to make the Loan Documents valid, binding and legal obligations of Mortgagor for the security of the Indebtedness Hereby Secured, in accordance with their respective terms, have been duly performed.

## ARTICLE III

### PAYMENT BY MORTGAGOR

Section 3.01 Covenant to Pay. Mortgagor hereby expressly covenants, promises and agrees that it will duly and punctually pay the Indebtedness Hereby Secured at the times and in the manner herein or in the Note or in the other Loan Documents provided, according to the true intent and meaning hereof and thereof, time being of the essence for such payments. Any remittance by check or draft shall be made subject to the condition that such check or draft may be handled for collection in accordance with the practice of the collecting bank or banks, and any receipt issued therefor shall be ineffective until the amount due is actually received by the Mortgagee.

Section 3.02 Limitation on Liability. The covenant of the Mortgagor to pay principal and interest is included in the Note secured hereby for the purpose of establishing and continuing the existence of the indebtedness. However, it is a condition of said covenant and those contained herein that in the event of a default under the terms hereof, the Mortgagee shall take no action against the Mortgagor, or its partners, except such as may be necessary to subject to the satisfaction of the Indebtedness Hereby Secured, the Property described herein and any chattels appurtenant to the use thereof, provided, that nothing in this covenant and no action so taken shall operate to impair any obligation of the Mortgagor under the Building Loan Agreement and/or the HUD Regulatory Agreement herein referred to and made a part hereof (including, with respect thereto, the rights of HUD) or to deprive the Mortgagee of any rights it may have by law which are not expressly waived. This Section shall not be deemed to limit the remedies of the Mortgagee, its successors or assigns, in law or in equity, pursuant to this Mortgage, provided that the exercise of any such remedies, including the obtaining of any judgments or decrees at law or in equity or other orders shall not impose any personal liability on Mortgagor or any partner of Mortgagor.

The provisions of this Section shall not be deemed to limit claims by Mortgagee or HUD for the following:

(a) Misapplication of insurance or condemnation proceeds;

(b) Misapplication of Mortgage Loan proceeds;

(c) Improper application of tenant security deposits or pre-paid rents;

(d) Failure, prior to Mortgagor's default hereunder, to properly apply rents and other revenue of the Property actually collected by Mortgagor to necessary and proper expenses of the Property, including the Indebtedness Hereby Secured or failure, after Mortgagor's default hereunder, to properly apply rents and other revenue of the Property actually collected by the Mortgagor (i) to necessary and proper expenses of the Property or (ii) to reduce the Indebtedness Hereby Secured by applying such amounts first to costs permitted to be paid from Project revenues by this Mortgage and by HUD regulations, then to unpaid interest due and finally to the principal balance outstanding on the Note or other Indebtedness Hereby Secured; and

(e) Failure to pay valid mechanic's and/or materialmen's liens filed against the Property prior to Mortgagor's default under the Indebtedness Hereby Secured or filed after Mortgagor's default under the Indebtedness Hereby Secured to the extent the claim set forth in such lien relates to labor performed or materials supplied prior to the date of Mortgagor's default under the Indebtedness Hereby Secured.

## ARTICLE IV

### PARTICULAR COVENANTS

**Section 4.01 <u>Title to Property and Authority to Convey.</u>** Mortgagor covenants that, at the time of the execution, delivery and recording of this Mortgage, it is the absolute and lawful owner of the legal and beneficial title to, and is lawfully seised and possessed of, and has good title to all of the Property, and it has good right and lawful authority to bargain, sell, grant and convey the same as provided in this Mortgage, in fee simple as to all real property described in Exhibit A, and that said Property is free and clear of all encumbrances except for those encumbrances approved by Mortgagee as specified in Exhibit C attached hereto and made a part hereof.  Mortgagor hereby covenants, agrees and warrants that it will defend the

-6-



title of such property, and every part thereof, unto Mortgagee and its successors and assigns, against all claims and demands by any person or persons, and will execute such further assurances thereof as may be required by Mortgagee.

Section 4.02 Recordation and Filings. At any and all times, Mortgagor will promptly do, prepare, execute, acknowledge, deliver, file and record and will cause to be done, prepared, executed, acknowledged, delivered, filed and recorded all and every such actions, deeds, indentures, conveyances, transfers, assignments, instruments and financing statements under the Uniform Commercial Code and assurances in law as Mortgagee shall reasonably require for the better assuring, conveying, transferring, assigning and confirming unto Mortgagee all and singular the hereditaments and premises, estates and Property, real and personal, hereby granted, conveyed or transferred, or intended to be; and Mortgagor will bear all expenses, charges and taxes in connection therewith. Mortgagor shall promptly take all actions necessary to perfect and maintain the priority and validity of Mortgagee's interest in the Property as a first and paramount lien and charge against the rights, claims and interests of all other persons and parties. Upon failure by Mortgagor to do so, Mortgagee may make, execute, record, file, re-record or refile any such actions, deeds, indentures, conveyances, transfers, assignments, instruments and financing statements under the Uniform Commercial Code and assurances in law for and in the name of Mortgagor, and Mortgagor hereby appoints Mortgagee its agent and attorney-in-fact to do so, such appointment to stand irrevocable as being coupled with an interest.

Section 4.03 Use or Alteration of the Project. Mortgagor covenants that it will not permit or suffer the use of the Project, the Property or any portion thereof for any purpose other than for a multifamily apartment housing project (including the commercial and other ancillary uses permitted or approved in writing by Mortgagee), and as is further provided in the HUD Regulatory Agreement. Mortgagor covenants that it shall not without the prior written consent of Mortgagee remove any Property from the Real Estate unless such removal is of personal property in the ordinary course of business and the personal property so removed is simultaneously replaced with like property of equal or greater value. Mortgagor covenants that it shall not, without the prior written consent of Mortgagee, permit any material alterations of or additions to buildings or other improvements now existing or hereafter constructed with respect to the Project. For purposes of this Section any expenditure in excess of Fifty Thousand and No/100 Dollars ($50,000.00) shall be considered material.

Mortgagor covenants to comply with all present and future statutes, laws, ordinances and governmental rules, regulations and orders which are applicable to the Property.

-7-



Section 4.04 **HUD Regulatory Agreement.**  Mortgagor agrees that the HUD Regulatory Agreement shall be recorded immediately following this instrument, and that it is incorporated in and hereby made a part of this Mortgage. Upon default under the HUD Regulatory Agreement, and with the prior written approval of HUD as long as the Coinsurance Contract is in effect, Mortgagee may declare such default to be an Event of Default under this Mortgage as provided in Article VI hereof and may proceed as provided in Article VI hereof.

Section 4.05 **Restriction on Transfer; Leases.**  Anything herein to the contrary notwithstanding, Mortgagor shall not convey, sell, assign, lease, (except commercial space leases previously approved in writing by Mortgagee and leases for residential units in the ordinary course of business), transfer or otherwise dispose of, or obtain secondary financing on, the Property or any part thereof or any interest therein, whether voluntary or involuntary, by operation of law or otherwise, without the prior written consent of the Mortgagee and, if such approval is required under the Coinsurance Contract, the Secretary of HUD.

All commercial leases now existing or hereafter entered into shall be subordinate and subject to the lien of this Mortgage and Mortgagor shall require any and all tenants of commercial space to enter into a subordination and attornment agreement in a form satisfactory to Mortgagee.  Mortgagee may at its option, permit the Mortgagor to include a non-disturbance provision in any such subordination and attornment agreement.

Whether in violation of the provisions of this section or pursuant to consent, if Mortgagor has demised, or shall hereafter demise, the Property or any part thereof by leases subordinate or junior either by the date thereof or by the express terms thereof to the lien of this Mortgage, any such lease shall be subject to the condition that in the event of any foreclosure sale or sales hereunder, by virtue of judicial proceedings or otherwise, such leases shall, at the option of the Mortgagee, continue in full force and effect and the tenants thereunder will, upon request, attorn to and acknowledge the foreclosure purchaser or purchasers at such sale as landlord thereunder. The Mortgagee may, at its option and in its sole discretion, require that any or all of the leases affecting the Property, other than leases for individual rental units, be made subject and subordinate to the lien of this Mortgage.  In the absence of a recorded agreement expressly subordinating this Mortgage to any or all of such leases, said leases shall be deemed to be subordinate in all respects to this Mortgage.

Section 4.06 **Aggregate Monthly Payments.**  In order more fully to protect the security of this Mortgage, Mortgagor, toget-

-8-



her with and in addition to the monthly payments of principal and interest (or interest only until the first payment to principal) under the terms of the Note, beginning with the first payment to principal under the Note and monthly thereafter until the Note is fully paid, will pay to Mortgagee the following sums:

(a) So long as the Mortgage Loan is coinsured under the provisions of the Housing Act and the Coinsurance Regulations, an amount sufficient to accumulate in the hands of Mortgagee one month prior to the due date the annual mortgage co-insurance premium (including any lender's premium) payable to HUD and Mortgagee aggregating 0.75% per year calculated on the average daily principal balance of the Mortgage Loan scheduled to be outstanding during the year covered thereby (without taking into account delinquent payments or prepayments).

(b) A sum equal to the ground rents, if any, next due, plus the premiums next due on all required insurance policies, plus sewer and water rates, taxes and special assessments next due on the Property (all as estimated by the Mortgagee), less all sums already paid therefor, divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, water rates, taxes and assessments will become delinquent, such sums to be held by Mortgagee in trust to pay said ground rents, premiums, sewer and water rates, taxes and special assessments.

(c) All monthly payments required to be made under the HUD Regulatory Agreement to the reserve for replacements.

All payments mentioned in the three preceding clauses and all other payments to be made under the Note shall be added together and the aggregate amount shall be paid each month in a single payment to be applied by Mortgagee in the following order:

(i) amounts payable under clause (a) above;

(ii) amounts payable under clause (b) above;

(iii) interest on the Note;

(iv) amortisation of the principal sum of the Note; and

(v) amounts payable under clause (c) above.

The amounts paid to Mortgagee under clauses (a), (b) and (c) above (the "Funds") shall be held in one or more accounts with Mortgagee.  Unless applicable law requires interest, earnings or

-9-

profits to be paid, Mortgagee shall not be required to pay Mortgagor any interest, earnings or profits on the Funds except that Mortgagor's benefit that portion of the Funds consisting of the reserve for replacements in a manner consistent with applicable HUD requirements. Mortgagee shall give to Mortgagor, without charge, an annual accounting of the Funds in Mortgagee's normal format showing credits and debits to the Funds and the purpose for which each debit to the Funds was made.

Section 4.07 **Treatment of Accumulations of Monthly Payments.** Any excess funds paid by Mortgagor pursuant to Sections 4.06(a) and (b) remaining after payment of the items herein provided on an annual basis, shall be credited to subsequent monthly payments of the same nature; but if any such item shall exceed the estimate therefor, Mortgagor shall without demand forthwith make good the deficiency. In the event the Indebtedness Hereby Secured is paid in full by Mortgagor in accordance with the terms of the Note, accumulations under Section 4.06 not required to meet obligations due for which the payments were collected shall be refunded to Mortgagor. If the Property is sold through foreclosure or is acquired by Mortgagee after default, any then remaining balance of the accumulation under Section 4.06 hereof shall be credited against the Indebtedness Hereby Secured.

Section 4.08 **Payment of Impositions.**

(a) Mortgagor will pay all ground rents, if any, taxes, special assessments, sewer and water rates and other governmental or municipal charges or Impositions, to the extent provision therefor has not been made by monthly payments as hereinabove provided, before the same become delinquent or subject to interest or penalties, and in default thereof Mortgagee may pay the same without waiving or affecting its option to foreclose or any other rights hereunder. All such sums paid by Mortgagee, plus any sums which Mortgagee has advanced to pay mortgage insurance premiums or other insurance premiums not paid for by monthly payment hereunder or otherwise paid by Mortgagor, shall be added to the Indebtedness Hereby Secured, shall bear interest at the Mortgage Loan rate specified in the Note from the date of the advance and shall be due and payable to Mortgagee upon demand. Nothing contained in this paragraph shall be construed as requiring Mortgagee to advance or expend monies for any purposes mentioned in this paragraph.

