# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 00-6147 CIV-LENARD/TURNOFF

01 MAY 4  PM 3: 56

813268 ONTARIO, INC., as  General
Partner of OAKLAND PARK (FLORIDA)
LIMITED PARTNERSHIP, an Ontario limited
partnership; as limited partner of, and on behalf
of OAKLAND LAKES, LTD., a Florida Limited
Partnership;

    Plaintiff,

vs.

OAKLAND LAKES, LTD., a Florida Limited
Partnership, WILLIAM O. BRISBEN,
W.O. BRISBEN COMPANIES, INC., and
ROBERT E. SCHULER, as General Partners
of OAKLAND LAKES, LTD., THE SECRETARY
OF HOUSING AND URBAN DEVELOPMENT, and
CONDOR ONE, INC., a Delaware Corporation,

    Defendants.
_____/

### Case No. 00-7847-CIV-LENARD/TURNOFF

CONDOR ONE, INC.,
a Delaware corporation,

    Plaintiff,

vs.

OAKLAND LAKES, LTD., a Florida Limited
Partnership, THE FLORIDA HOUSING FINANCE
CORPORATION f/k/a THE FLORIDA HOUSING
FINANCE AGENCY, a Florida not-for-profit
corporation, and WILSON C. ATKINSON, III, as Trustee,

    Defendants.
_____/

## MOTION FOR SUMMARY JUDGMENT, STATEMENT OF UNCONTESTED FACTS AND SUPPORTING MEMORANDUM OF LAW BY CONDOR ONE, INC.

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

Condor One, Inc. ("Condor One"), plaintiff in consolidated (and administratively closed) Case No. 00-7847 Civ-Lenard/Turnoff, by and through its undersigned counsel and pursuant to Fed.R.Civ.P. 56 and S.D. Fla. L.R. 7.5, files this motion for summary judgment on Counts I (foreclosure of mortgage) of the amended complaint. In support thereof, Condor One states that the pleadings, together with affidavits, show that there is no genuine issue as to any material fact and Condor One is entitled to summary judgment as a matter of law.

## PRELIMINARY STATEMENT

This is a mortgage foreclosure action which was originally filed by Plaintiff Condor One in state court and removed to federal court by Defendant Oakland Lakes, Ltd. ("Oakland Lakes"). Oakland Lakes, the owner of a residential apartment complex located in Fort Lauderdale, Florida, is the maker of a note and mortgage now held by Condor One.

## PROCEDURAL BACKGROUND

1. This consolidated action commenced on January 31, 2000, when 813268 Ontario, Inc. ("813268 Ontario") filed a complaint (the "Federal Declaratory Action") as the general partner of Oakland Park (Florida) Limited Partnership, one of the limited partners of Oakland Lakes, seeking declaratory relief against, *inter alia*, Condor One and The Secretary of Housing and Urban Development ("HUD").

2. On August 24, 2000, Condor One filed its complaint in the Circuit Court for the 17th Judicial Circuit, in and for Broward County, Florida, Case No. 00-014108 (18) (the "State Court Foreclosure Proceeding").

3. On December 18, 2000, the State Court Foreclosure Proceeding was noticed for removal pursuant to the Notice of Removal filed by Oakland Lakes in the United States District

2

Court for the Southern District of Florida, Miami Division, Case No. 007847-CIV-Jordan.

4.    On December 22, 2000, the Court entered an order in this action granting Condor One's Motion To Sequester Rents and thereafter entered an agreed order extending its prior order granting the Motion to Sequester Rents.

5.    On January 18, 2001, the removed State Court Foreclosure Proceeding was consolidated with <u>813268 Ontario, Inc. v. Oakland Lakes, Ltd.</u>, Case No. 00-6147 CIV-Lenard/Turnoff, and administratively closed.

6.    Thereafter, Condor One and Oakland Lakes entered into a forbearance and settlement agreement pursuant to which a joint motion to appoint receiver and a joint motion for disbursement of funds held pursuant to rents sequestration order was filed.

7.    On April 10, 2001, Robert Ballard was appointed receiver by order of this Court and directed to collect and preserve the rents, income and profits of the Mortgaged Property.

8.    On April 11, 2001, Condor One filed its amended complaint in this action naming the Florida Housing Finance Corporation and Wilson C. Atkinson, III, as Trustee, as additional defendants.

9.    On May 4, 2001, the Defendant Florida Housing Finance Corporation filed its answer to the amended complaint.

10.    On May 8, 2001, Wilson C. Atkinson, III, as Trustee, executed a release of lien which has been filed in the Public Records of Miami-Dade County, Florida.  A copy of that release is attached as Exhibit "A."

## STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

11.    Oakland Lakes is the owner of the Sailboat Pointe Apartments, f/k/a the Lakes of

3

Casablanca apartment project, located at 2325 N.W. 33rd Street, Fort Lauderdale, Florida ("the Property"). *See* Oakland Lakes' answer to the amended complaint ¶ 10.

12.     The Property is encumbered by a mortgage dated October 5, 1989 (the "Mortgage") which secures repayment of a promissory note of even date (the "Note") in the original principal amount of $22,779,600, each executed by Oakland Lakes in favor of Cincinnati Mortgage Corporation. *See* Oakland Lakes' answer to the amended complaint ¶ 11 and12.

13.     Subsequent to October 5, 1989, Oakland Lakes defaulted on its payment obligations on the Note and Mortgage and thereafter the Note and Mortgage were assigned by Cincinnati Mortgage Corporation to the Government National Mortgage Association and thereafter were assigned to The Secretary of Housing and Urban Development ("HUD").     *See* Oakland Lakes' answer to the amended complaint ¶¶ 13-19.

14.     Effective February 1, 1995, HUD and Oakland Lakes, entered into a Provisional Workout Arrangement ("PWA") under which HUD agreed to forbear from enforcing the terms and provisions of the defaulted Note and Mortgage provided certain conditions were met by Oakland Lakes. *See* Oakland Lakes' answer to the amended complaint ¶ 20-22.

15.     On May 8, 1995, HUD assigned the Note, Mortgage, other loan documents and PWA to Condor One which continues to own and hold such documents. *See* Oakland Lakes' answer to the amended complaint ¶ 23 and 30.

16.     Oakland Lakes defaulted under the terms of the PWA by, among other things, failing to make certain payments when the same became due.  Thereafter, on July 14, 2000, Condor One served Oakland Lakes with a demand letter reciting Oakland Lakes' default and asserting Condor One's rights under the Note and Mortgage and PWA and accelerating all amounts due under the Note and Mortgage and, pursuant to Florida Statutes, § 697.07, demanding all rents, income and profits

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

from and of the Mortgaged Property. *See* Oakland Lakes' answer to the amended complaint ¶ 26, 27 and 32.

17.    As of May 17, 2001, the outstanding principal balance of the Note is $22,773,531.78, and accrued unpaid interest and charges on the Note are $2,278,034.03 for a total of $25,051,565.81. Interest on the principal balance of the Note continues to accrue in the per diem amount of $5,218.93.[1]  *See* Affidavit of Doug Goldrick.

## MEMORANDUM OF LAW AND CITATION OF AUTHORITY

Condor One submits the following memorandum of law and citation of authorities in support of its motion for summary judgment.

### I.  This Matter is Ripe for Summary Judgment

No dispute as to any material fact exists, and judgment should be entered in favor of Condor One as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548 (1986).

### II.  Summary Judgment Should Be Entered in Favor of Condor One on the Foreclosure of the Mortgage

Under the terms of a note and mortgage, the obligation of a mortgagor to pay and the right of a mortgagee to foreclose are absolute and are not contingent upon the personal circumstances affecting the mortgagor's ability to pay, *i.e.* the mortgagor's default in payments gives rise to the mortgagee's claim of foreclosure. *See* First Wisconsin Nat'l Bank of Milwaukee v. Roose, 348 So. 2d 610, 611 (Fla. 4th DCA 1977) (holding that a mortgagor, after having defaulted in its mortgage payment obligations, cannot seek to direct the mortgagee's foreclosure on collateral).

---

[1]  Condor One holds the aggregate sum of $225,000.00 in tax escrow.

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

Under Florida law, mortgages are assignable, and the assignee stands in the shoes of the assignor receiving those benefits and rights as the assignor would receive. Fla. Stat. § 701.01; Williams, Solomon, Kanner & Damiam v. American Bankers Life Assurance Company of Florida, 379 So. 2d. 119, 121 (Fla. 3d DCA 1979) (holding that "[a] mortgage that is assigned as collateral security may be foreclosed by the assignee"); United of Florida, Inc. v. Illini Fed. S&L Ass'n, 341 So. 2d 793, 794 (Fla. 2d DCA 1977). Moreover, the actual holder of negotiable paper has the right to enforce the terms thereof. *See* Florida Statutes §§ 673.1041 (defining promissory notes as negotiable instruments), 673.2031 (providing that the transfer of a negotiable instrument "vests in the transferee any right of the transferor to enforce the instrument") and 673.3011(1) (providing that a holder may enforce the instrument). *See also* Florida Statutes § 68.06 (providing that "[t]he assignment or endorsement of any instrument vests the assignee or endorsee with the same rights, powers, and capacities as were possessed by the assignor or endorser").