(b) In the event of the passage after the date of this Mortgage of any law deducting from the value of real property for the purposes of taxation any lien thereon or changing in any way the laws for the taxation of mortgages or debts secured by mortgage for federal, state or local purposes or the manner of the collection of any such taxes, and imposing a tax, either directly

-10-

or indirectly, on this Mortgage, the Note or the debt which it secures, the Mortgagee shall have the right to declare the principal sum and the interest due on the date to be specified by not less than thirty (30) days' written notice to be given to Mortgagor by Mortgagee; provided, however, that such election shall be ineffective if Mortgagor is permitted by law to pay the whole of such tax in addition to all other payments required hereunder, and if Mortgagor, prior to such specified date, does pay such tax and agrees to pay any such tax when thereafter levied or assessed against the premises, and such agreement shall constitute a modification of this Mortgage. This Section 4.08(b) shall not be applicable so long as this Mortgage is coinsured by HUD.

Section 4.09 **Permitted Contests.** Mortgagor may in good faith contest, by proper legal proceedings, the validity or amount of any tax, special assessment or other charge or imposition which Mortgagor has agreed to pay pursuant to the provisions of Section 4.08 hereof and may delay payment or discharge thereof during the period in which the same is being contested; provided, however, that if payment is delayed: (i) such proceedings shall suspend the collection thereof from Mortgagor, Mortgagee, or either of them, and from the Property; (ii) in any such event, Mortgagor shall deposit with Mortgagee, as security for the payment or discharge of such contested item, an amount equal thereto plus interest, penalties and costs (to the extent such amount is not already in the hands of Mortgagee); and (iii) such contested item and all costs and penalties, if any, shall have been paid at least sixty (60) days before the date on which the Property, or any portion thereof, may be sold in order to satisfy any such contested item.

Section 4.10 **Insurance.** Mortgagor will at all times keep the Property insured against loss by fire and all of the other risks ordinarily covered by insurance of the type known as "fire and extended coverage" in such amounts, in such form and with such coverages and endorsements as may be required from time to time by Mortgagee. All such insurance shall be carried for such periods as may be required by Mortgagee, and shall be in an amount which will comply with the Coinsurance Regulations, but if required by Mortgagee, as to losses other than loss of rental income, such insurance shall be in an amount which is not less than the greatest of (i) eighty percent (80%) of the actual cash value of the Property, (ii) the unpaid principal amount of the Mortgage Loan, and (iii) such amount as will avoid treatment of Mortgagor as a coinsurer with the issuer of the policy. Mortgagor will at all times keep and maintain public liability and property damage insurance covering injury and damage to persons and property with limits of not less than $1,000,000 per occurrence. Mortgagee reserves the right to increase said limits should sound business practice so dictate. Mortgagor shall also maintain, at any and all times required by Mortgagee, rental interruption insurance in such amount as may be required from

-11-

time to time by Mortgagee. Mortgagor shall also maintain, at any
and all times required by Mortgagee, broad form builders' risk
insurance with respect to the Property and the construction or
reconstruction of any improvements thereto. All such policies as
aforesaid shall be in standard form and endorsed with standard
mortgagee clauses with loss payable to Mortgagee, the Secretary
of HUD and such other parties as may be designated by Mortgagee,
as their interests may appear, and shall contain a clause pro-
viding, that the policy may not be cancelled or modified without
thirty (30) days' prior written notice to Mortgagee. Mortgagor
shall deliver all such policies evidencing the insurance required
hereunder to Mortgagee, and will likewise deliver renewals of
such policies not less than thirty (30) days in advance of the
expiration of same, stamped "paid" by the issuer thereof. The
carriers providing the insurance shall be chosen by Mortgagor
subject to approval by Mortgagee provided that such approval
shall not be unreasonably withheld.

Mortgagor shall at all times comply (and cause its agents,
contractors and subcontractors to comply) with all applicable
worker's compensation insurance requirements.

Section 4.11 **Maintenance and Repairs.** Mortgagor shall keep
the Property in good condition and repair, and will not permit or
suffer any waste of the Property. Mortgagor will, at its sole
cost and expense, promptly and in a good workmanlike manner make
all needful and proper renewals, replacements and repairs to the
property, including alterations and repairs as may be required by
laws, ordinances and regulations necessary to insure that the
value of the Property as security shall not be impaired.

In the event the Property suffers an uninsured loss, Mort-
gagor if required to do so by Mortgagee, shall use its own funds
to repair and restore the Property. If, in any such event,
Mortgagor fails to make such repairs or restoration, Mortgagee
may advance sums necessary to complete such repair and restora-
tion. Any such advance by Mortgagee shall become part of the
Indebtedness Hereby Secured, shall bear interest at the Mortgage
Loan rate specified in the Note from the date of the advance, and
shall be due and payable to Mortgagee upon demand.

Section 4.12 **Indemnification by Mortgagor.** Subject to the
provisions of Section 3.02 hereof, Mortgagor will protect, indem-
nify and save harmless Mortgagee and the Secretary of HUD (the
party being indemnified is sometimes called the "Indemnitee")
from and against all liabilities, obligations, claims, damages,
penalties, causes of action, costs and expenses (including,
without limitation, attorneys' fees and expenses at or prior to
trial and on appeal) imposed upon or incurred by or asserted
against any such indemnitee by reason of (i) any accident, injury
to or death of persons or loss of or damage to property occurring
on or about the Property or the adjoining sidewalks, curbs,

-12-



streets, or ways; (ii) any use, nonuse or condition of any of the
Property or the adjoining sidewalks, curbs, streets or ways;
(iii) any failure on the part of Mortgagor to perform or comply
with any of the terms of this Mortgage or the Building Loan
Agreement; or (iv) performance of any labor or services or the
furnishing of any materials or other property in respect of any
portion of the Property or the use thereof. In case any action,
suit or proceeding is brought against any such indemnitee by
reason of any such occurrence, Mortgagor, upon the request of any
such indemnitee, will at Mortgagor's expense resist and defend
such action, suit or proceeding or will cause the same to be
resisted or defended by counsel designated by the Mortgagor and
reasonably acceptable to the indemnitee, provided that such
approval shall not be required in the case of defense by counsel
designated by any insurance company undertaking such defense
pursuant to any applicable policy of insurance. Any amounts
payable to Mortgagee by reason of the application of this para-
graph shall become immediately due and payable, shall be secured
by the Property as if part of the Indebtedness Hereby Secured,
and shall bear interest at the Mortgage Loan rate specified in
the Note from the date loss or damage is sustained by Mortgagee
until paid. This obligation of Mortgagor shall survive any
termination or satisfaction of this Mortgage.

Section 4.13 <u>Operation of the Property to be Sole Activity
of Mortgagor.</u> So long as any of the Indebtedness Hereby Secured
remains outstanding, Mortgagor shall not engage in any business
or activity other than, or in addition to, the ownership, opera-
tion and management of the Property. This Section shall not
apply to the general or limited partners of Mortgagor.

Section 4.14 <u>Permitted Liens.</u> Mortgagor will not create or
permit a lien to exist against the Property inferior or superior
to the lien of this Mortgage, other than liens for real estate
taxes and assessments not yet due and payable, and inferior liens
for which the prior written consent of Mortgagee has been ob-
tained in accordance with the Coinsurance Regulations.

Section 4.15 <u>Assignment of Rents and Leases and Profits.</u>

(a) To further secure the obligations of Mortgagor under
the Note and this Mortgage, as collateral security therefor,
Mortgagor hereby irrevocably assigns to Mortgagee all the rents,
profits, issue and income of the Property, and any and all leases
and/or subleases (together the "Leases") thereof, which are in
force on the date hereof, or which may be hereafter entered into,
as further security for the Indebtedness Hereby Secured, and the
Mortgagor shall not further assign nor encumber the rents of the
Property, or any part thereof, without the prior written consent
of the Mortgagee. Mortgagee shall not be obligated to perform or
discharge any obligation or duty to be performed or discharged by
Mortgagor under any of said Leases, and this assignment shall not



-13-

place any responsibility upon Mortgagee for the control, care, management, or repair of the Property or make the Mortgagee derivatively responsible or liable for any negligence in the management, operation, upkeep, repair, or control of the Property, whenever occurring.  At the option of the Mortgagee, this assignment shall become effective immediately upon the occurrence of an Event of Default hereunder.  Provided, however, that all such rents, and all rents, profits and payments due Mortgagor under such Leases shall be payable to Mortgagor and be its sole property until such time as an Event of Default as hereafter described shall occur, provided, further, that no rent more than one month in advance plus a security deposit shall be collected or accepted without the prior written consent of Mortgagee, and no rent shall be collected or accepted in violation of any law, ordinance, rule, regulation or order.  Mortgagor agrees that said assignment of rents and leases is an essential consideration for the making of the Mortgage Loan by Mortgagee.  Mortgagor agrees that it will faithfully perform and comply with all terms, conditions and covenants of any Lease covering any part of the Property.  Upon Mortgagee's request from time to time, Mortgagor shall furnish Mortgagee a statement, in affidavit form and in such reasonable detail as Mortgagee may require, of all Leases on the Property and the status thereof and, on demand, to furnish Mortgagee executed counterparts of any and all such Leases.

(b)  Upon the occurrence of any Event of Default, Mortgagee may at its option at any time thereafter: (i) proceed to enter upon, take possession of, and manage and operate the Property under the foregoing assignment without becoming a mortgagee in possession; (ii) proceed to perform any or all obligations of the Mortgagor under the Leases, and exercise the rights of the Mortgagor contained therein as fully as the Mortgagor itself could, without regard to the adequacy of security for the indebtedness hereby secured and with or without bringing any legal action or causing any receiver to be appointed by any court; (iii) let or re-let the Property or any part thereof and enforce, modify, cancel or accept the surrender of any of the Leases; (iv) evict lessees pursuant to appropriate legal proceedings; (v) bring or defend any suits in connection with the possession of the Property or any part thereof, in the name of the Mortgagor and/or Mortgagee; (vi) make such repairs as the Mortgagee may reasonably deem appropriate; (vii) pay out of rents, income, profits, reserves, escrows and/or security deposits (or from other sources of funds) any liens, taxes, assessments, insurance premiums, management fees, utility charges, costs of keeping the Property in good condition and repair and/or any other fees, expenses, premiums, costs or charges which Mortgagee deems to be necessary or appropriate in connection with the Note, Mortgage, Leases, the Property and/or the operation of the Property; (viii) fix or modify rents; (ix) in the name of either the Mortgagor and/or the Mortgagee sue for or otherwise collect and receive all rents, issues and profits, including those past due and unpaid, and

-14-

apply the same first against all costs and expenses of the opera-
tion of the Property, of the performance of the Mortgagor's
obligations under the Leases and of such collection, including
reasonable attorneys' fees, and any amounts remaining after such
application will be applied next to accrued and unpaid interest
and the remainder thereof, if any, to the payment of principal of
the Indebtedness Hereby Secured; (x) without regard to the ade-
quacy of security for the Indebtedness Hereby Secured, have a
receiver appointed to manage and collect income and rents from
the Property; (xi) cancel or terminate any or all of the Leases;
and (xii) do all other things the Mortgagee may deem necessary or
proper to protect its security.  Entry upon and taking possession
of the Property and the collection of the rents and the appli-
cation thereof will not operate to cure or waive any default
under any instrument given by the Mortgagor to the Mortgagee or
prohibit the taking of any other action by the Mortgagee under
any such other instrument, or at law or in equity to enforce the
payment of the Indebtedness Hereby Secured or to realize on any
other security or guarantee.  The existence and/or exercise of
the rights of Mortgagee set forth in this Section 4.15 shall not
create any obligations on the part of the Mortgagee other than
for Mortgagee's gross negligence or willful misconduct.