The undisputed facts of this case establish the following: (i) Condor One owns the Note and Mortgage; (ii) Oakland Lakes has been in default under the terms of the Mortgage and Note since well before February 1, 1995; (iii) Oakland Lakes has been in default of the terms of the PWA from and after July 1, 2000; and (iv) there is no dispute as to the amounts due under the Note. As such, Condor One owns and holds the Note and Mortgage, which Oakland Lakes admits are in default, and has the absolute right to foreclose the Mortgage based upon amounts due under the Note.

### III. Any Interest of FHFA is Extinguished by the Foreclosure of the Mortgage and is Subordinate to the Lien of the Mortgage

Defendant Florida Housing Finance Agency ("FHFA") claims an interest regarding the Property by virtue of that certain Land Use Restriction Agreement ("Restriction Agreement") made as of October 1, 1989 among FHFA, Oakland Lakes and Cincinnati Mortgage Corporation and

6

recorded in Official Records Book 6821, Page 479 of the Public Records of Broward County, Florida. A copy of the Restriction Agreement is attached as Exhibit "B."

In its answer to the amended complaint, FHFA asserts its interest is not inferior to the lien of the Mortgage. *See* FHFA's answer to the amended complaint ¶ 15. A review of the terms of the Land Use Restriction Agreement, however, reveals that the restrictions contained therein automatically terminate and are extinguished by this foreclosure.

The Restriction Agreement is a contract between FHFA, Oakland Lakes (as borrower and developer) and Cincinnati Mortgage Corporation (as the lender) and provides that, in exchange for certain revenue bond financing, the developer (Oakland Lakes) shall operate the Property under certain specified restrictions. Those restrictions include the requirement that the developer make available a specified percentage of the residential apartment units in the Property for low income housing as more specifically set forth in the Restriction Agreement. Upon information and belief, Oakland Lakes (as developer) complied with these requirements from 1989 through 2001.

The Restriction Agreement provides that it shall remain in effect for a minimum of fifteen years after certain occupancy rates are achieved. Since the project was built in 1989, the earliest date at which the term of the Restriction Agreement would expire is 2004. However, Section 9 of the Restriction Agreement further provides that, notwithstanding the term of the Restriction Agreement, the restrictions regarding the use and operation of the project shall "automatically terminate in the event of involuntary compliance caused by . . . foreclosure . . . ." *See* Section 9(b) of the Restriction Agreement.

The foreclosure of the Mortgage sought by Condor One in this proceeding will cause the public sale of the Property for the purpose of raising the funds necessary to pay the debt owed to

7

Condor One. This is precisely the event described in Section 9(b) of the Restriction Agreement. Accordingly, by the provisions of the Restriction Agreement itself, the foreclosure of the Mortgage will result in involuntary compliance by the developer (Oakland Lakes) and the restrictions contained in the Restriction Agreement thereupon automatically terminate. As a result, the foreclosure of the Mortgage will extinguish the obligations set forth under the Restriction Agreement. The interest which FHFA has with respect to the Property, therefore, is subordinate to the lien of the Mortgage and will cease upon the foreclosure of the Mortgage.

## IV. Conclusion

Condor One owns and holds the defaulted Mortgage and Note and is entitled to foreclosure of the Mortgage based upon the defaulted obligation due under the Note. Any interest FHFA has with respect to the Property automatically terminates upon foreclosure of the Mortgage and, therefore, is subordinate to the lien of the Mortgage. Accordingly, Condor One is entitled to summary judgment of foreclosure of the Mortgage in its favor.

Respectfully submitted,

**BILZIN SUMBERG DUNN BAENA**
**PRICE & AXELROD LLP**
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By: _____
David W. Trench
Florida Bar No. 202975

8

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was furnished via U.S. Mail on this 24th day of May, 2001 to: **Richard T. Woulfe, Esq.,** Co-Counsel for Plaintiff, Bunnell, Woulfe, Kirschbaum, Keller, Cohen & McIntyre, P.A., P.O. Drawer 030340, 888 E. Las Olas Boulevard, Suite 400, Ft. Lauderdale, Florida 33303-0340; **Robert E. Messick, Esq.,** Co-Counsel for Plaintiff, Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A., 2033 Main Street, Suite 600, Sarasota, Florida 34237; **Elizabeth G. Arthur, Esq.,** Counsel for Florida Housing Finance Corporation, 227 North Bronough Street, Suite 5000, Tallahassee, Florida 32301; and **Wilson C. Atkinson, III, Trustee,** Atkinson Diner Stone Mankuta & Ploucha, P.A., 1946 Tyler, Hollywood, Florida 33020.

David W. Trench

BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP
2500 FIRST UNION FINANCIAL CENTER • MIAMI, FLORIDA 33131-2336

EXECUTION COPY

## LAND USE RESTRICTION AGREEMENT

**89401317**

**THIS LAND USE RESTRICTION AGREEMENT** (the "Agreement") is made and entered into as of the 1st day of October, 1989, among the FLORIDA HOUSING FINANCE AGENCY, a state agency and instrumentality and a public body corporate and politic existing under the laws of the State of Florida (the "Agency"), OAKLAND LAKES, LTD., a Florida limited partnership (the "Developer"), and CITIZENS AND SOUTHERN TRUST COMPANY (FLORIDA), NATIONAL ASSOCIATION, a national banking association (the "Trustee") as trustee under that certain Trust Indenture (the "Indenture") described below.

### PREAMBLE

**WHEREAS**, the Agency has been created and organized pursuant to and in accordance with the provisions of the Florida Housing Finance Agency Act, *Florida Statutes*, §§ 420.501-.516, as amended (the "Act"), for the purpose, among others, of financing multi-family residential housing projects that will provide decent, safe and sanitary housing for individuals and families of low, moderate or middle income in the State of Florida; and

**WHEREAS**, the Agency has agreed, under certain conditions, to provide financing from the proceeds of special purpose revenue bonds issued under the Act by the Division of Bond Finance of the State of Florida Department of General Services (the "Division"), on behalf of and in the name of the Agency to the Developer (the "Loan") for the purpose of providing construction and permanent financing for a multi-family residential housing project (the "Project") located within Broward County, Florida (the "County"), on land the legal description of which is set forth on Exhibit "A" hereto, to be occupied partially (at least twenty percent (20%) of the units) by individuals of lower income within the meaning of Section 142(d) of the Internal Revenue Code of 1986, as amended (the "Code"), all for the public purpose of assisting persons of low, moderate or middle income within the State of Florida (the "State") to afford the costs of decent, safe and sanitary housing; and

**WHEREAS**, the Agency has authorized the Division, acting on behalf of the Agency, to issue and sell the Agency's Housing Revenue Bonds, 1989 Series C (Oakland Park Apartments Project) (the "Bonds"), in the aggregate principal amount of $24,000,000,

**THIS INSTRUMENT PREPARED BY
AND TO BE RETURNED TO:**
David L. Lapides, Esquire
ANNIS, MITCHELL, COCKEY,
EDWARDS & ROEHN, P.A.
Post Office Box 3433
Tampa, Florida 33601

BE RETURNED TO:
ATKINSON, JENNE, DINER,
STONE & COHEN, P.A.
P O. DRAWER 2088
HOLLYWOOD, FL 33022

WILL CALL

ATTACHMENT / EXHIBIT

pursuant to a Trust Indenture, dated as of October 1, 1989, by and between the Agency and the Trustee (the "Indenture"), to obtain funds to finance the Project pursuant to a Financing Agreement, dated as of October 1, 1989 (the "Financing Agreement"), by and among the Agency, the Trustee, CINCINNATI MORTGAGE CORPORATION, an Ohio corporation (the "FHA Co-Insurer"), THE SUMITOMO BANK, LIMITED, a Japanese banking corporation acting through its Chicago, Illinois Branch (the "L/C Issuer"), and the Developer, all under and in accordance with the Constitution and laws of the State of Florida; and

WHEREAS, the Developer has executed in favor of the Agency a Mortgage and Security Agreement, dated as of October 1, 1989, (the "Mortgage") and recorded under Clerk's File No. _____, in the public records of Broward County, Florida (collectively, the "Security Documents"), and the Agency has assigned its rights as mortgagee and/or secured party under the Security Documents to the Trustee pursuant to an Assignment of Mortgage and Security Agreement, dated as of October 1, 1989 and recorded under Clerk's File No. _____, and the Trustee has further assigned its rights as mortgagee and/or secured party under the Mortgage to the FHA Co-Insurer pursuant to a separate Assignment of Mortgage and Security Agreement, dated as of October 1, 1989 and recorded under Clerk's File No. _____, all in the public records of Broward County, Florida; and

WHEREAS, the Developer and the FHA Co-Insurer, as assignee of the Mortgage, has executed an Amended and Restated Mortgage, Assignment of Rents and Security Agreement, dated as of October 1, 1989 and recorded under Clerk's File No. _____ in the public records of Broward County, Florida; and

WHEREAS, the Developer and the FHA Co-Insurer have executed a Regulatory Agreement, dated as of October 1, 1989, and recorded under Clerk's File No. _____ in the public records of Broward County, Florida (the "HUD Regulatory Agreement"), setting forth certain covenants and agreements of the Developer as required by the UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT ("HUD") Regulations; and

WHEREAS, the L/C Issuer has issued its Transferable Irrevocable Direct Pay Letter of Credit to the Trustee to secure payment of principal of and interest on the Bonds; and

WHEREAS, the Indenture and the Financing Agreement require, as a condition of making the Loan, the execution and delivery of this Agreement; and

WHEREAS, in order to satisfy such requirement, the Agency, the Trustee and the Developer have determined to enter into this Agreement to set forth certain terms and conditions relating to the acquisition, construction and operation of the Project;

- 2 -

**NOW, THEREFORE,** in consideration of the mutual covenants undertaking set forth in the Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agency, the Trustee and the Developer do hereby contract and agree as follows:

## AGREEMENT

Section 1. **Definitions and Interpretation.**

(a) Unless otherwise expressly provided in this Agreement, or unless the context clearly requires otherwise, the following terms shall have the respective meanings set forth below for all purposes of this Agreement:

"**Act**" shall mean the Florida Housing Finance Agency Act, **Florida Statutes,** §§ 420.501-.516, as amended.