     (c)  Mortgagee may give notice of the foregoing assignment
at any time to any of the lessees.  Lessees may rely on any
notice given them by Mortgagee pursuant to the foregoing assign-
ment and Mortgagor agrees to hold harmless any lessee with re-
spect to any payment made or action taken in reliance on any such
notice.

     Section 4.16  Books and Records; Financial Statements.
Mortgagor hereby agrees that Mortgagee shall have the right to
inspect the books and records of the operation of the Property
and make copies thereof at all reasonable times and upon reason-
able notice to Mortgagor.  Mortgagor shall furnish to Mortgagee,
within ninety (90) days after the end of each fiscal year of
Mortgagor, a balance sheet, statement of income and expenses of
the Property and a statement of changes in financial position,
all prepared in accordance with generally accepted accounting
principals consistently applied, and which shall be certified by
the chief financial officer of Mortgagor.  Such financial state-
ments shall set forth, in reasonable detail, rents received and
total operating expenses of the Property and shall be accompanied
by a certificate executed by the chief financial officer of
Mortgagor certifying that there exists no Event of Default under
this Mortgage or any of the Loan Documents (and no circumstances
which, with the passage of time, the giving of notice, or both,
would constitute an Event of Default).  Such financial statements
shall be audited by an independent certified accountant.    In
addition, Mortgagor shall promptly provide to Mortgagee such
other financial statements and information with respect to the
Property, Mortgagor and/or Project as Mortgagee may, from time to

-15-

time, request. All expenses in connection with financial state-
ments shall be borne by the Mortgagor.

Section 4.17 Zoning Changes. Mortgagor agrees not to parti-
cipate in any proceedings for, or acquiesce in, any change or
proposed change of, zoning laws or regulations governing the
Property, the creation of a subdivision of or cut-up involving
the Property, consolidation of the Property with any other prop-
erty, nor to subject the Property to any declaration of condo-
minium, "time-share" ownership or other provisions for subdivided
or common ownership, without the prior written consent and parti-
cipation of Mortgagee. Promptly after Mortgagor becomes aware
thereof, Mortgagor shall notify Mortgagee of any proposed change
in the zoning of the Property or any portion thereof.

Section 4.18 Coinsurance Regulations and Housing Act.
Mortgagor shall comply in a timely fashion with any and all
obligations of Mortgagor under the Coinsurance Regulations and
National Housing Act which are applicable to Mortgagor and/or the
Project.

## ARTICLE V

### CASUALTY AND CONDEMNATION: CERTAIN PREPAYMENTS

Section 5.01 Casualty. If the Property, or any part there-
of, shall be damaged by fire or other hazard against which insur-
ance is held, the amount paid by any insurance company pursuant
to the contract of insurance shall, to the extent of the In-
debtedness Hereby Secured then remaining unpaid, be paid to
Mortgagee, and at Mortgagee's election, may be applied to reduc-
tion of the Indebtedness Hereby Secured as set forth in Section
5.03 hereof or released for the repair or restoration of the
Property to substantially the same condition as existed before
the casualty. In the event of such loss or damage, all proceeds
of insurance shall be payable to Mortgagee, and Mortgagor hereby
authorizes and directs any affected insurance company to make
payment of such proceeds directly to Mortgagee. Mortgagee is
hereby authorized and empowered by Mortgagor to settle, adjust,
or compromise any claims for loss, damage, or destruction under
any policy or policies of insurance. All such amounts together
with amounts, if any, earned thereon pending the decisions wheth-
er to repair and restore are herein referred to as the "Insurance
Fund." Mortgagor will give immediate notice by mail to the
Mortgagee and the Secretary of Housing and Urban Development,
acting by and through the Federal Housing Commissioner, of any
fire damage or other casualty to the Property.

Section 5.02 Condemnation: Application of Proceeds. Mort-
gagor agrees that if the Property, or any part thereof, is con-
demned under any power of eminent domain or acquired for any

-16-




public use or quasi-public use, Mortgagor shall give prompt
written notice thereof to Mortgagee, and the damages, proceeds,
and consideration for such acquisition to the extent of the full
amount of Indebtedness Hereby Secured remaining unpaid are hereby
assigned by Mortgagor to Mortgagee and shall be paid forthwith to
Mortgagee for the account of Mortgagor, to be applied by Mort-
gagee on account of the Indebtedness Hereby Secured as set forth
in Section 5.03 hereof.   Mortgagee shall be entitled, at its
option, to appear in its own name in any action or proceeding
relating to such condemnation and shall have the right to com-
promise or settle such proceeding subject to reasonable approval
by the Mortgagor.  In case of any partial condemnation, Mortgagee
may in its sole discretion, elect to release a portion or all of
the proceeds to Mortgagor for repairs and restoration of the
Property.  All such amounts together with amounts, if any, earned
thereon pending the decision whether to repair and restore are
herein referred to as the "Condemnation Fund."

        Section 5.03 Prepayment from Amounts in the Insurance or
Condemnation Funds.   Within thirty (30) days after Mortgagee's
receipt of any Insurance or condemnation proceeds pursuant to
Sections 5.01 and 5.02 as applicable Mortgagee shall give to
Mortgagor notice of Mortgagee's election to apply the Insurance
Fund or Condemnation Fund to either (i) reduction of the Indebt-
edness Hereby Secured or (ii) pay costs and expenses for the
repair and restoration of the Property.  Upon any election by
Mortgagee to apply the   surance Fund or Condemnation Fund to a
reduction of the Indebtedness Hereby Secured, Mortgagee shall
give notice to Mortgagor that the Indebtedness Hereby Secured, or
so much of the principal thereof as can be paid from the Insur-
ance Fund or Condemnation Fund must be prepaid as hereinafter set
forth.  The amount of such fund shall be deemed to have been
received on the date of such notice.  The effective date of such
prepayment (the "effective date"), in case of any such notice
which has been given prior to the 25th day of any month, shall be
the 16th day of the next following month, or in case of any such
notice given on or after the 25th day of any month, the 16th day
of the second following month.  If the entire Indebtedness Hereby
Secured shall be discharged from such insurance or condemnation
proceeds, Mortgagee shall not be required to release the lien of
this Mortgage from the Property until the date which is ninety-
five (95) days after the effective date of such discharge of the
Indebtedness Hereby Secured so as to protect the Mortgagee
against any loss of security if such discharge of the Indebted-
ness Hereby Secured is subsequently rescinded by a trustee in
bankruptcy with respect to the Mortgagor.  On the applicable
effective date, the Indebtedness Hereby Secured shall be deemed
prepaid to the extent hereinafter provided.  If, after giving
effect to such prepayment, the entire amount of the Indebtedness
Hereby Secured has not been discharged, the amount of the applic-
able fund shall be deemed to have been applied first to the
accrued and unpaid interest on the amount prepaid through the

-17-

effective date, and then to the prepayment of the principal balance of the Mortgage Loan. In the event of any partial prepayment of the principal balance of the Mortgage Loan pursuant to the provisions of this section, an amount equal to (i) the amount of interest on the principal balance of the Mortgage Loan prepaid pursuant to the provisions of this section from the first day of the month in which the effective date occurs to the effective date, plus (ii) all interest actually earned by Mortgagee from investment of the Insurance Fund or Condemnation Fund, as applicable, from the date of the initial notice of the prepayment by Mortgagee to Mortgagor through the day immediately preceding the effective date, shall be credited to Mortgagor's next scheduled installment of principal and interest on the Mortgage Loan. Following any prepayment which discharges the entire amount of the Indebtedness Hereby Secured, Mortgagee shall refund to Mortgagor the amount referred to in clause (ii) of the immediately preceding sentence.

Section 5.04 **Due Diligence by Mortgagor to Complete Repairs or Restoration; Disbursement.** If, at Mortgagee's election, insurance or condemnation proceeds are released for repair or restoration of the Property, Mortgagor shall promptly commence and diligently prosecute the completion of such repairs or restoration. Such repairs shall be effected in accordance with all appropriate HUD requirements. Mortgagor if required to do so by Mortgagee, shall use its own funds to complete repair or restoration of the Property if insurance or condemnation proceeds, as applicable, are insufficient to accomplish same. If, in order to complete repair or restoration of the Property to the satisfaction of Mortgagee, it is necessary for Mortgagor to use its own funds, and Mortgagor fails to do so, Mortgagee may at its option and election advance sums necessary to complete such repair and restoration. Any such advance by Mortgagee shall become part of the Indebtedness Hereby Secured, shall bear interest at the Mortgage Loan rate specified in the Note from the date of the advance and shall be due and payable to Mortgagee upon demand.

Section 5.05 **Release of Amounts in the Insurance or Condemnation Funds.** If, at Mortgagee's election, insurance or condemnation proceeds are released for repair or restoration of the Property pursuant to this Article V, such proceeds shall be disbursed by the Mortgagee from time to time as work progresses, provided that prior to any disbursement, Mortgagee is in receipt of proof, satisfactory to it, that the work has been completed, and further provided that the Mortgagee is in receipt of proof, reasonably satisfactory to it, that there are no outstanding mechanics' liens or materialmen's liens and that all charged costs and expenses incurred with respect to work completed have been paid for in full. Mortgagor shall provide Mortgagee with such contractors' and subcontractors' affidavits and materialmen's certificates and such other evidences of payment as Mortgagee may require in connection with the disbursement of such



-18-



proceeds. In addition, Mortgagee may, at Mortgagee's option, condition disbursement of said proceeds, from time to time as construction progresses, on Mortgagee's approval of plans and specifications of an architect reasonably satisfactory to Mortgagee, contractor's cost estimates, architect's certificates, title insurance policies and endorsements, and such other evidence of costs, percentage of completion of construction, application of payments, satisfaction of liens and evidence of title as Mortgagee may require, and the provisions of the Building Loan Agreement shall, to the extent deemed applicable by Mortgagee, apply to such restoration. Repair, restoration, or reconstruction of any portion(s) of the Property must be substantially equal in size, quality and value to such portion(s) of the Property immediately before the loss, damage, or condemnation. Any proceeds remaining after the completion of such repair, restoration, or replacement may, at the option of the Mortgagee, be applied by the Mortgagee as a partial prepayment under Section 5.03.

## ARTICLE VI

## EVENTS OF DEFAULT AND REMEDIES

Section 6.01 _Event of Default_. The occurrence of any one of the following events shall constitute an Event of Default:

 (a) Any default in any payment on the Note or hereunder, as set forth in Section 4.06 hereof, or any renewal or extension thereof or of any note or notes hereafter given for interest covering any extension, with interest thereon from maturity of the same, when and as the same shall become due and payable, and if such default is not made good prior to the due date of the next installment payment under the Note.

 (b) Any default in payment, when due (except under circumstances expressly provided for in Section 4.09 hereof), of any tax, sewer or water rate or special assessment now or hereafter assessed against the Property, or any part thereof, while this Mortgage exists, or any default in failing to maintain any insurance required hereunder or under any other of the Loan Documents, while this Mortgage exists, or default in payment on demand of any sum or sums advanced by Mortgagee on account of any costs and expenses of this Mortgage, or on account of any such tax or special assessment, sewer and water rate or insurance, or expense of litigation, or on account of any lien on said land and premises, with interest thereon at the Mortgage Loan rate specified in the Note from date of advance, or upon default of any other payment provided for in this Mortgage or



-19-



under any other of the Loan Documents, when and as due, or any default under the Building Loan Agreement, and the continuation of any such default for a period of thirty (30) days or more following written notice given to Mortgagor by Mortgagee specifying the default, provided that (i) a default in payment as provided in Section 4.06 hereof shall not require notice to Mortgagor, but shall be treated in accordance with clause (a) above and (ii) a default in failing to maintain any insurance required hereunder or under any other of the Loan Documents shall not require notice to Mortgagor, but shall be treated as an Event of Default immediately upon such default.

(c)    Any default in the observance or performance of any other of the covenants or agreements contained herein or under the Note, or any other of the Loan Documents if such default shall continue for thirty (30) days after written notice given to Mortgagor by Mortgagee specifying the default.