"**Affiliated Party**" of a person shall mean a person such that (i) the relationship between such persons would result in a disallowance of losses under Section 267 or Section 707(b) of the Code; or (ii) such persons are members of the same controlled group of corporations (as defined in Section 1563(a) of the Code, except that "more than 50%" shall be substituted for "at least 80%" each place it appears therein); or (iii) a partnership and each of its partners (and their spouses and minor children); or (iv) and "S" corporation and each of its shareholders (and their spouses and minor children).

"**Agency**" shall mean the FLORIDA HOUSING FINANCE AGENCY, a state agency and instrumentality and a public body corporate and politic existing under the laws of the State of Florida, and any agency or other entity of the State of Florida that shall hereafter succeed to the powers, duties and functions of the Agency.

"**Bond Counsel**" shall mean the firm of bond attorneys whose opinion is set forth on the Bonds or their successors appointed by the/Agency. In the event that the Agency has not appointed such successors, then the term "Bond Counsel" shall mean a nationally recognized attorney or law firm experienced in the financing of facilities for non-exempt persons through the issuance of revenue bonds whose interest is excluded from gross income from federal income tax purposes under Section 103 of the Code selected by the Developer and approved by the Agency, such approval not to be unreasonably withheld.

"**Bonds**" shall mean those certain $24,000,000 Florida Housing Finance Agency Housing Revenue Bonds, 1989 Series C (Oakland Park Apartments Project) issued by the Division on behalf of and in the name of the Agency pursuant to the terms of the Indenture.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended or any successor statute as it applies to the Bonds, and any applicable final, temporary or proposed Treasury Regulations and Revenue Rulings thereunder. References in this Agreement to any specific provisions of the Code shall be deemed to include any successor provision of such provision of the Code that may apply to the Bonds.

"**Compliance Certificate**" shall mean a Compliance Certificate, substantially in the form of Exhibit "C" to the Financing Agreement, as such form may be revised by the Agency from time to time upon the advice of Bond Counsel.

"**Completion Certificate**" shall mean a certificate, signed by an authorized representative of the Developer, substantially in the form of Exhibit "E" to the Financing Agreement.

"**Completion Date**" shall mean the date of substantial completion of the Project set forth in the Completion Certificate submitted in accordance with Section 9.2 of the Financing Agreement.

"**County**" shall mean Broward County, Florida.

"**Developer**" shall mean OAKLAND LAKES, LTD., a Florida limited partnership, and its successors and assigns as permitted under Section 8 of this Agreement.

"**FHA Co-Insurer**" shall mean CINCINNATI MORTGAGE CORPORATION, an Ohio corporation, and its successors and assigns.

"**Financing Agreement**" shall mean the Financing Agreement, dated as of October 1, 1989, among the Agency, the Trustee, the FHA Co-Insurer, the L/C Issuer and the Developer, as amended and supplemented from time to time.

"**GNMA**" shall mean the Government National Mortgage Association, a body corporate organized and existing under the laws of the United States of America within HUD or any successor federal agency.

"**GNMA Securities**" shall mean, respectively, the fully-modified pass-through Construction Loan Certificates to be issued by the FHA Co-Insurer to the Trustee in connection with individual construction loan advances for the Project, and the fully-modified, pass-through Project Loan Certificate to be issued by the FHA Co-Insurer to the Trustee in exchange for the CLCs after Final Endorsement in accordance with the National Housing Act.

"**HUD**" shall mean the United States Department of Housing and Urban Development, or any successor federal agency.

— 4 —

"**HUD Regulations**" shall mean the rules and regulations applicable to the Project promulgated from time to time by HUD pursuant to the National Housing Act.

"**HUD Regulatory Agreement**" shall mean the Regulatory Agreement, dated as of October 1, 1989, between the Developer and the FHA Co-Insurer, and recorded in public records of Broward County, Florida, as amended and supplemented from time to time.

"**Income Certification**" shall mean an income certification, substantially in the form included as Exhibit "B" to the Financing Agreement, as such form may be revised by the Agency from time to time upon the advice of Bond Counsel.

"**Indenture**" shall mean the Trust Indenture, dated as of October 1, 1989, between the Agency and the Trustee, pursuant to which the Bonds are issued and secured, as amended and supplemented from time to time.

"**Land Use Restriction Agreement**" or "**Agreement**" shall mean this Land Use Restriction Agreement, as amended or supplemented from time to time.

"**L/C Issuer**" shall mean THE SUMITOMO BANK, LIMITED, a banking corporation organized under the laws of Japan, acting through its Chicago, Illinois Branch, and any successors or assigns, including any provider of Alternate Security.

"**Loan**" shall mean the Loan from the Agency to the Developer with respect to the Project, to be made in accordance with the Financing Agreement for the purpose of financing the acquisition, construction and development and, thereafter, the ownership of the Project.

"**Loan Documents**" shall mean this Agreement, the Financing Agreement, the Note, the Mortgage, the other Security Documents and the Servicing Agreement, together with all other documents, instruments and agreements that evidence or secure the Loan, all as amended or supplemented from time to time.

"**Lower-Income Tenants**" shall mean individuals of low or moderate income, as adjusted for family size, within the meaning of Section 142(d) of the Code and applicable regulations thereunder, as the same may be amended from time to time (but only to the extent such regulations apply to the Project). In no event, however, shall occupants of a unit be considered to be of low or moderate income if all the occupants are students (as defined in Section 151(c)(4) of the Code), no one of whom is entitled to file a joint federal income tax return. The method of determining low or moderate income in effect as of the date of issuance of the Bonds shall be determinative, even if such method is subsequently changed.

- 5 -

"**Mortgage**" shall mean the Mortgage and Security Agreement, dated as of October 1, 1989, of the Developer granting the Agency and its successors and assigns, a first priority mortgage lien on and security interest in the land, buildings and equipment constituting the Project and in all other property described therein, and initially securing the payment of all obligations of the Developer under the Financing Agreement and the Note, all as amended or supplemented from time to time.

"**National Housing Act**" shall mean the National Housing Act of 1934, as amended and codified at 12 U.S.C. §§ 1701 et. seq.

"**Note**" shall mean the Developer's Promissory Note, dated as of October ___, 1989, payable to the order of the Agency in the amount of $24,000,000.00, and evidencing the Loan.

"**Project**" shall mean the land, described in Exhibit "A" to this Agreement and the buildings, structures, facilities and equipment now or hereafter comprising a multi-family residential rental project of approximately 376 units located within Broward County, Florida, that will be acquired, constructed, developed, operated and maintained in compliance with this Agreement, the Financing Agreement and the Loan Servicing Agreement.

"**Qualified Project Period**" shall mean that period, beginning on the first day on which at least ten percent (10%) of the residential units in the Project are first occupied, and ending on the later of (i) the date which is fifteen (15) years after the date on which at least fifty percent (50%) of the residential units in the Project are first occupied; or, (ii) the first day on which no tax-exempt private activity bond (including but not limited to the Bonds) issued with respect to the Project is outstanding; or (iii) the date on which any assistance provided with respect to the Project under Section 8 of the United States Housing Act of 1937, as amended, terminates.

"**Rental Housing**" shall mean dwelling units made available for rental, and not for ownership, by Lower-Income Tenants and members of the general public, each of which units shall contain complete living facilities that are to be used other than on a transient basis, together with facilities that are functionally related or subordinate to the living facilities. The units shall at all times be constructed and maintained in substantial accordance with applicable building code standards of the County.

"**Servicer**" shall mean FIRST HOUSING DEVELOPMENT CORPORATION OF FLORIDA, a Florida corporation, and its successors and assigns.

- 6 -

"**Servicing Agreement**" shall mean the Loan Servicing Agreement, dated as of October 1, 1989, among the Agency, the Servicer and the Developer.

"**State**" shall mean the State of Florida.

"**Term of This Agreement**" shall mean the term pursuant to Section 9 of this Agreement.

"**Trustee**" shall mean CITIZENS AND SOUTHERN TRUST COMPANY (FLORIDA), NATIONAL ASSOCIATION, a national banking association, and its successors and assigns or any successor Trustee appointed by the Agency pursuant to the Indenture.