(d)    Mortgagor having filed a voluntary petition or having been adjudicated as bankrupt or insolvent after the filing of a voluntary petition, or having filed any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors; or seeking or consenting to or acquiescing in the appointment of any trustee, receiver or liquidator of Mortgagor or of all or any part of its properties or assets, or making any general assignment for the benefit of creditors, or admitting in writing its inability to pay its debts generally as they become due.

(e)    A court of competent jurisdiction having entered an order, judgment or decree approving a petition filed against Mortgagor seeking any reorganization, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, and such order, judgment or decree remaining unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the first date of entry thereof; or any trustee, receiver or liquidator of Mortgagor or of all or any part of its properties or assets, being appointed without the consent or acquiescence of Mortgagor and such appointment remaining unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive).



-20-



(f)   For the purpose of clauses (d) or (e) above, any refer-
ence to Mortgagor shall be deemed to separately apply
to any general partner.

(g)   Final judgment for the payment of money in excess of
Twenty Thousand Dollars ($20,000.00) having been ren-
dered against Mortgagor and such judgment not being
discharged or bonded to Mortgagee's satisfaction, or a
stay of execution thereon not procured, within thirty
(30) days after the date of entry thereof, or if there-
after such judgment remains unsatisfied for a period of
fifteen (15) days after the termination of any such
stay of execution.

Section 6.02 Acceleration.  If any Event of Default shall
occur, then, at the option and election of Mortgagee, the entire
Indebtedness Hereby Secured shall become due, payable and col-
lectible at once and thereafter as Mortgagee may elect, regard-
less of the date of maturity and without notice, and may be
enforced and recovered at once.

Section 6.03 Remedies.  If any Event of Default shall have
occurred, Mortgagee may elect to exercise or cause to be exer-
cised any or all of the remedies provided for in this Mortgage
and at law, including without limitation the following:

(a)   Mortgagee shall be entitled to apply at any time prior
to or during any foreclosure suit to the court having
jurisdiction thereof for the appointment of a receiver
of all or a portion of the Property, and all rents,
incomes, profits, issues, and revenues thereof, derived
from any source.  It is hereby expressly covenanted and
agreed that thereupon the court shall forthwith appoint
such receiver with the usual powers and duties of
receivers in similar cases, and the appointment shall
be made by the court as a matter of Mortgagee's strict
right, and without reference to the adequacy or inade-
quacy of the value of the Property hereby mortgaged, or
to the solvency or insolvency of the Mortgagor or any
other party defendant to such suit.  The Mortgagor
hereby specifically waives the right to object to the
appointment of a receiver as described herein and
hereby expressly consents that such appointment shall
be made as an admitted equity and is Mortgagee's abso-
lute right, and that the appointment may be done with-
out notice to the Mortgagor.  Mortgagor further con-
sents to the appointment of the Mortgagee or any of-
ficer or employee of Mortgagee as receiver.

(b)   Mortgagee may foreclose this Mortgage and sell the
Property as an entirety or in separate parcels or

-21-



parts, under the judgment or decree of a court or courts of competent jurisdiction.

(c) Mortgagee may, either after foreclosure and/or the appointment of a receiver as hereinbefore provided, or without same, proceed by suit or suits at law or equity or by any other appropriate remedy to protect and enforce the rights of Mortgagee whether for the specific performance of any covenant or agreement contained herein, or in aid of the execution of any power herein granted, or to foreclose the Mortgage, or to sell, as an entirety or in several parcels or parts, the Property under the judgment or decree of a court or courts of competent jurisdiction, or otherwise. Mortgagee's remedies shall not be exhausted by any single exercise thereof, and may be pursued concurrently, consecutively and repeatedly until all of the Indebtedness Hereby Secured is paid in full.

(d) Mortgagee shall apply the proceeds of sale, or foreclosure of the Property, first, to the payment of reasonable attorney's fees and expenses prior to, and at trial and on appeal, if any; secondly, to discharge all taxes, levies and assessments, with costs and interest if they have priority over the lien of the Mortgage, including the due pro rata portion thereof for the current year; thirdly , to discharge in the order of their priority, if any, the remaining debts and obligations secured by the Mortgage and any liens of record inferior to the Mortgage under which sale is made, with lawful interest; and, fourthly, the residue of the proceeds shall be paid to Mortgagor, or its assigns; provided, however, that Mortgagee as to such residue shall not be bound by any inheritance, devise, conveyance, assignment or lien of or upon Mortgagor's equity, without actual notice thereof prior to distribution.

(e) In the case of any receivership, insolvency, bankruptcy, liquidation or other judicial proceeding relative to Mortgagor or affecting the Property, Mortgagee may pursue and perfect claims against the Property arising under this Mortgage and the Note.

(f) Mortgagee may take such other and further actions as may be required and permitted, it being understood that no remedy under this Mortgage is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or as now or hereinafter existing at law or in equity or by statute.

-22-



Section 6.04 **Reinstatement**. If, after the occurrence of an Event of Default, Mortgagor cures the default prior to completion of foreclosure, receivership or other proceedings pursuant to Section 6.03 above, and Mortgagor pays to Mortgagee all reasonable and actual expenses incurred by Mortgagee in connection with the foreclosure, receivership or other proceedings, including, without limitation, all reasonable attorney's fees and expenses prior to and at trial and on appeal, advertising costs, Mortgagee's fees, auctioneer's commissions and payments or reimbursements made by Mortgagee on account of the GNMA Securities (in the event that Mortgagee has issued mortgage-backed securities as described in Section 4.10), the Mortgage Loan shall with the prior written consent of the Mortgagee in accordance with the Coinsurance Contract be reinstated as if an Event of Default had not occurred.

Section 6.05 **Mortgagee's Role at Sale**. Upon any foreclosure sale, Mortgagee may bid and become the purchaser of the Property, and upon compliance with the terms of sale, may hold, retain and possess and dispose of such Property in its own absolute right, without further accountability.

Section 6.06 **Waiver by Mortgagor**. Mortgagor agrees, to the extent that it may lawfully so agree, that in the case of an Event of Default on its part, as aforesaid, neither Mortgagor nor anyone claiming through or under it shall, or will, set up, seek or claim to take advantage of any exemption laws (whether under the State Constitution, Homestead laws, or otherwise), or laws providing for any appraisement, apportionment, valuation, stay, extension or redemption now or hereafter in force in the locality where the Property is situated, in order to prevent or hinder the enforcement or foreclosure of the Mortgage, or the final or absolute putting into possession thereof, immediately after such foreclosure, of the purchaser thereof. Mortgagor, for itself and all who claim through or under it, hereby waives, to the fullest extent that it may lawfully do so, the benefit of all such laws and any and all right to have the estate comprising the security intended to be created hereby marshalled upon any foreclosure of the lien hereof and agrees that Mortgagee or any court having jurisdiction to foreclose such lien may sell the Property as an entirety or in parts, and further hereby waives any right to assert in any bankruptcy proceeding in which Mortgagor is debtor: (i) that the Property should be valued by any method other than liquidation value where Mortgagee seeks "adequate protection" or relief from the automatic stay under the Bankruptcy Code, (ii) that Mortgagee's security interest in cash proceeds of the Property, including rent payments received, is limited to any amount less than the actual amount of such proceeds deposited in deposit accounts of Mortgagor and commingled with other funds, (iii) use of cash proceeds of the Property, including rent payments received, without consent of Mortgagee unless authorized by the bankruptcy court in which such bank-

-23-



ruptcy is pending, after notice and a hearing, and (iv) use of cash proceeds of the Property, including rent payments received, unless Mortgagee is granted an additional substitute lien in other property to the extent such cash proceeds are used by Mortgagor.   If an Event of Default occurs, Mortgagor shall pay all costs and expenses including reasonable attorneys' fees at and prior to trial and on appeal, incurred in the collection of the Note, the Indebtedness Hereby Secured or obligations under this Mortgage.

Section 6.07 No Waiver, Etc.  Any waiver of any Event of Default hereunder shall not extend to or affect any subsequent or other then existing Event of Default, nor shall it impair any rights or remedies relating to any such subsequent or other then existing Event of Default.  No delay or omission of Mortgagee to exercise any right or power accruing upon any Event of Default shall impair any such right or power or shall be construed to be a waiver of any such Event of Default or an acquiescence therein, or shall extend to any subsequent Event of Default, and every power and remedy given by the Mortgage may be exercised, from time to time, and as often as may be deemed expedient by Mortgagee.

Section 6.08 Costs and Expenses.  In any suit to foreclose the lien of this Mortgage, there shall be allowed and included as additional indebtedness in the decree of sale, to the extent permitted by law, all expenditures and expenses that may be paid or incurred by or on behalf of Mortgagee, for reasonable attorneys' fees, court costs, appraisers' fees, sheriff's fees, documentary and expert evidence, stenographers' charges, publication costs and such other costs and expenses as Mortgagee may deem reasonably necessary to prosecute such suit or to evidence to bidders at any sale that may be had pursuant to such decree the true condition of the title to or the value of the Property.  To the extent permitted by law, all such expenditures and expenses shall become payable on demand with interest thereon from the date of expenditure at the interest rate charged under the Note.

In addition, Mortgagor shall pay to Mortgagee promptly upon demand all expenditures and expenses incurred by Mortgagee in connection with (a) any proceeding to which Mortgagee shall be a party, either as plaintiff, claimant or defendant, by reason of this Mortgage or any of the indebtedness; (b) preparations for the commencement of any suit for foreclosure after accrual of such right to foreclosure, whether or not actually commenced; and/or (c) preparation for the defense of or investigation of any threatened suit, claim or proceeding that might affect the Property, whether or not actually commenced.

Section 6.09 Certain Remedies Subject to HUD Approval. Before Mortgagee may accelerate and declare the Indebtedness Hereby Secured due and payable for an Event of Default hereunder

-24-

arising from (i) a default under the HUD Regulatory Agreement, (ii) a violation of the restrictions on transfers under Section 4.05, (iii) a failure to make monthly payments to the Replacement Reserve Fund, (iv) a violation of Section 4.13 as to sole business of Borrower being operation of the Property, or (v) a failure to provide financial statements under Section 4.16; Mortgagee shall obtain the prior written consent of the Secretary of HUD.

## ARTICLE VII

### MISCELLANEOUS PROVISIONS



Section 7.01 Assignment of Mortgage. Subject to any applicable requirements of HUD, Mortgagee may sell, assign, transfer, convey, pledge or encumber the Note or all or any part of its interest, rights and obligations thereunder or under this Mortgage to one or more persons or parties, and Mortgagor hereby consents to any such sale, assignment, transfer, conveyance, pledge or encumbrance and agrees upon the request of Mortgagee or its assignee to execute and deliver promptly any instrument confirming Mortgagor's consent as effectuating, as necessary, such sale, assignment, transfer, conveyance, pledge or encumbrance.

Section 7.02 Notices. Any notice, demand or request required or permitted hereunder to be given to Mortgagor or Mortgagee shall be sufficiently given if in writing and personally delivered or mailed by registered or certified first class mail, postage prepaid, addressed to:

Mortgagor:    Oakland Lakes, Ltd.
              4750 Ashwood Drive, Suite 300
              Cincinnati, Ohio 45241
              Attention: William O. Brisben

Mortgagee:    Cincinnati Mortgage Corporation
              2368 Victory Parkway, Suite 210
              Cincinnati, Ohio 45206
              Attention: Robert W. Jorden

or at such other address as either Mortgagor or Mortgagee may have furnished to the other in writing, and shall be deemed to be given when mailed.

-25-



Section 7.03 Security Agreement.