(b)  The terms and phrases used in the Recitals of this Agreement have been included for convenience of reference only, and the meaning, construction and interpretation of all such terms and phrases shall be determined by reference to this Section 1.  The titles and headings in this Agreement have been inserted for convenience of reference only and shall not be deemed to modify or restrict any of the provisions of this Agreement.

(c)  All other capitalized terms used in this Agreement that are not defined in this Section 1 shall have the meanings ascribed to them in the Indenture.

(d)  Unless the context clearly requires otherwise, words of the masculine gender shall be construed as including the feminine and neuter genders, and vice versa, and words of the singular number shall be construed to include the plural number, and vice versa.  This Agreement and all of the terms and provisions hereof shall be construed to effectuate the purposes set forth in this Agreement and to sustain the validity hereof.

Section 2.  **Residential Rental Project**.  The Agency and the Developer hereby acknowledge and declare their understanding and intent that the Project is to be owned, managed and operated as a "qualified residential rental project," as such phrase as used in Section 142(d) of the Code.  To that end, the Developer hereby represents, covenants and agrees as follows:

(a)  That the Project is being acquired and constructed for the purpose of providing multi-family Rental Housing, and that the Project shall be owned, managed and operated as multi-family Rental Housing, all in accordance with this Agreement, Section 142(d) of the Code and Treasury Regulations thereunder as the same may be amended from time to time; and

- 7 -



(b)  That all of the residential units in the Project shall be similarly constructed and each such residential units shall contain complete facilities for living, sleeping, eating, cooking and sanitation for at least a single individual or a family; and

(c)  That, during the Term of this Agreement, (i) none of the residential units in the Project shall at any time be utilized on a transient basis; (ii) none of the residential units in the Project shall ever be leased or rented for an initial period of less than one hundred twenty (120) days; and (iii) neither the Project nor any portion thereof shall ever be used as a hotel, motel, dormitory, fraternity house, sorority house, rooming house, hospital, sanitarium, nursing home, rest home, trailer court or trailer park, or health club or recreational facility (other than recreational facilities that are available only to tenants and their guests without charge for their use and that are customarily found in Rental Housing projects); and

(d)  That, during the Term of this Agreement, (i) the residential units in the Project shall be leased and rented, or made available for rental on a continuous basis, to members of the general public; and (ii) the Developer shall not give preference in renting residential units in the Project to any particular class or group of persons, other than Lower-Income Tenants as provided in this Agreement; provided, however, that an insubstantial number of residential units in the Project, not to exceed five (5) units, may be occupied by maintenance, security or managerial employees of the Developer or its property manager, which employees must be reasonably necessary for operation of the Project; and

(e)  That the Project shall consist of one or more discrete edifices of other man-made construction, each consisting of an independent foundation, outer walls and roof, and containing four (4) or more residential units and functionally-related facilities, all of which shall be (i) owned by the same person for federal tax purposes; (ii) located on a common tract of land or two or more contiguous tracts of land; provided, however, that separate tracts of land that are separated only by a road, street, stream or similar property shall for purposes hereof be deemed to be contiguous; and (iii) financed by the Loan or otherwise pursuant to a common plan of financing, and which shall consist entirely of:

(1)  Dwelling units which are similar in quality and type of construction and amenities; and

(2)  Facilities functionally related and subordinate in purpose and size to the property described in Section 2(e)(1) above, e.g., parking areas, laundries, swimming pools, tennis courts

- 8 -



and other recreational facilities (none of which may be unavailable to any person because such person is a Lower-Income Tenant) and other facilities that are reasonably required for the Project, e.g., heating and cooling equipment, trash disposal equipment, or residential units for resident managers and maintenance personnel; and

(f) That, during the Term of this Agreement, the Project shall not include a unit in a building where all residential units in such building are not also included in the Project; and

(g) That, during the Term of this Agreement, the Developer shall not convert the Project to condominium ownership; and

(h) That, during the Term of this Agreement, no part of the Project shall at any time be owned or used by a cooperative housing corporation; and

(i) That, during the Term of this Agreement, no unit in the Project shall be occupied by the Developer or an individual or family related to the Developer at any time unless such person resides in a unit in a building or structure which contains at least five (5) residential units and is a resident manager or other necessary employee (e.g., maintenance and security personnel); but, in no event shall the number of residential units occupied by the Developer or an individual or family related to the Developer exceed five (5) units; and

(j) That any non-revenue residential units for Developer use, including but not limited to, models in excess of one (1) unit, shall be financed at the Developer's expense from moneys other than Bond proceeds; and

(k) That, within thirty (30) days after the first day on which at least ten percent (10%) of the residential units in the Project are first occupied, the Developer shall prepare and submit to the Agency, the Trustee and the Servicer a certificate in recordable form identifying such date to evidence the commencement of the Qualified Project Period; and

(l) That, within thirty (30) days after the first day on which at least fifty percent (50%) of the residential units in the Project are first occupied, the Developer shall prepare and submit to the Agency, the Trustee and the Servicer a certificate in recordable form identifying such date for purposes of the calculation of the termination of the Qualified Project Period; and



- 9 -

(m) That substantially all (at least ninety-five percent (95%)) of the proceeds of the Bonds shall be used to finance the construction or acquisition of land, buildings and equipment that qualifies as residential Rental Housing or facilities related and/or subordinate thereto;

(n) That no more than twenty-five percent (25%) of the proceeds of the Bonds shall be used for the acquisition of land (including direct or indirect interests in land); and

(o) That the Developer shall not discriminate on the basis of age, race, creed, religion, color, sex, marital status, familial status, handicap or national origin in the lease, use or occupancy of the Project or in connection with the employment or application for employment of persons for the operation and management of the Project; and

(p) That the Developer shall not refuse to lease residential units or deny occupancy in the Project to persons whose family includes minor dependents who will occupy such unit, unless such refusal is based upon factors not related to the presence of such minors in the family; provided, however, the Developer may limit to two (2) individuals the number of occupants of a studio or one-bedroom apartment unit and limit to four (4) individuals the number of occupants of a two-bedroom apartment unit; and

(q) That the Agency reserves the right to approve all advertisements with respect to the Project for compliance and consistency with current Agency policies and that the Developer will withdraw from circulation advertisements determined by the Agency to violate or be inconsistent with its policies; and

(r) That the Developer shall submit an annual report to the Secretary of the Treasury as required by Section 142(d)(7) of the Code and deliver a copy thereof to the Agency and to the Trustee; and

(s) That the Developer shall comply with a minimum of two (2) of the nine (9) public policy criteria of the Agency set forth below:

(1) At least ten percent (10%) of the units in the Project shall be three (3) bedroom units;

(2) At least two percent (2%) of the units in the Project shall be four (4) bedroom units;

(3) At least twenty percent (20%) of each unit size in excess of one (1) bedroom and studio units in the Project shall be occupied or reserved for occupancy by persons or families having incomes at or below eighty percent (80%) of the median

- 10 -

income.  No more than twenty percent (20%) of all
one (1) bedroom and studio units in the Project may
be used to satisfy the federal requirement that at
least twenty percent (20%) of all units be rented
to persons or families having incomes at or below
eighty percent (80%) of the median income;

(4)  The units in the Project shall have
substantially lower rent rates than comparably-
sized new units in the area;

(5)  At least thirty percent (30%) of the
units in the Project shall be occupied or reserved
for occupancy by persons or families having incomes
at or below eighty percent (80%) of the median
income;

(6)  At least twenty percent (20%) of the
units in the Project shall be allocated for
priority in renting to applicants for occupancy who
currently reside in substandard housing.   The
Agency shall assist in implementing this priority;

(7)  At least twenty percent (20%) of the
units in the Project shall be allocated for
priority in renting to applicants for occupancy who
have been certified to receive rent assistance
payments by a local housing assistance program.
The Agency shall assist in implementing this
priority;

(8)  At least ten percent (10%) of the units
in the Project shall be occupied or reserved for
occupancy by persons or families having incomes at
or below fifty percent (50%) of the median income;
and

(9)  The proposed Project shall be serviced by
existing infrastructure or will provide needed
rental housing units for persons or families
residing in or near a central business district who
qualify as Lower-Income Tenants.

The Developer has selected the public policy criteria
set forth in Section 2(s)(8) and (9) in satisfaction of this
covenant.   The Developer shall continue to satisfy the foregoing
public policy criteria during the Term of this Agreement unless
the Agency, in its sole and absolute discretion agrees, in
writing, otherwise

Unless the provisions of this Section 2 are amended as
permitted under Section 14(b) hereof, the provisions of this
Section shall remain in effect during the Term of this Agreement;

- 11 -

provided, however, that the Developer may be discharged from its
obligations under this Section 2 and Section 3 hereof to the
extent that the same are assumed by any successor in interest to
the Developer pursuant to Section 8 hereof.