(a) In addition to being a mortgage, this Mortgage is intended to be a security agreement pursuant to the Uniform Commercial Code for any of the items specified herein as part of the Property, which under applicable law may be subject to a security interest pursuant to the Uniform Commercial Code, and Mortgagor hereby grants Mortgagee a security interest in said items, and all substitutions, replacements, replacement parts, additions, repairs, repair parts, accessions and accessories incorporated therein or affixed thereto in which Mortgagor acquires an interest, and the proceeds thereof (sometimes referred to herein as the "Collateral"). Mortgagor agrees that Mortgagee may file this Mortgage, or a reproduction thereof, in the real estate records or other appropriate index, as a financing statement for any of the items specified above as part of the Property. Any reproduction of this Mortgage or of any other security agreement or financing statement shall be sufficient as a financing statement. In addition, Mortgagor agrees to execute and deliver to Mortgagee, upon Mortgagee's request, any financing statements, as well as extensions, renewals and amendments thereof, and reproductions of this Mortgage in such form as Mortgagee may require, to perfect or protect the security interest hereby created with respect to the Collateral, or to more fully describe the Collateral. Mortgagor shall pay all costs of and expenses (including reasonable expenses of counsel and filing fees) relative to the preparation and filing of any financing statements and any extensions, renewals, amendments and releases thereof, and shall pay all reasonable costs and expenses of any record searches for financing statements Mortgagee may reasonably require. Mortgagor hereby irrevocably authorizes Mortgagee as Mortgagor's agent and attorney in fact to execute and file any UCC Financing Statements and similar instruments signed by Mortgagee alone.

(b) Upon Mortgagor's breach of any covenant or agreement of Mortgagor contained in this Mortgage, including the covenants to pay when due all sums secured by this Mortgage, Mortgagee shall have the remedies of a secured party under the Uniform Commercial Code and, at Mortgagee's option, may also invoke all other remedies as provided herein. In exercising any of said remedies, Mortgagee may proceed against the items of real property and any items of personal property specified herein as part of the Property separately or together and in any order whatsoever, without in any way affecting the availability of Mortgagee's remedies under the Uniform Commercial Code or any of the other remedies provided herein. Mortgagor hereby agrees that a notice sent to it at least ten (10) days before the time of any intended public sale or of the time after which any private sale or other disposition of the Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. Until any default hereunder, Mortgagor may have possession of the Collater-

-26-







al and use it in any lawful manner not inconsistent with this Section 7.03 and not inconsistent with any policy of insurance thereon.

(c) Mortgagor will, at its own cost and expense, keep the Collateral in as good and substantial repair as the same is in at this date, or as the same is when acquired, reasonable wear and tear excepted, making replacements when and where necessary.

(d) At its option, Mortgagee may discharge taxes, liens or secured interests or other encumbrances at any time levied or placed on the Collateral, may pay for insurance on the Collateral and may pay for the maintenance and preservation of the Collateral. Mortgagor agrees to reimburse Mortgagee on demand for any payment made, or any expense incurred by Mortgagee pursuant to the foregoing authorization together with interest thereon at the interest rate set forth in the Note.

(e) Mortgagor will not later than thirty (30) days after acquiring additional Collateral promptly advise Mortgagee of the type, description, nature, cost and quantity thereof. Should Mortgagor at any time fail to advise Mortgagee of any such acquisition, such failure shall not affect, diminish, modify or limit Mortgagee's lien or security interest in all Collateral which the Mortgagor may acquire from time to time hereafter.

Section 7.04 <u>Governing Law.</u> The Note and this Mortgage are made and delivered in and shall be governed by and construed in accordance with the laws of the State. In the event that any provision of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provisions, and to this end the provisions of the Mortgage and the Note are declared to be severable.

Section 7.05 <u>Nondiscrimination.</u> Mortgagor covenants and agrees that so long as this Mortgage and the Note secured hereby are coinsured by HUD, or held under the provisions of the Housing Act, it will not execute or file for record any instrument which imposes a restriction upon the sale or occupancy of the Property on the basis of race, color or creed. Upon any violation of this undertaking, Mortgagee may, at its option, and with the prior written consent of HUD, declare the Indebtedness Hereby Secured immediately due and payable.

Section 7.06 <u>Amendments.</u> This Mortgage may be amended or modified only by a written instrument executed by Mortgagor and Mortgagee and any purported modification or amendment hereof, by whatever means, which is not in strict conformance with the foregoing shall be null and void and absolutely ineffective.





-27-

Section 7.07 __Third Parties.__   The Mortgagor and Mortgagee intend that there are no third party beneficiaries to this Mortgage except for HUD.

Section 7.08 __Rights of Mortgagee.__  Mortgagee may, at its option, do all things provided or permitted to be done by a mortgagee under the laws of the State of Florida for the protection of Mortgagee's interest in the property.

Section 7.09 __Mortgagor's Obligations Unconditional.__   The obligations of the Mortgagor to make payments of any and all amounts due hereunder shall be absolute and unconditional without defense or set-off by reason of any default whatsoever, including, without limitation a default by any tenant of the Property under any lease with the Mortgagor or under any other agreement or instrument between the Mortgagee and the Mortgagor, and such payments to Mortgagee shall not be decreased, abated, postponed or delayed for any reason whatsoever, including without limitation, any acts or circumstances that may constitute failure of consideration, destruction of or damage to the Property, the taking of any part of the Property, commercial frustration of purpose, failure of any person to perform or observe any agreement, whether expressed or implied, or any duty, liability or obligation arising out of or connected with this Mortgage, the Note, or any of the other Loan Documents, or failure of any tenant of the Property to pay the fees, rentals or other charges owed to Mortgagor, and irrespective of whether or not any such tenant of the Property receives either partial or total reimbursement as a credit against such payment, it being the intention of the parties that the payments required of the Mortgagor hereunder will be paid in full when due without any delay or diminution whatsoever.

Section 7.10 __Additional Limitations on Mortgagee's Duties.__ Mortgagor hereby acknowledges and agrees that the undertaking of Mortgagee under this Mortgage is limited as follows:

Except as specifically appointed herein as attorney-in-fact to act on behalf of Mortgagor, Mortgagee shall not act in any way as the agent for or trustee of Mortgagor.  Mortgagee does not intend to act in any way for or on behalf of Mortgagor with respect to disbursement of the proceeds of the indebtedness secured hereby.  Its purpose in making the requirements set forth herein and in the Building Loan Agreement and Loan Documents is that of a lender protecting the priority of its mortgage and the value of its security.  Mortgagee assumes no responsibility for the completion of any improvements erected or to be erected upon the Property, the payment of bills or any other details in connection with the Property, any plans and specifications in connection with the Property, or Mortgagor's relations with any contractors.  This Mortgage is not to be construed by Mortgagor or anyone furnishing labor, materials, or any other work or

-28-




product for improving the Property as an agreement upon the part of Mortgagee to assure anyone that he will be paid for furnishing such labor, materials or any other work or product; any such person must look entirely to Mortgagor for such payment. Mortgagee assumes no responsibility to Mortgagor for the architectural or structural soundness of any improvements on or to be erected upon the Property or for the approval of any plans and specifications in connection therewith or for any improvements as finally completed.

Section 7.11 Mortgage; Building Loan Agreement; Construction.

(a)   It is agreed between the Mortgagor and Mortgagee that this Mortgage is intended to secure the balance of obligatory loan advances to be made after the Mortgage is delivered to the Recorder for record, said loan advances to be made pursuant to the provisions of the Building Loan Agreement.  The maximum amount of unpaid balances of such loan advances in the aggregate and exclusive of interest accrued thereon is Twenty Two Million Seven Hundred Seventy Nine Thousand Six Hundred and no/100 Dollars ($22,779,600.00).  The Mortgagor understands and agrees that Mortgagor may not reborrow amounts of principal under the Note which have already been repaid without the prior written consent of HUD.  In addition to the foregoing advances, the Mortgage shall secure unpaid balances of advances made by Mortgagee to protect said premises including but not limited to advances to pay taxes, assessments, and all other amounts which Mortgagor herein agrees to pay for the protection of the premises and any and all other advances that may be made by Mortgagee under this Mortgage, together with interest thereon.

(b)   Mortgagor warrants and represents that the funds to be advanced herein are to be used in the construction of certain improvements on the lands herein described, in accordance with the Building Loan Agreement which Building Loan Agreement (except such part or parts thereof as may be inconsistent herewith) is incorporated herein by reference to the same extent and effect as if fully set forth and made a part of this Mortgage; and if the construction of the improvements to be made pursuant to said Building Loan Agreement shall not be carried on with reasonable diligence, or shall be discontinued at any time for any reason, the Mortgagee, after due notice to the Mortgagor or any subsequent owner, is hereby invested with full and complete authority to enter upon the Property, employ watchmen to protect such improvements from depredation or injury and to preserve and protect the personal property therein, and to continue any and all outstanding contracts for the erection and completion of said building or buildings, to make and enter into any contracts and and obligations wherever necessary, either in its own name or in the name of the Mortgagor, and to pay and discharge all debts, obligations, and liabilities incurred thereby.  All such sums so



-29-

advanced by the Mortgagee (exclusive of advances of the principal of the indebtedness secured hereby) shall be added to the principal of the indebtedness secured hereby and shall be secured by this Mortgage and shall be due and payable on demand with interest at the rate specified in the Note. The principal sum and other charges provided for herein shall, at the option of the Mortgagee or holder of this Mortgage and the Note securing the same, become due and payable on the failure of the Mortgagor to keep and perform any of the covenants, conditions, and agreements of said Building Loan Agreement.

(c) This Mortgage secures an obligation incurred for the construction of improvements to the Property and, as such, is a "construction mortgage" as said term is used and defined under Article 9 of the Uniform Commercial Code as effective in the State.

Section 7.12 **Binding Effect.** All the terms, covenants and conditions of this Mortgage shall bind Mortgagor, its partners and their respective heirs, successors and assigns and shall inure to the benefit of and be available to the Mortgagees, its successors and assigns.

Section 7.13 **Interpretation; Time of the Essence.** All references to Mortgagor and Mortgagee shall be read in the singular or plural, and in the masculine, feminine or neuter gender, as the sense may require. Time is of the essence with respect to each and every obligation of Mortgagor under the Note, the Mortgage and the other Loan Documents.

Section 7.14 **Estoppel Certificate.** Mortgagor shall, within ten days of a written request from Mortgagee, furnish Mortgagee with a written statement, duly acknowledged, setting forth the sums secured by this Mortgage and such other information as Mortgagee may reasonably request.

Section 7.15 **Right to Inspect and/or Enter Property.** Mortgagee and its agents, representatives and employees are authorized subject to applicable state and federal laws and regulations, to enter at any reasonable time or times upon or in any part of the Property for the purpose of inspecting the same and for the purpose of performing any of the acts that Mortgagee is authorized to perform under the terms of this Mortgage.

PROVIDED ALWAYS that if Mortgagor shall (i) pay according to the tenor and effect thereof all principal and interest evidenced by the Note and any extensions, replacements, modifications or renewals thereof and (ii) pay and perform all obligations of this Mortgage, and all other security agreements, supplements and other instruments now or hereafter executed by Mortgagor for the purpose of further evidencing or securing all or any part of the indebtedness under or secured by this Mortgage, then this Mortgage shall be void; otherwise to remain in full force and effect.

-30-





IN WITNESS WHEREOF, the said Mortgagor has caused these presents to be signed in its name by its General Partner as of the date first above written.

WITNESS/ATTEST:

OAKLAND LAKES, LTD., a
Florida limited partnership

By: _____
William O. Brisben,
General Partner

STATE OF OHIO            )
                         )  SS:
COUNTY OF HAMILTON       )

Before me, a Notary Public in and for said County, personally appeared William O. Brisben, to me known and known to me to be the person who, as General Partner of Oakland Lakes, Ltd., a Florida limited partnership, which executed the foregoing instrument, signed the same and acknowledged to me that he did so sign said instrument in the name and on behalf of said partnership, that the same is his free act and deed as such partner and the free act and deed of said partnership.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my official seal in said County and State this 2nd day of October 1989.



This Instrument Prepared By:   Barrett N. _____, Esq.
                              Strauss & _____
                              Professional Association
                              2100 Central Trust Center
                              201 East Fifth Street
                              Cincinnati, Ohio  45202-4186
                              (513) 621-2120

22459-77-S
Fla.
1/23/89

-31-

EXHIBIT "A"

PARCEL I:

TRACT A OAKLAND LAKES, according to the Plat thereof, recorded in Plat Book 111, Page 7, of the Public Records of Broward County, Florida.