        **Section 3. Lower-Income Tenants.**  In order to satisfy the
requirements of the Act and the Code, the Developer hereby
represents, covenants and agrees that, during the Qualified
Project Period:

        (a)  (i) On the first day of the Qualified Project
Period, and thereafter during the initial rent-up of the Project,
at least twenty percent (20%) of the occupied and completed
residential units in the Project shall be occupied by Lower-
Income Tenants, prior to the satisfaction of which requirement,
no additional units shall be rented or leased except to an
individual or family that is also a Lower-Income Tenant, and (ii)
after the initial rental occupancy of such residential units by
Lower-Income Tenants, at least twenty percent (20%) of the
completed residential units in the Project at all times shall be
rented to and occupied by (or held available for rental by, if
previously rented to and occupied by a Lower-Income Tenant)
Lower-Income Tenants as required by Section 142(d) of the Code.
For purposes of complying with the foregoing requirements, if the
income of an individual or family resident in a unit did not
exceed the applicable income limit (adjusted for family size) at
the commencement of such resident's occupancy or as of a prior
annual income determination, the income of such individual or
family shall be treated as continuing to not exceed the
applicable income limit.  The preceding sentence shall cease to
apply to any individual or family whose income, as of the most
recent determination, exceeds one hundred forty percent (140%) of
the applicable income limit, adjusted for family size, if after
such determination, but before the next income determination, any
residential unit of comparable or smaller size in the Project is
occupied by a new individual or family resident whose income
exceeds the applicable income limit, adjusted for family size.

        (b)  The Developer shall obtain from each Lower-Income
Tenant and maintain on file a sworn and notarized Income
Certification immediately prior to the initial occupancy of a
residential unit in the Project by such Lower-Income Tenants.
The Developer shall also obtain, at least annually thereafter,
and maintain on file a sworn and notarized Income Certification
from each Lower-Income Tenant (and from each tenant whose
residential unit is deemed to be occupied by a Lower-Income
Tenant under Section 3(a) above) to determine whether the then
current income of such Lower-Income Tenants (or such tenants
whose residential units are deemed to be occupied by Lower-Income
Tenants) residing in the Project exceed the applicable income
limits, adjusted for family size (and the Developer shall require
each Lower-Income Tenant (or tenant whose residential unit is
deemed to be occupied by a Lower-Income Tenant) to notify the

- 12 -

Developer of any material change of information in his, her or their, as the case may be, most recent Income Certification). The Income Certification shall be in the form and contain such information as may be required by the Code and the policies of the Agency (initially in the form attached as Exhibit "B" to the Financing Agreement), as the same may be from time to time amended by the Agency on the advice of Bond Counsel, or in such other form and manner as may be required by applicable rules, rulings, procedures, official statements, regulations or policies now or hereafter promulgated or proposed by the Department of the Treasury or the Internal Revenue Service with respect to private activity bonds issued under the Code.  Photocopies of each such Income Certification shall be submitted to the Agency, the Trustee and the Servicer (i) on or before the twenty-fifth (25th) day of the calendar month following the calendar month during which the first residential unit in the Project is first occupied, (ii) on or before the twenty-fifth (25th) day of each calendar month thereafter, and (iii) as requested by the Agency or the Servicer, which may be as often as may be necessary, in the opinion of the Agency or Bond Counsel, to comply with the provisions of the Code.

(c)  The Developer shall maintain complete and accurate records pertaining to the residential units occupied or to be occupied by Lower-Income Tenants for at least six (6) years following the indicated date of each such record and shall permit any duly authorized representative of the Agency, the Trustee, the Servicer, the FHA Co-Insurer, the L/C Issuer, the Department of the Treasury or the Internal Revenue Service to inspect the books and records of the Developer pertaining to the Income Certifications and income substantiation materials of Lower-Income Tenants residing in the Project upon reasonable notice and at reasonable times.

(d)  The Developer shall immediately notify the Agency, the Trustee and the Servicer, the FHA Co-Insurer and the L/C Issuer if at any time the residential units in the Project are not occupied or available for occupancy as provided in Section 3(a) above, and the Developer shall prepare and submit to the Agency, the Trustee and the Servicer, not later than the twenty-fifth (25th) day of each month following the date of initial occupancy of any units in the Project, a Compliance Certificate executed by the Developer stating, among other matters, the number of residential units of the Project which, as of the first day of such month, in each case, were occupied by Lower-Income Tenants or were deemed to be occupied by Lower-Income Tenants, as provided in Section 3(a) above.

The provisions of this Section 3 relating to Lower-Income Tenants shall terminate upon the expiration of the Qualified Project Period.  Developer expressly acknowledges that the

- 13 -

foregoing restrictions may survive the repayment of the Loan and redemption of the Bonds prior to the expiration of the Qualified Project Period.

Section 4. **Indemnification.** The Developer hereby covenants and agrees to indemnify and hold the State, the Division, the Agency, the Trustee and the Servicer, and their respective members, directors, officers, employees, attorneys, agents and representatives (any or all of the foregoing collectively referred to as the "Indemnified Persons") harmless from and against any and all losses, damages, judgments (including specifically punitive damage awards), arbitration awards, amounts paid in settlements, costs and expenses and liabilities of whatsoever nature or kind (including, but not limited to, reasonable attorneys' fees whether or not suit is brought and whether incurred in connection with settlement negotiations, investigations of claims, at trial, on appeal, in bankruptcy or other creditors' proceedings or otherwise, expert witness fees and expenses and court costs) directly or indirectly resulting from, arising out of or in connection with any act or omission to act by the Developer or any of its partners, directors, officers, employees, attorneys or agents or other persons under direct contract to the Developer or acting on its behalf, resulting from, arising out of or relating to: (i) the issuance, offer for sale, sale or distribution and delivery of the Bonds, (ii) the interpretation or enforcement of any provision of this Land Use Restriction Agreement, the Indenture or the Financing Agreement, and any other documents, instruments and agreements executed in connection therewith, (iii) any written statements or representations made or given by the Developer or by any partner, director, officer, employee, attorney or agent of the Developer or person under direct contract to the Developer or acting on the Developer's behalf to any Indemnified Persons relating to statements or representations or financial information or (iv) the design, construction, installation, operation, use, occupancy, maintenance or ownership of the Project.

If any claim for indemnification by one or more Indemnified Persons arises out of a claim for monetary damages by a person other than the Indemnified Persons, the Developer shall undertake to conduct any proceedings or negotiations in connection therewith which are necessary to defend the Indemnified Persons and shall take all such steps or proceedings as the Developer in good faith deems necessary to settle or defeat any such claims, and to employ counsel to contest any such claims; provided, however, that the Developer shall reasonably consider the advice of the Indemnified Persons as to the defense of such claims, and the Indemnified Persons shall have the right to participate, at their own expense, in such defense, but control of such litigation and settlement shall remain with the Developer. The Indemnified Persons shall provide all reasonable cooperation in connection with any such defense by the Developer. Counsel

- 14 -

(except as provided above) and auditor fees, filing fees and court fees of all proceedings, contests or lawsuits with respect to any such claim or asserted liability shall be borne by the Developer. If any such claim is made hereunder and the Developer does not undertake the defense thereof, the Indemnified Persons shall be entitled to control such litigation and settlement and shall be entitled to indemnity with respect thereto all costs incurred in connection therewith pursuant to the terms of this Section 4. To the extent that the Developer undertakes the defense of such claim, the Indemnified Persons shall be entitled to indemnity hereunder only to the extent that such defense is unsuccessful as determined by a final judgment of a court of competent jurisdiction, or by written acknowledgment of the parties. The Developer reserves the right to appeal any judgment rendered. __The obligations of the Developer under this Section 4 are subject to recourse.__

Section 5. __Consideration__. The Agency has authorized and the Division has issued the Bonds to obtain moneys for the purpose, among others, of providing funds to the Developer to acquire, construct and operate the Project as Rental Housing through the purchase of GNMA Securities from the FHA Co-Insurer. In consideration of the issuance of the Bonds by the Division, the Agency and the Developer have entered into this Agreement.

Section 6. __Reliance__. The Agency and the Developer hereby recognize and agree that the representations and covenants set forth herein may be relied upon by all persons interested in the legality and validity of the Bonds and in the exclusion from gross income for federal income tax purposes of the interest on the Bonds. In performing their duties and obligations hereunder, the Agency and the Trustee may rely upon statements and certificates of the Developer and Lower-Income Tenants believed in good faith to be genuine and to have been executed by the proper person or persons, and upon audits of the books and records of the Developer pertaining to occupancy of the Project. In addition, the Agency and the Trustee may consult with counsel, and the opinion of such counsel shall be full and complete authorization and protection with respect to any action taken or suffered by the Agency or the Trustee hereunder in good faith and in conformity with the opinion of such counsel. The Developer shall reimburse the Agency and Trustee for reasonable attorneys' fees and expenses incurred in obtaining the opinion of such counsel. In performing its duties and obligations hereunder, the Developer may rely upon certificates of Lower-Income Tenants reasonably believed to be genuine and to have been executed by the proper person or persons.

Section 7. __Project Within the County Limits__. The Developer hereby represents and warrants that the Project will be located entirely within the limits of the County.