- and -

PARCEL II:

TRACT B, OAKLAND LAKES, according to the Plat thereof, recorded in Plat Book 111, Page 7, of the Public Records of Broward County, Florida.

- and -

PARCEL III:

A portion of the North one-half (N1/2) of the Southeast one-quarter (SE1/4) of SECTION 20, TOWNSHIP 49 SOUTH, RANGE 42 EAST, being more particularly described as follows:

Commencing at the Southeast corner of the said North one-half (N1/2) of the Southeast one-quarter (SE1/4) of Section 20; thence South 89°07'10" West, along the South line of the said North one-half (N1/2) of the Southeast one-quarter (SE1/4), a distance of 498.42 feet, to the POINT OF BEGINNING of this description, said point also being the Northeast corner of said Tract B; thence continue South 89°07'10" West, along the last described course and the North line of said Tract B and Tract "A", a distance of 1937.45 feet; thence North 01°50'43" East, a distance of 25.03 feet; thence North 89°07'10" East, along a line parallel with and 25.00 feet North of, as measured at right angles to the South line of the North one-half (N1/2) of the Southeast one-quarter (SE1/4) of Section 20, a distance of 1936.83 feet; thence South 00°00'00" East along a northerly projection of the East line of said Tract B, a distance of 25.00 feet to the POINT OF BEGINNING.

- and -

PARCEL IV:

A parcel of land lying in the City of Oakland Park, Broward County, Florida, being a portion of Tract G of "OAKLAND LAKES," according to the Plat thereof, as recorded in Plat Book 111, at Page 7, of the Public Records of Broward County, Florida, and being more particularly described as follows:

Commence at the Northeast corner of said Tract G; thence run S 89°05'55" W along the North line of said Tract G for 113.19 feet to the Point of Beginning; thence run South for 336.04 feet to a point; thence run S 89°05'55" W for 30.03 feet to a point; thence run S 00°54'05" E for 1.07 feet to a point; thence run N 84°03'31" W for 29.67 feet to a point; thence run N 00°54'05" W for 30.54 feet to a point; thence run N 89°05'55" E for 35.00 feet to a point; thence run South for 32.01 feet to a point; thence run N 89°05'55" E for 24.00 feet to a point; thence run North for 338.04 feet to a Point of Intersection with said North line of Tract G; thence run N 89°05'55" E along said North line of Tract G for 1.00 feet to the Point of Beginning.

Said lands situate, lying and being in Broward County, Florida.





SAID PROPERTY ALSO BEING DESCRIBED AS:

EXHIBIT 4
(CONTINUED)

DESCRIPTION:

A PORTION OF THE N½ OF THE SE¼ OF SECTION 20, TOWNSHIP 49 SOUTH,
RANGE 42 EAST, TOGETHER WITH ALL OF TRACTS "A", "B" AND A PORTION
OF TRACT "G", "OAKLAND LAKES", ACCORDING TO THE PLAT THEREOF,
AS RECORDED IN PLAT BOOK 111, PAGE 7 OF THE PUBLIC RECORDS OF
BROWARD COUNTY, FLORIDA, ALL BEING MORE PARTICULARLY DESCRIBED
AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT "A"; THENCE
N 89°07'10" E, ALONG THE NORTH LINE OF SAID TRACT "A", A DISTANCE
OF 175.15 FEET; THENCE N 01°50'43" E, A DISTANCE OF 25.03 FEET;
THENCE N 89°07'10" E, ALONG A LINE PARALLEL WITH AND 25.00 FEET
NORTH OF, AS MEASURED AT RIGHT ANGLES TO THE SOUTH LINE OF THE
NORTH ONE-HALF (N½) OF THE SOUTHEAST ONE-QUARTER (SE¼) OF SECTION
20, A DISTANCE OF 1936.65 FEET; THENCE S 00°00'00" E, ALONG A
NORTHERLY PROJECTION OF THE EAST LINE OF SAID TRACT "B" AND THE
EAST LINE OF SAID TRACT "B", A DISTANCE OF 999.87 FEET TO THE
SOUTHEAST CORNER OF SAID TRACT "B"; THENCE S 89°05'55" W ALONG
THE SOUTH LINE OF SAID TRACT "B", A DISTANCE OF 460.00 FEET TO
THE NORTHEAST CORNER OF SAID TRACT "G"; THENCE CONTINUE
S 89°05'55" W ALONG THE NORTH LINE OF SAID TRACT "G" AND THE
SOUTH LINE OF SAID TRACT "A", A DISTANCE OF 113.19 FEET; THENCE
RUN SOUTH FOR 336.04 FEET TO A POINT; THENCE RUN S 89°05'55" W
FOR 30.03 FEET TO A POINT; THENCE RUN S 00°54'05" E FOR 1.07
FEET TO A POINT; THENCE RUN N 84°03'31" W FOR 29.67 FEET TO A
POINT; THE LAST THREE DESCRIBED COURSES BEING ALONG THE NORTH
RIGHT OF WAY LINE OF OAKLAND PARK BOULEVARD AS RECORDED
IN OFFICIAL RECORD BOOK 13439, PAGE 730 OF THE PUBLIC RECORDS
OF BROWARD COUNTY, FLORIDA; THENCE RUN N 00°54'05" W FOR 30.54
FEET TO A POINT; THENCE RUN N 89°05'55" E FOR 35.00 FEET TO A
POINT; THENCE RUN SOUTH FOR 31.01 FEET TO A POINT; THENCE RUN
N 89°05'55" E FOR 24.00 FEET TO A POINT; THENCE RUN NORTH FOR
335.04 FEET TO A POINT OF INTERSECTION WITH SAID NORTH LINE OF
TRACT "G" AND THE SOUTH LINE OF SAID TRACT "A"; THENCE
S 89°05'55" W, ALONG THE SOUTH LINE OF SAID TRACT "A", A DISTANCE
OF 1512.81 FEET TO THE SOUTHWEST CORNER OF SAID TRACT "A"; THENCE
N 00°19'45" W, A DISTANCE OF 7.34 FEET; THENCE N 03°49'07" W,
A DISTANCE OF 328.61 FEET; THENCE N 00°19'45" W, A DISTANCE OF
640.02 FEET TO THE POINT OF BEGINNING, THE LAST THREE DESCRIBED
COURSES BEING ALONG THE WEST LINE OF SAID TRACT "A" AND THE EAST
RIGHT OF WAY LINE OF N.W. 27TH AVENUE AS SHOWN ON SAID "OAKLAND
LAKES" PLAT.

SAID LANDS SITUATE, LYING AND BEING IN THE CITY OF OAKLAND PARK,
BROWARD COUNTY, FLORIDA, CONTAINING 2,103,817 SQUARE FEET OR
48.297 ACRES, MORE OR LESS.





## EXHIBIT B

As used herein, the term "Debtor" shall mean and include the terms "Mortgagor," "Grantor" and "Borrower" and the term "Creditor" shall mean and include the terms "Lender," "Beneficiary" and "Secured Party."

This Exhibit B refers to the following, which may be located on the premises of, relate to, or be used in connection with, the acquisition, construction, rehabilitation, reconstruction, equipping, repair, ownership, management, or operation of a multifamily apartment complex known as Lakes of Casablanca (the "Project"), FHA Project No. 066-36650 located in the County of Broward, State of Florida, in which Debtor has an interest now or hereafter existing or acquired:

1.   All materials now owned or hereafter acquired by the Debtor and intended for construction, rehabilitation, reconstruction, alteration, repair of any building, structure or improvement now or hereafter erected or placed on the Real Estate, all of which materials shall be deemed to be included within the Project immediately upon the delivery thereof to the Project.

2.   All of the walks, fences, shrubbery, driveways, fixtures, machinery, apparatus, equipment, fittings, chattels and other goods and other personal property of every kind and description whatsoever, now owned or hereafter acquired by the Debtor and attached to or contained in and used or usable in connection with any present or future operation of the Project, including, by way of example rather than of limitation, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, motors, furnaces, compressors and transformers; all generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment and fixtures, fans and switchboards; all telephone equipment; all piping, tubing, plumbing equipment and fixtures; all heating, refrigeration, air conditioning, cooling, ventilating, sprinkling, water, power and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture installed or to be installed or used or usable in the operation of any part of the Project or facilities erected or to be erected in or upon the Real Estate; and every renewal or replacement thereof or articles in substitution therefor, whether or not the same are now or hereafter attached to the

-1-





Real Estate in any manner; all except for any right, title or interest therein owned by any tenant (it being agreed by the Debtor and Secured Party that all personal property owned by the Debtor and placed by it on the Real Estate shall, so far as permitted by law, be deemed to be affixed to the Real Estate, appropriated to its use, and covered by the Mortgage and/or any Financing Statements, as applicable).

3.    All of the Debtor's right, title and interest in and to any and all judgments, awards of damages (including but not limited to severance and consequential damages), payments, proceeds, settlements or other compensation (collectively, the "Awards") heretofore or hereafter made, including interest thereon, and the right to receive the same, as a result of, in connection with, or in lieu of (i) any taking of the Property or any part thereof by the exercise of the power of condemnation or eminent domain, or the police power, (ii) any change or alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Property or any part thereof (including but not limited to destruction or decrease in value by fire or other casualty), all of which Awards, rights thereto and shares therein are hereby assigned to the Secured Party, who is hereby authorized to collect and receive the proceeds thereof and to give property receipts and acquittances therefor and to apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the indebtedness secured hereby.

4.    All of the Debtor's right, title and interest in any and all payments, proceeds, settlements or other compensation heretofore or hereafter made, including any interest thereon, and the right to receive the same from any and all insurance policies covering the Property or any portion thereof, or any of the other property described herein.

5.    The interest of the Debtor in all of the rents, royalties, issues, profits, revenues, income and other benefits of the Property, or arising from the use or enjoyment of all or any portion thereof, or from any lease or agreement pertaining thereto, and all right, title and interest of the Debtor in and to, and remedies under, all contract rights, accounts receivable and general intangibles arising out of or in connection with any and all leases and subleases of the Property, or any part thereof, and of the other property described herein, or any part thereof, both now in existence or hereafter entered into, together with all proceeds (cash and non-cash) thereof; and including, without limitation, all cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder.

6.    All of the Debtor's rights, options, powers and privileges in and to (but not the Debtor's obligations and burdens under) any construction contract, architectural and engineering

-2-



agreements and management contracts pertaining to the construction, development, ownership, equipping and management of the Property and all of the Debtor's right, title and interest in and to (but not the Debtor's obligations and burdens under) all architectural, engineering and similar plans, specifications, drawings, reports, surveys, plats, permits and the like, contracts for construction, operation and maintenance of, or provision of services to, the Property or any of the other property described herein, and all sewer taps and allocations, agreements for utilities, bonds and the like, all relating to the Property.

7.   All of the records and books of account now or hereafter maintained by or on behalf of Mortgagor in connection with the Project.

8.   All names now or hereafter used in connection with the Project and the goodwill associated therewith.

9.   All intangible personal property, accounts, licenses, permits, instruments, contract rights, and chattel paper of the Debtor, including but not limited to cash; accounts receivable; bank accounts; certificates of deposit; securities; promissory notes, rents; rights (if any) to amounts held in escrow; insurance proceeds; condemnation rights; deposits judgments, liens and causes of action; warranties and guarantees.

10.   The interest of the Debtor in any cash escrow fund and in any and all funds, securities, instruments, documents and other property which are at any time paid to, deposited with, under the control of, or in the possession of the Secured Party, or any of its agents, branches, affiliates, correspondents or others acting on its behalf, which rights shall be in addition to any right of set-off or right of lien that the Secured Party may otherwise enjoy under applicable law, regardless of whether the same arose out of or relates in any way, whether directly or indirectly, to the Project located upon the Real Estate.

11.   The interest of the Debtor in any and all funds created or established and held by any trustee pursuant to any indenture of trust or similar instrument authorizing the issuance of bonds or notes for the purpose of financing the Project located upon the Real Estate.