- 15 -

**Section 8.  Sale, Lease or Transfer of Project.**

(a)  The Developer shall not enter into a sale, lease, exchange, assignment, conveyance, transfer or other disposition (collectively, a "Disposition") of all or substantially all of the Project without the prior written consent of the Agency.  The Agency's consent required under this Section 8 may be withheld during the first twenty-four (24) months from the date of the recording of this Agreement for any reason whatsoever in the Agency's sole and absolute discretion; provided, however, thereafter the Agency shall not unreasonably withhold its written consent to a Disposition, as long as the requirements of this Section 8 are fully satisfied.  It is expressly agreed that, in connection with determining whether to grant or withhold such consent, the Agency may (but is not obligated to), among other things:  (i)  consider the creditworthiness of the party to whom such Disposition will be made and such party's management ability with respect to the Project; (ii)  consider whether or not the security for repayment of the Loan and other payment obligations under the Financing Agreement, and the performance of the obligations under this Land Use Restriction Agreement (without regard to whether any Bonds are outstanding) under any Loan Document, or the Agency's ability to enforce its rights, remedies and recourses with respect to such security will be impaired in any way or to any degree by the proposed Disposition; (iii)  require that the Agency be reimbursed for all reasonable costs and expenses incurred by the Agency (or by the Servicer on the Agency's behalf, including the Servicer's fees in connection therewith) in connection with investigating the creditworthiness and management ability of the party to whom such Disposition will be made in determining whether the Agency's security will be impaired by the proposed Disposition; (iv)  require the payment to the Agency of a transfer fee equal to the cost of documenting the disposition in the Agency's records; (v)  require the payment of the Agency's reasonable attorneys' fees and expenses in connection with such Disposition; (vi)  require the express, unconditional assumption of all payment obligations under the Loan, the Financing Agreement, and the Environmental Indemnification Agreement and the unconditional assumption of all performance obligations under this Land Use Restriction Agreement, the Financing Agreement, the Environmental Indemnification Agreement and any other document, agreement or instrument evidencing or securing the Developer's obligations under the Loan Documents by the party to whom such Disposition will be made (with or without the release of the transferor Developer from liability for such obligations), which assumption shall be in form and substance satisfactory to the Agency, and require the recording of such assumption document; (vii)  require the execution of modification agreements, supplemental mortgage documents, financing statements and such other documents, agreements and instruments as the Agency or its counsel may

- 16 -

require, and (viii) require endorsements to any existing Agency or Trustee title insurance policies insuring the Agency's liens and security interests covering the Project.

(b) The Project shall not be transferred by the Developer to the entity from which it was acquired, or to any Affiliated Party of such entity before five (5) years from the date of the recording of this Agreement in the Public Records of Broward County, Florida. It is hereby expressly stipulated and agreed that any Disposition of the Project by the Developer in violation of this Section 8 shall be null, void and without effect, shall cause a reversion of title to the transferor Developer, and shall be ineffective to relieve the Developer of its obligations under this Land Use Restriction Agreement, the Financing Agreement and any other document, agreement or instrument evidencing or securing the transferor Developer's obligations thereunder. The Developer shall include, verbatim or by incorporation by reference, all requirements and restrictions contained in this Land Use Restriction Agreement in any deed or other documents transferring any interest in the Project to any other person or entity to the end that such transferee has notice of and is bound by such restrictions, and shall obtain the express written assumption of this Land Use Restriction Agreement by any such transferee.

(c) The restrictions contained in Section 8(a) and the requirements contained in the last sentence of Section 8(b) shall not be applicable to any of the following: (i) any transfer pursuant to or in lieu of a foreclosure or any exercise of remedies (including, without limitation, foreclosure) under the Mortgage; (ii) any sale, transfer, assignment, encumbrance or addition of partnership interests in the Developer; provided, however, that at least one general partner of the Developer shall be William O. Brisben or W.O. Brisben Companies, Inc. or a partnership in which William O. Brisben or W.O. Brisben Companies, Inc. is a general partner; (iii) grants of utility-related easements, governmental easements, and service-related leases or easements, such as laundry service leases or television cable easements, over portions of the Project, provided, however, the same are granted in the ordinary course of business in connection with the operation of the Project as contemplated by this Land Use Restriction Agreement, and any other easement and use agreements which may be consented to by the Agency; (iv) leases of apartment units to Lower-Income Tenants in accordance with the requirements of this Land Use Restriction Agreement; (v) any sale or conveyance to a condemning governmental authority as a direct result of a condemnation or a governmental taking or a threat thereof; (vi) the placing of a subordinate mortgage lien, assignment of leases and rents or security interests on or pertaining to the Project if made expressly subject and subordinate to this Land Use Restriction Agreement; or (vii) any change in allocations or preferred return of capital, depreciation or losses or any final adjustment

- 17 -

in capital accounts (all of which may be freely transferred or adjusted by Developer pursuant to Developer's partnership agreement).

## Section 9.   Term.

(a)   This Agreement shall become effective upon its execution and delivery, and shall remain in full force and effect until the expiration of the Qualified Project Period (the "Term of this Agreement"), it being expressly agreed and understood that the provisions of this Agreement may survive the repayment in full of the Financing Agreement, if such repayment occurs prior to the later of such events. Upon the termination of this Agreement, upon request of any party hereto, the Agency, the Trustee, the Developer and any successor party hereto shall execute a recordable document prepared by the Agency or its counsel further evidencing such termination.

(b)   Notwithstanding Section 9(a), the restrictions contained in Section 2 and Section 3 of this Agreement regarding the use and operation of the Project shall automatically terminate in the event of involuntary noncompliance caused by fire, seizure, requisition, foreclosure or transfer of title by deed in lieu of foreclosure to an entity other than to the Developer or to an Affiliated Party of the Developer, change in a federal law or an action of a federal authority after the date the Bonds are issued which prevents compliance with the covenants expressed herein, or condemnation or similar event (as determined by the Agency upon the advice of Bond Counsel), but only if, within a reasonable period either (i) all Bonds are redeemed and paid in full and all obligations under the Financing Agreement are paid in full, or (ii) amounts received as a consequence of such event are used to provide a project that meets and is subject to the requirements of the Code and applicable Treasury Regulations thereunder.  In such event, upon the request of the Developer and at the expense of the Developer, the parties hereto shall execute an appropriate document in recordable form prepared by the Agency or its counsel to evidence such automatic termination.    This / Section 9(b) shall not apply (and the restrictions contained in Sections 2 and 3 shall thereafter apply) to the Project in the event that, subsequent to any involuntary noncompliance as described in this Section 9(b) but prior to the expiration of the Term of this Agreement, an obligor (as defined in Treasury Regulation Section 1.103-13(b)(4)(iv)(a)) or a related person (as defined in Treasury Regulation Section 1.103-10(e)) obtains an ownership interest in the Project for tax purposes.

(c)   Notwithstanding any other provisions of this Agreement, this entire Agreement, or any of the provisions or Sections hereof, may be terminated upon agreement by the Agency,

the Trustee, the Developer, the FHA Co-Insurer and, while the
Letter of Credit is outstanding, the L/C Issuer if there shall
have been received an opinion of Bond Counsel that such
termination will not adversely affect the exclusion from gross
income for federal income tax purposes of the interest on the
Bonds, which opinion the Agency and the Trustee may rely on
conclusively.

       Section 10. **Damage, Destruction or Condemnation of the
Project.** In the event that the Project is damaged or destroyed
or title to the Project, or any part thereof, is taken by any
governmental body through the exercise, or the threat of the
exercise, of the power of eminent domain, the proceeds of such
event shall be disbursed in accordance with the terms of the
Mortgage.

       Section 11. **Enforcement.** If the Developer defaults in the
performance of its obligations under this Agreement or breaches
any covenant, agreement or warranty of the Developer set forth in
this Agreement, and if such default or breach remains uncured for
a period of thirty (30) days after notice thereof shall have been
given by the Trustee or the Agency to the Developer (or for an
extended period approved in writing by Bond Counsel (x) if such
default or breach stated in such notice can be corrected, but not
within such thirty (30) day period, and (y) if the Developer
commences such correction within such thirty (30) day period and
thereafter diligently pursues the same to completion within such
extended period), then the Agency or the Trustee (subject to
Section 15 of this Agreement) may take whatever action at law or
in equity or otherwise, whether for specific performance of any
covenant in this Agreement or such other remedy as may be deemed
most effectual by the Agency, to enforce the obligations of the
Developer under this Agreement.

      Notwithstanding any of the foregoing, but subject to Section
15 of this Agreement, the Agency and the Trustee (at the
direction of the Agency) shall have the right to seek specific
performance of any of the covenants, agreements and requirements
of this Agreement concerning the construction and operation of
the Project.

      The Agency shall have the right to require the Developer to
remove any Manager or Managing Agent who does not require
compliance with this Agreement upon such Manager's or Managing
Agent's being given thirty (30) days' written notice of a
violation, and such right shall be expressly acknowledged in any
contract between the Developer and any Manager or Managing Agent.

      The Agency and the Trustee (at the direction of the Agency)
shall have the right, either jointly or severally, to enforce
this Agreement and require curing of defaults in such shorter

periods than specified above as Bond Counsel may determine necessary to maintain the exclusion from gross income of interest on the Bonds for federal income tax purposes.

The Trustee shall have the right, in accordance with this Section 11, following the written consent of the Agency, to exercise any or all of the Agency's rights or remedies hereunder.

The Trustee may rely conclusively on an opinion of counsel as to the appropriate remedy to exercise hereunder. The Trustee shall be under no obligation to take any action described in this Section 11 unless it receives adequate, indemnification for its fees, expenses (including attorneys' fees) and liability.

Section 12.  **Recording and Filing; Covenants to Run With the Land**.