12.   Any collateral provided by the Debtor for its account to each and every issuer of a letter of credit, subject to the prior claim of the issuer of any such letter of credit to such collateral.

13.   All inventory, including raw materials, components, work-in-process, finished merchandise and packing and shipping materials.

-3-

14.    Proceeds, products, returns, additions, accessions and substitutions of and to any or all of the above.

15.    Any of the above arising or acquired by the Debtor or to which the Debtor may have a legal or beneficial interest in on the date hereof and at any time in the future.

16.    Any of the above which may become fixtures by virtue of attachment to the Real Estate.

22450-77-S

-4-

EXHIBIT C

(1)   Taxes for the year 1989, and subsequent years which are not yet due and payable.

(2)   Easements and other matters as shown on the Plat of OAKLAND LAKES, recorded in Plat Book 111, Page 7; as modified by Resolution of the City of Oakland Park No. R-88-187 recorded January 18, 1989 in Official Records Book 16120, Page 58 and Resolution of Broward County recorded July 5, 1989 in Official Records Book 16571, Page 993, which Resolutions abandon 30 feet utility and drainage easement over the north 20 feet of Tracts A and B and further modified by that certain Agreement to Place Notation on Plat recorded in Official Records Book 16212, Page 566.

(3)   Agreement with the CITY OF OAKLAND PARK, recorded September 23, 1981 in Official Records Book 9809, Page 661.

(4)   Utility Easement(s) granted to the CITY OF OAKLAND PARK recorded July 16, 1987 in Official Records Book 14625, Page 291.

(5)   Roadway Easement recorded in Official Records Book 13439, Page 773, as set forth in Resolution NO. R-86-44 recorded May 30, 1986 in Official Records Book 13439, Page 730.

(6)   Master Development Plan for Oakland Lakes recorded September 7, 1988 in Official Records Book 15760, Page 500.

(7)   Agreement Governing Land Development for Oakland Lakes Planned Unit Development recorded September 7, 1988 in Official Records Book 15760, Page 494.


AS TO PARCELS I AND III ONLY:

(8)   Drainage Easements recorded February 16, 1989 in Official Records Book 16203, Page 534; in Official Records Book 16203, Page 528; in Official Records Book 16203, Page 532; and in Official Records Book 16203, Page 536.

AS TO PARCEL III ONLY:

(9)   Reservations for fill and minerals together with an easement for purposes of dredging and removing fill and minerals, in favor of HPAV, a Florida general partnership, set forth in that certain Warranty Deed dated June 15, 1981, recorded September 21, 1981 in Official Records Book 9804, Page 807.



(10)  Easement recorded September 17, 1971 in Official Records Book 4612, Page 817.

(11)  Riparian and littoral rights are neith guaranteed nor insured.

(12)  Submerged land is not insured.

AS TO PARCEL IV ONLY:

(13)  Private Easement Agreement for access recorded March 18, 1982 in Official Records Book 10087, Page 363.

(14)  Resolution No. R-86-21 recorded in Official Records Book 13436, Page 558, which resolution abandons existing non-vehicular access lines on the aforesaid Plat of Oakland Lakes along southerly boundary of Tract G thereto.

(15)  Road Contribution Agreement recorded in Official Records Book 9802, Page 677.

AS TO PARCEL I ONLY:

(16)  Utility Easement in favor of the City of Oakland Park recorded in Official Records Book 14625, Page 295.

RECORDED IN THE OFFICIAL RECORDS BOOK
OF BROWARD COUNTY, FLORIDA
L. A. HESTER
COUNTY ADMINISTRATOR






DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

PROJECT NAME: **LAKES OF CASABLANCA**

PROJECT NO: **066-94074**          EFFECTIVE DATE: **February 1, 1995**

LOCATION: **Oakland Park, FL** EXPIRATION DATE: **January 1, 2001**

# PROVISIONAL WORKOUT ARRANGEMENT

The undersigned mortgagor hereby expressly acknowledges that the Mortgage and Note secured by the above project is in default. To afford an opportunity to effect reinstatement, the Secretary, Department of Housing and Urban Development, will hold the defaulted Note and Mortgage on the subject project under the terms and conditions stated herein. Failure of the property to perform as projected will not excuse performance of any clauses in this Arrangement. The written terms of the workout are complete and there are no oral side agreements or verbal understandings which might affect the workout at some future date.

1. **Possession.** The mortgagor acknowledges that the default entitles HUD to assume possession of the encumbered premises, but that possession has not been demanded. As an inducement for HUD approval of this Arrangement, the mortgagor agrees that it will not oppose or interfere in any way should HUD demand possession by reason of subsequent default under the terms of this arrangement.

2. **Junior Obligations.** The mortgagor agrees that project revenues will not be used to repay either interest or principal for any project obligations, other than reasonable and necessary operating expenses, that are junior to the Secretary's lien.

3. **Payment Provision.** All payments will be made to the lock box and copies of each check will be sent to the Field Office in Jacksonville, Florida. The mortgagor agrees to make monthly payments in a timely manner until this Arrangement is accepted by all parties. Unless otherwise identified, at HUD's option, these remittances will be applied in the sequence illustrated on form HUD-2771, Statement of Multifamily Mortgage Account. The source of the amounts used in this Arrangement is form HUD-2771, Statement Of Multifamily Mortgage Account, payment due date 08/01/94. If the amounts on form HUD-2771 change, the mortgagor will pay the new amount billed monthly, with the exception that only the required percent of interest, as identified below, will be paid.



2

a.1. For the two (2) year period beginning February 1, 1995, and continuing through January 31, 1997, the mortgagor will remit by the first of each month $166,368.09, which consists of Service Charges of $9,405.90, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 70 percent of interest, which is $109,598.00.

a.2. Beginning February 1, 1997, and continuing through January 31, 1998, the mortgagor will remit by the first of each month $182,024.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 80 percent of interest, which is $125,255.00.

a.3. Beginning February 1, 1998, and continuing through January 31, 1999, the mortgagor will remit by the first of each month $197,680.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 90 percent of interest, which is $140,911.00.

a.4. Beginning February 1, 1999, and continuing through January 31, 2000, the mortgagor will remit by the first of each month $213,337.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 100 percent of interest, which is $156,568.00.

a.5. Beginning February 1, 2000, and continuing through January 31, 2001, the mortgagor will remit by the first of each month $228,994.28, which consists of Service Charges of $9,405.09, Tax Escrow of $47,364.19, and a minimum payment sufficient to pay through 110 percent of interest, which is $172,225.00.

b.   Failure to remit net cash is cause for HUD to proceed with foreclosure.   Net cash in excess of $25,000 remaining in the property accounts each month after payment of necessary and reasonable project operating expenses, and payment of the minimum monthly payment as noted in paragraphs 3(a)(1) through 3(a)(5) above, will be remitted to HUD within 15 days.   At HUD's option, these funds may first be applied against delinquent Other (Late)  Charges  and  then  against  other  accrued delinquencies in the payment sequence outlined as "Account Items" of form HUD-2771.

c.   At no time will the owner permit any delinquency to accrue in either the service charge due HUD or the tax escrow as billed by HUD each month.

3

    d.  A four percent late charge will be assessed against payments not received by the fifteenth of the month. In addition to the above payments, the owner will remit $2,000.00 monthly until Other Charges have been eliminated. Future Late Charges will be paid monthly as incurred. Any Late Charges not resolved upon completion of this Arrangement will be paid in full prior to Mortgage Modification.

4.  **Lump Sum Payments**. The owner will not remit any additional funds as a lump sum payment to meet equity capital requirements.

5.  **Balance Sheet Reclassification**. Owner agrees to reclassify $580,900 listed as Accounts Payable General Partner on the Balance Sheet to Equity. Owner certifies these funds were advanced to fund operating shortages since final endorsement and were used for necessary and reasonable operating expenses. These funds may only be recovered after successful completion of this Arrangement and may only be taken from Surplus Cash as that term is defined by the Regulatory Agreement. These funds do not represent a lien on the property.

6.  **Mortgage Modification**.

    a.  If the mortgagor has fully complied with the terms of this Arrangement and HUD has determined that it is financially feasible, as of **February 1, 2001**, HUD agrees to recast any delinquent principal and interest equal to or less than ten (10) percent of the original mortgage amount at the current mortgage interest rate of **8.25** percent, amortized over the remaining term of the mortgage, but not less than **180** months. The amount of delinquent interest and principal **together** cannot exceed ten percent of the original mortgage amount.

    b.  The mortgagor agrees to modify the Note and Mortgage to insert a call provision. The call provision gives the mortgagee the option to declare the entire indebtedness due and payable at or after ten (10) years from the date of the modification.

    c.  In the event the mortgage and note is considered for modification, the property must demonstrate that net operating income can support the increased debt service. If it cannot, the mortgagor agrees to fund the amount necessary to buy down the mortgage to an amount supportable by net operating income.

d.   If, at the time of recast, a delinquency in excess of the
10 percent HUD allowance remains, the owner will make a
lump sum payment to fund the deficit.

7.   **Equity Kicker.**  If, at any time, Maker sells, assigns,
transfers, converts or conveys the Property (collectively a
"Sale") or, if Maker refinances the indebtedness secured by
the Property (a "Refinancing"), twenty five and one quarter
(25.25) percent of the Gross Sale, Conversion or Refinancing
Proceeds shall be paid by Maker to Mortgagee or its successors
and assigns at the closing of the Sale or Refinancing (the
"Sale or Refinancing Obligation").   If none of the above
circumstances occur and the Mortgagor pays the note in full
through normal amortization, twenty five and one quarter
(25.25) percent of the mutually agreed upon appraised value or
twenty five and one quarter (25.25) percent of the original
mortgage value, whichever is greater, shall be paid by Maker
to Mortgagee or its successors and assigns on the date of
Mortgage Satisfaction.

"Proceeds" are defined as the amount needed to payoff or
refinance the note securing the real estate plus any equity
"pulled", minus the mortgage balance and minus reasonable
closing costs.  Gross Sale, Conversion or Refinancing Proceeds
shall also mean consideration of any kind directly or
indirectly received by Maker, or its principals, in connection
with a Sale, Conversion or Refinancing.

The obligation set forth above shall be effective until one of
the stated conditions has been fulfilled and shall apply to
the first Sale, Conversion, Mortgage Satisfaction or
Refinancing, after the date of this Arrangement, which
Mortgagee determines is an arms-length transaction for full
value.   No Sale or Refinancing shall occur unless Mortgagee
consents in writing.  Maker must certify (subject to 18 U.S.C.
1001) to Mortgagee that the Sale, Conversion or Refinancing is
not an identity of interest transaction.

8.   **Repairs.**  Past delinquency in the Reserve for Replacement is
hereby forgiven.  The physical property will be maintained in
accordance with the requirements of the Regulatory Agreement.
All disbursements from the RFR Account will be approved by the
Jacksonville Field Office in accordance with the Regulatory
Agreement.   The mortgagor agrees to monthly escrow $6,360.84
to the Reserve For Replacement account and acknowledges this
amount may be increased at any time during this Arrangement if
the Field Office determines an increase is necessary to
maintain the property in a manner acceptable to HUD.  Separate
remittance checks must be written monthly, clearly identifying
the payment to assure proper application by HUD.  These checks
will be submitted in addition to the minimum mortgage payment.

5

9. **Accounting Reports**. During the term of this Arrangement, the mortgagor will submit monthly Reports for Establishing Net Income (Forms HUD-93479, 93480, and 93481). The reports will be mailed to the HUD Office in Jacksonville, Florida.

10. **Distributions**. The mortgagor agrees not to take any distributions while the mortgage is being held in default under the terms of this Arrangement and of the original Note, Mortgage and Regulatory Agreement.

11. **Cancellation Clause**. This Arrangement is on a month-to-month basis. The Secretary agrees to take no action because of the existing monetary default, provided the mortgagor remits the required minimum monthly payment and satisfactorily performs the other requirements of this Arrangement. Failure of the mortgagor to meet the terms of this Arrangement will be sufficient cause for the Secretary to immediately terminate this Arrangement and to commence foreclosure action. Failure of the mortgagor to meet the terms of the Arrangement is also grounds for the Department to consider taking administrative sanctions against the mortgagor including, but not limited to, suspension or debarment from participation in HUD programs.