(a)  Upon execution and delivery by the parties hereto, the Developer shall cause this Agreement and all amendments and supplements hereto to be recorded and filed in the official public records of the County and in such manner and in such other places as the Agency may reasonably request, and shall pay all fees and charges incurred in connection therewith.

(b)  This Agreement and the covenants contained herein shall run with the land and shall bind, and the benefits shall inure to, respectively, the Developer, the Agency, the Trustee the FHA Co-Insurer and HUD, and their respective successors and assigns during the Term of this Agreement.

Section 13.  **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, both substantive and remedial.

Section 14.  **Assignments and Amendments**.

(a)  The Developer shall not assign its interest hereunder, except in writing and in accordance with the provisions of Section 8 hereof.

(b)  To the extent that the Code and the regulations promulgated thereunder, or any amendments thereto as may be applicable to the Project and necessary to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds, shall impose requirements upon the ownership or operation of the Project more or less restrictive than those imposed by this Agreement, the Developer, the Agency and the Trustee agree that this Agreement shall be deemed to be automatically amended to impose such additional or more restrictive requirements or to delete or impose less restrictive requirements, as appropriate; **provided**, **however**, this Section 14 shall not affect requirements of this Agreement imposed by State law. The Developer, the Agency and the Trustee shall execute,

- 20 -

deliver and, if applicable, file of record any and all documents and instruments necessary in the opinion of Bond Counsel to maintain the exclusion from gross income for federal income tax purposes of the interest on the Bonds, and if either the Developer or the Agency defaults in the performance of its obligation under this Section 14(b), the Developer and the Agency hereby appoint the Trustee as their respective true and lawful attorneys-in-fact to execute, deliver and, if applicable, file of record on behalf of the Developer or the Agency, as is applicable, any such document or instrument; provided, however, that the Trustee shall take no action under this Section 14(b) without first giving thirty (30) days' written notice to the Developer and the Agency of its intention to take such action and without first providing the Developer or the Agency, or all such parties, as is applicable, an opportunity to comply with the requirements of this Section 14(b); and provided, further, that the Trustee shall take no action under this Section 14(b) which will have a substantially detrimental effect upon the Developer or upon the operation of the Project without first notifying the Developer in writing.

(c)  The Agency, the Trustee and the Developer may from time to time enter into one or more amendments or supplements to this Agreement, for any of the following purposes:

(i)  To correct or amplify the description of the Project; or

(ii)  To evidence the succession of another person or entity to the Agency, the Trustee or the Developer and the assumption by any successor of the covenants of its predecessor; or

(iii)  To add to the covenants of the Developer for the benefit of the other parties to this Agreement or the owners of the Bonds to the extent required in order to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds pursuant to the Code; or

(iv)  To cure any ambiguities, to correct or supplement any provision of this Agreement which may be inconsistent with any other provision herein, or to make any other provision with respect to matters or questions arising under this Agreement, which will not be inconsistent with the provisions of this Agreement; provided, however, that such action shall not adversely affect the interests of the owners of the Bonds; or

(v)  To preserve or perfect any exclusion from gross income for federal income tax purposes of interest on the Bonds; or

- 21 -

(vi)  With an approving opinion of Bond Counsel stating
that such amendment or supplement shall not adversely affect
the exclusion from gross income for federal income tax
purposes of interest on the Bonds , to amend the covenants
of the Developer hereunder to the extent consistent with any
applicable  amendment  to  the  Code  or  the  regulations
promulgated thereunder.

In no event shall this Agreement be amended or supplemented
to prohibit the Developer from taking actions required by HUD or
to require the Developer from taking actions prohibited by HUD
pursuant to the National Housing Act, applicable mortgage insur-
ance regulations or the HUD/FHA loan documents.

Section 15.  Nonrecourse Liability of the Developer.

(a)  The  Agency  expressly  agrees  that  the  personal
liability of the Developer and the partners in the Developer
shall  be  strictly  and  absolutely  limited  to  the  property
encumbered by the Mortgage and other security documents, and the
leases,  rents,  profits  and  issues  thereof  and  any  other
collateral securing the Loan, except as provided in Section
15(b).  If an event of default shall occur,  the Agency shall not
and may not seek any judgment (i) for a deficiency against the
Developer or any partners in the Developer in any action to fore-
close, to exercise a power of sale, to confirm any foreclosure or
sale under power of sale, or to exercise any other rights or
power under or by reason of the Mortgage or any other security
documents evidencing or securing the obligations of the Developer
under this Agreement or (ii)  on this Agreement or with respect
to the Loan except as a part of judicial proceedings to foreclose
the Mortgage or other security documents securing the obligations
of  the  Developer  under  this  Agreement  or  except  as  part  of
judicial  proceedings  for  a  judgment  or  decree  of  specific
performance of agreements and covenants hereunder.  In the event
any suit is brought on the Loan or any amount secured by the
Mortgage  or  other  security  documents  as  part  of  judicial
proceedings  to  foreclose  the  Mortgage   lien  and/or  security
interest, or to confirm any foreclosure or sale pursuant to power
of sale thereunder, any  judgment obtained in such suit shall
constitute a lien on and will be and can be enforced only
against,  the  property  encumbered  by  the  Mortgage  and  other
security documents,   and the leases, rents, profits and issues
thereof and not against any other asset of the Developer or the
partners in the Developer,  and terms of such judgment shall
expressly so provide.

(b)  Notwithstanding Section 15(a), the Developer and
its general partners shall be personally liable for, and the
Agency and the Trustee shall have the right to seek a judgment
for money damages (including a deficiency judgment) to enforce,
payment of (i)  the Agency's, the Trustee's and the Servicer's
annual fees and expenses and extraordinary costs and expenses,

- 22 -

including but not limited to legal fees and out-of-pocket costs and expenses of Bond Counsel, Agency Counsel and Trustee's counsel incurred in connection with the interpretation or enforcement of the Indenture, the Financing Agreement or this Land Use Restriction Agreement; (ii) liability and indemnification for removal or clean up of environmental hazards on the Project premises; and (iii) any other obligations under this Land Use Restriction Agreement, all of which foregoing obligations shall bear interest at the rate of eighteen percent (18%) from the due date thereof (or, in the case of liability and indemnification for removal or cleanup of environmental hazards, from the date demand for payment thereof is made) until the date paid in full.

Section 16. HUD/FHA Co-Insurance Requirements. In the event that the Mortgage shall be and continues to be co-insured by HUD pursuant to the National Housing Act, the following provisions shall apply:

(a) This Land Use Restriction Agreement shall be subordinate in lien and priority to the Mortgage.

(b) Notwithstanding anything in this Land Use Restriction Agreement to the contrary, the provisions hereof are subordinate to all applicable HUD co-insurance (and Section 8, if applicable) regulations and related administrative requirements. In the event of any conflict between the provision of this Land Use Restriction Agreement and the provisions of any applicable HUD Regulations, related HUD administrative requirements, or HUD/FHA Loan Documents, the HUD Regulations, related administrative requirements or Loan Documents shall control.

(c) This Land Use Restriction Agreement shall automatically terminate upon foreclosure of the Mortgage by, or transfer of title to the Project by deed in lieu of foreclosure of the Mortgage to, the FHA Co-Insurer.

(d) Notwithstanding anything in this Land Use Restriction Agreement to the contrary, failure to comply with this Agreement shall not be a basis for default under the Mortgage.

(e) Notwithstanding anything in this Land Use Restriction Agreement to the contrary, enforcement of this Agreement shall not result in a claim against the Project, or Mortgage proceeds, any reserve or deposit required by HUD in the Mortgage transaction, or rents or other income from the Project other than available surplus cash.

(f) This Land Use Restriction Agreement cannot be amended without the prior, written approval of the FHA Co-Insurer.

- 23 -

(g) Notwithstanding anything in this Land Use Restriction Agreement to the contrary, nothing in this Agreement shall require (nor shall this Agreement be amended or supplemented to require) the Developer to take any action to preserve the exclusion of interest on the Bonds from gross income for federal income tax purposes that is prohibited by HUD pursuant to the National Housing Act, applicable HUD co-insurance regulations, the HUD/FHA Loan Documents or Section 8 of the United States Housing Act of 1937 and regulations, thereunder, if applicable, or to prohibit the Developer from taking action that might jeopardize the exclusion of interest on the Bonds from gross income for federal income tax purposes, that is required by HUD pursuant to the National Housing Act, applicable HUD co-insurance regulations, the HUD/FHA Loan Documents or Section 8 of the United States Housing Act of 1937 and regulations thereunder, if applicable.

(h) In the event that any covenant or provision contained in this Agreement is more stringent or burdensome than the minimum requirements, as in effect on the date hereof, imposed for the financing of multi-family residential rental housing developments with bonds, the interest on which is excluded from gross income for federal income tax purposes pursuant to Section 103 of the Code, such covenant or provision shall automatically become and be deemed a nullity and shall be reduced to and be replaced by the comparable minimum requirement provided for in Section 142(d) of the Code in effect on the date of execution of this Agreement, as if the same were fully set forth at length herein.