12. **Criminal Sanctions for Misuse of Project Funds**. The mortgagor acknowledges that the use of project funds derived from the project covered by this Arrangement for any purpose other than to meet actual and necessary project expenses may be a criminal offense punishable by a fine of not more than $5,000 and imprisonment of not more than three (3) years or both.

DATE APPROVED: ___December 22, 1994___
Oakland Lakes, Ltd.

MORTGAGOR SIGNATURE: _____

MORTGAGOR TITLE: ___William G. Grisson___
___General Partner___

**ASSISTANT SECRETARY FOR HOUSING-FEDERAL HOUSING COMMISSIONER:**

BY: ___Ferdinand R. Juluke Jr.___

TITLE: ___Ferdinand R. Juluke, Jr., Director, Multifamily Division, 4HHS___

DATE: ___Jun 5, 1995___



PREPARED (IN CONSULTATION WITH
A MEMBER OF THE FLORIDA BAR) BY
AND AFTER RECORDING PLEASE RETURN TO:

Latham & Watkins
885 Third Avenue, Suite 1000
New York, New York 10022-4802
Att'n: Joshua Stein, Esq.

Former FHA Project No.:    066-94026
Asset No.:                 10026
Project Name:              LAKES OF CASABLANCA
County, State:             Broward, Florida

ASSIGNMENT OF AMENDED AND RESTATED RENEWAL MORTGAGE, ASSIGNMENT
OF RENTS AND SECURITY AGREEMENT AND
OTHER COLLATERAL LOAN DOCUMENTS

The SECRETARY OF HOUSING AND URBAN DEVELOPMENT, solely in its capacity as
mortgagee ("HUD"), pursuant to the terms of that certain Amended and Restated Loan Sale Agreement
dated as of March 28, 1995 (the "Loan Sale Agreement") between HUD and Condor One, Inc., a Delaware
corporation ("Assignee"), having a mailing address of c/o General Electric Capital Corporation, 292 Long
Ridge Road, Stamford (Fairfield County), Connecticut 04927, Attention: Legal Operation, and in
consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by Assignee, hereby
assigns, transfers, sets over and conveys to Assignee, its successors and assigns, the following, all as they
may have been modified, consolidated, assigned, amended, restated, or supplemented (whether or not of
record) through and including May 8, 1995.

That certain Amended and Restated Renewal Mortgage, Assignment of Rents and Security
Agreement executed by Oakland Lakes, Ltd., a Florida limited partnership, for the benefit
of Cincinnati Mortgage Corporation, an Ohio corporation, as Mortgagee, dated October 5,
1989, and recorded on October 5, 1989, at Book 16818, Page 609, in the Official Records
of Broward County, Florida (the "Mortgage"), which Mortgage secures, that certain
Amended and Restated Renewal Mortgage Note dated October 5, 1989, made by Oakland
Lakes, Ltd., a Florida limited partnership, in favor of Cincinnati Mortgage Corporation, an
Ohio corporation ("Note"), together with the indebtedness secured by said Mortgage and
evidenced by said Note, and any right, title, and interest of HUD (if any) in and to the
property described in said Mortgage; and

FL 52-66-94026 ASSIGNMENT 1





Such other documents, agreements, instruments, and other collateral (excluding the Regulatory Agreement referenced in the Mortgage) which evidence, secure or otherwise relate to HUD's right, title or interest in and to the Mortgage and/or the Note, including without limitation the Security Agreement, if any, and the title insurance policies and hazard insurance policies that may presently be in effect.

The Note was endorsed by HUD to Assignee without "FHA Mortgage Insurance" (as such term is defined in the Loan Sale Agreement).

IN WITNESS WHEREOF, HUD has caused this Assignment to be executed and delivered by its duly authorized agent as of May 8, 1995.

Witness:

SECRETARY OF HOUSING AND URBAN
DEVELOPMENT

By _____
(Authorized Agent)
William Richbourg

### ACKNOWLEDGMENT

DISTRICT OF COLUMBIA     )
                         )
                         )

BEFORE ME, _Rita R. Ross_ a Notary Public in and for the jurisdiction aforesaid, on this _1st_ day of _May_, 1995, personally appeared __William Richbourg__ who is personally well known to me (or sufficiently proven) to be an authorized agent of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT and the person who executed the foregoing instrument by virtue of the authority vested in him/her and he/she did acknowledge the signing of the foregoing instrument to be his/her free and voluntary act and deed as the agent of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT, for and on behalf of the SECRETARY OF HOUSING AND URBAN DEVELOPMENT for the uses, purposes and consideration therein set forth.

Witness my hand and official seal, this _1st_ day of _May_, 1995.

_____
Notary Public

My Commission expires: _____

FL 52-66-94026 ASSIGNMENT 2

May 8, 1995

Brisben Management Inc.
7300 E. Kemper Rd
Cincinnati, OH 45249

Re:    Lakes of Casablanca
      52-6694026

Dear Sirs:

Condor One, Inc. (Condor) has acquired the above referenced loan from the Department of Housing and Urban Development (HUD), and has contracted with GE Capital Realty Group, Inc. (CRG) to manage and supervise all servicing activities. The following is intended to assist you in dealing with certain administrative matters related to this transition, and to help CRG quickly establish the appropriate servicing routines. The referenced loan is one of several being acquired simultaneously. Some of the following may not apply to your loan since we have utilized a form letter in an attempt to provide you with a quick notice of the purchase. Please call the undersigned if you desire clarification of the following.

### For All Loans

Remit Payments
to:        GE Capital Asset Management
         Attn. Libby Luther
         2000 West Loop South, Suite 1917
         Houston, TX 77027

Property
Information:      Please provide the following within seven days:

1. Operating Statements - annual statements for 1994 and 1993, plus monthly operating statements for year-to-date 1995;
2. 1995 Operating Budget;
3. Current Rent Roll - and list of rental rates per unit type;
4. Site Inspection Contact - name and phone number of person who will coordinate a CRG site inspection;
5. Evidence of Insurance - a certified copy of the policy or a properly executed Accord 27 naming Condor as mortgagee/loss payee;
6. Tax Receipts - or other evidence of 1994 tax payments; and
7. Current Financial Statements - for the borrower and any guarantors

We recognize some of this information may have previously been provided to HUD, however, its prompt submission will facilitate a smooth transition

SECRETARY OF HOUSING
AND URBAN DEVELOPMENT

Washington, D C

May 8  1995

Oakland Lakes. Ltd , a Florida limited
   partnership
Brisben Management, Inc
4750 Ashwood Dr , Suite 404
Cincinnati. OH  45241

Oakland Lakes, Ltd , a Florida limited
   partnership
4700 Ashwood Dr , Suite 404
Cincinnati, OH  45241

Former FHA Project No.  066-94026
Asset No  10026
Project Name:  **LAKES OF CASABLANCA**
County, State:  **Broward. Florida**

To Whom It May Concern:

This is to inform you that effective on May 8, 1995, the referenced mortgage loan has been sold and conveyed by the **SECRETARY OF HOUSING AND URBAN DEVELOPMENT** ("HUD") to **CONDOR ONE, INC., a Delaware corporation** ("Condor"), an affiliate of General Electric Capital Corporation.

Condor has contracted with **GE Capital Realty Group, Inc.**, for asset management and loan servicing for your account  All future payments should be made payable to "Condor One, Inc ," and sent to the following location:

Condor One. Inc.
2000 W  Loop South, Suite 1917
Houston, Texas  77027
Att'n  Ms. Libby Luther
Former FHA Project No.: 066-94026
GECRG Project No.  52-66-94026

All other correspondence should be sent to

Condor One. Inc
c/o GE Capital Realty Group, Inc
Att n  Loan Servicing Department - LAKES OF CASABLANCA
Former FHA Project No  066-94026
GECRG Project No  52-66-94026
Two Bent Tree Tower
16479 Dallas Parkway. Suite 400
Dallas, Texas  75248

If you have any questions regarding this matter, please contact your HUD account representative or Judy
Evitts at GE Capital Realty Group. Inc . at (214) 447-2500

Sincerely,

**SECRETARY OF HOUSING
AND URBAN DEVELOPMENT**

By  _____
     Authorized Agent

   William Richbourg

A PARTNERSHIP OF PROFESSIONAL ASSOC.          1

2500 FIRST UNION FINANCIAL CENTER
200 SOUTH BISCAYNE BOULEVARD • MIAMI, FLORIDA 33131-2336
TELEPHONE  305) 374-7580 • FAX  305) 374-7593
E-MAIL  NFO@BILZIN.COM

ONE EAST BROWARD BOULEVARD • SUITE 700
FORT LAUDERDALE, FLORIDA 33301
TELEPHONE  954) 356-0030 • FAX  954) 356-0406

David H. Trench, Esq.
Direct Dial: (305) 350-2350
E-Mail: Dtrench@Bilzin.com

July 14, 2000

Oakland Lakes, Ltd.
4750 Ashwood Drive
Suite 300
Cincinnati, Ohio 45241
Attention: William O. Brisben

> Re:   That certain Amended and Restated Renewal Mortgage, Assignment of Rents
> and Security Agreement executed by Oakland Lakes, Ltd., a Florida limited
> partnership, for the benefit of Cincinnati Mortgage Corporation, an Ohio
> corporation, as Mortgagee, dated October 5, 1989, and recorded on October 5,
> 1989 at Book 16818, Page 609, in the Official Records Book of Broward County,
> Florida ("Mortgage"), which Mortgage secures that certain Amended and
> Restated Renewal Mortgage Note dated October 5, 1989, made by Oakland
> Lakes, Ltd., a Florida limited partnership, in favor of Cincinnati Mortgage
> Corporation, an Ohio corporation ("Note").

Dear Mr. Brisben:

We are counsel to Condor One, Inc. ("Condor One"). By virtue of an assignment dated May 8, 1995, from the Secretary of Housing and Urban Development ("HUD"), Condor One is the owner and holder of the Note and Mortgage referenced above.

Oakland Lakes, Ltd. has been in default under the Note and Mortgage since a date prior to February 1, 1995, as it acknowledged in that certain Provisional Workout Agreement between it and HUD bearing the effective date of February 1, 1995 ("PWA"). Oakland Lakes, Ltd. has failed to make the payment due on July 1, 2000 and such failure is both a violation of the terms of the PWA as well as an independent event of default under the Note and Mortgage. As a result, all amounts due under the Note and Mortgage have been accelerated and are now due and payable in full.

In addition, Condor One has been orally advised that the insurance required under the Mortgage has been canceled and neither we nor Condor One have received evidence of replacement

Oakland Lakes, Ltd.
July 14, 2000
Page 2


insurance. The failure to maintain the required insurance is a separate and independent event of default under the Mortgage. Condor One hereby declares the Note and Mortgage in default for such failure.

Pursuant to its rights under the Note and Mortgage, and in accordance with Florida Statutes §697.07, Condor One hereby demands that all rents, income and profits from and of the property encumbered by the Mortgage and any leases or subleases thereof, received and collected by or on behalf of Oakland Lakes, Ltd., be paid to Condor One immediately.

We have been advised that there may have been a conveyance of some or all of the ownership interest in Oakland Lakes, Ltd., but neither we nor Condor One have received written evidence confirming or describing such transfer. In abundance of caution, we are delivering copies of this notice to those who we have been advised may be the recipients or the representatives of the recipients of any such transfer. This notice shall apply to all recipients to the extent they have an interest in the referenced matter as if specifically addressed to them.

Sincerely,

David W. Trench

DWT:gmi

cc:   Jason A. Lessinger, Esq. (via mail and facsimile)
      813268 Ontario, Inc.
      Oakland Park (Florida) Limited Partnership
      Sol Roter (via mail and facsimile)

G DMS 72655-13375 0283374 02
4 24 2000