(i) In consideration of HUD's agreeing to coinsure the Loan, and in reliance by HUD upon the promises of the Developer, the FHA Co-Insurer and the Agency to comply herewith, HUD has reserved the right to require the Agency to remove or void any restriction that exceed the requirements of Section 142(d) of the Code upon a determination by HUD that the restriction is threatening the financial viability of the Project (i.e., impairing the Developer's ability to sustain a level of income sufficient to meet all financial obligations of the Project, including debt service costs, HUD-required escrows, and Project operating expenses). In the absence of the Agency's complying with a HUD request to take appropriate action to remove a restriction, the Agency, the Trustee and the Developer expressly recognize, and consent to the exercise of, the power of HUD to take appropriate action unilaterally to remove or void the restriction without regard to the terms of the legal instrument containing the restriction.

Section 17. **Notice.** Any notice required to be given hereunder shall be given by personal delivery, by certified or registered U.S. mail or by expedited delivery service at the addresses specified below or at such other addresses as may be specified in writing by the parties hereto, and any such notice

- 24 -

shall be deemed received on the date of delivery if by personal delivery or expedited delivery service, or upon actual receipt if sent by certified or registered U.S. Mail:

DEVELOPER:    OAKLAND LAKES, LTD.
c/o W. O. Brisben Companies, Inc.
4750 Ashwood Drive, Suite 300
Cincinnati, Ohio 45241
Attention: _____

AGENCY:    FLORIDA HOUSING FINANCE AGENCY
2740 Centerview Drive, Suite 300
Tallahassee, Florida 32399-2100
Attention:  Executive Director

TRUSTEE:    CITIZENS AND SOUTHERN TRUST COMPANY (FLORIDA),
NATIONAL ASSOCIATION
One Financial Plaza, 13th Floor
Ft. Lauderdale, Florida 33394
Attention:  Corporate Trust Department

Section 18. **Severability**. If any provision of this Agreement shall be held by any court of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be deemed omitted from this Agreement and the validity, legality and enforceability of the remaining portions of this Agreement shall remain in full force and effect, but such holding shall not affect the validity, legality or enforceability of such provision under other, dissimilar facts or circumstances.

Section 19. **Multiple Counterparts**. This Agreement may be simultaneously executed in multiple counterparts, all of which shall constitute one and the same instrument and each of which shall be deemed to be an original.

**(THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK)**

- 25 -

### SIGNATURE PAGE FOR
### LAND USE RESTRICTION AGREEMENT

IN WITNESS WHEREOF, the Agency, the Trustee and the Developer have executed this Agreement as of the date first written above.

WITNESSES:

FLORIDA HOUSING FINANCE AGENCY, a state agency and instrumentality

By: _____
   Member

                    (SEAL)

ATTEST: _____

_____
Executive Director

STATE OF _FLORIDA_

COUNTY OF _HILLSBOROUGH_

The foregoing Land Use Restriction Agreement was executed before me this _4th_ day of _October_, 1989, by _William J. Ramsey_, as Member, and by Mark A. Hendrickson, as Executive Director of the FLORIDA HOUSING FINANCE AGENCY, a state agency and instrumentality of the State of Florida, on behalf of said Agency.

_____
Notary Public

My Commission expires: _____

Notary Public, State of Florida
My Commission Expires June 8, 1992

(THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK)

- 26 -

## SIGNATURE PAGE FOR
## LAND USE RESTRICTION AGREEMENT

IN WITNESS WHEREOF, the Agency, the Trustee and the Developer have executed this Agreement as of the date first written above.

WITNESSES:

CITIZENS AND SOUTHERN TRUST COMPANY (FLORIDA), NATIONAL ASSOCIATION, a national banking association, as Trustee

By: _____
Vice President

(SEAL)

STATE OF _FLORIDA_

COUNTY OF _HILLSBOROUGH_

The foregoing Land Use Restriction Agreement was executed before me this _4th_ day of _October_, 1989, by RAYMOND E. IFERT, as Vice President of CITIZENS AND SOUTHERN TRUST COMPANY (FLORIDA), NATIONAL ASSOCIATION, a national banking association, on behalf of said Bank.

_____
Notary Public

My Commission expires:

Notary Public, State of Florida
My Commission Expires June 8, 1992
Bonded Thru Troy Fain Insurance Inc.

(THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK)

- 27 -

### SIGNATURE PAGE FOR
### LAND USE RESTRICTION AGREEMENT

IN WITNESS WHEREOF, the Agency, the Trustee and the Developer have executed this Agreement as of the date first written above.

WITNESSES:

OAKLAND LAKES, LTD., a Florida limited partnership

By: _William O. Brisben_, one of two general partners of Oakland Lakes, Ltd.

By: W.O. BRISBEN COMPANIES, INC., an Ohio corporation, one of two general partners of Oakland Lakes, Ltd.

By: _William O. Brisben_
President

(SEAL)

STATE OF _FLORIDA_

COUNTY OF _HILLSBOROUGH_

The foregoing Land Use Restriction Agreement was executed before me this _4th_ day of _October_, 1989, by William O. Brisben, individually as one of two general partners of OAKLAND LAKES, LTD., and as President of W.O. Brisben Companies, Inc., one of two general partners of OAKLAND LAKES, LTD., on behalf of said Partnership and said Corporation.

_____
Notary Public

My Commission expires:_____

Notary Public, State of Florida
My Commission Expires June 8, 1992
Bonded Thru Troy Fain Insurance Inc.

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-047

- 28 -

Prepared by and when
when recorded return to:
James W. Shindell, Esq.
Bilzin Sumberg Dunn Baena Price & Axelrod LLP
2500 First Union Financial Center
Miami, Florida 33131-2336

_____
(For Recorder's Use Only)

## SATISFACTION AND RELEASE OF LIEN

For and in consideration of the sum of Ten Dollars ($10.00) paid to Wilson C. Atkinson, III, Trustee ("Releasing Party"), whose address is Atkinson, Diner, Stone, Mankuta & Ploucha, P.A. 1946 Tyler Street, Hollywood, FL 33022-2088 and for other good and valuable consideration, receipt of which is acknowledged, Releasing Party satisfies the lien filed by Releasing Party for the sum of $1,709,664.90 in Official Records Book 19117, Page 452, and amended by instrument recorded in Official Records Book 19205, Page 983, and as further assigned by instrument recorded in Official Records Book 22860, Page 201, of the Public Records of Broward County, Florida, due Releasing Party for labor and/or services and/or materials on said property; and said lien is declared fully satisfied. Said property is described as follows:

See Legal Description Attached hereto and made a part hereof as Exhibit A

WITNESS my hand and seal this _8_ day of May, 2001.

Signed. sealed and delivered
in the presence of:

Sign Name: _____
Print Name: _Jessenia Padron_

Sign Name: _____
Print Name: _CINDY CLARK_

By: _____
Print Name: Wilson C. Atkinson, III, Trustee

STATE OF _FLORIDA_ )
                                    ) SS:
COUNTY OF _BROWARD_ )

The foregoing instrument was acknowledged before me this _8TH_ day of May, 2001, by Wilson C. Atkinson, III, Trustee; such person is personally known to me or has produced a driver's license as identification.

Sign Name: _____
Print Name: _CINDY CLARK_

_____
My Commission Expires:
Notary Public
Serial No. (none if blank): _____

ATTACHMENT EXHIBIT

CINDY CLARK
MY COMMISSION # CC 760888
EXPIRES: 10/26/2002
1-800-3-NOTARY    Fla. Notary Services & Bonding Co.

EXHIBIT "A"

PARCEL I:

TRACT A OAKLAND LAKES, according to the Plat thereof, recorded in Plat Book 111, Page 7, of the Public Records of Broward County, Florida.

- and -

PARCEL II:

TRACT B, OAKLAND LAKES, according to the Plat thereof, recorded in Plat Book 111, Page 7, of the Public Records of Broward County, Florida, less and except the easterly 75 feet thereof.

- and -

PARCEL III:

A portion of the North one-half (N1/2) of the Southeast one-quarter (SE1/4) of SECTION 29, TOWNSHIP 49 SOUTH, RANGE 42 EAST, being more particularly described as follows:

Commencing at the Southeast corner of the said North one-half (N1/2) of the Southeast one-quarter (SE1/4) of Section 29; thence South 89°47'26" West, along the South line of the said North one-half (N1/2) of the Southeast one-quarter (SE1/4), a distance of 496.42 feet, to the POINT OF BEGINNING of this description, said point also being the Northeast corner of said Tract B; thence continue South 89°47'26" West, along the Southerly extension and the North line of said Tract B and Tract "A", a distance of 1137.45 feet; thence North 01°09'43" East, a distance of 20.02 feet; thence North 89°47'26" East, along a line parallel with and 20.00 feet North of, as measured at right angles to the North line of the North one-half (N1/2) of the Southeast one-quarter (SE1/4) of Section 29, a distance of 1135.52 feet; thence South 45°44'06" East along a Northerly projection of the East line of said Tract B, a distance of 28.00 feet to the POINT OF BEGINNING, less and except the easterly 75 feet thereof.

Said lands situate, lying and being in Broward County, Florida.

MINOR Legibility of writing, typing & printing unsatisfactory in this document when microfilmed.

RECORDED IN THE OFFICIAL RECORDS BOOK OF BROWARD COUNTY, FLORIDA COUNTY ADMINISTRATOR

RECORDED IN THE OFFICIAL RECORDS BOOK OF BROWARD COUNTY, FLORIDA